**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| PARKERVISION, INC.,<br>*Plaintiff,*<br>v.<br>QUALCOMM INCORPORATED,<br>*Defendant.* | Civil Action No. 3:11-cv-719-J-37-JBT |
| QUALCOMM INCORPORATED,<br>*Counterclaim Plaintiff,*<br>v.<br>PARKERVISION, INC., and<br>STERNE, KESSLER, GOLDSTEIN & FOX PLLC<br>*Counterclaim Defendants.* | |

**Defendant Qualcomm's Answer**
**and Counterclaims**

Defendant Qualcomm Incorporated ("Qualcomm") hereby answers the Complaint of Plaintiff ParkerVision, Inc. ("ParkerVision"):

## ANSWER

1. Qualcomm denies the allegations of paragraph 1, but admits that ParkerVision purports to seek damages and injunctive relief.

2. Qualcomm denies the allegations of paragraph 2.

3. Qualcomm admits the allegations of paragraph 3.

4. Qualcomm admits that Qualcomm is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, Dan Diego, California, 92121. Qualcomm admits that it conducts business in the Middle District of Florida. Qualcomm denies the remaining allegations of paragraph 4.

5. Qualcomm denies the allegations of paragraph 5.

6. Qualcomm admits the allegations of paragraph 6.

7. Qualcomm denies the allegations of paragraph 7, but does not assert lack of personal jurisdiction as a defense to this action.

8. Qualcomm denies the allegations of paragraph 8, but does not assert lack of venue as a defense to this action.

9. Qualcomm lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 9, except denies that the cited patents are valid or enforceable.

10. Qualcomm admits that ParkerVision has not granted Qualcomm a license to practice the patents-in-suit. Qualcomm lacks knowledge or information sufficient to form a belief about the truth of the allegations of ownership of the patents-in-suit. Qualcomm denies the remaining allegations of paragraph 10.

11. Qualcomm denies the allegations of paragraph 11.

12. Qualcomm denies the allegations of paragraph 12.

13. Qualcomm denies the allegations of paragraph 13.

**Prayer For Relief**

Qualcomm denies that ParkerVision is entitled to the requested relief or any other relief.

**Affirmative Defenses**

Qualcomm asserts the following affirmative defenses.

**Failure To State A Claim**

ParkerVision's complaint fails to state a claim upon which relief can be granted.

**Non-Infringement**

Qualcomm has not infringed, and currently does not infringe, any valid claim of any of U.S. Patent Nos. 6,061,551 (the "'551 Patent"), 6,266,518 (the "'518 Patent"), 6,370,371 (the "'371 Patent"), 7,496,342 (the "'342 Patent"), 7,515,896 (the "'896 Patent"), 7,724,845 (the "'845 Patent"), and 7,822,401 (the "'401 Patent") (collectively, the "Patents-in-Suit"), directly, indirectly, contributorily, by inducement, under the doctrine of equivalents or in any other manner.

**Invalidity**

Each claim of the Patents-in-Suit is invalid for failure to comply with one or more provisions of Title 35, United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

**Prosecution History Estoppel and Disclaimer**

ParkerVision's claims of patent infringement against Qualcomm are barred in whole or in part by the doctrines of prosecution history estoppel and/or prosecution disclaimer.

**Laches**

The '551 Patent, the '518 Patent and the '371 Patent are unenforceable, in whole or in part, against Qualcomm under the doctrine of laches, because ParkerVision waited until July 2011, many years after the issuance of these patents, to sue Qualcomm, which delay was unreasonable and has prejudiced Qualcomm.

**Inequitable Conduct**

The Patents-in-Suit are unenforceable because individuals owing a duty of candor to the United States Patent and Trademark Office (the "PTO"), including applicants for the Patents-in-Suit, the attorneys prosecuting those patents, and others associated with ParkerVision and/or its predecessors in title (collectively, the "Applicants"), engaged in inequitable conduct through affirmative misstatements made to the PTO during prosecution. This inequitable conduct renders the Patents-in-Suit unenforceable.

**Unclean Hands**

ParkerVision's claims of patent infringement against Qualcomm are barred in whole or in part by the doctrine of unclean hands.

**COUNTERCLAIMS**

ParkerVision's brief, barebones complaint alleging that Qualcomm infringes seven patents represents the culmination of a course of improper and unethical patent practice that spans more than a decade. Beginning in 1998, ParkerVision began applying for a series of patents generally focused on methods of "down-converting" electromagnetic radio waves from the very high frequencies at which they are wirelessly transmitted. Although dauntingly dense to a person not skilled in the field of radio-

frequency ("RF") technology, the patents in fact cover and claim technologies long known to the field, and, to the extent useful, they are certainly not novel. To obtain these patents ParkerVision repeatedly concealed the fact that what it was claiming to invent was, in fact, old technology by describing its alleged inventions using new and confusing terminology. These patents should never have issued.

But they did, in large part because ParkerVision perpetrated a fraud on the U. S. Patent and Trademark Office (the "PTO"). Undoubtedly mindful of the fatal defects in its patent applications, ParkerVision procured the patents through a dual campaign of distraction and deception. Distraction, by "burying" the PTO with numerous – not fewer than 1200 – references, including such plainly irrelevant items as ParkerVision press releases concerning changes in management, ParkerVision quarterly financial results, and scientific articles discussing the relative rates of rainfall and distribution of rain-droplet size in temperate and tropical regions. *See, e.g.*, Vilar, E. *et al.*, "Scattering and Extinction: Dependence Upon Raindrop Size Distribution in Temperate (Barcelona) and Tropical (Belem) Regions," 10th International Conf. On Antennas and Propagation, April 14-17, 1997, pp. 2.230-2.233. And deception, by badly and falsely misstating to the examiner what several plainly relevant and invalidating references disclosed, so that the PTO would not pay any attention to them in considering whether to grant ParkerVision the patents it sought.

Then, having succeeded in procuring the patents through breaches of their duty of candor to the PTO, ParkerVision turned to enforce them against Qualcomm with the aid of its long-term patent counsel, Sterne, Kessler, Goldstein & Fox PLLC

("Sterne Kessler"), the same firm that had prosecuted the patents-in-suit in the PTO. In doing so, ParkerVision caused Sterne Kessler to breach its duty of loyalty to one of its other longstanding clients: Qualcomm. Over the past decade and longer, during the same period over which Sterne Kessler prosecuted the seven patents-in-suit, Sterne Kessler served Qualcomm in over 100 patent matters — including the prosecution of patents for Qualcomm in the same field as the Patents-in-Suit— and has continued to serve it through the present. In breach of the most fundamental of legal ethical duties, Sterne Kessler assisted ParkerVision in suing Sterne Kessler's own client, Qualcomm, in this action.

