CASE NO. 3:11-cv-719-J-37TEM

PARKERVISION, INC.,

     Plaintiff.

v.

QUALCOMM INCORPORATED,

     Defendant.

_____/

QUALCOMM INCORPORATED,

     Counterclaim Plaintiff,

v.

PARKERVISION, INC, AND
STERNE, KESSLER, GOLDSTEIN & FOX PLLC,

     Counterclaim Defendants.

_____/

**DECLARATION OF PROFESSOR DAVID HRICIK**
**(Expert Witness)**

I, David Charles Hricik, state the following:

**Qualifications**

1.    My name is David Charles Hricik. I am a Professor of Law at Mercer University School of Law, the author of the legal treatise PATENT ETHICS – LITIGATION, and the co-author of the legal treatise PATENT ETHICS – PROSECUTION. I have served as the chair of the Professionalism & Ethics Committee of the American Intellectual Property Law Association, which is the largest intellectual property organization in the country, as well as the chair of the Ethics & Professionalism Committee of the Intellectual Property Law Section of the American Bar Association.

2.    I am a member in good standing of the bars of the states of Texas (1988) and Georgia (2007). I am admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Fifth Circuit, the United States Court of Appeals for the Federal Circuit, the state courts of Texas and Georgia, and certain United States District Courts.  I started my full-time legal career in 1988 as an associate and later became Special Counsel with Baker & Botts, L.L.P., where I spent a significant amount of my time serving as in-house counsel. I then became a partner with what was then Slusser & Frost, LLP. Later, I became Of Counsel to what was then Yetter & Warden, LLP. From 1988 through 2002, I represented clients in numerous matters, focusing on civil litigation, patent practice, disqualification, and legal malpractice.

3.    As noted above, I am currently a Professor of Law at Mercer University School of Law, in Macon, Georgia, where I have taught full-time since 2002. This school year (2011-12), I am also a Visiting Professor of Law at Atlanta's John Marshall School of Law, teaching Professional Responsibility and Federal Civil Procedure. Over the past

eight years, I have taught Law of Lawyering, Patent Law, Civil Lawsuits, Remedies, and other courses at Mercer. I have also taught courses in legal ethics at the University of Texas School of Law and at the University of Houston Law Center, and courses in both business law & ethics and e-commerce law for MBA students at St. Edward's University in Austin, Texas.

4.      I have continued to advise and consult with private practitioners, in-house counsel, corporations and other entities, and law firms across the country on ethics matters. I often am retained as a confidential ethics advisor concerning matters involving ethical or malpractice issues. I was retained by the United States Patent and Trademark Office's Office of Enrollment and Discipline to serve as an ethics expert during grievance proceedings, and have also advised the Office of the Attorney General of the State of Texas on ethical issues.

5.      I have defended lawyers in disciplinary proceedings and served as an expert for lawyers in disciplinary proceedings. I was also repeatedly appointed as a member of the Texas Disciplinary Rules of Professional Conduct Committee of the Texas State Bar, and was a member of its drafting subcommittee.

6.      Essentially continuously since 1989, I have advised lawyers concerning conflicts of interest and other matters of legal ethics and fiduciary obligations. Those representations and consultations have included advising firms, individual lawyers, patent agents, and in-house counsel and corporations under state rules similar to if not identical to the rules implicated in this case, and have also regularly advised lawyers on engagement letters, consent, prospective consent, and related issues. I have significant experience providing advice concerning the duties lawyers owe to current and former

clients, fiduciary duties generally, and choice of law in legal ethical matters, particularly in federal court and in patent practice.

7.     In addition to the legal treatises referenced above, I have also authored numerous articles and book chapters about various aspects of legal ethics. The articles have appeared in academic journals that include the most highly respected ethics journals in the country, as well as journals targeted to practicing lawyers. My articles have been relied upon by the courts, including the United States Court of Appeal for the Federal Circuit, on both ethical issues and substantive law.

8.     Further, throughout the past fifteen years, I have regularly taught both public and private continuing legal education courses and risk management seminars on ethical issues facing lawyers. I estimate I have given over 100 private or public educational presentations on legal ethics. Among those presentations were in-house presentations at law firms of all sizes, Fortune 100 Corporations, and numerous national, state, local, and specialized bar associations. That has included presentations in Florida, Michigan, Virginia, New York, Washington, D.C., and the United States Patent & Trademark Office.  It has included multiple presentations for the Federal Circuit Bar Association, the American Bar Association, and the American Intellectual Property Law Association.

9.     I have also audited and reviewed engagement letters for law firms, advised firms about conflicts of interest in patent practice (including litigation, patent prosecution (including *inter partes* proceedings in the United States Patent & Trademark Office), and opinion work).  I have audited and advised firms with patent prosecution work on docketing, checking for conflicts of interest, and other forms of risk management.  I have

also advised various insurance companies and related entities such as Lloyds of London on risk management in patent practice.

10.     Finally and more recently, I have served as an expert witness for counsel for parties in legal malpractice cases and other litigation, including cases or proceedings (such as disqualification proceedings or disputes over the scope of protective orders) involving conflicts of interest, client identity, and related matters.

11.     As a result of these two decades of work, I have become very familiar with ethical and fiduciary obligations of lawyers, practitioners, patent agents, and law firm management.  I am often introduced as the nation's leading expert in the field of ethical issues in patent practice.

12.     My CV (attached) sets out other details of my qualifications.

**Materials Reviewed, Scope of Declaration, and Compensation**

13.     I have relied upon my knowledge, experience, and training in the field of legal ethics, reviewed authorities including those discussed in this declaration, and had access to the following materials provided by counsel:

- The live pleadings;

- Counterclaim Defendant, Sterne, Kessler, Goldstein & Fox's, Motion to Dismiss Qualcomm's Counterclaims, Motion for More Definite Statement, Or, in the Alternative, Motion to Abate Qualcomm's Counterclaims and Incorporated Memorandum of Law;

- Qualcomm's Motion for a Preliminary Injunction and Supporting Memorandum of Law, including its exhibits and attachments to those exhibits ("Qualcomm's Motion");

- The seven ParkerVision patents-in-suit ("ParkerVision's Patents-in-Suit");

- U.S. Patent. No. 6,985,711 B2 ("Qualcomm's '711 Patent");

- The declarations of Mr. Robert Sterne and Mr. Michael Ray of Sterne, Kessler, Goldstein & Fox, PLLC. ("Sterne Kessler") and exhibits thereto;

- A letter dated April 15, 2010 to Mr. Alex Rogers, Esq., Senior Vice President, Legal Counsel, Qualcomm Incorporated from Mr. Michael B. Ray of Sterne, Kessler along with the referenced Outside Counsel Guidelines (dated effective February 1, 2009) (the "April 2010 Letter Agreement"); [1] and

- Additional materials referenced in this report.

14.     I have been engaged by Gunster, Yoakley & Stewart, P.A. ("Gunster"), counsel for Sterne, Kessler to evaluate and opine on any ethical limitations on Sterne Kessler's right to defend itself in the lawsuit styled *ParkerVision, Inc. v. Qualcomm Inc.,* Case No. 3:11-cv-719-J-37TEM (the "ParkerVision Infringement Action"), and related issues.

15.     I am being compensated for my time. Payment is not contingent on the outcome of Qualcomm's Motion or any issue in the case, or the substance of my testimony or opinions.

### Facts, Analysis, and Opinions

16.     At the outset, it is important to emphasize that this is *not* a traditional disqualification motion:  Qualcomm is seeking monetary damages and injunctive relief

---

[1]     Qualcomm's counsel did not provide Mr. Smith with a copy this important conflict waiver letter, even though it is dated more than a decade closer to this dispute than the one it did provide to him and which he discussed in his opinion.  As a result, his opinions are based upon an incomplete set of facts.

against Sterne Kessler. Further, the relief Qualcomm seeks is in my experience radical since it could effectively preclude ParkerVision and its litigation counsel – McKool Smith, and Allen, Dyer, Doppelt, Milbrath & Gilchrist, PA – from communicating with Sterne Kessler lawyers about the prosecution of the patents-in-suit and *vice versa*. It would interfere with any firm from defending Sterne Kessler against either the counterclaims for money damages or the claims that Sterne Kessler lawyers, while representing ParkerVision, intentionally deceived the Patent Office – charges that, if true, could result in disciplinary action by the Patent Office against Sterne Kessler lawyers. I have never seen any party to a proceeding seek the relief that Qualcomm seeks here.

17. To show its entitlement to a preliminary injunction, Qualcomm asserts violations of Florida's Rules of Professional Conduct (the "Florida Rules"). *E.g.,* Smith Decl. ¶ 9(a). Assuming Florida Rules apply,[2] the question first becomes whether proof of violation of a Florida Rule establishes a basis for civil liability, since this is *not* a traditional disqualification motion but is instead a suit for money damages and affirmative injunctive relief, an order that would bind not just the law firm but third

---

[2]     As with many federal courts, this Court and the Eleventh Circuit have adopted a different approach to determining *ethical issues* facing counsel appearing in federal court litigation. *See Santillana v. Florida St. Ct. Sys.*, 2010 WL 4567827 (M.D. Fla. Nov. 3, 2010) ("Motions to disqualify are governed by two sources of authority: (1) the local rules of the court in which counsel appears; and (2) federal common law."), citing *Hermann v. Gutterguard, Inc.,* 199 Fed. Appx. 745 (11th Cir. Sept. 11, 2006).

        In addition, Qualcomm, a California-centered corporation, entered into agreements with Sterne Kessler, a D.C.-centered law firm, that address conflicts of interest and the relationship between the company and law firm. Traditional choice of law analyses would hardly point to Florida law as governing those agreements or as defining tort obligations between them, whatever rules might apply to a traditional disqualification motion filed in this Court.

        If Florida law does not apply, then Qualcomm has obviously not shown that it is likely to succeed on the merits. However, as that is the basis Qualcomm has relied upon, that is the basis for my opinion.

parties. The Florida Rules themselves state: "Violation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached." Fl. R., Preamble. Mr. Smith's opinions are based only upon violation of the Florida Rules, not his expertise in or familiarity with patent law firms with national practices, the law of fiduciary duties in California or the District of Columbia, or anything else.

18.    Some context for the role of Sterne Kessler in representing Qualcomm is important to my opinion. Sterne Kessler has represented ParkerVision in various intellectual property matters since 1998. Ray Decl. ¶ 23. These were significant representations, with ParkerVision paying Sterne Kessler just under $1,000,000 for each of the past three years, according to Qualcomm. Qualcomm's Answer and Counterclaims, ¶ 122.

19.    By contrast, Sterne Kessler's representation of Qualcomm has been sporadic and far less significant to that significantly larger company. According to the Rogers Declaration, Qualcomm owns 10,000 patents and has tens of thousands of patents pending around the world. Rogers Decl. ¶ 5. A search of the databases at uspto.gov reveals that Qualcomm has been assigned almost 4,600 patents since 1976. *See* Table A, attached hereto. Mr. Rogers stated that Sterne Kessler had obtained 50 patents for it. Rogers Decl. ¶ 10. In my research, I was unable to locate a single lawsuit in which Sterne Kessler represented Qualcomm, though the data indicated that Qualcomm had sued or been sued about 200 times in recent years. Cravath Swaine & Moore LLP is

Qualcomm's principal outside patent counsel.[3]

20.    It is also pertinent to my opinion that Qualcomm knew that Sterne Kessler was representing ParkerVision.  Since before January, 1999, Qualcomm's CEO and its Chief Patent Counsel both knew that Sterne Kessler had represented ParkerVision in various matters, including "in the areas of patent preparation and prosecution; IP-related transactional work; and infringement, patentability, and freedom-to-use investigations." Rogers Decl. Ex. 1, p. 2 (Jan. 12, 1999 letter).

21.    It is also pertinent to my opinion that, with Qualcomm's consent, in early 1999 Mr. Robert Sterne of Sterne Kessler represented ParkerVision in a negotiation between ParkerVision and Qualcomm.  *See id.*   Under this 1999 letter agreement, ParkerVision was to provide proprietary and confidential information to Qualcomm, and not the other way around, so that Qualcomm could assess whether and if so under what terms to license certain technology from ParkerVision. The letter agreement concluded:

> Obviously, there never is an assurance that any business negotiation is successful, and if this negotiation were unsuccessful and hypothetically resulted in some dispute between the parties, we would not represent either party in connection with a dispute.  Moreover, we understand that the waiver that each of you is giving us for this representation would be limited to the negotiation process, and would not necessarily apply to future matters involving both companies without further discussion or agreement.  Finally, we have agreed to your request, as a condition for this waiver of any potential conflict, that no one at SKGF would in any future matter take an adversarial position (e.g., participate in litigation against either QUALCOMM or ParkerVision on any matters), at last as long as we continue to represent such company, even in unrelated matters.

---

[3]    "In its role as principal patent and antitrust litigation counsel for Qualcomm, Cravath has represented the Company in numerous matters, including in multi-jurisdictional licensing and patent litigation with Nokia." http://www.cravath.com/practices/DetailExtended.aspx?FirmService=61 (visited Nov. 27, 2011).

