UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


| | | |
|---|---|---|
| PARKERVISION, INC., | ) | Jacksonville, Florida |
| | ) | |
| Plaintiff, | ) | Case No. 3:11-cv-719-37TEM |
| | ) | |
| -vs- | ) | December 14, 2011 |
| | ) | |
| QUALCOMM INCORPORATED, | ) | 3:00 p.m. |
| | ) | |
| Defendant. | ) | Courtroom 12C |
| _____ | ) | |


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROY B. DALTON, JR.
UNITED STATES DISTRICT JUDGE




OFFICIAL COURT REPORTER:

        Scott N. Gamertsfelder, RMR
        300 N. Hogan Street, Suite 9-150
        Jacksonville, FL 32202
        Telephone: (904) 301-6843


                    (Proceedings reported by stenography;
                        Transcript produced by computer.)

PLAINTIFF and COUNTER DEFENDANT PARKERVISION COUNSEL:

**Douglas Aaron Cawley, Esq.**
McKool Smith, PC
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4000

**Stephen D. Busey, Esq.**
Smith, Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202
(904) 359-7700

DEFENDANT and COUNTER PLAINTIFF QUALCOMM:

**David Greenwald, Esq.**
**John Andrew DeVault III, Esq.**
**Joseph Everett Lasher, Esq.**
**Keith R. Hummel, Esq.**
Cravath, Swaine & Moore, LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

COUNTER DEFENDANT STERNE, KESSLER, GOLDSTEIN & FOX, PLLC:

**David M. Wells, Esq.**
**David R. Atkinson, Esq.**
Gunster, Yoakley & Stewart, PA
225 Water Street, Suite 1750
Jacksonville, FL 32202
(904) 354-1980

P R O C E E D I N G S

December 14, 2011                                      3:00 p.m.

- - -

COURT SECURITY OFFICER:  All rise.  This Court is now in session.

THE COURT:  Good afternoon.

Miss Flick, will you call the case, please, ma'am.

COURTROOM DEPUTY:  Case 3:11-cv-719, Parkervision versus Qualcomm.

Counsel, please state your appearance for the record.

MR. BUSEY:  Good afternoon, your Honor.  I'm Stephen Busey of Smith, Hulsey & Busey, here on behalf of Parkervision.

I have with me in the court today Doug Cawley of the law firm of McKool Smith of Dallas, Texas, who is our co-counsel and will take the lead in the argument today. He's been admitted pro hoc by Judge Morris.  I also have in the courtroom today Jeff Parker, who is the chief executive officer of Parkervision.

THE COURT:  Good afternoon, Mr. Parker.

MR. DeVAULT:  Your Honor, John DeVault on behalf of Qualcomm, the Defendant and Counterclaim Plaintiff.  I'm here with my co-counsel from Cravath, Keith Hummel, David Greenwald, Joe Lasher, all of whom have been admitted pro hoc before this Court.  Also present is Alex Rogers, Senior Vice President and legal counsel of Qualcomm.

1    MR. LASHER:  Good afternoon, your Honor.

2    THE COURT:  Thank you.

3    MR. WELLS:  Good afternoon, your Honor.  David Wells

4    of Gunster Yoakley, together with David Atkinson of my firm,

5    representing Sterne, Kessler, Goldstein & Fox today.  With us

6    is David Como, partner in the firm of Sterne Kessler.

7    THE COURT:  All right.  Welcome.  Thank you all.

8    We are here on the application for preliminary

9    injunction filed by the Defendant and Counterclaim Plaintiff

10   Qualcomm and Qualcomm's motion -- I don't have the docket

11   number handy, but I trust there is no confusion about the

12   matter that's before the Court this morning.

13   So with that, the Court has a number of questions,

14   but I think they are probably best held until I hear from the

15   parties with regard to their respective arguments.  So, counsel

16   for Qualcomm, would you like to lay out the issues for the

17   Court's resolution, and then we will take the parties

18   in seriatim afterwards and see where we are.

19   MR. HUMMEL:  Yes, your Honor.  Good afternoon.  Keith

20   Hummel, again, for Qualcomm.

21   You are right, your Honor, that we are here on

22   Qualcomm's motion for preliminary injunction essentially to

23   disqualify Sterne Kessler from providing legal advice and

24   assistance to Parkervision during the course of this

25   litigation.

1    This is a somewhat unusual motion in the sense that

2 at its core, it is a dispute over whether Sterne Kessler should

3 be disqualified from taking certain actions, but Sterne Kessler

4 has not appeared as counsel of record in this case, which

5 causes a number of problems which we will have to deal with as

6 we go through the motion.

7    Sterne Kessler is a defendant here, and they are a

8 defendant here because they had a long-standing relationship

9 with Qualcomm as their legal advisors; and at the same time

10 they had a long-standing relationship with Parkervision, and

11 for many, many years those two relationships existed in harmony

12 and there was no conflict between Parkervision and Qualcomm.

13    That all changed in July of this year when this

14 lawsuit was filed; and soon after the lawsuit was filed,

15 Qualcomm received a call from Michael Ray, who is the managing

16 director of Sterne Kessler, essentially saying that in light of

17 the lawsuit having been filed by Parkervision and given Sterne

18 Kessler's relationship with Parkervision, that they would like

19 to essentially withdraw from their representation of Qualcomm.

20    Mr. Rogers, when he received this call, suggested

21 that was not possible because Sterne Kessler was engaged in

22 ongoing work for Qualcomm and that there was a discussion which

23 Mr. Rogers expressed his concern that Sterne Kessler had not

24 done any work for Parkervision to allow Parkervision to file

25 the lawsuit against Qualcomm or do any such work in the future.

1    This was Qualcomm asking its lawyers at the time to

2    affirm that its lawyers were not going to act against it in the

3    future or had not acted against it in the past.  Rather than

4    receiving a response that said, of course we are not going to

5    do that, Qualcomm received the first of very many cagier, dodgy

6    responses to the question.

7    Rather than saying, no, we haven't provided

8    assistance in the past and we are not going to do so in the

9    future and we are not going to appear as counsel of record, we

10   had some very carefully worded responses, and those responses

11   were on the order of that we are not going to provide

12   assistance in the future; we are not representing -- I'll put

13   that in quotes because that goes to the heart of the matter

14   here -- Parkervision in this dispute; and that we lately have

15   been getting the response that we don't intend to assist

16   Parkervision in the future.

17   However, the big problem here is that Sterne Kessler

18   refused to answer the question, have you provided assistance in

19   the past that permitted Parkervision to file this lawsuit, and

20   do you unequivocally intend not to assist them in the future or

21   represent them in the future?

22   That's why we are here today, because faced with

23   these cagey responses, Qualcomm had really no other choice, it

24   felt, but to sue Sterne Kessler for breach of fiduciary duty

25   and for breach of contract.

They did that not lightly. It's not a good thing to sue lawyers; no one likes to do that. But in the situation in which we find ourselves now, Qualcomm felt it had no other choice. It seems perfectly plain from the papers now that Sterne Kessler provided some form of assistance to Parkervision in filing this lawsuit, and it appears from the way the papers have been written that that assistance came in the form of providing an infringement analysis.

I don't know how familiar your Honor is with patent cases, but a lot of due diligence goes into a patent litigation. Patent litigations start well before the filing of the complaint; and in a patent litigation, the first thing you have to do is find a product from a competitor that has what you think is going to be infringing your patent, and you've got to match up the patent with the product, and you have to determine whether there is infringement, and you have to do that by carefully analyzing claims in the patent.

Here we have seven patents at issue, and there are 423 claims. Someone had to go through all of those claims tying to figure out whether Qualcomm's products infringe or not in order for Parkervision to have a Rule 11 basis to file the complaint. We believe very strongly, based on circumstantial evidence and the refusal to deny, that that is what went on, that Sterne Kessler performed that analysis and that analysis -- performed that analysis against a current client of

theirs, Qualcomm, we believe very strongly is a breach of fiduciary duty and breach of loyalty and also breaches the engagement letters that Sterne Kessler signed with Qualcomm.

So with that introduction, your Honor, I would like to go through the analysis which shows that what Sterne Kessler did in performing this analysis is a breach of the ethical rules and a breach of fiduciary duty. That's No. 1.

No. 2, then the question is, well, if it's a breach, was there a waiver? I would like to show your Honor there was in fact no waiver of any such conflict. Then because we are in this unusual situation that Sterns Kessler has not appeared in this case, has acted, as we believe, behind the scenes, arguably Qualcomm has to go through the preliminary injunction four-part test to show it's entitled to injunction.

Oddly enough, if Sterne Kessler had appeared in this case your Honor could order disqualification virtually automatically without considering any four-part test and Qualcomm would not have to go through the burden of proving its entitlement to a preliminary injunction, but they haven't appeared. As we say, they have been acting behind the scenes.

THE COURT: They haven't appeared as counsel.

