**THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

PARKERVISION, INC.,

               *Plaintiff,*

      v.

QUALCOMM INCORPORATED,

               *Defendant.*

QUALCOMM INCORPORATED,

               *Counterclaim Plaintiff,*

      v.

PARKERVISION, INC., and
STERNE, KESSLER, GOLDSTEIN & FOX PLLC

               *Counterclaim Defendants.*

Case No. 3:11-cv-719-J-37-TEM

## QUALCOMM'S REBUTTAL BRIEF ON CLAIM CONSTRUCTION

ParkerVision repeatedly ignores the definitions set forth in its own patents, makes unwarranted objections to Qualcomm's proposed constructions and baldly asserts that its constructions reflect the understanding of one skilled in the art without providing *any* evidence as to that understanding.  In contrast, Qualcomm provides constructions that follow the definitions and teachings of the Patents and offers expert evidence as to the understanding of one of ordinary skill in the art.  Indeed, while ParkerVision wrongly criticized Qualcomm for supposedly "deceptive claim construction arguments," ParkerVision is the party offering constructions that do not conform to established claim construction standards.

## I.   Construction of Disputed Claim Limitations[1]

### A.   Transferring Energy

| Term | Qualcomm | ParkerVision |
|---|---|---|
| "transferring non-negligible amounts of energy from the carrier signal" | "moving sufficient energy from the carrier signal into storage to cause substantial distortion of the carrier signal" | "transferring energy (i.e., voltage and current over time) in amounts that are distinguishable from noise" |

ParkerVision incorrectly identifies the dispute here as concerning only what constitutes a "non-negligible amount[] of energy."  (Dkt. 122 at 4.)  Consequently, ParkerVision fails to give meaning to the key term "*transferring*," leaving that term undefined in its construction.  Thus, ParkerVision's construction "remains just as ambiguous as the original claim language that it seeks to clarify and fails to delineate the scope of the claims for the jury." *Sec. Chain Co. v. Quality Chain Corp.*, 2011 U.S. Dist. LEXIS 51818, at *18-19 (D. Or. May 13, 2011) (rejecting a construction of "embracing without gripping" that ignored the term "gripping").

ParkerVision's construction is also defective because it reads out of the claim the source of the transferred energy—*i.e.*, that it comes "from the carrier signal."  Such a

---

[1] Qualcomm submits herewith the Supplemental Declaration of Joseph E. Lasher ("Lasher Suppl. Decl."), dated July 27, 2012, and the Declaration of Robert M. Fox, Ph.D., in Response to ParkerVision's Opening Brief on Claim Construction ("Fox Op. Decl."), dated July 27, 2012.

construction must be rejected.  *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1337 (Fed. Cir. 2010) (rejecting a construction that would "have us read the time extension information limitation entirely out of the claims").[2]

ParkerVision's construction also improperly defines "energy" as "voltage and current over time."  This definition of energy has no basis in the Patents and is contrary to the understanding of a person having ordinary skill in the art.  (*See* Fox Op. Decl. ¶ 6 (defining "energy").)  ParkerVision's attempt to alter the plain meaning of "energy" is neither accurate nor necessary.

Even putting aside these significant defects, ParkerVision's construction is plainly incorrect because it fails to reflect the clear distinction drawn in the Patents between down-conversion by "transferring energy" and down-conversion by "under-sampling."  (*See* Dkt. 119 at 3-9.)  It is not unique to the Patents' purported "energy transfer" system that the down-converted signal has sufficient energy to be distinguishable from noise—that is true of *any functional RF receiver*.  (*See* Fox Op. Decl. ¶ 7.)[3]  Thus, the mere fact that a down-converted signal has sufficient energy to be distinguishable from noise fails to demonstrate that a "non-negligible amount of energy" has been transferred.  (*Id.*)

As shown in Qualcomm's opening brief, the Patents make clear that "transferring non-negligible amounts of energy from the carrier signal" involves moving energy from the carrier signal into storage sufficient to cause non-negligible (*i.e.*, substantial) distortion

---

[2] *See also Cablestrand Corp. v. Wallshein*, U.S. App. LEXIS 12411, at *6 (Fed. Cir. May 24, 1994) (rejecting a construction that "would render meaningless [an] express claim limitation"); *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) ("[a]ll the limitations of a claim must be considered meaningful").

[3] Indeed, the '551 Patent makes clear that this feature does not distinguish an energy transfer system from an under-sampling system, noting that "[t]he negligible amounts of energy transferred by the under-sampling systems disclosed in Section II *may not be* sufficient to distinguish received signals over noise."  '551 Patent 63:23-26 (emphasis added).  Moreover, ParkerVision's construction merely raises the question of what quantum of noise must be distinguishable from the signal.

of the carrier signal.  (*See* Dkt. 119 7-8; '551 Patent 67:55-67, Figs. 83A & 83B (showing "non-negligible distortions" that "represent non-negligible amounts of transferred energy, in the form of charge that is transferred to . . . storage").)  ParkerVision repeatedly characterized this distortion as the principal feature that distinguished its energy transfer systems from under-sampling systems,[4] and from the prior art.[5]  Indeed, the very embodiment described in the '551 Patent that ParkerVision proclaims as exemplifying its invention (*see* Dkt. 122 at 2), shows substantial distortion of the carrier signal corresponding to transferring non-negligible amounts of energy.  *See* '551 Patents Figs 60A-D, 89:25-32.  Additionally, at the July 24, 2012 tutorial hearing, ParkerVision's witness, inventor David Sorrells, re-affirmed that distortion of the input signal is an integral part of transferring energy.  (*See* Lasher Suppl. Decl. Ex. 5 at 88:16-89:7.)

