UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PARKERVISION, INC., a Florida ) Jacksonville, Florida
corporation, )
 )
                    Plaintiff, ) No. 3:11-cv-719-J-37TEM
 )
          vs. ) December 17, 2012
 )
QUALCOMM, INCORPORATED, a ) 2:30 p.m.
Delaware corporation, )
 )
                    Defendant. ) Courtroom 5B
_____ )


**TRANSCRIPT OF MOTIONS HEARING**
BEFORE THE HONORABLE THOMAS E. MORRIS
UNITED STATES DISTRICT MAGISTRATE JUDGE

OFFICIAL COURT REPORTER:

          Scott N. Gamertsfelder, RMR, FCRR
          300 North Hogan Street, No. 9-150
          Jacksonville, FL 32202
          Telephone:  (904) 301-6843

(Proceedings reported by stenography; transcript produced by computer.)

1           A P P E A R A N C E S

2    PLAINTIFF COUNSEL:

3           **Joshua W. Budwin, Esquire**
            **Mario Apreotesi, Esquire**
4           McKool Smith, PC
            Suite 1700
5           300 West 6th Street
            Austin, TX 78701
6           (512) 692-8272

7           **Stephen D. Busey, Esquire**
            Smith, Hulsey & Busey
8           225 Water Street, Suite 1800
            Jacksonville, FL 32202
9           (904) 359-7700

10

11   DEFENSE COUNSEL:

12          **John Andrew DeVault III, Esquire**
            Bedell, Dittmar, DeVault, Pillans & Coxe, PA
13          101 East Adams Street
            Jacksonville, FL 32202
14          (904) 353-0211

15          **Keith R. Hummel, Esquire**
            **David Greenwald, Esquire**
16          **Peter A. Emmi, Esquire**
            Cravath, Swaine & Moore, LLP
17          825 Eighth Avenue
            New York, NY 10019
18          (212) 474-1000

19

20

21

22

23

24

25

P R O C E E D I N G S

December 17, 2012                                    2:30 p.m.

- - -

COURT SECURITY OFFICER:  All rise.

The United States District Court in and for the Middle District of Florida is now in session.  The Honorable Thomas E. Morris presiding.

Please be seated.

THE COURT:  Good afternoon.  We are here on the case of *Parkervision versus Qualcomm, Incorporated*, Case No. 3:11-cv-719-J-37TEM.  We are here for a hearing on several matters.

First, would counsel please announce their appearances.

MR. BUDWIN:  Josh Budwin with McKool Smith.  With me is Steve Busey and Mario Apreotesi.  We also have a representative from our client, CEO Jeff Parker, and we are ready to proceed.

MR. DeVAULT:  John DeVault here on behalf of Qualcomm, along with Keith Hummel, David Greenwald, and Peter Emmi of the Cravath firm.

THE COURT:  I don't know that we will have to get into any of the matters that have been submitted in camera or anything that would be in violation of the confidentiality order, if we made it public; but if counsel -- if we approach

1   something like that, we might have to close the courtroom for

2   that aspect.  If counsel would, please, remind me if we get

3   to that point.

4            MR. BUDWIN:  Of course not, your Honor.  I

5   agree with you, I don't think that will be an issue at least

6   from our side.

7            THE COURT:  All right.  I appreciate the parties

8   were able to resolve a few of the matters that were in

9   dispute, and I received the joint notice this morning that

10  was filed on that.

11           As I understand it, there are four issues, I

12  believe, that are still in dispute.  Would both parties

13  agree?

14           MR. BUDWIN:  That's correct from our perspective,

15  your Honor.

16           MR. HUMMEL:  Ours also, your Honor.

17           THE COURT:  I believe the best way to approach it

18  may be to have those four argued and then the response to

19  that and then go on to the second one after that.  There may

20  be some interrelation.

21           MR. DeVAULT:  Your Honor, if it's agreeable with

22  the Court, we will split up some of the arguments depending

23  on the issues.

24           THE COURT:  That's fine.

25           MR. DeVAULT:  Thank you.

1          THE COURT:  Mr. Budwin, I'll hear from you first.

2          MR. BUDWIN:  Is it okay if I argue from here, so I

3  can see the screen?

4          THE COURT:  Yes, I have no objection to that.  We

5  have a court reporter and microphones.

6          MR. BUDWIN:  As your Honor stated, there are four

7  issues in dispute today, and we can address each one

8  chronologically.  The first issue that we have is our

9  Interrogatory No. 4.

10          THE COURT:  All right.

11          MR. BUDWIN:  We served this interrogatory back in

12  January of this year, so almost a year ago; and the purpose

13  of this interrogatory was to help us early in the case

14  understand what the difference is that Qualcomm intended were

15  between the various different accused products.  We wanted to

16  know this information so we could focus our discovery and our

17  review of Qualcomm's schematics.

18          So we served our interrogatory in January;

19  Qualcomm wrote back.  The first response was in February of

20  this year and referred us to Exhibit B, which is attached to

21  their interrogatory, and the Exhibit B contained a list of

22  the various accused products and told us certain information

23  about those products -- I'll put a part of that up here --

24  which tells us they did direct conversion and it tells us

25  they used passive mixers, which are two of the things that we

1  believe tend to show infringement.

2          The thing the initial response didn't do is what

3  the interrogatory asked, which was identify any differences

4  between the accused products.  So we complained to Qualcomm

5  about that; and in June of this year they supplemented, this

6  time lodging an objection, telling us it was the subject of

7  expert discovery.

8          Of course, we weren't happy with that, and so we

9  filed our Motion to Compel in September of this year.

10          On September 14th, which is eight days after we

11  filed our Motion to Compel, Qualcomm supplemented again; and

12  for the first time in response to an interrogatory that had

13  been outstanding for nine months, they referred us to

14  Rule 33(D).

15          We have spent a lot of time, money, and effort in

16  inspecting Qualcomm's schematic in this case.  We have

17  traveled to California at least three, maybe four times to

18  look at them.  They are in a secure facility.  The review

19  conditions are pretty difficult, at least in the first few

20  instances.  There are tens of thousands of pages of

21  schematics.  They are very highly technical and have to be

22  reviewed by experts in the field, and we believe that

23  Qualcomm's reliance on Rule 33(D) is improper because, as

24  your Honor knows, the rule states "Reliance on Rule 33(D) is

25  proper only if the burden of deriving or ascertaining the

1   answer will be substantially the same on the answering party

2   as it is on the requesting party."

3           Here, we believe that the burden is nowhere near

4   the same.  We don't design the schematics.  We don't maintain

5   the schematics.  We don't have access to them in their native

6   form, using tools that engineers would routinely use to

7   inspect them.  When we want to look at them, we have to get

8   on a plane, travel to California, look at them in a secure

9   facility; and so we believe that the reliance on Rule 33(D)

10  here is improper.  There are some case law on point from this

11  district related to this issue.

12          So, generally, we know from case law that reliance

13  on the rule is inappropriate when it asks for parties to

14  state a contention or to state facts supporting its

15  allegations.

16          That's precisely what our interrogatory asked for.

17  We want to know Qualcomm's contention as to the differences

18  between the accused products as it matters to this case.

19          We don't need them to list every difference, all

20  the differences.  The interrogatory doesn't ask for that.  We

21  want to know their contention as to any material differences

22  that their noninfringement expert is going to submit a report

23  on at some point.

24          So we're almost at the end of discovery and we

25  have not had the ability to rely on this information

1 throughout discovery; but we have an expert report due in

2 short order, and I believe we are entitled to know Qualcomm's

3 contention as to what's different between each of the accused

4 products to ensure that our report properly addresses all of

5 those differences. We have the burden to go first, and it's

6 very difficult to supplement a report after the fact.

7 There is a case from the Eastern District of Texas

8 that I believe is directly on point to this. And as

9 your Honor is aware, we are applying Eastern District of

10 Texas patent rules in this case.

11 In this case, the Laser Dynamics case we cite, the

12 Judge Ward case from 2009, the plaintiff served a 'rog, just

13 exactly as we did, and asked the defendant to explain how

14 certain aspects of the accused disk drive functioned, just as

15 our 'rog asked Qualcomm to explain to us the difference in

16 functionality between the accused products.

17 There, as here, the party objected, sought to rely

18 on Rule 33(D), and the Court said, "The interrogatories are

19 directed to the functionality of the defendant's own

20 products" -- just as ours is -- "and it's implausible to

21 contend that the plaintiff stand on equal footing when it

22 comes to determining how the defendant's own products

23 operate."

24 We are not on equal footing with Qualcomm in

25 determining how the products operate, and we have used our

best efforts to try to determine that for ours; but I believe that we are still entitled to understand what Qualcomm contends is different.

