IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case no.:  3:11-cv-719-J-37TEM

| | | |
|---|---|---|
| PARKERVISION, INC., | ) | Orlando, Florida |
| | ) | January 10, 2013 |
| Plaintiff, | ) | 10:00 a.m. |
| | ) | |
| v. | ) | |
| | ) | |
| QUALCOMM, INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | | |
| QUALCOMM, INCORPORATED, | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PARKERVISION, INC., and STERNE | ) | |
| KESSLER GOLDSTEIN FOX, PLLC, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

Transcript of a motion hearing (held in Orlando)

before the Honorable Roy B. Dalton

United States District Court Judge

Court Reporter:        Diane C. Peede, RMR, CRR
                       United States Courthouse
                       401 West Central Blvd., #4600
                       Orlando, Florida  32801
                       (407) 615-0305

Proceedings recorded by mechanical stenography, transcript
produced by computer.

**Appearances:**

**Counsel for Plaintiff:**  Douglas A. Cawley
                          Stephen D. Busey
                          Joshua W. Budwin


**Counsel for Defendant:**  Keith R. Hummel
                           David Greenwald
                           John A. DeVault, III

**P R O C E E D I N G S**

THE COURT:  Good morning.

MR. CAWLEY:  Good morning, Your Honor.

MR. HUMMEL:  Good morning, Your Honor.

THE COURT:  We're here in connection with ParkerVision versus Qualcomm, case number 3:11-cv-719.

Counsel, if I could get your appearances for the record, please.

MR. CAWLEY:  Good morning, Your Honor.  I'm Douglas Cawley for the Plaintiff, ParkerVision, and we're ready to proceed.

THE COURT:  Good morning, Mr. Cawley.

MR. HUMMEL:  Good morning, Your Honor.  Keith Hummel from Cravath, Swaine and Moore.

With me today is David Greenwald, John DeVault, and at the second counsel table is our associate, Joseph Lasher.

THE COURT:  Thank you, Mr. Hummel.

Gentlemen, I asked you to come in this morning.  I scheduled this hearing because, in the spare time that I have allocated to review the pending motions in this case when I'm not wrestling with your claims construction terms, I found myself left with some questions in connection with this pending motion to dismiss the claims of inequitable conduct that were brought by way of counterclaim and affirmative defenses by Qualcomm.

1          Mr. Hummel, since -- I mean, Mr. Cawley, since it's

2    ParkerVision's motion to dismiss, let me ask you to address

3    the pending motion, if you would, please, initially, and then

4    I have some specific questions.  I may interrupt you or I may

5    wait until I hear from Mr. Hummel and try to get the

6    questions answered collectively; but at the outset, I notice

7    that both of you indicated in your papers that the -- you

8    both started off with your description of the standard,

9    talking about an Iqbal/Twombly Rule 8 standard, and it

10   doesn't appear to me that's the standard at all, that it's a

11   9(B) Exergen standard.

12          So I confess that I was put a bit put off the mark

13   when I began my review of your papers, even though both of

14   you do refer to Exergen and talk about the particularity

15   pleading context.

16          So, anyway, let's talk about it at least based on

17   the presumption that I'm starting off with the assumption

18   that the rule of pleading as described in Exergen and as set

19   forth in 9(b) applies to pleading claims for inequitable

20   conduct.

21          MR. CAWLEY:  Certainly, Your Honor.  Thank you for

22   this opportunity to address the Court.

23          MR. BUDWIN:  Ma'am, could I have this, please?

24          THE COURT:  Sure.  If you want to use

25   the equipment --

1              MR. CAWLEY:  We would like to use the slides --

2              THE COURT:  -- you just need to let my courtroom

3     deputy know.

4              MR. CAWLEY:  -- off the feed.

5              THE COURTROOM DEPUTY:  Is it at the front table?

6              THE COURT:  I have it on my screen.

7              THE COURTROOM DEPUTY:  Okay.

8              THE COURT:  Do you have it there?

9              MR. BUDWIN:  We have it here, Doug.

10             MR. CAWLEY:  It's not here.  So I guess I can look

11    over here, Judge.

12             THE COURT:  Well, I apologize.  We just had this

13    reconfigured.  So we may be having some technical

14    difficulties.

15             MR. CAWLEY:  It may not be turned on, I suppose.

16    That's frequently an issue.

17             Let's not worry about it.

18             Thank you, Your Honor.  I'm here, of course, on

19    behalf of ParkerVision to discuss our motion to dismiss on

20    the pleadings, the inequitable conduct allegations.

21             With me today are Mr. David Sorrells on the front

22    row back here.  He is the lead inventor on the patent.  Mr.

23    Sorrells holds and is an inventor on over 200 U.S. patents.

24             Next to him is Mr. Michael Lee.  He is the

25    prosecuting attorney from Washington, D.C., who handled this

prosecution before the Patent Office.  Mr. Lee has a 20-year

career prosecuting patents before the U.S.P.T.O.

This is the first time that either of these

gentlemen stand accused of defrauding the Patent Office.

The Court, of course, is familiar with the legal

standards that are peculiar to pleading inequitable conduct

in a patent case.  So I don't intend to spend any significant

amount of time discussing those standards, unless the Court

would like to get more deeply into them; but just to take one

minute, I would respectfully remind the Court that for more

than a decade, the Federal Circuit Court of Appeals

recognized and characterized pleadings of inequitable conduct

in patent cases as a plague on patent litigation because they

were made too frequently and indiscriminately.

About two years ago, in an en banc decision in

Therasense, the federal circuit explicitly raised the

standard for pleading and proving inequitable conduct, and

they did that with both prongs of what is required.  They

first raised the standard from of materiality to a but-for

standard.  There must be a pleading which plausibly

establishes that but for the alleged misconduct, the patent

would not have issued.

In the same Therasense decision, they raised the

standard for the level of intent that must be pled and

proven, holding in Therasense that the facts pled must be

1    sufficient to require a finding of deceitful intent.

2          Now, in this case, Your Honor, there are extensive

3    pleadings that have been made by Qualcomm that are the

4    subject of this motion.  There are more than 100 numbered

5    paragraphs in which Qualcomm makes various allegations and

6    moves from alleged misconduct to alleged misconduct.

7          In preparation for this hearing, I have carefully

8    gone through all of those 100 allegations and I'm confident

9    that they all fall into just three categories of alleged

10   misconduct; and what I would like to do in the course of this

11   argument --

12         THE COURT:  Those would be varying, failure to

13   disclose, and the four prior art references?

14         MR. CAWLEY:  Yes.  Exactly, Your Honor.  So what I

15   would like to do is to discuss those one by one.  The first

16   one that I was going to take up is the alleged

17   misrepresentation about those four references, then to talk

18   about the failure to update the petition to make special with

19   the Parssinen reference, and finally to talking about

20   burying.

21         Now, before I get into those specifically, I think

22   it would be useful again to spend about one minute on the

23   relevant chronology of this prosecution.  The '551 patent was

24   filed October 21, 1998; and the petition to make special,

25   that we'll talk about in a little more detail in a minute,

but it's basically a petition asking for accelerated
examination, was filed March 2, 1999.

During that time both ParkerVision and Qualcomm
were engaged in licensing discussions for this technology,
even though the patent hadn't issued.  It had been applied
for.  And on March 25th, 1999, Qualcomm provided the
Parssinen reference to ParkerVision.

The next thing that happened is that the petition
to make special was marked "Received" by the Patent Office on
March 31st.  Now, here's a potential for some potential
confusion.  I think there was a little bit of confusion in
the briefing, and I hope there won't be in the oral argument.

THE COURT:  Let's do this, Mr. Cawley.  I apologize
for the interruption, but I want to try to use our time as
efficiently as we can.  Let me ask you to focus on -- if you
don't mind, let's move from this burying and the failure to
disclose to the issue of what has been alleged to be the
demonstrably false representations to the Patent Office with
respect to these four pieces of prior art.

