**UNITED STATES DISTRICT COURT**
**THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| PARKERVISION, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> QUALCOMM INCORPORATED, <br><br> *Defendant.* | Case No. 3:11-cv-719-J-37-TEM |

**QUALCOMM'S OPPOSITION TO**
**PARKERVISION'S MOTION FOR SUMMARY JUDGMENT OF NO INVALIDITY**

# TABLE OF CONTENTS

Page

Request for Oral Argument ................................................................................. 1

I.  Introduction ................................................................................................. 1

II.  Factual Background ..................................................................................... 2

    A.  Direct Downconversion Circuits Are Old in the Art. ................................ 2

        1.  Wireless communication requires downconversion......................... 2

        2.  Prior art devices used multiplication and filtering to directly downconvert. ............................................................................ 3

    B.  The Prior Art Disclosed ParkerVision's Claimed "Energy Sampling" Invention. ................................................................................ 6

III.  Argument ..................................................................................................... 8

    A.  Summary Judgment Standard .................................................................. 8

    B.  Disputed Issues of Fact Preclude Summary Judgment on Anticipation and Obviousness........................................................... 9

        1.  Dr. Razavi has provided detailed evidence showing that the asserted claims are anticipated and obvious. .............................. 9

        2.  Even under ParkerVision's "discharge" theory, Qualcomm's cited prior art references raise material factual disputes. ........................................................................ 11

        3.  ParkerVision's discharge theory conflicts with the Court's construction, the patents, and the record evidence......................... 15

    C.  Claims 4 and 7 of the '845 Patent Are Invalid for Indefiniteness.............. 17

    D.  The Court Should Reject ParkerVision's Remaining Arguments. ............. 18

IV.  Conclusion ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................. 8

*Billups-Rothenberg, Inc. v. Associated Regional & Univ. Pathologists, Inc.,*
642 F.3d 1031 (Fed. Cir. 2011) ........................................................................... 14

*BJ Servs. Co. v. Halliburton Energy Services, Inc.,*
338 F.3d 1368 (Fed. Cir. 2003) ........................................................................... 20

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................. 8

*Crown Operations Int'l, Inc. v. Solutia Inc.,*
289 F.3d 1367 (Fed. Cir. 2002) ........................................................................... 19

*Crown Packaging Tech. Inc. v. Rexam Beverage Co.,*
559 F.3d 1308 (Fed. Cir. 2009) ........................................................................... 19

*Deere & Co. v. Bush Hog, LLC,*
703 F.3d 1349 (Fed. Cir. 2012) ........................................................................... 8

*Diamond Heads, LLC v. Everingham,*
No. 07-cv-462, 2009 WL 1046067 (M.D. Fla. Apr. 20, 2009) ........................... 8

*Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co.,*
No. 10-cv-819-J-37 JBT, slip op. (M.D. Fla. Jan 8., 2012) (Dalton, J.) ............... 1, 8, 9, 10

*Group One, Ltd. v. Hallmark Cards, Inc.,*
407 F.3d 1297 (Fed. Cir. 2005) ........................................................................... 18

*Hairston v. Gainesville Sun Publ'g Co.,*
9 F.3d 913 (11th Cir. 1993) ................................................................................. 8

*Halliburton Energy Services, Inc. v. M-I LLC,*
514 F.3d 1244 (Fed. Cir. 2008) ........................................................................... 19

*Havco Wood Products, LLC v. Industrial Hardwood Products, Inc.,*
2013 WL 1497429 (W.D. Wis. 2013) ................................................................. 20

*Howmedica Osteonics Corp. v. Zimmer, Inc.,*
Civ. No. 05-897 (WHW), 2007 WL 1741763 (D.N.J. June 13, 2007), *aff'd,* 397 F. App'x
654 (Fed. Cir. 2010) ........................................................................................... 18

*KLA-Tencor Corp. v. Xitronix Corp.,*
    2011 WL 318123 (W.D. Tex. 2011) ................................................................................ 19

*Rembrandt Data Technologies, LP v. AOL, LLC,*
    2009 WL 4030753 (E.D. Va. 2009), *aff'd*, 641 F.3d 1331, 98 USPQ2d 1393 (Fed. Cir.
    2011) .................................................................................................................................... 18

*Sandvik Intellectual Property AB v. Kennametal, Inc.,*
    No. 2:10-cv-00654, at *2-3, *8-9 (W.D. Pa. July 24, 2012) ............................................. 18

*Source Search Techs., LLC v. LendingTree, LLC,*
    588 F.3d 1063 (Fed. Cir. 2009) ........................................................................................ 17

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,*
    418 F.3d 1326 (Fed. Cir. 2005) ........................................................................................ 19

## STATUTES

35 U.S.C. §§ 101, 102, 103, 112 ............................................................................................ 20

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) .............................................................................................................. 8

Local Rule 3.01(j) .................................................................................................................. 1

Qualcomm hereby opposes ParkerVision's Motion for Summary Judgment of No Invalidity (Dkt. 269) on the grounds detailed below.

## Request for Oral Argument

Pursuant to Local Rule 3.01(j), Qualcomm respectfully requests oral argument. Qualcomm estimates that a hearing time of two hours for this motion will be sufficient.

