**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

PARKERVISION, INC.,

        Plaintiff,

v.                                     Case No. 3:11-cv-719-J-37TEM

QUALCOMM INCORPORATED,

        Defendant.

_____

**PARKERVISION'S RESPONSE TO QUALCOMM'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**


**REDACTED VERSION**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................1

      A.    ParkerVision's Direct Down-Conversion Patents-in-Suit. ......................1

      B.    Qualcomm's Pre-Suit Internal Correspondence Regarding
            The Patents-in-Suit.................................................................................2

      C.    Qualcomm's Own Patent Cites To ParkerVision's '734
            Patent......................................................................................................4

      D.    Shortly Before Its Infringement Began, Qualcomm
            Revisited ParkerVision. .........................................................................5

III.  LEGAL STANDARD..............................................................................................5

IV.   ARGUMENT AND AUTHORITIES IN OPPOSITION .....................................5

      A.    Summary Judgment Of No Pre-Suit Indirect Infringement
            Should Be Denied. ..................................................................................5

            1.    To Establish Indirect Infringement, ParkerVision
                  May Prove Qualcomm's Knowledge Of, Or Willful
                  Blindness To, The Patents..............................................................5

            2.    Qualcomm Had Pre-Suit Knowledge Of The '551,
                  '371, And '734 Patents. ..................................................................6

            3.    A Jury Could Reasonably Infer That Qualcomm
                  Had Pre-Suit Knowledge Of The '518, '342, And
                  '845 Patents....................................................................................6

            4.    A Jury Could Reasonably Find That Qualcomm
                  Was Willfully Blind..........................................................................8

      B.    Summary Judgment As To "50% Duty Cycle Products"
            Should Be Denied. ..................................................................................9

            1.    Qualcomm Claims To Not Know The Duty Cycles
                  Of The Accused Products. .............................................................10

            2.    Qualcomm Has Not Established That The Timing
                  Diagrams It Relies Upon Are Representative Of
                  The Duty Cycle Of Any Accused Product....................................11

3.    Dr. Prucnal Did Not Admit That "50% Duty Cycle" Products Do Not Infringe. .......................................................................12

4.    Issues Of Material Fact Exist As To Which Products Are Properly Styled As "50% Duty Cycle Products." ........................................................................................14

5.    Issues Of Material Fact Exist As To The Duty Cycles Of The Identified Products. ..........................................15

6.    Dr. Prucnal Provides Sufficient Evidence That "50% Duty Cycle Products" Infringe To Defeat Summary Judgment. ...............................................................19

C.    Dismissal Of ParkerVision's Claims As To The Atheros Products Is Proper. ...............................................................20

V.    CONCLUSION ...........................................................................................20

McKool 890019

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................5, 19

*Broadcomm Corp. v. Qualcomm, Inc.*,
   543 F.3d 683 (Fed. Cir. 2008))............................................................................6

*Cloud Farm Assocs., L.P. v. Volkswagen Grp. of Am., Inc.*,
   No. 10-502-LPS, 2012 U.S. Dist. LEXIS 104982 (D. Del. July 27, 2012)..............................6

*Edwards Sys. Tech., Inc. v. Digital Control Sys.*,
   99 F. App'x 911 (Fed. Cir. 2004).....................................................................9, 19

*Fox Grp., Inc. v. Cree, Inc.*
   819 F. Supp. 2d 520 (E.D. Va. 2011), *aff'd in part, vacated in part on other grounds
   by* 700 F.3d 1300 (Fed. Cir. 2012)............................................................................19

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011)..................................................................................5

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
   637 F.3d 1314 (Fed. Cir. 2011)..........................................................................9

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006).........................................................................5

*PalTalk Holdings, Inc. v. Microsoft Corp.*,
   No. 2:06-CV-367, 2009 U.S. Dist. LEXIS 131087 (E.D. Tex. Feb. 2, 2009).........................7

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
   182 F.3d 1298 (Fed. Cir. 1999)..........................................................................9

*Rolls-Royce Ltd. v. GTE Valeron Corp.*,
   800 F.2d 1101 (Fed. Cir. 1986).........................................................................6

*Sealant Sys. Int'l v. TEK Global*,
   Nos. 11-00774 PSG, 11-1649 PSG, 2012 U.S. Dist. LEXIS 752
   (N.D. Cal. Jan. 4, 2012)................................................................................6

*Siemens v. Seagate Tech.*,
   No. 06-788JVS, 2009 U.S. Dist. LEXIS 132522 (C.D. Cal. Apr. 27, 2009)...........................4

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013)...................................................................6, 7

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   No: 2:07-CV-497-TJW-CE, 2011 U.S. Dist. LEXIS 91668
   (E.D. Tex. Aug. 17, 2011), *aff'd*, 709 F.3d 1365 (Fed. Cir. 2013)...........................7

*Teva Pharms. USA, Inc. v. Pfizer Inc.*,
   395 F.3d 1324 (Fed. Cir. 2005)...................................................................19

*Titanide Ventures, LLC v. IBM Corp.*,
   No. 4:12-CV-196, 2012 U.S. Dist. LEXIS 163430 (E.D. Tex. Oct. 18, 2012) .......................6

*Univ. of Pittsburgh v. Varian Med. Sys., Inc.*,
   877 F. Supp. 2d 294 (W.D. Pa. 2012)...................................................................3

*Versata Software, Inc. v. Internet Brands*,
   No. 2:08-cv-313-WCB, slip op. (E.D. Tex. June 1, 2012) ...................................................20

*Versata Software, Inc. v. SAP Am., Inc.*,
   2013 U.S. App. LEXIS 8838 (Fed. Cir. May 1, 2013) .........................................16

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995)...................................................................20

**STATUTES**

35 U.S.C. § 271(b) ...................................................................5

35 U.S.C. § 271(c) ...................................................................5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ...................................................................5

McKool 890019

## I.      INTRODUCTION

Qualcomm's motion asserts three grounds for summary judgment: (i) that Qualcomm lacked pre-suit knowledge of the '518, '734, '342, and '845 Patents; (ii) that what it terms "50% Duty Cycle Products" do not infringe; and (iii) that the Atheros Products do not infringe.