To oppose this improper course of conduct on the part of ParkerVision and its longstanding patent counsel, Qualcomm asserts the following counterclaims against ParkerVision and joins as an additional counterclaim-defendant, Sterne Kessler:

**Parties**

14. Qualcomm is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California. Qualcomm is a corporation engaged in the design, manufacture, and sale of wireless communication equipment and technology, including, primarily, cell phone technology. Qualcomm is the world's largest supplier of cell phone chips.

15. ParkerVision is a Florida corporation with its principal place of business at 7915 Baymeadows Way, Jacksonville, Florida.

16. Sterne Kessler Goldstein & Fox PLLC is a limited liability partnership law firm headquartered in Washington, D.C., and specializing in patent law.

**Jurisdiction**

17. This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), 1367, and 2201.

18. Qualcomm seeks, *inter alia*, declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 and Rule 57 of the Federal Rules of Civil Procedure.

19. ParkerVision is a resident of the State of Florida and, by filing this action, has submitted to this Court's exercise of personal jurisdiction.

20. This Court may exercise personal jurisdiction over Sterne Kessler because by counseling and assisting ParkerVision with respect to the filing of this action against Qualcomm in this district, Sterne Kessler committed a tortious act within the state of Florida, and because by serving as ParkerVision's patent counsel generally for more than a decade, Sterne Kessler continuously conducted a substantial amount of business in Florida with ParkerVision.

**Background**

21. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO. 37 C.F.R. § 1.56. A breach of this duty may constitute inequitable conduct, rendering the patent unenforceable.

22. In clear violation of their duty of candor and good faith, individuals substantively involved in the prosecution of the '551 Patent (the "Applicants"), including the prosecuting attorneys from Sterne Kessler, made repeated false statements to the Examiner concerning the scope and teaching of highly relevant prior art submitted in connection with a March 21, 1999 Petition to Make Special Under 37 C.F.R.

§ 1.102(d) and Incorporated Information Disclosure Statement (the "Petition"). In particular, the Applicants mischaracterized five or more references that clearly rendered the pending claims unpatentable by stating that each prior art reference failed to disclose the claimed combination of elements. These mischaracterizations were false, and made with specific intent to mislead the Examiner to secure allowance of unpatentable claims.

23. Further, the Applicants also failed to satisfy their duty of candor by "burying" the examiner with hundreds of references so as to distract the Examiner's attention from highly relevant references. For example, during the prosecution of the '551 Patent, in a single, September 21, 1999 Information Disclosure Statement ("IDS"), the Applicants submitted over 400 references to the Examiner. Detailed examination of these 400 references disclosed in the September 21, 1999 IDS has revealed that at least 60% of the 149 disclosed non-patent references are entirely irrelevant to the claimed inventions and at least 20% of the 263 disclosed patent references appear to be irrelevant to the claimed invention. In that same IDS, however, buried beneath the more than 150 irrelevant references, were a handful of highly relevant references—such as U.S. Patent No. 4,320,536 (the "'536 Patent")—that, if they had been called to the Examiner's full attention, would have precluded issuance of the pending claims.

24. Thereafter, the Applicants continued to overwhelm the PTO with voluminous disclosures of largely irrelevant documents, for no apparent purpose other than to distract the Examiner from more material references, such as the '536 Patent. The Applicants submitted 45 additional IDSs during the prosecution of all the Patents-in-Suit, which included 818 additional references (for a total of 1251 references submitted

across all of the Patents-in-Suit), many of which, like the bulk of the over 400 included in the September 21, 1999 IDS, were irrelevant to ParkerVision's claimed invention.

25. The vast number of irrelevant references cited to the PTO during prosecution of the '551 Patent alone include, among other things, ParkerVision press releases concerning changes in management (*e.g.*, "Press Release, 'ParkerVision, Inc. Announces The Retirement of William H. Fletcher, Chief Financial Officer,' 1 Page, May 11, 1994."), ParkerVision quarterly financial results (*e.g.*, "Press Release, 'Parkervision Announces First Quarter Financial Results,' 3 Pages May 4, 1998"), and scientific articles from clearly unrelated fields, such as the following:

- Vilar, E. *et al.*, "Comparison of Rainfall Rate Duration Distributions for ILE-IFE and Barcelona," Electronics Letters, vol. 28, No. 20, Sep. 24, 1992, pp. 1922-1924 (providing "[a] comparative statistical study of durations . . . of rainfall rates . . . for the temperate region of Barcelona and the tropical region of Ile-Ife (Nigeria)"); and
- Vilar, E. *et al.*, "Scattering and Extinction: Dependence Upon Raindrop Size Distribution in Temperate (Barcelona) and Tropical (Belem) Regions," 10th International Conf. On Antennas and Propagation, April 14-17, 1997, pp. 2.230-2.233 (reporting the results of a study conducted in Belem and Barcelona, showing "no significant differences in raindrop size distribution between the two sites").

As the abstracts of the Vilar articles make abundantly clear, these papers provide a statistical analysis of rainfall variations in tropical and temperate regions, and have no relevance to the claimed subject matter, *i.e.*, radio-frequency receivers or the down-conversion of electromagnetic signals.

26. The Applicants' behavior, including their mischaracterizations of the prior art and their efforts to bury the Examiner with irrelevant references, constitutes a

pattern of intentional misconduct designed to mislead the PTO to secure the allowance of the '551 Patent. This inequitable conduct renders the '551 Patent unenforceable.

**<u>The Applicants' False and Misleading Statements About the Prior Art</u>**

27. On March 21, 1999, the Applicants submitted to the PTO a Petition to Make Special Under 37 C.F.R. § 1.102(d) and Incorporated Information Disclosure Statement (the "Petition to Make Special") that included, *inter alia*, a description of the Applicants' pre-examination search for prior art, a copy of each document identified by the pre-examination search and deemed most closely related to the subject matter encompassed by the claims, and a discussion of those documents distinguishing the claimed subject matter from the identified prior art.

28. A Petition to Make Special is a petition seeking permission for accelerated examination of a patent application based on one or more justifications for doing so as specified in 37 C.F.R. § 1.102(d) and Manual of Patent Examination Procedure ("MPEP") § 708.02. One of the main requirements for submission of a Petition is that the applicant perform a pre-examination search, submit a copy of each of the references deemed most closely related to the subject matter, and include "a detailed discussion of the references, which points out, with … particularity … how the claimed subject matter is patentable over the references." MPEP § 708.02[VIII] (7th Ed., July 1998); *see also* MPEP § 708.02[VIII] (8th Ed., July 2010).