*Id.*, p. 2-3.  Qualcomm and ParkerVision did not reach any agreement, and nothing of record shows that the failure resulted in any dispute between them.

22.     It is also pertinent to my opinion that none of the ParkerVision Patents-in-Suit had even issued at the time of the negotiations between ParkerVision and Qualcomm, and Qualcomm has not asserted that the ParkerVision Infringement Action is the hypothetical "dispute between the parties" referred to in that 1999 letter.

23.     The volume of work that Sterne Kessler had been performing for Qualcomm had decreased and in February 2006, the firm transferred the handling of various applications to Qualcomm, and did very little work for Qualcomm for the next two years.  Ray Decl. ¶ 14.  Because of Qualcomm's size and the potential for conflicts of interest, the parties terminated their relationship on March 3, 2008.  *Id*. ¶ 15.

24.     In March 2010, more than ten years after the 1999 letter among Sterne Kessler, Qualcomm, and ParkerVision, Qualcomm sought to retain Sterne Kessler anew.  *Id.* ¶ 16.  Qualcomm sought to retain Sterne Kessler to advise it with respect to patents owned by a third party, called here "X Corporation."  *See* Ray Decl. ¶ 17, Ex. 7.  Eventually, Sterne Kessler agreed to provide "analysis and legal opinions" concerning the patents and if necessary to prepare and file reexamination requests and to assist litigation counsel with respect to any dispute involving those patents.  *Id.*  This letter contains language consenting to certain conflicts of interest that, in my opinion, applies here.[4]

25.     It is important to my opinion that the April 2010 Letter Agreement was made between Mr. Alex Rogers, an attorney who was Senior Vice President, Legal

---

[4]     Qualcomm did not afford Mr. Smith the opportunity to consider this key letter or any of the similar ones.  *See* Smith Decl. ¶ 7.  *Cf.* Ray Decl. ¶¶ 16-20.

Counsel for Qualcomm,[5] and Sterne Kessler after what was careful negotiation.  *See* Ray Decl. ¶¶ 17-18.

26.     Ultimately, after negotiation, Sterne Kessler and Qualcomm agreed that the approach to conflicts of interest in Qualcomm's "Outside Counsel Guidelines" did *not* apply to Sterne Kessler, but instead very specific terms were agreed upon by individualized agreement.  *See* Ray Decl. ¶ 16.   The parties' negotiated agreement provided in pertinent part as follows:

> Because we [*i.e.,* Sterne Kessler] represent a broad and diverse client base, there may be times when we represent other clients that are involved in disputes or transactions adverse to Qualcomm… that are unrelated to this representation.  For example, we may represent present or future clients in intellectual property matters such as preparation and prosecution of patent and trademark applications, interferences, reexaminations, oppositions, patent analysis and opinions, and legislative/policy matters that may involve or affect Qualcomm…. where we do not represent Qualcomm in the same matter.   We may also represent a present or future client in a future lawsuit, appeal, or other inter partes proceeding against Qualcomm, so long as SKGF does not

---

[5]     Mr. Rogers did not describe his background in his declaration. Online, I found this biographical sketch which confirms he has the credentials one would expect patent counsel for a large corporation to have, including more than twenty years of high-end patent litigation experience:

> Alex Rogers is a Senior Vice President and Legal Counsel for Qualcomm Incorporated. He joined Qualcomm in January 2001. Since that time he has managed intellectual property and commercial litigation matters for the company and is currently the head of its litigation group. Prior to joining Qualcomm, he was an associate and then a partner with the law firm of Gray, Cary, Ware & Friedenrich, now DLA Piper, where he was a litigator and trial lawyer for fourteen years, specializing in intellectual property litigation for various technology companies. He received his Bachelor of Arts Degree from Georgetown University in 1979, studied for one year at the Hebrew University in Israel, earned his Master's Degree in Literature from Georgetown in 1985, and then obtained his Juris Doctor from Georgetown in 1987.

http://consero.com/insights/faculty-alex-h-rogers-qualcomm-incorporated-senior-vice-president-and-legal-counsel (visited November 27, 2011).

represent Qualcomm in the same matter and SKGF is not in possession of confidential information of Qualcomm that would preclude the representation adverse to Qualcomm in violation of an applicable rule of the professional conduct. We understand that this consent does not extend to concurrent representation of clients adverse to Qualcomm in a litigation concurrent with the firm's representation of Qualcomm.

Based on the foregoing, Qualcomm agrees that our representation of Qualcomm will not disqualify our firm from opposing Qualcomm in other matters except litigation concurrent with our representation of Qualcomm that are substantially unrelated to the subject matter of this representation, and Qualcomm hereby consents to those opposing representations and waives any conflict of interest with respect to such opposing representations. We agree, however, not to use any proprietary or other confidential information of a nonpublic nature concerning Qualcomm, that was acquired by SKGF as a result of this representation, to the disadvantage of Qualcomm in connection with any litigation or other matter in which we are opposed to Qualcomm.

Ray Decl. ¶ 18, Ex. 7.

27.     Qualcomm's Senior Vice President, Legal Counsel agreed to permit Sterne Kessler to engage in various adverse representations. The parties agreed in a writing signed by Qualcomm's Senior Vice President, Legal Counsel, presumably after he read and considered it, that Sterne Kessler could be adverse to Qualcomm in all varieties of unrelated disputes and transactions, including *inter partes* proceedings of all kinds, except actual litigation (whether related or not); provided, of course, that the firm would not use nonpublic Qualcomm confidential information to Qualcomm's disadvantage. The following paragraphs explain my analysis of what Qualcomm agreed to permit Sterne Kessler to do, and the exception to that permission for concurrent litigation. *See id.* ¶ 20. However, this chart shows it somewhat simplified:

| Permitted if Not Substantially Related to X Corporation Matter and Not Involving Adverse Use of Qualcomm Confidential Information | Not Permitted |
|---|---|
| Adverse disputes or transactions including patent prosecution, trademark filings, patent opinions and analyses, legislative/policy matters, appeals, *inter partes* adverse matters including reexamination, interferences, and oppositions, and litigation after Qualcomm ceased to be a Sterne Kessler client. | Adverse matters in litigation concurrent with Sterne Kessler's representation of Qualcomm, even in unrelated matters. |

28.    For ease of understanding these terms, which are familiar to patent lawyers but perhaps not to laymen, I next break these down into adverse *inter partes* and adverse *ex parte* proceedings and provide a brief description of each.

29.    ***Adverse* Inter Partes *Proceedings***.  Qualcomm gave Sterne Kessler permission to appear in significant, highly adversarial administrative proceedings in which Sterne Kessler would be seeking to destroy or narrow patents owned by Qualcomm.  Specifically, so long as it was not substantially related to the opinions concerning the patents owned by X Corporation[6] or would result in use of Qualcomm nonpublic confidential information against it, Sterne Kessler could represent clients adverse to Qualcomm in different forms of *inter partes* adverse proceedings, including: (a) in an interference proceeding between a Qualcomm patent and a patent owned by another Sterne Kessler client, in which Sterne Kessler would be arguing in an administrative proceeding in the Patent Office that its other client, and not Qualcomm, was entitled to a patent on particular subject matter;[7] (b) in a reexamination proceeding of

---

[6]    Mr. Ray stated there were other letters with identical language.  The same analysis discussed here would apply to each of them. Ray Decl.  ¶ 17.

[7]    In my experience, patent counsel would know that, among other things, this permitted Sterne Kessler to:  (a) analyze Qualcomm patents for potentially interfering

a patent owned by Qualcomm, meaning that Sterne Kessler could represent a client in an administrative proceeding in the Patent Office for a client who was seeking to destroy or narrow a patent owned by Qualcomm;[8] and (c) in an opposition proceeding to a Qualcomm patent issued abroad, meaning that Sterne Kessler would represent a client who was seeking to destroy a foreign patent owned by Qualcomm.[9]

30. *Adverse* **Ex Parte** *Representations*. Qualcomm consented to allow Sterne Kessler to undertake adverse *ex parte* representations. While none could be substantially related to the opinions concerning the patents owned by X Corporation or result in use of

---

subject matter; (b) appear as counsel in an interference proceeding between Qualcomm and another Sterne Kessler client; (c) argue for narrow interpretations of Qualcomm patents; (d) argue for priority in favor of another Sterne Kessler client against Qualcomm; and (e) obtain a judgment from the Patent Office that could eliminate patent rights previously held by Qualcomm. (Again, subject to the *proviso* above.) The Patent Office has recognized that it is "adverse" to appear against a client in an interference proceeding. *Anderson v. Eppstein,* 59 U.S.P.Q.2d 1280 (Bd. Pat. App. & Interf. May 11, 2001) (denying motion to disqualify because work for former client was not on a patent that was "identical or essentially the same as the subject matter" as the patent involved in the adverse representation in the interference).

[8] In my experience, patent counsel would have known that, among other things, this permitted Sterne Kessler to: (a) analyze Qualcomm patents; (b) assist other clients to request reexamination of a Qualcomm patent; (c) request a reexamination of a Qualcomm patent, which means representing to the Patent Office that (at the pertinent times) there is a substantial new question of patentability as to a Qualcomm patent; (d) participate in a reexamination proceeding against a Qualcomm patent, which would include arguing to the Patent Office that it was invalid; and (e) temporarily derail any enforcement effort by Qualcomm of any patent in reexamination since often litigation is stayed pending reexamination. (Again, subject to the *proviso* above.) Patent counsel know that reexamination is an expensive process for the patentee, and it is often used as a defensive tool by accused infringers after they are sued for infringement. It is an adverse representation. (To be complete, there is also an *ex parte* administrative procedure for reexamination.)

[9] In my experience, patent counsel would know that, among other things, this letter permitted Sterne Kessler to: (a) advise clients as to the strengths and weaknesses of Qualcomm patents abroad; (b) represent clients in *inter partes* proceedings where Sterne Kessler's client's goal would be to have a Qualcomm patent revoked (taken away) or narrowed; and (c) obtain an order revoking or narrowing Qualcomm patent protection abroad. (Again, subject to the *proviso* above.) (To be clear, opposition proceedings vary by jurisdiction, but that is a fair characterization.)

Qualcomm nonpublic confidential information against Qualcomm, Sterne Kessler could represent a client adverse to Qualcomm while preparing or prosecuting patents or trademarks, and to engage in certain adverse legislative and policy-oriented representations.[10]

31.     While the provision allowing for adverse patent prosecution is important for what it permitted,[11] the consent to allow Sterne Kessler to provide adverse analyses and opinions is in my opinion highly significant to Qualcomm's Motion.   After all, Qualcomm gave this consent in its request for Sterne Kessler to provide "opinions and legal analysis" regarding patents owned by X Corporation.   Qualcomm obviously knew what was involved in obtaining an opinion of counsel, and so obviously knew what it was agreeing to when it consented for Sterne Kessler to engage in these adverse *ex parte* (indeed, typically highly confidential) representations.   For these reasons, I discuss this provision at additional length.

32.     So long as it was not substantially related to the opinions concerning the patents owned by X Corporation or would result in use of Qualcomm nonpublic confidential information against it, Sterne Kessler could represent clients in disputes or transactions adverse to Qualcomm involving analysis and opinions of Qualcomm's patents for other clients.  (Again, subject to the *proviso* above.)

---

[10]     In addition, so long as it was not substantially related to the opinions concerning the patents owned by X Corporation or would result in use of Qualcomm nonpublic confidential information against it, Sterne Kessler could represent clients in disputes or transactions adverse to Qualcomm involving legislative or policy matters.  This provision does not appear to be implicated here as directly as are the other provisions.

[11]     In my experience, patent counsel would know that, among other things, this permitted Sterne Kessler to:  (a) draft claims to cover products made by Qualcomm after analyzing those products; (b) traverse rejections applying Qualcomm patents; (c) draft patents to block or otherwise interfere with Qualcomm's business activities. (Again, subject to the *proviso* above.)

33.     There are three common types of analyses or opinions of counsel: an opinion on whether a patent is or is not invalid; an opinion on whether a patent is or is not infringed; and (though uncommon in my experience) an opinion on whether a patent is or is not enforceable in equity. Lawyers provide analyses and opinions both for patentees and for potential infringers. I first discuss some of the activities that are involved in providing opinions to and analyses for accused infringers before turning to opinions given to and analyses provided by lawyers to patentees.

34.     When provided to potential infringers, opinions of counsel serve several functions, but common among them are to advise a client on whether its proposed activities infringe a valid, enforceable patent. Similarly, if a party is sued for infringing a patent, a factor in whether its infringement will be deemed "willful" and so subject to punitive damages, is whether it had a good faith reasonable belief that it was not infringing a valid, enforceable patent. Thus, Qualcomm agreed that Sterne Kessler could provide another client with an opinion that could be used to defeat a claim by Qualcomm for "willful" infringement – of allowing for up to treble damages, attorneys' fees, and costs in an infringement suit brought by Qualcomm. In my experience, patent counsel would know that the courts and bar associations that have addressed the issue have held that it is adverse for a law firm to provide an opinion to one client about another client's patents. Yet, Qualcomm permitted Sterne Kessler to do so.