MR. HUMMEL: That's correct, they have not appeared as counsel. They are here as a party. This, again, is a very unusual situation, your Honor; but they are not here as counsel, but they are before you as a party.

1    My position, your Honor, would be that you would be
2  entitled to enjoin them or disqualify them based on a violation
3  of the ethical rules without having to go through the
4  preliminary injunction factors; but we clearly meet the
5  preliminary injunction factors, and so I think either way you
6  look at it, you have the power to issue the injunction that we
7  are seeking.
8    Now, Sterns Kessler in their opposition papers raised
9  a lot of objections to a blanket injunction, and we narrowed
10 our request for injunction quite a bit.  We submitted a revised
11 injunction for your Honor's consideration.  I would like to go
12 through that with you at some point and explain to you why
13 those particular protections are needed; but at the bottom,
14 what we are trying to do here is not in any way prevent Sterns
15 Kessler or Parkervision from defending themselves in this
16 litigation.  That's a complete red herring.  That's not what we
17 are trying to do.  They have every right to defend themselves
18 against the claims we brought against them.
19    What Sterns Kessler does not have a right to do under
20 the ethical rules, under common sense, under common courtesy is
21 to act contrary to Qualcomm's interests, because at the time
22 this lawsuit was filed and at the time they performed services
23 for Parkervision, we believe Qualcomm was still a current
24 client.
25    What's the applicable rule?  There is a lot of

back-and-forth in the papers whether Rule 4-1.7 or 4-1.9

applies, and 1.7 applies if at the time the adversity arose

between Parkervision and Qualcomm whether Sterns Kessler had

both firms as clients.  We believe that rule applies.  We

believe there is not even a close question.

THE COURT:  Is there a consensus that the Florida

rules of professional responsibility govern their dispute?

MR. HUMMEL:  I think that's the way the parties have

briefed this case, and I believe that there is consensus on

that view.

I know their professor was a little bit hesitant

about that, but everybody has treated the rules that apply as

the Florida rules.  I think we gave some analysis on why the

Florida rules should apply; but I think on these basic

principles, I'm not sure the rules are drastically different in

any jurisdiction in the U.S.  You can't represent one client

against another, while they are both clients, in an adverse

proceeding.  That's a basic tenet.

THE COURT:  Well, there may be -- I don't mean to

preempt your arguments, but it strikes me there may be some

consideration with respect to choice of law issues as it

relates to this overall question of substantial similarity, but

I'll let you all address those issues and then I'll follow up

with questions that I have because you'll probably answer them

in the course of your arguments.

1       MR. HUMMEL:  Your Honor, my strong view on this is,

2  you don't ever have to get to substantial similarity, and I'll

3  explain why.

4       Rule 1.7 indisputably prevents a law firm from

5  representing two clients when there is adversity between them.

6  There is no question it's indisputable that at the time this

7  complaint was filed -- so even if we take that as the measuring

8  stick here, at the time the complaint was filed in July of this

9  year, Qualcomm was a client of Sterns Kessler and Parkervision

10  was a client of Sterns Kessler.  There is no dispute about

11  that.  At the time they were both clients.

12       The only question is whether in performing tasks for

13  Parkervision behind the scenes and not appearing as counsel of

14  record, did Sterns Kessler violate the ethical rule 4-1.7; and

15  as I described before for your Honor, what we believe they did

16  was do an infringement analysis, figure out whether Qualcomm's

17  products allegedly infringed the patent in suit, and then that

18  forms the basis for the complaint that was filed against

19  Qualcomm.  You have to do that analysis in order to file the

20  complaint.

21       Sterns Kessler, reading the rule very narrowly,

22  focuses on the word "representation"; and the rule does say,

23  "Except as provided in subsection B, a lawyer shall not

24  represent a client if the representation of one client will be

25  directly adverse to another client."  So they focus in on

1  representation.

2      You'll see in the papers that what Sterns Kessler

3  tries to do is tab in the word "representation" into a very,

4  very narrow box; and they define representation as appearing in

5  court, which they indisputably have not done, and preparing the

6  complaint, which by extension, I guess they mean preparing

7  papers that are filed in court.

8      We all know based on common sense that representation

9  extends beyond filing papers in court and appearing in court.

10  If it were the case that those were the only things that

11  created representation, 90 percent of the lawyers who practice

12  in the United States would not be representing anybody and,

13  therefore, the ethical rules wouldn't apply.  So as a matter of

14  common sense, representation has to have a greater meaning than

15  that.

16      In fact, if you look at the authorities, the

17  authorities do support the proposition that representation is

18  more than being in court and filing papers.

19      It was surprising to me because we had to go hunt and

20  peck for those decisions, I think because it's such a basic

21  principle such as the sun is coming up in the morning and sets

22  in the evening, that representation -- when you consider

23  yourself to be representing a client, you are doing more than

24  standing up in court or filing papers.

25      There are cases we cited to you.  There is the *Hilton*

*versus Barnett Bank* case from the Middle District of Florida, I believe, and I'll read a quote from that case.

It says, "A firm is, per se, ineligible to participate in an action if it has concurrently represented adverse interests at any point during the action," and they use the word "participate." That means take any action. It doesn't necessarily mean appear in court or filing papers.

If that wasn't clear enough, the court in *Hilton versus Barnett* goes on to cite the case from New York called *Strategem versus Heron,* and the parenthetical that the Hilton court writes to describe Strategem is as follows:

"The law firm was, per se, ineligible to represent the plaintiff where the firm had not clearly terminated its representation of the defendant's wholly-owned subsidiary by the time preparation for litigation commenced on plaintiff's behalf."

Preparation for litigation by definition is prior to the complaint; and if you read the Strategem case itself, it is clear what was happening there and the conduct which was occurring created the conflict and, therefore, the representation was contemplating suing and doing some preparation for filing the complaint. These are the exact same activities we say Sterns Kessler was engaged in and created a representation, concurrent adverse representation in violation of 4-1.7A.

1    But Sterns Kessler also takes this view.  Before we

2    got into a dispute where Sterns Kessler involved its lawyers

3    and hired lawyers, Michael Ray, again, the managing partner, as

4    I understand it, director of Sterns Kessler, after his

5    conversation with Mr. Rogers, wrote to Qualcomm, wrote to

6    Mr. Rogers, and he said, "We further recognize that the terms

7    of the representation letters" -- and these are the letters

8    that Sterns Kessler now characterizes as waivers, waiver

9    letters -- we characterize them as engagement letters -- he

10   says, "We further recognize that the terms of the

11   representation letters do not provide consent for Sterns

12   Kessler to represent clients adverse to Qualcomm in litigation

13   if the firm is concurrently representing Qualcomm."

14   So there is the word represent, the same word that we

15   are going to be arguing about here.

16   The very next sentence in Mr. Ray's letter says the

17   following:

18   "Accordingly" -- so he's referring back to what he

19   knows he's not allowed to do -- "accordingly" -- and he

20   categorizes what Sterns Kessler is not going to do, i.e., what

21   constitutes representation.

22   "Accordingly, Sterns Kessler will not enter its

23   appearance or otherwise act as counsel for Parkervision in the

24   pending Florida matter or any related litigation between

25   Qualcomm and Parkervision.  We will not advise Parkervision or

1    its litigation counsel regarding the Florida matter or any

2    other litigation with Qualcomm."

3         He says these commitments will remain in place so

4    long as Qualcomm remains a firm client.  That gives us an

5    apprehension about what will happen in the future.

6         But he says, unequivocally, "We will not do any of

7    these tasks," and these tasks are far beyond appearing in court

8    and filing a complaint or other papers.  They understand,

9    Sterns Kessler, before they engage lawyers that they are not

10   allowed to do any of these activities that are behind the

11   scenes.

12        Qualcomm's own legal expert, legal ethics expert,

13   patent legal ethics expert, recognizes the same thing about

14   representation, despite what he says in his affidavit.  What he

15   says in his patent book, "Patent Ethics," which just came out

16   last year, he says, at Page 37 and 38, "A firm that cannot

17   represent the party opposing a current client in litigation

18   also cannot help some other firm do the same, trying to avoid

19   adversity solely by not making an appearance in court.

20        "Put the other way, if the firm would be disqualified

21   if it appeared in court, it can't avoid disqualification by

22   simply acting out of court."

23        All of these sources ought to end the dispute about

24   what representation means.  It means more than appearing in

25   court, and it means more than filing papers or drafting the

papers.

So if you apply rule 4-1.7A strictly, disqualification would be required of Sterns Kessler because they did have an adverse concurrent -- by their own admission -- concurrent representation that was adverse.

Then the question becomes, was there a waiver, because as we all know, you can waive ethics violations and you can waive situations that might breach your fiduciary duty otherwise, as we think this did.