Only Qualcomm's construction—"moving sufficient energy from the carrier signal into storage to cause substantial distortion of the carrier signal"—is consistent with the teaching of the patent and the understanding of a person of ordinary skill in the art.

B.     Terms Related to Generation of a Lower Frequency Signal or a Baseband Signal

| Term | Qualcomm | ParkerVision |
|------|----------|--------------|
| "generating a lower frequency signal from the transferred energy" | "creating a lower frequency signal from the previously transferred energy" | [no construction necessary] |

ParkerVision contends that no construction is necessary because "there is no dispute about the technical scope of 'generating.'"  (Dkt. 122 at 6.)  However, the parties not only dispute the meaning of "generating" but also disagree about whether the phrase "generating a lower frequency signal *from the transferred energy*" requires a specific order of

---

[4] *See* Dkt. 119 at 6-9; '551 Patent 67: 55-67; Dkt. 120 Ex. 5 ['493 File History, February 4, 2002 Amendment].

[5] *See* Dkt. 119 at 6-9; Dkt. 120 Ex. 5; Dkt. 120 Ex. 7 [EP '359 File History, Mar. 4 2002 Amendment]; Dkt. 120 Ex. 6 [ParkerVision White Paper] at 1 ("D2D technology not only distorts the radio carrier waveform in the process of extracting the data, it actually destroys (crushes) the carrier waveform").

operations—*i.e.,* whether energy must first be transferred before a signal can be generated *from* that energy.  These disputes are critical to determining the scope of the claims for assessing issues of both infringement and invalidity, and must be resolved at the claim construction stage. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d. 1351, 1360 (Fed. Cir. 2008) ("[w]hen the parties raise an actual dispute regarding the proper scope of [the] claims, the court, not the jury, must resolve that dispute").

ParkerVision asserts, without support, that Qualcomm's construction "should be rejected because the ordinary meaning of 'generating' is not 'creating.'"  ParkerVision is simply wrong; the plain meaning of "generating" is "creating."  *See* Webster's New Roget's A-Z Thesaurus (2003) at 90.  Indeed, ParkerVision's witness at the tutorial hearing, named inventor David Sorrells, equated the terms.  (*See* Lasher Suppl. Decl. Ex. 4 at 40:7-11.)

ParkerVision did not even try to rebut Qualcomm's showing that there is a temporal relationship between "generating" and the transferred/integrated energy.  (*See* Dkt. 119 at 5-6.)  Therefore, Qualcomm's construction, which requires that the "lower frequency signal" be created from "the previously [transferred/integrated] energy," should be adopted.

C.     "Harmonic or Subharmonic of the Carrier Signal" Terms

| Term | Qualcomm | ParkerVision |
|---|---|---|
| "n represents a harmonic or subharmonic of the carrier signal" | "n is 0.5 or an integer greater than 1" | "n is 0.5 or an integer greater than or equal to 1" |

Qualcomm's construction, which precludes "n" from being "1", is based solidly on the disclosure in the patent that "n=1" corresponds not to a harmonic or subharmonic, but to the "fundamental frequency" of the carrier signal.  (*See* '551 Patent 71:49-65; '518 Patent 70:66-71:22; *see also* Dkt. 119 at 12-13.)  By contrast, ParkerVision's construction has no basis in the Patents.  The Patents do not characterize "n=1" as corresponding to an aliasing rate frequency

4

that is a "harmonic or subharmonic of the carrier signal," as required by the claims.  The specification passages cited by ParkerVision discuss possible values for "n" only in the abstract. (*See* Dkt. 122:6-7 (citing '551 Patent 71:31-33, 58).)  In the special case where "n represents *a harmonic or subharmonic of the carrier signal*," the Patent specifically precludes "n" from equaling "1" by designating it the "fundamental frequency."

ParkerVision's suggestion that the "fundamental frequency" is a "special harmonic" is inconsistent with the Patents, which clearly distinguish between the fundamental frequency and "a harmonic or subharmonic" thereof.  The '551 Patent describes the down-conversion of an AM signal to a demodulated baseband signal using an "aliasing rate . . . substantially equal to the frequency of the AM signal [*i.e.*, the carrier signal] *or* to a harmonic or subharmonic thereof."  *See* '551 Patent 83:65-84:1 (emphasis added).  An aliasing rate with a frequency equal to that of the carrier signal corresponds to a value for n equal to 1.  *See* '551 Patent 71:49-65.  Thus, the '551 Patent distinguishes between aliasing rates corresponding to values for n=1 — *i.e.*, the fundamental frequency — and aliasing rates corresponding to values for n corresponding to "a harmonic or subharmonic" of the carrier signal.  In light of this distinction, and combined with the fact that the Patents refer to n=1 as corresponding to the "fundamental frequency," and never a "harmonic of subharmonic of the carrier signal," a person of skill in the art would plainly construe the term, as Qualcomm has proposed, to exclude a value for n that is equal to 1.