Now, Qualcomm knows at least some aspect of what it contends is different. The difference is they won't tell us when we ask, but when it benefits them in some way, they will come forward with some of the differences. So there were some pending motions related to the infringement contentions before your Honor that I believe you issued ruling on recently.

When Qualcomm was moving to strike our contentions, they submitted a declaration from one of their engineers; and I looked at this declaration and I thought, this is at least partially going to exactly what our interrogatory asked.

Their engineer reviewed the schematics, talked to the Qualcomm engineers who designed the circuit, and then he goes on for pages trying to say how they are different. The receiver that is in the accused products contain a very different circuit design; they are very different from the design.

I won't go through every page of the declaration, but he continues and he has sections explaining what the differences are.

If Qualcomm could go to an engineer to have him

1 look at the circuit design and provide a declaration based on

2 his review of the circuit design and talking to others, there

3 is absolutely no reason why they can't provide a narrative

4 response to our interrogatory in a form that we can rely upon

5 for purposes of this case.

6        If they wanted to take this declaration,

7 incorporate it into their interrogatory and say this is the

8 sum total of the differences that we are aware of, that we

9 are going to rely upon for this case, we would be perfectly

10 happy with that, your Honor.

11        They know what the differences are.  They are

12 uniquely situated to tell us, and they have told us at least

13 partially in support of a motion, but not in a form that I

14 can actively rely upon when it comes to trial or for other

15 purposes.

16        That's the argument on this issue, your Honor.

17        THE COURT:  All right.

18        MR. HUMMEL:  Your Honor, Keith Hummel for

19 Qualcomm.  Good afternoon.

20        Your Honor, the actual interrogatory says,

21 "Identify and describe the differences between the products

22 disclosed in response to Interrogatory No. 2 with respect to

23 the receiver or receiver function that performs direct

24 conversion."

25        Now, when we first got this interrogatory at the

1    beginning of the year, since it doesn't provide any detail

2    about what exactly is required, I understood this for us to

3    describe to Parkervision what is the type of circuitry that

4    is actually used in the products that they had accused under

5    infringement.

6            To put this in context, at the time what we had

7    was an initial infringement contention from Parkervision

8    which contained some number of accused devices.  Some of

9    those accused devices had something called active mixers.

10   I'm being a little technical here.  Some had passive mixers,

11   some of them didn't do direct down-conversion at all.

12           What Mr. Budwin didn't tell you was our initial

13   response to this interrogatory provided a chart, which is the

14   binder that Parkervision supplied you of all of our

15   interrogatory answers, does have this document.  It's behind

16   Tab 1A, and that Exhibit B document does go through all of

17   the accused products and says whether it has a passive mixer,

18   no direct down-conversion, active mixers, or whatnot.

19           So when we first got this interrogatory, that's

20   what I thought they were looking for.  What is the circuitry

21   that does the direct down-conversion?

22           There is nothing in here that says, Tell me all

23   the differences; tell me every little difference between the

24   circuitry here that could possibly be conceivably significant

25   in this case.  It doesn't say any of that.

1        For the first time today I heard Mr. Budwin say, I

2   don't want all the differences.  And he's right to say that,

3   because the schematics for these things are incredibly

4   complicated, and there are difference between the products.

5        He doesn't want everything.  He wants the ones

6   that are relevant to this case.  Okay.  What does that mean?

7   That means relevant to Parkervision's claims of infringement;

8   and right now, what I have from Parkervision are inadequate

9   infringement contentions that provide detailed infringement

10  charts -- allegedly infringement charts for one product.

11       Even though Parkervision has accused 85 products

12  of infringement, and even though Mr. Budwin now knows -- now

13  knows for sure, because his experts have spent eleven days

14  looking at our detailed schematics, he knows that the accused

15  circuitry is different amongst the different accused

16  products.  So his infringement analysis, the one that his

17  experts are going to put forward, are going to have to take

18  into consideration the structural differences of the accused

19  circuitry which he now knows about.

20       I don't know what his infringement analysis is

21  going to be, so I don't know sitting here today what's a

22  significant difference and what's not.  How could I?  I have

23  not been put on notice of Parkervision's infringement

24  analysis.  That will come in due course after the Markman

25  ruling comes out and we know how certain terms are going to

1    be construed.

2         Then Parkervision has an opportunity to amend its

3    infringement contentions in a response to the Markman ruling

4    that's in the case management order.  We get to respond on

5    validity.  Then there are the motions which your Honor took

6    under advisement to strike portions of the infringement

7    contentions and for them to amend their infringement

8    contentions which have to be resolved -- or may have to be

9    resolved after the Markman ruling.

10         So there is a lot of road to hoe before we get to

11   know exactly what is at issue in this case.  It could be that

12   85 of the accused products go by the byway because of the

13   Markman ruling.  It could be that two of them are still

14   around.  It could be your Honor agrees with me that they are

15   only entitled to accuse three products of infringement.  But

16   right now they want us to categorically say, here are all the

17   differences in these products, and these are complicated

18   things.

19         We don't know and we don't care, Qualcomm, as a

20   business, what the differences are between our circuitry.

21   Frankly, that's not the issue in this case.  The issue is,

22   you don't compare product A to product B.  You compare

23   product A to the claims that are at issue in this case.

24         Now, how that's traditionally done is through

25   expert reports, which is why when we initially objected to

this interrogatory -- and we have never withdrawn the
objection -- we objected because it was premature and because
it goes into the realm of what experts do.  That's what
experts do in this case, and that's what their experts have
done.

So, no, we don't have comparisons between the
circuitry.  What we had to do in order to move to strike
their infringement contentions is we had to put an engineer
and some lawyers together to go through some of the circuitry
to try to identify some of the differences.  Some of the
differences, not all because, again, I don't know what their
infringement contentions are going to be.

So we went through to figure out structurally how
do these things look different?  How do these things look
different, such that they are providing us only with one set
of infringement charts was inadequate, and we went in and we
found, yes, the circuitry is different.

By the way, they have got an expert from Princeton
and another expert who went and looked at these schematics;
and Mr. Budwin is not correct that the experts keep having to
go back to the room in California.  They are entitled under
the confidential agreement to print out schematics, and they
have.  They have printed out the relevant schematics and have
the ability to print out the relative schematics and take
them home and study them to their heart's content.

What I suggest they have to do is exactly what we have to do. We had to spend a lot of time just to identify those small, small amount of differences in the accused circuitry, and we had to figure that out. We don't have the giant book of differences at Qualcomm.

So what I'm suggesting to you is, this is an attempt to get Qualcomm a whole lot of busy work. It's going to take hundreds, if not thousands, of hours to catalog the differences between these products, and it's unnecessary. It's unnecessary because some of these products might fall out; some of these claims might fall out. It's inconceivable, your Honor, that they are going to go to trial with 85 claims asserted against 82 products -- I may have gotten it backwards -- and every single claim in every one of those patents that's in the asserted claim is going to be asserted against each product. No, that's not going to happen.

They haven't done their homework on infringement. They want me to do it for them. That's not the way patent cases are structured. That's not the way any cases are structured.

It's a fallacy to say just because, Qualcomm, they are your products, you know more about them, of course we do. That's the case in every single situation where someone provides business records pursuant to Rule 33(D), every

1    single time.  The defendant always knows.  Always knows.

2            But when it comes to compiling facts, compiling

3    differences, those types of things, fact issues, which can be

4    discerned from their experts just as well as ours, that is a

5    proper subject of Rule 33(D).  I contend this information is

6    completely irrelevant; but if they want to do it, they have

7    the means to do this exercise.  They can do it; and if they

8    want to, they should.

9            This is not an issue of contentions.  There is no

10   issue in this case that turns on -- I think properly, that

11   turns on the contention of what is your contention about the

12   differences between the accused products, because that's not

13   the relevant issue here.

14           The issue is, do the claims read on the product?

15   So do the claims read on the product, not does this product

16   differ from this product.  It's a different analysis.  The

17   analysis he wants us to do at great burden and expense is

18   completely irrelevant, burdensome, and should not be done.

19           Thank you, your Honor.

20           THE COURT:  All right.  Mr. Budwin, do you want to

21   reply to that?

22           MR. BUDWIN:  Yes, your Honor, I would appreciate

23   the opportunity.

24           So there are obviously several statements made

25   that I don't agree with.  The first is, our interrogatory has

1  no relation to our mental state.  It has everything to do

2  with Qualcomm's mental statement.

3         I showed you the declaration of their engineer,

4  and you heard Mr. Hummel say the lawyers and engineers sat

5  together and came up with some differences.  Well, why can't

6  the lawyers and engineers sit down and come up with some

7  differences that they contend are relevant, not that I

8  contend are relevant, and tell them to us in response to our

9  interrogatory?  I would suggest to the Court a good starting

10  point for that is the declaration on the work they have

11  already done.

12         Mr. Hummel also talked about how some of this work

13  may go by the wayside depending on developments in the case.