MR. CAWLEY:  Certainly, Your Honor.

THE COURT:  I'm going to give Mr. Hummel an
opportunity to address the other two, but I have concerns
about how the materiality prong of Therasense could have
possibly been met with respect to the Parssinen disclosure,
and I also have some questions for Mr. Hummel about the

burying aspect.  But I think to more efficiently use your
time, until I hear from Mr. Hummel on those two issues, I'd
like you to focus on the alleged misrepresentations by Mr.
Lee and Mr. Sorrells to the Patent Office in connection with
these four pieces of prior art.

     MR. CAWLEY:  Glad to do that, Your Honor.  Let me
move directly to that.

     As Your Honor knows, these are representations made
in the petition to make special, a petition asking for
accelerated examination; and in return forgetting accelerated
examination, the patent applicant must do some things that
aren't normally required.  They must do a search of prior art
references, which is not usually required.

     They are required by the rules in connection with
the petition to make special to specifically reveal to the
Patent Office the references they know of or have found which
are most closely related to the patentable subject matter and
they are required by the rules to give a detailed explanation
of why the relevant claims are nevertheless allowable over
those references that are identified as those most closely
related to the patentable subject matter.  That's what
happened here.

     Here is an excerpt from the disclosure in the
petition to make special which refers to the four references
in question, and they were number one, numbers nine and ten,

and number 16.

So the first thing I observe is that rather than trying to hide or ask the examiner not to consider these references, they're affirmatively brought by forth by ParkerVision and affirmatively stated these are among the most pertinent references.

Each of them, though, lack at least -- maybe more than one, but at least one fundamental difference from the claims advocated by ParkerVision, and that is the ParkerVision invention teaches the transfer of non-negligible amounts of energy, and none of the prior art does.

The first reference therefore in distinguishing, reference number one, ParkerVision told the Patent Office the patent teaches transferring non-negligible amounts of energy; and in discussing the first reference, Fisher, they pointed out to the Patent Office that Fisher does not teach that technology.  It teaches a type of sampling technology known in the prior art, but not the transfer of non-negligible amounts of energy.  Likewise for the second reference.

Again, ParkerVision points out that while the patent teaches transferring non-negligible amounts of energy, that the Schlitz reference again involves sampling known in the prior art, but nowhere does it teach the transfer of non-negligible amounts of energy.

Likewise with the third patent, the Williams

reference, again, this was the key fundamental distinction over Williams, is that although Williams teaches a type of sampling known in the prior art, it, too, does not teach the transfer of non-negligible amounts of energy; and the same distinction was made in connection with the final reference, which was not a patent but the Fisher article.

Now, I'm prepared and I should actually say other more technical members of my team are prepared to get down into, as far as the Court would like to go, the merits or demerits of those technical distinctions; but this, after all, is a motion to dismiss on the pleadings.

So, while I'm not sure that's important at this stage for the Court to actually adjudicate whether those distinctions were meritorious or not, whether they would rise or fall, this is what is required in the patent prosecution and required specifically in the motion to make special: The applicant must explain to the Patent Office why its proposed claims are patentable over the references that it has disclosed in that petition.

That's exactly what ParkerVision did here.

The law is that attorney argument is not an actionable misrepresentation in the context of inequitable conduct. We cite the court here to the Young case, where the federal circuit says attorney argument and interpretation of what the prior art discloses do not constitute affirmative

1    misrepresentations of material fact sufficient to support

2    inequitable conduct; and specifically in that case, that

3    interpretations of what references teach and why, what is

4    disclosed in those references is different from the claims,

5    that's not inequitable conduct.

6              Indeed, Your Honor, I would suggest to the Court

7    that what went on here, a statement to the Patent Office that

8    this reference or these four references, which are concededly

9    the closest to the applied-for claims, that they are

10   different for certain reasons.  That's what prosecution

11   consists of.  That's what prosecuting attorneys do all day

12   every day is to say --

13             THE COURT:  Mr. Cawley isn't that a matter of proof

14   as opposed to a matter of pleading?

15             MR. CAWLEY:  It's not, Your Honor, because Qualcomm

16   under the standard of Exergen is required to show who, what,

17   where and why.  They are required to plead specifically, what

18   do you claim is the misstatement to the Patent Office?  And

19   they have done that.

20             Our point is that as a matter of law, what they

21   have pled is not inequitable conduct.

22             THE COURT:  I'm going to hear from Mr. Hummel.  Mr.

23   Hummel has alleged, as I look at his papers, that these

24   distinctions that were described to the Patent Office were

25   demonstrably false, I believe is his language in his

pleading, and I'm going to hear from him as to what the

good-faith basis was for making the claim that Mr. Lee and

Mr. Sorrells made a claim to the Patent Office that was

demonstrably false.

MR. CAWLEY:  I understand, Your Honor.

THE COURT:  If, in fact, that is proven to be the

case, do you contest the sufficiency of the pleading?

MR. CAWLEY:  Yes, I contest the sufficiency of the

pleading, because the proceedings show on their face that

what was said to the Patent Office was an attorney's

interpretation of what the prior art discloses, and that is

not inequitable conduct.

The only authority that has been cited by Qualcomm

in support of this proposition is the Ring Plus case; and the

Ring Plus case is a very thin reed, for a number of reasons.

First of all, Ring Plus was a pre-Therasense case.  So the

court applied, understandably, the wrong standard of

inequitable conduct.

In Ring Plus, the district court had found that

there were two statements about two references that were

demonstrably false and therefore were inequitable conduct.

The federal circuit found that there was clear

error as to one of those statements, and then applied the

pre-Therasense standard of materiality to the second

statement and found that it was not clear error.

1    However, the federal circuit then immediately went

2    on to find that the intent prong was not satisfied and

3    therefore reversed the finding of inequitable conduct.  What

4    that means is, of course, that even this pre-Therasense

5    discussion of the characterization of that reference is

6    dicta.

7    Finally, Your Honor, if we turn to exactly what the

8    statement was in Ring Plus, I think that it illustrates the

9    issue that Your Honor is grappling with.  In Ring Plus, there

10   was a statement in the background of the invention that a

11   particular reference could be ignored because it disclosed no

12   software to operate those systems and the district court

13   found -- and the federal circuit, at least in dicta, found

14   there was no clear error -- that that was a fundamental

15   misstatement about the nature of the reference.

16   Here, what we have is, first of all, by including

17   it in the petition to make special, ParkerVision has not

18   encouraged the P.T.O. to ignore the reference, but, to the

19   contrary, has specifically identified it as one of the most

20   relevant references or these four as among the most relevant

21   references; and, second, for each one has specifically

22   identified features that are not contained in the reference.

23   Now, I think it's likely, Your Honor, when we're

24   talking about the underlying merits of those allegations,

25   that if Qualcomm continues to advocate that these particular

references are among the most relevant and in fact do

disclose those things, then we're liable to see an

adjudication of that in connection with the invalidity case;

but on the issue of inequitable conduct, all that was pled

here, all that could be pled is attorney argument explaining

an interpretation of what is and isn't in the reference.

Ring Plus does not stand for the proposition that

is inequitable conduct, and indeed the federal circuit has

told us it is not.

Your Honor, as I understand how Your Honor would

like to proceed, I'm prepared, of course, to discuss burying,

to discuss the failure to amend the petition to include the

Parssinen reference; but if the court would like to stop now

and hear from Qualcomm --

THE COURT:  I would.  I'd like to hear from Mr.

Hummel; and then I'll give you an opportunity, Mr. Cawley, to

the extent that Mr. Hummel discusses issues that you want to

respond to, I'll give you an opportunity to do that briefly.