## I.      Introduction

As this Court has previously observed, "a patentee seeking summary judgment on invalidity embarks on a troublesome venture – more troublesome, the Court presumes, than a patentee may realize."[1]  Here, ParkerVision attempts an even more daunting task – seeking summary judgment of no invalidity based on a new and erroneous claim construction that ParkerVision neither proposed nor argued before now.

Qualcomm's expert, Dr. Razavi, addresses the prior art in a report spanning hundreds of pages, providing a claim-by-claim, element-by-element analysis showing that the asserted claims are anticipated and obvious in view of many references.  Unable to refute Dr. Razavi's analysis, ParkerVision belatedly attempts to rewrite the claims, arguing that the claimed low frequency "signal" that is "generated" cannot be the time-varying voltage on the storage capacitor.  ParkerVision's new argument conflicts with the patents-in-suit, which show that time-varying voltages across the capacitors are, in fact, lower-frequency "signals."  In any event, even if ParkerVision's erroneous new claim construction were adopted, Dr. Razavi's opinions create a genuine issue of fact for trial.  As set forth below, Dr. Razavi performed simulations of the prior art and found the "telltale" signs of the alleged invention.

The remaining items addressed by ParkerVision's motion likewise present fact issues or

---

[1] *Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co.*, No. 10-cv-819-J-37 JBT, slip op. at 8-10 (M.D. Fla. Jan 8., 2012) (Dalton, J.)

are no longer being asserted by Qualcomm.  Accordingly, ParkerVision's summary judgment motion should be denied in its entirety.

## II.    Factual Background

### A.    Direct Downconversion Circuits Are Old in the Art.

#### 1.    Wireless communication requires downconversion.

The patents-in-suit relate to wireless communications.[2]  (*See generally* Ex. 1, Ex. A, ¶¶ 41-87.)  Wireless communications use the frequency, amplitude, and phase characteristics of signals to communicate information.  Compared to the wireless carrier, information signals are low-frequency signals.  (*Id.*, ¶ 43.)  To transmit information wirelessly over the air, the low-frequency information signal is used to modulate a high-frequency signal.  (*Id.*, ¶ 52.)  This process is called "upconversion."  (*Id.*)  At the receiver, the modulated signal must be "downconverted" back to the lower frequency, removing the high-frequency components.  (*Id.*, ¶ 54.)  "Direct downconversion" refers to a receiver that converts the modulated high-frequency signal to the low-frequency information signal in a single stage.  (*Id.*, ¶ 47.)

Direct downconversion receivers have been used since the 1920s.  Early devices include the homodyne system described by F.M. Colebrook in 1924 and the synchrodyne receiver described by D.G. Tucker in 1947.  (*Id.*, ¶¶ 70-71.)  From the 1980s, modern direct conversion receivers include a variety of configurations used in numerous applications, such as paging, ham radio, GSM cell phone applications, and cordless phones.  (*Id.*, ¶¶ 79-83.)  Qualcomm has cited numerous prior art references disclosing direct downconversion circuits that anticipate and render obvious the asserted claims in this case.

---

[2] Qualcomm provides its disagreements with ParkerVision's Statement of Undisputed Facts in the Factual Background section and the body of the brief below.

2.    Prior art devices used multiplication and filtering to directly downconvert.

The components used in direct downconversion were well-known long before the patents-in-suit.  Wireless devices can use mixers to convert between different frequencies. Mathematically, a mixer multiplies two signals together.  (*Id.*, ¶ 58.)  In this context, multiplication creates two new signals, one having a frequency that is the *sum* of the two original signals and one having a frequency that is the *difference* between the two original signals.  (*Id.*, ¶ 58.)  Figure 3.4(b) below, which comes from a 1998 textbook written by Qualcomm's expert Dr. Razavi, depicts a "frequency domain"[3] diagram showing upconversion.



(*Id.*)

In Figure 3.4(b), the information signal is shown on the left as a low-frequency signal distributed around zero.  Multiplying the information signal by the high-frequency signal centered at $\omega_c$ creates the two new signals on the right.  One of the new signals is centered at the sum of the two input center frequencies $(0 + \omega_c)$, and the other new signal is centered at the difference between the two input center frequencies $(0 - \omega_c)$.  (*Id.*, ¶ 61.)

The downconversion process works in a similar way.  The figure below modifies Razavi's Figure 3.4(b) to show multiplication when used in the downconversion process.



The mixer multiplies the received signal, which is centered at the high frequency $(\omega_c)$,

---

[3] A "frequency domain" diagram maps frequencies along the x-axis and amplitude along the y-axis. A "time domain" diagram, in contrast, maps time along the x-axis and amplitude along the y-axis.

3

with a signal at the same high frequency ($\omega_c$) generated locally at the receiver.  Multiplication

creates a copy centered at the sum of the two input center frequencies ($\omega_c + \omega_c = 2\omega_c$) and a copy

centered at the difference of the two input center frequencies ($\omega_c - \omega_c = 0$).  A filter then removes

the high-frequency copy at $2\omega_c$, leaving the original information signal centered at zero.