As to the first two grounds, genuine issues of material fact exist which preclude summary judgment. First, the evidence establishes—and Qualcomm does not dispute—that Qualcomm had pre-suit knowledge of at least the '551, '371, and '734 Patents, and that its executives, attorneys, and product designers had numerous pre-suit communications regarding ParkerVision and its patents. From this evidence, a reasonable jury could conclude that Qualcomm also had pre-suit knowledge of, or was willfully blind to, the '518, '342, and '845 Patents. Second, genuine issues of material fact exist as to the infringement of the "50% Duty Cycle Products" because the evidence establishes that: (i) Qualcomm does not know the operating duty cycle of its products; (ii) these products operate at or are capable of operating with a duty cycle less than 50%; (iii) Dr. Prucnal's alleged "admission" applies only to products with hypothetically "ideal" 50% duty cycles; and (iv) none of Qualcomm's products have hypothetically "ideal" 50% duty cycles.

As to the third ground, dismissal of ParkerVision's infringement claim as to the Atheros Products is proper. Qualcomm's non-infringement counterclaim should be dismissed as moot.

## II.      STATEMENT OF FACTS[1]

### A.  ParkerVision's Direct Down-Conversion Patents-in-Suit.

1.      The '551 Patent, "Method and System for Down-Converting Electromagnetic Signals," was filed on October 21, 1998 and issued on May 9, 2000. The prosecution history of

---

[1] Each of the alleged "facts" at pages 1-11 of Qualcomm's Motion are not undisputed and are unsupported. As these "facts" are not germane to Qualcomm's Motion, no point-by-point response is provided. However, it is worth noting that Qualcomm's own internal documentation valued ParkerVision's contribution as $2-10 per unit. Ex. 67.

the '551 Patent includes a reference to the then-pending patent Application Serial No. 09/376,359, which issued as the '518 Patent. Ex. 28 (QCPV000307287 at 996).

2.      The '518 Patent, a continuation of the '551 Patent, "Method and System for Down-Converting Electromagnetic Signals by Sampling and Integrating Over Apertures," was filed on August 18, 1999 and issued on July 24, 2001.

3.      The '371 Patent, "Applications of Universal Frequency Translation," was filed on March 3, 1999 and issued on April 9, 2002. The first column of the '371 Patent incorporates the '551 Patent by reference. '371 Patent at 1:10-18.[2]

4.      The '734 Patent, "Differential Frequency Down-Conversion Using Techniques of Universal Frequency Translation Technology," was filed on December 12, 2002 and issued on November 8, 2005. It incorporates the '551, '940, '555, '706, and '371 Patents. '734 Patent at 1:10-27.

5.      The '342 Patent, "Down-Converting Electromagnetic Signals, Including Controlled Discharge of Capacitors," was filed on October 25, 2004 and issued on Feb. 24, 2009. It incorporates the '551, '940, '555, '706, and '371 Patents. '342 Patent at 1:19-35.

6.      The '845 Patent, "Method and System for Down-Converting and Electromagnetic Signal, and Transforms for Same," was filed on March 28, 2006 and issued on May 25, 2010.

**B.  Qualcomm's Pre-Suit Internal Correspondence Regarding The Patents-in-Suit.**

7.      From 1998 to 1999 ParkerVision provided Qualcomm with several demonstration board prototypes (named Eddie 1 and Eddie 2) that each implemented a semi-integrated down-converter. These prototypes embodied the ParkerVision down-conversion technology protected by each of ParkerVision's Patents-in-Suit. Exs. 29; 30; 31 at 305:4-15.

---

[2] The '371 Patent incorporates the following ParkerVision patents: U.S. Patent No. 6,091,940 ("the '940 Patent"); U.S. Patent No. 6,061,555 ("the '555 Patent"); and U.S. Patent No. 6,049,706 ("the '706 Patent"). *Id.* at 1:10-30.

8.      In 1999, ParkerVision informed Qualcomm that ParkerVision had patents pending

for its down-conversion technology. Exs. 32; 33 at 82:9-17; 34. Specifically, in meetings

involving ParkerVision's patent counsel Rob Sterne and Mike Lee, ParkerVision disclosed to

Qualcomm's executives, attorneys, and product designers ten pending U.S. patent applications,

including the applications for what became the '551, '940, '555, and '706 Patents. Ex. 32; *see*

*also* Ex. 35. A few days after the disclosure of ParkerVision's patent filings, Charles Wheatley,

Qualcomm's Senior Vice President for Technology, described to other Qualcomm executives a

conversation he had with Ben Miller, Qualcomm's Senior Vice President and Chief Patent

Strategist:

> Ben Miller and I spent about 6 hours [Wednesday] looking over some of the patent
> applications prepared by Parker Vision. . . . They are trying to capture every possible
> version of any use of their basic device. Even so there are still some holes in the present
> documents, which are being covered in newer applications. They would not tell us exactly
> when or what they have filed, but did allow that they expected to receive at least some
> patents in the not too distant future. . . . Bottom line is, I think it is going to be very difficult
> for anybody to ever use this technique without stepping on one or more of their claims.