29. Information disclosure statements are lists of prior art references applicants provide to examiners for the purpose of bringing those references to the examiners' attention.

30. When the Applicants submitted the Petition to Make Special, the Application included, in relevant part, the following independent claim ("Pending Claim 8"):

> 8. A method for directly down-converting a modulated carrier to a demodulated baseband signal, comprising the steps of:
>
> (1) receiving the modulated carrier signal; and
> (2) transferring non-negligible amounts of energy from the modulated carrier signal, at a rate that is substantially equal to a sub-harmonic of the modulated carrier signal, whereby the transferred non-negligible amounts of energy forms the demodulated baseband signal.

31. In the Petition to Make Special, the Applicants listed 21 prior art references deemed "most closely related to the subject matter encompassed by the claims." The cited references include:

- U.S. Patent 4,253,066, titled "Synchronous Detection with Sampling," issued February 24, 1981 to Fisher *et al.* ("Fisher 1981");

- U.S. Patent 5,557,642, titled "Direct Conversion Receiver for Multiple Protocols," issued September 17, 1996 to Williams ("Williams 1996");

- U.S. Patent 5,339,459, titled "High Speed Sample and Hold Circuit and Radio Constructed Therewith," issued August. 16, 1994 to Schiltz *et al.* ("Schiltz 1994");

- Faulkner and Vilar, "Subharmonic Sampling for the Measurement of Short-Term Stability of Microwave Oscillators," IEEE Transactions on Instrumentation and Measurement, Vol. 1M-32, No. 1, March 1983, pp. 208-213 ("Faulkner 1983"); and

- U.S. Patent 4,346,477, titled "Phase Locked Sampling Radio Receiver," issued August 24, 1982 to Gordy ("Gordy 1982")

(collectively, the "Subharmonic Sampling Exemplars").

32. The Applicants, through their prosecution counsel, Sterne Kessler, distinguished each of these references as failing to disclose the combination of the elements of Pending Claim 8, namely "receiving a modulated carrier signal" and "transferring non-negligible amounts of energy from the modulated carrier signal, at a rate that is substantially equal to a sub-harmonic of the modulated carrier signal, whereby the transferred non-negligible amounts of energy forms a demodulated signal." But each of the five references listed above plainly discloses these elements as shown below.

33. For example, in distinguishing Fisher 1981, the Applicants stated:

> Reference 1 [Fisher 1981] appears to be related to a synchronous detector that samples an amplitude modulated wave for short periods. *Reference 1 does not teach or suggest directly down-converting a modulated carrier signal to a demodulated baseband signal*, as recited in the claims. Considering claim 8, for example, *Reference 1 does not teach or suggest the combination of receiving a modulated carrier signal and transferring non-negligible amounts of energy from the modulated carrier signal, at a rate that is substantially equal to a sub-harmonic of the modulated carrier signal, whereby the transferred non-negligible amounts of energy forms the demodulated baseband signal*. (Emphasis added).

34. Review of Fisher 1981 shows that the Applicants' characterization of Reference 1 was false. The Fisher 1981 Abstract discloses:

> [*A*] *receiving apparatus for a* double-sideband *amplitude-modulated wave*, a synchronous detector which *samples the modulated wave* for short periods centered on instants of peaks of the carrier at regularly-occurring intervals, *with a sampling frequency* greater than the Nyquist frequency for the modulating wave, *equal to the carrier frequency divided by an integer,* and *reconstructs the modulating wave from the sequence of samples in a reconstruction filter*. (Emphasis added).

35. On its face, Fisher 1981 teaches all of the elements that the Applicants described as missing from Fisher 1981:

- The system in Fisher 1981 includes a "receiving apparatus for a[n] . . . amplitude-modulated wave," which one of ordinary skill in the art would have understood as teaching "receiving the modulated carrier signal." *See* Abstract, Fig. 1.

- The system in Fisher 1981 "samples the modulated wave for short periods centered on instants of peaks of the carrier at regularly-occurring intervals," in particular a "[s]ampling gate 2 is normally closed and is opened for short periods . . . at regularly occurring intervals," which one of ordinary skill in the art would have understood as teaching "transferring non-negligible amounts of energy from the modulated carrier signal." *See* Abstract, col. 2:15-18, Fig. 1.

- The system in Fisher 1981 transfers energy "with a sampling frequency . . . equal to the carrier frequency divided by an integer," which one of ordinary skill in the art would have understood as teaching "at a rate that is substantially equal to a sub-harmonic of the modulated carrier signal." *See* Abstract.

- The system in Fisher 1981 "reconstructs the modulating wave from the sequence of samples," in particular, "[s]amples of a double-sideband amplitude-modulated wave may be reconstructed as an accurate replica of the modulating function," which one of ordinary in the art would have understood as teaching "form[ing] the demodulated baseband signal." *See* Abstract, col. 1:67-2:2.

36. The Applicants' false description of Fisher 1981 was made with specific intent to mislead and deceive the PTO.

37. An analysis of Williams 1996 shows that the Applicants' characterization of Williams 1996 was also false.

38. When distinguishing Pending Claim 8 from Williams 1996, the Applicants stated:

> Reference 10 [Williams 1996] appears to be related to a direct conversion receiver for multiple protocols including a sample and hold circuit, a sigma-delta loop and a decimator. Reference 10 does not teach or suggest directly down-converting a modulated carrier signal to a demodulated baseband signal, as recited in the claims. Considering claim 8, for example, *reference 10 does not teach or suggest the combination of receiving a modulated carrier signal and transferring non-negligible amounts of energy from the modulated carrier signal, at a rate that is substantially equal to a sub-harmonic of the modulated carrier signal, whereby the transferred non-negligible amounts of energy forms the demodulated baseband signal.* (Emphasis added).

39. However, a review of the patent shows that Williams 1996 teaches all of the elements that the Applicants described as missing from Williams 1996:

- Williams 1996 notes that "RF energy [is] received at antenna 301,"which one of ordinary skill in the art would have understood as teaching "receiving a modulated carrier." *See* col. 4:12-19; Fig. 3.

- Williams 1996 discloses a system in which the signal is "sub-sampled by sample and hold circuit 331 clocked by clock CLK1 having frequency $\omega_1$," which one of ordinary skill in the art would have understood as teaching "transferring non-negligible amounts of energy from the modulated carrier signal." *See* col. 4:27-29; Fig. 3.