35.     Different kinds of work and analyses underlie opinions of counsel, and it varies depending on the type of opinion involved – validity, infringement, or enforceability. Obviously, my opinion here is general and a particular patent opinion or analysis can involve some, all, or other types of work.

36.     With respect to a validity opinion, in my experience, patent counsel would understand that, among other things, this letter permitted Sterne Kessler to:  (a) analyze a patent owned by Qualcomm and provide good faith reasonable arguments to its client that Qualcomm's patent was invalid; (b) interpret claims of Qualcomm's patents in ways that might be adverse to Qualcomm's interests or at least inconsistent with how it would interpret the same claims; (c) ultimately provide a written opinion to a client that it could use in federal court to assist in rendering a Qualcomm patent to be worthless; and (d) provide a written opinion to defeat a claim for treble damages, attorneys' fees, and costs. (Again, subject to the *proviso* above.)

37.     With respect to an infringement opinion, in my experience patent counsel would understand that, among other things, this letter permitted Sterne Kessler to:  (a) analyze patents held by Qualcomm and create claim charts and other analytical tools to advise the other client whether its products or activities infringed Qualcomm's patent; (b) interpret the claims of the Qualcomm's patent in a way that might be adverse to Qualcomm or at least inconsistent with how it would interpret the same claims; (c) ultimately provide a written opinion to a client that it could use in federal court to assist in rendering a Qualcomm patent to be worthless; and (d) provide a written opinion defeat a claim for treble damages, attorneys' fees, and costs. (Again, subject to the *proviso* above.)

38.     With respect to an enforceability opinion, though rare, in my experience patent counsel would understand that, among other things, this letter permitted Sterne Kessler to:  (a) analyze patents held by Qualcomm and construct reasonable and good faith arguments that Qualcomm or its counsel had failed to satisfy their duty of candor to

the Patent Office, meaning that Qualcomm or its counsel had intentionally failed to disclose information material to patentability of a claim, or had intentionally made a misrepresentation that was material to patentability of a claim; (b) assist a client in creating arguments that would reduce if not destroy the value of patents owned by Qualcomm, whether in terms of licensing or litigation value; and (c) ultimately provide a written opinion to a client that it could use in federal court to defeat a claim for treble damages, attorneys' fees, and costs. (Again, subject to the *proviso* above.)

39.     With respect to opinions or analyses given to patentees, typically these come in the form of Rule 11 investigations and the like.  *See* David Hricik, PATENT ETHICS – LITIGATION 94-103 (Oxford University Press 2009).  Federal courts require that patentee engage in reasonable pre-suit investigation.  Qualcomm agreed that Sterne Kessler could provide opinions and analyses about patents (again, however, the firm could not appear in litigation).

40.     With respect to validity opinions and analyses, it is rare in my experience for a patent owner to require much investigation into the validity of its own patent, given the presumption of validity.  However, under some circumstances additional investigation is required, and patent counsel would know that, among other things, this letter permitted Sterne Kessler to: (a) interpret the claims of another client's patent in a way that might be adverse to Qualcomm's interests or at least inconsistent with how it would interpret the same claims; and (b) interpret the scope and content of the prior art in a way that might be adverse to Qualcomm's interests or at least inconsistent with how it would interpret the same prior art.  In all events, the opinions or analyses that Sterne Kessler prepared could be used by the patentee against any claim for sanctions or attorneys' fees under

Section 285 if the patent were found invalid in litigation.

41.    With respect to infringement opinions and analyses, in this context sophisticated patent counsel would know that, among other things, this letter meant Sterne Kessler could:  (a) analyze patents held by another client and create claim charts and other analytical tools to advise the other client whether Qualcomm's products or activities infringed the other client's patent; and (b) interpret the claims of the other client's patent in a way that might be adverse to Qualcomm or at least inconsistent with how it would interpret the same claims.  In all events, the opinions or analyses that Sterne Kessler prepared could be used by the patentee against any claim for sanctions or attorneys' fees under Section 285 if the patent were found not to be infringed in litigation.

42.    With respect to enforceability opinions and analyses, again it is rare in my experience for a patentee to do much investigation into the enforceability of its own patents, again owing to the statutory presumption of validity.  However, under some circumstances additional investigation is required, and so patent counsel would know that this letter, among other things, allowed Sterne Kessler to: (a) interpret the claims of another client's patent in a way that might be adverse to Qualcomm's interests or at least inconsistent with how it would interpret the same claims; and (b) interpret the scope and content of the prior art in a way that might be adverse to Qualcomm's interests or at least inconsistent with how it would interpret the same prior art.  In all events, the opinions or analyses that Sterne Kessler prepared could be used by the patentee against any claim for sanctions or attorneys' fees under Section 285 if the patent were found unenforceable in litigation.

43.    It is against this April 2010 Letter Agreement that Qualcomm's Motion

must be examined. In my opinion, it is helpful to separate the analysis into three time periods: the time period prior to the filing of suit; the time period between the filing of suit and the filing of the counterclaim; and the time period after the filing of the counterclaim.

**Sterne Kessler's Alleged Activities Before Qualcomm Sued it as a Counterclaim Defendant.**

44.     As shown above, prior to the filing of the counterclaim Sterne Kessler and Qualcomm had agreed in the April 2010 Letter Agreement that Sterne Kessler could be adverse to Qualcomm in lawsuits, reexaminations, opinion work, patent analyses, interferences, and other forms of *inter partes* representations.

45.     Sterne Kessler did not appear as counsel in litigation adverse to Qualcomm. Instead, its alleged activities consisted of (a) "walk[ing]" ParkerVision "through the process of" verifying alleged infringement by Qualcomm and (b) being "involved in the creation [and] prosecution" of the ParkerVision Patents-in-Suit. Qualcomm's Motion at p. 7, 8.

46.     Assuming these allegations are true, in my opinion these activities were well within the scope of the consent provided by Qualcomm and its counsel in April 2010 as a condition of agreeing to represent Qualcomm. "Verifying infringement" alleges that Sterne Kessler provided an opinion or analysis to ParkerVision that Qualcomm infringed the ParkerVision Patents-in-Suit. This is precisely what Qualcomm agreed to in the April 2010 Letter Agreement. Prosecuting patents is also expressly covered. Thus, in my opinion, the April 2010 Letter Agreement expressly covered both these activities.

47.     Under Florida law, prospective consent to an adverse representation can occur in an engagement letter. Where, as here, the letter was reviewed (indeed, signed) by

counsel for Qualcomm, in my opinion was clearly between knowledgeable and sophisticated parties, and was quite detailed in the sorts of adverse representations that Sterne Kessler would undertake, in my opinion under Florida law consent was informed. *See General Cigar Holdings, Inc. v. Altadis, S.A.,* 144 F. Supp.2d 1334, 1339 (S.D. Fla. 2001) (denying motion to disqualify and finding prospective consent adequate under similar circumstances).[12] This is particularly so because, *at least according to Qualcomm's Motion*, it had long known that Sterne Kessler represented ParkerVision in the very same technology at issue here.

48.     Thus, in my opinion, the work that Sterne Kessler allegedly did was squarely within an effective prospective consent evidenced in writing by the April 2010 Letter Agreement.

> **The Filing of the Answer Asserting Inequitable Conduct and the Counterclaim Seeking Affirmative Monetary Relief Each Required that Sterne Kessler Withdraw, But Even if Withdrawal was Not Required, Withdrawal was Proper, and so in All Events the Firm's Ability to be Adverse to Qualcomm Should be Measured under Florida's Former Client Rules.**

49.     It appears undisputed that Sterne Kessler was representing Qualcomm when this suit was filed. The exchange of correspondence between the parties in the late summer and fall of this year shows that, after Sterne Kessler sought to withdraw from representing Qualcomm, Qualcomm objected and the firm agreed to "continue to work

---

[12]     Again, the letter here was by a California corporation asking a D.C. firm to do work in D.C. on patent matters. Under the D.C. Rules of Professional Conduct, prospective consent is effective if *either* "(1) the consent is specific as to the types of potentially adverse representations and types of adverse clients… *or* the waiving client has available in-house or other counsel independent of the lawyer soliciting the waiver." D.C. R. Prof. Conduct 1.7, cmt. 31 (emph. added). As shown above, not only did Qualcomm have "available" in-house counsel, senior and sophisticated in-house patent counsel negotiated the April 2010 Letter Agreement. In my opinion, the record shows informed consent under D.C. law as well.

on and complete the on-going matters that it is handling for Qualcomm and will not seek to terminate its representation of Qualcomm." Rogers Decl. Ex. 3. In addition, the firm agreed that it would not "enter its appearance or otherwise act as counsel for ParkerVision" in this suit nor "advise ParkerVision or its litigation counsel regarding the Florida matter or any other litigation with Qualcomm." *Id.* The firm, however, stated that either party could call upon the firm to provide documents or testimony regarding the ParkerVision Patents-in-Suit, since Sterne Kessler lawyers had prosecuted them. *Id.*

50.     As promised, Sterne Kessler completed to Qualcomm's satisfaction one of the two open projects. *Id.* Ex. 6. However, Qualcomm on September 16, 2011 filed its Answer and Counterclaims in this action. Among other things, Qualcomm accused Sterne Kessler of engaging in deliberate fraud on the Patent Office, alleging that in numerous ways Sterne Kessler lawyers had "made repeated false statements" to the Patent Office, actually had acted "with specific intent to mislead" the Patent Office, that they buried the Office with "irrelevant" prior art and "mischaracterized" other art, and engaged in a "pattern of intentional misconduct designed to mislead the PTO" into allowing the ParkerVision Patents-in-Suit.

51.     These allegations (if true) could result in loss of patent rights owned by ParkerVision. Inequitable conduct is an affirmative defense to patent infringement that requires proof that a person substantively involved in prosecuting the patent intentionally misrepresented or failed to disclose material information to the PTO and did so with an intent to deceive. If inequitable conduct is found, then the patent (and perhaps even related ones) may be held by the court to be unenforceable, even though valid. In addition, the patent owner may be required to pay the attorneys' fees of the accused

infringer. *See* David Hricik, *Combining Prosecution with Other Forms of Representation* in Drafting Patents for Litigation and Licensing 639 (ABA/BNA 2008). Thus, not only would a finding of inequitable conduct result in denial of recovery of damages for infringement, it could mean that ParkerVision would be liable to Qualcomm for attorneys' fees, costs, and other monetary sanctions under 35 U.S.C. § 285 and other federal statutes and doctrines.

52. In addition to accusing Sterne Kessler lawyers of intentionally deceiving the Patent Office through a pattern of repeated conduct, Qualcomm asserted claims for affirmative relief against Sterne Kessler. Among other things, Qualcomm asserted a breach of fiduciary duty claim based upon its allegation that Sterne Kessler had provided "legal counsel to ParkerVision in preparing to file this action." Counterclaim ¶ 147. It also alleged that Sterne Kessler breached the January 12, 1999 letter. *Id.* ¶¶ 156-59.

53. Finally, Qualcomm asserted that ParkerVision aided and abetted Sterne Kessler's breach of fiduciary duty and that ParkerVision tortiously interfered with the January 1999 letter agreement between Sterne Kessler and Qualcomm. *Id.* ¶¶ 150-155; 160-164.

54. In response to the filing by Qualcomm of these counterclaims, Sterne Kessler withdrew on October 14, 2011. Rogers Decl. Ex. 6. The firm offered to be available for a reasonable time to assist with transition of the one remaining open matter. *Id.*

55. In response, Qualcomm asserted that both of the remaining matters remained open, but (stating it was doing so without waiving any argument) requested

return of the files from Sterne Kessler. *Id.* Ex. 7.[13]

56.     In my opinion, Sterne Kessler was *required* to withdraw from representing Qualcomm. Again, movants rely only on Florida law. Although it is difficult for me to see how Florida law controls whether a D.C.-centered firm can withdraw from representing a California-centered client in a representation with nothing to do with Florida, that is the basis of the motion.

57.     The Florida Rule governing withdrawal states in pertinent part:

(a)     Except as stated in subdivision (c) [which relates to obtaining permission from a tribunal to withdraw, an issue not pertinent here], a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

> (1)     the representation will result in violation of the Rules of Professional Conduct or law…

Fl. R. 4-1.16(a). Under the rules governing a current client conflict, a lawyer may not represent a client when "there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."