So where do we look for a waiver? Was there informed consent? The plaintiff needs no informed consent when you see from the papers and affidavits, your Honor, that when Mr. Ray called Alex Rogers, Mr. Rogers did not give any consent to Sterns Kessler performing anything that was adverse to Qualcomm. In fact, he expressed concern that Sterns Kessler not do that in the future and not have done it in the past, and that was the reason why we got Mr. Ray's letter on August 25th of 2011 saying that they will not do anything to assist Parkervision, at least as long as they were still a Qualcomm client -- Qualcomm was a Sterns Kessler client.

There is no prior written waiver either. Written waiver is acceptable if there is informed consent and then there is a signature that's -- a signed waiver that's clear.

The engagement letters that are at issue here -- and the one perhaps we can look at, your Honor, is the first of the

1  engagement letters that the parties executed on April 15th of

2  2010.  That appears in Mr. Rogers' second affidavit as

3  Exhibit 2.  Actually appears in a number of different places;

4  and in that engagement letter, which was originally prepared by

5  Sterns Kessler, the original letter had a very, very broad

6  waiver and essentially let Sterns Kessler engage in litigation

7  opposite Qualcomm, concurrent litigation, as long as they

8  didn't act on the other side and as long as they didn't have

9  information in their possession which would have given them an

10  advantage.  So if there was a substantial relationship.

11       Qualcomm said, unequivocally, we do not want to give

12  you a waiver for litigation when you are currently a client.

13  We don't want you, our lawyers, representing someone else

14  against us in litigation; and so the engagement letter was

15  altered by adding the following at Qualcomm's behest:

16       "We understand this consent does not extend to

17  concurrent representation to clients adverse to Qualcomm in the

18  litigation concurrent with the firm's representation of

19  Qualcomm."

20       That was added by Qualcomm and carved out litigation.

21  The next sentence -- next paragraph begins "Based on the

22  foregoing, Qualcomm agrees that our representation to Qualcomm

23  will not disqualify our firm from opposing Qualcomm in other

24  matters"; and, critically, Qualcomm added the following

25  language:  "Except litigation concurrent with our

1   representation of Qualcomm."

2          So there is a carve-out for litigation.  Adverse

3   litigation was off limits.

4          Notably, when Mr. Ray had his conversations with

5   Mr. Rogers prior to the involvement of the Sterns Kessler's

6   lawyers, there was no mention of a waiver, no mention of any

7   analysis of the letter, engagement letters, that let Sterns

8   Kessler perform tasks adverse to Qualcomm.

9          The current interpretation by Sterns Kessler of the

10  waiver letter is that they are permitted to engage in

11  precomplaint infringement analysis under the rubric of what's

12  called patent analysis and opinions in the engagement letter.

13         There is absolutely no support for the proposition

14  that a patent analysis and opinions means that you can act in

15  litigation.  In other words, there is an explicit carve-out

16  for, no, you can't act in litigation.  So trying to read into

17  the language that says you can perform patent analysis and

18  opinions, which typically means defensive opinions against

19  someone's assertion against you -- when somebody is trying to

20  introduce a product into the market or is accused of

21  infringement, they often engage patent firms and give them an

22  opinion they don't infringe.

23         If you look at the structure of the letter itself --

24         THE COURT:  Is it your contention that is a term of

25  art that does not have any application to analysis of patent

1    infringement offensively?

2           MR. HUMMEL:  Absolutely.  That is absolutely the way

3    that Mr. Riley understood that, and there was no interpretation

4    of patent analysis and opinions being litigation related until

5    well after this dispute arose.

6           In fact, your Honor, if you look at the structure of

7    the Sterns Kessler waiver letter -- and I don't want to read it

8    all to you in the interest of time, but if you look at the

9    structure, there are four sentences of interest.  One is an

10   introduction of the concept of there being adversity between

11   the parties; and it basically says, we, Sterns Kessler, in the

12   future may find ourselves adverse to Qualcomm.

13          The second sentence says, "for example," and then it

14   lists, "We may represent present or future clients in IP

15   matters," intellectual property matters, "such as preparation

16   and prosecution of patent and trademark applications,

17   interferences, re-examination, opposition, patent analysis and

18   opinions, and legislative policy matters that may involve or

19   affect Qualcomm."

20          Those are all nonlitigation patents.  They are

21   intellectual property matters, but they are not litigation.

22   Sentence three does address litigation, and this was put in by

23   Sterns Kessler, and that provides a broad waiver that we may

24   also represent a present or future client in a future lawsuit

25   appeal or other interparties proceeding.  Interparties

proceeding actually is a term of art in the patent office that says it's a type of re-examination where two sides are battling it out; but that's addressed here where there is adversity with trial-like stuff, litigation-like stuff, it's addressed in this paragraph.

In this paragraph -- this sentence, I'm sorry -- this sentence, Sterns Kessler tried to get a broad waiver that is the waiver I described to you just moments ago that they could represent Qualcomm in any matter except where Sterns Kessler is representing Qualcomm in the same matter -- I'm sorry, this gets a little confusing -- or that Qualcomm would preclude -- the representation would be precluded because there is a violation of the applicable rules of professional conduct.

That was not acceptable to Qualcomm, so they added the fourth sentence, which is the litigation carve-out. "We understand that this consent does not extend to concurrent representation of clients adverse to Qualcomm in the litigation representation concurrent with the firm's representation of Qualcomm."

That is the most specific clause here, and it absolutely trumps any interpretation that patent analysis and opinions which appears in the nonlitigation sentence includes the ability to prepare an infringement analysis whose sole purpose is to provide a Rule 11 basis for filing of a complaint against Qualcomm.  That's not permitted.

So we have a clear breach of the ethical rules. We
have a clear breach of fiduciary duty, the duty of loyalty to
Qualcomm, we have injury to Qualcomm because an analysis is
being done to show they are infringing, and there is no waiver.

In light of this, an injunction is entirely
appropriate. Again, if Sterne Kessler were here before you as
counsel of record, you should disqualify them on the spot and
enter whatever order was necessary to protect Qualcomm in the
future.

Here, we have to go through, arguably -- I don't
think so -- but, arguably, the four-factor test here. I just
described for you the basis for our arguments on breach of
fiduciary duty and, arguably, breach of contract. We believe
we have a strong likelihood of success on the merits. If the
facts are as I described them, we win almost assuredly.

Irreparable harm. When there is concurrent
representation, irreparable harm is presumed because we don't
want lawyers suing their own clients. We don't have to go for
a search for information that's substantially similar or areas
that are substantially similar. We had that here, but we don't
need it. Sterns Kessler prosecuted 50 patents in the area of
radio frequency. Radio frequency is the general subject matter
of the patents that are asserted against them in this case.

THE COURT: You need more than that, don't you, if I
have to reach the substantial similarity argument? Just for

1  purposes of discussion, don't you need more than that?  In

2  fact, don't you need to show quite narrowly that the prior

3  representation was, for lack of a better term, virtually

4  identical to the representation that is currently the cause of

5  the discomfort?

6       MR. HUMMEL:  I don't think I have to prove they are

7  virtually identical.

8       THE COURT:  That's a poor choice of words by the

9  Court.  I apologize for it.  Certainly the examination is much

10 more narrow, you would agree?

11      MR. HUMMEL:  I do, your Honor, because there is an

12 examination, where there is no examination when you come to the

13 concurrent representation and when there is adversity.  Here's

14 a situation where we had a 10- or 12-year relationship,

15 depending on how you count the years.  We have a substantial

16 relationship between Sterns Kessler and Qualcomm.  They have

17 prosecuted -- I don't even know how many patents, but it's over

18 50 because we had 50 patents just in the area of radio

19 frequency, which is the subject matter of these patents.  We

20 have one prosecution by Sterns Kessler of a patent in the exact

21 same narrow field, direct down-conversions, which, your Honor,

22 we will talk a lot about this in the coming months; but the

23 technology here is direct down-conversion of a carrier signal

24 to a base band signal in your cell phone, so the waves that

25 come over the air go into your phone and have to be converted

into what you can hear, base band voice signal.

They prosecuted patents in the very area, and they have done other work for us, including in the area of opinions where they have gained a tremendous amount of Qualcomm confidential information.

All I can do at this point, your Honor, because I don't know precisely what Sterns Kessler did, I just know from the refusal to deny what we have asked them, that they did something, and it looks like it was an infringement analysis. I don't know what confidential information they used of Qualcomm's. I don't even know if they would know. That's the reason for the rules that say if you are concurrently representing someone, you can't do that, because we presume that there was irreparable harm and use of the confidential information.

So all I can do is tell you that they have a tremendous amount of information. It is in the same area, RF, radio frequency; and in one instance they prosecuted a patent for some period of time that was in the direct area that we have here, direct down-conversion of RF signals to base band signals. To me, that's enough.

But as I said, I don't think we need to get there because I don't think we get to the point of having to show a substantial relationship.

The harm to us for having Sterns Kessler continue --

1  Parkervision to continue to benefit from Sterns Kessler's

2  advice in any way is, of course, irreparable because it cannot

3  be undone at the end of the trial.  We don't want our lawyers

4  to give legal advice to our adversaries in the course of

5  litigation; but, again, we are talking about legal advice.  We

6  are not talking about assistance as they would normally give as

7  a fact witness, and that's important.