ParkerVision contends that Qualcomm's construction improperly excludes the case where n=1 because that case is "*a preferred embodiment*" of the claimed inventions.  (*See* Dkt. 122 at 6-7.)  However, nowhere in the Patents is the case were n=1 ever identified as a preferred embodiment of the claimed inventions.  Moreover, there is no rule of claim construction requiring that all disclosed embodiments be encompassed within the scope of the asserted

claims.  In fact, the law is to the contrary.  *See August Tech Corp. v. Camtek, Ltd.*, 655 F.3d 1278,

1285 (Fed. Cir. 2011) ("[t]he mere fact that there is an alternative embodiment disclosed in the

[patent] that is not encompassed by [a proposed] claim construction" does not outweigh the

language of the claim, especially when the [proposed] construction is supported by the intrinsic

evidence").[6]  Indeed, it is well-established that disclosed embodiments that are not claimed are

dedicated to the public.  *See, e.g., Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 2012 WL 604138, at

*6 (E.D. Cal. Feb. 23, 2012).

ParkerVision's remorse regarding its claim drafting is not sufficient grounds to

now include the fundamental frequency when it chose to limit its claims to a harmonic or

subharmonic of the carrier signal in order to secure the patent grant.  Qualcomm's fully

supported construction should be adopted.

### D.      "Lower Frequency Signal"

| Term | Qualcomm | ParkerVision |
|---|---|---|
| "lower frequency signal" | "a signal with frequency below the carrier signal frequency and above the baseband frequency" | "a signal with frequency below the carrier signal frequency" |

ParkerVision's proposed construction of "lower frequency signal" disregards the

Patents' explicit definition of this term as a signal with "an intermediate frequency"—*i.e.*, below

the frequency of the carrier signal and above baseband.  *See* Dkt. 119 at 10-11; '551 Patent 19:7-20

("When a modulated carrier signal is down-converted to a lower frequency signal, the lower

frequency signal is referred to herein as an intermediate frequency (IF) signal $F_{IF}$"); 14:45-48

("An IF signal frequency can be any frequency above zero Hz.  Unless otherwise stated, the

---

[6] *See also Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215-16 (Fed. Cir. 2008) (construing claims to exclude disclosed embodiments); *Tip Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F. 3d 1364, 1372-73 (Fed. Cir. 2008) ("the claims of the patent need not encompass all disclosed embodiments"); *PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) (noting that all claims need not be construed to cover all disclosed embodiments).

terms lower frequency, intermediate frequency and IF are used interchangeably herein"). Here, ParkerVision acted as its own lexicographer, and for this reason alone, ParkerVision's construction should be rejected. *See Abbott Labs. v. Andrx Pharms, Inc.*, 473 F. 3d 1196, 1210 (Fed. Cir. 2007) (noting that use of the phrase "as used herein" in the specification may indicate that the patentee has acted as its own lexicographer).

ParkerVision cites to a portion of the '551 Patent discussing generally the down-conversion of electromagnetic signals. (Dkt. 122 at 8 (citing '551 Patent 23:28-67).) However, that passage does not even use the claim term to be construed, "lower frequency signal." Rather, it describes the down-conversion of a carrier signal "*to lower frequencies,*" and notes that direct down-conversion is a "special case" where the "signal is directly down-converted to a demodulated baseband signal." (*Id.*) That the specification identifies direct conversion to baseband as a special case, distinct from down-conversion utilizing an intermediate frequency, is entirely consistent with the construction proposed by Qualcomm. Indeed, when the Patent defines "lower frequency signal" it *specifically excludes* the special case of the baseband signal.

E. "Controlling a Charging and Discharging Cycle of the First and Second Capacitors with First and Second Switching Devices, Respectively"

| Term | Qualcomm | ParkerVision |
|---|---|---|
| "controlling a charging and discharging cycle of the first and second capacitors with first and second switching devices . . . respectively" | "using the switching devices to control separately the time during which the charging of the capacitors occurs and the time during which the discharging of the capacitors occurs" | "using a first switch device to control the charging and discharging of a first capacitor and a second switch device to control the charging and discharging of a second capacitor" |

ParkerVision offers no support for its construction of this term, instead complaining about the length of the term to be construed and accusing Qualcomm of trying to rewrite the claims. (*See* Dkt. 122 at 9.) This objection makes no sense, however, as ParkerVision itself proposed a construction of the term that differs from the claim language. And no claim

construction rule precludes construction of an entire phrase where its meaning is in dispute.  To the contrary, claim construction disputes often arise that cannot be addressed by construing an isolated term.  *See Rackman v. Microsoft Corp.*, 102 F. Supp. 2d 113, 119 (E.D.N.Y. 2000) (construing an entire phrase because a subpart could not be understood in isolation).