14  That's always true in discovery in every case.  And the

15  federal rules have a procedure in place for supplementing

16  your discovery responses if and when you learn that the

17  information contained in them is no longer accurate.

18         So they could provide us a response to our

19  interrogatory, including the information that they already

20  included in that declaration and anything else that they are

21  aware of, and if additional facts and circumstances further

22  down the line so warrant, they can supplement that response.

23         The other thing I would like to respond to briefly

24  is Mr. Hummel's attack on our infringement contentions and

25  one of the reasons why this interrogatory is so important.

1        We provided an infringement contention where we

2  went out and reverse-engineered a Qualcomm product, one

3  chipset, at very great expense.  It cost us more than a

4  hundred thousand dollars to get that report.

5        We took that information from that report,

6  together with public information that Qualcomm has -- they

7  have some patents and some papers -- and we were able to

8  determine based upon those patents and those papers what

9  additional other Qualcomm products contained the same or

10  substantially the same circuit design as the one we obtained

11  at great expense.

12        Our contention in our infringement contention,

13  especially until we are proven otherwise, is that the circuit

14  design in the QSC6270, which is the product we

15  reverse-engineered, is the same or is materially the same in

16  all the other Qualcomm-accused products.

17        Qualcomm contends that's not the case.  They know

18  what our contention is.  If they contend that's not the case,

19  then they should tell us; and that's all we are looking for

20  here, is their contention as to what the differences are.

21        We wanted that a year ago so we could properly

22  frame discovery.  Now we are almost at the end of discovery,

23  so we didn't have that opportunity; but we would like to know

24  that answer so we could properly frame our expert report.

25        Thank you, your Honor.

1          THE COURT:  All right.  Mr. Hummel, do you have

2     any reply to that?

3          MR. HUMMEL:  Yes, your Honor.

4          Basically it's the same thing I said in the

5     beginning except I will point out that the exercise that

6     Mr. Budwin wants to happen, of course, could happen; but in

7     patent cases, as in every other case, there has to be a

8     balance between relevance and burden.

9          This particular exercise is burdensome and its

10    relevance is zero, because what Mr. Budwin -- the whole

11    premise of Mr. Budwin's argument here is that Parkervision is

12    going to show that one product is the same as the other

13    product.

14         That is not the patent infringement analysis that

15    must be done.  The analysis, again, is between the claim and

16    the product.

17         He has the burden of showing what he just said,

18    that the accused circuitry is the same.  He knows that; and

19    if he doesn't know that, his expert knows they are not the

20    same; and he has to do a separate infringement analysis for

21    each one based on the schematic in front of him, not based on

22    some work product that Qualcomm does.  He has to compare the

23    product to his patent claims.  That's the exercise that will

24    happen when we get to infringement contentions or revised

25    infringement contentions and the expert reports.  That's the

1  traditional way this is done.  There is no point of doing a

2  lot of busy work that may or may not be used later on.  He

3  doesn't need it at that point.

4  　　　　THE COURT:  Mr. Budwin, have you received the

5  schematics now that you wish to have?

6  　　　　MR. BUDWIN:  Yes, your Honor.  This is one of the

7  other disputed issues is we have gone out and printed a whole

8  host of pages, and there was a dispute over how much of those

9  we should get.  The agreement that the parties agreed to is,

10  we went back on the next day and printed smaller sections of

11  the areas that we believe were most relevant, and those were

12  provided to us.

13  　　　　The agreement with Qualcomm provides that if

14  Qualcomm relies on any of those additional pages that we

15  printed that they haven't given to us, they will give them to

16  us and give us ten days to decide whether to rely upon them.

17  　　　　THE COURT:  All right.  The second issue, then,

18  concerns Interrogatory No. 9.

19  　　　　MR. BUDWIN:  Yes, your Honor.

20  　　　　So I've got Interrogatory No. 9 up here on the

21  screen, and this requires a little bit of additional

22  background facts so that you can understand the root of the

23  dispute between the parties with respect to this

24  interrogatory.

25  　　　　So what we are asking for in Interrogatory No. 9

is quarter-by-quarter basis, certain financial data from

Qualcomm as related to the accused products.  Revenues,

costs, expenses, profits, things of that nature.

The fundamental dispute of Qualcomm as related to

this issue is twofold.  First, we disagree with the

methodology that Qualcomm uses to count whether a sale is

within the U.S. or not.  We believe we should be provided

with additional information so that we can perform our own

calculation.  Qualcomm can then dispute whether we have

calculated it correctly on the facts or not.  We contend the

way they calculated U.S. sales is incorrect, and we need

additional information beyond that.

The other issue is for how Qualcomm apportions

revenue as related to the accused products.

The patents in this case cover receivers.  What

Qualcomm sells that we accuse of infringement is one of two

things.  It's a transceiver, which is both a transmitter and

a receiver, or it's a chipset, which is a transceiver, a

receiver, and a base band processor, all on the same piece of

silicon.

Qualcomm is apportioning out the revenues for the

receiver portion of those combined products in a way that we

don't agree with.  That's the crux of the issue, how you

account for U.S. sales and how you account for revenue for

the things we accuse of infringement.

1    They have used a methodology to answer our

2  interrogatories, and we disagree with that methodology.  I'll

3  provide a little bit more background on that.

4    Here's the response that we got in the

5  supplemental response to Interrogatory No. 9.  "The locus of

6  a sale in the U.S. is the ship-to address associated with

7  each sale within the U.S."

8    So Qualcomm has limited -- this is the first

9  issue.  Qualcomm has limited the revenue they have given us

10  to sales where the ship-to address is within the

11  United States.

12    It gets a little more different, but we have to

13  look at how Qualcomm's corporate structure is set up.  I've

14  got a response to another one of Qualcomm's interrogatories

15  on the screen.

16    Qualcomm has two international subsidiaries that

17  are involved in determining or involved in purchasing product

18  sources.  My understanding of what happens is Qualcomm,

19  Incorporated, the parent company in the United States,

20  designs the products that we accuse of infringement.

21    Qualcomm, Incorporated ships those designs to one

22  of Qualcomm's international subsidiaries, that international

23  subsidiary works with a contract fab in Taiwan, China,

24  somewhere of that nature, to have the products made.  The

25  international subsidiary takes delivery of those products,

and I have it here, and a small portion of those products are
then shipped to Qualcomm, Inc. by Qualcomm's international
subsidiaries.  The vast majority of those are delivered to
original equipment manufacturers Apple, Samsung, Motorola,
HTC.

THE COURT:  Overseas?

MR. BUDWIN:  Overseas.

We believe that we are entitled to a portion of
the revenue from the sales that occur overseas -- and this
relates to the next interrogatory that we are going to talk
about -- because Qualcomm designs its chips with the
knowledge that they are going to come to the United States.
Not that 100 percent of them will come to the United States,
but that some amount of them will.  We know that because they
are designed to work with the FCC requirements of the
United States on the frequency bands within the United States
and to address certain carrier-specific issues within the
United States.

I think this corporate structure is important.  So
Qualcomm's international subsidiaries probably sell a very
small percentage to the parent company in the United States,
and that's the only revenue information we are getting.  They
are excluding all of the revenues made to anybody else
overseas, regardless of whether those products come into the
United States.

1    There is going to be a dispute between the parties

2    over how you account for that international revenue.  Our

3    belief is we can show that 40 percent of those sales, for

4    example, come to the United States and that Qualcomm knows,

5    which are disputed issues of fact to be resolved by the

6    fact-finder.  Our contention is, if we can show that, we are

7    entitled to that information and to base the damages theory

8    on it and we need that information from Qualcomm.

9         It's interesting to look at this response to this

10   interrogatory also.  This relates to QCT, the Qualcomm

11   international subsidiary based in the British Virgin Islands.

12   They have zero employees, and all of their officers of the

13   British Virgin Islands subsidiary are either officers or

14   employees of Qualcomm, Inc., the U.S. entity.  So there is

15   certainly direction and control there as well.

16        Qualcomm's clearly set up this way for tax

17   purposes, but the tax laws and patent laws are different.  We

18   have some cases about why worldwide sales revenue are

19   relevant.  Those were in the letter we delivered to

20   your Honor this morning and served on opposing counsel, so I

21   won't go through those now.  Clearly it's relevant for

22   damages issues, also relevant for nondamages issues.

23        I told you the second problem we had with their

24   methodology was not just the way they calculated U.S. sales,

25   but also how they apportioned revenue for just that receiver

1   portion as opposed to the transceiver or the processor.

2           As we have told the Court and as everybody is

3   aware, Parkervision and Qualcomm had licensing negotiations

4   in the late 1990s.  There was an actual relationship between

5   the parties related to the technology at issue in this case.