Mr. Hummel, to sort of direct your argument a

little bit, I wanted to hear from Mr. Cawley primarily on the

four pieces of prior art and I have some specific questions

for you about that, but with respect to the burying and the

failure to disclose, let me tell you what my principal

concerns are and ask you to address them.

With respect to the burying charge, for instance,

1    I am concerned with how it is that you think that your

2    pleading can meet the -- well, here's my concern.  When I

3    read Therasense and I look at the other authorities that you

4    all have provided to me and the Court's own research, I am

5    concerned about this potential Catch-22 argument that the

6    prosecuting attorneys at the Patent Office must be suffering

7    under, which is, are we better served by making a

8    comprehensive -- and I understand people can quibble over

9    whether or not something is comprehensive or overbroad --

10   demonstration to the Patent Office of material in support of

11   my application for patent or am I better off trying to

12   sharpen my focus and leave myself exposed to an inequitable

13   conduct claim that I failed to bring matters to the Patent

14   Office's attention that are relevant and bear on the question

15   of whether or not this patent should be issued in the first

16   place?

17          It seems to me that that's a fairly serious concern

18   for people like Mr. Lee and others who prosecute before the

19   Patent and Trademark Office.  So I'd like for you to address

20   that for me first.

21          Secondly, just so you can know where I'm headed, I

22   have reservations as to how -- I don't understand how you

23   could possibly meet the materiality but-for test with respect

24   to the Parssinen disclosure since that disclosure is actually

25   referenced in the '551 patent.  So I need you to help me

1   understand that aspect; and then, last, I have some specific

2   questions for you on these four pieces of prior art.

3           MR. HUMMEL:  Fine, Your Honor.  So we'll start with

4   the burying case, and what I should say at the outset is we

5   don't view this as three buckets of conduct.  In other words,

6   we're not making a separate claim for burying.  We're not

7   making a separate claim for the Parssinen reference and a

8   separate claim for the four references put in the petition to

9   make special.  We are alleging a pattern of inequitable

10  conduct, a pattern of egregious conduct, a calculated plan of

11  which all of these things are a part.

12          So I don't think it is proper for us to look at, as

13  ParkerVision would like to, is this a burying case?  Is this

14  a non-disclosure case?  Is this a misrepresentation case?

15          It is all of one pattern of conduct.  And I will

16  tell you, Your Honor, that we were very mindful of Therasense

17  when we filed this counterclaim.  I don't advocate filing

18  inequitable conduct claims when they're not warranted; and if

19  this was a case where I did not have the petition to make

20  special and where I did not have the affirmative

21  misrepresentations that I have here with respect to

22  Parssinen, which I'll get to, and the four references and I

23  was just faced with a situation where ParkerVision had

24  inundated the Patent Office with -- I don't know -- somewhere

25  between 800 and 1200 references, I don't know if I would have

felt able to bring a burying case by itself, to be perfectly

honest with Your Honor.

Now, there are a lot of disturbing --

THE COURT: Let me interrupt you for a second and

tell you I'm happy for you to address it any way you want. I

just wanted to lay out for you what my concerns were, but I

want to tell you my principal concern and probably the

overarching reason that I have you all here this morning is

that I would like for you to discuss for me what you think

the obligations are of a lawyer filing in the United States

District Court a claim that a prosecuting attorney committed

fraud on the Patent Office.

What is the obligation of a lawyer to have a bona

fide belief that the facts support making that kind of an

allegation against a member of the Bar as well as a private

citizen? Because I'm gravely concerned about that, quite

honestly, and I'd like for you to tell me your view of what

you think is required in order for a lawyer to make that sort

of a filing.

MR. HUMMEL: I think it's the standard that

everybody has when you're bringing a counterclaim for

something like fraud. You have to have a good-faith basis

under Rule 11 for signing the Complaint, and I did.

We spent an enormous amount of time crawling

through the references that were cited to the Patent Office.

1      We did not accuse ParkerVision, Mr. Lee and Mr. Sorrells of

2      misrepresenting all 21 references they put in the petition to

3      make special.  We went carefully through them.

4              There are paragraph after paragraph after paragraph

5      in the counterclaim which shows that what they said to the

6      Patent Office this reference does not teach, is actually

7      taught.

8              Mr. Cawley showed you some excerpts from our

9      counterclaim, but he didn't show you the parts of the

10     counterclaim where we actually go through this analysis.

11             Does Your Honor have a copy of it?  I can provide a

12     copy, but I would like to refer to the actual counterclaim.

13             THE COURT:  I have the counterclaim, if that's what

14     you mean, yeah.  I have it in front of me.

15             MR. HUMMEL:  So if we looked at, starting in

16     paragraph 30, which is where we go through the detailed

17     analysis of ParkerVision's mischaracterization of the prior

18     art and the petition to make special, and again we only

19     accuse them of misrepresenting four of those references, not

20     all 21, and if you take a look down, it says in paragraph 30

21     that they filed the petition to make special.

22             In 31 we identify one of the pending claims at the

23     time, which is pending claim eight, and it has the elements

24     of that claim set right there.

25             Then we have the petition to make special

requirement that they identify, the most closely related to

this -- prior art most closely related to the subject matter

encompassed by the claims; and then there's the four that we

accuse of being misrepresented.

When we get to 34, we say the actual statement in

the petition to make special, and say, for example, in

distinguishing Fisher 1981, the applicant stated reference

one, Fisher, appears to be related to a synchronist detector

that samples an amplitude modulated wave for short periods.

Reference one does not teach or suggest directly

downconverting a modulated carrier signal to a demodulated

base band signal, as are cited in the claims.

Then they go on to say considering claim eight, the

one that we have in paragraph 31, for example, reference one

does not teach or suggest -- that is a factual statement --

does not teach or suggest the combination of receiving a

modulated carrier signal and transferring non-negligible

amounts of energy, and it continues to go on through the

things that ParkerVision is telling the P.T.O. examiner do

not exist in this piece of prior art.

If you'll turn the page, Your Honor, and you go to

paragraph 35, we describe what the abstract of Fisher 1981

says and have put in italics the things that are actually

disclosed which they say are not disclosed; and then we go

through the actual reference in paragraph 36, and each of

those bullet points relates to a portion of what they say it
does not teach.  For example, in the first one, the system in
Fisher 1981 includes a receiving apparatus for an amplitude
modulated wave, see the abstract in figure one, which one of
ordinary skill in the art would have understood as teaching
the receiving the modulated carrier signal limitation of
pending claim eight, which ParkerVision back in paragraph 34
said was not taught in that reference; and we go on paragraph
after paragraph for the next several pages going through each
of the four references to show that each of the elements that
ParkerVision said as a factual matter do not exist in that
reference, actually exist.

That is enough to plead inequitable conduct,
existence of a material misrepresentation.

You have to understand, Your Honor, that this was
done in the context of a petition to make special.  I only
have a few slides and they're all on the petition to make
special.  If we could switch over to it, perhaps I can just
take you through what a petition to make special is so you
understand.  If I did not have the petition to make special
in this case, we would not be in this courtroom today.  The
petition to make special changes everything.

An applicant has a duty of candor with the P.T.O.
Your Honor knows that.  Everybody knows that who prosecutes
patents.

1          The patent bargain requires, since it's ex parte

2     and since I wasn't allowed be there, Qualcomm wasn't allowed

3     to be there in the prosecution, it requires the person

4     prosecuting the application and all others subsequently

5     involved in the application to be absolutely honest with the

6     P.T.O.  You can't game the system.  You can't tell them

7     half-truths.  You have to be absolutely honest.  You have a

8     duty of candor.

9          There's that case that Learned Hand said about the

10    fiduciary having the utmost punctilio of whatever it is.