Figure 5-8 below from the prior art 1995 Couch textbook shows this standard

configuration of a mixer followed by a filter, which can be used for either upconversion or

downconversion.  The mixer (shown in yellow) multiplies the received signal ($v_{in}(t)$) by the

high-frequency signal ($v_{LO}(t)$) generated by the "local oscillator" (blue).  The output of the mixer

is then sent to a filter (green).



**FIGURE 5-8** Mixer followed by a filter for either up or down conversion.
(Ex. 2, Fig. 5-8 at 259 (annotated).)

Many prior art receivers employed a "square wave local oscillator signal."  (Ex. 1, Ex. A,

¶ 65.)  In this configuration, rather than multiplying the incoming signal with a smooth

sinusoidal wave function, the receiver uses a square wave function to accomplish

multiplication.  The table below depicts a sinusoidal wave function on the left and a square

wave function on the right:

| Sinusoidal Wave (Ex. 1, Ex. A, ¶ 58 (Fig. 3.4(a))) | Square wave (Ex. 2, Fig. 5-10) |
|---|---|
| | |

The square wave (shown below as *s(t)*) controls the opening and closing of the switch, with the switch closed when *s(t)* has a value of "1" and open when *s(t)* has a value of "0." Opening and closing the switch in this way results in essentially the same multiplication operation as multiplying two sinusoidal waves, with the same downconversion result.  Figure 5-10 from the prior art 1995 Couch textbook shows the square-wave followed by the filter.



**FIGURE 5-10**  Linear time-varying device used as a mixer.

(Ex. 2, Fig. 5-10 at 261.)  Qualcomm's expert Dr. Razavi applied these well-known principles in his report.  (*See* Ex. 1, Ex. A, ¶¶ 55-66, 100-101, 129, 166.)[4]

The two figures from Couch show the filter as a black box.  "Filters use energy storage elements to obtain frequency discrimination."  (Ex. 2 at 246; Ex. 1, Ex. A, ¶ 61.)  The figure below shows a long-known configuration for a "low-pass filter," a filter that allows low-

---

[4] ParkerVision's expert Dr. Prucnal agrees with Qualcomm that the mixing step generates the downconverted signal, stating more than 100 times in his claim charts for the '551, '518, and '371 patents that, in the Qualcomm accused products, "the RF carrier signal is mixed with the quadrature LO control signals to generate the downconverted lower frequency signal *at the output of the mixer*."  (Ex. 4 at 23-43, 68-70, 95-104; Ex. 5 at 103-13; Ex. 6 at 23-40, 52-62 (emphasis added).)

frequency components to pass but removes high-frequency components.  The energy storage element in this filter is a capacitor (C) (shown in green).[5]



(*See* Ex. 7, Fig. 11 at 2066; Ex. 8, Fig. 7-9 at 171.)

B.    The Prior Art Disclosed ParkerVision's Claimed "Energy Sampling" Invention.

ParkerVision's case and all its claims arise from an alleged invention it now describes as "energy sampling."  According to ParkerVision, "[d]irect conversion receivers based on energy sampling downconverters generate the baseband signal by transferring and accumulating energy from the modulated carrier signal onto a storage element such as a capacitor." (Ex. 3 at 45.)

In the annotated figure below, the input signal is referred to as the "input EM signal." (Dkt. 157-1 at 109.)  Then, an "energy transfer signal" (shown in blue) closes a switch (yellow) at a rate that accomplishes multiplication.  "When the switch closes, non-negligible current from the RF [radio frequency] carrier is allowed to flow into a relatively large capacitor.  The

---

[5] In more detail, the capacitor (C) stores energy received from the input signal ($v_1(t)$).  The amount of energy stored in the capacitor is given by the equation, $E = 0.5*C*V^2$, where E is the energy stored in the capacitor, C is the capacitance of the capacitor, and V is the voltage.  (*E.g.*, Ex. 3 at 49.)  During operation, the capacitor will discharge some or all of the stored energy.  Energy discharged from the capacitor lowers the voltage differential according to the same equation, $E = 0.5*C*V^2$.  (*Id.*)  The filter works by averaging out energy from high-frequency components over a period of time.  (Ex. 1, Ex. A, ¶ 714; Ex. 3 at 48-49.)  Filters with large capacitors and/or high resistance remove more high-frequency components. (*Id.*)

capacitor [shown in green] accumulates and stores energy while the switch is closed." (Ex. 3 at

45.) Then, "[w]hen the switch opens, part of the accumulated non-negligible energy in the

capacitor is transferred to the load impedance." (*Id.*) ParkerVision argues that a "telltale" sign

of an energy sampler is a "sawtooth" waveform created by the use of a low-impedance[6] load

after the capacitor.[7] (Dkt. 269 at 11 (citing '551 patent, Fig. 57E).)

| Schematic | Waveform |
|---|---|
|  | |

('551 patent, Fig. 82A, Dkt. 157-1 at 109 (annotated); Dkt. 269 at 11 (citing '551 patent, Fig. 57E).)