Ex. 35; *see also* Exs. 32; 36 at 19-22.

9.      Press releases concerning the issuance of the '551 Patent (and the '940, '555, and

'706 Patents) were found in the files of Qualcomm attorney Adam Tachner. Exs. 37 at 4; 38; 39.

Qualcomm co-founders Franklin Antonio and Klein Gilhousen, along with Qualcomm

executives, attorneys, and product designers, including Lou Lupin (Qualcomm's former General

Counsel), Sanjay Jha (the former head of Qualcomm Technologies and Ventures), Charles

Persico (current Senior Vice President of Technology), Paul Peterzell (former Vice President of

Technology), Don Schrock (former Executive Vice President and President of Qualcomm

CDMA Technologies), Ben Miller, and Charles Wheatley, sent and received emails protected by attorney-client privilege related to ParkerVision patents. Ex. 40 at 1, 17, 18, 68, 104.[3]

10.     A copy of the '551 Patent was found in the custodial files of Paul Peterzell. Ex. 37 at 4; Ex. 41. Qualcomm attorney Ray Hom ordered a copy of the '551 Patent and its file history in January 2001. Ex. 42. Qualcomm attorneys Sean English and Ray Hom, and Qualcomm's Monique Hatch, Victoria Pacey, and Stephanie Young were aware of the '551 Patent (as well as the '940, '555, and '706 Patents) in or before February 2001. Exs. 37 at 5; 40 at 102, 103, 110, 111. Qualcomm attorneys Phil Wadsworth, Sean English, and Charles Brown received emails and documents protected by attorney-client privilege and the work product doctrine relating to the '551 Patent. Exs. 37 at 4; 40 at 103, 107, 111. A copy of the prosecution history of the '551 Patent was also found in the custodial files of Qualcomm attorney Charles Brown. Ex. 37 at 5.

11.     In May 2002, Qualcomm co-founder Franklin Antonio received a ParkerVision press release concerning the issuance of the '371 Patent. Exs. 37 at 5; 17. Shortly thereafter, Franklin Antonio forwarded this press release to other Qualcomm executives, including at least Klein Gilhousen (co-founder and Senior Vice President of Technology), Roberto Padovani (Executive Vice President and Chief Technical Officer), and Charles Wheatley. Ex. 43. Also in May 2002, Franklin Antonio and Qualcomm attorney Sean English had email communications protected by attorney-client privilege regarding a ParkerVision patent. Ex. 37 at 5.

**C.  Qualcomm's Own Patent Cites To ParkerVision's '734 Patent.**

12.     During the prosecution of Qualcomm Patent No. 8,050,649 ("the '649 Patent"), the examiner cited the '734 Patent in December 2009. Exs. 44; 45.

---

[3] The fact of these communications is admissible even though the content of the communications is protected by attorney-client privilege. *See Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 877 F. Supp. 2d 294 at 307-08 (W.D. Pa. 2012) (holding admittance of privilege log into evidence was not an error and did not constitute prejudicial error);

**D. Shortly Before Its Infringement Began, Qualcomm Revisited ParkerVision.**

13.     In May 2004, Qualcomm product designers Steven Ciccarelli and Seyfi Bazarjani revisited "the idea of RF sampling" for receivers using ParkerVision's approach in Qualcomm's "next generation radio transceiver." Ex. 46. Mr. Bazarjani stated he would "set up a meeting with Chuck [Wheatley] to go over parker vision [sic] approach and see if we can make it work." *Id.*

## III.   LEGAL STANDARD

Summary judgment is appropriate where no genuine issues of material fact exist. Fed. R. Civ. P. 56(a). The court determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also id.* at 255, 257.

## IV.   ARGUMENT AND AUTHORITIES IN OPPOSITION

**A. Summary Judgment Of No Pre-Suit Indirect Infringement Should Be Denied.**

1.   To Establish Indirect Infringement, ParkerVision May Prove Qualcomm's Knowledge Of, Or Willful Blindness To, The Patents.

Liability for induced or contributory infringement under 35 U.S.C. § 271(b) or (c) requires "knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). The knowledge requirement includes showing either actual knowledge of, or willful blindness to, the existence of the patent. *Id.* at 2068. A willfully blind defendant is "one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070-71. The doctrine of willful blindness has "two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists; and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 2070.

---

*Siemens v. Seagate Tech.*, No. 06-788JVS, 2009 U.S. Dist. LEXIS 132522, at *17-19 (C.D. Cal. Apr. 27, 2009) (finding privilege log admissible evidence).

McKool 890019

ParkerVision may prove indirect infringement and pre-suit knowledge of its patents through direct or circumstantial evidence. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). "The drawing of inferences, particularly in respect of an intent-implicating question . . . is peculiarly within the province of the fact finder that observed the witnesses." *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986).

2.  Qualcomm Had Pre-Suit Knowledge Of The '551, '371, And '734 Patents.

Qualcomm executives, attorneys, and product designers undisputedly had pre-suit knowledge of the '551, '371, and '734 Patents, among other ParkerVision patents. First, as detailed above, numerous senior Qualcomm personnel had pre-suit knowledge of the '551 Patent. *Supra* Part II.B. Second, many senior Qualcomm personnel likewise had pre-suit knowledge of the '371 Patent. *Id*. Third, the citation of the '734 Patent in the prosecution history of one of Qualcomm's own patents demonstrates that it had pre-suit knowledge of the '734 Patent.[4] *Supra* Part II.C.