- The system in Williams 1996 transfers energy "[b]y 'sub-sampling' [with] sample and hold circuit [to provide] aliased copies of the original signal [such that the] resulting signal B . . . contains the original signal having a carrier frequency $\omega_c$ and aliased copies of that original signal centered at integral multiples of $\omega_1$, the sampling frequency of sampling hold circuit 331," which one of ordinary skill in the art would have understood as teaching "at a rate that is substantially equal to a subharmonic of the modulated carrier signal." *See* col. 4:36-41; Fig. 6.

- Williams 1996 discloses that "[s]ignal B is converted by oversampling" and then "decimation" to achieve direct conversion, *i.e.,* conversion directly to baseband, which one of ordinary in the art would have understood as teaching "form[ing]

> the demodulated baseband signal." *See* col. 4:58-60; col. 5:25-55; Fig. 3.

40. The Applicants' mischaracterization of Williams 1996 was made with specific intent to mislead and deceive the PTO.

41. Review of Schiltz 1994 shows that the Applicants' description of this reference was also false.

42. When distinguishing Pending Claim 8 from Schiltz 1994, the Applicants stated that the reference did not disclose the claimed combination of elements:

> Reference 9 [Schiltz 1994] appears to be related to a sample and hold circuit, and to radios that use such circuit. Reference 9 does not teach or suggest directly down-converting a modulated carrier signal to a demodulated baseband signal, as recited in the claims. Considering claim 8, for example, *reference 9 does not teach or suggest the combination of receiving a modulated carrier signal and transferring non-negligible amounts of energy from the modulated carrier signal, at a rate that is substantially equal to a -sub-harmonic of the modulated carrier signal, whereby the transferred- non-negligible amounts of energy forms the demodulated baseband signal*.

43. However, the Schiltz 1994 Abstract states:

> The *sample and hold circuit may be used as a wide bandwidth mixer*. In a radio application, a pulse generator provides a stream of pulses in which *the sampling rate times an integer number equals the RF frequency minus the IF frequency*.

44. On its face, Schiltz 1994 teaches all of the elements that the Applicants described as missing from the reference:

- One of ordinary skill in the art would have understood antenna 12 from Figure 1 of Schiltz 1994 as inherently teaching "receiving the modulated carrier."

- Schiltz 1994 discloses that a "sample and hold circuit may be used as a wide bandwidth mixer" and that "[t]he IF frequency is

determined by characteristics of a pulse stream supplied by a pulse generator 30 to a control input of sample and hold circuit 26," which one of ordinary skill in the art would have understood as teaching "transferring non-negligible amounts of energy from the modulated carrier signal." *See* Abstract, col. 3:66-68; Fig. 1.

- Schiltz 1994 describes a system that transfers energy by specifying that "the sampling rate times an integer number equals the RF frequency minus the IF frequency," which one of ordinary skill in the art would have understood as teaching "at a rate that is substantially equal to a subharmonic of the modulated carrier signal." *See* Abstract.

- One of ordinary skill in the art would have understood Figure 1 from Schiltz 1994 as inherently teaching "form[ing] the demodulated baseband signal."

45. The Applicants' false characterization of Schiltz 1994 was made with specific intent to mislead and deceive the PTO.

46. Review of Faulkner 1983 shows that the Applicants' characterization of Reference 16 was also false.

47. When distinguishing Pending Claim 8 from Faulkner 1983, the Applicants stated:

> Reference 16 [Faulkner 1983] appears to be related to a down-conversion system based on a sub-harmonic sampling technique. Reference 16 does not teach or suggest directly down-converting a modulated carrier signal to a demodulated baseband signal, as recited in the claims. Considering claim 8, for example, *reference 16 does not teach or suggest the combination of receiving a modulated carrier signal and transferring non-negligible amounts of energy from the modulated carrier signal, at a rate that is substantially equal to a sub-harmonic of the modulated carrier signal, whereby the transferred non-negligible amounts of energy forms the demodulated baseband signal*. (Emphasis added)

48. However, the abstract of Faulkner 1983 states, in pertinent part, "This paper is concerned with the theoretical principles, description, operation, and

performance of *a down-conversion system based on the sub-harmonic sampling technique*." (Emphasis added.)

49. Further, the last full paragraph on page 208 of Faulkner 1983 states:

> The operation of the measurement system outlined in Fig. 1 is based on a process known as *subharmonic sampling, whereby the oscillator microwave signal of interest is sampled at a rate lower than the nominal carrier frequency. This results in replicas of the signal spectrum symmetrically positioned around the various harmonics of the sampling function. The net result is a form of down-conversion and the recovery of the original microwave signal spectrum can be carried out by bandpass filtering one of the replicas*[.]

50. On its face, Faulkner 1983 teaches all of the elements that the Applicants described as missing from the reference:

- Faulkner 1983 describes a "nominal carrier frequency," which one of ordinary skill in the art would have understood as teaching "receiving the modulated carrier." *See* p. 208.

- Faulkner 1983 describes "subharmonic sampling, whereby the oscillator microwave signal of interest is sampled at a rate lower than the nominal carrier frequency," which one of ordinary skill in the art would have understood as teaching "transferring non-negligible amounts of energy from the modulated carrier signal." *See* p. 208.

- Faulkner 1983 describes a system that transfers energy using "subharmonic sampling" which one of ordinary skill in the art would have understood as teaching the "at a rate that is substantially equal to a subharmonic of the modulated carrier signal." *See* p. 208.

- Faulkner 1983 describes a system wherein "[t]he net result is a form of down-conversion and the recovery of the original microwave signal spectrum can be carried out," which one of ordinary skill in the art would have understood as teaching "form[ing] the demodulated baseband signal." *See* p. 208.

51. The Applicants' false characterization of Faulkner 1983 was made with specific intent to mislead and deceive the PTO.

52. Review of Gordy 1982 shows that the Applicants' characterization of Gordy 1982 was also false.

53. When distinguishing Pending Claim 8 from Gordy 1982, the Applicants stated:

> Reference 2 [Gordy] appears to be related to a phase locked sampling radio receiver in which a harmonic of an intermediate frequency is selected to control the frequency of a phase locked loop. Reference 2 does not teach or suggest directly down-converting a modulated carrier signal to a demodulated baseband signal, as recited in the claims. Considering claim 8, for example, *Reference 2 does not teach or suggest the combination of receiving a modulated carrier signal and transferring non-negligible amounts of energy from the modulated carrier signal, at a rate that is substantially equal to a sub-harmonic of the modulated carrier signal, whereby the transferred non-negligible amounts of energy forms the demodulated baseband signal*. (Emphasis added.)