58.     In my opinion, a firm faced with substantial allegations that its lawyers had intentionally deceived the Patent Office must withdraw from providing an opinion of counsel to the client making those charges. As the Federal Circuit recently explained in an *en banc* decision, any charge of inequitable conduct has "ruinous consequences for the

---

[13]     After some additional correspondence, Qualcomm filed the Qualcomm Motion on November 10, 2011. The request for injunctive relief was predicated on claims that (1) Sterne Kessler was in violation of Florida Rule 4-1.7(a); (2) Sterne Kessler was in violation of Florida Rule 4-1.9(a); (3) Qualcomm was likely to prevail on its claims for breach of fiduciary duty and breach of contract; and (4) the other elements required for the extraordinary relief of a preliminary injunction were present.

reputation of" the attorney so charged – and here the conduct is characterized as being particularly egregious and as having been done with deceptive intent. *TheraSense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1288 (Fed. Cir. 2011). When a firm is defending against such serious charges by a client, in my view there is a material limitation on the firm because the lawyer's personal interests are seriously adverse to the client. Further, I would have advised the Sterne Kessler firm that it had to withdraw because any opinion it provided to Qualcomm could be impeached by the very allegations being made by Qualcomm against Sterne Kessler. How could Qualcomm reasonably rely upon an opinion received from a firm that had engaged in the conduct alleged by Qualcomm to have occurred? Further still, the claim for money damages by Qualcomm against Sterne Kessler also required its withdrawal, in my opinion, and for similar reasons.

59. Additionally, withdrawal is required is because this claim by Qualcomm triggered Sterne Kessler's ability to make adverse disclosure. Under Florida Rule 4-1.6(b). That rule provides in part:

> A lawyer may reveal such information to the extent the lawyer reasonably believes necessary….
>
> > (2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and client…

Rule 4-1.6(d) provides: "When disclosure is mandated or permitted, the lawyer shall disclose no more information than is required to meet the requirements or accomplish the purposes of this rule."

60. There is no doubt that a lawyer sued by a client has interests that are adverse to that client. In fact, the comments characterize Rule 1.6(b)(2) as disclosure

"adverse to the client." The comments explain:

> Where a legal claim or disciplinary charge alleges complicity of the lawyer in a client's conduct or other misconduct of the lawyer involving representation of the client, the lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense. The same is true with respect to a claim involving the conduct or representation of a former client. The lawyer's right to respond arises when an assertion of such complicity has been made. Subdivision (c) does not require the lawyer to await the commencement of an action or proceeding that charges such complicity, so that the defense may be established by responding directly to a third party who has made such an assertion.

*Id.* cmt. "American law has long recognized the right of a lawyer to employ confidential client information in self-defense." RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 64, cmt. b. *See, e.g., id.* Illustration 2.

61. Further, because Qualcomm has asserted that ParkerVision intentionally induced Sterne Kessler to breach the 1999 letter agreement (*e.g.,* counterclaim ¶ 164), and that ParkerVision knowingly participated in Sterne Kessler's breach of fiduciary duty to Qualcomm (*id.* ¶ 154), Sterne Kessler is allowed to defend itself. As comments to the Florida Rule explain:

> If the lawyer is charged with wrongdoing in which the client's conduct is implicated, the rule of confidentiality should not prevent the lawyer from defending against the charge. Such a charge can arise in a civil, criminal, or professional disciplinary proceeding and can be based on a wrong allegedly committed by the lawyer against the client or on a wrong alleged by a third person; for example, a person claiming to have been defrauded by the lawyer and client acting together.

Fl. R. 4-1.6, cmt.

62. The rules recognize that the lawyer is able to make these disclosures but that the lawyer is acting "adversely" to the client – in self-defense. There is no doubt a charge of inequitable conduct triggers this right. In my opinion, especially where as here the claims involve moral turpitude and intentional misconduct of the worst possible kind

in patent practice, Sterne Kessler was required to withdraw, and allowed to defend itself.

63. Even when withdrawal is not required, a lawyer may withdraw under Florida law where "withdrawal can be accomplished without material adverse effect on the interests of the client," or "other good cause for withdrawal exists." Fl. R. 1.16(b). In my opinion, the inequitable conduct allegations and the affirmative counterclaims each independently gave Sterne Kessler good cause to withdraw. "Irreparable breakdown of the client-lawyer relationship due to other causes is likewise a ground for withdrawal." RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 32, cmt. l; *see Whiting v. Lacara,* 187 F.3d 317 (2d Cir. 1999) (client threatened to sue lawyer unless lawyer pursued a claim that had been dismissed already).

64. There appears to be some dispute over whether withdrawal could be accomplished without material adverse effects on Qualcomm; however, if that is established, then withdrawal would be proper under that provision as well.

65. Withdrawal would also be proper under Florida law, which under some circumstances allows a law firm to withdraw from representing a client and then to be adverse to that client so long as the adverse representation is not substantially related. Qualcomm does not mention this Florida authority which rejects a rigid and mechanical application of the so-called "hot potato" rule.

66. Florida Ethics Opinion 70-57 (Jan. 8, 1971) states:

If a dispute that arises between an attorney's clients has no relationship to the attorney's representation of either party and the attorney has received no information in regard to the dispute, the attorney may withdraw from representing one client and thereafter represent the other in the dispute.

*67.* Echoing this bar opinion, a comment to the later-adopted Florida Rules states: "Where more than 1 client is involved and the lawyer withdraws because a

conflict arises after representation, whether the lawyer may continue to represent any of the clients is determined by rule 4-1.9." Fl. R. 4-1.9, cmt.

     *68.*    Consistent with both, Florida federal courts have recognized that if a lawyer immediately seeks to withdraw when two clients become adverse, whether the lawyer may properly represent a remaining client is determined by the former client rule. *Florida Ins. Guaranty Ass'n., Inc. v. Carey Canada, Inc.,* 749 F. Supp. 255, 261 (S.D. Fl. 1990) (recognizing exception but finding facts did not fit within it);[14] *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491 (11th Cir. 1989) (applying former client conflict rules even though client was current client at time of adversity, where firm dropped client).

     *69.*    As soon as Qualcomm objected to Sterne Kessler's involvement in this matter, Sterne Kessler sought to withdraw. While it refrained from doing so based upon assurances from Qualcomm that a long term relationship was to ensue, in my opinion withdrawal was permissible even under this line of cases, and even had withdrawal occurred solely to allow Sterne Kessler to treat Qualcomm as a former client.[15]

---

[14]    This has been referred to as the "Carey Canada exception" to the so-called hot potato rule. *Sabrix, Inc. v. Carolina Cas. Ins. Co.,* 2003 WL 23538035 (D. Or. July 23, 2003).

[15]    Sterne Kessler did not "immediately" seek to withdraw from representing Qualcomm. Instead, it agreed to continue to represent Qualcomm in the last matters, relying upon Qualcomm's statements that Qualcomm intended for the two to share a long-term relationship. Then, contrary to its assurances, Qualcomm sued Sterne Kessler. Where a client hides the conflict of interest, courts have found an even greater willingness to permit "drop and sue." "Although attorneys have the affirmative duty to seek out and discover possible conflicts, clients should not actively conceal potential conflicts from their counsel." *Microsoft Corp. v. Commonwealth Scientific and Indus. Research Organisation,* 2007 WL 4376104 (E.D. Tex. Dec. 13, 2007) *citing Klein v. Churchhill Coal Corp.,* 612 F. Supp. 247, 251 (S.D.N.Y. 1985) ("a person may not immunize himself from suit by a lawyer by fraudulently maneuvering the lawyer into a position where he might be said to have a conflict of interest").

*70.* I have reviewed the only Florida decision cited by Qualcomm, *Harrison v. Fisons Corp.,* 819 F. Supp. 1039 (M.D. Fla. 1993). That court refused to "allow[] lawyers to pick the more attractive representation" by dropping the disfavored client. *Id.* at 1042. That is in my opinion not what happened here, since Sterne Kessler prosecuted the ParkerVision Patents-in-Suit. Loyalty demands that it stand by the client for whom it did this extensive work in its time of need.

**Because Qualcomm Sued Sterne Kessler, the Firm is Free to be Adverse to Qualcomm in This Matter.**

*71.* As I understand Qualcomm's Motion, an attorney who is sued by a client is, nonetheless, subject to the current client conflict rules or, at minimum, the former client conflict of interest rules. In my opinion, this grossly misapprehends the Florida Rules and would render self-defense impossible.

*72.* There can be no doubt that a firm that is sued by a client, or former client, can act adversely to its client or former client by defending itself.[16] Yet, if the current or former client rules apply, as Qualcomm contends, the firm will be acting in violation of the ethical rules, since it will obviously be adverse to its current or former client in the same or a substantially related matter in which it represented the current or former client. The conflict of interest rules simply do not and cannot apply, since they would preclude a lawyer sued for malpractice from assisting in his own defense.

*73.* In my opinion, a lawyer whose ability to defend himself under Rule 1.6(b) has been triggered is not subject to the conflicts of interest rules, at least with respect to defending against those claims. To hold otherwise would mean that a lawyer could never

---

[16] Sterne Kessler is not attempting to represent ParkerVision behind the scenes without making an appearance in the case. Instead, it is a party with the right to defend itself against serious charges leveled at it in federal court.

defend himself by providing legal advice or services in his own defense. An injunction based upon those rules would place any lawyer who communicated with the defendant-law firm in jeopardy of being held in contempt.

*74.* Even assuming the former client rule applies, as shown below, in my opinion it is not violated here.

### No Substantial Relationship and No Attempt by Qualcomm to Prove Likelihood of Use of Qualcomm Confidences to its Disadvantage

75. Qualcomm argues liability should be imposed upon Sterne Kessler if Sterne Kessler was adverse to Qualcomm in a matter substantially related to the firm's representations of Qualcomm. However, in making this assertion Qualcomm in its motion conflates two distinct ethical rules: one prohibiting being adverse to a former client in substantially related matters, and the other prohibiting misuse of confidential information. In my opinion, Qualcomm has offered no evidence of either a substantial relationship between Sterne Kessler's work for Qualcomm and this lawsuit, and it has wholly failed to meet the strict burdens of proof necessary to establish a violation of the rules prohibiting misuse of information.[17]

76. Florida has distinct prohibitions in its rule specific to former client conflicts Rule 4-1.9, which provides in full:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the

---

[17] I observe that Qualcomm asserts that its motion can be supported by reliance on presumptions that are used in the context of traditional disqualification motions, not suits seeking injunctive relief and money damages. In my opinion, it is wholly improper to rely upon imputed knowledge in the context of these counterclaims, which is essentially assert legal malpractice.

interests of the former client unless the former client gives informed consent; or

(b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known; or

(c) reveal information relating to the representation except as these rules would permit or require with respect to a client.

77.     Thus, discipline is appropriate if either there is an adverse representation in a substantially related matter, *or* the lawyer has used information relating to the representation to disadvantage the former client, *or* the lawyer has revealed information relating to the representation.   These are distinct inquiries in the disqualification context.

78.     Qualcomm relies upon the Florida Rules to show it is likely to prevail on the merits, but it obscures the fact that Florida deliberately adopted a narrower definition of "substantial relationship" than some other states or the Model Rules.   Florida federal courts have already recognized that the Florida Rules "narrowly defined the concept of 'substantially related'"[18] when adopting this definition:

> *Matters are "substantially related" for purposes of this rule if they involve the same transaction or legal dispute*, or if the current matter would involve the lawyer attacking work that the lawyer performed for the former client.  For example, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent.

Fl. R. 4-1.9, cmt. (emph. added).

79.     In my experience and opinion, this is a narrow definition of "substantial relationship." It is, however, remarkably similar to the test used by the Patent Office.  *See*

---

[18]     *In re Patrick Power Corp.*, 2007 WL 2883179 (Bankr. S.D. Fla. Sept. 26, 2007).

*Anderson v. Eppstein,* 59 U.S.P.Q.2d 1280 (Bd. Pat. App. & Interf. May 11, 2001) (denying motion to disqualify because work for client was not on a patent that was "identical or essentially the same as the subject matter" as the patent involved in the interference).

80.     Qualcomm does not even attempt to make the showing required by Florida Rules. No one offers an opinion that work Sterne Kessler had performed for Qualcomm is substantially related to Sterne Kessler's work for ParkerVision.[19]

81.     Instead, Qualcomm's Motion states that "having formerly represented Qualcomm in a prosecution of a patent related to Qualcomm's direct conversion receiver technology, Sterne Kessler is precluded from now representing ParkerVision in connection with this litigation alleging that Qualcomm's direct conversion receivers infringe the patents-in-suit."  Qualcomm's Motion at 19.  This unsworn assertion that the Qualcomm '711 Patent and the ParkerVision Patents-in-Suit involve "Qualcomm's direct conversion receiver technology" is insufficient even under the broader definition of "substantial relationship" that existed prior to its rejection by the Florida Rules.  *Moyroud v. Itek Corp.,* 528 F. Supp. 707 (S.D. Fla. 1981) (argument that patents related to same type of machine was insufficient to establish a substantial relationship).

82.     Thus, Qualcomm has not established a substantial relationship under even the broad definition of substantial relationship, let alone the definition in the Florida Rules upon which it relies.[20]

---

[19]     Mr. Smith did not opine that the matters are substantially related.  Smith Decl. ¶ 9.