8          THE COURT:  We will come back to this because I would

9  like to hear, obviously, from other counsel, but one of the

10  questions I would like for you to ponder but not answer at the

11  moment is -- and we will come back to it -- maybe some of the

12  other lawyers will address it and then you'll have an

13  opportunity to come back and speak to it -- is that one of the

14  things that I puzzle over, confessing not to be a patent

15  lawyer, but nonetheless, able to appreciate the delicacies of

16  the representation issues here, and the concern that the Court

17  has is, if I were to be persuaded an injunctive relief was

18  appropriate, the concern about putting limitations on Sterne's

19  ability to defend itself and to work cooperatively with a

20  co-defendant, which would seem at first blush they would have

21  every right to do, to defend claims that are being brought

22  against them by Qualcomm to the extent that they had either a

23  strategic interest in working cooperatively with a co-defendant

24  or an interest that was merit-based in working in connection

25  with the co-defendant in marshaling a defense to the claims to

the extent there is any commonality to the claims. And I
confess that I'm not in any way an expert on things like
infringement and bad conduct with respect to the application to
the patent trademark office. Those are things that you all
will educate me on as we move through the process, but ponder
that, and we will come back to it.

MR. HUMMEL: I do have an answer, but I'll sit down.

THE COURT: Mr. Wells, probably it would be
appropriate, I guess, to take you next.

MR. WELLS: Yes, your Honor. Thank you.

If it please the Court, David Wells representing
Sterns, Kessler, Goldstein & Fox.

There simply is nothing to enjoin here. Sterne
Kessler is not representing Parkervision. It is not seeking to
represent Parkervision, has not, as alleged in the papers,
without any affidavit or evidentiary support, behind the scenes
secretly represented Parkervision over the four months from the
time the lawsuit was filed until that time that they withdraw.
There simply is no evidentiary basis whatsoever.

The detailed affidavit of Mr. Michael Ray at
Paragraph 5 makes it abundantly clear that Sterne Kessler has
done nothing since this lawsuit was filed. They did nothing
with respect to preparing the complaint, drafting the
complaint, putting the complaint together; and since the
lawsuit was filed, have done absolutely nothing to do anything

1  to advance the cause of Parkervision.

2          Their role, a role they didn't seek and don't

3  particularly appreciate, has been that of defendant.  What they

4  need to do in this lawsuit is to be able to act as a defendant

5  and to defend themselves.  They are not here in opposition to

6  this motion seeking to provide legal services to Parkervision,

7  which is the definition of representation, and indeed it would

8  be broader than simply filing an appearance in the lawsuit;

9  and, indeed, if they were secretly behind the scenes working

10  with Parkervision or Parkervision's counsel, that would be

11  inappropriate.  They are not doing that.

12          They have affirmed under penalty of perjury they are

13  not doing that.  There has been absolutely no evidence offered

14  that they are doing that.  It is impossible to meet the

15  standards of a preliminary injunction and show a substantial

16  likelihood of success on the record when there is no evidence

17  of a desire on Sterne Kessler's part to represent Parkervision

18  or any evidence that they have attempted to do so or are doing

19  so behind the scenes.

20          They will be, together with me and my co-counsel,

21  acting contrary to Qualcomm's interest as described by my

22  opponent because they do not believe -- they disagree

23  vehemently with any contention that they engaged in inequitable

24  conduct before the patent office, and they intend to do all

25  they can to defend and demonstrate that their efforts before

1   the patent office were ethical and appropriate.  That will be,

2   obviously, contrary to the interest of Qualcomm.

3           To do that, of necessity, they are going to need to

4   be able to communicate with their client of that time,

5   Parkervision, with the technical people, the intellectual

6   property whizzes who came up with this technology and came to

7   Sterne Kessler to have it prosecuted into a patent, the folks

8   that they worked with in terms of what to search for, what

9   prior art to use, how to describe that prior art, how to

10  explain that that prior art didn't do what this new art did.

11          They are going to need to do all of that, and by

12  definition that would be contrary to Qualcomm's interests, and

13  by definition it will be something more than pure facts.  How

14  does a patent lawyer who sat there and made informed legal

15  decisions as to how to describe prior art, how to explain that

16  that prior art didn't apply, that there were advances here

17  going to do it without using the legal side of his brain,

18  without using the same advocacy that he used back at that time?

19  How is that anything other than legal advice, albeit factual?

20  So to be precluded from that would be akin to tying their hands

21  and feet and throwing them in the pool and telling them to

22  swim.  It would be simply inappropriate.

23          I find it fascinating that the letter that Qualcomm

24  started this with is Mr. Ray's letter of August 25, 2011, and

25  what's happened?  It's long-time client has filed a patent

infringement lawsuit against its long-time client.  They are in
the horribly awkward position of one client suing another
client, and even worse because their named partner and founder
sits on the board of Parkervision.

So what does Mr. Ray do?  He politely and properly
contacts Qualcomm, points out the obvious discomfort, obvious
issue, offers to withdraw, whereupon he's told, no, we don't
want you to withdraw.  We want you as our lawyers.

Their August 16th letter speaks of this long-term
relationship that we have had; we would like you to continue;
please stay our lawyers.  He responds on August 25th.  He says,
we will stay your lawyers, and makes it very clear.  There is
no equivocation; there are no cagey words.  It couldn't be any
more black and white.

With respect to the litigation recently brought by
Parkervision against Qualcomm, we recognize that we have an
ongoing attorney-client relationship with both Parkervision and
Qualcomm.  We further recognize that the terms that are in the
representation letters don't provide us with the ability to
represent clients adverse to Qualcomm in litigation.

"Accordingly, Sterne Kessler will not enter its
appearance" -- they didn't stop there; it wasn't cagey -- "or
otherwise act as counsel for Parkervision in the pending
Florida matter" -- and they went further -- "or any related
litigation between Qualcomm and Parkervision."

1    They went even further.  "We will not advise

2  Parkervision or its litigation counsel regarding the Florida

3  matter or any other litigation with Qualcomm."

4    How much more clear and unequivocal could that be?

5  But he went further and said, "It's a matter of record we

6  prosecuted the patents-in-suit in the Florida matter.  Our

7  firm, therefore, may be called upon by either party in the

8  litigation to provide relevant documents, information, or

9  testimony regarding our past work on such patents.  We view

10  such a role to be consistent with our ethical obligations, and

11  indeed it is," and he left it sit there; and that's where it

12  would have sat but for the fact that Qualcomm chose to sue, in

13  a counterclaim, both Parkervision and Parkervision's attorneys,

14  Sterne Kessler, and the gravamen of that is not this breach of

15  duty that allegedly took place in 2011.  The gravamen of it,

16  the guts of it where they think their damages are is the claim

17  that these patents are invalid because they were perpetrated by

18  Sterne Kessler and Parkervision through some massive fraud upon

19  the patent office.

20    These are allegations that the Federal District Court

21  that deals with these patent matters day in and day out pointed

22  out are erroneous types of allegations when leveled against a

23  patent attorney.  It would be, if outside of the pleadings,

24  libel, per se, and slander, per se, because it goes right to

25  what they do as a living.  That's what changed things; but even

then, in writing on three separate occasions, Qualcomm and Qualcomm's counsel were advised that "While we will defend ourselves, we are not going to represent Parkervision in the litigation; we are not going to be providing legal services to them," and it went even farther. "We don't think that we have any confidential information that would bear" -- "your confidential information that would bear upon defending against inequitable conduct; but if that were to be the case, we would provide appropriate protections by advising you of that fact and seeking a protective order from the court."

And we even went so far as to provide a proposed protective order that would provide a mechanism for advance notice, if there was any type of confidential information that needed to be disclosed, and a provision for protection of that. In the event that the parties didn't agree, if Qualcomm didn't believe it to be relevant to the defense, the ability to come to the Court. They could not have acted any more properly. They could not have done anything more to avoid what we have here at this point in time.

So at the end of the day, we have nothing to enjoin. There is no representation. This isn't the *Hilton versus Barnett* case, which was my case, which one of the two times in my career I've moved to disqualify counsel.

In that case, the Battaglia Ross firm represented Barnett Bank of Pinellas County. They sued Barnett Bank of

Pinellas County.  We asked them to withdraw politely, and they would not do so.  So we had to ask the court for assistance, and the Court made them withdraw because they weren't entitled to represent Barnett Bank of Pinellas County in one matter and sue them in another matter.

That's not what's going on here; and I can assure the Court that if Mr. Battaglia had withdrawn and told me that's what he was doing, I wouldn't then have followed up with a motion for preliminary injunction, because I was worried somehow that he would secretly behind the scenes come back and represent that company.  I would have taken it at its face and moved on.