ParkerVision's construction should not be adopted because it attempts to read out of the claim the word "cycle."  *See Fujitsu*, 620 F.3d at 1337.  The term "cycle" requires a particular period of time during which either charging or discharging occurs.  ParkerVision's proposed construction impermissibly broadens the claims to include using switching devices to control *continuous* charging and/or *continuous* discharging, and not merely separate charging or discharging *cycles*.  Such a construction is directly contradicted by the language of the claims.  Accordingly, this term should be construed as Qualcomm has proposed.

F.      "Sampling"

| Term | Qualcomm | ParkerVision |
|------|----------|--------------|
| "sampling" | "reducing a continuous signal to a discrete signal" | "capturing energy of a signal at discrete times" |

In an attempt to shoehorn the concept of "capturing energy" into the well-defined term "sampling," ParkerVision proposes a construction at odds with both the plain meaning of the term to a person of ordinary skill in the art and, remarkably, the definition that ParkerVision itself proffered in its infringement contentions in this case.  (*See* Dkt. 119 at 3-4.) ParkerVision claims, on the one hand, that its construction is an "ordinary" meaning of "sampling"—*i.e.*, that the patentee did not act as its own lexicographer—and, on the other hand, that "sampling" should be construed contrary to its well-understood definition to mean "capturing energy."  Such a drastic redefinition, however, cannot be supported absent lexicography, which ParkerVision denies.  (Dkt. 122 at 10-11.)

8

To justify its departure from the customary meaning of the word "sampling" that it previously embraced, ParkerVision cites to two specification passages, 50 columns apart, neither of which support its construction.  The first passage—which ParkerVision admits refers to the prior art, and not the invention—concerns sampling "various *amplitudes*" of an AM signal and thus fails to support ParkerVision's construction because "amplitude" here refers to voltage, and not to energy.  The second passage does not even use any form of the word "sample," and thus fails to demonstrate that the patentee intended "sample" to have anything other than its ordinary meaning.  *See* '518 Patent 73:54-56.  Accordingly, the term "sampling" should be construed, as Qualcomm has proposed, according to its well-understood meaning.

G.     "Under-Samples" and "Sub-Sampling"

| Term | Qualcomm | ParkerVision |
|---|---|---|
| "under-samples" | "samples at an aliasing rate using negligible apertures" | "sampling at an aliasing rate" |
| "sub-sampling" | "sampling at a sub-harmonic rate" | "sampling at an aliasing rate" |

ParkerVision erroneously contends that "under-sampling" and "sub-sampling" mean exactly the same thing:  "sampling at an aliasing rate."  Nothing in the Patents supports this equivalency, however, nor would a person of ordinary skill in the art understand the terms to have identical meaning.  (*See* Dkt. 121 ¶ 32 ("the term 'sub-sampling' does not have a consistent definition in the art").)  Had the patentees intended the terms to have the same definition, they would have equated them in the specification.  *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed Cir. 1996) (rejecting a claim construction that equated two different terms where nothing in the patent supported that equivalency).

ParkerVision's construction of "under-sampling" should also be rejected because it fails to account for the clear distinction drawn in the Patents between (i) down-conversion by "under-sampling" the carrier signal and (ii) down-conversion by "transferring energy" from the

9

carrier signal.  (*See* Dkt. 119 at 4-9; Dkt. 121 ¶¶ 27-30, 34-41 ; '551 Patent 63:1-68:45, Fig. 45A (Venn diagram showing "transferring energy" and "under-sampling" as distinct approaches to down-conversion); '734 Patent 15:29-53.)  Specifically, ParkerVision defines "under-sampl[ing]" as merely "sampling at an aliasing rate."  But the Patents make clear that both "under-sampling" and "transferring energy" use the same basic sample-and-hold circuit configuration and involve sampling the signal "at an aliasing rate."  (*See* Dkt. 121 ¶ 22-25.)  Thus, "sampling at an aliasing rate" fails to distinguish between "transferring energy" and "under-sampling."  By contrast, Qualcomm's construction gives effect to the clear distinction drawn in the Patents by noting that "under-sampling" requires the use of "negligible apertures."  (*See* Dkt. 119 at 4-6; '551 Patent 28:2-5, 31:15-21, 63:1-7; Dkt. 121 ¶ 29.)  Accordingly, the term "under-samples" should be construed to mean "samples at an aliasing rate using negligible apertures."

Additionally, ParkerVision offers no support in the Patent for its construction of "sub-sampling" as "sampling at an aliasing rate."  (*See* Dkt. 122 at 10-11.)  The term is never once used in the Patents, other than in the claims, leaving a person of ordinary skill in the art to deduce its meaning from the various disclosed examples.  For the reasons set forth in Qualcomm's opening brief, a person of ordinary skill in the art would understand the terms "sub-sample" and "sub-sampling" to mean "sample/sampling at a sub-harmonic rate."