6           What I have on the screen and what was attached to

7   our motion is a document that came out of it.  The royalty

8   rates have been redacted, consistent with what was filed with

9   the Court, but you can see the parties were negotiating rates

10  on receivers, on transceivers, which is where the one chip

11  contains both the transmitter and a receiver, and on the

12  integrated base.

13          In damages, you have to construct what's called a

14  hypothetical negotiation; what would the parties have

15  actually hypothetically negotiated between themselves.

16          Here -- and this is the first patent case that

17  I've worked on in my career -- we don't have a hypothetical

18  negotiation.  We have an actual negotiation.  We believe that

19  the proper damages model in this case will look at what the

20  parties actually negotiated and the things the parties

21  contemplated attaching royalty rates to.

22          So Qualcomm will dispute with us as a matter of

23  fact whether we are giving too much weight to the receiver as

24  opposed to the transmitter portion of the chip or whether we

25  are giving not enough weight to the base band.  They are

going to argue, obviously, that the nonpatented features are
what drive them, and we are going to argue the opposite of
that disputed issue of fact to be resolved by the
fact-finder; but to properly phrase the issue for the
fact-finder, we need the evidence, and they haven't provided
that to us.

There is a whole bunch of Georgia-Pacific factors
on damages that are cited in the letter to your Honor and in
the briefing. I won't go through those. I think this
relates to one of the questions that you posed to us about
cost savings. We don't have to go through those, but that's
the gist of my argument on this issue, your Honor.

I'm prepared to yield the floor.

THE COURT: All right. Mr. Greenwald?

MR. GREENWALD: Thank you, your Honor. David
Greenwald for Qualcomm.

I would like to take the two issues that
Mr. Budwin has raised, but for reasons I think will come
clear, in reverse order.

On the first issue, whether we have only provided
in response to 'rog 9 apportioned financial information,
apportioned revenues, the short answer and complete answer to
this is just we have not done any apportionment. We have not
done any apportionment.

Your Honor, we explained that to Mr. Budwin on the

1 meet and confer in this matter. He either didn't hear us

2 clearly or for whatever reason doesn't understand our

3 position or the data we gave him as we understand it, but we

4 are confident we understand it correctly.

5        To explain why that is, I think just a little bit

6 of background on the types of products that are at issue in

7 this case. Mr. Budwin briefly explained that. I would just

8 like to elaborate a little bit.

9        Mr. Budwin is correct; the accused products in

10 this case, the ones they have accused of infringement and the

11 ones we concede are accused of infringement, do fall into

12 three categories. They are all single unitary products.

13 They are all integrated products. They are all physically

14 part of a single chip, if you will, a tiny, little square

15 piece of silicon. They are, yes, receivers which do nothing

16 but receive a signal with the help of the circuitry that they

17 contend infringes their patents.

18        Then there are somewhat more complex integrated

19 single standalone products called transceivers. Those both

20 have the receiver functionality and also have the ability to

21 transmit signals. They don't transmit using any technology

22 that's at issue in the patents here; but, nonetheless, it's a

23 single unitary product.

24        Lastly, the most complex of all are what

25 Mr. Budwin correctly referred to as integrated RF base band

chips.  These, again, are not collections of different chips,
they are not a part of chipsets or chipset solutions.  They
are single stand-alone products.

In response to 'rog 9, we provided for 75 such
products.  By "such products," I mean receivers,
transceivers, and integrated RF base bands.  The complete
U.S. revenues, sales revenues, for those products we did not
make any apportionment, by which I understand Mr. Budwin to
mean if, for example, integrated RF base band, if we sold,
just for purposes of illustration, a million dollars worth of
that.  We didn't report to him a million dollars.  We said,
oh, 20 percent of that is attributable to the receiver
functionality, so we are only going to report in 'rog 9
$200,000.

That's not what we did.  We reported a million
dollars, if those are the figures.  So I think the
fundamental premise -- and I'm sorry if that perhaps comes
down to this, but I think it's just a fundamental
misunderstanding which we attempted to correct at least at
the meet and confer, if not earlier, underlies this portion
of this motion.

Second of all, with respect to what he contends to
be the prong of the motion challenging our decision to
provide only financial information for sales of products
shipped to the U.S., here, it is correct that in our response

1    to 'rog 9, we only provided data, financial data for

2    shipments of product to the United States, and we have made

3    very clear to him and in our papers and in the meet and

4    confer why we have done that.

5            I should say that there is no briefing.  We even

6    had no notice that he takes issue with the proposition that

7    the proper direct infringement royalty base here is based

8    upon the sales of products shipped to the U.S. as opposed to

9    some other way of determining them.

10           What he seems to be taking issue with is the

11   proposition that we at this stage of the case should be

12   providing not only that subset of revenues, what we will call

13   the U.S. ship-to revenues, U.S.-only revenues, but also

14   worldwide revenues.  And, yes, there, he is correct.  We have

15   not provided those at this point, and our reasons why are

16   transparent.

17           Your Honor, that information, if it ever becomes

18   relevant to any claim in this case, it will only be to a

19   claim of what's called induced infringement.  Not a claim

20   that we by shipping, selling, shipping products to customers

21   based in the U.S. directly infringe the patent, but that by

22   selling products abroad -- and we certainly do -- an

23   overwhelming majority of the cell phone manufacturers who buy

24   Qualcomm's products are based abroad, that by selling those

25   products to those cell phone manufacturers abroad we induced

1   third parties to infringe the patent.

2            Now, this is a statutory ground for infringement

3   liability, but only if it's been pleaded properly, only if

4   it's been pleaded in accordance with the pleading standards

5   set down in Twombly Iqbal that the federal circuit in I

6   believe March of this year in the bill of lading case made

7   crystal clear applies to claims of induced infringement.

8            Based upon that, your Honor, we moved to dismiss

9   their complaint for failure to state a claim of induced

10  infringement.  That motion was granted.  Granted.  There was

11  no question that their first complaint in this action --

12  perhaps their second.  I forget which one, but in any event,

13  the complaint we moved against was inadequate.

14           The Court granted them leave to amend, but

15  Judge Dalton in his order granting them leave to amend made

16  crystal clear what they had to do.  It was plain to us when

17  we got that amended complaint that they hadn't done that, and

18  therefore, yet again, had not complied with Twombly Iqbal,

19  which if your Honor is familiar, is a decision designed

20  precisely to spare defendants of the need to engage in

21  discovery on claims that are not plausibly alleged.

22           We moved to dismiss that.  That motion was

23  pending, and we made very clear in our opposition papers to

24  this motion that if that motion is denied, then we will

25  produce this nonapportioned -- nonapportioned worldwide

1 revenue data; but we feel until such time, it is not

2 consistent with Twombly Iqbal, given the prior proceedings to

3 date, for us to be called upon to produce this information.

4          Thank you.

5          THE COURT:  Mr. Greenwald, in Exhibit D where you

6 have percentages for each quarter and I think there are five

7 different categories of expenses --

8          MR. GREENWALD:  Yes.

9          THE COURT:  -- are those, then, all based on

10 United States numbers or are those worldwide?

11          MR. GREENWALD:  That's different, your Honor.

12 It's based on everything, and the reason for that is we don't

13 keep product-specific, we don't keep country-specific,

14 shipment-specific cost data.

15          Costs do have to be sort of -- they are kept at a

16 much higher corporate level, if you will.  So, for example,

17 R and D, there is no R and D line for specific products.

18 There are R and D lines for the divisions, and that then is

19 apportioned.  There, there is apportionment going on.  It's

20 completely different from the apportionment that he's

21 complaining about.

22          There, there is apportionment according to sort of

23 revenue figures and their relations to the revenues from

24 other products in the divisions.  So there, there is

25 apportionment going on, but I believe it is the cost -- if

1    there came a time when we were under an obligation to produce

2    worldwide revenue data, I do not believe -- I can check on

3    this, but I do not believe the cost data would change.  The

4    cost percentages would remain the same.

5           THE COURT:  So these numbers on Exhibit D are if

6    you have plants or subsidiaries have plants in Hong Kong or

7    somewhere else manufacturing, these would cover that as well?

8           MR. GREENWALD:  We actually don't manufacture.  My

9    understanding is Qualcomm does not actually manufacture chips

10    itself.  It contracts it out to foundries and such.  So the

11    costs, yes, they are cost data for Qualcomm as a group.

12           THE COURT:  Okay.

13           MR. GREENWALD:  If that's incorrect in any

14    respect, I will inform the Court.

15           THE COURT:  All right.  Mr. Budwin?

16           MR. BUDWIN:  If I can respond briefly on just the

17    point you just asked Mr. Greenwald about, I'm looking at

18    Qualcomm's supplemental response to Interrogatory No. 9, not

19    the second supplemental response; but here they say,

20    "Accordingly, costs of goods sold within the United States

21    are estimated by determining the portion of worldwide costs

22    to each product allocable to sales within the U.S."