11    This is the same type of thing.  You have to be straight with

12    the P.T.O.

13          Petition to make special.  Even more important --

14          THE COURT:  Where's the line, Mr. Hummel?  I mean,

15    are you allowed as a prosecuting attorney before the Patent

16    Office to make a case to the patent examiner that this prior

17    art is distinguishable from the product that I am submitting

18    and I ought to be granted a patent notwithstanding this prior

19    art because X, Y, Z?  Where is the line?

20          MR. HUMMEL:  Right.  Well, the line in the normal

21    back and forth is a patent examiner will say to you, "I think

22    that you are not entitled to a patent because of this piece

23    of prior art."

24          So there's a pointing to a particular part of the

25    prior art, the figure, whatnot, and then the applicant is

entitled to say, "No. You're wrong. That particular part of
that patent or that patent or that piece of prior art is not
what I'm teaching, and for the following reasons."

Here, this is done, Your Honor, before any
examination by the Patent Office. It is designed to let the
Patent Office proceed in a fast manner, by having the
applicant take on certain duties it doesn't otherwise have.

The bargain here is you get to go to the front of
the line. If you file a petition to make special, you go to
the very front of the line. You are getting examined before
all the hundreds of thousands of other applications that are
sitting in the Patent Office, but the bargain is you have to
do the work for the Patent Office that they ordinarily would
do. You have to do a patent search, which an ordinary
applicant does not have to do.

You have to do a patent search. You have to look
carefully through those references. You have to pick the
ones that are most closely related to your alleged invention,
and then you have to describe that and tell the Patent Office
why your invention is patentable over those references.

Frankly, that's not what ParkerVision did here.
They just said these references don't teach these things,
which we believe and we have demonstrated in the pleading and
are prepared to demonstrate at trial actually are taught by
these references. What they said to the Patent Office was,

"Don't worry about these references.  They don't teach any of this.  Ignore them."

If they had said to the Patent Office, "Fisher, for example, describes X, Y and Z, but that's not us, for the following reasons," that would be attorney argument.  In fact, some of the cases they cited are exactly that, the Young case.

The Young case is about a method to declaw a cat; and the Patent Office in an office action, not in a petition to make special, in an office action says to the applicant, "This reference teaches your invention and here is the figure and here is how I interpret that figure."

The patentee then said, "No, we don't believe that, because this little dotted line here shows that it doesn't do what we do.  We cut by the cuticle.  This cuts by the -- between the two bones, through the skin," and that was the critical distinction.  Do you go through the cuticle or do you go through the skin?  I know it doesn't sound like a lot, but it was a lot for this patent.

There was a legitimate argument, the Court found, over what that figure showed.

Here, the Patent Office wasn't given the opportunity to have that argument.  What it was told was this is not relevant.  These are not relevant, and it is not good enough to say, "Okay.  The reference is in front of the

Patent Office, and therefore the examiner had the opportunity to disagree with you."

That's not what the position to make special procedure is all about; and in fact there's a case, it might be in fact the Ring Plus case, which is, by the way, on all fours here which says you can't do that. You can't lie about the reference to the Patent Office. That's a material misrepresentation.

Under Therasense, by the way, just to get off on a tangent for a second, Therasense is talking about a non-disclosure case, where the patentee, the defendant in a litigation, finds out that what it believes is a material reference was all along in the files of the defendant -- of the patentee, and the patentee did not disclose it to the Patent Office.

The plague on the courts and applicants that Therasense is talking about is the knee-jerk reaction by defense lawyers to say, "Aha." You had this piece of prior art. You didn't disclose it to the Patent Office. Therefore, you must have committed inequitable conduct." That's what Therasense is designed to get rid of.

The intent standard, yes, it applies to material misrepresentations just as much as non-disclosure, but Therasense carves out a special rule for misrepresentations. It says in misrepresentations, just like the cases from the

Supreme Court upon which the unclean hands, the inequitable
conduct doctrine was founded, if you have an affirmative
misrepresentation, such as the filing of a false affidavit
and other things where there's a false statement, materiality
is presumed, because otherwise why would someone go through
the effort of making a false statement if they didn't think
it was material?  So that's a different standard.

Here, the patent -- I got off a on tangent and I
forgot where I was, but the -- ah, the Ring Plus case.  The
Ring Plus case here is on all fours, and the best way to
understand what Ring Plus says is to read it, not to
summarize it in some way that doesn't make any sense or is
not true, but to read it.

Here's what Ring Plus actually says.  In the
background, and that's part of the patent, applicants
identified Streitzel and Sleevi as related art and stated
that in each of the aforesaid references, there is no
algorithm or software proposed for operating the telephone
system.  Thus, Strietzel and Sleevi both propose hardware-
based systems but no software to operate those systems.

It's a statement of fact, just like it's a
statement of fact that these references in the petition to
make special did not have certain things.  It's a statement
of fact, not attorney argument.

Ring Plus says, continues, the court now observing

what Strietzel and Sleevi says, neither Strietzel nor Sleevi
explicitly discloses software for operating a telephone
system.  However, as the district court observed, both
references describe components that are generally understood
by persons of skill in the art, the relevant standard, to be
associated with computers and software.

The references also disclose methods of operating a
telephone system.  Although the disclosure of software is
certainly not express in either Strietzel or Sleevi, we
cannot say the court clearly erred in finding that a person
of skill in the art -- again, a person of skill in the art --
would have understood the references to disclose software-
based algorithms.  Therefore, the court did not clearly err
in finding that the applicant's background section was a
misrepresentation.

Now, here's the same argument -- the last passage
I'm going to read is the same argument that ParkerVision is
making.  Ring Plus argues that because Strietzel and Sleevi
were before the examiner during the prosecution, the
background statement was merely attorney argument and cannot
be a material misrepresentation.  Although an attorney is
free to argue vigorously in favor of patentability without
being subject to allegations of inequitable conduct, the law
prohibits genuine misrepresentations of material fact.

It's the exact same case.  Our allegations are

1  exactly the same, and that provides a good-faith basis for me

2  to file this counterclaim, which I did not file lightly.

3          THE COURT:  Let me ask you this, Mr. Hummel.  I

4  understand that you object to the concept of segregating the

5  claims of burying and failure to disclose and the

6  misrepresentations that you allege occurred with respect to

7  the four prior pieces of art, but humor me for a moment and

8  let me ask you whether or not you would agree that if the

9  failure-to-disclose issue, for instance, standing alone,

10  would you agree that the fact that the Patent Office

11  references the Parssinen disclosure in the patent and there's

12  no debate, I don't think, about whether or not they received

13  it -- whether they received it timely and those sorts of

14  things, I understand, are subject to debate, but how could

15  that possibly meet the Therasense materiality but-for test?

16          MR. HUMMEL:  I don't think it does and I'm not

17  making that claim.

18          THE COURT:  Okay.

19          MR. HUMMEL:  Your Honor, I'm not making a claim

20  that Parssinen was non-disclosed, okay?  But what I am making

21  a claim --

22          THE COURT:  Well, I understand your claim.  Your

23  claim is that it was late disclosed and that it was disclosed

24  as part of an ongoing pattern of ParkerVision to mislead,

25  deceive, dupe and otherwise persuade the Patent Office to do

1   something they ought not have done.

2          MR. HUMMEL:  Right.  And I think because, again,

3   we're in the petition to make special, where you go to the

4   front of the line, special rules apply.

5          THE COURT:  Well, educate me on that subject for

6   just a minute.  Tell me, for instance, what it is about the

7   petition to make special -- other than an accelerated review

8   and the obligations that then become incumbent upon the

9   patent applicant to do things they might not otherwise be

10  required to do, once that happens and the patent ultimately

11  issues, tell me how it is that this petition to make special

12  changes the but-for materiality test set down by Therasense

13  in terms of this alleged failure to timely disclose

14  Parssinen, and I think we can also talk in that same bucket

15  combination of this burying charge that you make in your

16  papers.