In short, like in the prior art, the opening and closing of the switch in ParkerVision's

purported "energy sampling" invention multiplies the input signal and the locally generated

signal to generate the downconverted lower frequency signal, and the capacitor provides "low-

pass filtering of the signal." (Ex. 3 at 50; Ex. 4 at 23-43, 68-70, 95-104; Ex. 5 at 103-13; Ex. 6 at 23-

40, 52-62; Ex. 1, Ex. A, ¶¶ 88-101, 109-129.)

---

[6] "Impedance" refers to the opposition to current in an electric circuit, which is analogous to the resistance in a single component.

[7] Dkt. 269 at 11 ("Transferred energy is discharged from the storage device ... resulting in a sawtooth-like waveform that represents the repeated charging and discharging of the storage device."); Ex. 9 at 142:19-23 ("Q.... [Y]ou said the sawtooth pattern on the capacitor is one of the telltales of energy sampling, right? A. Yes."); Ex. 3 at 129-30.)

III.  **Argument**

A.  Summary Judgment Standard

A court may grant summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Diamond Heads, LLC v. Everingham*, No. 07-cv-462, 2009 WL 1046067, at *3 (M.D. Fla. Apr. 20, 2009) (citing *Celotex*, 477 U.S. at 323; *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)). "The Court must draw all inferences in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor." *Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co.*, No. 10-cv-819-J-37 JBT, slip op. at 2-3 (M.D. Fla. Jan 8., 2012) (Dalton, J.); *Hairston*, 9 F.3d at 919.

As this Court has explained, a motion seeking summary judgment of no invalidity:

does nothing more than test the sufficiency of an affirmative defense which, in the context of patent litigation, most of the time do not lend themselves to the type of categorical proof required by Rule 56. When faced with such a motion, an accused infringer need only raise a factual dispute – any factual dispute will do – that is related to the defense.

And this is why such motions are troublesome. Affirmative defenses to claims of patent infringement often turn on factual issues. The scope and content of the prior art are fact questions. Anticipation is a question of fact. Obviousness is a question of law based on underlying factual determinations.... Thus, an accused infringer has its pick of numerous factual issues that it may raise to defeat a summary judgment.

Motions such as this involve significant costs – those spent to raise and fairly present the issue; those spent to identify factual disputes and fairly oppose such motions; and those spent by the judiciary to analyze such complex factual and legal issues – and are not likely to be well-founded unless the defense involves relatively simple and straightforward fact. Further, denial of a patentee's summary judgment motion on an affirmative defense also does nothing to narrow the issues at trial.

*Graphic Packaging Int'l, Inc.*, No. 10-cv-819-J-37 JBT, slip op. at 8-10 (internal citations omitted)

(Dalton, J.).

      B.      <u>Disputed Issues of Fact Preclude Summary Judgment on Anticipation and Obviousness.</u>

ParkerVision limits its partial summary judgment motion regarding prior art invalidity

to a single claim requirement. (Dkt. 269 at 6-17.) ParkerVision contends that Qualcomm has not

shown that the prior art discloses the "generating" limitations from the asserted independent

claims of the '551, '518, or '371 patents. (*Id.*) The Court should deny ParkerVision's motion

because disputed issues of material fact preclude summary judgment.

      1.      <u>Dr. Razavi has provided detailed evidence showing that the asserted claims are anticipated and obvious.</u>

Qualcomm's expert Dr. Razavi is one of the world's leading experts in the field of RF

communications. (Ex. 1, Ex. A, ¶¶ 2-14.) He is a Professor of Electrical Engineering at the

University of California Los Angeles, where he is the Director of the Communications Circuits

Laboratory. (*Id.*, ¶ 2.) He has focused on the design of RF communications circuits throughout

his career at AT&T Bell Laboratories, Hewlett-Packard, and UCLA. (*Id.*, ¶¶ 3-6.) He has

received many awards and recognitions in the field and published numerous articles and

textbooks. (*Id.*, ¶¶ 6-12.) He authored the *RF Microelectronics* textbook discussed above, which

has been translated into several languages and cited more than 2,700 times. (*Id.*)

Dr. Razavi carefully analyzed the asserted claims in this case, comparing them on a

claim-by-claim and limitation-by-limitation basis to the prior art. His report includes a high-

level explanation of each ground of invalidity and detailed invalidity claim charts for each of

the scores of asserted claims. (*See generally, e.g.*, Ex. 1, Ex. A; Exs. 10-18.) Combined together,

the cover pleading and exhibits span more than 1,700 pages.

ParkerVision mistakenly argues that Dr. Razavi simply skipped the "generating"

limitation of the asserted independent claims, conflating it with another element.  (Dkt. 269 at

6-10.)  During claim construction, the Court rejected any temporal limitation on the

"generating" step, holding that the transferring and generating steps may occur simultaneously.

(Dkt. 243 at 39-40.)  The Court otherwise found no construction of the "generating" step was

necessary, leaving the phrase to its plain and ordinary meaning.  (*Id.*)

       Dr. Razavi's invalidity analysis applies this plain and ordinary meaning within the

framework of the fundamental principles of physics described above.[8]  For example, with

respect to the Weisskopf reference, Dr. Razavi stated in the body of the report:

> As the Court noted in its Claim Construction Order, this "generating" step can
> happen simultaneously with the transferring of energy from the carrier signal
> (Claim Construction Order, pp. 39-40), which is exactly what happens in
> Weisskopf. As described above, the energy transferred in each sample occurs
> when the "GATE" in Figure 2 is closed, allowing current to flow to the capacitor.
> At the same time, this gating by the LO also causes the frequency translation of
> the carrier frequency to the lower frequency. This principle of physics is
> admitted in ParkerVision's infringement contentions ....