3.  A Jury Could Reasonably Infer That Qualcomm Had Pre-Suit Knowledge Of The '518, '342, And '845 Patents.

In light of Qualcomm's pre-suit knowledge of ParkerVision's '551, '371 and '734 Patents, a reasonable jury could infer from all of the circumstances that Qualcomm also had pre-suit knowledge of the '518, '342, and '845 Patents. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1380 (Fed. Cir. 2013) ("[D]irect evidence of knowledge is not required to support a finding of inducement."); *see also Broadcomm Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 699

---

[4] *See Titanide Ventures, LLC v. IBM Corp.*, No. 4:12-CV-196, 2012 U.S. Dist. LEXIS 163430, at *10 (E.D. Tex. Oct. 18, 2012) (noting that patent office's citation of patent "is sufficient to show knowledge at the pleading stage"); *see also Sealant Sys. Int'l v. TEK Global*, Nos. 11-00774 PSG, 11-1649 PSG, 2012 U.S. Dist. LEXIS 752, at *9-10 (N.D. Cal. Jan. 4, 2012) (holding that defendant had pre-suit knowledge of patent when examiner referenced it in prosecution of defendant's patent); *Cloud Farm Assocs., L.P. v. Volkswagen Grp. of Am., Inc.*, No. 10-502-LPS, 2012 U.S. Dist. LEXIS 104982, at *10-11 (D. Del. July 27, 2012) (same); *PalTalk Holdings, Inc. v. Microsoft Corp.*, No. 2:06-CV-367, 2009 U.S. Dist. LEXIS 131087, at *6-7 (E.D. Tex. Feb. 2, 2009) (same).

(Fed. Cir. 2008) ("[T]he requisite intent to induce infringement may be inferred from all of the circumstances.") (internal quotation marks and citation omitted).

In *SynQor*, the Federal Circuit concluded that plaintiff SynQor had presented sufficient evidence from which a reasonable jury could infer that each defendant had pre-suit knowledge of the patents-in-suit. 709 F.3d at 1380. Specifically, SynQor showed that each defendant possessed SynQor's datasheets or products marked with SynQor's earlier patents, including a patent to which the patents-in-suit claimed priority. *Id.* In addition, SynQor's expert opined that the defendants had expended "significant efforts" to imitate SynQor's products and "that those efforts would have exposed Defendants to SynQor's patents." *Id.* Further, some defendants monitored SynQor's patents and one possessed a patent-in-suit prior to the suit's filing. *Id.*

Similar to the defendants in *SynQor*, Qualcomm had pre-suit knowledge of ParkerVision's earlier patents, specifically the '551, '940, '555, '706, and '371 Patents, soon after they issued. Not only did Qualcomm's senior executives and attorneys have knowledge of ParkerVision's earlier patents, but Qualcomm's privilege log reveals that Qualcomm co-founders, executives, attorneys, and product designers had privileged communications regarding ParkerVision and its patents from 2000 through 2002. *Supra* Part II.B. And ParkerVision's expert has opined that Qualcomm "copied" ParkerVision's designs. Ex. 68 at 89-104. The correspondence from Seyfi Bazarjani regarding reviewing ParkerVision's approach to "see if we can make it work" further supports that Qualcomm "copied" ParkerVision's designs. Ex. 46. As in *SynQor*, Qualcomm had in its possession a patent to which another patent-in-suit claims priority. The '518 Patent is a continuation of the '551 Patent. And the '734 and '342 Patents incorporate by reference the '551, '940, '555, '706, and '371 Patents. Additionally, ParkerVision

expressly informed Qualcomm that it was filing additional patents. Ex. 35; *see also* Ex. 47 at 122:21-124:9.

Based on all of the evidence, particularly when viewed in the light most favorable to ParkerVision, a jury could reasonably infer that Qualcomm was aware that ParkerVision had many patents in the field of direct down-conversion, knew that ParkerVision intended to file for additional patents, monitored ParkerVision's activities and patents, and therefore had pre-suit knowledge of the '518, '342, and '845 Patents. *Supra* Part II.B; *see SynQor, Inc. v. Artesyn Techs., Inc.*, No: 2:07-CV-497-TJW-CE, 2011 U.S. Dist. LEXIS 91668, at *13-18, 26-27 (E.D. Tex. Aug. 17, 2011) (noting a reasonable jury could infer that, given the competitive nature of the industry, the defendants, who were aware of the parent patent to the patents-in-suit, would continue to monitor products and learn of continuation patents once issued), *aff'd*, 709 F.3d 1365 (Fed. Cir. 2013).

4.   A Jury Could Reasonably Find That Qualcomm Was Willfully Blind.

Additionally, a reasonable jury could find that Qualcomm was willfully blind to the '518, '342, and '845 Patents. First, a jury could reasonably conclude that Qualcomm subjectively believed that ParkerVision's technology was covered by additional patents. ParkerVision's patent attorneys attended meetings with Qualcomm, and ParkerVision expressly informed Qualcomm that it was filing additional patents. Ex. 35. And, Qualcomm executives and attorneys recognized that ParkerVision was "trying to capture every possible version of any use of their basic device." *Id*. Charles Wheatley explained to other Qualcomm executives, attorneys and product designers that ParkerVision was filing "newer applications" and that it would "be very difficult for anybody to ever use this technique without stepping on one or more of [ParkerVision's] claims." *Id*. This correspondence reached Qualcomm co-founder Franklin Antonio and executives, attorneys, and product designers, including Prashant Kantak, Steve

Ciccarelli, Saed Younis, Sanjay Jha, Rob Gilmore, Seyfi Bazarjani, Johan Lodenius, Bill Cheney, Brian Butler, and Bill Miller. *Id.*; *see also* Ex. 47 at 122:21-124:9. Qualcomm knew that ParkerVision would have additional patents covering its down-conversion technology. *See also supra* Part II.B.