54. However, the Gordy 1982 Abstract discloses:

> A radio receiver is disclosed in which *a received signal is amplified, filtered, and then sampled at a rate determined by a clock signal* produced by a selectable-rate, digital oscillator. *In sampling the received signal, a family of harmonics are generated which are distributed in a pattern determined by the sampling rate. . . . [A] second sampling process is driven by a second clock signal* produced by a variable-rate, digital oscillator. This produces a second family of harmonics which are derived from the intermediate frequency signal. *The second clock signal rate is selected to produce one harmonic which has a carrier component centered on zero frequency. This harmonic, which is the desired baseband signal, is separated from the other harmonics by means of a low-pass filter.*

55. Thus, on its face, Gordy 1982 discloses all of the elements that the Applicants described as missing from the reference:

- Gordy 1982 describes "a received signal," which one of ordinary skill in the art would have understood as teaching "receiving the modulated carrier." *See* Abstract.

- Gordy 1982 discloses that the RF signal is "sampled at a rate determined by a clock signal," which one of ordinary skill in the art would have understood as teaching "transferring non-negligible amounts of energy from the modulated carrier signal." *See* Abstract.

- Gordy 1982 discloses that "a family of harmonics are generated which are distributed in a pattern determined by the sampling rate . . . and [t]he second clock signal rate is selected to produce one harmonic which has a carrier component centered on zero frequency," which one of ordinary skill in the art would have understood as teaching "at a rate that is substantially equal to a subharmonic of the modulated carrier signal." *See* Abstract.

- Gordy 1982 explains that "[t]his harmonic, which is the desired baseband signal, is separated from the other harmonics," which one of ordinary skill in the art would have understood as teaching "form[ing] the demodulated baseband signal." *See* Abstract.

56. The Applicants' false characterization of Gordy 1982 was made with specific intent to mislead and deceive the PTO.

57. Applicants' false statements and material misrepresentations concerning the teachings of Fisher 1981, Williams 1996, Schiltz 1984, Faulkner 1983, and Gordy 1982, as well as the other references cited in the Petition to Make Special were made with specific intent to mislead and deceive the PTO. Such misrepresentations violate 37 C.F.R. § 1.56 and render the '551 Patent unenforceable.

58. On August 3, 1999, after the Petition to Make Special was granted, the Examiner issued an Office Action acknowledging receipt of the IDS that included the 21 references discussed in the Petition to Make Special including, *inter alia*, the Subharmonic Sampling Exemplars. In that Office Action, the Examiner rejected Pending

Claim 8 over the combination of U.S. Patent Nos. 4,888,557 ("Puckette"), cited as Reference 4 in the Petition to Make Special, and 5,903,827 ("Kennan"). None of the pending claims was rejected over the Subharmonic Sampling Exemplars discussed above.

59. On November 18, 1999, the Applicants participated in an interview with the Examiner. The Examiner Interview Summary Record is missing from the file history of the '551 Patent.

60. After that interview, Applicants filed a Response to the August 3, 1999 Office Action, amending Pending Claim 8 in an attempt to traverse the Examiner's rejection. In support of allowing the amended claim, the Applicants stated that, during the November 18, 1999 Examiner Interview, the Examiner agreed that Pending Claim 8, as amended, would be allowable.

61. On November 24, 1999, the Applicants filed a Response to the August 3, 1999 Office Action, and amended Pending Claim 8 to traverse the rejection.

62. After that amendment, which would not have been sufficient to overcome a rejection of Pending Claim 8 over the Subharmonic Sampling Exemplars, Pending Claim 8 issued as Claim 1 of the '551 Patent.

**First Count**

**(Declaration of Unenforceability of the '551 Patent Due to Inequitable Conduct)**

63. Qualcomm incorporates by reference and realleges paragraphs 14 - 62 above as though fully stated herein.

64. ParkerVision contends that the '551 Patent is enforceable and has created a substantial, immediate and real controversy between the parties as to the enforceability of the '551 Patent.

65. During the prosecution of the '551 Patent, the Applicants made several false statements concerning the scope and content of the Subharmonic Sampling Exemplars with the specific intent to mislead and deceive the PTO. But for the Applicants' materially false characterizations of the Subharmonic Sampling Exemplars, Claim 1 of the '551 Patent would not have issued.

66. The Applicants' specific intent to mislead and deceive the PTO may be inferred not only from their affirmative mischaracterizations of the Subharmonic Sampling Exemplars, but also from their efforts to bury highly relevant prior art in submissions to the PTO among hundreds of irrelevant references. Such intent is the single most reasonable evidence to be drawn from these circumstances.

67. The Applicants' inequitable conduct renders the '551 Patent unenforceable.

**<u>Second Count</u>**

**<u>(Declaration of Unenforceability of the '518 Patent Due to Inequitable Conduct)</u>**

68. Qualcomm incorporates by reference and realleges paragraphs 14 - 67 above as though fully stated herein.

69. ParkerVision contends that the '518 Patent is enforceable and has created a substantial, immediate and real controversy between the parties as to the enforceability of the '518 Patent.

70. The ‘518 Patent is a continuation of the ‘551 Patent and, as such, a direct descendant of the ‘551 Patent.

71. The ‘551 and ‘518 Patents have the same inventors.

72. The ‘551 and ‘518 Patents have identical specifications and claim similar or substantially similar subject matter related to down-conversion of an electromagnetic signal, the subject of the material misrepresentations made to the PTO in connection with the prosecution of the ‘551 Patent.

73. During the prosecution of the ‘518 Patent, ParkerVision filed a terminal disclaimer to obviate a double patenting rejection over the ‘551 Patent, thereby confirming the substantial relation between the subject matter claimed in both patents.

74. The ‘518 Patent is unenforceable as a result of ParkerVision’s material misrepresentations made during the prosecution of the ‘551 Patent.

**Third Count**

**(Declaration of Unenforceability of the ‘371 Patent Due to Inequitable Conduct)**

75. Qualcomm incorporates by reference and realleges paragraphs 14 - 74 above as though fully stated herein.

76. ParkerVision contends that the ‘371 Patent is enforceable and has created a substantial, immediate and real controversy between the parties as to the enforceability of the ‘371 Patent.

77. The ‘371 Patent incorporates by reference the ‘551 Patent.

78. The ‘551 and ‘371 Patents have the same inventors.

79. The ‘551 and ‘371 Patents claim similar or substantially similar subject matter related to down-conversion of an electromagnetic signal, the subject of the

material misrepresentations made to the PTO in connection with the prosecution of the '551 Patent.

80. During prosecution of the '371 Patent, ParkerVision filed a terminal disclaimer to obviate a double patenting rejection over the '551 Patent, thereby confirming the substantial relation between the subject matter claimed in both patents.

81. The '371 Patent is unenforceable as a result of ParkerVision's material misrepresentations made during the prosecution of the '551 Patent.