[20]     Rather than attempting to meet the narrower definition of "substantial relationship" under Florida's Rules, Mr. Smith and Qualcomm rely upon definitions of "substantial relationship" specifically rejected by the State of Florida.  Mr. Smith states

83.     In my opinion, determining a substantial relationship requires analyzing the law and facts, not relying upon bald assertions, but the latter is all that Qualcomm has proffered here.  *See* David Hricik, PATENT ETHICS – LITIGATION 50-53 (Oxford University Press 2009).  Although it is not Sterne Kessler's burden to prove a lack of a substantial relationship, I reviewed the ParkerVision Patents-in-Suit and the Qualcomm '711 Patent, and I see no indicia of a substantial relationship between them under Florida law.  Among other things, the Qualcomm '711 Patent does not cite any of the ParkerVision Patents-in-Suit, and of the hundreds of references cited, only two patents are cited by the Qualcomm '711 Patent *and* any of the ParkerVision Patents-in-Suit.

84.     The argument that Qualcomm makes to broaden Florida's substantial relationship test instead is a basis for disqualification under a different subsection of Florida Rule 4-1.9.  Under Rule 4-1.9(b), however, Qualcomm should have come forward in its motion actually disclosed (*in camera* if need be, for counsel's eyes only) the confidential information that it contends it disclosed to Sterne Kessler and which

---

that a substantial relationship exists, not just when an adverse representation involves the same transaction or legal dispute as the prior representation of the client (what Florida requires), but also "if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  Smith Decl. ¶ 9.

Qualcomm's Motion does the same thing, and in doing so takes a quotation grossly out of context. Specifically, Qualcomm states that, under Florida Rule 4-1.9(a), a substantial relationship may be found *either* if the present and former representations "involve the same transaction or legal dispute" *or* "if there is otherwise 'a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.' *Morgan Stanley & Co., Inc. v. Solomon,* 2009 WL 413519, at *6 (S.D. Fla. Feb. 19, 2009)."  Qualcomm's Motion at 18-19.  Florida's Rule does not say that.  The *Morgan Stanley* did not say that. Instead, the language cropped by Qualcomm's counsel is from a parenthetical where the *Morgan Stanley* court observed when, *under the Model Rules*, matters are substantially related.  The court *never* suggested that under Florida's Rule matters could be "substantially related" under the same test as the Model Rules.

would materially advance ParkerVision's position here. *See* David Hricik, PATENT ETHICS – LITIGATION 53-54 (Oxford University Press 2009) (collecting cases).

85.     Qualcomm has made no such proffer. The only basis for disqualification in Qualcomm's Motion is Sterne Kessler's prosecution of Qualcomm's '711 Patent, but Qualcomm made no effort to prove – which it must -- that prosecuting Qualcomm's '711 Patent exposed Sterne Kessler to Qualcomm confidential information that would be material to this case. This is especially difficult because information that has become generally known is not "confidential" under the Florida Rules.[21] In my experience, information that a lawyer receives during patent prosecution is to a large extent publicly disclosed in the filing.[22]

86.     There is no evidence I have seen that Sterne Kessler possesses Qualcomm

---

[21]     Fl. R. 4-1.9, cmt. ("However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client. Information that has been widely disseminated by the media to the public, or that typically would be obtained by any reasonably prudent lawyer who had never represented the former client, should be considered generally known and ordinarily will not be disqualifying. The essential question is whether, but for having represented the former client, the lawyer would know or discover the information.").

[22]     The D.C. Rules do not have a counterpart to Florida Rule 4-1.9(b), but the D.C. Rules have a broader definition of substantial relationship: "Matters are 'substantially related'… if they involve the same transaction or legal disputes or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." D.C. R. Prof. Conduct 1.9, cmt. 3.

However, information that "has been disclosed to the public or other parties adverse to the former client" ordinarily does not count in determining whether matters are substantially related. *Id.* Thus, under the D.C. Rules Qualcomm would still need to show that either prosecution of the Qualcomm '711 Patent is the same as Sterne Kessler's work or that Sterne Kessler acquired nonpublic confidential information that could materially advance ParkerVision's position here. It has in my opinion wholly failed to do so, and I have seen no evidence that it could.

To be complete, there are differences in the allocation of burdens of proof and the procedures used between the D.C. and Florida approaches but in this motion they end up at the same place.

confidential information that could materially advance ParkerVision's position in this matter, particularly discounting information that is publicly available. There is, as a result, no proof of a likelihood that Qualcomm will prevail on its claim that Sterne Kessler will misuse nonpublic Qualcomm confidential information.[23]

**The Relief Sought is Overly Broad.**

87.     As I understand it, Qualcomm's Motion seeks an order precluding Sterne Kessler from providing any legal advice or services to ParkerVision or its counsel in this matter, which could include providing information regarding what was done, or not, during prosecution of the ParkerVision Patents-in-Suit. In my opinion, this relief is improperly broad since it ignores the fact that there was nothing unethical about Sterne Kessler representing ParkerVision in obtaining these patents, and there is nothing unethical about any of the firms that are representing ParkerVision in this case from acting adversely to Qualcomm. Yet, if those firms are subject to contempt of court if they do what they must do to competently represent ParkerVision – consult with Sterne Kessler lawyers about the prosecution of the ParkerVision Patents-in-Suit, for example – then ParkerVision will effectively be precluded from suing Qualcomm on these patents or defending against the serious charges of inequitable conduct.

88.     In my opinion, Sterne Kessler's right to defend itself is limited only by its confidentiality obligations under Rule 1.6. Based upon the declaration of Mr. Ray, Sterne Kessler does not believe it has any Qualcomm confidential information that is pertinent to this suit and does not believe it will be necessary to disclose any Qualcomm confidential information to defend itself. Ray Decl. ¶ 8. In my opinion, if Sterne Kessler

---

[23]     Even if it had such information, Sterne Kessler could use the information in its defense, subject to a confidentiality order and the limitations in Rule 1.6.

did later determine it needed to use such information, its ethical obligations could be met through the use of confidentiality or other orders from a court before making such disclosures.

## Conclusion

In my opinion, Qualcomm has failed to establish violations of the Florida Rules set forth in its motion.

UNDER PENALTIES OF PERJURY, I declare that I have read the foregoing declaration and that the facts stated in it are true.

David Hricik
Date:  November 30, 2011

TABLE A
U.S. Patents Assigned to Qualcomm

**USPTO Patent Full-Text and Image Database**

| Home | Quick | Advanced | Pat Num | Help |
|---|---|---|---|---|

| Next List | Bottom | View Cart |
|---|---|---|

*Searching US Patent Collection...*

**Results of Search in US Patent Collection db for:**
**AN/qualcomm**: 4574 patents.
*Hits **1** through **50** out of **4574***

[Next 50 Hits]

[Jump To] [_____]

[Refine Search] [an/(qualcomm)_____]

**David Hricik**
Professor of Law
Mercer University School of Law
1021 Georgia Ave.
Macon, GA 31207

## Education

Northwestern University School of Law, J.D. 1988.

*Cum laude;* Note & Comment Editor, Northwestern Journal of International Law & Business; Legal Writing Award; Dean's List.

University of Arizona, B.A. (English) 1984.

High Honors; *Phi Beta Kappa*; Intern to the Arizona State Senate and U.S. House of Representatives; Dean's List; Academic Scholarships.

## Academic Positions

Visiting Professor of Law.  Atlanta's John Marshall School of Law (Atlanta, GA, 2011-12).  Professional Responsibility; Federal Civil Procedure.

Professor of Law (Assistant; then Associate; now full). Mercer University School of Law (Macon, GA, 2002-).  Property; Advanced Property and Intellectual Property and the Internet; Patent Law & Litigation; Law of Lawyering (Professional Responsibility); Civil Lawsuits (Civil Procedure); Remedies; ADR (1 week pre-course).

Adjunct Professor of Law.  Law School at the University of Lausanne (Lausanne, Switzerland, Summer 2010).  Comparative Intellectual Property Law.

Adjunct Professor of Law.  Nankai University (Tianjin, China, Summer 2009).  Comparative Intellectual Property Law.

Visiting Professor of Law.  University of Houston Law Center (Houston, TX, Summers 2004, 2006, 2008).  Professional Responsibility.

Adjunct Professor of Law.  University of Texas School of Law (Austin, TX, 1998, 2000-02).  Litigation Ethics; Negotiation.

Adjunct Professor.  St. Edward's University Graduate School of Management (Austin, TX, 2001-02).  E-Commerce Law; Business Law and Ethics.

Adjunct Professor of Law.  University of Houston Law Center (Houston, TX, various years).  Legal Research and Writing.

**Legal Practice**

Of Counsel, Yetter & Warden, LLP (Houston, TX, 2001-02).

Representations included patent, trademark, antitrust, false advertising, legal malpractice defense, and ethics consultations.

Solo Practitioner (Austin, TX, 2000-01).

Consulted law firms and lawyers regarding conflicts of interest, risk management, and patent litigation and practice.

Partner, Slusser & Frost, LLP (1999-2000).

Representations included patent and complex commercial cases and civil appeals; Founding partner; General firm management.

Associate/Special Counsel, Baker Botts, LLP (1988-1999).

Worked with the trial, appellate, and intellectual property departments and served as in-house counsel.

**Other Professional Employment**

Various presentations to Fortune 100 corporations concerning ethical issues in in-house practice, including IP specific issues; various private presentations to small, medium, and large firms concerning ethical issues in intellectual property practice.

Expert witness in several malpractice and patent infringement arbitrations and suits involving alleged errors and conflicts in patent practice, inequitable conduct, and other issues, working with counsel who represented both plaintiffs and defendants. Testifying by deposition or at trial in the last four years in the following:

- *Dura Global Technologies, Inc. v. Magna Donnelly Corp.,* Civil Action No. 2:07-cv-10945 (E. D. Mich.).

- *Protostorm v. Antonelli, Terry, Stout & Kraus LLP et al* (Civ. A. No. 08 CIV 931 (NGG)(JO) E.D. N.Y. 2010).

- *Nolen et al v. Andrews Kurth et al* (Civ. A. No. MO-10-CA-8-HLH W.D. Tex. 2010).

- *Retractable Syringe v. Becton, Dickinson & Co.* (Civ. A. No. 2:07-CV-250 E.D. Tex. 2009)

- *Vaxxion v. Foley & Lardner* (3:2007cv00280 S.D. Cal. 2009).

- *Air Measurement Technologies v. Akin Gump* (Cause No. SA03CA0541 RF W.D. Tex. 2008).

Consult with law firms, AON, ALAS, Lloyds of London, and other insurance entities concerning conflicts of interest and risk management.

Lecturer for Kaplan Bar Preparation on Pennsylvania Ethics and Georgia Non-monetary Remedies (2010-11).

## Publications

### Books

ETHICAL ISSUES IN PATENT LITIGATION (Oxford University Press 2010).

ETHICAL ISSUES IN PATENT PROSECUTION (Oxford University Press 2009) (co-author with Mercedes Meyer) (2d ed. forthcoming).

MASTERING CIVIL PROCEDURE (Carolina Academic Press 2008) (2d ed. 2011).

MODERN STATUTORY INTERPRETATION: PROBLEMS, THEORIES, AND LAWYERING STRATEGIES (Carolina Academic Press 2006; 2d ed. 2009) (co-author with Professor Jellum).

TEACHERS MANUAL FOR MODERN STATUTORY INTERPRETATION (Carolina Academic Press 2006; 2d ed. 2009) (co-author with Professor Jellum).

PROPERTY: CASES, DOCUMENTS, AND LAWYERING STRATEGIES (Lexis/Nexis 2004; 2d ed. 2008; 3rd ed. forthcoming 2011) (co-author with Professors Crump & Caudill).

TEACHERS MANUAL FOR PROPERTY: CASES, DOCUMENTS, AND LAWYERING STRATEGIES (Lexis/Nexis 2004; 2d ed. 2008; 3rd ed. forthcoming, 2011) (co-author).

SUPPLEMENTS FOR PROPERTY: CASES, DOCUMENTS, AND LAWYERING STRATEGIES (co-author) (Lexis/Nexis 2005, 2006, 2007, 2009).

LAW SCHOOL BASICS (Nova Press, 1996, 2000).

INFORMATION SECURITY FOR LAWYERS AND LAW FIRMS (ex-officio editor) (Am. B. Ass'n. 2006).

### Articles

*Legal Ethics and Non-Practicing Entities: Being on the Receiving End Matters Too,* 27 Santa Clara J. of High Tech. 793 (Sept. 2011).

*What Experts can do for Your IP Case,* ABA Intell. Prop. L. Newsletter 6 (Fall 2011).

*Motions to Disqualify in Texas State and Federal Court* 74 Tex. B. J. 466 (June 2011) (co-authored with Jae Ellis).

*Tweet me Some Ethics*, 17 J. Nat'l. Ass'n. of Consumer Advocates 1 (Jan. 2011) (co-authored with Natasha Crispin and Prashant Patel).

*An Article we Wrote Ourselves to the Future: Early 21st Century Views on Ethics and the Internet,* 1 St. Mary's J. on Legal Malpractice 114 (2011) (co-authored with Natasha Crispin and Prashant Patel).

*Ethics and the Internet: It's a Funny Old New World*, The Practical Lawyer 21 (March 2011) (co-authored with Natasha Crispin and Prashant Patel).