Here we are a defendant.  We have a right to defend. The conflict rules, frankly, don't apply because we are not here seeking representation of the Parkervision firm.  The only rule that applies is our obligation to protect confidences of Qualcomm.

Once we withdrew under Rule 4-1.16, we have every right to use those confidences if they apply and if they are relevant to what's going on.  We had to withdraw.  There is certainly no basis to suggest, as their expert has, that somehow we could have continued to represent Qualcomm in their patent matters, having been advised by Qualcomm that we breached fiduciary duties and we engaged in massive fraud upon the patent court.

It's very clear under Rule 4-1.16 that given that our ability to represent them was compromised, we had to withdraw because it would materially interfere with our ability to zealously represent them. Once that's the case, the only issue is confidential information. Rule 4-1.6C says we may use it. We may use it if in fact it becomes relevant. We scratched our heads about that and in the affidavits filed have said we don't think we will.

There is nothing that we would have learned from Qualcomm that would have had any kind of relationship to the patent work that was being done for Parkervision at that time and certainly wouldn't have any relationship to what we chose as prior art to put before the patent office and whether or not that was an appropriate decision, what to show and what not to show, and how to describe it. We don't think it's going to be this.

We said in our papers that we don't at this point in time see any basis to ever use it; and we have gone further to say that if that's the case, and consistent with Rule 4.16E, we will take all protections to limit it to only that which is absolutely necessary, provide prior notice, and then operate under a protective order entered by this Court which more than adequately protects the interest of Qualcomm and allows us to proceed forward with what we need to do.

So to wrap up and to leave plenty of time for my

co-counsel -- or actually Parkervision's counsel -- the
injunction should be denied, and I would go one step further.

One thing that concerns me, you could say -- or
everybody could say -- why not just enter an injunction?  Let's
just be careful here.  There is no basis for a prophylactic
injunction, I would submit, your Honor.  There is certainly no
factual legal basis in this record to indicate there is any
likelihood of success on the merits, any danger that somehow
Sterne Kessler is going to be in their representing
Parkervision.  It's not going to happen.  They have made it
very clear it's not going to happen, and there is no evidence
of it happening.  But there would be significant harm to Sterne
Kessler to enter such an injunction.

One of the standards you look at is the balancing of
harm against the record where there is no evidence that Sterne
Kessler has done anything to enter an injunction, which anybody
else looking at it will understand it requires a substantial
likelihood of success on the merits, irreparable harm, and is
founded on the basis that we engaged in inequitable conduct
before the patent office and procured a patent that shouldn't
have been procured and then conspired with your client to act
to the detriment of another client, brands Sterne Kessler and
brands them for no good reason on this record.

We intend to defend ourselves zealously against these
claims that we acted inappropriately with the patent office

1    because they do have heinous consequences.

2          The sole business of Sterne Kessler is intellectual

3    property, the prosecution and defense of patents.  So we submit

4    that it would be absolutely inappropriate to provide for some

5    type of protection like that, and I pause at this question.  As

6    your Honor is seeing from Mr. Ray's affidavit, Sterne Kessler

7    is convinced this is a litigation tactic.  I'm not here to

8    argue that, but they are convinced of it.

9          Would it be appropriate for me to ask for a

10   preliminary injunction that the patent counsel for Qualcomm

11   comply with Rule 11?  I think not.  I think that we are all

12   beyond that and we are all better than that.

13         The thing to be doing here is to deny the injunction

14   and enter an appropriate protective order.  We have now twice

15   provided proposed orders, the most recent one yesterday.  I

16   have a copy that I would appreciate being able to give to the

17   Court that simply denies the injunction and enters a protective

18   order that provides no confidential information of Qualcomm

19   would be used without prior notice, the ability of Qualcomm to

20   review it and say, I don't agree, it's not relevant, it can't

21   be used, and then come before the Court.  In the event it is

22   used, provides it can only be used in this litigation with the

23   appropriate protections for Qualcomm.

24         I would tender that now if your Honor will let me.

25         THE COURT:  Fine.  Give that to Miss Flick and she

1    will hand it up.

2         MR. WELLS:  I've already provided it to opposing

3    counsel.

4         (Document tendered)

5         MR. WELLS:  So to conclude, your Honor, there is

6    simply no basis for any preliminary injunctive relief here.

7    There is nothing in this record to demonstrate that Sterne

8    Kessler has somehow secretly, behind the scenes, been aiding

9    Parkervision or aiding Parkervision's counsel.  I'm here to

10   tell you as an officer of the court, I certainly wouldn't let

11   it happen.

12        Thank you.

13        THE COURT:  Thank you, Mr. Wells.

14        Mr. Cawley.

15        MR. CAWLEY:  Good afternoon, your Honor.

16        THE COURT:  Good afternoon.

17        MR. CAWLEY:  Douglas Cawley of McKool Smith of Dallas

18   for Parkervision.

19        Your Honor, with respect, the requested relief of a

20   preliminary injunction should be denied because there is no

21   proof of a real and immediate threat of future injury to

22   Qualcomm.

23        Parkervision is a publicly traded Florida

24   corporation, has about 50 employees, and it's located here in

25   Jacksonville.

This litigation began when Parkervision filed suit asserting that seven of its patents are willfully infringed by Qualcomm.  The firm of Sterne Kessler in Washington, D.C. represented Parkervision for 13 years and prosecuted or helped obtain all of the seven patents asserted in this case by representing Parkervision before the United States Patent and Trademark Office.

Over those 13 years, Parkervision spent many millions of dollars in attorneys' fees with Sterne Kessler in obtaining those and other patents to protect its technology.

However, Parkervision recognizes that as a result of the inescapable fact that Sterne Kessler represented both Parkervision and Qualcomm, the services of Sterne Kessler are unavailable to Parkervision in connection with this litigation.

Parkervision has received no confidential Qualcomm information from Sterne Kessler.  Furthermore, Parkervision has represented to the Court in its papers, as I do again today, that Sterne Kessler will not represent Parkervision in this litigation.

Now, my firm did not file this litigation.  We were first retained by Parkervision in September of this year, a couple of months after the litigation was filed.  My firm did an independent evaluation of the patents and of the assertion against Qualcomm.  We spent well in excess of a hundred hours doing that evaluation.  In the course of that evaluation, we

did not speak on any substantive basis to any lawyer of Sterne

Kessler, nor did we review any materials prepared by Sterne

Kessler. But Parkervision is not attempting to play games with

the word "representation" as Qualcomm's lawyer would allege.

Parkervision has also represented in its papers, as I

do again today, that during the course of this litigation in

the future that Parkervision will not seek and will not allow

Sterne Kessler to give it legal advice about this litigation or

that is in any way adverse to the rights of Qualcomm.

Furthermore, Parkervision will not seek and will not

allow Sterne Kessler to act behind the scenes, in the words of

Qualcomm's brief, to give legal assistance to Parkervision

adverse to Qualcomm.

Now, the fact that there is a 13-year history of

representation of Parkervision by Sterne Kessler does mean

there are certain actions we are going to request that Sterne

Kessler take. First of all, there is a substantial body of

prior attorney-client communications in the course of Sterne

Kessler's representation of Parkervision, and we believe that

it's entirely proper for us to communicate about those. They

have nothing to do with Qualcomm.

Sterne Kessler lawyers will inevitably, it appears,

be witnesses in this litigation. There has been a claim that

Sterne Kessler and Parkervision have committed fraud on the

patent office in obtaining the patents in this lawsuit. It's

1   almost certain that some Sterne Kessler lawyers will be

2   witnesses to deal with that issue, and we believe that we

3   should be entitled to discuss with the Sterne Kessler lawyers

4   what they did before the patent office, why they made certain

5   decisions in prosecuting the patents.  For example, why they

6   decided to submit certain prior art references to the patent

7   officers and why they decided not to.

8           Furthermore, your Honor, Parkervision has been sued

9   by Qualcomm for conspiring with Sterne Kessler to somehow help

10  Sterne Kessler violate its fiduciary obligations to Qualcomm,

11  and Parkervision has been sued alleging that we have interfered

12  with the contract relations between Sterne Kessler law firm and

13  Qualcomm.

14          Now, candidly, we believe that at the end of the day

15  the Court will find there is no Rule 11 basis whatsoever for

16  those allegations that have been pled against Parkervision; but

17  in the meanwhile, we have to be able to defend ourselves.  And

18  how can we possibly defend ourselves against a claim that we

19  conspired to help Sterne Kessler violate their fiduciary duties

20  unless we can communicate with them about what it is they did

21  and what it is they didn't do?

22          I would suggest, your Honor, that there are two

23  closely related legal issues presented to the Court by the

24  facts that you have heard.  The first is standing, under

25  Article 3, to issue a preliminary injunction, and the second is

the irreparable harm prong of the four-prong test for a preliminary injunction.