H.    Energy Integration Terms

| Term | Qualcomm | ParkerVision |
|---|---|---|
| "integrating the . . . energy" | Term is indefinite.  If construction is necessary, it should be construed as "storing in a storage module the energy transferred during an aperture period" | "accumulating the energy" |
| "accumulating the result" | "storing in a storage module the energy transferred over multiple aperture periods" | [no construction necessary] |

10

ParkerVision's constructions of the energy integration terms seek to equate, without explanation or support, the concepts of "integrating . . . energy" and "accumulating . . . energy." (*See* Dkt. 122 at 12-13.)  But, as noted in Qualcomm's opening brief, the '845 Patent makes clear that these terms have different meanings.  (Dkt. 19 at 17-18.)  Specifically, it is apparent from the claims and specification of the '845 Patent that "integrating energy" is performed during a single aperture period ("integrates across *an* acquisition aperture"), while "accumulating" is performed over multiple apertures.  (*See* Dkt. 119 at 17-18 (citing '845 Patent 145:44-47, 152:45-48); Dkt. 121 ¶ 52.)  Thus, ParkerVision's proposed constructions fail both because they improperly equate "integrating energy" with "accumulating energy" and because they do not recognize that "accumulating" happens over multiple apertures while "integrating" happens over a single aperture.  (*See* Dkt. 121 ¶ 52.)

ParkerVision's contention that Qualcomm's construction of "integrating the . . . energy" improperly requires "storing" transferred energy (*see* Dkt. 122 at 12-13) makes no sense.  ParkerVision itself contends that "integrating energy can be implemented using capacitors," which it refers to as circuit components that store charge.  (*Id.* at 12.)  Indeed, throughout the Patents—including the portions ParkerVision cites in alleged support of its construction—capacitors are referred to as "storage modules"—*i.e.*, circuit components that *store* charge.  *See, e.g.*, '551 Patent 66:55-59, 67:14-18, 98:28-30, 100:1-3, 100:14-17, 101:53-66, 103:26-37.)  Thus, it is plain from the Patents that, to the extent the term is not indefinite, "integrating . . . the energy" requires storing energy in a storage module.  (*See* Dkt. 121 ¶ 48.)

To the extent that ParkerVision's objection is based on the false premise that "storing in a storage module" requires "*persistently*" storing energy for some undefined amount of time, it is off-base.  Just as ParkerVision's proposed language contemplates "accumulating *and discharging* of energy" (Dkt. 122 at 12), Qualcomm's proposed construction contemplates

11

both storing and discharging of energy.  Qualcomm's proposed construction does not impose

any temporal requirement that is not shared by ParkerVision's own construction.

I.        "Finite Time Integrating Module" Terms

| Term | Qualcomm | ParkerVision |
|------|----------|--------------|
| "finite time integrating module" | "a module with a switch, a pulse generator, and a storage module that stores the energy transferred during an aperture period" | "circuitry that can perform a finite time integrating operation" |
| "finite time integrating operation" | "an operation that distorts the carrier signal and stores the energy transferred during an aperture period" | "convolving a portion of the carrier signal with an approximate representation of itself" |

The parties agree that "finite time integrating module" and "finite time

integrating operation" are not terms of art, and therefore can be understood only in light of the

Patents.  ParkerVision's construction of "finite time integrating module" is purely functional,

and essentially refers only to its construction of "finite time integrating operation."  This

functional definition is inappropriate, however, because the '845 Patent describes three distinct

circuits that each perform different operations.  ParkerVision attempts to obliterate those

structural distinctions and have each distinct circuit perform the same operation.

ParkerVision's construction of "finite time integrating operation" fails to reflect

the clear teaching in the '845 Patent that a "finite time integrating operation" is only an

*approximation* of a matched filter/correlating operation, and that it does not use the same

circuitry or method steps.  (*See* '845 Patent 128:44-51, 130:34-41.)  Specifically, ParkerVision

contends that, like the operation of a matched filter/correlator, a finite time integrating

operation involves "convolving a portion of the carrier signal with an approximate

representation of itself."  (Dkt. 122 at 13.)  This construction cannot be correct because it would

render identical "a matched filter/correlating operation" and a "finite time integrating

operation."  ('845 Patent 129:30-34.)

Not only is such a construction contradicted by the specification of the '845 Patent, *see* '845 Patent 128:44-51, 130:34-41, but also it is undermined by the prosecution history of the '845 Patent.  The original claims in the application for the '845 Patent related to "matched filter/correlator operation[s]" and two methods of approximating such operations, called "finite time integrating operation[s]" and "RC processing operation[s]."  (*See* Lasher Suppl. Decl. Ex. 1 at 2-3.)  The Examiner found that these claims embraced three distinct inventions and required ParkerVision to select one invention for further prosecution.  (*Id.*)  ParkerVision elected claims directed only to the finite time integrating embodiments.  (*See* Lasher Suppl. Decl. Ex. 2 at 1.)  A person of ordinary skill in the art would therefore understand that a "matched filter/correlator operation" is distinct from a "finite time integrating operation."