23           So it's my reading it's using the same allocation

24    methodology as previously.  I may be mistaken, but that's my

25    understanding.

1    MR. GREENWALD:  I think we are saying the same

2 thing.  If that wasn't clear, I think I was trying to say,

3 perhaps inarticulately, exactly what that response says.

4    MR. BUDWIN:  And I'll respond briefly to the point

5 Mr. Greenwald raised.

6    THE COURT:  Okay.

7    MR. BUDWIN:  I'm willing to accept his

8 representation on the first issue that they are not doing any

9 apportionment and they have given us all the revenues for the

10 receivers, transceivers, and the base bands.

11    I disagree that's what the meet-and-confer process

12 led to.  We wouldn't be here on an issue if that was what the

13 meet-and-confer process led to.  I believe there is

14 correspondence from us saying that our understanding was they

15 were doing that apportionment.  If we are incorrect and I

16 heard Mr. Greenwald represent in open court they weren't

17 doing that apportionment, I'll accept that.

18    The issue remains about the apportionments of U.S.

19 sales, and you heard Mr. Greenwald inform the Court that the

20 reason he's not providing this is because of the pending

21 motion to strike.

22    MR. GREENWALD:  Motion to dismiss, your Honor.

23    MR. BUDWIN:  Motion to dismiss.  Sorry.  Motion to

24 dismiss our indirect infringement claims.

25    So I agree with Mr. Greenwald that what we seek is

1  relevant to indirect infringement, but it's also relevant to

2  nondamages issues as well.  So here's a case where they are

3  talking about worldwide sales that may be relevant to

4  nondamages issues, including commercial success, which is a

5  secondary indicia of nonobviousness.

6          Even on that pending motion to dismiss,

7  your Honor -- we will leave the merits of that to be decided

8  on another date -- we have attached a motion to dismiss

9  Qualcomm's inequitable conduct claims pending since March,

10  and Judge Dalton set a hearing on that for January.

11          We did not take a unilateral view of discovery and

12  refuse them discovery on their inequitable conduct claim

13  pending our motion to dismiss.  They deposed our prosecuting

14  attorney on it, they deposed our inventor on it, and they've

15  gotten a ton of discovery on it as to why we are not here on

16  their motion.  If we would have refused them discovery on

17  their inequitable conduct claim, you better believe that

18  there would be a motion to compel to bring that issue before

19  the Court before the close of fact discovery.

20          We have got close of fact discovery, as set by the

21  Court, that was technically November 30th.  Parties have

22  filed a joint motion to extend that deadline to the end of

23  this month, December 31st.  I and our firm does not take a

24  unilateral view of relevance, and we work very hard with

25  opposing counsel to get them the information they need so

they can prepare their case using whatever theories they may want to argue about and will wait until trial, or before the fact-finder on summary judgment, to litigate the merits of those issues.

        We need basic discovery, or are entitled to it, before the close of fact discovery, which we are almost up against, in order to frame our case and put an expert report out there. If we don't get a ruling on the motion to dismiss until late in the game, and if we don't get the discovery on this issue until late in the game, we are going to have an issue of having to supplement expert reports, refile Daubert challenges to expert methodologies on damages, and all that is going to happen at some point after.

        The easier course and the course of less resistance is for them to provide us that information now and let us formulate our theories and we will litigate them on the merits.

        Thank you, your Honor.

        MR. GREENWALD: One additional data point to add to this discussion.

        It wasn't just in the meet and confer that we so informed Parkervision. We said it quite clearly in our opposing papers we filed in late September. Page 11, "Contrary to Parkervision's Motion to Compel, Qualcomm did not tell Parkervision that it provided financial data for

1  only the receiver portion of the Exhibit B products.  Quite

2  the opposite.  Qualcomm provided and informed Parkervision

3  that it provided revenue data for each of the Exhibit B

4  products in their entirety."

5          THE COURT:  What would be the problem,

6  Mr. Greenwald, for providing at least in camera to the

7  plaintiffs the worldwide sales numbers?

8          MR. GREENWALD:  There would be no logistical

9  problem with doing that.  We have access to them, certainly.

10          THE COURT:  And they are already available?

11          MR. GREENWALD:  They are available.

12          THE COURT:  They are compiled?

13          MR. GREENWALD:  They are available.  There is no

14  question they are.

15          We feel it's inconsistent with Iqbal and Twombly

16  to subject us to discovery on an issue that is currently, in

17  our view, irrelevant to the case, both because of the prior

18  dismissal on the truly immaterial changes to the pleading

19  that Parkervision made when it amended its complaint and, in

20  fact, disregarded the instructions Judge Dalton had given as

21  to what he wanted to see in an amended complaint.

22          THE COURT:  What about the reverse where

23  Mr. Budwin is saying they are providing information on the

24  issue they are litigating as well and deposing that you have

25  requested?

1          MR. GREENWALD:  Well, look, I can point to

2     examples, your Honor, very recent examples in which they have

3     declined -- they have flatly declined to give us discovery on

4     issues that we have given formal notice in a court filing

5     that are at issue in the case.  That would be as part of a

6     formal pleading if only we were procedurally authorized to

7     make such a pleading at this time, i.e., upon the resolution

8     of this pending motion to dismiss such as we would file an

9     answer.

10          I can give you -- I can supply to the Court many,

11    many recent RFPs, interrogatories where they have said this

12    is not relevant to any counterclaim currently in the case

13    and, therefore, we decline to give discovery even though we

14    filed in court a notice with respect to that.

15          It's not as if this is some unilateral withholding

16    that's going on.  Both sides have taken the position that if

17    something is not yet in the case, it is not proper subject

18    for discovery.

19          The inequitable conduct counterclaim is somewhat

20    different in this respect.  We are not in a situation where

21    they moved to dismiss it, it was dismissed, and we got leave

22    to replead it and we did nothing different.  I think we would

23    be in a different situation here.

24          Here, the pleading we made, I believe, is at least

25    in most respects -- and it is the subject of the solitary --

1   the single motion to dismiss that Parkervision filed I

2   believe earlier this year or late at the end of last -- I

3   think earlier this year, has never been dismissed.

4           THE COURT:  Okay.  All right.

5           As to Interrogatory No. 17.

6           MR. BUDWIN:  Yes, your Honor.

7           This will relate somewhat to the issue that we

8   addressed, and I suspect maybe the answer from Qualcomm would

9   be the same, but Interrogatory 17 asks Qualcomm to identify

10  and describe whether it designed its products with the

11  knowledge and intent and belief that those products are

12  income in the United States.

13          Let's look at Qualcomm's response and then square

14  that with the public information, which is all we have been

15  able to glean on this issue, your Honor.

16          They tell us these products are designed to work

17  in many countries.  This is the first response, but they

18  don't know which ones are imported into the United States,

19  and this kind of relates to the earlier interrogatory.

20          We weren't happy with this response.  We had some

21  discussions with them about it.  They supplemented it, and

22  they said the products are designed to work in the

23  United States and other countries and comply with certain

24  other governmental regulations.

25          What they didn't tell us was whether they designed

1  products specifically for the United States or with the

2  knowledge that those products, some amount of them, will

3  ultimately come to the United States. This relates to

4  inducement and contributory infringement, 271(D) and (C).

5  There was some discussion on this. I have some case law on

6  inducement that we won't have to go through.

7          But let me show you, your Honor, Qualcomm's web

8  page. I looked at Qualcomm's interrogatory response saying,

9  Oh, we don't know exactly what comes to the United States.

10 We really don't have any knowledge of that.

11         They maintain a web page that anybody can go to

12 that contains a list of devices sold in the United States

13 that contain the accused products. Somebody at Qualcomm put

14 together this web page. Somebody at Qualcomm knows that

15 these products that contained the accused products are sold

16 in the United States.

17         If you look, it says, "Find a smart phone," and

18 you can sort by carrier. Here are the carriers. Verizon.

19 Verizon is only in the United States. So some somebody at

20 Qualcomm knows that Verizon sells not just these six phones,

21 but many, many phones from many manufacturers -- HTC,

22 Motorola, Samsung -- and does so in the United States.

23         We have redacted a portion of this document, but

24 this is called "The U.S. Variants." So here we know that

25 Qualcomm has U.S.-specific variants of some of its products.

We also know that there are many industry reports -- Gardner,
things of that nature -- on sales of smart phones and sales
of smart phones by the receiver type and base band processor
in the United States.

Somebody at Qualcomm, I would believe -- their
marketing department elsewhere, purchases and has access to
those third-party reports.  Maybe if Qualcomm doesn't keep a
list itself, which is what I understand them to be saying and
find hard to believe in light of this web page, somebody at
Qualcomm will have access to those third-party reports or
somebody at Qualcomm could call and ask their customers, Hey,
how many of these do you bring into the United States?