17          Tell me how it is that the petition to make

18  special, once that's happened, once the Patent Office has

19  moved the application to the front of the line, how does that

20  change the materiality test with respect to the actual

21  issuance of the patent?

22          MR. HUMMEL:  I'm struggling to understand Your

23  Honor's question.

24          THE COURT:  Well, as I understand it, you're making

25  the case that the petition to make special somehow changes

1    the evaluation of the conduct of ParkerVision in their

2    conduct before the Patent Office, because they have these,

3    for lack of a better term, heightened responsibilities in

4    connection with the petition to make special.

5            My question, and I confess that I'm not as

6    knowledgeable as I would like to be about what happens in the

7    Patent Office after the petition to make special is granted

8    or received or acted upon and ParkerVision's claim now goes

9    to the front of the line, as you described --

10           MR. HUMMEL:  Okay.

11           THE COURT:  -- so here's my question.  Once that

12   happens, the patent still has not issued.  So the patent

13   ultimately issues.  My question is, how can a disclosure or a

14   reference that is provided to the Patent Office, whether it's

15   provided in connection with the petition to make special or

16   sometime thereafter, how could that possibly meet the

17   Therasense materiality test, the but-for test, if in fact the

18   Patent Office had it, reviewed it, considered it and issued

19   the patent notwithstanding?

20           MR. HUMMEL:  That's exactly what the last paragraph

21   of the Ring Plus case describes and it's exactly what

22   Therasense describes in dicta.

23           Therasense, again, is a non-disclosure case where

24   the reference was never disclosed, okay?  But it does say

25   that if you lie about a fact, lie about a reference, just

like Ring Plus, they lied about the contents of a reference,

that's a material misrepresentation. It doesn't matter that

the Patent Office then has the reference. Of course it has

the reference. You're making a material misrepresentation

about something that the Patent Office has.

THE COURT: Does your claim allege that the

Parssinen reference was misrepresented?

MR. HUMMEL: Yes, and here's why, Your Honor.

THE COURT: Where is that in your papers?

MR. HUMMEL: It's in the papers -- it's in the --

THE COURT: I'll find it.

MR. HUMMEL: No, no, no. I can tell you the

paragraphs of the Complaint where it exists.

While I do that, can you get me my timeline,

please. Could someone advance that, and find the references

for the Judge.

Your Honor, I just want to make sure we're clear on

the timeline here. If you look at what's up in front of you

right now, it's a brief timeline of the prosecution -- some

aspects of the prosecution of the '551 patent; and if you

look on October 21, 1998, the '551 application is filed.

On March 2nd, 1999, and Mr. Cawley was right, right

in the middle of our negotiations with ParkerVision,

ParkerVision files a petition to make special, with the

representations we've looked at and which we've put in detail

1    in the Complaint.

2          On March 25th -- on March 17th, actually, there's a

3    meeting between Qualcomm and ParkerVision, where ParkerVision

4    for the first time reveals some of the technology to us

5    underlying their claims.  So they provide some detail about

6    the actual invention which they have in the '551.

7          We go off, analyze that -- and I know this is

8    outside the bounds of the motion to dismiss, but it's

9    context.  We go off, analyze it and provide them -- I think

10   this is actually in the Complaint -- in the Counterclaim.  We

11   provide them with a memorandum criticizing their technology

12   and explaining why it's in the prior art, and we actually

13   provide them with two pieces of prior art, the Parssinen

14   reference and another reference.  I don't know if it's Wang

15   or Chang, but another reference.  We say these are relevant.

16         ParkerVision absolutely thinks this is relevant,

17   for reasons I'll show you when we get to trial on this,

18   absolutely thinks Parssinen is a disaster for them; but if

19   you see on the timeline, the petition to make special is

20   still pending, still pending.  It's not granted until June of

21   1999.

22         Despite getting Parssinen from us, which we allege

23   in the Complaint, as we must, is a more closely related piece

24   of prior art than the other references in the petition to

25   make special; and you'll get expert testimony on that.  It's

the only way to prove that. It's more -- it's not cumulative. It's more relevant. Parssinen is more relevant. They don't submit it to the Patent Office.

Now, remember, they're now seeking expedited review. They want to go to the front of the line. They don't want to be behind those hundreds of thousands of applications. And in 1998, the year they filed the '551, 288,000 patent applications are filed and there are hundreds of thousands still pending from the years before that. They want to go to the front of the line. They have a heightened duty to be straight with the Patent Office.

Do they tell the Patent Office about Parssinen? No. They're going to have all sorts of arguments that say, "We didn't think it was relevant," or not relevant, but that's for you to decide, Your Honor, or the jury, if you delegate it to the jury. Do you believe them or do you not believe them?

Were they worried that the petition was going to mess up -- the Parssinen thing was going to mess up their ability to get this patent? Did they want to save it until later and bury it rather than telling the Patent Office that it was the most important piece of prior art?

THE COURT: Here's my question, Mr. Hummel. I get it.

MR. HUMMEL: Okay.

1          THE COURT:  I mean, I get it, I think.  I mean, I

2     think I understand why it is that this says that the

3     inequitable connotations that you ascribe to it; but my

4     question though really is more a legal question, which is --

5          MR. HUMMEL:  I know your question.  Let me answer

6     the question, because it's a big buildup and I understand

7     your question completely.

8          We believe and we allege that ParkerVision had a

9     duty to update the petition to make special; and when it did

10    not include Parssinen but instead included Parssinen in a

11    run-of-the-mill I.D.S., later on, along with other -- in

12    September 21, along with other references, and I believe

13    there are a bunch of references filed on that day, that the

14    Patent Office deems that submission of Parssinen in that

15    I.D.S. to be an affirmative representation that it is not as

16    relevant as the pieces of prior art submitted in the petition

17    to make special, and that is an affirmative misrepresentation

18    and it's not cured by the fact that the Parssinen reference

19    is in front of the Patent Office.  It's absolutely not cured.

20         THE COURT:  Don't you have to make the assumption,

21    though, that the Patent Office, when they received the

22    Parssinen -- am I saying that correctly?  When they

23    received --

24         MR. HUMMEL:  Parssinen.

25         THE COURT:  When they received Parssinen, do you or

1   do you not have to establish that but for -- that the patent

2   would not have issued but for that conduct?

3               MR. HUMMEL:  I do not.  Okay, Your Honor.

4               THE COURT:  Do you understand what I'm wrestling

5   with?  What I'm wrestling is let's suppose, for purposes of

6   argument, not to get Mr. Cawley agitated, but let's suppose

7   for purpose of argument that I were to accept that the

8   conduct of ParkerVision in receiving the Parssinen

9   information while the petition for special treatment was

10  pending, failing to disclose that to the Patent Office is

11  inequitable conduct, that that should not be tolerated.

12              The next question is, the patent nonetheless

13  issues.

14              MR. HUMMEL:  Right.

15              THE COURT:  The Patent Office receives, albeit in

16  an untimely fashion, according to your description, the

17  Parssinen reference.  Doesn't Therasense teach us that the

18  legal effect of the Parssinen reference, having been received

19  by the Patent Office prior to the issuance of the patent,

20  eliminates your claim?

21              MR. HUMMEL:  No, and here's why, Your Honor.

22              THE COURT:  Okay.

23              MR. HUMMEL:  You're talking about a case of

24  non-disclosure, where the argument is you didn't disclose

25  this reference at some point early on in the prosecution and

1    then you stuck it in something later on; and the answer to

2    that is, well, the Patent Office --

3              THE COURT:  No, no.  Again, I apologize for

4    continuing to disrupt you, but I'm trying to get an answer to

5    this specific question.  The specific question I'm trying to

6    get an answer for is, does Therasense stand for the

7    proposition that if a reference is received by the Patent

8    Office prior to the issuance of the patent, that there can be

9    no claim for failure to disclose or failure to timely

10   disclose, because doesn't it presume that in the issuance of

11   the patent, that the patent examiner, if he received or she

12   received the reference, that they considered it?