(*E.g.*, Ex. 1, Ex. A, ¶¶ 166-167.[9])  He followed this description with a detailed analysis of the

"generating" limitation in the claim charts.  (*E.g.*, Ex. 10 at D.1-1 to D.1-7.[10])  Dr. Razavi's

detailed analysis on all claims and all limitations raises exactly the type of factual issues

precluding summary judgment the Court described in *Graphic Packaging*.  *See Graphic Packaging*

---

[8] Specifically, Dr. Razavi shows that, in downconversion, switching the gate at an appropriate
frequency, such as the carrier frequency, downconverts the signal, and the capacitor acts to filter away
some of the high-frequency components and/or to measure the voltage of the downconverted signal.
(*E.g.*, Razavi, ¶ 166; *see also id.*, ¶¶ 55-66, 100-101, 129).)

[9] *See also* Razavi Rep., ¶¶ 175-76, 188-90, 199-201, 207-08, 220-21, 231-33, 239-41, 273-74, 297, 362-63,
370-71, 377-78, 384-85, 391-92, 398-99, 405-06, 432, 438-39, 445, 451, 457, 463, 486-92, 495, 521-24, 529-36,
538-45, and 546-52.

[10] *See also* **'551 patent**: Ex. 10 (Weisskopf) at D.1-5 to D.1-7, D.1-24 to D.1-27; Ex. 11 (Estabrook) at D.2-
4 to D.2-5, D.2-20; Ex. 12 (Nozawa) at D3-6 to D3-7, D3-24 to D3-25; **'518 patent**: Ex. 13 (Weisskopf) at E.1-
8 to E.1-11, E.1-22 to E.1-25, E.1-34 to E.1-36, E.1-40 to E.1-43; Ex. 14 (Estabrook) at E.2-7 to E.2-8, E.2-21 to
E.2-24, E.2-33 to E.2-37, E.2-43 to E.2-47; Ex. 15 (Nozawa) at E.3-8 to E.3-9, E.3-21 to E.3-23, E.3-30 to E.3-
31, E.3-38 to E.3-39; **'371 patent**: Ex. 16 (Weisskopf) at F.1-9 to F.1-11, F.1-19 to F.1-21; Ex. 17 (Estabrook) at
F.3-8 to F.3-9, F.3-16 to F.3-17; Ex. 18 (Nozawa) at F.4-6, F.4-13 to F.4-14.

*Int'l, Inc.*, No. 10-cv-819-J-37 JBT, slip op. at 8-10 (internal citations omitted) (Dalton, J.).

> 2.   Even under ParkerVision's "discharge" theory, Qualcomm's cited prior art references raise material factual disputes.

In its motion for summary judgment, ParkerVision also contends that only energy discharged from the capacitor can meet the "generating" limitation.  (Dkt. 269 at 11-12.) ParkerVision argues that the discharge "result[s] in a sawtooth-like waveform that represents the repeated charging and discharging of the storage device."  (*Id*.)  ParkerVision's motion, however, simply ignores the disclosures of the sawtooth charge/discharge cycle in the references cited by Qualcomm.  This opposition will address three such references: Estabrook, Nozawa, and Weisskopf.

> a)   Estabrook

In 1988 and 1989, long before the patents-in-suit, Polly Estabrook of Stanford University and the California Institute of Technology and Bruce Lusignan of Stanford published two papers.  (*E.g.*, Ex. 1, Ex. A, ¶¶ 168-177.)  The first paper ("Estabrook 1988") describes a design tool for optimizing mixers and applies the tool to several common circuits existing at the time for downconverting over-the-air radio signals.  (Ex. 19 at 1107.)  The second paper uses the same circuit in a direct downconversion application.  (Ex. 20 at 71.)

Figure 3 from Estabrook 1988 shows one of the analyzed circuits.  Figure 3, on the left below, discloses the same components described in the ParkerVision patents in this case, depicting a switch implemented as a diode (yellow), controlled by the "ILO" control signal (blue), which charges a capacitor (green).  The Estabrook circuit generates a sawtooth waveform, as shown by the simulations performed by both parties' experts.  ParkerVision's expert simulated the Estabrook circuit and obtained the results depicted below on the right.



(Ex. 19, Fig. 3 at 1108 (annotated); Ex. 21 at 42.)

ParkerVision's expert Dr. Prucnal conceded in deposition that his simulation of the

Estabrook circuit exhibits a sawtooth waveform:

> Q.   ... [Y]ou said the sawtooth pattern on the capacitor is one of the telltales of energy sampling, right?
>
> A. Yes.
>
> Q.   And if you look at Page 42 of Appendix A of your rebuttal report, Exhibit 2, that's your simulation of the voltage across the capacitor in your Estabrook Circuit No. 1, correct?
>
> A.   Yes.
>
> Q.   And that's a sawtooth, right?
>
> ....
>
> A.   Yes.  It shows a charging and a discharging.
>
> Q.   And a sawtooth?
>
> A.   In a sawtooth fashion.