Second, based on the evidence ParkerVision has presented, the jury could reasonably conclude that if Qualcomm did not know of the '518, '342, and '845 Patents prior to this litigation, it is only because Qualcomm took deliberate steps to avoid learning of those patents. Facts and circumstances leading to this conclusion include: (i) Qualcomm's exposure to ParkerVision's early patent applications; (ii) Quaclomm's knowledge that ParkerVision would file additional patents; (iii) ParkerVision giving Qualcomm several prototypes embodying its patents (including the '518, '342, and '845 Patents); (iv) Qualcomm's knowledge of ParkerVision's patents generally and the breadth of ParkerVision's claims; and (v) discussion by Qualcomm about revisiting the ParkerVision "approach" for its next generation of receivers in 2004, shortly before its infringement began. *See supra* Parts II.B, II.C, and II.D.

### B.  Summary Judgment As To "50% Duty Cycle Products" Should Be Denied.

Qualcomm moves for summary judgment of non-infringement with respect to what it terms "50% Duty Cycle Products."[5] Dkt. 270 at 20-25. Summary judgment is improper because:

---

[5] Qualcomm identifies the following as "50% Duty Cycle Products": Astra (RGR6240), Bahama (WCN2243), Bali (BTS4020, BTS4020BD, BTS4021, BTS4050, BTS4051, BTS4052), Catalina (BTS4054, BTS4055), Clemente (BTS5045), Eagleray (FTR8700), Fiji (BTS4025), Fury (MBP2700), GZIF4 (RTR6236, RTR6237, RTR6280, RTR6285, RTR6285A, MXU6219, RGR1000, RGR1100), Hercules (RTR8700), Iris (WCN3660), Libra/Gemini (WCN1312), Marimba (Bluetooth portions of QSC6155, QSC6165, QSC6175, QSC6185, QSC6195, QSC6295, QSC6695, QTR8200, QTR8201, QTR8600, QTR8600L, QTR8601), Ramsis (QSC6055, QSC6065, QSC6075, QSC6085, MDM6085), Spitfire (MBP1600, MBP1610), Tomahawk (MBP2600), Volans (WCN1314), Voltron (RTR6500, MXC6369), and Ywing (WCN1320). *Compare* Dkt. 270 at n.9, *with* Ex. 48.

    ParkerVision initially identified the Astra, Bahama, GZIF4, Iris, Libra/Gemini, Marimba, Ramsis, Solo, Volans, Voltron, and Ywing products as having "approximate half cycle" (or 50%) duty cycles, *see* claim 3 of '845 Patent, but reserved the right to update or modify this list. Dkt. 152-1 Ex. A at 4.  Based on the schematics, design documents, and other discovery that has been produced in this case, however, ParkerVision believes that each of Qualcomm's Accused Products are capable of operating at duty cycles less than 50%.

(i) Qualcomm claims to not know the operating duty cycle of "50% Duty Cycle Products"; (ii) Qualcomm's own documentation proves that "50% Duty Cycle Products" operate at or are capable of operating at duty cycles less than 50%; (iii) Dr. Prucnal's alleged admission applies only to products with a hypothetically "ideal" 50% duty cycle; and (iv) none of Qualcomm's accused products operate at a hypothetically "ideal" 50% duty cycle.

An infringement analysis involves construing the claims and comparing the properly construed claims to the infringing device to determine whether the claim limitations are present. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1318-19 (Fed. Cir. 2011). While claim construction is a question of law, infringement is a question of fact. *Id.* at 1319. "Thus, summary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (citations omitted); *see also Edwards Sys. Tech., Inc. v. Digital Control Sys.*, 99 F. App'x 911, 921 (Fed. Cir. 2004)("battle of the experts" renders summary judgment improper).

1. Qualcomm Claims To Not Know The Duty Cycles Of The Accused Products.

ParkerVision served discovery on Qualcomm to ascertain the duty cycles of the accused products, including those identified as "50% Duty Cycle Products." *See* Ex. 49 at 28-31.[6] In response, Qualcomm stated that it does not measure or know the duty cycles of its products:

- "Qualcomm also objects to this Interrogatory to the extent it requests that Qualcomm include information about 'simulations' and 'actual measurements' of waveforms at various nodes in the accused products that do not exist." *Id.* at 29.

- "With respect to obtaining actual measurements of a receiver IC chip, Qualcomm typically does not have access to the input nodes of the mixer. Therefore, Qualcomm generally does not measure the voltage and current waveforms versus time at the input nodes of the mixer." *Id.* at 30.

---

[6] Qualcomm refused to answer this Interrogatory and the Court granted ParkerVision's motion to compel. Dkt. 232.

McKool 890019

If, as Qualcomm claims, it does not measure or know the "voltage and current waveforms versus time at the input nodes of the mixer," it cannot know the duty cycles at which its accused products operate. In the absence of this information, neither Qualcomm nor Dr. Fox can credibly characterize any of Qualcomm's accused products according to its duty cycle.

> 2.  Qualcomm Has Not Established That The Timing Diagrams It Relies Upon Are Representative Of The Duty Cycle Of Any Accused Product.