**Fourth Count**

**(Declaration of Unenforceability of the '342 Patent Due to Inequitable Conduct)**

82. Qualcomm incorporates by reference and realleges paragraphs 14 - 81 above as though fully stated herein. ParkerVision contends that the '342 Patent is enforceable and has created a substantial, immediate and real controversy between the parties as to the enforceability of the '342 Patent. The '342 Patent is a direct descendant of the '551 Patent.

83. All the inventors of the '551 Patent are also inventors of the '342 Patent.

84. The '551 and '342 Patents claim similar or substantially similar subject matter related to down-conversion of an electromagnetic signal, the subject of the material misrepresentations made to the PTO in connection with the prosecution of the '551 Patent.

85. The '342 Patent is unenforceable as a result of ParkerVision's material misrepresentations made during the prosecution of the '551 Patent.

**<u>Fifth Count</u>**

**<u>(Declaration of Unenforceability of the '896 Patent Due to Inequitable Conduct)</u>**

86. Qualcomm incorporates by reference and realleges paragraphs 14 - 85 above as though fully stated herein.

87. ParkerVision contends that the '896 Patent is enforceable and has created a substantial, immediate and real controversy between the parties as to the enforceability of the '896 Patent.

88. The '896 Patent is a direct descendant of the '551 Patent.

89. The '551 Patent is incorporated by reference into the '896 Patent.

90. The '551 and '896 Patents have the same inventors.

91. The '551 and '896 Patents claim similar or substantially similar subject matter related to down-conversion of an electromagnetic signal, the subject of the material misrepresentations made to the PTO in connection with the prosecution of the '551 Patent.

92. The '896 Patent is unenforceable as a result of ParkerVision's material misrepresentations made during the prosecution of the '551 Patent.

**<u>Sixth Count</u>**

**<u>(Declaration of Unenforceability of the '845 Patent Due to Inequitable Conduct)</u>**

93. Qualcomm incorporates by reference and realleges paragraphs 14 - 92 above as though fully stated herein.

94. ParkerVision contends that the '845 Patent is enforceable and has created a substantial, immediate and real controversy between the parties as to the enforceability of the '896 Patent.

95. The '845 Patent is a direct descendant of the '551 Patent.

96. The '845 Patent incorporates by reference Provisional Application 60/171,349, which incorporates by reference the '551 Patent.

97. All the inventors of the '551 Patent are also inventors of the '845 Patent.

98. The '551 and '845 Patents claim similar or substantially similar subject matter related to down-conversion of an electromagnetic signal, the subject of the material misrepresentations made to the PTO in connection with the prosecution of the '551 Patent.

99. The '845 Patent is unenforceable as a result of ParkerVision's material misrepresentations made during the prosecution of the '551 Patent.

**Seventh Count**

**(Declaration of Unenforceability of the '401 Patent Due to Inequitable Conduct)**

100. Qualcomm incorporates by reference and realleges paragraphs 14 - 99 above as though fully stated herein.

101. ParkerVision contends that the '401 Patent is enforceable and has created a substantial, immediate and real controversy between the parties as to the enforceability of the '401 Patent.

102. The '401 Patent is a direct descendant of the '551 Patent.

103. The '551 Patent is incorporated by reference into the '401 Patent.

104. All the inventors of the '551 Patent are also inventors of the '401 Patent.

105. The '551 and '401 Patents claim similar or substantially similar subject matter related to down-conversion of an electromagnetic signal, the subject of the

material misrepresentations made to the PTO in connection with the prosecution of the '551 Patent.

106. The '401 Patent is unenforceable as a result of ParkerVision's material misrepresentations made during the prosecution of the '551 Patent.

**Eighth Count**

**(Declaration of Non-Infringement of the Patents-in-Suit)**

107. Qualcomm incorporates by reference and realleges paragraphs 14 - 106 above as though fully stated herein.

108. ParkerVision claims to be owner of all right, title and interest in the Patents-in-Suit.

109. ParkerVision has accused Qualcomm of infringement of the Patents-in-Suit and has created a substantial, immediate and real controversy between the parties as to the infringement of the Patents-in-Suit.

110. Qualcomm has not infringed, and currently does not infringe, any valid claim of any of the Patents-in-Suit, directly, indirect, contributorily, by inducement, under the doctrine of equivalents or in any other manner, and ParkerVision is entitled to no relief for any claim of alleged infringement.

**Ninth Count**

**(Declaration of Invalidity of the Patents-in-Suit)**

111. Qualcomm incorporates by reference and realleges paragraphs 14 - 110 above as though fully stated herein.

112. ParkerVision contends that the Patents-in-Suit are valid and has created a substantial, immediate and real controversy between the parties as to the invalidity of the Patents-in-Suit.

113. Each claim of the Patents-in-Suit is invalid for failure to comply with one or more provisions of Title 35, United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112, and ParkerVision is entitled to no relief for any claim relating to their alleged validity.

**Tenth Count**

**(Sterne Kessler's Breach of Fiduciary Duty)**

114. Qualcomm incorporates by reference and realleges paragraphs 14 - 113 above as though fully stated herein.

115. Qualcomm regularly retains outside law firms to assist in the filing and prosecution of the many patent applications it files every year. Through this "prosecution work," performed in conjunction with Qualcomm's in-house patent counsel, outside attorneys retained by Qualcomm acquire very detailed knowledge of the properties of Qualcomm's products. That knowledge is highly confidential.

116. Qualcomm also frequently retains outside law firms to assist in the assessment of whether third parties suing and/or seeking licenses from Qualcomm to their patented technology have viable claims for infringement. Through this "opinion work," as through prosecution work, outside attorneys acquire very detailed knowledge of the properties of Qualcomm's products. That knowledge is highly confidential.

117. One such firm that Qualcomm has regularly retained for patent prosecution and opinion work is Sterne Kessler.

118. Qualcomm first retained Sterne Kessler prior to 1998.

119. Between 1998 and the present, Qualcomm has retained Sterne Kessler for over 100 matters, primarily for patent prosecution work, but also for opinion work.

120. Sterne Kessler has also served ParkerVision as its patent counsel for many years, including as prosecution counsel for the Patents-in-Suit.

121. One of Sterne Kessler's founding partners, Robert Sterne, served as a member of ParkerVision's board from 2000 to 2003, and then again from 2006 to the present.

122. ParkerVision's most recent Form 10-K reports payments of $794,000, $909,000, and $1,160,000 in 2010, 2009, and 2008, respectively, to Sterne Kessler.