*Congratulations on Your Hallucinations: Why the 1992 Amendment to Rule 1.56 is Irrelevant to Inequitable Conduct,* 38 Am. Intell. Prop. L. Q.J. 1 (2010) (co-author with Seth Trimble).

*Memoriam for Professor Ed Brewer,* 36 N. Ky. L. Rev. vii (2009).

*Infinite Combinations: Conflicts of Interest in Patent Litigation*, 26 Del. Lawyer 14 (2009).

*Remedies for the Infringer?* 20 ABA Intell. Prop. Litig. 11 (Summer 2009).

*"Metadata: Are You in Danger of an Ethics Violation,"* 13 ABA Young Lawyer 2 (June 2009)*,"* (co-authored with Chase Scott),

*An Update Current Client Conflicts of Interest*, 19 Intellectual Property Litigation 1 (Spring 2008).

*Some limits on Evidence Gathering in the Digital Age*, 25 GPSolo 24 (Dec. 2008) (co-author with student).

*Metadata: The Ghosts Haunting e-Documents*, 82 Fl. B.J. 32 (Oct. 2008) (co-author with student).

*Patents Compared to Trademarks: The Duty of Candor/The Avoidance of Fraud*, 97 Trademark Rep. 1317 (Dec. 2007) (co-author).

*Writing Matters: Common Comma Conundrums Part II*, 13 Ga. B.J. 64 (Apr. 2008) (co author).

*Metadata: Ethical Obligations of the Witting and Unwitting Recipient,* 13 Ga. B.J. 30 (Apr. 2008) (co-author).

*Metadata: Ghosts Haunting e-Documents*, 18 Ga. B.J. 16 (Feb. 2008) (co-author) (cover story).

*Writing Matters: Common Comma Conundrums*, 16 Ga. B.J. 64 (Feb. 2008) (co-author).

*Patent Agents: The Person You Are,* 20 Geo. J. Legal Ethics 261 (2007).

*Avoiding Conflicts from Client E-mails*, co-authored with second year law student Chase Scott, 11 No. 3. J. Internet Law (Sept. 2007).

*Patent Agents: The Person You Are*, 20 Geo. J. Legal Ethics 261 (2007).

*An Opinion of Counsel from Trial Counsel: A Handful of Sand?,* 35 Am. Intell. Prop. L.Q.J. 171 (Spring 2007).

*Patents and Trademarks: The Duty of Good Faith,* 89 J. Pat. & Trademark Off. Soc'y 287 (Apr. 2007) (co-author with Baker McKenzie partner Tamsen Valoir) (invited reprint).

*Mining for Embedded Data: Is it Ethical to Take Intentional Advantage of Other Peoples Failures*?, 8 N.C. J. L. & Tech. 231 (2007).

*Inadvertently Produced Privileged Documents under the New Federal Rules of Civil Procedure: You Ask for it Back, but Then What?* 12 Ga. B.J. 18 (June 2007).

*Writing Matters* (a regular column in the Georgia Bar Journal co-authored with Professor Sneddon began Feb. 2007 and continuing).

*Don't Settle Your License Away*, 69 Tex. B.J. 126 (Feb. 2006) (co-author with David Warden).

*The Speed of Normal: Conflicts, Competency, and Confidentiality in the Digital Age,* 10 Computer L. Rev. & Tech. J. 73 (2006).

*Lawyers Still Worry Too Much About Transmitting E-mail Over the Internet,* 10 J. Tech. L. & Pol'y 265 (2005) (invited symposium submission) (co-author).

*To Whom it May Concern: Using Disclaimers to Avoid Disqualification by Receipt of Unsolicited E-mail from Prospective Clients*, 16 Prof. Lawyer 1 (2005).

*I Can Tell When You're Telling Lies: Metadata in Litigation and Transactional Practice*, 16 J. Legal Prof. 79 (2006) (invited submission).

*Why There Should Be Fewer Articles Like This One: Law Professors Should Write More for Legal Decision-Makers and Less for Themselves,* 38 Suffolk U. L. Rev. 761 (2005) (co-author with Prof. Salzmann).

*The Ethical Responsibilities and Liability Risks Arising From Representing a Single Client in Multiple Patent-Related Representations: How Things Snowball,* 18 Geo. J. Legal Ethics 421 (Spring 2005).

*Arbitration Clauses for On-Going Relationships*, Jan/Feb Houston Lawyer (2005) (co-author with Shawn Bates).

*You're a Whole Different Person When You're Scared: Ethics on the Internet (Part I),* Law Computing Magazine (November 2004).

*Save a Little Room for Me: The Necessity of Naming as Inventors Practitioners Who Conceive of Claimed Subject Matter,* 5 Loyola L. & Tech. J. 1 (Spring 2005) (reprinted; co-author with two students).

*Infinite Combinations: Whether The Duty of Competency Requires Lawyers to Include Choice of Law Clauses in Contracts They Draft for Their Clients* 12 Willamette J. of Int'l L. & Disp. Res. 241 (Winter 2004).

*Reading Too Much Into Nothing: The Metaphor of Place and the Internet*, 55 Mercer L. Rev. 855 (2004).

*Save a Little Room for Me: The Necessity of Naming as Inventors Practitioners Who Conceive of Claimed Subject Matter,* 55 Mercer L. Rev. 635 (Spring 2004) (co-author with two students).

*The Transmission and Receipt of Invisible Confidential Information,* 8 ABA Consumer & Personal Rights Legislation Newsletter (Winter 2003/2004) (with Robert R. Jueneman).

*Trouble Waiting to Happen: Malpractice and Ethical Issues in Patent Prosecution*, 31 Am. Intell. Prop. L. Q.J. 387 (Fall 2003).

*The Use of Website Disclaimers Regarding the Obligation of Confidentiality for U.S. Law Firms* 4 World Internet Law Report 29 (Sept. 2003).

*The Truth Be Told? The Ethics of Using Undercover Testers and Investigators in Civil Litigation,* VIII ABA Section of Litigation Consumer & Personal Rights Litigation Newsletter (Summer 2003).

*In the New Digital World, Old-World Ethics Still Apply*, 4 World Internet Law Report 26 (May 2003).

*Troublesome Issues Facing Prosecuting Litigators and Their Firms,* 21 Intell. Prop. Newsletter 16 (Spring 2003).

*Wrong About Everything: Application by the District Courts of Federal Rule of Civil Procedure 9(b) to Inequitable Conduct,* 86 Marquette L. Rev. 895 (2003).

*Dragons Along the Information Superhighway,* 29 L. Pract. Mgmt. 24 (March 2003).

*Aerial Boundaries: The Duty of Candor as a Limitation on the Duty of Patent Practitioners to Advocate for Maximum Patent Coverage*, 44 So. Tex. L. Rev. 205 (Winter 2002).

*Hidden Dangers: ASPs and Ethics* Law Practice Management 32 (March 2002) (with Peter Krakaur).

*Life in Dark Waters: Ethical and Professional Responsibilities of Adjunct Law Professors,* 42 So. Tex. L. Rev. 379 (2001).

*Disparities in Legal Ethical Standards Between State and Federal Judicial Systems*, 13 Geo. J. Legal Ethics 577 (2000) (with Jae Ellis).

*Lawyer-Client Arbitration Agreements Require Care and Disclosure*, Tex. Lawyer 62 (June 19, 2000).

*The Risks and Responsibilities of Attorneys and Firms Prosecuting Patents for Different Clients in Related Technologies*, 8 Tex. Intel. Prop. L.J. 1 (2000).

*Lawyers Worry Too Much About Transmitting Client Confidences by Internet E- mail,* 11 Geo. J. Legal Ethics 459 (1998).

*Attorney Liability to Nonclients: Is Privity the Issue?,* 9 Professional Lawyer, 1 (1998).

*Professionalism in Intellectual Property Practice*, 16 Intell. Prop. 3 (1998).

*The 1998 Mass Tort Symposium: Legal Ethical Issues at the Cutting Edge of Substantive and Procedural Law*, 17 Rev. Litig. 419 (1998).

*Remedies of the Infringer: The Use by the Infringer of Implied and Common Law Federal Rights, State Law Claims, and Contract to Shift Liability for Infringement of Patents, Copyrights, and Trademarks*, 28 Tex. Tech. L. Rev. 1027 (1997).

*Reflections of a Trial Lawyer on the Symposium: Dialogue with the Devil in Me,* 38 So. Tex. L. Rev. 745 (1997).

*Uncertainty, Confusion, and Despair: The Impact of Legal Ethical Rules on Large Firm Practice*, 16 Rev. Litig. 705 (1997).

*Confidentiality and Privilege in High-Tech Communications*, 8 Prof. Law. 1 (1997).

*Confidentiality & Privilege in High-Tech Communications*, 60 Tex. B.J. 104 (1997).

*Trade Secrets: An Update on the Impact of State and Federal Efforts to Broaden the Public Right of Access to Court Records*, 23 Am. Intell. Prop. L. Ass'n. Q.J. 161 (1996) (with Tom Adolph and Jayme Partridge).

*Batson, J.E.B. and Purkett: A Step-by-Step-by-Step Guide to the Three Step Process of Making and Challenging Peremptory Challenges in Federal Court,* 37 So. Tex. L. Rev. 127 (1996) (with William Slusser and Matthew Eastus).

*Peremptory Challenges in Federal Intellectual Property Litigation,* 2 IP Litigator 1 (1996) (with William Slusser).

*Price Erosion as Factor in Damages*, 30 les Nouvelles 69 (June 1995) (with David Warden and Dudley Smith).

*The Allocation of the Risk of Infringement of Intellectual Property Rights Under Article 2 of the U.C.C.*, 20 Am. Intell. Prop. L. Ass'n. Q. J. 71 (1992).

## Blogs and Websites

www.legalethicsforum.com (co-blogger)

www.legalethics.com (blogger)

www.Hricik.com

## Chapters

*Combining Prosecution with Other Forms of Representation,* in DRAFTING PATENTS FOR LITIGATION AND LICENSING (ABA/BNA 2008) (updated 2009, 2010, 2011).

*The American Legal System*, in ARGUMENT AND PERSUASION: WRITING IN THE DISCIPLINES (University of Florida 2003).

*The American Legal System*, in Laurence Behrens & Leonard J. Rosen, WRITING AND READING ACROSS THE CURRICULUM (Addison Wesley Longman, Inc. 7th ed. 2000).

*Discovery,* in STATE CIVIL JUSTICE REFORM: PAST SUCCESSES, FUTURE CHALLENGES (National Legal Center for the Public Interest, 1994).

## Media Quotations

Op-Ed, Hold Lawyers Liable for Misconduct, National Law Journal (Aug. 2011).

"Seduced: For Lawyers, the Appeal of Social Media Is Obvious. It's Also Dangerous," ABA J. (Feb. 2011).

"'Metadata' mining vexes lawyers, bars," Nat'l L.J. (Jan. 2008).

"Malpractice Issue Poses Quandary for Qualcomm," IPLA 360 (Jan. 10, 2008).

"Patent Malpractice Suits a Growing Threat," IPLAW 360 (Nov. 14, 2007).

"Targeting Depo Tactics" (ABA Journal, Nov. 2006).

"Justices weigh key patent Issues (Nat'l L. J. Oct. 2, 2006).

"H-P Case Sends Chill Through Bar," 27 Nat'l L.J. 6 (Sept. 18, 2006).

"$2 Million Fee in 9/11 Case Draws Fire," 5 ABA J. E-REport 2 (Sept. 8, 2006).

"Ratings War," 5 ABA J. E-Report 1 (Aug. 4, 2006).

"Surfing for Lawyers," 5 ABA J. E-Report 4 (July 21, 2006).

"Attorney Coupon Offer Clipped," 5 ABA Journal E-Report 4 (Jan. 20, 2006).

"How to Avoid Losing Your Patent," 19 The Scientist 34 (Nov. 7, 2005).

"Practice News," 93 Ill. B.J. 498 (Oct. 2005).

"Don't Buy this Ad: Missouri to Require Disclaimer Telling Potential Clients to Look Deeper," Vol. 4, No. 40 E-Journal Report (Sept. 30, 2005).

"Midstate looks at first female justice's legacy," (Macon Telegraph, July 2, 2005).

"The National Pulse: Opinion Clarifies Ex Parte Contact: Not All of Opponent's Employees Must Be Reached Through Attorney, Ohio Says," ABA Journal E-Report (March 25, 2005).

"Should Lawyers Use E-mail to Communicate with Clients?," 92 Ill. B.J. 92 (Nov. 2004).

WMAZ (CBS, Macon, Georgia) (discussed the proposed amendments to the Georgia Constitution concerning same-sex marriage and certification of questions to the Georgia Supreme Court) (Nov. 1 & 2, 2004).

"Referendum question could change rules for Justices," Macon Telegraph 5B (Oct. 27, 2004) (discussing proposed amendment to permit certification of questions to the Georgia Supreme Court).

"With Client Consent, Retainer Pacts Can Compel Arbitration of Fee Fights/Court Sidesteps Issue of Whether Such Clauses Can Repel Malpractice Suits," New Jersey Law Journal (May 14, 2003).