The Supreme Court has told us in *Los Angeles versus Lyons* in 1983 that in order to have standing for a federal court, under Article 3, to issue a preliminary injunction, there must be proof of a real and immediate threat of future injury. That's the gold standard test for the Court to have standing to issue a preliminary injunction.

That certainly would also satisfy the test for irreparable injury if the Court has standing and moves on to a consideration of those four factors.

There is a bit of a red herring in some of the briefing about whether or not the Court can consider past facts in deciding whether or not to enter an injunction, and I would submit that that is a confused bit of red herring.

Of course we acknowledge that the Court can consider past facts. As far as I'm aware, all facts are past. If they haven't happened yet, they are not facts. But whether we are looking at something that happened in the past or not, the test remains, is there a real and immediate threat of future injury.

Now, Qualcomm's lawyers spent a good time this afternoon attempting to make out a case of a breach of fiduciary duty and possibly a breach of ethical obligations by the law firm of Sterne Kessler.

I don't think they made out that case, but in a

1   sense, that's not really my fight because Parkervision doesn't

2   have anything to do with that relationship.

3           But my point is this: Even if the Court were to find

4   that a case of violation of legal ethics or a case of breach of

5   fiduciary duty in the past has made out, the question remains,

6   what proof is before the Court that under the facts your Honor

7   has heard there is a real and immediate threat of future harm?

8           Consider for a moment the fact situation that the

9   Supreme Court was addressing in *Los Angeles versus Lyons*.

10   Mr. Lyons suffered injury when he was put in a chokehold by the

11   LAPD. He brought suit in federal court to recover damages for

12   his injuries, as I recall, for violation of his civil rights,

13   and he also sought a preliminary injunction against the

14   Los Angeles Police Department continuing to use what he

15   characterized as a dangerous form of restraint. His basis for

16   that injunction was to say, there was a chance he might get

17   arrested again and he would be injured if he was put in a

18   chokehold again.

19           The Supreme Court said, you know, Mr. Lyons will

20   either eventually prevail or lose on his underlying claim that

21   he was improperly treated by the LAPD. That's going to be

22   litigated some day; but as to the issue of a preliminary

23   injunction, the federal court lacks Article 3 standing to grant

24   that injunction because there is no real and immediate threat

25   of future harm. Future is the key there. Because regardless

1   of what happened to Mr. Lyons, or regardless of what Sterne

2   Kessler may have done vis-a-vis its fiduciary obligation or its

3   ethical obligations, where is the proof that there is a real

4   and immediate threat of future injury to Qualcomm by any action

5   of Parkervision?

6       We would respectfully submit, your Honor, that that

7   proof is entirely lacking.  For that reason, the Court should

8   deny Qualcomm's application for preliminary injunction.

9       THE COURT:  All right.  Thank you, Mr. Cawley.

10      Mr. Hummel.

11      MR. HUMMEL:  Yes, your Honor.

12      THE COURT:  Not to preempt your response, because I'm

13  interested in all of it, but I am interested in Mr. Cawley's

14  last argument, and I want to see if I have misunderstood some

15  portion of your initial presentation.  So let me ask the

16  question this way:

17      As I understand your initial presentation, while not

18  abandoning the other items that you address in your papers,

19  you're principally positing that the concurrent representation

20  by the Sterne Kessler law firm at the time that the Rule 11

21  investigation, for lack of a better descriptive term, into the

22  bona fides of the litigation that was instituted by

23  Parkervision against Qualcomm violated both your contractual

24  arrangement with Sterne Kessler and their obligation to comply

25  with the code of professional responsibility, is that

1   essentially your arguments as presented initially?

2          MR. HUMMEL:  That's correct, your Honor.

3          THE COURT:  So to Mr. Cawley's point that if in fact

4   that occurred -- let's assume for the purposes of the

5   conversation that this did occur, even though it's been denied

6   fairly vigorously, but let's suppose it did occur, what about

7   Mr. Cawley's argument that that milk is spilt and that there is

8   no standing posited in the court at the moment to

9   prophylactically enjoin Sterne Kessler from doing something

10  that they would be obligated not to do in any event, even in

11  the absence of an injunction?

12         As I said, I don't want to preempt the other things

13  you want to discuss, but that was on my mind.

14         MR. HUMMEL:  No, I was going to go to this directly,

15  your Honor, because today in Mr. Wells's presentation and

16  Mr. Cawley's presentation, we had a lot more representations,

17  unequivocal representations, than we have had in the past.

18         However, there is one thing that neither one of them

19  said, and I respectfully disagree with, your Honor, is that

20  neither one of them actually denied that Sterne Kessler had

21  performed the Rule 11 analysis, as your Honor puts it.  So,

22  therefore, we have to assume that they did that.

23         There was no forceable denial of that.  There were

24  very careful denials and very careful representations of what

25  was going to happen in the future, and I accept those, and I

1   accept the bona fides of Mr. Cawley and Mr. Wells about what is

2   going to happen in the future, except it's not enough.

3              There is a real controversy here.  Sterne Kessler, as

4   Mr. Wells said, absolutely was the firm that prosecuted these

5   patents.  They spent 11, 13 years.  I don't know how many years

6   Mr. Wells said they had.  They are the experts in these

7   patents.  The super-duper experts.  There is no one on the face

8   of the earth who is more of an expert on these patents than

9   Sterne Kessler.

10             Sterne Kessler took that analysis while they were

11  Qualcomm's client, took their knowledge of this patent, their

12  knowledge of how it works.  They wrote the patent.  They

13  obtained the claims.  They know the technology, maybe better

14  than Parkervision, and they took all of that brain power and

15  directed it against their current client, Qualcomm, and

16  performed an analysis.

17             That analysis exists.  It's a piece of paper or it's

18  in someone's brain.  If it's in their brain, they can't get it

19  out.  If it's a piece of paper, they can circulate it anywhere.

20             Sterne Kessler -- we recognize that Sterne Kessler

21  lawyers are going to have to talk to Parkervision lawyers, and

22  here's where the rubber meets the road.  Is there a danger to

23  us?  Absolutely.  And is there a danger that can be resolved,

24  that can be fixed through an injunction?  Yes.  And is there a

25  way that it can be done that does not prejudice any of

1  Parkervision's or Qualcomm's due process rights to defend

2  themselves?  Absolutely yes.

3        I think what we have to do at this point, your Honor,

4  is talk about specifics because the claims that are against

5  Sterne Kessler are for beach of fiduciary duty and for breach

6  of contract, and that is based on facts that have occurred

7  basically this year.  At least we think this year.  We don't

8  know how far back the disloyalty may have occurred.

9        THE COURT:  But you've also alleged, have you not,

10  that they engaged in misrepresentation or fraud with respect to

11  the patent office and that they conspired with Parkervision in

12  that respect?  Those are not insignificant allegations.

13        MR. HUMMEL:  Not insignificant at all, and they were

14  taken --

15        THE COURT:  I hope they are not cavalierly made.

16        MR. HUMMEL:  Not at all.  I was just about to say,

17  they were not cavalierly made.  There was a lot of

18  investigation, a lot of care taken in this.  I know there is

19  the case about the, you know, inequitable conduct, and I

20  completely agree, and we were very careful about this, and we

21  think we are going to prevail, and we are certainly entitled to

22  prosecute those actions, and they are entitled to defend

23  themselves.  We absolutely agree.

24        But if you look at the claims that Parkervision

25  conspired with Sterne Kessler to violate the fiduciary duties,

that's based on facts that don't require any analysis of the
patent. We don't mind if they talk to each other about that.
When it comes to inequitable conduct, Sterne Kessler lawyers
are going to have to talk to the Parkervision lawyers to gather
the facts because Sterne Kessler is the firm that prosecuted it
in front of the patent office; and when they talk about the
facts, I don't have a problem with that. That's pretty clear.

There is one area which should be completely off
limits, and we need rules of engagement here, your Honor, to
make sure that Qualcomm is not further injured by having its
lawyers act against it.

When it comes to infringement, there is absolutely no
reason for the Sterne Kessler lawyers to speak to the
Parkervision lawyers or Parkervision itself. Absolutely none.
There is not a single allegation in the lawsuit against Sterne
Kessler that requires Sterne Kessler to talk to them about
infringement, and there is nothing in the lawsuit where Sterne
Kessler could legitimately, consistent with its obligations to
Qualcomm, have ever performed an infringement analysis. They
could not have appeared in this Court and could not have
asserted an infringement claim against Qualcomm, and they
should not be able to do it through the back door.

So the rules of engagement ought to be in the form of
an injunction that Sterne Kessler lawyers cannot talk to
Parkervision's lawyers or Parkervision and Sterne Kessler

1    cannot speak to Parkervision about infringement.  That's off

2    limits, and that is where the greatest danger to us is because

3    that's where Sterne Kessler may use their great knowledge of

4    Qualcomm's products and the patent to match them up, just like

5    they did in filing the -- preparing the Rule 11 analysis.

6           The third area that's going to be in dispute here is

7    validity.  Validity is a slightly tougher issue, but I think

8    there is a solution there, too.