J.       Differential Down Conversion Terms

| Term | Qualcomm | ParkerVision |
|---|---|---|
| "differentially down-converting" | "down-converting a differential input signal and outputting a differential down-converted replica of the input signal" | "down-converting a carrier signal by differentially combining positive and negative transferred energy samples" |

The dispute here is whether, as Qualcomm contends, this term requires the down-conversion of a differential input signal to produce a differential down-converted replica of the input signal or, as ParkerVision contends, the term requires only "differentially combining positive and negative transferred energy samples."[7]  As Professor Fox explains, a "differential signal" consists of a pair of signals, one positive and one negative, where the negative signal is an inverted version of the positive signal.  (Dkt. 121 ¶ 26.)  A differential circuit configuration involves the use of parallel circuit blocks, each of which is used to down-convert either the positive or negative component of the differential signal.  (*Id.*)  Such a circuit

---

[7] ParkerVision's construction is also flawed because the phrase "negative . . . energy samples" would have no meaning to a person of ordinary skill in the art, as energy is a always positive quantity.  (*See* Fox Op. Decl. ¶ 13.)

takes as input a differential signal and outputs a down-converted replica of the input signal that is itself a differential signal.  (*Id.*)

ParkerVision's proposed construction should be rejected because it is based solely on embodiments in the '734 Patent that have nothing to do with any claimed invention. In particular, all claims of the '734 Patent require a storage element that is coupled between the two circuit blocks that differentially down-convert the input signal.  (*See* Fox Op. Decl. ¶ 15.) Thus, the only embodiments in the patent relevant to the construction of "differentially down-converting" are those that include a capacitor between the two down-converting blocks of the differential circuits.  (*Id.*)  The only examples in the specification to which ParkerVision cites in support of its proposed construction lack that structure.  (*See id.* ¶¶ 15-16; Dkt. 122 at 15-16.)  By contrast, the embodiment Qualcomm cites in support of its proposed construction—*i.e*, '734 Patent Figure 95—has the claimed structure.

ParkerVision contends that Qualcomm improperly excludes the "preferred embodiment" depicted in Figures 93 and 94A.  However, those figures cannot possibly represent "preferred embodiments" of any claim of the '734 Patent because they do not include capacitors between the two down-converting blocks, as required by all claims.  (*See* Fox Op. Decl. ¶¶ 15-16.)  Critically, the requirement of a storage element between the two blocks was specifically added into the claims by ParkerVision in an amendment during the prosecution of the '734 Patent in order to distinguish the claimed invention over prior art that included the down-converting circuit structures similar to those found in Figures 93 and 94A.  (Lasher Suppl. Decl. Ex. 3 at 4.)

K.      "Universal Frequency Down-Converter (UFD)"

| Term | Qualcomm | ParkerVision |
|------|----------|--------------|
| "universal frequency down-converter (UFD)" | "circuitry with a switch, an integrator coupled to said switch, | "circuitry that generates a down converted output signal from an |

|  | and a pulse generator coupled to said switch" | input signal" |

The parties agree that the term "Universal Frequency Down-Converter (UFD)" is not a term of art and, therefore, its meaning must be supplied by the Patents.  Qualcomm's construction defines UFD in purely structural terms, based on the language of the claim in which it appears.  By contrast, ParkerVision has offered a purely functional definition, without regard to structure.  By failing to provide any structural constraints to the meaning of the term UFD, ParkerVision's construction is too broad.  Specifically, by defining a UFD as "circuitry" that performs a generic function, ParkerVision disregards the teaching in the '371 Patent that a UFD is a particular implementation of a Universal Frequency Translator ("UFT"), which has clearly defined structural requirements.  (*See* '371 Patent Figs. 1B, 20A & 20A-1.)

L.   Impedance Matching Terms

| Term | Qualcomm | ParkerVision |
| --- | --- | --- |
| "impedance matching" | "maximizing power transfer throughout a signal path" | "transferring desired power" |

ParkerVision concedes that "impedance matching" is a well-known term of art, (Dkt 122 at 17-18), but nevertheless contends that the Court should disregard the plain meaning of the term as proposed by Qualcomm.  (*See* Dkt. 119 at 18-19; Dkt 121 ¶ 53.)  ParkerVision's only justification is to complain that Qualcomm's proposed construction renders it difficult for ParkerVision to prove infringement.  (*See* Dkt. 122 at 17-18.)  That is not a legitimate basis for abandoning the plain meaning of the claim language.  *See MarcTec, LLC v. Johnson & Johnson*, 394 Fed. Appx. 685, 686 (Fed. Cir. 2010) (affirming claim construction that rendered proof of infringement impossible).

ParkerVision's construction of "impedance matching" also adds significant ambiguity to the claims by requiring "transferring *desired* power."  Neither ParkerVision's

15

construction nor the Patents offer any guidance as to determining whether and how much power is "desired."[8]  Thus, unlike Qualcomm's objective standard, requiring maximization of power, ParkerVision's subjective standard for "impedance matching" renders the claims indefinite because "desired power" is impossible to quantify.