They have the ability to get the information to
the extent they don't already have it.  I believe they
already have it, but they can get it, if they don't; and we
have gone so far -- your Honor saw a briefing on this -- to
help Qualcomm file a request with governmental agencies to
get discovery.  Again, we believe in cooperating.  We didn't
have the information they were seeking in our possession,
custody, or control, but we helped them get it from a source
that was difficult to access.

So I believe they have the information we want.
They couldn't put up a web page and could say it's a U.S.
variant otherwise; but if they don't, they can get it and
they should get it and they should tell us.

1          Thank you, your Honor.

2          THE COURT:  Mr. Budwin, the Exhibit A that was

3     attached, column one of that, the product was sold in the

4     United States or not and it lists about 39 or 40 products

5     that are sold in the United States, and a large number of

6     those are not.

7          Does that relate to this in any way, or are you

8     saying other products are brought back that aren't sold in

9     the United States?

10          MR. BUDWIN:  Let me find that response, your Honor.

11          THE COURT:  This was attached to the interrogatory

12     before, or part of it.

13          MR. BUDWIN:  This is tab A.

14          THE COURT:  Yes, tab A, I think.

15          MR. BUDWIN:  Maybe if you can help me, your Honor.

16     So there are numbered tabs.  Is it tab 3A?

17          THE COURT:  It's in the book you provided on the

18     interrogatory answers today.

19          MR. BUDWIN:  Yes.  I apologize, your Honor.  I'm

20     having trouble locating what you are referring to.

21          THE COURT:  It's under 1A and in back of the

22     yellow divider, if you have the same divider.  I don't know

23     if you do or not.

24          MR. BUDWIN:  Exhibit A.  Sorry, I don't see the

25     reference.

THE COURT:  That chart looks like the same one I'm looking at, but looking in column 1, the first column of that.

MR. BUDWIN:  Sold in the U.S., "No.  No.  No."

So, again, the issue we have got is we are not -- we are interested in whether it's sold in the United States, but Qualcomm is saying it's only sold in the United States if there's a shipped-to address from the British Virgin Islands subsidiary to Qualcomm, Inc.

We believe that Qualcomm has the knowledge that the people that they sell to overseas import the products back into the United States; and, so, if we changed this to say, does Qualcomm know that the product is imported to the United States by Qualcomm itself, which is what I believe this response is telling us, or others that Qualcomm knows of, that would be acceptable.

But we are limited to the U.S. shipped-to addresses now, which prevents us from formulating a full damages theory and an indirect infringement theory, and that's why we need access to that information, your Honor.

Thank you.

MR. GREENWALD:  Your Honor, here, too, I wonder whether this is a false dispute.  There is not -- there cannot be any question that Qualcomm knows that when it sells its chips both to U.S.-based and to foreign cell phone

1  manufacturers that some of them are going to find their way

2  into phones that they, not Qualcomm, make, because Qualcomm

3  does not make phones.  Some of them will find their way into

4  phones that end up in the U.S.

5          There is no dispute on this, nor have we

6  questioned that in our response or in our supplemental

7  response to Interrogatory No. 17.

8          What Interrogatory No. 17 asks is, "Identify and

9  describe whether you design each of those products" -- that

10 is, the Exhibit B products -- "with the knowledge, intent, or

11 belief that each such product will be or is likely to be

12 imported into, sold, or used in the U.S."  Then it has a

13 series of subparts.

14         To help your Honor wade through it, because we

15 gave a full response to each subpart, I prepared something in

16 a table format that sets forth a response to each of the

17 subparts.  If you work through it, as I hope you will -- and

18 I hope it's not too hard, but I don't think it is, it's made

19 clear we have not disputed in that we design many -- indeed,

20 the majority.  There are a few that aren't, but we have not

21 disputed that we design the majority for use within the

22 United States or potential use within the United States.

23         The only thing we did here, though, was to make

24 our answer complete is we said we didn't design it for use

25 exclusively within the U.S.

1    Imagine this were a case about a book publisher,
2  Random House that publishes books in English and the
3  plaintiff asks Random House, tell me whether you publish your
4  books with the intent they be read in the United States.

5    Well, the answer would be, Well, since we publish
6  in English, yes, of course we publish them with that
7  knowledge or intent; but we also intend for them to be read
8  in Canada, Australia, and the U.K.

9    That's because of nothing we have done or not some
10 conscious decision about the way we decided to structure our
11 business.  That's just because of the nature, A, of the way
12 the cell phone and the wireless industry has evolved with
13 respect to standards and, B, with respect to the rules of
14 physics.  Let me be a little more descriptive here.

15    One of the questions here is whether you design
16 each product to comply with the telecommunication standards
17 used in the U.S.  Well, telecommunication standards are kind
18 of like languages.  They are not country-specific, or at
19 least most are not country-specific.  The ones in place in
20 the U.S., I think one is called LTE; one is called CDMA.
21 They are kind of like English.  Yes, they are used here, but
22 they are used in a variety of other countries, too.

23    So for us to say that we design our products as we
24 do to comply with these telecommunication standards is not
25 equivalent to a statement that we design it for use in the

United States and only in the United States, and that's what
our answer says.

Frequency bands. Frequency bands are not
country-specific. They are not even planetary-specific. The
same frequency bands that are used to transmit cell phone and
radio communications on this planet could be used on other
planets as well.

What is true is that regulatory agencies
throughout the world, the FCC and others, do allocate the
spectrum in different ways; but because the spectrum is
limited, it's generally -- perhaps always the case -- that
bands are used -- overlapping bands are used in different
countries.

One of the exhibits they gave -- that they cited
and is attached to their motion -- I'm sorry, I don't have it
with me -- but it pointed to the fact that one of the phones
into which our chips ultimately get incorporated -- I believe
an LG phone, uses the 850/1900 frequency bands; and they say,
Ah-ha, we found it off the internet that you guys design your
products for use in -- chips for use in phones that use the
frequency bands in use in the U.S.

First of all, we didn't dispute that. We agreed
we design it for use on those bands, but those bands are also
in use in Brazil, India, China, Korea.

We have answered every single subpart of this

interrogatory with as much detail as we possibly can.

The thing they are really complaining about is not something of our making. It's the simple fact that chips are designed for use by cell phone manufacturers who design phones and devices for use in multiple geographic markets. And once, I think, the Court appreciates that and perhaps Parkervision counsel appreciates that, I think the objection to this supplemental interrogatory response, which was filed I believe only a couple of -- served, I should say, only a couple of days before they demanded a meet and confer and then filed their motion the following day -- I think the objections to this response fall by the wayside.

If there are any other questions on this, I would be happy to answer.

THE COURT: You do say in one of the responses that in three of the products listed in Exhibit B, Qualcomm has learned that its customers purchased these products for use in low-end feature phones sold exclusively in certain Asian markets.

MR. GREENWALD: Yes.

THE COURT: Does that imply you know what other products are also brought back into the United States or not?

MR. GREENWALD: This is the exception that proves the rule. When we went through this list of 75 products with knowledgeable people at Qualcomm to prepare this response it

1  was for all but three of those that we really didn't know,

2  and I'll get to why we really don't know actually in a

3  moment.  You have reminded me of something, your Honor.

4         For these, it's hard -- actually, we probably

5  don't know a hundred percent, but for these, we are informed

6  by the engineers who worked on them that they are such --

7  they are designed for use in phones that just don't get sold

8  in the United States today.  They are sort of backward phones

9  like the ones I still use.  They don't have any apps on them

10  or anything.  They just have like a clock or a stopwatch you

11  can use.  So that was the basis for that.  But for the

12  others, we just don't know.

13         Mr. Budwin contends -- and he's just wrong -- that

14  we can call up our telephone manufacturer customers, our

15  Bluetooth manufacturer customers, what we call original

16  equipment manufacturers -- OEM is the acronym.  Think of them

17  as the cell phone manufacturers.  Apple, Nokia, LG,

18  Samsung -- and say, tell me how many of these phones have

19  this chip that you shipped into the United States.  They will

20  not tell us.  That is very -- for whatever reason, that's

21  very sensitive information.  We certainly do not have

22  possession, custody, or control of that information such that

23  we could be subject to a discovery obligation under the

24  federal rules.

25         If we were ordered to go to our customers and ask

1  for that, I don't think we could comply because they would

2  not tell us.

3       Thank you.

4       MR. BUDWIN:  Your Honor, brief response?

5       If you would look at what Mr. Greenwald handed up

6  to you -- and I think this will ultimately frame the dispute,

7  just above the portion that you read, the last sentence of

8  the first paragraph on the first page says, "Thus, Qualcomm

9  generally lacks knowledge concerning the ultimate destination

10 of its products."

11      We heard Mr. Greenwald tell us it's not in dispute

12 they manufacture them and comply with the U.S.