13             MR. HUMMEL:  Okay.  If I was making --

14             THE COURT:  In other words, it's not a

15   non-disclosure case.  Those are easy or easier, certainly.

16   That you didn't give them -- let's suppose the facts were

17   such that ParkerVision had never disclosed the Parssinen

18   reference.  That's a much easier determination, to at least

19   argue that had they received the Parssinen reference, the

20   patent would not have issued.

21             Here, they received the Parssinen reference.  They

22   didn't receive it in good faith.  They didn't receive it in a

23   timely fashion, if your allegations are proven to be correct,

24   but the patent issued nonetheless.

25             So my question is, doesn't that defeat the but-for

1    prong of Therasense --

2              MR. HUMMEL:  No, Your Honor, because --

3              THE COURT:  -- the materiality prong?

4              MR. HUMMEL:  No, Your Honor, because, with respect,

5    what we're alleging here are neither of those things.  What

6    we're alleging is when Parssinen was submitted ultimately,

7    when it was submitted, the submission in the context of

8    having a petition to make special, in this special context,

9    that submission was a representation by ParkerVision that

10   Parssinen was not more closely related to the subject matter

11   of the '551 application than the references in the petition

12   to make special, and we say that's false and that's a

13   material misrepresentation.

14             In Therasense --

15             THE COURT:  But, again, the granting of the

16   petition to make special is not the issuance of the patent.

17   Now, granted, it may have given ParkerVision preferential

18   treatment to which they were not entitled, and I'm going back

19   now to my threshold question when I asked you to educate me

20   about the process after the petition for special treatment is

21   granted by the Patent Office.

22             MR. HUMMEL:  Right.

23             THE COURT:  Other than the fact that you have been

24   moved to the front of the line and you have these heightened

25   responsibilities to collect information and disclose it to

the Patent Office, what else is different from that point forward, if anything?

MR. HUMMEL:  Everything is faster.  So everything is faster because the examiner is -- instead of the examiner having to do the prior art search, you've done the prior art search for the examiner.

In the normal course, the examiner gets an application.  If the patentee has prior art, he has to disclose it; but the patentee has no obligation to go out and search for prior art.  So the Patent Office has to do that.

Here, you do the -- the applicant does the Patent Office's work.  So you do the prior art search and you give it to the examiner, but you don't give everything en masse to the examiner.  You give the references that are most closely related and then you affirmatively explain to the examiner why they're not relevant.

Here, they said because it doesn't practice any of this.  We say they lied about the elements.

So, as a result of that, the examiner can do his work much more quickly, because you have made representations to him in this special case.  "I want to go to the front of the line, and I'm going to be super honest with you and I'm going to do your work, and here's the most relevant stuff you should look at."

Now everything proceeds very quickly.  Whereas

normally the examiner has six months or he has as many months as he wants, I think, eventually, you know, the way they do it, he has three months. Then the reply is due in three months, and then there's one month and then you're done. And, frankly, even when you get to the printing stage, the C.F.R. says you get top priority, quote, unquote, "top priority" in printing. You get special treatment all the way through in order to be super honest.

Now, why this is relevant is during the course of this prosecution back and forth, the examiner has every right in this special circumstance to rely on your search that you found the most relevant prior art. After all, you have a lot more time than the examiner does and you have a lot more resources and a lot more skill than the poor examiner, who has to look at -- by the way, have you seen the '551 patent? It's this big.

THE COURT: What do you think?

MR. HUMMEL: Markman hearing. It's this big. It's huge. It's gigantic.

So, down the road here, we have a misrepresentation of the significance of Parssinen. They say -- they submit Parssinen with a bunch of other references -- "Don't tell the examiner this is more relevant or as relevant as the 21 items we showed you back then," and it slips through. That's a material misrepresentation.

1           Therasense says -- in discussing this, says --

2    let's look at Therasense.  "When the patentee has engaged in

3    affirmative acts of egregious misconduct, such as the filing

4    of an unmistakably false affidavit, the misconduct is

5    material."

6           There's no but-for causation.  It's material, per

7    se material; and to anticipate the argument, "Oh, that's

8    about false affidavits," Therasense goes on to say, in

9    response to a dissent argument that says, "Oh, it's limited

10   to false statements," in actuality, however, the materiality

11   standards set forth in this opinion includes an exception for

12   affirmative acts of egregious misconduct, not just the filing

13   of false affidavits.

14          The making of a false statement, an implicit false

15   statement, by operation of law, when you file the Parssinen

16   reference is a misstatement nonetheless.  It does away with

17   but-for causation; and the only thing we're going to have to

18   talk about, Your Honor, is whether there's specific intent to

19   deceive, and that's uniquely a trial issue, not on a motion

20   to dismiss.

21          THE COURT:  All right.  Thank you, Mr. Hummel.

22          Mr. Cawley, let me give you an opportunity to

23   respond.

24          MR. CAWLEY:  Thank you, Your Honor.  Your Honor,

25   Qualcomm begins its argument by saying that they are alleging

a pattern of conduct.  Essentially what they're saying is,

"Well, we may not be able to point to any particular conduct

which we think is inequitable conduct; but if we name enough

different kinds, maybe it's in there somewhere."

That's not the Exergen standard.  The Exergen

standard is they must plead with particularity particular

acts that they are relying on; and as the Court has already

observed, there's three.  The first is the alleged

misrepresentation of the four references.

I explained in my opening statements that what we

fundamentally told the Patent Office was that none of them

teach transferring non-negligible amounts of energy.

Qualcomm then comes back and says, "Well, here's

some things that they said and these were there."  They never

say that the references actually disclose transferring

non-negligible amounts of energy, but maybe one of skill of

the art would know that.

Your Honor sees attorneys arguing about this.

THE COURT:  Mr. Hummel says that the

representations made with respect to the four pieces of prior

art are demonstrably false.  Isn't that enough to get him

over the pleading hurdle?

MR. CAWLEY:  If they were, maybe; but what they

are, they are not demonstrably false.

THE COURT:  Is the Court in the position of making

a determination on the papers, on what's in the Complaint, is

the Court obliged at this stage, in order to -- in order to

issue a ruling favorable to your cause, to read this

description that was provided by Mr. Lee and Mr. Sorrells to

the Patent Office and reach the conclusion as to whether or

not this representation is demonstrably false?

MR. CAWLEY:  I think not, Your Honor.  I think this

is the algorithm of it.  I would suggest that the Court is

obligated to follow under the current law.

The Court first should read the allegations and the

nature of the statements that were made to the Patent Office

and ask the question:  Is this attorney argument or

characterization of the prior art?

THE COURT:  But I keep coming back to this and it

seems to me, at least intuitively, that that is a factual

determination, not a question to be made on the pleadings.

In other words, how can I -- if Mr. Hummel asserts in his

papers that these representations are demonstrably false,

am I not required to accept that for purposes of the pleading

as true?

MR. CAWLEY:  Not in the face of the requirement of

Exergen that the specifics be pled.

THE COURT:  Well, he's pled -- let's --

MR. CAWLEY:  He has pled specifics.

THE COURT:  Let's talk about Exergen says you've

got to plead the who, what, where, why and how under 9(b)

just as you would if you were describing a complaint alleging

fraud; and Mr. Hummel's papers allege that Mr. Lee and Mr.

Sorrells -- and Mr. Hummel's represented here in open court

that he had a good-faith basis for making this claim -- that

they affirmatively misrepresented, that they lied to the

Patent Office about these four pieces of prior art.