(Ex. 9 at 142:19-143:9; *see also id.* at 144:17-145:9 (conceding that Estabrook discloses a low

impedance load allowing the capacitor to discharge).)  The results from the simulation by

Qualcomm's expert show the same sawtooth pattern.  (Ex. 22 at 3-6.)  This evidence of discharge

presents at least a genuine issue of fact precluding summary judgment, even under

ParkerVision's theory.

b)    Nozawa

Several years after the Estabrook reference, a Japanese ham radio enthusiast named

Yasuo Nozawa published an article regarding a direct downconversion receiver in the

July/August 1993 issue of the HAM Journal ("Nozawa").  (Ex. 23; *e.g.*, Ex. 1, Ex. A, ¶¶ 178-187.)

As shown below on the left, the Nozawa architecture has the same configuration of switches

(yellow), control signal (blue), and capacitors (green) identified by ParkerVision as key to

energy sampling.  As depicted below on the right from simulations performed by Qualcomm's

expert, Nozawa also discloses the "telltale" sawtooth wave pattern.  These facts likewise

preclude summary judgment on invalidity.

| Schematic | Waveform |
|---|---|
|  | |

(Ex. 23, Fig. 11 at 29 (annotated); Ex. 22 at 12 (detail).)

c)    Weisskopf

Around the same time as the Nozawa reference, Peter Weisskopf published a paper

titled "Subharmonic Sampling of Microwave Signal Processing Requirements" ("Weisskopf").

(Ex. 24; *e.g.*, Ex. 1, Ex. A, ¶¶ 157-167.)  Weisskopf describes two embodiments of a direct

downconversion sampler, one with a low-impedance load after the capacitor and one with a

high-impedance load.  Each embodiment includes the same architecture as ParkerVision's

alleged energy sampling invention: a switch (yellow), control signal (blue), and capacitor

(green).  The low-impedance-load embodiment likewise includes sawtooth waveform, indicated

by the red arrows added below.[11]  (Ex. 24, Fig. 5; Ex. 25 at 64:6-65:1 (Figure 5 shows discharge).)



(Ex. 24, Fig. 2 at 240 (annotated); *id.*, Fig. 5 at 243 (annotated).)

For Weisskopf, ParkerVision argues that it allegedly "teaches away" from the claimed

invention, because Weisskopf discloses that "transitioning energy to the output will result in

poor performance."  (Ex. 26 at 34; *id.* at 33-35; Ex. 27 at 8, 12-13.)  This argument fails as a matter

of law.  As the Federal Circuit recognizes, "[a] reference is no less anticipatory if, after

disclosing the invention, the reference then disparages it."  *Billups-Rothenberg, Inc. v. Associated

Regional & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1038-39 (Fed. Cir. 2011) (internal quotation

omitted).  Accordingly, Weisskopf's low-impedance embodiment also presents a material

factual dispute precluding summary judgment, even if it also says that energy sampling will not

---

[11] The sawtooth waveform in Figure 5 has upward discharges for samples on the left and
downwards discharges for samples on the right.

14

work well in certain circumstances.[12]

        3.      <u>ParkerVision's discharge theory conflicts with the Court's construction, the patents, and the record evidence.</u>

As set forth above, Dr. Razavi's opinion creates numerous genuine issues of fact under ParkerVision's "discharge" theory, which argues that the lower frequency signal must be generated from energy discharged from the capacitor through a low-impedance load. Summary judgment is also inappropriate because ParkerVision's convoluted new[13] discharge theory essentially seeks to redefine the term "signal" to exclude the voltage on a capacitor. Nothing in the Court's construction, the claims, or the record supports ParkerVision's position. The claims at-issue in this motion require only that the signal be generated; they have no discharge requirement.

        a)      The Court's construction does not require generating the "signal" by energy discharge.

ParkerVision first mistakenly argues that the Court's construction requires a sawtooth signal generated solely by energy discharged through a low-impedance load. (Dkt. 269 at 11-14.) Despite arguing only plain meaning during claim construction, ParkerVision now contends that the claimed "signal" may not be a voltage across the capacitor. ParkerVision's only support for this new argument is the Court's statement that "one could understand the claim language identified by Qualcomm as referring to the fact that transferred energy is the source of the energy used to generate the down-converted signal." (Dkt. 234 at 40.) The Court's statement, however, is perfectly consistent with the "signal" generated using the transferred energy being the changing voltage across the capacitor.

---

[12] In addition, even Dr. Prucnal's rebuttal report acknowledges that the high-impedance embodiment has discharge, even if the amount of discharge is small. (Ex. 21 at 27.)

[13] ParkerVision did not raise its discharge theory in its infringement contentions.