While stating that it did not know the actual, operational duty cycles of the accused products, Qualcomm referred ParkerVision to the measurement information in its "design-review documentation." *See* Ex. 49 at 28-31. As ParkerVision's expert Dr. Prucnal testified, an "ideal" representation of a duty cycle (such as those depicted in the design-review documentation) does not correspond to the actual duty cycle of the products in operation. *See* Ex. 50 at 226:11-16.[7] In fact, Qualcomm itself recognizes that the operating duty cycle of its products could vary depending on fabrication and manufacturing process variations. ███████████████

████████████████████████████████████████████████████████████

Qualcomm's Motion is entirely devoid of any evidence establishing that the timing diagrams it relies upon (*see* Dkt. 270 at 24) correspond to the duty cycles of the accused products in operation. Nor can Qualcomm offer such evidence, because in order to do so it would need information that it claimed in discovery not to have. Ex. 49 at 28-31.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ This is illustrated by figures from the

textbook of one of Qualcomm's experts, Dr. Razavi. As Dr. Razavi explains in the context of 50% duty cycles, even though it may be "ideal" to have a square LO waveform, "[i]n practice, it is difficult to generate square LO waveforms." Ex. 52 at 499, 501. Because of this, the actual LO control waveform in a 50% duty cycle product will not be perfectly square. *Id*. Rather, it will look something like this:



*Id*. Accordingly, genuine issues of material fact exist as to whether the timing diagrams relied upon by Qualcomm's Motion are representative of the operation of any accused product.

      3.   <u>Dr. Prucnal Did Not Admit That "50% Duty Cycle" Products Do Not Infringe.</u>

In its motion, Qualcomm states that Dr. Prucnal made "a candid admission" that he could not opine that the 50% Duty Cycle Products infringe. Dkt. 270 at 23. Qualcomm asserts that Dr. Prucnal "admitted that in an *ideal* 50% duty cycle product at all times during each cycle of the carrier signal either switch M1 or switch M3 will be closed and therefore 'transferring energy' to the capacitor," concluding that "Dr. Prucnal was clear that in such circumstance no energy is discharged from the capacitor." *Id.* at 22-23 (quoting Ex. 50 at 230:1-5) (emphasis added). Qualcomm overlooks important aspects of Dr. Prucnal's testimony.

First, as set forth above, the "ideal" duty cycle Dr. Prucnal was testifying about relates to hypothetical products and has not been shown to correspond to the duty cycle of any accused product. Ex. 52 at 349. Second, in his deposition, Dr. Prucnal did *not* testify that even in the hypothetical case of an ideal 50% duty cycle product there would be no discharge of energy from

---

[7] ParkerVision additionally explained to Qualcomm in correspondence related to ascertaining the duty cycles of Qualcomm's products that the timing diagrams in Qualcomm's design-review documentation do not correspond to the actual duty cycle of the product. Ex. 51.

the storage device, as Qualcomm asserts. Rather, Dr. Prucnal testified that the capacitor "is charging alternately from two different signals," but that the capacitor nonetheless "has a *discharge* path from there." Ex. 50 at 222:10-15. He testified that in even in the hypothetically ideal case, the capacitor would discharge:

> Q. So there is no discharge cycle on either of those capacitors, right?
>
> A. As I said, *I don't agree* with that because it's going to depend upon the impedance scene looking forward in this circuit where charging the capacitor and then energy is being transferred into it from one or the other of these two LOI+--I am sorry--ILNA+ or ILNA- but *then that has the opportunity to discharge as well*.

*Id.* at 223:15-24 (emphasis added). Dr. Prucnal continued, explaining that the transferred energy would be discharged from the capacitor:

> Q. All right. Can you tell me if there is charging and discharging going on?
>
> A. Well, there is going to be transfer of energy into the capacitor from -- alternately from ILNA+ and ILNA minus, and *that energy is going to leave the capacitor* but I haven't modeled that.
>
> Q. Okay. So the answer to my question, do you know if there are *charging and discharging cycles* on the capacitors of the 50 percent duty cycle products, the shunt capacitors. The answer is, you do not know sitting here today, correct?
>
> A. Well, as I said a moment ago, at least in the case *where these are real 50 percent duty cycle waveforms*, they are not perfectly contiguous as they are shown here with infinite slope. So in that case, we wouldn't see a flow at all times from ILNA+ or ILNA minus. *So in that case, I would understand that there is a discharge* between -- between those portions of the two -- the two waveforms. But in the ideal case, one is 50 percent duty cycle and they both go to one capacitor because there is always current flowing from one or the other into the capacitor, I can't say that there is discharging.

*Id.* at 229:8-230:5 (emphasis added). Dr. Prucnal thus testified that in a hypothetically ideal 50% duty cycle product there would not necessarily be a "*discharging cycle*," but in a "real" case "there is a discharge." *Id*. Dr. Prucnal did *not* testify that such hypothetically ideal products would be non-infringing, nor did he testify that any of Qualcomm's accused products meet this hypothetical ideal. *See id.* at 223:15-24.