123. During the course of Sterne Kessler's early representation of Qualcomm, there arose a time in early 1999 (prior to the issuance of any of the Patents-in-Suit) that Sterne Kessler sought the consent of Qualcomm and ParkerVision for Robert Sterne to represent ParkerVision in (ultimately unproductive) negotiations between ParkerVision and Qualcomm concerning technology of which ParkerVision claimed ownership.

124. In connection with that representation, ParkerVision and Qualcomm each agreed to waive, with important limitations, the conflict of interest that resulted from Sterne's representation of ParkerVision in negotiations opposite Sterne Kessler's client, Qualcomm.

125. In soliciting that consent from Qualcomm, however, Sterne Kessler stated in a January 12, 1999 letter agreement signed by Sterne on behalf of Sterne Kessler, and by authorized representatives of ParkerVision and Qualcomm, that "if this negotiation

were unsuccessful and hypothetically resulted in some dispute between the parties, [Sterne Kessler] would not represent either party in connection with such a dispute."

126. Furthermore, in this same letter agreement, Sterne Kessler committed, "as a condition for this waiver of any potential conflict, that no one at [Sterne Kessler] would in any future matter take an adversarial position (e.g., participate in litigation against either QUALCOMM or ParkerVision on any matters), at least as long as we continue to represent such company, even in unrelated matters."

127. Beginning in 2010, Qualcomm retained Sterne Kessler for six matters, involving primarily the preparation of opinions and associated litigation support.

128. For each of those matters, Qualcomm executed an engagement letter prepared by Sterne Kessler. Those letters, while requesting waivers of certain types of conflicts of interest, did not call upon Qualcomm to waive the conflict of interest that would arise if Sterne Kessler represented another client in litigation against Qualcomm while Qualcomm was a current client of Sterne Kessler. To the contrary, in every such letter, Sterne Kessler stated, "We understand that this consent does not extend to concurrent representation of clients adverse to Qualcomm in a litigation concurrent with the firm's representation of Qualcomm."

129. In addition, in every one of its 2010 engagement letters with Qualcomm, Sterne Kessler confirmed that even after Qualcomm ceased to be a Sterne Kessler client, Sterne Kessler would not represent a different client in litigation against Qualcomm if Sterne Kessler was "in possession of confidential information of Qualcomm that would

preclude the representation adverse to Qualcomm in violation of an applicable rule of professional conduct."

130. Of the six matters for which Qualcomm has recently retained Sterne Kessler (all of which are highly confidential), two are still ongoing.

131. On July 20, 2011, ParkerVision filed this lawsuit against Qualcomm alleging infringement of the Patents-in-Suit, each of which was prosecuted by members of Sterne Kessler.

132. During a July 21, 2011 conference call with investment analysts, the day after the filing of the Complaint, Jeffrey Parker, ParkerVision's founder and CEO was asked the following question and gave the following answer:

> Q: . . . [H]elp us here, understand the discovery process that you found these infringements were occurring. Evidently they've been going on for a good while, how did they come to the forefront?
>
> A: Well, I can't really go into the detail of how we discovered this. That's going to come out in the lawsuit. But I'm comfortable saying to you that when we discovered it, we took the information to our legal counselors immediately. They helped walk us through the process of verification and we are absolutely certain of this infringement. . . .

133. Although Parker did not identify the "legal counselors" who helped ParkerVision "walk through the process of verification," ParkerVision's website identifies Sterne Kessler as the company's "Patent Counsel." The website does not identify any other law firm serving that function. Each of the Patents-in-Suit identifies Sterne Kessler as the sole prosecuting counsel.

134. ParkerVision's most recent quarterly filing discloses "the investment of approximately $0.4 million in intellectual property filings" during the first six months of 2011.

135. At the same July 21 conference call, another analyst asked Parker about Robert Sterne's role specifically in the decision to file this action: "Could you talk about Bob Sterne's involvement in making this decision?" To which Parker responded: "Right. Well, the Sterne firm started from day one analyzing the core invention. . . . So, they've been very involved in the creation prosecution of the patent *and they will continue to be*." (Emphasis added).

136. On August 1, 2011, in house legal counsel for Qualcomm was contacted by the partner at Sterne Kessler handling the ongoing Qualcomm matters. During a subsequent telephone call, that Sterne Kessler lawyer advised Qualcomm's legal counsel that Sterne Kessler needed to "wrap up" its work on the legal matters it was handling for Qualcomm, in light of the recently filed lawsuit between ParkerVision and Qualcomm. Legal counsel for Qualcomm responded that Sterne Kessler's work on those matters was far from complete and that Qualcomm would not consent to premature termination of Sterne Kessler's representation of Qualcomm. The Sterne Kessler lawyer noted that the firm was in a "tough spot," as Sterne had been an advisor to ParkerVision for some time.

137. On August 16, 2011, Qualcomm sent a letter to Sterne Kessler, seeking information about the extent of Sterne Kessler's involvement in the present litigation

and reiterating Qualcomm's refusal to allow Sterne Kessler to prematurely withdraw from its ongoing representation of Qualcomm.

138. On August 25, 2011, Sterne Kessler responded, acknowledging that Qualcomm was a current client of Sterne Kessler and stating that "Sterne Kessler will not enter its appearance or otherwise act as counsel for ParkerVision in the pending Florida matter or any related litigation" and "will not advise ParkerVision or its litigation counsel regarding the Florida matter or any other litigation with Qualcomm . . . . so long as Qualcomm remains a firm client."

139. Sterne Kessler's August 25 response was silent, however, on several questions Qualcomm had posed in its August 16 letter, including whether Sterne Kessler had helped ParkerVision prepare this action against its current client, Qualcomm, and whether Robert Sterne, a director of ParkerVision, had recused himself from any ParkerVision board discussions concerning the initiation of this action.

140. As the reason for declining to answer these and other questions, Sterne Kessler cited "our obligations of confidentiality under District of Columbia Rule of Professional Conduct 1.6," which prohibits a lawyer from revealing client "confidences" and "secrets."

141. If Sterne Kessler had not in fact assisted ParkerVision in the preparation of this action, Sterne Kessler would have been able to disclose that lack of assistance without compromising any "secret" of ParkerVision, as that term is defined in codes of ethical conduct governing lawyers. And in no event would the fact of such assistance (as distinct from its substance) be privileged or a "confidence" of ParkerVision.

142. Similarly, Qualcomm's query whether Sterne had recused himself from board discussions and votes on the initiation of a lawsuit against Qualcomm sought information not gained through Sterne Kessler's professional relationship with ParkerVision but rather through Sterne's personal service on ParkerVision's board. Under no set of facts could the information Qualcomm sought qualify as a confidence under legal ethics rules.