"Do Not Read Unless You Agree to the Following….", 48 A.B.A. J. E-Report (Dec. 20, 2002).

**Service**

Master and Pupillage Group Leader, Atlanta Intellectual Property Inn of Court (2010-).

Member, Executive Committee of the Professional Responsibility Section of the American Association of Law Schools (2010-).

Board Member, Macon Symphony Orchestra (2007-09).

Member, Law School Policy Committee (2006-09).

Member, Law school Curriculum Committee (2008-11).

Coordinator, ADR Pre-course (2004-07).

Coach, American Trial Lawyers Association Mock Trial Team (2002-04).

Coach, American Intellectual Property Law Association Team (2007).

Coach, William Daniels Criminal Law Trial Team (2004-05).

Member, Mercer Law School Admissions Committee (2003-2004).

Member, Mercer Law School Distance Learning Committee (2002-) (Chair, 2005-).

Faculty Secretary (2005-07).

Co-Chair, Attorneys' Liability Subcommittee of Professional Liability Litigation Committee, ABA Section of Litigation (2009-10).

Co-Chair, Risk Management Subcommittee of the Professional Responsibility Committee of the ABA (2007-09).

Chair, American Intellectual Property Law Association Committee on Professionalism & Ethics (2005-2007).

Chair, ABA Committee on Professional Responsibility of the Intellectual Property Section (2002-03).

Vice-Chair, ABA Committee on Professional Responsibility of the Intellectual Property Section (2001-02).

Member, Professionalism & Ethics Committee of the American Intellectual Property Law Association (2003-06).

Master and Pupillage Group Leader, Richard Linn IP Inn of Court Atlanta (2011-)

Master, Augustus Bootle Inn of Court (2003-2010).

Member, Editorial Board, Computer Assisted Learning Institute (2002-08).

Member, ABA Subcommittee on Corporate Aspects of Information Technology of the Committee on Cyberspace Law (2001-).

Advisory Board Member and Instructor, Cleonline.com (1998-).

Member, Texas Disciplinary Rules of Professional Conduct Committee of the Texas State Bar, 1997-2002. Member, drafting subcommittee 1999-2002. Member of the special joint subcommittee that drafted the Texas advertising rules regulating the Internet.

Member, Texas Appellate Lawyer's Creed Drafting Committee (1998).

Member, Editorial Review Board *Jurimetrics* (1997-2000).

Chair, Amicus Brief Committee of the Houston Intellectual Property Law Association (1995-96).

## Public Proceedings, Seminars, and Symposia

*Professionalism in Intellectual Property Practice,* Corporate Counsel Institute (Georgia State University School of Law, Nov. 2011).

*Is Your Patent Counsel Acting Unethically?* (Int'l Performance Management Institute, Palm Springs, CA Nov. 2011).

*Ethics in Patent Practice* (Univ. of Texas School of Law CLE, Austin, TX Oct. 2011).

*Ethics in Patent Practice* (Univ. of Las Vegas School of Law, Oct. 2011).

*Will* TheraSense *Ease Administrative Burden of Complex Domestic and International Patent Prosecution?,* 2011 High Technology Summit (Center for Advanced Study & Research on Intellectual Property, University of Washington School of Law, Seattle, WA July 2011).

*Texas Disciplinary Rules that Affect Patent Litigators,* (7th Annual Advanced Patent Litigation Course, San Antonio, TX, July 2011).

*How to Have Fewer Clients and Make More Money* (Dunlap Codding Lecture in IP Ethics for the Oklahoma Intellectual Bar Association Annual Meeting, Dallas, TX, June 2011).

*How to Have Fewer Clients and Make More Money* (9th Annual Rocky Mountain Intellectual Property Law Association Annual Meeting, Denver, CO, June 2011).

Ethics and Confidentiality in the Digital World (Webcast for The Professional Education Broadcast Network with Lucian Pera and Bill Freivogel on May 3, 2011).

*How to Have Fewer Clients and Make More Money* (John Marshall School of Law, Chicago, IL, Apr. 28, 2011).

*How to Have Fewer Clients and Make More Money* (Florida Intellectual Property Law Ass'n, Ft. Lauderdale, Florida Apr. 20, 2011).

Ethics in IP, (Seattle Biosimilars Conference with Mr. Don Ware of Foley Hoag and Ms. Irene Pleasure of Genentech, Apr. 2011).

Panelist, (Seattle Biosimilars Conference with Ms. Barbara Fiacco of Foley Hoag, Apr. 2011).

*How to Have Fewer Clients and Make More Money,* (University of Texas Intellectual Property Law Journal Symposium, Austin, TX March 2011).

*How to Have Fewer Clients and Make More Money* (Texas St. B. CLE Conference, Dallas, TX, March 2011).

*Ethics and Social Media*, (St. Mary's Law School Legal Malpractice Symposium, San Antonio Texas, March 2011).

Panelist, *Ethics and IP* (Am. Intell. Prop. L. Ass'n. Spring Meeting, Orlando, FLA) (January 2011, telephonic).

*Ethics and IP,* (Federal Circuit visit to Atlanta, November 2010).

*Corporate Counsel Fees and Professionalism* (Ga. Corp. Counsel Ass'n., Fall 2010).

*Ethics and IP* (Iowa Intellectual Property Law Ass'n., Des Moines, IA, Fall 2010).

*Ethics* (Ass'n of Legal Administrators, Chicago, IL Fall 2010).

*Ethics and IP* (Widener University School of Law/DuPont Fall 2010).

*An Ethical Lawyer Meets the Internet,* a series of five two-hour talks to roughly 1,400 lawyers in Providence, Bristol, and Kingston Rhode Island on ethics and the Internet.

*An Ethical IP Lawyer Meets the Internet,* Virginia State Bar Intellectual Property Law Section Annual Meeting (Williamsburg, VA October 2, 2010).

*Ethical Issues in Intellectual Property Practice*, Widener University School of Law Annual Intellectual Property CLE (Wilmington, DE Sept. 21, 2010).

*How Ethics Rules Prevent Compliance with Rules 11 and 9(b) and Iqbal,* 8th Annual Rocky Mountain IP Institute (Denver, CO June 2010).

*Swindling the Bald: Ethical Issues in Patent Practice,* Kansas State Bar Association Annual IP Institute (Overland Park, KS, May 2010).

Panelist, *Ethical Issues in Patent Practice* (ABA IP Section Annual Meeting (Alexandria, VA, April 2010).

*How Ethics Rules Prevent Compliance with Rules 11 and 9(b) and Iqbal,* Franklin Pierce Law Center, (Concord, NH, April 2010).

*How Ethics Rules Prevent Compliance with Rules 11 and 9(b) and Iqbal,* Washington in the West (UCLA Law School, Los Angeles, April 2010).

*Statutory Interpretation and the Model Rules*, Georgia State University School of Law Faculty Presentation (Atlanta, GA March 2010).

*How Ethics Rules Prevent Compliance with Rules 11 and 9(b) and Iqbal,* Washington State Intellectual Property Law Association Annual Meeting (Seattle, WA, March 2010).

*Luncheon presentation entitled How Ethics Rules Prevent Compliance with Rules 11 and 9(b) and Iqbal,* 2010 State Bar of Texas Advanced Intellectual Property Law Symposium (Austin, TX March 4, 2010).

*Luncheon panel on inequitable conduct,* 2010 State Bar of Texas Advanced Intellectual Property Law Symposium (Austin, TX March 4, 2010).

*How Ethics Rules Prevent Compliance with Rules 11 and 9(b) and Iqbal,* Iowa Bar Association Federal Practice Section (Des Moines, IA, Dec. 2009).

*About Ten Issues Facing Patent Practitioners*, University of Texas Advanced Patent Law Institute (Austin, TX, Oct. 30, 2009).

Panelist, AON Large Firm Symposium (San Francisco, CA Oct. 2009).

*Do Ethics Preclude Adequate Pre-suit Investigation in Patent Cases?*, Iowa Intellectual Property Law Association Annual Meeting (Riverside, Iowa, October 2009).

*Professionalism in IP Litigation,* Corporate Counsel Institute Annual Meeting (Atlanta, GA, November 3, 2009).

*Swindling the Bald: How to Avoid Taking a Haircut While Representing Clients,* at the annual meeting of the Association of Patent Law Firms (Chicago, IL September 17, 2009).

*Ethical Issues in IP Practice*, 19th Annual All Ohio Annual Institute on Intellectual Property (Cleveland, Ohio, September 15, 2009).

*Ethical Issues in IP Practice*, 19th Annual All Ohio Annual Institute on Intellectual Property (Covington, Kentucky (September 16, 2009).

*How Much of the Real Estate Transaction to Teach in First Year Property*, (SEALS Annual Meeting, Palm Beach, FLA, Aug. 8, 2009).

Panelist, *Ethical Issues in Patent Prosecution and Litigation*, Annual Bench/Bar Conference of the Federal Circuit (West Virginia, June 2009).

*Is Inequitable Conduct Becoming Inequitable?* American Intellectual Property Law Association Meeting (San Diego, CA, May 2009).

Panelist, *Ethics in Cyberspace*, International Trademark Association Annual Meeting (Seattle, WA, May 2009).

Panelist, *New Defenses and Attacks in Patent Practice*, AIPLA Annual Meeting, San Diego, CA (May 2009).

Panelist, *Ethical Issues in Patent Prosecution and Litigation* (with two practitioners at the SpringPosium Annual Meeting of the Georgia Intellectual Property Law Association, Adairsville, GA May 2009).

*Swindling the Bald* (Dinner presentation at the joint meeting of the Washington and Oregon Intellectual Property Law Associations) (Woodinville, WA, May 2009).

*Oops I Did it Again! What Britney Spears can teach us about ethical issues in technology (*facilitated luncheon discussion at ABA Section of Litigation annual meeting, section of professional liability litigation, Atlanta, GA May 2009).

*Creative Ways to Teach Civil Procedure* (SEALS Summer 2008).

*Ethical issues arising from metadata* (National Association of Legal Professionals (Feb. 2008).

Teleconference on ethical issues arising from technology (Virginia Bar Association February 27, 2009).

*Docketing and Risk Management in Patent Prosecution* (ARMA International annual meeting, Las Vegas, Nevada Oct. 2008).

*Professionalism in Trademark and Patent Practice* at Georgia State University's Corporate IP Institute in Atlanta, Georgia (Oct. 2008).

*Ethical Issues in Patent Prosecution* at the University of Texas School of Laws Advanced Patent Law Institute in Austin, Texas (Oct. 2008).

*Conflicts of Interest in Patent Practice* (Minneapolis Intellectual Property Law Association in Minneapolis, Minnesota, Oct. 2008).

*High Stakes Liability Exposure: IP Based Claim*" (Boston at the Spring 2008 National Legal Malpractice Conference, hosted by the ABA Standing Committee on Lawyers Professional Responsibility).

*Liability and Conflicts in Patent Practice*, Philadelphia Intellectual Property Law Association on liability (Spring 2008).

*Ethical Issues in Intellectual Property Practice* (6th Annual Rocky Mountain Intellectual Property & Technology Institute in Denver, CO. June 2008).

*Conflicts of Interest in Patent Litigation* at the George Mason University School of Law 7th Annual Symposium on Hot Topics in Patent Law (Alexandria, VA, July 2008).

*Technology and Conflicts in Business Practice*, Virginia Business Law Annual Meeting (Charlottesville, VA, Feb. 2008).

*Prosecution Ethics,* Toledo IP Association (Dec. 6, 2007).

*Technology Ethics*, Small & Solo Section of Atlanta Bar Ass'n.,  (Dec. 4, 2007).

*Conflicts in Patent and Trademark Practice*, Colorado Bar Association IP Section (Nov. 2007).

*Technology Ethics,* Virginia Bar Association Annual Conference for Information Technology Lawyers (Sept. 29, 2007).

*Current Client Conflicts & Liability in Patent Practice*, Iowa Intellectual Property Law Association Annual Conference (Oct. 6, 2007)

*Protecting Your Clients, Yourself, and Your Business* (Roger Williams School of Law, RI, August 9, 2007).

*Ethics in Patent Practice for Patent Agents*, National Association of Patent Practitioners (Las Vegas, NV, July 9, 2007).

*Conflicts of Interest in Patent Practice* (AIPLA, Portland, OR June 21, 2007).

*Conflicts of Interest in Patent Practice* (AIPLA, Minneapolis, MN June 14, 2007).

*Conflicts of Interest in Patent Practice* (AIPLA, Washington, DC June 7, 2007).

*Ethical Issues in Trademark Practice* (Panel) (International Trademark Association Annual Meeting, Chicago, IL Apr. 30, 2007).

*Managing the Expert Witness -- An Advanced Discussion* (Panel) (ABA National Legal Malpractice Conference, Washington, DC April 26, 2007).

*Concurrent Conflicts in Patent Practice* (Georgia SpringPosium Intellectual Property CLE Symposium, Atlanta, GA Apr 12. 2007).

Two panels at the American Bar Association's 2007 TechShow meeting in Chicago, Illinois (March 26, 2007).