9           When it comes to validity we are going to assert that

10    any number of pieces of what's called prior art -- these are

11    public documents or public devices -- render the claims of the

12    patent invalid.  Because of the inequitable conduct claim,

13    whether certain pieces of prior art were in front of the patent

14    office, not in front of the patent office, I agree with

15    Mr. Cawley that we are going to have to have discussions about

16    what decisions were made in the past about the prior art that

17    Sterne Kessler decided to bring to the attention of the patent

18    office and the arguments that they made to the patent office

19    about why these pieces of prior art didn't render the claims

20    invalid.  They are going to have to have discussions about

21    those.

22           So I think that the way to fashion a remedy that

23    makes sense there is to permit the Sterne Kessler lawyers to

24    talk to the Parkervision lawyers on pieces of prior art that

25    were what's called "of record."  These are pieces of prior art

1   that were in fact before the patent office, not new pieces of

2   prior art that Qualcomm has at this time.

3       The way this works in front of the patent office is

4   you have the duty of candor to the patent office.  This is what

5   we say they violated.  You have a duty of candor when you are

6   seeking a patent.  It's an ex parte proceeding, so the rules

7   require the applicant to disclose all prior art that it knows

8   and to properly characterize it in front of the patent office.

9   The patent office then goes back and forth with the

10  application.

11      So all the prior art that Sterne Kessler and

12  Parkervision provided to the patent office, they are going to

13  have to be entitled to speak to each other about.  And is there

14  some danger to Qualcomm?  Yes, there probably is.  But is it an

15  enjoinable danger in the way that could be sorted out?

16  Probably not.

17      THE COURT:  Mr. Hummel, why is injunctive relief --

18  let's just skip over for a minute and let's have a pragmatic

19  conversation about it.  Let's forget the four-prong test and

20  irreparable harm and substantial likelihood of success and

21  let's talk about a pragmatic solution.

22      I would tend to agree with you.  I thought -- well,

23  maybe we don't agree.  I thought the representations from

24  counsel were fairly explicit about what they would not do going

25  forward.  So I'm curious as to whether or not the ultimate

1   result wouldn't be better fashioned by a collaborative
2   agreement between the parties in the essence -- in the nature
3   of a protective order.  I've not read any of this that was
4   given to me by Mr. Wells.  I don't know whether any portion of
5   it would be acceptable to you or would address your client's
6   concerns, but you-all know far more, far more, about both the
7   substantive law and the facts and the prior representation than
8   I do.
9           It seems to me from the standpoint of practicality
10  that a much better solution could be fashioned to address your
11  concerns and to allow Sterne Kessler to defend themselves and
12  to allow Parkervision to defend itself by the lawyers working
13  collaboratively to come up with a protective order that gives
14  your client some assurances that what was represented here in
15  open court is in fact going to occur, and certainly none of
16  us -- and I think I can conclude you among them -- have any
17  reason to suspect or believe that's not the case.  Certainly
18  the Court has no reason to suspect that's not the case.
19          So I just put that to you, without any indication one
20  way or the other as to how I might be inclined to rule.
21  Obviously that's what I'm here for; and if you submit the
22  matter to me for resolution, I will resolve it, but it just
23  strikes me as being perhaps not the most -- not the most
24  pragmatic resolution of what is admittedly a delicate issue.
25          I can appreciate Qualcomm's concerns about what's

being disclosed, how is it being disclosed, when is it being disclosed, is it inimical to us. I can also appreciate the concern that Sterne Kessler has got very serious allegations which have been leveled against it by Qualcomm, which I'm sure they take them seriously. The Court certainly takes them seriously, and I hope your clients take them seriously as well, as I'm confident they do. I have no reason to question your representation to that effect, but that's my obligation, and that's all it is. It's an observation which I put out there for you all to consider.

MR. HUMMEL: Let me respond to that.

The representations that were made today, just so we are clear, are of a different nature and force than we had before this proceeding. So in my view, having the proceeding, although unfortunate that we had to take up your Honor's time on this, the representations that we received today are by far more forceful and clear and specific than they were before. But we still do have this lingering concern which has to be resolved in some way; and, frankly, given the fact that I had to make this motion and have to go through all this, I want something enforceable.

So can I ask you a question? Are you suggesting that we have an enforceable protective order of the court which would set forth these rules of conduct, presumably if we were able to reach an agreement?

1    THE COURT:  Well, without putting the cart before the

2  horse, what I'm suggesting is that a collaborative effort by

3  the lawyers to try to reach some rules of engagement, to use

4  your term, about these matters that have been argued today and

5  have been briefed comprehensively in the papers, if that could

6  be -- if you-all could reach an agreement and present it to the

7  Court with an agreed-upon enforcement mechanism, or at least an

8  enforcement process, I just think that would be a much more

9  practical resolution of the problem than to, frankly, submit it

10  to me to make a resolution that one of you will not like,

11  probably, at the end of the day.

12    That's not a direct answer to your question because I

13  frankly don't know what you are going to end up with at the end

14  of your conversation.  My hope would be that you could end up

15  with an agreement that satisfies your client that the harm

16  that's done is at least identified, recognized, and resolved to

17  the extent that it can be to your satisfaction and that your

18  client is assured, and that's assuming there has been -- I'm

19  not prejudging that -- and your client is assured that the

20  representations that were made today in open court are going to

21  be honored.

22    As I said, there is certainly no reason to expect

23  that they wouldn't be; and if they are not for whatever reason,

24  you have a very good record in the representations of the

25  lawyers here today and reducing that record to something more

1    manageable in the form of a protective order might solve the

2    problem.  It might solve the problem in such a way that Sterne

3    Kessler, frankly, doesn't have to suffer the harm to reputation

4    that it might suffer if an injunction were to issue, however

5    benign it might be, and your client would not have to be

6    concerned about the prospect of the court essentially denying

7    the motion for preliminary injunction and affording you no

8    relief.

9         If I deny your motion for preliminary injunction and

10   don't embrace any of the proposals for protective order, you

11   will essentially be left with no assurance that your concerns

12   will be met.

13        I'm trying to offer you what I think is a better way.

14        MR. HUMMEL:  Can I beg the Court's indulgence for 30

15   seconds to consult with my client?

16        THE COURT:  Sure.

17        (Discussion held off the record.)

18        THE COURT:  Let's do this:  Let's take a five-minute

19   recess.  We will come back at 20 after, because one of the

20   other things I would like to do, since I have you all here, is

21   I would like to talk about some case management issues, if you

22   all can give me a little bit of your time and avoid potentially

23   another Rule 16 conference that might cost your clients and you

24   some inconvenience and expense to have to come back.  So if you

25   can accommodate me in that respect, we will be in recess until

1   20 after the hour and give you a chance to confer with your

2   clients, and we will go from there.

3              MR. HUMMEL:  Thank you, your Honor.

4              COURT SECURITY OFFICER:  All rise.

5              (*Recess taken from 4:13 p.m. to 4:20 p.m.*)

6              THE COURT:  Mr. Hummel, anything further?

7              MR. HUMMEL:  Yes, your Honor.

8              I conferred with my client and I also conferred with

9    Mr. Wells and Mr. Cawley.  We do think it's worth taking

10   your Honor up on the offer to let us try to work out what I

11   call the rules of engagement on our own.

12             THE COURT:  Okay.

13             MR. HUMMEL:  I would say, give us a week, ten days or

14   so to try to work something out.

15             THE COURT:  I'll tell you what we will do in light of

16   the holidays, which I hope that you are all going to take the

17   opportunity to enjoy, because you should -- they come along too

18   infrequently and it's too important to miss -- what I will do

19   is, I'm going to essentially take the matter under submission

20   and won't do any further work on it and won't expend any more

21   judicial labor on the preliminary injunction, and until I hear

22   further from you that you are at impasse -- and I'll take that

23   word from either party.

24             If any of the three of you feel that you've gotten to

25   the point where you would like the Court to move forward, all

1  you need to do is get that word to me.  What I would hope to

2  hear, though, is that you've reached an agreement on it, and I

3  assume you'll get that news to me as well.  So being the

4  cockeyed optimist that I am, I will hold out hope that will be

5  the outcome of your conversations.

6          MR. HUMMEL:  I'm a realist, but I'm with you.

7          THE COURT:  Thank you very much.

8          What I would like to do, again, because I am a

9  cockeyed optimist, I'm confident at some point we will reach

10 the merits or begin to reach the merits of this litigation, and

11 I know that you have a deadline approaching at the end of the

12 month for the submission of a Case Management Report, and I

13 don't want that to be a -- I would like for that to be a

14 substantively helpful exercise, particularly for the Court, but

15 for the parties as well.  So I would appreciate getting some

16 input from you all as to a number of things.

17         First of all, let me just rattle off some things that

18 are on my list, and we can talk about them in no particular

19 order.