M.      "Interpolation Filter"

| Terms | Qualcomm | ParkerVision |
|---|---|---|
| "interpolation filter" | "a component that adds additional values between sampled values and then filters both the original samples and the added values" | "circuitry that outputs a smoothed signal between the input sampled values" |

ParkerVision contends, without support, that "a person of skill in the art would understand that an interpolation filter smoothes a signal by interpolating the input values." (Dkt. 122 at 18.)  However, "interpolation" refers to "the fitting of a continuous signal to a set of sample values," which is commonly used "for reconstructing a function, either approximately or exactly, from samples." (Lasher Decl. Ex. 2 at 5; *see also* Lasher Decl. Ex. 10 [The New IEEE Standard Dictionary of Electrical and Electronics Terms (1993)] (defining "interpolation function" as "[a] function that may be used to obtain additional values between sampled values").)  Further, a filter is simply a something that performs mathematical operations on a sampled signal to affect (*e.g.*, to reduce or enhance) certain aspects of that signal.  Thus, a person of ordinary skill would understand "interpolation filter" to mean a component that adds additional values between sampled values and then filters the result.

Unable to dispute Qualcomm's proper construction, ParkerVision again contends that Qualcomm is excluding a "preferred embodiment" of the '845 Patent.  (*See* Dkt.

---

[8] The language cited by ParkerVision in favor of its subjective standard, '551 Patent 105:30-43, fails to support its construction and is entirely consistent with Qualcomm's construction.  To calculate the impedance values needed to transfer maximum power, one must consider the desired load to be driven.  *See* '551 Patent 105:30-51.

16

122 at 18.)  But there is no such preferred embodiment and, moreover, there is no rule of claim construction requiring that all disclosed embodiments be encompassed within the scope of the claims.  (*See supra, at* 5.)

N.      "Asynchronous Energy Transfer Signal"

| Term | Qualcomm | ParkerVision |
|------|----------|--------------|
| "asynchronous energy transfer signal" | Term is indefinite.  If construction is necessary, it should be construed as "non-synchronous energy transfer signal" | "an energy transfer signal with a phase that varies with respect to the phase of the carrier signal" |

Qualcomm demonstrated in its opening brief that the term "asynchronous energy transfer signal" is indefinite, because it uses the relational term "asynchronous" without defining a proper frame of reference—*i.e.,* the signal to which it is asynchronous.  In an attempt to avoid indefiniteness, ParkerVision attempts to supply the missing frame of reference ("with respect to the phase of the carrier signal") in its construction.  Nothing in the Patents, however, supports ParkerVision's construction.  ParkerVision cites to Figures 83E and 83F, but nothing in the Patents identifies the signals represented by these diagrams as being "asynchronous" to the signal depicted by 83A, which ParkerVision appears to assume (incorrectly) to be an energy transfer signal.  (Dkt. 122 at 19.)  Nor does the Patent describe 83E or 83F as being a carrier signal that is asynchronous to any identified "energy transfer signal," such as 83C.

ParkerVision is also wrong that Qualcomm's indefiniteness argument must be rejected simply because Qualcomm offered an alternative construction.  *See, e.g., Illinois Computer Research LLC v. HarperCollins Publishers, Inc.,* 10 CIV. 9124 KBF, 2012 WL 163801, at *11-12 (S.D.N.Y. Jan. 19, 2012) (finding a claim indefinite even though the defendant proposed an alternative construction).

## II.    Construction of Means-Plus-Function Claims

### A.    Means-Plus-Function Claim Incorporating "Integrated Energy" Terms

| Function | Qualcomm | ParkerVision |
|---|---|---|
| "integrating the energy over the aperture periods" | Indefinite, alternatively: | Structure: one or more of energy storage circuitry disclosed in Figs. 68C, 68F, or equivalents thereof. |
| "integrating the transferred energy over the aperture periods" | Structure: the storage modules shown in Figures 67A ("storage module 6716"{capacitor storage module implementation only]), 68C ("capacitive storage module 6802"), 68G ("capacitive storage module"), 82A ("storage capacitance 8208"), 82B ("storage capacitance 8208"), 95 ("storage capacitance"). | |
| "generating the baseband signal from the integrated energy" | Indefinite, alternatively: | Structure: any arrangement of (i) one or more of the switch circuitry controlled by any one of pulse generators and (ii) one or more of the energy storage circuitry disclosed or described in Figs. 63, 64A, 64B, 65, 67A, 68G, 69, 74, 76AE, 77A-C, 82A, 82B, 86, 88, 90, 92, 94A, 95, 101, 110, 111, or equivalents thereof. |
| "generating the second signal from the integrated energy" | Structure: the storage modules shown in Figures 67A ("storage module 6716"{capacitor storage module implementation only]), 68C ("capacitive storage module 6802"), 68G ("capacitive storage module"), 82A ("storage capacitance 8208"), 82B ("storage capacitance 8208"), 95 ("storage capacitance"). | |

The dispute over these terms is whether, as Qualcomm has proposed, the terms are indefinite because each contains some form of the terms "integrating . . . energy" or "integrated energy."  (*See* Dkt. 119 at 24.)  If the Court agrees with Qualcomm that these claims are indefinite, then it need not address the further dispute between the parties concerning which structures disclosed in the Patents are capable of performing these claimed functions.

### 1.    "means for integrating the energy over the aperture periods" and "means for integrating the transferred energy over the aperture periods"

To the extent that the terms are not indefinite, the parties agree that the corresponding structure for each element includes a capacitive storage module that stores energy over an aperture period.  (Dkt. 110-2 at 16-17; Dkt. 122 at 21-22.)  ParkerVision claims that Qualcomm "conspicuously omits [Fig.] 68F where the capacitor is in line." (*See* Dkt. 122 at 22).  However, nowhere in the specification is the structure of Figure 68F tied to the function of

integrating the energy over the aperture periods.  Absent such connection in the specification, it does not qualify as a corresponding structure.  *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).