13 telecommunication standards, FCC requirements, things of that

14 nature.  You're only going to design them to comply with the

15 FCC requirements, which is U.S. only, U.S. specific.  You're

16 only going to have knowledge of which phones work on Verizon,

17 again, U.S. specific.

18      If they would amend that response to say, thus,

19 Qualcomm designs its products so that they will comply or --

20 strike that.

21      Qualcomm knows that some amount of its products

22 will ultimately be destined for the United States, we would

23 have no dispute.  The reason they phrased it in the way they

24 phrased it is they know an element of our claim for indirect

25 infringement is intent; and they are trying to make it clear

1  that even though they design and comply with the FCC

2  standards, even though they know which phones are on the

3  Verizon network, they don't have the intent, so we can't meet

4  our burden of proof on that element.

5         THE COURT:  Are you saying the phone designed for

6  FCC standards can't be sold in other countries?

7         MR. BUDWIN:  No, I'm not disputing that at all.

8  The phone might comply with the FCC standards and it might

9  work overseas.  I would agree with that 100 percent; but by

10  designing the phone to comply with the FCC standards, they

11  know that some amount of those phones -- it's not disputed

12  whether it's a million or one -- are coming to the U.S.

13         That's the nub of the dispute.  They know some of

14  their products, some amount of each of the products, except

15  for those low-end phones, are coming to the U.S., and they

16  should tell us they have that knowledge.  They won't tell us

17  that because they know it's not in the claim.

18         Thank you.

19         THE COURT:  Mr. Greenwald?

20         MR. GREENWALD:  Your Honor, I can do nothing

21  better than just to refer your Honor to the response we gave,

22  particularly with respect to subpart 2.  "The following

23  Exhibit B products " -- and then there is a long list of

24  them -- "are designed to comply with cellular or broadcast

25  telecom standards used in the U.S.," but there are no U.S.

telecommunication standards.  That's a fallacy here.  There
are no U.S. specific.  There are telecommunication standards
that are used in the U.S., as well as other countries around
the world.

Cellular broadcast telecommunication frequency
bands are used in the U.S., as well as in other countries,
and certain U.S. governmental regulations related to cellular
or broadcast telecommunications equipment.  Here, too, those
regulations, those FCC regulations, they pertain to the
products made by the cell phone manufacturers.  They are the
ones who have to comply with those specs.

Yes, if they ask a question of us, Will we be able
to meet it if we use your chips?  I believe we do inform them
when we get that question or even in the product literature
whether they do.  But by saying that, it doesn't mean that we
have designed them to comply solely with those U.S. specs and
not specs that are in place in other countries, promulgated
by the equivalent of the FCC in those other countries.

I think -- really, I think it's a false dichotomy
that's being set up by this motion.  I believe, more
importantly, as it relates to this motion, this answer is
complete in all respects.

It is true, we do generally lack knowledge of the
ultimate destination of its products.  When we send these
chips to Samsung, all we know is Samsung takes them and puts

them into phones.  We have some idea of which phones they go
into, but Samsung doesn't sell phones just for the U.S.  They
sell phones throughout the world.

MR. BUDWIN:  Just a brief response again,
your Honor?

THE COURT:  All right.

MR. BUDWIN:  If you look to the third page -- or
point 3 on the second page of what Mr. Greenwald held up to
you, they also say, "The Exhibit B products listed
immediately above are also designed to comply with certain
specifications set by U.S.-based telecommunication service
providers, like Verizon."

If you are designing them to comply with those
specifications, you can't jibe that with the response we get
on the first page:  They lack knowledge concerning the
ultimate destination.

If you are designing to comply with the U.S.
carrier specifications, you know that some amount of those
products will be used by those entities.

THE COURT:  Are they denying that they know some
products are going to come back to the United States, though?

MR. BUDWIN:  Your Honor, I read it right here.
The line we read earlier:  "Qualcomm lacks knowledge
concerning the destination of its products."

THE COURT:  That's not the same thing as denying

1   they know some eventually will come back to the

2   United States.

3           MR. BUDWIN: I read their response as a denial.

4   Anything that's not an admission I contend is a denial and

5   not an admission, and that's what we are looking for,

6   your Honor, is an admission.

7           THE COURT: All right. Anything else on that?

8           MR. GREENWALD: Your Honor, I read it the way you

9   do. I don't see any other way to read it.

10           THE COURT: Okay. All right. As to the last

11   issue concerning 30(B)(1) deposition. Mr. Budwin?

12           MR. BUDWIN: Yes, your Honor. We served a

13   30(B)(1) notice on Qualcomm, directed to any non-deposed,

14   non-expert trial witnesses. Frankly, we would like to depose

15   people before they come and testify at trial so we are not

16   blindsided by that testimony.

17           THE COURT: But there is a conflict, if they call

18   90-some witnesses and you take the depositions, three of

19   which you already have.

20           MR. BUDWIN: So that's what I was going to point

21   out. We have looked at their initial disclosures, and they

22   have identified -- and they go on and on -- I think at the

23   time we filed the brief, 90-some people. Now we are up to a

24   hundred or pretty close to a hundred, if not quite there.

25   So, yes, we do have a problem. We are limited to ten

depositions, which we had to share with our counter-claim

defendants, Sterne Kessler, who now has a claim; and before

that happened, they had already taken two of those ten

depositions, so we are left with eight, to deal with a

hundred people.

We don't want to take all 100 depositions.  We are

not asking to take all 100 depositions.  It's not in the

interest of the parties or anybody to take a hundred

depositions.

What we are really looking for is compliance with

this local rule, which we address in our brief, and I know --

I noticed Qualcomm's brief was totally silent on it.

It's the general policy of the Court that a

nonresident defendant who intends to be presented in person

at trial may reasonably be deposed at least once in this

lawsuit.

We don't want to come to trial and have people

that we have never deposed before sitting on the stand,

testifying about things; and we are perfectly happy to wait

until some point before trial, consistent with this rule, to

take those depositions.  We tried to take them during the

discovery period, but offered a compromise to Qualcomm, if

after you identified these people -- which I believe the

deadline is in February, which is after the close of

discovery -- we would be willing to take those depositions at

1  that time, assuming we can get the permission of the Court to

2  do so.  That is all we are looking for.

3         We are a much smaller company than they are.  Our

4  initial disclosures -- or their initial disclosures, I

5  believe, identified about 12 Parkervision personnel as being

6  potentially relevant.  And, you know, I believe fairness

7  requires giving us the opportunity to depose people so we are

8  not surprised by their testimony at trial.

9         Thank you.

10        THE COURT:  Mr. DeVault?

11        MR. DeVAULT:  May it please the Court?

12        Your Honor, by this notice, reportedly under

13 30(B)(1), Parkervision is seeking leave to take in excess of

14 90 depositions.  Such a notice is contrary to Rule 30, which

15 limits to ten per side, absent order of the Court otherwise.

16 It's contrary to the Case Management Order in this specific

17 case.

18        You will recall that the parties proposed,

19 following the case management conference, 150 hours of

20 depositions per side.  Assuming you can take a deposition in

21 two hours or less, then that would permit 75 depositions.

22 The Court flatly rejected the stipulation of the parties and

23 said ten per side.

24        So it violates that, and it violates the uniform

25 practice in this district by which the parties have to abide

1  by the Case Management Order.

2      They say that the notice is consistent with the

3  local rules, but Parkervision has not cited one case in this

4  district, and I'm unaware of any which would permit

5  depositions such as this in violation of Rule 30 and in

6  violation of the Case Management Order.

7      Indeed, your Honor has in prior cases addressed

8  requests by parties to exceed ten depositions, specifically

9  in the Lockheed Martin case. You addressed it in the

10 Bituminous Fire and Marine Insurance case; and in those

11 cases, you said that to exceed ten depositions a party must

12 make a particularized showing why the discovery is necessary,

13 and there is no showing of such in this instance.

14     Your Honor will recall, in 1993 the federal rules

15 were amended. Before that, there was no limit on the number

16 of depositions that a party could take.

17     The Advisory Committee to the federal rules

18 thought it necessary to put such limits to assure judicial

19 review and to develop a mutually cost-effective plan for

20 discovery.

21     Prior to this amendment, there were no limits.

22 There are now. There is a safety valve under Rule 30.

23 That's for the parties to seek court approval otherwise. The

24 parties sought that, and it was rejected.

25     The local rule which has been referred to does not

1 take exception to that.  That local rule, 3.04, I believe,

2 was instituted long before the case management practice was

3 instituted in this district.  It was to permit only with

4 respect to the corporate representative of a foreign

5 corporation to come in and be deposed before trial.  It did

6 not address the fact witnesses.