            If he alleges that Mr. Sorrells and Mr. Lee lied to

the Patent Office, isn't that enough to get over a motion to

dismiss?

            MR. CAWLEY:  With respect, no, it's not, Your

Honor.  First of all, it must be placed in the context of the

petition to make special.

            The references that were referred to were in the

petition to make special affirmatively identified by

ParkerVision as among the most relevant references.  To say

that they lied within the meaning of Ring Plus and said, "You

don't need to look at this," is completely undercut by the

fact that the applicant affirmatively said, "These four are

among the 21 most relevant references."

            In terms of the specific statements that were made,

as required to be made, to distinguish those references --

that's what the rules require -- if Your Honor reads those

references and determines that they are attorney argument or

characterizations of what is and isn't in the prior art, that

is protected by the federal circuit and does not constitute
inequitable conduct.

If Your Honor believes, on the other hand, that's
really not attorney argument and is not a characterization of
what's in the prior art, then Your Honor would have to
proceed to basically a factual inquiry:  Is the statements --
are the statements that they made false or true?

But Your Honor does not have to get there if you
conclude that what is pled as inequitable conduct is in fact
attorney argument or characterization of what is and isn't in
the prior art.

Now, let me speak briefly about the Parssinen
reference in connection with the petition to make special.

Turn that around so that I can see where we are.

Finally, just briefly, on the topic of bury.

As we've heard, the rules relating to the petition
to make special require the applicant to affirmatively
conduct a search -- that's not usually required -- and to
disclose to the Patent Office the most relevant references,
and further require that they explain in detail why those
references don't anticipate the requested claims.

There is a rule in connection with the petition to
make special that while it's pending, if the applicant
discovers a reference that is among the most relevant, that
they are to amend the petition to make special to disclose

that.

So Your Honor may be curious, why didn't that happen in this case in connection with Parssinen? And although that goes beyond the pleadings and into the evidence, the answer is, as Mr. Sorrells testified here in his deposition, he got the Parssinen reference. He read it and he found that it not only does not disclose the transfer of non-negligible amounts of energy, but it teaches away from that, and explains that that's not a good approach.

Mr. Sorrells, having analyzed that reference, then called Qualcomm's head technology officer who was participating in the negotiation. He listened to Mr. Sorrells and then wrote this e-mail internally, and I won't take the time to go through it in detail, but what it says is, "I agree with Mr. Sorrells, and in fact the Parssinen reference does not teach transferring non-negligible amounts of energy. It does something fundamentally different than Parssinen." That's why there was no amendment of the pending petition to make special.

But I want to turn directly to the question that Your Honor asked Qualcomm's attorney repeatedly. Okay. Maybe they didn't comply with some rule related to the petition to make special; but if it was ultimately disclosed, how could you possibly meet the but-for standard?

And, with respect, the federal circuit has already

1    anticipated that question and given us the answer.

2           There's a case that I'm sorry to say did not end up

3    in the briefs of either of the parties in this matter and it

4    is Powell versus Home Depot.  In Powell versus Home Depot,

5    the applicant had made certain statements in support of a

6    petition to make special.  The law changed while that case

7    was pending in Therasense, and Mr. Powell, the applicant,

8    argued at oral argument that the -- excuse me.  Home Depot,

9    the defendant, argued that Mr. Powell's conduct in failing to

10   correct the petition to make special constitutes inequitable

11   conduct under Therasense.

12          The federal circuit flatly, as a matter of law,

13   rejected that argument, holding that when, as here, the

14   patent applicant fails to update the record to inform the

15   P.T.O. that the circumstances which support a petition to

16   make special no longer exist, that conduct does not

17   constitute inequitable conduct, exactly the question that

18   Your Honor has.

19          If it gets disclosed after the fact, how does even

20   allege -- an alleged violation of the rules pertaining to a

21   petition to make special satisfy the but-for test?  The

22   federal circuit has told us as a matter of law, it doesn't.

23          Finally, Your Honor, on the issue of burying the

24   Parssinen reference, burying is a very questionable legal

25   theory.  There are some old cases, some of them back to

before even the formation of the federal circuit, that do suggest that burying a reference with a lot of irrelevant references might be inequitable conduct.

More recent district court cases, for example, from the District of Delaware have flatly rejected the concept of burying, saying that you either disclosed the reference or you didn't.

No federal circuit case has ever recognized burying as inequitable conduct. No post-Therasense case, either district court or federal circuit, has ever recognized it. But what Your Honor knows is that the petition to make special has some peculiar requirements. One of them is that, unlike in an ordinary application, the applicant is required to perform a search and, unsurprisingly, those searching will produce some relevant references, but they'll produce a lot of references which are of questionable relevance.

After performing the search in this case, in connection with this patent, ParkerVision discovered that there were hundreds of responses to the search that the rules specify is required. So what are they to do about that?

Well, even though they're not required to do it, what they did was to tailor several different disclosures to the Patent Office to help the examiner understand what it was that was being disclosed and to understand which references were likely to be more relevant than others.

1          There were the 21 references in the petition to

2    make special that ParkerVision characterized as the most

3    relevant.

4          There had been searches done in connection with

5    foreign patent applications.  So there was a separate

6    disclosure that was limited to the results of those searches

7    for the foreign searches.

8          ParkerVision, as we've already heard, had received

9    some references from potential licensees that it was

10   negotiating with; and that's important, of course, because a

11   licensee is motivated to try and find prior art to avoid a

12   license or to reduce the value of a license.  So ParkerVision

13   did a separate disclosure for references received from

14   licensees.

15         There was a separate disclosure for materials from

16   ParkerVision itself, and then there was a miscellaneous

17   disclosure and that was a big one.  It included over 400

18   references in the miscellaneous disclosure, mostly references

19   that had come from the prior art search, but which

20   ParkerVision did not think warranted inclusion in the

21   petition to make special.

22         It included, for example, the two infamous

23   references that ParkerVision relies on in its brief involving

24   the statistical analysis of the size of raindrops.  That was

25   in the miscellaneous disclosure.

1          In connection with that kind of reference,

2    ParkerVision had a choice to make.  It could either

3    unilaterally decide that a reference wasn't relevant, even

4    though it was responsive to the search, and not submit it at

5    all.  That's one choice it could have made.  But I think that

6    everyone in this courtroom knows that if it had made that

7    choice, what we would be hearing today would be Qualcomm

8    saying, "Your Honor, statistical analysis of raindrops

9    involves a statistical methodology that's equally applicable

10   to electromagnetic waveforms."

11         They knew about this important reference and didn't

12   disclose it to the Patent Office.  So ParkerVision didn't

13   make that choice.  Instead, ParkerVision decided if it's

14   responsive to the search request, but we don't see the

15   relevance of it, we're going to put it in the miscellaneous

16   category and we'll leave it up to the patent examiner to

17   decide if they want to pursue it or not.

18         Now, to get back though to the specifics of this

19   motion, Exergen requires that Qualcomm plead with

20   particularity the who, what, where and why of the failure to

21   disclose or, in this case, of the burying of the Parssinen

22   reference.

23         Here's what Qualcomm should have pled to Your

24   Honor.  First of all, this is the cover page of the

25   three-page disclosure that disclosed Parssinen to the Patent

Office; and as Your Honor can see, it specifically informed the Patent Office in the last sentence that these are references that were provided by potential licensees.

The second page of that disclosure contain these 22 patents, and the third page and last page contain the disclosure of these five articles, and Parssinen is the second one.

This is a limited disclosure, a disclosure that specifically identified that these are materials received from licensees and therefore potentially relevant, and which disclosed Parssinen as one of only five non-patent references.

If these facts had been fully pled by Qualcomm, they would affirmatively demonstrate to the court that there's no burying here.