Although voltage and energy are different, a signal tracking the energy stored in the capacitor at any given moment in the charge/discharge cycle is directly related to the voltage across the capacitor.  (*See supra* § II.A.)  All invalidity experts identified by the parties agree that the energy stored in the capacitor manifests itself as a voltage.  Qualcomm's expert Dr. Razavi testified that "the energy that is transferred to the capacitor gives rise or generates the voltage across the capacitor, because these are fundamentally related by a simple physics relationship." (Ex. 28 at 270:5-23.)  ParkerVision's expert Dr. Prucnal likewise conceded that the energy stored on the capacitor "appears as a voltage on the capacitor."  (Ex. 9 at 142:4-18.)  Another ParkerVision expert, Peter Weisskopf, agreed that "any time you get a voltage on a capacitor …, that capacitor will store energy" and the accumulated "energy can be measured as a voltage," which "is dependent on the value of the capacitor."  (Ex. 25 at 61:12-16, 104:5-105:17.) Moreover, the patents themselves describe the sawtooth voltage pattern on the capacitor as being the generated downconverted signal.  (*E.g.*, '551 patent, col. 85:40-42, Dkt. 157-2 ("FIG. 57E illustrates a demodulated baseband signal 5712, which is generated by the down-conversion process.").)

In addition, ParkerVision's infringement allegations rest on simulations of Qualcomm's products performed by ParkerVision's expert, which depict the downconverted signal as a voltage across a capacitor, not as energy discharged from the capacitor:

> Q. But if I go to page 7 … of Appendix K, one of those colors is the lower frequency signal that's generated, right?
>
> A. That's right.
>
> Q. And it's measured as a voltage, correct?
>
> A. That's correct.
>
> Q. And it is equal to the voltage across the capacitor?
>
> A. Oh, yes, yes.

(Ex. 9 at 108:12-20.)  The term "signal" must be construed the same for both invalidity and noninfringement.  *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) ("As this court has repeatedly instructed in the past, it is axiomatic that claims are construed the same way for both invalidity and infringement.") (internal quotation omitted).

Accordingly, the Court should reject ParkerVision's belated argument that signals generated as voltages across the capacitor cannot be the claimed "signals."

> b)     The claims do not require a low-impedance load.

The other portion of ParkerVision's new discharge theory—that the circuit requires a low-impedance load for discharging the energy—likewise has no support in the claim language or the Court's construction.  As Dr. Ravazi discussed in his report, the claims themselves suggest that a low-impedance load is not a fundamental requirement of energy sampling itself. (Ex. 1, Ex. A, ¶¶ 121-122 (citing, *e.g.*, claim 68 of the '551 patent: "including **high impedance loads** and low impedance loads") (emphasis added); *see also id.*, ¶ 123 (citing claim 85, which recites "controlling a sample and hold system," which includes a high-impedance load).) Moreover, the Court's *Markman* order construes two means-plus-function limitations including "generating" limitations.  (Dkt. 269 at 45-46.)  The Court's construction, however, requires only a switch and capacitor, without any limitation regarding low-impedance circuitry.  (*Id.*)  In sum, ParkerVision's new discharge theory contradicts the Court's construction and intrinsic record and, even if adopted, fails to support summary judgment.

> C.     Claims 4 and 7 of the '845 Patent Are Invalid for Indefiniteness.

ParkerVision's motion also addresses indefiniteness arguments arising from errors in claims 4 and 7 of the '845 patent.  ParkerVision concedes that the claims contain errors, and does not dispute that it has never filed a certificate of correction with the Patent Office.  ParkerVision, however, contends that the Court should rewrite the claims to fix the errors.  (Dkt. 269 at 22-24.)

17

The law does not require the Court to rewrite the claims, especially where, as here, the purported fixes are not clear from the face of the patent itself. *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1302–03 (Fed. Cir. 2005) (affirming motion for JMOL of indefiniteness where the error was "not evident on the face of the patent" and stating that the patentee could seek a certificate of correction effective for future causes of action).[14]  Moreover, ParkerVision's proposed fix to claim 7 would not solve the problem.  ParkerVision argues that moving "dt" inside the parenthesis would fix the error, but fails to acknowledge that doing so would mistakenly equate energy to a quantity with units of voltage squared and time squared.  (*See* Ex. 1, Ex. A, ¶ 809.)

> D.    The Court Should Reject ParkerVision's Remaining Arguments.

The remainder of ParkerVision's motion for summary judgment should also be rejected. First, on non-enablement, Mr. Sorrells' tutorial purported to show that prior art devices could not distinguish the signal from noise and interference but energy sampling could.  After the tutorial, Qualcomm's expert Dr. Ravazi re-ran the simulations performed by Mr. Sorrells using Mr. Sorrells' own data but at the n=9 subharmonic embodiment claimed by the patents.  (*E.g.*, Ex. 1, Ex. A, ¶¶ 55-60, 140-152, 351-353, 514-516.)  These re-run simulations for the n=9 embodiment, however, exhibited no ability to distinguish between signal and noise.  Because a patent must enable the full scope of its claims, the identified claims are invalid.