### 4.  Issues Of Material Fact Exist As To Which Products Are Properly Styled As "50% Duty Cycle Products."[8]

The list of "50% Duty Cycle Products" identified by Qualcomm in its Motion differs from the list set forth by Qualcomm's expert. Dr. Fox identified two additional "50% Duty Cycle Products": RTR6275 (GZIF3 design) and QSC1105 (Merlin(QCT) design). *Compare* Ex. 3 at 34-35 *with* Dkt. 270 at 24. In addition, neither Qualcomm, nor Dr. Fox, provided *any* documentary evidence that the Astra, Bahama, Catalina, Clemente, Fiji, or Spitfire designs are "50% Duty Cycle Products." *See* Ex. 3 at 34-35; Dkt. 270 at 24. Even where evidence was cited, the cited evidence does not support Qualcomm's identifications:



[8] Qualcomm points to no documentation that categorizes any of the accused products as "50% Duty Cycle Products." Rather, the categorization of certain products as "50% Duty Cycle Products" is a creation of Qualcomm's expert Dr. Fox. ParkerVision disagrees with Qualcomm's and Dr. Fox's categorization. In fact, and as set forth herein, these products are more properly characterized as "variable duty cycle products."

14

McKool 890019



*See* Prucnal Decl. Genuine issues of material fact exist as to whether Qualcomm's motion properly identifies "50% Duty Cycle Products."

        5.   Issues Of Material Fact Exist As To The Duty Cycles Of The Identified Products.

In its Motion, Qualcomm states that "it is indisputable that the switches in Qualcomm's 50% Duty Cycle Products are each closed for at least 50% of each frequency cycle." Dkt. 270 at

20; *see also id.* at 23. This is not "indisputable"—Qualcomm's own documentation suggests that the 50% Duty Cycle Products in fact operate at various duty cycles.

First, the evidence relied upon by Qualcomm to identify the 50% Duty Cycle Products does not support the assertion that the sampling switches in these products are closed for at least 50% of each frequency cycle. The evidence demonstrates duty cycles less than 50%:



*See* Prucanl Decl.[9]

Second, the LO timing diagrams cited in Qualcomm's Motion do not establish that certain products operate with a duty cycle at or above 50%. *See, e.g.*, Dkt. 270 at 24. For a passive mixer to operate with a 50% duty cycle, the positive transistor must turn on and the negative transistor must turn off at exactly the same point—in both time and voltage—without separation or overlap.[10] As explained by Dr. Razavi's textbook, the point at which an NMOSFET used as a switch conducts current is affected by many different circuit variables, such as rise time, fall time, flicker noise, device mismatch, drive current, DC biasing, the shape of the control signal, and the time it takes for current to begin to flow across the MOSFET's channel. *See* Ex. 52 at 385. In practice, any difference in time or voltage of the turning on and turning off of the two transistors changes the duty cycle from the ideal 50%. *See* Ex. 52 at 349, 368, & 398.

Third, unlike an ideal switch, the MOSFET (used by each of the Accused Products) does not have discrete turn on and turn off voltages at which current either flows through the device or not. *See* Ex. 54 at 27-28. As the voltage between the transistor's gate and source increases above the threshold voltage, the NMOSFET switch is in triode region and is not completely "on" until it reaches its full conductance. *See id*. Similarly, it is not completely "off" until the gate-source voltage is below the threshold voltage, known as the cutoff region. *See id*. This means that, in practice, it takes some finite amount of time for a FET to switch from "on" to "off" positions,

---

[9] Claims 23-26, 31, 32, 135, 161, 192, 193, 195, 196, 198, 202, and 203 of the '551 Patent, Claims 82, 90, and 91 of the '518 Patent, Claims 1, 2, 22, 23, 25, and 31 of the '371 Patent, Claims 1, 4-6, and 9 of the '734 Patent, and Claims 13, 17-20, and 22-24 of the '845 Patent are apparatus claims. Even if the Court agrees with Qualcomm that a duty cycle at or above 50% does not infringe, products capable of operating with a duty cycle less than 50%—including each of those in the bullet list above—nonetheless infringe these apparatus claims. *Versata Software, Inc. v. SAP Am., Inc.*, 2013 U.S. App. LEXIS 8838, at *16 (Fed. Cir. May 1, 2013) ("[A]n accused product may be found to infringe if it is reasonably capable of satisfying the claim limitation." (citation and quotation marks omitted)).
[10]

and a separate and different amount of time for a FET to switch from "off" to on" positions, meaning that the "on" and "off" points are not perfectly equal, as Qualcomm's Motion suggests. *See* Ex. 52 at 349. Rather than turning on and off instantaneously, an NMOSFET used as a switch (as it is used in each of the Accused Products) will go through a transient period between being fully on and fully off and vice versa. Ex. 52 at 349. This creates a difference in time and voltage between the "turn on" and "turn off" points of the switches,



Accordingly there will be an "non-transfer time" during which energy is not transferred to the capacitor and it discharges. *Id*.

Fourth, one of ordinary skill in the art would recognize that it is not desirable to have overlapping duty cycles, as would occur in a hypothetically ideal 50% or greater duty cycle.[11] In fact, Qualcomm's own expert Dr. Razavi teaches that operating with a duty cycle above 50% creates a "common-mode input" that results in "the input signal [being] 'wasted' because it produces no differential component. Ex. 52 at 349; *see also id.* at 374, 378. This overlap state is not ideal because the circuit is unable to down-convert an accurate version of the lower frequency signal that was modulated onto the carrier. *Id.* Overlap in the LO control signals is such a concern that Dr. Razavi teaches away from the use of 50% duty cycle LO signals, stating that "[a]nother useful attribute of the 25% duty cycle . . . is that the mixer switches driven by [the differential LO signals] $LO_0$ and $LO_{180}$ (or by $LO_{90}$ and $LO_{270}$) are not on simultaneously. As a result, the mixer contributes smaller noise and nonlinearity." *Id.* at 368.