143. Based on Sterne Kessler's refusal to respond to Qualcomm's successive inquiries about the nature of the assistance Sterne Kessler and Robert Sterne provided to ParkerVision in connection with the filing of this action, coupled with Parker's comments at the July 21 conference call and the inherent technical complexity of the seven Patents-in-Suit, it is reasonable to infer that such assistance from ParkerVision's longstanding patent counsel and sole prosecution counsel for the Patents-in-Suit was substantial.

144. Sterne Kessler, as Qualcomm's current counsel, owes Qualcomm fiduciary duties that include the duty of loyalty.

145. Among the most fundamental components of a lawyer's fiduciary duty of loyalty to a client is the duty not to assist others in bringing suit against that client.

146. That duty is recognized in the ethical rules governing the conduct of lawyers, such as the American Bar Association Model Rule 1.7 and its D.C. and Florida counterparts.

147. Sterne Kessler has breached the fiduciary duty of loyalty it owes to Qualcomm by providing legal counsel to ParkerVision in preparing to file this action.

148. Sterne Kessler also breached its fiduciary duty of loyalty to Qualcomm when one of its partners, Robert Sterne, participated in and failed to recuse himself from ParkerVision board discussions concerning the initiation of the present litigation against Qualcomm.

149. Qualcomm has been injured as a proximate result of Sterne Kessler's breaches of its fiduciary duty of loyalty by, among other things, being required to defend against a lawsuit alleging the infringement of patents procured through affirmative misrepresentations to the PTO by ParkerVision and Sterne Kessler.

**Eleventh Count**

**(ParkerVision's Aiding and Abetting Breach of Fiduciary Duty)**

150. Qualcomm incorporates by reference and realleges paragraphs 14 - 149 above as though fully stated herein.

151. Sterne Kessler, as Qualcomm's longstanding patent prosecution and opinion counsel, owes Qualcomm fiduciary duties.

152. ParkerVision has known since at least 1999 that Sterne Kessler has served Qualcomm as a client and, accordingly, that Sterne Kessler owes a fiduciary duty to Qualcomm.

153. Sterne Kessler has breached the fiduciary duty of loyalty it owes to Qualcomm by providing legal counsel to ParkerVision in preparing to file this action.

154. ParkerVision knowingly participated in that breach by retaining Sterne Kessler in connection with preparing to file this action against Qualcomm.

155. Qualcomm has been injured as a proximate result of ParkerVision's aiding and abetting of Sterne Kessler's breach of its fiduciary duty, by, among other

things, being required to defend against a lawsuit alleging the infringement of patents procured through affirmative misrepresentations to the PTO by ParkerVision and Sterne Kessler.

**Twelfth Count**

**(Sterne Kessler's Breach of Contract)**

156. Qualcomm incorporates by reference and realleges paragraphs 14 - 155 above as though fully stated herein.

157. The January 12, 1999 letter agreement among Sterne Kessler, Qualcomm, and ParkerVision constitutes a valid contract.

158. Sterne Kessler materially breached that agreement by representing ParkerVision and participating on behalf of ParkerVision in litigation against Qualcomm.

159. Qualcomm has suffered injury as a proximate result of Sterne Kessler's breach of contract, by, among other things, being required to defend against a lawsuit alleging the infringement of patents procured through affirmative misrepresentations to the PTO by ParkerVision and Sterne Kessler.

**Thirteenth Count**

**(ParkerVision's Tortious Interference with a Contractual Relationship)**

160. Qualcomm incorporates by reference and realleges paragraphs 14 - 159 above as though fully stated herein.

161. The January 12, 1999 letter agreement among Sterne Kessler, Qualcomm, and ParkerVision constitutes a valid contract.

162. As a party to the contract, ParkerVision had knowledge of Sterne Kessler's promise that "no one at [Sterne Kessler] would in any future matter take an adversarial position (e.g., participate in litigation against either QUALCOMM or ParkerVision on any matters), at least as long as we continue to represent such company, even in unrelated matters."

163. By retaining Sterne Kessler in connection with the present litigation, ParkerVision intentionally and without justification interfered with the contractual relationship between Qualcomm and Sterne Kessler, resulting in Sterne Kessler's material breach of contract.

164. Qualcomm has suffered injury as a proximate result of ParkerVision's inducement of Sterne Kessler's breach of contract, by, among other things, being required to defend against a lawsuit alleging the infringement of patents procured through affirmative misrepresentations to the PTO by ParkerVision and Sterne Kessler.

**<u>Prayer for Relief</u>**

WHEREFORE, Qualcomm respectfully requests that this Court enter a Judgment and Order:

A. Dismissing the Complaint, and each count thereof, with prejudice and denying ParkerVision any relief whatsoever;

B. Declaring that all asserted claims of the Patents-in-Suit are invalid, not infringed, and/or unenforceable;

C. Finding that this case is an exceptional case pursuant to 35 U.S.C. § 285 or otherwise, and awarding Qualcomm its costs, together with reasonable attorneys' fees and all of its expenses for defending this suit;

D. Awarding Qualcomm compensatory damages for Sterne Kessler's breach of its fiduciary duty, and for ParkerVision's aiding and abetting of such breach;

E. Awarding Qualcomm compensatory damages for Sterne Kessler's breach of contract, and for ParkerVision's inducement of such breach; and

F. Awarding Qualcomm any such other costs and further relief as the Court may deem just and proper.

September 16, 2011

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE
Professional Association

By: s/ John A. DeVault, III
John A. DeVault, III
Florida Bar No. 103979
jad@bedellfirm.com
Courtney K. Grimm
cgrimm@bedellfirm.com
Florida Bar No. 953740
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone: (904) 353-0211
Facsimile: (904) 353-9307

-and-

CRAVATH, SWAINE & MOORE LLP
Keith R. Hummel (admitted pro hac vice) (Trial Counsel)
khummel@cravath.com
David Greenwald (admitted pro hac vice)
dgreenwald@cravath.com
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

-and-

CADWALADER, WICKERSHAM & TAFT LLP
Christopher A. Hughes (admitted pro hac vice)
Christopher.Hughes @cwt.com
1 World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

*Counsel for Defendant, Counterclaim Plaintiff Qualcomm Incorporated*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of September, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Stephen D. Busey
busey@smithhulsey.com

James A. Bolling
jbolling@smithhulsey.com

Ava K. Doppelt
adoppelt@addmg.com

Brian R. Gilchrist
bgilchrist@addmg.com

s/John A. DeVault, III
John A. DeVault, III
Florida Bar No. 103979
E-mail: jad@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone: (904) 353-0211
Facsimile: (904) 353-9307
*Attorney for Defendant,*
*Counterclaim Plaintiff*