*Ethical Issues in Opinions of Counsel and in Working with Patent Agents* (March 2, 2007 Dallas, TX 20th Annual State Bar of Texas Intellectual Property Course).

*Ethics and Patent Agents* (telephonic presentation by to 3M employees in Minnesota and Texas (Macon, GA Feb. 9, 2007).

*Metadata* (Macon, GA Feb. 7, 2007 Middle Georgia Trial Lawyers Association).

Panelist, *Ethics in Office Management* (Chicago Bar Ass'n, Jan. 13, 2007).

Webcast, *Navigating Conflicts of Interest in Patent Prosecution* (American Intellectual Property Law Association Dec. 8, 2006).

*Ethics Update*, Mercer Continuing Legal Education (Dec. 8, 2006).

Moderator, panel on ethical issues in patent prosecution and panel member addressing ethical issues in intellectual property litigation (Loyola Los Angeles Law School Nov. 17, 2006).

Webcast, *Ethical Issues Concerning Patent Agents* (American Intellectual Property Law Association Nov. 10, 2006).

Panelist along with Judge Sharon Prost of the United States Court of Appeals for the Federal Circuit, and Judge Kent A. Jordan of the United States District Court for the District of Delaware at a plenary session of the Annual Meeting of the American Intellectual Property Law Association in Washington D.C. (Oct. 19, 2006)

*Ethical Issues Facing Patent Agents* (AIPLA Annual Meeting, Washington, D.C. Oct. 19, 2006).

*Ghosts in the Machine* Symposium (University of North Carolina School of Law Symposium Oct. 13, 2006).

*Issues Facing Information Technology Lawyers* (6th Annual Virginia Information Technology Legal Institute, Fairfax, VA, Sept. 29, 2006).

*Patent Subject Matter Conflicts* (University of Florida School of Law, Sept. 15, 2006).

*Death, Disaster and Other More Common Ethics Issues* (Rhode Island, Aug. & Sept. 2006).

*Ethical Issues in IP Practice* (Houston & San Jose CA June 2006).

*Ethical Issues in the Online Delivery of Legal Services* (ABA National Conference on Professional Responsibility (Panelist) (Vancouver, Canada June 2006 at the 32nd Nat'l Conference on Professional Responsibility).

*Blawg Ethics* (San Francisco, CA Blog Law & Blogging for Lawyers Conference (April 21, 2006).

*Ethical Issues in Patent Prosecution and Trademark and Copyright Practice*, 11th Annual Intellectual Property Institute, Washington State Intellectual Property Law Association (Seattle, WA March 24, 2006).

*Prosecution Bars and Other Issues Associated with Combining Other Forms of Representation with Prosecution*, University of Akron School of Law 8th Annual Richard C. Sughrue Symposium on Intellectual Property Law and Policy (Akron, OH March 6, 2006).

Panelist, *Ethical Traps to Avoid When Developing Business: Online and Off*, 19th Annual Intellectual Property Law Course, State Bar of Texas (San Antonio, TX March 3, 2006).

Panelist, *Intellectual Property Ethics & Professionalism Issues*, Institute of Continuing Legal Education in Georgia (Atlanta, GA Feb. 22, 2006).

*Intellectual Property Ethyx*, American Intellectual Property Law Association Spring Meeting (moderator/host for interactive ethical game show on IP issues) (Feb. 4, 2006, Palm Springs, CA).

*Using Technology Solutions to Minimize Legal Malpractice* at the National Forum on LPL/Legal Malpractice (Jan. 20, 2006, Miami Beach, FL).

*Ethics and Experts Witnesses in Civil Litigation* (Iowa State Bar Association Federal Practice Committee, Dec. 2, 2005, Des Moines, IA).

*Ethical Issues from Combining Litigation with Prosecution* (Intellectual Property Owners' Association Annual PTO Day Meeting, Dec. 2005 Washington, D.C.).

*Ethical Issues in Entertainment and Intellectual Property Practices*, 17th Annual Entertainment Law & Intellectual Property Law Meeting (San Juan, Puerto Rico Nov. 2005) (panel).

*Ethical Issues Arising From Combining Litigation with Prosecution* (American Intellectual Property Law Association Annual Meeting, Oct. 29, 2005, Washington D.C.).

Ethics in the Digital Age (Rhode Island Bar Association, various locations and dates, August & September 2005).

*Why Law Professors Should Write More For Legal Decision-Makers and Less for Themselves* (Southeastern Association of Law Schools Annual Meeting, Hilton Head, SC July 17, 2005).

*Ethical Issues in Patent Prosecution and Litigation* (Va. St. B. Ass'n. Meeting, Alexandria, VA May 5, 2005).

*Ethical Issues in Patent Prosecution and Litigation* (Joint Meeting of the Washington State Patent Law Association & Oregon Patent Law Association, Stevenson, WA, Apr. 22, 2005).

*Conflicts of Interest and Ethics for Intellectual Property Lawyers in the post-Enron Era* (ABA's 20th Annual Intellectual Property Law Conference, Arlington, VA., April 2005).

*USPTO Ethics* (North Carolina Intellectual Property Law Section Annual Meeting (Charlotte, N.C., April 2005).

*Ethical Issues in Patent Practice* (telephonic presentation to the Sunnyvale, CA Sci3 Group, March 2005).

*Negligent Misrepresentation Under Section 552 and the Economic Loss Doctrine: The Same Thing Twice*? (Stetson University School of Law faculty colloquy exchange, Feb. 21, 2005).

*Ethical and Malpractice Issues in Intellectual Property Practice* (American Intellectual Property Law Association web-based presentation, Dec., 2004).

*The Expansion of Inequitable Conduct Law*, 9th Annual University of Texas School of Law Advanced Patent Law Institute (Austin, TX, Oct. 2004).

*The Expansion of Inequitable Conduct Law*, 4th Annual Dallas-Fort Worth Intellectual Property Law Seminar (Dallas, TX, Oct. 2004).

*Negligent Misrepresentation and Restatement (Torts) Section 552: The Same Thing Twice*?, Southeastern Association of Law Schools Annual Meeting (Kiawah Island, SC, July 30, 2004).

*Conflicts of Interest Problems for Patent Attorneys*, Third Annual George Mason University School of Law Symposium on Hot Topics in Patent Law (Arlington, VA, July 2004).

*The Duty of Candor in Patent Prosecution*, Texas State Bar Association Annual Meeting (San Antonio, TX June 2004).

Moderator, *Computer & Digital Data Security Issues* (Suffolk University School of Law Advanced Legal Studies Boston, MA, June 2004).

*Ethical Issues in Patent Prosecution & Litigation and Update on the New USPTO Lawyer Conduct Rules*, Boston Intellectual Property Law Association (Boston, MA June 2004).

*Ethics & Ex Parte Contacts*, Bootle Inns of Court (Macon, GA Apr. 2004).

*Swindling the Bald: Ethical Issues in Patent Prosecution and Litigation*, Annual Symposium of the University of Texas Journal of Intellectual Property Law (Austin, TX, Jan. 2004).

Panel Member, *Avoidance of Choice-of-Law Conflicts*, a section program at the 2004 Annual Meeting of the Association of American Law Schools (Atlanta, GA Jan. 2004).

Dinner Speaker and Faculty Organizer, Annual Mercer Law Review Symposium (on the Internet as property) (Macon, Oct., 2003).

*Ethics in Intellectual Property Practice and Litigation*, Washington State Patent Law Association (Seattle, WA Nov. 2003).

*Malpractice Checklist for Patent Law Practitioners*, University of Texas School of Law Advanced Patent Law Conference (Austin, TX Oct. 2003).

*Ethics in Intellectual Property Practice and Litigation*, Iowa Intellectual Property Law Association (Des Moines, IA Sept. 2003).

*Ethics in Intellectual Property Practice and Litigation*, Dallas-Fort Worth Intellectual Property Law Association (Dallas, TX Sept. 2003).

*Confidentiality and Privilege in High-Tech Communications*, Middle Georgia Bankruptcy Institute (Macon, GA 2003).

*Satisfying the Duty of Candor, United States Patent & Trademark Office* (Am. Intell. Prop. L. Ass'n, Arlington, VA 2003).

*The Ethical Risks of Prosecuting Patents for Different Clients in Related Technologies*, George Mason University School of Law Second Annual Symposium on Hot Topics in Patent Law (Arlington VA 2003).

*Ethics Issues in IP Practice and Litigation*, American Intellectual Property Law Association Annual Meeting (Atlanta, GA 2003).

*Ethical Issues in High Technology*, World Computer Law Association (Washington, D.C. 2003).

*Legal Ethics for Trademark Practitioners*, 18th Annual ABA Intellectual Property Law Conference (Washington, D.C. 2003).

*Should You Do It, Can You Do It: Multi-Representation for Single Client (opinion letters, patent prosecution, litigation),* State Bar of Texas Intellectual Property Association Annual Meeting (Austin TX 2003).

*A Malpractice Checklist for Advanced Patent Practitioners*, Seventh Annual University of Texas School of Law Advanced Patent Law Institute (Austin TX 2002).

*Satisfying the Duty of Candor*, 2002 American Intellectual Property Law Association Patent Prosecution Basic Training Seminar (Crystal City, VA 2002).

*Oops! I did it again!,* a panel discussion on ethical and malpractice issues arising from high technology, 2002 ABA Annual Meeting. (Washington, D.C. 2002).

*Basic Technology Ethics: What Do You Need to Know*?, ABA TechShow 2002 (Chicago IL 2002).

*The Problem with Being Everywhere: Conflicts of Interest and the Unauthorized Practice of Law in the Internet Age*, ABA TechShow 2002 (Chicago IL 2002).

*Five Ethical Issues Facing Patent Practitioners That No One Wants to Talk About*, University of Texas School of Law Intellectual Property Law Association Annual Symposium (Austin, TX 2002).

*Patterns of Conflicts of Interest*, 17th Annual Houston Intellectual Property Law Association Institute on Intellectual Property Law (Galveston, TX 2001).

*Ethical Issues in Patent Prosecution*, American Intellectual Property Law Association Patent Prosecution Basic Training (Crystal City, VA 2001).

*The ABCs of Negotiating Application Service Provider Agreements*, ABA Section of Business Law 2001 Spring Meeting (Philadelphia, PA 2001).

*Ethics: Liability Risks for Law Firms,* 14th Annual University of Texas School of Law Computer Law Conference (Austin, TX 2001).

*Ethics 2000 and Beyond*, Land Use Planning Law, University of Texas School of Law 5th Annual Land Use Planning Law Seminar (Austin, TX 2001).

*Ethical Considerations and Malpractice Prevention in Litigation, Litigation and Trial Tactics*, Houston Law Foundation (Houston & Dallas, TX 2000).

*Ethical Issues in Patent Practice, Intellectual Property Litigation in the 21st Century*, Tex. Intellectual Property Law Journal & Texas Intellectual Property Law Society (Austin, TX 2000).

*Ethical Issues in Intellectual Property Litigation*, Annual Meeting of the ABA Intellectual Property Law Section (Washington, D.C. 1999).

*Ethical Considerations and Pit-Falls of High-Tech Communications Between Counsel and Clients*, 1999 Spring Meeting of the ABA Section of Business Law (San Francisco, CA 1999).

*Selected Ethics, Liability and Malpractice Issues Facing Computer Lawyers*, University of Texas School of Law 12th Annual Computer Law Conference (Austin, TX 1999).

*Ethical and Malpractice Issues in Your Cross-Border Practice: It's A Big, Bad, and Largely Unexplored World Out There,* International Law Section of the Dallas Bar Association Annual Symposium (Dallas, TX 1999).

*Experts on Board: An Overview of Ethical Issues Arising in Connection with Using Experts in Litigation*, South Texas College of Law (Houston, TX 1999).

*Ethics and Communicating by Cordless Phones, Cellular Phones, and Computers*, Houston Bar Association Employment Law Section (Houston, TX 1999).

*Selected Ethical Issues in Licensing,* Practicing Law Institute (Dallas, TX 1998).

*Uncertainty, Confusion, and Despair: Ethics and Large-Firm Practice in Texas,* University of Texas Review of Litigation (Austin, TX 1998).

*Selected Ethical Issues*, Heart of America Biotechnology Conference (Minneapolis, MN 1998).

*Ethics and the Practice of Intellectual Property Law*, Houston Intellectual Property Law Annual Meeting (Galveston, TX 1997).

*Ethics in Patent Litigation*, University of Texas 2nd Annual Advanced Patent Law Institute (Austin, TX 1997).

*How to Become a Defendant in an IP Malpractice Suit (or Not?),* State Bar of Texas Intellectual Property Law Institute (San Antonio, TX 1996).

*Selected Issues Concerning Malpractice, Ethics, Professionalism, and the Practice of Intellectual Property Law*, Minnesota Intellectual Property Law Association (Minneapolis, MN 1996).

*Selected Legal Ethical Issues*, Attorney's Liability Assurance Society Symposium (Houston, TX 1996).

*Ethical Pitfalls of Daily Intellectual Property Practice*, Houston Intellectual Property Law Annual Meeting (Galveston, TX 1995).