20         No. 1, with respect to the Case Management Report

21 deadline of the 30th, is that a reasonable deadline?  And that

22 question should come probably at the end of the other things

23 I'm going to discuss, but I am confident that you all will want

24 to at least educate me in some respect about claims

25 construction issues.  I don't know what the depth and breadth

of the claims construction process is going to be. You all

know that much better than I do, but I would like to get some

feedback from you as to what you think is a reasonable time

period for claims construction and the scheduling of a Markman

hearing.

I would also like your input on some division in the

discovery initiatives as between those items that are more

relevant to claims construction as opposed to the infringement

validity/enforceability issues. So it seems to me it would

make some sense to bifurcate, for lack of a better term, our

discovery efforts pre- and post-Markman. So I would like for

you to give that some -- I would like for you to give that some

thought.

What do you think is a reasonable amount of time for

the Court to anticipate setting a Markman hearing? Then,

obviously, that will dictate sort of some of the dominos that

fall thereafter in terms of dispositive motions and pretrial

conference and submissions that the Court will require for

pretrial and the setting of the trial date.

With that having been said, let me just caution you

that while I am a patent novice, which I'm sure comes as no

surprise to any of you out there, I do know enough about the

administration of a complex case to know that it's important to

have ground rules as we go forward, and I'm going to work very

hard to make sure you understand what the ground rules are, and

1   I would like your cooperation in terms of trying to get those

2   identified and set early on, but I want to make sure you

3   understand from the claims construction process that you need

4   to comprehensively identify what the issues are that you are

5   going to litigate in the claims construction portion of the

6   case and not anticipate that you are going to get an

7   opportunity to relitigate or to add to that collection or to

8   expand your definitional conflicts after the Markman hearing.

9   So I just want to make sure you hear me loud and clear on that.

10          So with that caveat, and in no particular order, I

11  don't know if -- Parkervision, I guess, would probably, as the

12  plaintiff, be the most reasonable place to begin.

13          MR. CAWLEY:  If I might give a brief report to the

14  Court, prior to the mandated case management conference between

15  counsel, both sides exchanged proposed schedules encompassing

16  all the matters that your Honor has just covered.  Obviously

17  there were substantial divergences.

18          Ten days ago lead counsel met here in Jacksonville

19  for some substantial period of time to try to work out

20  schedules as far as we could.  I would say we made good

21  progress.  We certainly didn't reach agreement on everything,

22  but we reached agreement on a lot of things.  Subsequent to

23  that conference, we, Parkervision, circulated to the other

24  parties our understanding.  Actually, both sides circulated

25  written descriptions of our understanding of the agreements

1    that we had reached.

2            I believe that there is another telephone conference

3    scheduled for tomorrow to try and iron out some of the last

4    things that may be ironed out.  So at this point, I at least am

5    optimistic that there will be substantial, if not complete,

6    agreement amongst the parties about a schedule and method of

7    proceeding.

8            I think that is due -- is it Friday or Monday?

9            MR. HUMMEL:  I think what the judge was suggesting is

10   that perhaps that be due at the end of the month, but currently

11   it is due, I believe, on Monday.

12           THE COURT:  Is it?  I just had the 30th in my mind.

13   I thought that was the due date.

14           MR. CAWLEY:  We are certainly prepared to get that to

15   the Court on Monday as currently required.

16           In terms of the Court's inquiries about the claim

17   construction process, one of the things that we will propose to

18   your Honor is that both sides submit technology tutorials to

19   the Court in nonargumentative presentation about the technology

20   involved in this case and how it works and that we do that in

21   advance of Markman.

22           We will be proposing in the schedule that the parties

23   meet and confer in an attempt to reduce the number of claim

24   terms that the Court is asked to construe; that the parties

25   then jointly brief those claim terms, meaning that both sides

1  go at the same time in filing opening briefs and then both

2  sides file responsive briefs.

3       As far as the Markman hearing itself goes, I guess

4  that we hadn't envisioned really proposing anything specific to

5  the Court.  Some courts, of course, like to entertain expert

6  testimony at Markman hearings; some courts find that expert

7  testimony being what's called extrinsic evidence in the sense

8  that it's outside the patent that we are supposed to be really

9  focusing on, don't want to hear expert testimony at the Markman

10 hearing; some courts just leave that up to the parties.  So I

11 guess we will welcome any guidance that your Honor has now over

12 time after sort of looking at the briefs as to what you think

13 would be helpful.

14       We hear loud and clear your Honor's admonition that

15 the parties are to identify claim terms, brief claim terms,

16 argue claim terms when the time comes for that, and that it's

17 not a rolling peeling of the onion basically.  We expect to be

18 confined to the terms that we have identified and briefed and

19 ask your Honor to rule on.

20       Now, as far as the discovery program that your Honor

21 refers to, with that respect, we have not discussed and have

22 not really proposed to the Court a bifurcated discovery period.

23 Basically we have just set forth one discovery period, which

24 obviously there may be some claim-construction-related

25 discovery during the discovery period up to Markman; and then

1    after Markman, I guess it's too late to do any claim

2    construction discovery, but we haven't seen the utility

3    basically in slowing down the infringement and validity

4    discovery in order to have a period that's devoted exclusively

5    to claim construction discovery.

6          If the Court is strongly in the view that's

7    appropriate, then of course we will be glad to redo the

8    schedule.

9          THE COURT:  I'm not strongly of the view that it's

10   appropriate.  I mentioned it only because at least in my

11   admittedly limited experience with the other patent cases on my

12   docket, in some respects there is a resources issue which the

13   parties and the lawyers are concerned with in terms of being

14   able to allocate resources to cover all those bases, and

15   sometimes I have at least had the request that merits discovery

16   be at least postponed or limited in some respect before

17   Markman.

18         MR. CAWLEY:  I understand.

19         THE COURT:  If you all are comfortable that's not an

20   issue here, there is certainly no reason for me to foist my

21   views on you.  I just mentioned a willingness to talk about it.

22         MR. CAWLEY:  Okay.  If I could inquire, what's the

23   date we currently have set for the Markman?

24         MR. BUSEY:  Qualcomm is proposing an August date, and

25   I think Parkervision is proposing a few months before that.

1       MR. CAWLEY:  Roughly, your Honor, at this point in

2  the negotiation over deadlines, the Plaintiff Qualcomm will be

3  proposing a Markman hearing something in the order of May or

4  June.  Qualcomm apparently is going to propose something more

5  like August.  This is all 2012, of course.  Hopefully we can

6  narrow that disagreement or even eliminate it.

7       THE COURT:  Okay.  Well, I'm happy to hear from any

8  of the rest of you.  It sounds like you all are on track to

9  give me what I'm looking for, which is a substantive well-

10  considered Case Management Report; and the reason that is

11  important is because once I enter my Case Management Scheduling

12  Order, I will also forewarn you, I am a stickler for it, and

13  it's not going to be modified for anything other than

14  compelling circumstances, especially in a case like this,

15  because once we -- frankly, once we lose our time guardrails,

16  it becomes very difficult to get the cart back on the track.

17       MR. CAWLEY:  We understand, your Honor.

18       MR. HUMMEL:  Let me say, briefly, your Honor, I've

19  been intimately involved in coming up with Qualcomm's schedule,

20  and the negotiations have been going well.  One correction to

21  Mr. Cawley's presentation.  We have not yet received

22  Parkervision's revised schedule, I believe, and not casting any

23  aspersions on it.  It just takes time.  It may be helpful if

24  the parties had an additional week to try to meet and confer.

25  Otherwise, we will have to jam in the meet-and-confer this week

1   and get everything done by Monday.  I'm hopeful we can narrow

2   the gap a little bit and a week may help on that.

3           THE COURT:  I have no problem giving you an extra

4   week if you think it will help us get a more substantial

5   product.  If another week will help you resolve some of the

6   dispute, that will not cause me any heartburn at all.  I'm

7   happy to do that.  As I said, I had in my mind that the due

8   date was the 30th in any event.

9           MR. HUMMEL:  It won't affect any of the deadlines on

10  the Case Management Report.

11          THE COURT:  Okay.  Is there anything else that we can

12  get accomplished this afternoon?

13          MR. CAWLEY:  Not from Parkervision, your Honor.

14          MR. WELLS:  No, your Honor.

15          MR. HUMMEL:  No, your Honor.

16          THE COURT:  Thank you all.  I enjoyed and appreciate

17  your arguments very much.  As I said, Merry Christmas and happy

18  holidays to you all, and I look forward to our next meeting.

19          COURT SECURITY OFFICER:  All rise.

20          *(Proceedings adjourned at 4:33 p.m.)*

21                          - - -

22

23

24

25

1                    **C E R T I F I C A T E**

2        I certify that the foregoing is a correct transcript from

3    the stenographic notes taken in the above-entitled matter by

4    the undersigned.

5    /S/Scott N. Gamertsfelder, RMR        Date: December 20, 2011
     Official Court Reporter
6                                  - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25