> 2. <u>"means for generating the baseband signal from the integrated energy" and "means for generating the second signal from the integrated energy"</u>

As ParkerVision has recognized, "[a] structure is corresponding 'only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim'." (*See* Dkt. 122 at 20, quoting *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).)  The Patent clearly links the functions claimed in the terms "means for generating the baseband signal *from the integrated energy*" and "means for generating the second signal *from the integrated energy*" to the capacitors identified by Qualcomm—*i.e.*, capacitors that store energy *over an aperture period*.  '518 Patent 66:50-54.  The Patents do not make any link, nor does ParkerVision even attempt to identify one, between ParkerVision's additional proposed structures—much less "any arrangement" of them—and the claimed functions.

> B. <u>Means for Operating Said UFD to Perform at least Frequency Translation Operations</u>

| Function | Qualcomm | ParkerVision |
|---|---|---|
| "operating said UFD to perform at least frequency translation operations" | Indefinite. | Structure: a control signal of the UFD disclosed as signal 108 of Figs. 1A-1C, 2006 of Figs. 20A and 20A-1, or equivalents thereof. |

Claim 1 of the '371 Patent is directed to:

> An apparatus, comprising:  a universal frequency down-converter (UFD), including a switch, an integrator coupled to said switch, and a pulse generator coupled to said switch; . . . and means for operating *said UFD* to perform at least frequency translation operations.

(emphasis added.)  To satisfy the requirements of 35 U.S.C. § 112 ¶6, the Patent must disclose a structure capable of performing the claimed function, "operating *said* UFD."  Regardless of whether the Court accepts Qualcomm's structural definition of UFD or ParkerVision's functional definition of the term, "*said* UFD" in the claim necessarily refers to a UFD that consists of "a switch, an integrator coupled to said switch, and a pulse generator coupled to said switch."  Thus, to satisfy § 112 ¶6, the Patent must disclosure a structure capable of operating "a switch, an integrator coupled to said switch, and a pulse generator coupled to said switch."

ParkerVision contends that the '371 Patent discloses "a means for operating said UFD to perform at least frequency translation operation" in the form of a "control signal of the UFD," such as signal 108 in Figures 1A and 1C.  This construction is plainly incorrect, however, because it identifies as a structure capable of operating "said UFD" a signal that is generated by the pulse generator, which is itself a component of the UFD.   In other words, ParkerVision contends that the UFD itself is a "means for controlling said UFD."  That cannot be correct, and the claim is therefore indefinite.

C. <u>Terms for Which There Is No Dispute</u>

Qualcomm agrees with ParkerVision's proposals for both the claimed function and the disclosed structures for the following means-plus-function claim terms:  "means for sampling the carrier signal over aperture periods to transfer energy from the carrier signal at an aliasing rate," "means for sub-sampling the first signal over aperture periods to transfer energy from the first signal," and "means for impedance matching."

**Conclusion**

For the foregoing reasons, the claim language in dispute should be construed as Qualcomm proposes.

July 27, 2012

CRAVATH, SWAINE & MOORE LLP

By:    s/ Keith R. Hummel
      Keith R. Hummel (admitted pro hac vice) (Trial Counsel)
      khummel@cravath.com
      David Greenwald (admitted pro hac vice)
      dgreenwald@cravath.com
      Worldwide Plaza
      825 Eighth Avenue
      New York, New York  10019
      Telephone:  (212) 474-1000
      Facsimile:  (212) 474-3700

      -and-

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A.
      John A. DeVault, III
      Florida Bar No. 103979
      jad@bedellfirm.com
      Courtney K. Grimm
      cgrimm@bedellfirm.com
      Florida Bar No. 953740
      The Bedell Building
      101 East Adams Street
      Jacksonville, Florida 32202
      Telephone:  (904) 353-0211
      Facsimile:  (904) 353-9307

      -and-
CADWALADER, WICKERSHAM & TAFT LLP
      Christopher A. Hughes (admitted pro hac vice)
      Christopher.Hughes @cwt.com
      1 World Financial Center
      New York, New York 10281
      Telephone:  (212) 504-6000
      Facsimile:  (212) 504-6666

      -and-

GOODWIN PROCTER, LLP
>Steven A. Moore (admitted pro hac vice)
>samoore@goodwinprocter.com
>Richard W. Thill (admitted pro hac vice)
>rthill@goodwinprocter.com
>4365 Executive Drive, Suite 3000
>San Diego, CA 92121
>Telephone:  (858) 202-2700
>Facsimile:  (858) 457-1255

*Counsel for Defendant, Counterclaim Plaintiff Qualcomm Incorporated*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this July 27, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

<u>s/ Keith R. Hummel</u>
Keith R. Hummel (admitted pro hac vice)
khummel@cravath.com
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
*Attorney for Defendant,*
*Counterclaim Plaintiff*