7 　　　　　If this were to be the practice, your Honor, then

8 any party could, after a good faith Rule 26 compliance, come

9 in and file a notice under 30(B)(1) or 30(B)(6), whichever

10 they chose, and say that each person has discoverable

11 information that the disclosing party may use to support its

12 defenses.  So they could take that and depose a hundred

13 people, as they seek to do here.

14 　　　　　It's contrary to the rules; it's contrary here.

15 　　　　　They sought a deposition under Rule 30(B)(6).  We

16 complied with that.  This is an attempt to end-run around the

17 Case Management Order and should not be permitted.

18 　　　　　THE COURT:  Mr. DeVault, the 30(B)(6) deposition

19 has already occurred?

20 　　　　　MR. DeVAULT:  It has, and two others to be taken

21 in January, by stipulation.

22 　　　　　THE COURT:  Mr. Budwin, are you seeking to depose

23 more than ten?

24 　　　　　MR. BUDWIN:  Your Honor, we are not seeking to

25 depose a hundred people, and I believe we have taken seven

1  depositions to date, because Sterne Kessler, I believe,

2  took -- actually, it's fewer than that because we haven't

3  taken the 30(B)(6) deposition yet.  Five or six depositions

4  to date.

5          I don't want a hundred depositions.  I don't want

6  them to put everybody in their initial disclosure up.

7          If you read our notice -- and I heard Mr. DeVault

8  talk about the corporate representative.  Our notice asks

9  specifically for the person who is going to sit at the

10 counsel table and any other non-deposed fact witnesses.

11         So come the February deadline for disclosing trial

12 witnesses, if they identify 15 people, five of whom we have

13 already deposed, we are at a much smaller number; and I would

14 be willing to limit the time of each of those depositions to

15 no more than two or two-and-a-half hours and do them in a

16 serial manner.

17         We don't need a full seven-hour deposition.  I

18 don't believe we have taken any full seven-hour deposition of

19 the people we have deposed, but we would like the opportunity

20 to meet with and talk to any people in a deposition setting

21 before they show up in court and testify in front of the

22 judge and the jury.  Anything else is, you know, prejudicial

23 to us, your Honor.

24         THE COURT:  Mr. DeVault, do you have any idea how

25 many witnesses you are going to call?

1          MR. DeVAULT:  We don't at this stage, your Honor.

2     Obviously, because of the motions that are pending, the lack

3     of the Markman ruling, it's impossible to know at this point

4     how many witnesses will be called.

5          What's seeking to be done is to directly overrule

6     the Case Management Order that Judge Dalton entered and

7     Rule 30.  That's a product.  You can't ask for an unlimited

8     number -- you can ask for it, but unless the Court permits it

9     on, as your Honor said in those cases I cited, a

10    particularized need, there is no basis for it.

11         THE COURT:  Do you know who you will have with

12    Qualcomm sitting at the table with you at trial?

13         MR. DeVAULT:  I do not at this stage, your Honor.

14    We would have no objection to having mutually the

15    representatives at trial -- the corporate representatives be

16    subject to a deposition once those individuals are

17    identified, your Honor.  That's not a problem, but having an

18    unlimited scope of depositions of the number of all trial

19    witnesses certainly is.

20         THE COURT:  Is there any way you can designate of

21    the 93, or whatever number you listed, persons -- over a

22    hundred now, I believe it is -- these five or six you view as

23    the key witnesses on various points?

24         MR. DeVAULT:  Your Honor, obviously that's the

25    purpose of the interrogatories and discovery in order they

1  can take the ten.

2        THE COURT:  You have named names of persons who

3  have knowledge of certain items in your interrogatories?

4        MR. DeVAULT:  Absolutely.  And those are the ones

5  they have taken.  They have taken a number of depositions.

6  As he mentioned, Sterne Kessler look, I believe, two.  So

7  they have depositions of people that are particularly key,

8  and they have taken several of those already and stand to

9  take additional ones.

10       MR. BUDWIN:  Your Honor, if I may?

11       If the agreement is that any employee of either

12  party who testifies at trial can be subject to a deposition

13  of limited duration before trial, we would agree with that.

14       We believe that our personnel have already been

15  deposed.  Mr. Jeff Parker, who is the CEO of our company, was

16  deposed last week; and all of our other corporate officers

17  are either subject to deposition or have an outstanding

18  notice.

19       We are going at a distinct disadvantage to them,

20  and we would agree to that proposal.  Any employee who

21  testifies at trial, two hours at some point before trial.

22  That would be -- that would address the concern.

23       MR. DeVAULT:  Well, we haven't deposed all of the

24  inventors that they have identified, your Honor.  We tried to

25  concentrate on important witnesses, such as Mr. Parker, and

1   we assumed they have done the same thing through their

2   notices.  But what they are seeking here is to say you've

3   identified 95 witnesses in your Rule 26 disclosure; we want

4   an opportunity to depose them all.

5              THE COURT:  I don't hear him saying that.

6              MR. BUDWIN:  That's absolutely not what I'm

7   saying, your Honor.

8              MR. DeVAULT:  That's what the notice says,

9   your Honor.

10             THE COURT:  Well, he's limiting it some today, I

11  think.  At least put it that way.

12             MR. DeVAULT:  In any event, your Honor, the

13  parties laid out a plan for Judge Dalton in the case

14  management conference.  We sat in Mr. Busey's conference room

15  and drew it up.  We presented it; Judge Dalton rejected it.

16  I don't think that we can overrule that.

17             THE COURT:  Does Judge Dalton's Case Management

18  Order -- I'm not sure I have it right in front of me today --

19  limit you from any other agreements on things that you can

20  agree to outside the management order?

21             MR. BUDWIN:  Your Honor, it says we can agree to

22  limitations within the scope.  I don't believe we are allowed

23  to exceed what the order says.

24             THE COURT:  What about the deadline on taking

25  depositions?  You have a motion to enlarge that at this

1  point?

2       MR. BUDWIN:  Your Honor, the parties have filed a

3  joint motion to extend the discovery period to the end of

4  this month; and as was alluded to, there are a few that we

5  may have to take in January, and we will file a motion to

6  address those.

7       MR. DeVAULT:  Right.  That was a joint motion to

8  extend, your Honor; and Mr. Busey and I contacted the deputy

9  clerk, and they informed us that an order would be

10  forthcoming amending the discovery deadline.

11      THE COURT:  This particular issue sounds like one

12  that Congress could give more legislation on it, or whatever,

13  I guess; but it sounds like it's limited certainly for

14  Parkervision, and I understand that deposition limit is ten

15  as ordered by the Case Management Order and rules.

16      As far as helping choose the most significant of

17  those, I think the parties could get together and try to

18  agree on that a little bit.  I'm going to give you ten days

19  to try to do that and see if you can resolve this issue, to

20  pick out three or four of whatever depositions are left in

21  various areas, either financial area or in the technical area

22  and choose at least appropriate ones so we are not deposing a

23  janitor that might have picked up a document off the floor.

24  It just doesn't make any sense to do that in this type of

25  case.

1          MR. DeVAULT:  All right, your Honor.

2          MR. BUDWIN:  Your Honor, I appreciate that.

3          Could we have, given the holiday, a little more

4    than ten days to decide that?

5          THE COURT:  Yes.

6          MR. BUDWIN:  It may be difficult with everyone

7    traveling.

8          THE COURT:  I agree.  This is the 18th, is that

9    right?

10          MR. BUDWIN:  The 17th.

11          THE COURT:  What about the Friday after

12    New Year's?  The 5th, I believe it would be.

13          MR. BUDWIN:  That's acceptable for us.

14          MR. DeVAULT:  That's fine.

15          THE COURT:  All right.  Thank you, Counsel.

16          Anything else we can take up today?

17          MR. HUMMEL:  I think that's it, your Honor.

18          MR. BUDWIN:  One thing we would look for some

19    guidance from the Court on is the joint motion to extend

20    certain deadlines, but we appreciate that.

21          THE COURT:  I think that's pending before

22    Judge Dalton.  We will communicate with him.

23          MR. BUDWIN:  Thank you, your Honor.

24          THE COURT:  Either side ordering the transcript

25    today, contemplate doing that?

1          MR. BUDWIN:  I believe we will order a copy.

2          MR. HUMMEL:  Yes, your Honor.

3          THE COURT:  All right.  Thank you, Counsel.

4          We will be in recess.

5          *(Proceedings adjourned at 3:47 p.m.)*

6                          - - -

7  UNITED STATES DISTRICT COURT   )
                                  )
8  MIDDLE DISTRICT OF FLORIDA     )

9              C E R T I F I C A T E

10         I certify that the foregoing is a correct transcript

11  from the stenographic notes taken in the above-entitled

12  matter by the undersigned.

13

14   /S/Scott Gamertsfelder, RMR, FCRR
     Official Court Reporter          Date: December 27, 2012
15                          - - -

16

17

18

19

20

21

22

23

24

25