It's undisputed that this reference was before the Patent Office. It was disclosed at a time that it could have been considered. It was listed on the list of patents or -- excuse me -- of references considered.

In short, Your Honor, as a matter of pleading, we believe the Court should find that the alleged misrepresentation as to the four references in the petition to make special are attorney argument characterizing the content of the prior art and, as a matter of law, cannot be inequitable conduct; that the failure to update the petition,

1   again, under federal circuit authority, as a matter of law,

2   does not meet the but-for test of inequitable conduct; and

3   that the facts surrounding burying have not been adequately

4   pled under Exergen, because Qualcomm has failed to set forth

5   the circumstances under which the Parssinen reference was

6   disclosed, and had those facts been pled as required, they

7   would demonstrate to the Court conclusively that there was no

8   burying.

9           THE COURT:  Thank you, Mr. Cawley.

10          We're over our time, and it's against my general

11  practice, but I want to ask you, Mr. Hummel, to address two

12  things for me.  I want you to distinguish the Powell case for

13  me, if you can; and then, secondly, I want you to tell me if

14  you can cite to me any authority that stands for the

15  proposition that a course of conduct as opposed to discrete

16  acts can form the basis of a claim for inequitable conduct.

17  Limit your comments to those two things, because we're over

18  our time.

19          MR. HUMMEL:  Can I respond to that last point

20  quickly?

21          THE COURT:  You can take them in either order.

22          MR. HUMMEL:  No, no, no.  The last point Mr. Cawley

23  made.  He was accusing me of not pleading the I.D.S.

24          I have to tell Your Honor that the I.D.S. was not

25  in the court file that we got, that I.D.S.; and so we pled in

1    our Complaint that Parssinen must have been disclosed by

2    ParkerVision at some point because it shows up on the face of

3    the patent; but at the time, I couldn't have pled that

4    particular document because it wasn't in the court file.  It

5    was missing from the court file.  Three I.D.S.s were missing

6    from the court file.  It was impossible for me to plead what

7    Mr. Cawley thinks I should have plead.

8           Powell -- I haven't read Powell.  Just looking at

9    the snippets there -- it wasn't brought to my attention.  Mr.

10   Cawley obviously knew he was going to use it; but, for some

11   reason, he didn't tell me that he was going to use Powell at

12   this hearing, so I could read it.  I don't know how well I

13   can respond to it other than to say --

14          THE COURT:  Okay.  That's fine if you haven't read

15   it.  I actually have it in my hand, I mean, before Mr. Cawley

16   referenced it.  I don't know why neither party cited it in

17   their papers; but Powell says, and I'm reading from the case,

18   "Where, as here, the patent applicant fails to update the

19   record to inform the P.T.O. that the circumstances which

20   support a petition to make special no longer exist, that

21   conduct does not constitute inequitable conduct," citing

22   Therasense.

23          MR. HUMMEL:  Your Honor, I hesitate to --

24          THE COURT:  I don't want to put you in a position

25   of having to respond to a case you haven't read.

1          MR. HUMMEL:  Can I have five days to submit a two-
2     paragraph letter on it?

3          THE COURT:  I'll give you an opportunity to tell
4     me -- I don't need more than a page or two.  Just if you
5     think Powell is distinguishable in some way, I'll give you an
6     opportunity to bring that to my attention in a subsequent
7     filing within ten days; but I don't want to get into another
8     briefing where I have all the papers that I can handle with
9     respect to this case.

10         MR. HUMMEL:  I understand, Your Honor.  I'll keep
11    it to one page.

12         THE COURT:  Now tell me whether or not there's any
13    authority that you're aware of that supports the notion that
14    the Court could sustain a claim for inequitable conduct based
15    on a course or a pattern of behavior as opposed to a discrete
16    act.

17         MR. HUMMEL:  I'm trying to remember whether I found
18    any of those exact words, because most of the cases that I've
19    been reading for this deal with particular acts, usually the
20    failure to disclose one thing or one statement.  This is an
21    unusual case, because we have a whole pattern of different
22    things.

23         THE COURT:  Well, that's what prompts the question,
24    Mr. Hummel, because if you look at Exergen and if you look at
25    cases perhaps outside of the context of inequitable conduct,

1    but fraud cases, I mean, I don't profess to have the ability

2    to imagine every possible hypothetical, but I'm having a very

3    hard time imagining, for instance, a prosecution for fraud,

4    to take it outside the context of patents, where you could

5    allege fraud based on a course of conduct as opposed to

6    discrete acts of misrepresentation of fact, and I'm having

7    the same problem applying it to your description of what your

8    claim is with respect to ParkerVision's conduct before the

9    P.T.O.

10          If we don't -- if we don't separate these acts into

11   discrete acts, which Exergen would seem to suggest is

12   required, at least based on my reading of it, then tell me

13   what authority, if any, you know of that allows me to, in

14   essence, aggregate those things and say, "Well, maybe burying

15   in and of itself is not sufficient.  Maybe failure to

16   disclose timely in and of itself is not sufficient, but all

17   of this together just has a bad smell to it and I think it's

18   enough."  I'm not aware that I have the authority to do that.

19          MR. HUMMEL:  I think a course of conduct comes into

20   play in the securities context.  I don't know if I have a

21   particular case right in mind where there's been this much

22   conduct.  This may be an unusual case, Your Honor, a super

23   unusual case which has not been addressed by anybody.

24          But here, I have certain specific acts, and the

25   ones that I most care about, Your Honor, and that I have

argued here to you and that I think are the most egregious
are the lying about the four references in the petition to
make special and then the misrepresentation by operation of
law when the Parssinen reference was filed, that it is not
more -- those are the two things I care about.

THE COURT:  All right.

MR. HUMMEL:  The rest of the stuff is indicative of
an intent to deceive the Patent Office.

I'm not saying I have a separate case for burying;
but the evidence of burying, the evidence of putting
Parssinen in with all those other references, which include,
by the way, press releases of personnel changes at
ParkerVision, the rainfall droplets, the financial results of
ParkerVision, stuff that any patent lawyer, particularly one
who had 20 years experience, would know is not relevant, all
of that stuff is indicative of a specific intent to deceive
and should be left in this case.

THE COURT:  Thank you for your arguments.

I know that it's not lost on you, Mr. Hummel and
Mr. Cawley as well as the other lawyers in the courtroom,
that this Court takes very seriously allegations made against
individuals, members of the Bar or private persons, that they
committed fraud against the Patent and Trademark Office, and
I'm going to obviously evaluate the sufficiency of your
pleadings and I'll give you an order in due course.

1       But if, and I underline "if," these allegations in

2   any respect withstand the motion to dismiss, then I'm going

3   to very carefully evaluate the evidence with respect to

4   whether or not there was an affirmative misrepresentation,

5   deception or lie committed by the individuals to whom you

6   ascribe that conduct in the course of their appearance before

7   the Patent and Trademark Office, and I'm going to hold you to

8   that proof.

9       MR. HUMMEL:  All right.

10      THE COURT:  Thank you all for your arguments.

11      Just so that you know, as you probably gleaned from

12  my recent order amending the Case Management and Scheduling

13  Order, I am working my way through the claims construction

14  terms, and I can't give you a date by which I'll get a

15  Markman order out, but it's not for lack of attention.  The

16  task is somewhat overwhelming.  So I'm working on it.

17      Thank you all.

18      (Proceedings terminated at 11:15 a.m.)

19      - - - - - - - -

20          Reporter's Certification

21  I certify that the foregoing is a correct transcript from the

22  record of proceedings in the above-entitled matter.

23                      s/Diane Peede, RMR, CRR
                        Official Court Reporter
24                      United States District Court
    Date:  January 13, 2013    Middle District of Florida

25