In response, ParkerVision and its expert argue that a person of ordinary skill in the art

---

[14] *Rembrandt Data Technologies, LP v. AOL, LLC*, 2009 WL 4030753, *5 (E.D. Va. 2009) ("Courts have been extremely discerning in limiting the instances where they are willing to insert themselves to edit errors in patent language."), *aff'd*, 641 F.3d 1331, 1339–40, 98 USPQ2d 1393 (Fed. Cir. 2011) ("[T]he correction suggested by Rembrandt is 'not minor, obvious, free from reasonable debate or evident from the prosecution history.' This court will not redraft Rembrandt's claim."); *Howmedica Osteonics Corp. v. Zimmer, Inc.*, Civ. No. 05-897 (WHW), 2007 WL 1741763 (D.N.J. June 13, 2007), *aff'd*, 397 F. App'x 654 (Fed. Cir. 2010) (granting summary judgment of invalidity for indefiniteness of patent claims relying on an equation with undefined variables); *Sandvik Intellectual Property AB v. Kennametal, Inc.*, No. 2:10-cv-00654, at *2-3, *8-9 (W.D. Pa. July 24, 2012).

would have been able to make the n=9 embodiment, even if Mr. Sorrells did not.  Dr. Razavi and Dr. Prucnal simply have a "battle of the experts," and summary judgment is therefore inappropriate.  *See Crown Packaging Tech. v. Rexam Beverage*, 559 F.3d 1308, 1315 (Fed. Cir. 2009); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1337-38 (Fed. Cir. 2005) (reversing summary judgment of non invalidity due to fact issues regarding undue experimentation); *Crown Operations Int'l, Inc. v. Solutia Inc.*, 289 F.3d 1367, 1380-81 (Fed. Cir. 2002) (same).

Second, ParkerVision argues that the terms "substantial" and "accurate voltage reproduction" are not indefinite.  To meet the definiteness requirement of section 112, claims that use terms of degree must provide a standard for determining the terms' scope.  *KLA-Tencor Corp. v. Xitronix Corp.*, 2011 WL 318123, *3–*5 (W.D. Tex. 2011) (granting JMOL that term "substantially maximize" was invalid as indefinite—"[W]hen there is no objective standard by which to determine the scope of the word of degree, the word of degree renders the claims indefinite."); *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1256 (Fed. Cir. 2008) (affirming summary judgment of indefiniteness where term "fragile gel" was "ambiguous as to the requisite degree of fragileness").

Neither ParkerVision's motion nor its expert Dr. Prucnal have identified any such standard in the patents-in-suit, and the inventor Mr. Sorrells admitted he cannot do so.  (Dkt. 269 at 19-22; Ex. 26 at 20, 24-25; Ex. 29 at 247:22-250:17.)  Instead, ParkerVision relies upon *Deere* and similar cases to argue essentially that the term "substantial" is definite as a matter of law. (Dkt. 269 at 21 (citing *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349 (Fed. Cir. 2012).)  The indefiniteness inquiry requires a case-specific analysis, and the facts here, including Mr. Sorrells' own admission, militate against granting summary judgment.  Instead, the issue should go the jury or, at a minimum, be carried until after trial.  *BJ Servs. Co. v. Halliburton Energy Services, Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003) ("[D]efiniteness … is amenable to

19

resolution by the jury where the issues are factual in nature."); *Havco Wood Products, LLC v. Industrial Hardwood Products, Inc.*, 2013 WL 1497429, at *2-*4 (W.D. Wis. 2013) (addressing indefiniteness after trial).

Third, ParkerVision points to a statement in Qualcomm's invalidity counterclaim stating that "[e]ach claim of the Patents-in-Suit is invalid for failure to comply with one or more provisions of 35 U.S.C. §§ 101, 102, 103, and 112."  (Dkt. 248 at 3-5.)  During the litigation, Qualcomm limited its invalidity attacks to specific defenses for the claims asserted against Qualcomm.  As such, defenses which might have arisen within the scope of these counterclaims were never raised, and thus there is nothing to grant summary judgment against.

Finally, ParkerVision quotes a sentence in Dr. Razavi's report regarding a written description argument for claims 9 and 31 of the '551 patent.  As noted by Dr. Razavi during his deposition, Qualcomm has withdrawn that particular defense.

## IV.  Conclusion

For the reasons set forth above, Qualcomm respectfully requests that the Court deny ParkerVision's motion for partial summary judgment of no invalidity.

Dated: June 24, 2013

CRAVATH, SWAINE & MOORE LLP

By:   /s/ Keith R. Hummel

Keith R. Hummel (admitted pro hac vice)
khummel@cravath.com
David Greenwald (admitted pro hac vice)
dgreenwald@cravath.com
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

-and-

COOLEY LLP

Stephen C. Neal (admitted pro hac vice)
nealsc@cooley.com
Timothy S. Teter (admitted pro hac vice)
teterts@cooley.com
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone:  (650) 843-5182
Facsimile:  (650) 849-7400

-and-

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A.

John A. DeVault, III
Florida Bar No. 103979
jad@bedellfirm.com
Courtney K. Grimm
Florida Bar No. 953740
cgrimm@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone:  (904) 353-0211
Facsimile:  (904) 353-9307

*Counsel for Defendant Qualcomm Incorporated*

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of June, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Keith R. Hummel

Keith R. Hummel (admitted pro hac vice)
khummel@cravath.com
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
*Attorney for Defendant Qualcomm Incorporated*

1143912/HN

22