### 6.   Dr. Prucnal Provides Sufficient Evidence That "50% Duty Cycle Products" Infringe To Defeat Summary Judgment.

Dr. Prucnal opines that what Qualcomm terms "50% Duty Cycle Products" infringe the Patents-in-Suit. *See* Ex. 2 at 113-17; Exs. 58-63. This summary judgment evidence, together with the evidence set forth herein and in Dr. Prucnal's attached declaration, raise genuine issues of material fact as to the infringement of these products. As a result, summary judgment is improper. *Edwards Sys. Tech.*, 99 F. App'x at 921 (noting that a classic "battle of the experts" situation renders summary judgment improper). The jury should be permitted to hear Dr. Prucnal's opinions, weigh them against the opinions of Qualcomm's experts, and decide who to

---



credit—this is the classic weighing of credibility that is best reserved for trial. *Id*; *Anderson*, 477 U.S. at 255.

### C. Dismissal Of ParkerVision's Claims As To The Atheros Products Is Proper.

ParkerVision agrees that the summary judgment evidence does not establish infringement of the Atheros Products.[12] *See* Exs. 2 at 113; 50 at 231:25-232:17. Therefore, and as set forth in the attached proposed order, dismissal of ParkerVision's infringement claims with prejudice as to the Atheros Products is proper.[13]  After dismissing ParkerVision's infringement claim as to the Atheros Products, the Court should dismiss as moot Qualcomm's non-infringement counterclaim as to these products (as suggested in the attached Proposed Order).[14]

## V.   CONCLUSION

For all of the foregoing reasons, ParkerVision respectfully requests the Court deny-in-part Qualcomm's motion for partial summary judgment as to pre-suit knowledge and "50% Duty Cycle Products," grant-in-part Qualcomm's motion for partial summary judgment as to the Atheros Products, and enter the attached proposed order dismissing as moot Qualcomm's non-infringement counterclaim as to the Atheros Products.

---

[12] Qualcomm states that it "offered *unrebutted* expert opinion testimony that refuted any claim that the Atheros Products infringe." Dkt. 270 at 13. The Case Management Order did not provide ParkerVision with the opportunity to rebut the opinions set forth for the first time in Dr. Fox's rebuttal report. *See* Dkt. 225. ParkerVision does not agree with Dr. Fox's opinions and is prepared to rebut the testimony of Dr. Fox through cross-examination and the testimony of its experts at trial, should Qualcomm persist with its counterclaim.

[13] Qualcomm states that "ParkerVision has declined to stipulate to a judgment of noninfringement." Dkt. 270 at 11. This is untrue. ParkerVision proposed filing a joint motion to dismiss the Atheros products if Qualcomm would agree to dismiss certain of its counterclaims that lacked evidence. Ex. 66. Qualcomm never responded.

[14] *See Fox Grp., Inc. v. Cree, Inc.* 819 F. Supp. 2d 520, 522 n.2 (E.D. Va. 2011), *aff'd in part, vacated in part on other grounds by* 700 F.3d 1300 (Fed. Cir. 2012) (dismissing defendant's non-infringement counterclaim as moot after granting summary judgment on plaintiff's infringement claim); *Teva Pharms. USA, Inc. v. Pfizer Inc.*, 395 F.3d 1324, 1331 (Fed. Cir. 2005) ("Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has substantial discretion to decline that jurisdiction." (quotation and citation omitted)); *see also* Exs. 64-65 (*Versata Software, Inc. v. Internet Brands*, No. 2:08-cv-313-WCB, slip op. at 8-9 (E.D. Tex. June 1, 2012) (Bryson, J.) (declining to address declaratory judgment counterclaims "under the authority of *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).")).

McKool 890019

May 22, 2013                                    Respectfully submitted,

                                               **McKOOL SMITH, P.C.**

                                               */s/ Douglas A. Cawley*
                                               Douglas A. Cawley, Lead Attorney
                                               Texas State Bar No. 04035500
                                               E-mail: dcawley@mckoolsmith.com
                                               Richard A. Kamprath
                                               Texas State Bar No.: 24078767
                                               rkamprath@mckoolsmith.com
                                               Ivan Wang
                                               Texas State Bar No.: 24042679
                                               E-mail: iwang@mckoolsmith.com
                                               McKool Smith P.C.
                                               300 Crescent Court, Suite 1500
                                               Dallas, Texas 75201
                                               Telephone: (214) 978-4000
                                               Telecopier: (214) 978-4044

                                               T. Gordon White
                                               Texas State Bar No. 21333000
                                               gwhite@mckoolsmith.com
                                               Kevin L. Burgess
                                               Texas State Bar No. 24006927
                                               kburgess@mckoolsmith.com
                                               Josh W. Budwin
                                               Texas State Bar No. 24050347
                                               jbudwin@mckoolsmith.com
                                               Leah Buratti
                                               Texas State Bar No. 24064897
                                               lburatti@mckoolsmith.com
                                               Mario A. Apreotesi
                                               Texas State Bar No. 24080772
                                               mapreotesi@mckoolsmith.com
                                               McKool Smith P.C.
                                               300 West Sixth Street, Suite 1700
                                               Austin, Texas 78701
                                               Telephone: (512) 692-8700
                                               Telecopier: (512) 692-8744

                                               **SMITH HULSEY & BUSEY**

                                               /*s/ James A. Bolling*
                                               Stephen D. Busey

21

James A. Bolling
Florida Bar Number 117790
Florida Bar Number 901253
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jbolling@smithhulsey.com

*ATTORNEYS FOR PLAINTIFF*
*PARKERVISION, INC.*

22

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this day, June 24, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


*/s/ Leah B. Buratti*
Leah B. Buratti

McKool 890019