**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**PARKERVISION, INC.,**

        **Plaintiff,**

    **vs.**

**QUALCOMM INCORPORATED,**

        **Defendant.**

**Civil Action No. 3:11-cv-719-J-37TEM**

**PARKERVISION, INC.'S TRIAL BRIEF ON ISSUES OF LAW**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. ARGUMENT AND AUTHORITIES ...........................................................................1

    A.    Qualcomm Willfully Infringed The Patents-in-Suit By Acting Despite An Objectively High Risk That Its Actions Infringed A Valid Patent. ...........................................................1

         1.    Qualcomm knew of ParkerVision's energy transfer sampling technology and possessed prototypes that embody the Patents-in-Suit. ...............................................2

         2.    Before it began infringing, Qualcomm had actual knowledge of the Patents-in-Suit. .................................3

         3.    Qualcomm concluded after due diligence that ParkerVision's patents are valid and that use of energy transfer sampling technology without a license would infringe. ...............................................5

         4.    Shortly before infringement began, Qualcomm revisited the ParkerVision approach. .............................6

    B.    Qualcomm Cannot Meet Its Burden To Establish Laches. ......................6

         1.    Because ParkerVision filed suit less than six years after Qualcomm's accused infringement began, the presumption of laches cannot arise. ...............................7

         2.    Qualcomm cannot show unreasonable delay—upon discovering infringement, ParkerVision filed suit within one year. ..........................................................8

         3.    Qualcomm has not suffered any material prejudice ..................14

    C.    To Establish Equitable Estoppel, Qualcomm Must Show Reliance On Misleading Conduct. ..........................................17

         1.    ParkerVision consistently demonstrated to Qualcomm that it intended to enforce the Patents-in-Suit. ...............................................................17

         2.    Qualcomm cannot demonstrate reliance on a misleading statement. .......................................18

         3.    Qualcomm suffered no material prejudice. .............................19

D.     Qualcomm's Cannot Meet Its Burden to Overcome Presumption of Validity of the Patents-in-Suit.......................................................19

1.     Qualcomm cannot meet its burden to prove that any Asserted Claim of the '551, '518,'371, or '342 Patents is invalid as obvious. ...................................................................19

2.     Qualcomm cannot meet its burden to prove that any Asserted Claim is not properly enabled. ....................................................22

3.     Qualcomm cannot meet its burden to prove that any of the Asserted Claims are indefinite.........................................................23

E.     ParkerVision Intends To Brief Injunctions At A Later Date. ...............................25

III.   CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992)..................................................................... passim

*Adv. Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*,
  988 F.2d F.2d 1157, 1162 (Fed. Cir. 1993) ...........................................................9

*Andrew Corp. v. Gabriel Elecs., Inc.*,
  847 F.2d 819 (Fed. Cir. 1988)...........................................................................24

*Apple, Inc., v. Samsung Elecs. Co.*,
  Case No. 11-CV-01846, 2013 U.S. Dist. LEXIS 13237 (N.D. Cal. Jan. 29, 2013).....................25

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.*,
  338 F.3d 1368 (Fed. Cir. 2003).....................................................................22, 23

*Bristol Co. v. Bosch Rexroth Inc.*,
  758 F. Supp. 2d 1172 (D. Colo. Dec. 27, 2010) ....................................................15

*Creative Internet Adver. Corp. v. Yahoo! Inc.*,
  No. 6:07-CV-354-JDL, 2009 U.S. Dist. LEXIS 65666 (E.D. Tex. July 29, 2009) ................11

*Creative Internet Adver. Corp. v. Yahoo! Inc.*,
  No. 6:07-CV-354-JDL, 2009 U.S. Dist. LEXIS 65666 (E.D. Tex. July 29, 2009) .......7, 13, 14

*Deere & Co. v. Bush Hog, LLC*,
  703 F.3d 1349 (Fed. Cir. 2012)...........................................................................24

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
  114 F.3d 1547 (Fed. Cir. 1997)...........................................................................13

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
  435 F.3d 1366 (Fed. Cir. 2006)...........................................................................25

*Exxon Research & Eng'g Co. v. United States*,
  265 F.3d 1371 (Fed. Cir. 2001)...........................................................................24

*Fashion House, Inc. v. K Mart Corp.*,
  892 F.2d 1076 (1st Cir. 1989)...........................................................................10

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
  60 F.3d 770 (Fed. Cir. 1995)....................................................................11, 15, 16

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l*,
  LLC, 618 F.3d 1294 (Fed. Cir. 2010) ..................................................................19

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
   607 F.3d 776 (Fed. Cir. 2010) .................................................................................23

*Hall v. Aqua Queen Mfg., Inc.*,
   93 F.3d .......................................................................................................................16

*Hemstreet v. Computer Entry Sys. Corp.*,
   972 F.2d 1290 (Fed. Cir. 1992) .........................................................................15, 16

*Honeywell Int'l, Inc. v. United States*,
   609 F.3d 1292 (Fed. Cir. 2010) ...............................................................................23

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010), *aff'd* 131 S. Ct. 2238 (2011) ...................................2

*In re Seagate Tech., LLC*,
   497 F.3d 1360 (Fed. Cir. 2007) (en banc) .................................................................2

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ...........................................................................22, 23

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008) ...............................................................................20

*Invitrogen Corp. v. Clontech Labs., Inc.*,
   429 F.3d 1052 (Fed. Cir. 2005) .........................................................................22, 23

*Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
   315 F. Supp. 2d 589 (D. Del. 2004) .........................................................................16

*Johns Hopkins Univ. v. Cellpro, Inc.*,
   152 F.3d 1342 (Fed. Cir. 1998) ...............................................................................22

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
   275 F.3d 1347 (Fed. Cir. 2001) ...............................................................................24

*Medichem, S.A. v. Rolabo, S.L.*,
   353 F.3d 928 (Fed. Cir. 2003) .................................................................................20

*Meyers v. Asics Corp.*,
   974 F.2d 1304 (Fed. Cir. 1992) ......................................................................... passim

*Meyers v. Brooks Shoe, Inc.*,
   912 F.2d 1459 (Fed. Cir. 1990) .........................................................................10, 14

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   830 F. Supp. 2d 815 (N.D. Cal. 2011) .......................................................................7

**PARKERVISION, INC.'S TRIAL BRIEF ON ISSUES OF LAW**

*R2 Med. Sys. v. Katecho, Inc.*,
    931 F. Supp. 1397 (N.D. Ill. 1996) ................................................................13, 14

*Seattle Box Co. v. Indus. Crating & Packing, Inc.*,
    731 F.2d 818 (Fed. Cir. 1984)........................................................................24

*State Contr. & Eng'g Corp. v. Condotte Am., Inc.*,
    346 F.3d 1057 (Fed. Cir. 2003) ......................................................................15

*Ultimax v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009)........................................................................13

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    No. 99-cv-274, 2004 U.S. Dist. LEXIS 10730 (D. Del. June 9, 2004), *rev'd in part on
    other grounds*, 425 F.3d 1366 (Fed. Cir. 2005) ....................................................12

*Wanless v. Fedders*,
    145 F.3d 1461 (Fed. Cir. 1998)..............................................................9, 10, 12

*Wanless v. GE*,
    148 F.3d 1334 (Fed. Cir. 1998)................................................................9, 12

*Wellman, Inc. v. Eastman Chem. Co.*,
    642 F.3d 1355 (Fed. Cir. 2011)......................................................................23

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)..........................................................2, 19, 20

## STATUTES

35 U.S.C. § 103(a) ..........................................................................................19

35 U.S.C. § 112...............................................................................................22

## I.      INTRODUCTION

To aid the Court in resolving the questions of law that it must determine after trial in this case, ParkerVision respectfully submits this trial brief. The Court is tasked with the following issues of law: (1) if the jury concludes that Qualcomm willfully infringed ParkerVision's patents, whether such infringement was objectively willful; (2) if the jury concludes that ParkerVision's Patents-in-Suit are invalid as obvious, the Court decides the ultimate legal question; (3) if the jury concludes that ParkerVision's Patents-in-Suit are invalid for lack of enablement, the Court decides the ultimate legal question; (4) the issue of invalidity for indefiniteness; (5) Qualcomm's defense of laches; and (6) Qualcomm's defense of equitable estoppel.[1]

## II.     ARGUMENT AND AUTHORITIES

### A.      **Qualcomm Willfully Infringed The Patents-in-Suit By Acting Despite An Objectively High Risk That Its Actions Infringed A Valid Patent.**

Qualcomm's infringement of ParkerVision's patents was no accident. On the contrary, Qualcomm had specific knowledge of these patents as a result of negotiations with ParkerVision in 1998 and 1999—and had been concerned enough about the patents to conduct detailed investigations into their validity and scope. Qualcomm's engineers reached the conclusion that ParkerVision had invented something distinct from the prior art: "After reading all the references provided by Seyfi, I think PV is doing something different." Ex. 1. Qualcomm's engineers further concluded that "ParkerVision <u>does</u> have at least an element of the 'holy grail & patents to protect it." Ex. 2. But Qualcomm chose not to make a deal with ParkerVision, thinking it could save money by developing something itself: "If we can achieve the same without PV, why give PV free money." Ex. 3. After years of failed efforts to duplicate ParkerVision's results, Qualcomm decided to simply appropriate the technology that it knew full well that ParkerVision had patented. In 2004, Qualcomm's engineers internally decided that they would "go over parker

---

[1] As reflected in the parties' Pre-trial Statement, the parties request that the Court receive evidence as to Qualcomm's defenses of laches and equitable estoppel outside the presence of the jury. The parties propose presenting evidence on these issues while the jury retires to deliberate.

vision [sic] approach and see if we can make it work." Ex. 4. Such conduct is classic willful infringement. To prevail on an assertion of willful infringement, the plaintiff must prove (1) that the accused infringer "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent"; and (2) "this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).

The first prong asks the Court to make an objective determination regarding recklessness, leaving the ultimate legal question to the Court. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1008 (Fed. Cir. 2012). The Court's objective determination entails an "assessment of potential defenses based on the risk presented by the patent." *Id.* The mere fact that a defendant "presented several defenses at trial, including noninfringement and invalidity," does not preclude a finding of willful infringement. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010), *aff'd* 131 S. Ct. 2238 (2011). The second prong of *Seagate* requires the jury to focus on a subjective inquiry: whether "this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Seagate*, 497 F.3d at 1371. A finding of willful infringement is evaluated "in view of the totality" of the circumstances. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999).

### 1. Qualcomm knew of ParkerVision's energy transfer sampling technology and possessed prototypes that embody the Patents-in-Suit.

From the summer of 1998 through the spring of 1999, Qualcomm and ParkerVision engaged in licensing negotiations regarding ParkerVision's energy transfer sampling receiver technology. During these negotiations, ParkerVision gave Qualcomm a detailed view of its technology, going so far as to provide Qualcomm with several demonstration board prototypes (named Eddie 1 and Eddie 2) that embodied the ParkerVision down-conversion technology protected by ParkerVision's Patents-in-Suit. Ex. 5 at 305:4-15. ParkerVision provided the prototypes only after securing corporate nondisclosure agreements and multiple personal nondisclosure agreements. Ex. 6 at 436:8-20; Ex. 7; Ex. 8. Qualcomm conducted tests on these

boards for more than a year, ultimately concluding: "We are very impressed with the performance! . . . The truth is Parker Vision have stumbled on something revolutionary . . ." Ex. 9.

### 2. Before it began infringing, Qualcomm had actual knowledge of the Patents-in-Suit.

In 1999, ParkerVision informed Qualcomm that ParkerVision had patents pending for its down-conversion technology. Ex. 10; *see also* Ex. 11. And the evidence shows that Qualcomm executives, attorneys, and product designers had ample actual knowledge of the Patents-in-Suit before Qualcomm's infringement began:

| Role at Qualcomm | Name | Knowledge of Patents-in-Suit |
|---|---|---|
| Senior Director | Prashant Kantak | Kantak admitted that he was aware that ParkerVision was filing for patents that would cover its energy transfer sampling technology. Ex. 12 at 82:9-17. |
| Vice President and General Counsel of Qualcomm Atheros | Adam Tachner | Tachner had in his possession press releases regarding the '551 patent and copies of the patent itself. Ex. 13; *see also* Ex. 14. |
| Vice President of Technology | Paul Peterzell | Peterzell had in his possession press releases regarding the '551 patent and copies of the patent itself. Ex. 15; *see also* Ex. 16. Additionally, Peterzell sent and received email related to ParkerVision patents in July 2000. Ex. 17. |
| Vice President and in-house patent attorney | Charles Brown | Brown had a copy of the '551 Patent's prosecution history in his files. Ex. 18. |
| Attorney | Ray Hom | Hom ordered a copy of the '551 Patent and its file history in January 2001. Ex. 19. |
| Attorney | Sean English | English was aware of the '551 Patent in or before February 2001. Ex. 17 at 103, 111. |
| Attorney | Monique Hatch | Hatch was aware of the '551 Patent in or before February 2001. Ex. 17 at 110. |
| Attorney | Victoria Pacey | Pacey was aware of the '551 Patent in or before February 2001. Ex. 17 at 110. |
| Attorney | Stephanie Young | Young was aware of the '551 Patent in or before February 2001. Ex. 17 at 102. |
| Vice President of Technology | Chuck Wheatley | Wheatley and Ben Miller met with Jeff Parker, David Sorrells, and ParkerVision's patents lawyers to discuss |

| Role at Qualcomm | Name | Knowledge of Patents-in-Suit |
|---|---|---|
| | | ten of ParkerVision's pending patent applications one of which issued as the '551 patent. Ex. 20. As a result of this meeting between Qualcomm and ParkerVision in May 1999, Qualcomm's in-house patent lawyers and high level executives were aware that ParkerVision was in the process of filing additional "newer applications" to cover "holes" in their existing applications. Ex. 21; *see also* Ex. 22. <br><br>And as a result of meeting with ParkerVision and its patent lawyers and reviewing ParkerVision's patent applications, Wheatly told Kantak, Jah, Persico, Antonio and others that: "Bottom line is, I think it is going to be very difficult for anybody to ever use this technique [energy transfer sampling] without stepping on one or more of [ParkerVision's] claims." Ex. 21. |
| Co-founder | Franklin Antonio | In 2000, Antonio circulated information within Qualcomm regarding ParkerVision patents issuing— specifically that ParkerVision's '371 Patent had just issued. Ex. 23. <br><br>Antonio also sent and received emails to Qualcomm lawyers in July 2000 and May 2002 related to ParkerVision patents. Ex. 17 at 104, 68. |
| Former General Counsel | Lou Lupin | Lupin sent and received email related to ParkerVision patents in July 2000, December 2000, and January 2001. Ex. 17 at 1. |
| Former in-house lawyer for patent licensing, its general counsel, and current Vice Chairman | Steve Altman | Altman sent email related to a ParkerVision patent in December 2000. Ex. 17 at 1. |
| Former head of Qualcomm Technologies and Ventures | Sanjay Jha | Jha received email related to ParkerVision's patents in July 2000. Ex. 17 at 1. |
| Former Executive Vice President and President of Qualcomm CDMA Technologies | Don Schrock | Schrock sent and received email related to ParkerVision patents. Ex. 17 at 1. |

Additionally, Chuck Wheatley, Prashant Kantak, and other high level Qualcomm employees attended a presentation by Jeff Parker and David Sorrells regarding ParkerVision's patents. Ex. 24. Thus, Qualcomm indisputably had pre-infringement knowledge of ParkerVision's patents.

### 3. Qualcomm concluded after due diligence that ParkerVision's patents are valid and that use of energy transfer sampling technology without a license would infringe.

During its negotiations with ParkerVision, Qualcomm investigated the scope and validity of ParkerVision's patents—and concluded that ParkerVision was doing something different from the prior art. Qualcomm employees Chuck Wheatley and Ben Miller reviewed ParkerVision's patent applications. *See* Ex. 21. Wheatley was convinced that ParkerVision's applications were all encompassing—writing "[ParkerVision is] trying to capture every possible version of any use" of their technology; he also wrote that any holes "are being covered in newer applications." *Id.*

Qualcomm continued investigating ParkerVision's patents; in March 1999, Prashant Kantak, Chuck Wheatley and others wrote regarding Qualcomm's ongoing "[l]egal due diligence" on ParkerVision's patents. Ex. 25. After Qualcomm sent ParkerVision two references it thought anticipated ParkerVision's energy transfer sampling technology, David Sorrells explained to Chuck Wheatley "what it is that [ParkerVision] are doing that is lacking in the prior art samplers." Ex. 26. Chuck Wheatley then wrote internally that "[a]fter reading all the references provided by Seyfi [to ParkerVision], I think PV is doing something different." Ex. 1. In April 1999, Andy Oberst wrote internally that "ParkerVision <u>does</u> have at least an element of the 'holy grail' [and] patents to protect it." Ex. 2. Others in the industry warned Qualcomm that its products potentially infringed ParkerVision's patented technology. Don Schrock, in December 2000, received an email informing him that Mike Whitfield at First Union Securities had heard that Qualcomm's products "would require a license agreement between QCOM and ParkerVision." Ex. 27. Whitfield himself had "read [ParkerVision's] specific patent . . . and it appears very broad." *Id.*

Chuck Wheatley concluded that use of energy transfer sampling without a license would infringe. "Bottom line is"—he warned the group—"I think it is going to be very difficult for anybody to ever use this technique without stepping on one or more of their claims." Ex. 21.[2] In July 2000, Andy Oberst asked Prashant Kantak if there was any risk to Qualcomm with regard to the recent granting of ParkerVision's U.S. Patent 6,091,940, which covered ParkerVision's energy transfer sampling technology. Ex. 28. Kantak responded that there was a risk only if Qualcomm decided "to go with [ParkerVision's] direct conversion technique." *Id.* But in the face of these conclusions from its own engineers, Qualcomm plowed ahead with its efforts to develop products that would give it the benefits of ParkerVision's technology.

### 4.    Shortly before infringement began, Qualcomm revisited the ParkerVision approach.

Shortly before it began infringing Qualcomm intentionally revisited the ParkerVision approach. In May 2004, Qualcomm product designers Steven Ciccarelli and Seyfi Bazarjani revisited "the idea of RF sampling" for receivers using ParkerVision's approach in Qualcomm's "next generation radio transceiver." Ex. 4. Bazarjani stated he would "set up a meeting with Chuck [Wheatley] to go over parker vision [sic] approach and see if we can make it work." *Id.* Yet Qualcomm did not reopen negotiations with ParkerVision, did not license the patents, and did not pay ParkerVision a dime. Such conduct in the face of detailed knowledge of both ParkerVision's technology and its patents is necessarily willful infringement.

### B.    Qualcomm Cannot Meet Its Burden To Establish Laches.

To prevail on its laches defense, Qualcomm must prove two distinct factors. First, that ParkerVision "delayed filing suit for an unreasonable and inexcusable length of time from the time [it] knew or reasonably should have known of its claim" against Qualcomm. *A.C. Aukerman*

---

[2] Notably, despite Qualcomm's sizable legal section, it has not produced opinion of counsel in this case. The lack of an opinion of counsel supports a finding of willful infringement. *Finjan Software, Ltd. v. Secure Computing Corp.*, C.A. No. 06-369 (GMS), 2009 U.S. Dist. LEXIS 72825, at *49 (D. Del. Aug. 18, 2009) ("While there is no longer an affirmative duty of care that requires an accused infringer to obtain an opinion of counsel, the fact that Secure did not seek any such opinion may be considered in the totality of circumstances surrounding willful infringement."), *aff'd in part, rev'd in part*, 626 F.3d 1197 (Fed. Cir. 2010).

*Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). Second, that "the delay operated to the prejudice or injury" of Qualcomm. *Id*. Qualcomm bears the ultimate burden to prove each element by a preponderance of the evidence. *Id*. at 1039.[3] Courts typically find a period of delay "'unreasonable' only when it 'substantially exceeds' four years." *Mformation Techs., Inc. v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 840 (N.D. Cal. 2011); *see also, e.g.*, *IXYS Corp. v. Advanced Power Tech., Inc.*, 321 F. Supp. 2d 1156, 1163 (N.D. Cal. 2004); *Creative Internet Adver. Corp. v. Yahoo! Inc.*, No. 6:07-CV-354-JDL, 2009 U.S. Dist. LEXIS 65666, at *8-9 (E.D. Tex. July 29, 2009) (refusing to find a three-year delay unreasonable). The period of delay "is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." *Aukerman*, 960 F.2d at 1032.

### 1.     Because ParkerVision filed suit less than six years after Qualcomm's accused infringement began, the presumption of laches cannot arise.

While courts typically find delays unreasonable only when substantially in excess of four years, *see IXYS*, 321 F. Supp. 2d at 1163, a presumption of laches will arise only upon proof of a delay in filing suit for more than six years after actual or constructive knowledge of the infringement.  *Id*. at 1035-36. There can be no presumption of laches in this case. Because six years did not pass between Qualcomm's introduction of the accused products and ParkerVision's filing of this suit, the presumption cannot arise as a matter of law.

| January 2006 | Qualcomm first infringes the Patents-in-Suit with the RTR6275. Ex. 29 (Expert Report of P. Prucnal) at 63. |
|---|---|
| July 20, 2011 | ParkerVision files suit. Dkt. 1 at 1. |

---

[3] Even if the Court concludes that Qualcomm can establish the elements of laches by a preponderance of the evidence, preclusion of pre-suit damages is not required.  Aukerman, 960 F.2d at 1033. Application of the laches defense remains "discretionary, and as an equitable matter, the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties." Id. A defendant who had engaged in particularly egregious behavior—such as "conscious copying"—may change the equities significantly in the plaintiff's favor. Id. In the final analysis, "the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly bringing suit." Aukerman, 960 F.2d at 1034. Here the Court should decline to preclude ParkerVision from pre-suit recovery of damages, based upon Qualcomm's long-standing knowledge of its infringement, as detailed in the willfulness discussion, supra.

**2.     Qualcomm cannot show unreasonable delay—upon discovering infringement, ParkerVision filed suit within one year.**

In the absence of a presumption of laches, Qualcomm must show that ParkerVision unreasonably delayed in filing suit from the time that it had actual or constructive knowledge of Qualcomm's infringement. ParkerVision acted promptly to enforce its rights once it suspected Qualcomm's infringement—filing suit less than one year after this discovery.

**a)  Upon learning of Qualcomm's infringement, ParkerVision filed suit within one year.**

ParkerVision first learned of Qualcomm's infringement no earlier than September 2010. In the fall of 2010, ParkerVision employee Richard Harlan came across two Qualcomm patents using Google's patent search while researching DC offset technology. Ex. 30 at 16:13-17:1, 18:4-14. The patents—which described a technology resembling ParkerVision's D2D technology—led him to investigate further. *Id.* at 21:2-23. In early 2011, Harlan discovered a conference paper (dated 2011) describing in detail a Qualcomm chip with characteristics similar to ParkerVision's energy transfer sampling technology covered by the Patents-in-Suit. *Id.* at 21:2-23; *see* Ex. 31. The conference paper included circuitry diagrams and timing diagrams related to the operation of Qualcomm integrated circuits. *See* Ex. 31; Ex. 6. Concerned, Harlan contacted ParkerVision's Chief Technology Officer, and inventor of the Patents-in-Suit, David Sorrells. *Id.* at 456:15-25, 421:22-424:8; Ex. 30 at 32:18-33:2. Sorrells proceeded to carefully analyze the conference paper. *Id.* at 35:1-7. Upon reviewing the conference paper, Sorrells noted that there were "several key concepts" that ParkerVision has in its Patents-in-Suit reflected in the conference paper. Ex. 6 at 422:25-423:3. Sorrells then reported his findings to ParkerVision's CEO, Jeff Parker, and had others at ParkerVision verify his findings. *Id.* at 423:5-9.

Jeff Parker and David Sorrells decided further research was needed to verify their suspicions that Qualcomm infringed the Patents-in-Suit. *Id.* at 423:19-22. They asked Harlan to search for publicly available information regarding Qualcomm's products in order to study the direct conversion architecture being used by Qualcomm. *Id.* at 423:24-425:8. ParkerVision then analyzed the publicly available materials describing Qualcomm's products and the Patents-in-

8

Suit, and decided to hire counsel. *Id.* at 424:25-425:8. ParkerVision then filed this lawsuit on July 20, 2011. Dkt. 1 at 1. Because ParkerVision filed suit *less than a year* after suspecting Qualcomm's infringement of the Patents-in-Suit, Qualcomm cannot carry its burden to show unreasonable delay.

### b) Qualcomm's arguments of constructive knowledge must fail.

Qualcomm will likely attempt to charge ParkerVision with constructive notice. *See* Ex. 32; Ex. 33. If a patentee knows facts that would "put upon a man of ordinary intelligence the duty of inquiry," the patentee is "chargeable with such knowledge as he might have obtained upon inquiry." *Adv. Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d F.2d 1157, 1162 (Fed. Cir. 1993). Constructive knowledge of infringement may be imputed only to a patentee who is "negligently or willfully oblivious" to "pervasive, open and notorious activities that a reasonable patentee would suspect were infringing." *Wanless v. GE*, 148 F.3d 1334, 1338 (Fed. Cir. 1998). Where the facts known to the patentee do not establish a duty of inquiry or where the patentee satisfies its duty but does not or could not discover the infringement, constructive knowledge does not exist and the laches clock does not start. *See id.; see also Wanless v. Fedders*, 145 F.3d 1461, 1467 (Fed. Cir. 1998).

The Court should reject any constructive notice argument raised by Qualcomm because ParkerVision could not reasonably have discovered Qualcomm's infringement before it came across the Qualcomm patents and conference paper in late 2010 and early 2011. *See* Ex. 34 at 2. Qualcomm will likely attempt to establish constructive notice by pointing to three events: (1) Qualcomm's announcement of the release of its ZIF architecture, *see* Ex. 33; (2) the first commercial shipment of Accused Products in 2006 and accompanying publicity, *see id.*; and (3) ParkerVision's possession of certain device specification documents for Accused Products, *see* Ex. 6 at 427:1-431:3. Each argument lacks merit.

*First*, Qualcomm's publicity regarding its ZIF architecture is irrelevant. Qualcomm did not release the earliest Accused Product in this case (the RTR6275) until January 2006, so it is legally and factually impossible for ParkerVision to have had constructive knowledge of

Qualcomm's infringement prior to 2006. As a matter of law, the laches period cannot begin to run until the patents issue and infringement begins. *See, e.g.*, *Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1462 (Fed. Cir. 1990) (overruled in part on other grounds by *Aukerman Co.*, 960 F.2d at 1038-39).

*Second*, Qualcomm also claims that the commercial shipping of accused products in 2007 should have notified ParkerVision of its infringement. Ex. 33. In support, Qualcomm refers to a press release describing the QSC6055 chip. Ex. 3; Ex. 35. But the press release (and any other similar publicity regarding Accused Products) is far too vague to put a ParkerVision on notice that Qualcomm was infringing the Patents-in-Suit. Qualcomm's press release describes the receiver technology in extremely general terms that certainly does not go to the level of detail provided in Qualcomm's patents, conference paper or the reverse engineering report ParkerVision obtained. Whether publicly available information should have put the plaintiff on notice of possible infringement depends on the type and quality of information available.[4] Here the lack of sufficiently detailed technical information in Qualcomm's press releases could not have warned ParkerVision—a reasonably vigilant patentee—of the possibility of infringement.

*Third*, none of the documents in ParkerVision's possession that Qualcomm may point to include the level of technical detail sufficient to implicate infringement. At the outset, Qualcomm should be precluded from arguing that laches applies based on certain allegedly "confidential" or "proprietary" device specifications in ParkerVision's possession because Qualcomm failed to disclose this allegation in its response to ParkerVision's interrogatory regarding laches. (Nor did Qualcomm ever supplement its interrogatory responses to add these factual allegations to its defense.)[5] ParkerVision learned that Qualcomm might attempt to raise

---

[4] *See, e.g.*, *Fedders*, 145 F.3d at 1465–66 ("[T]he mere fact that single-phase motors are used in room air conditioners is not enough to suggest infringement because not all single-phase motors infringe. . . . For example, any advertisements for high-efficiency air-conditioners using single phase motors and having a capacitor capable of operating with specific characteristics should have alerted Wanlass to the prospect of infringement. . . .").

[5] *See Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1081 (1st Cir. 1989) (affirming trial court's exclusion of evidence based on party's failure to completely answer interrogatory).

this argument through Qualcomm's deposition questioning of ParkerVision's witnesses. *See, e.g.*, Ex. 6 at 419:8-424:10; Ex. 30 at 17:10-36:20.

In any event, the high level block diagrams and general performance measurements contained in the device specification documents do not include sufficient technical detail to put ParkerVision on notice of Qualcomm's infringement. *See, e.g.*, Ex. 36. As Sorrells noted in his deposition, these documents include high-level specifications. Ex. 6 at 430:18-19. ("[T]here's no design information in here. It's basically a block diagram level. It just allows me to do a comparative analysis in terms of overall general specs and power consumption.").

c) **ParkerVision cannot be charged with earlier constructive knowledge due to the difficulty and expense of discovering infringement, as well as the multiple NDAs.**

Even where a court finds some delay, reasonable excuses may justify all or part of a delay. *Creative Internet Adver. Corp.*, 2009 U.S. Dist. LEXIS 65666, at *8-9. Reasonable excuses include reliance on a pre-existing agreement or the difficulty and expense of discovering infringement. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995) (reversing summary judgment where trial court failed to consider whether reliance on agreement with alleged infringer made delay reasonable). Any justification "for a period of time deducts that time from the total period of delay." *Creative Internet Adver. Corp.*, 2009 U.S. Dist. LEXIS 65666, at *8-9. Here, to the extent that the Court concludes that ParkerVision had constructive notice of Qualcomm's infringement and delayed in filing suit, any such delay would be justified based on the parties' non-disclosure agreements, the difficulty and expense of discovering infringement, and the existence of closely related patents.

ParkerVision had no reason to suspect Qualcomm's infringement due to the multiple non-disclosure agreements Qualcomm signed. *See* Ex. 6 at 436:8-20. A party's belief that a party will honor a pre-existing agreement not to infringe may excuse all or part of a delay in bringing suit. *Gasser Chair Co.*, 60 F.3d at 774. Here, Qualcomm signed multiple nondisclosure agreements— personal as well as corporate. *See e.g.*, Ex. 37; Ex. 38. ParkerVision's reasonable belief that Qualcomm would abide by the terms of the non-disclosure agreements precludes a finding of

11

constructive knowledge and unreasonable delay in this case.

Additionally, the Federal Circuit recognizes that a patentee's duty to test products to reveal infringement "is a function of [the test's] cost and difficulty." *GE*, 148 F.3d at 1337. For certain inventions, determining whether an accused product infringes is "both easy and inexpensive." *Id.* at 1337. For other products, including the Accused Products, the complexity and expense of testing prohibits a reasonable patentee from testing for infringement absent cause.[6] Qualcomm's chip designs are not publically available. Without reverse engineering an integrated circuit or seeing a disclosure such as that in Qualcomm's 2011 conference paper (which included circuitry and timing diagrams), it would not have been possible for ParkerVision to learn the internal workings of Qualcomm's integrated circuits. Ex. 6 at 439:21-440:2. To confirm infringement, ParkerVision ultimately invested in a reverse engineering report—at a cost of $128,000. Ex. 34 at 3. ParkerVision could not afford to obtain such an expensive analysis on a routine basis. ParkerVision was diligent once it had a reason to suspect infringement in light of Qualcomm's conference paper in 2011, but it could not reasonably have discovered Qualcomm's transgressions at an earlier date.

### d) Qualcomm's secrecy precludes a finding of constructive knowledge and unreasonable delay

While the laches analysis focuses first on the patentee's conduct, "the infringer's activities are relevant to whether the patentee's conduct was reasonable, including the infringer's efforts to maintain the secrecy of its processes. . . . An infringer cannot cloak its activities in secrecy and simultaneously accuse the patent holder of failing to . . . protect its rights." *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co*., No. 99-cv-274, 2004 U.S. Dist. LEXIS 10730 at *57 (D. Del. June 9, 2004) (emphasis added), *rev'd in part on other grounds*, 425 F.3d 1366 (Fed. Cir. 2005). Imputing constructive knowledge is improper when the infringement is

---

[6] *Fedders*, 145 F.3d at 1465 ("Imposing a duty upon Wanlass to monitor the air-conditioning industry by periodically testing all others' products, therefore, would be unreasonable. . . . Mr. Wanlass's companies could not afford to purchase and dismantle every air-conditioner model on the market and test the single-phase motor found inside.").

"in secret," and cannot be determined through testing. *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997); *Ultimax v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1350 (Fed. Cir. 2009). The evidence overwhelmingly establishes that ParkerVision could not have detected Qualcomm's infringement by studying or testing chips. Qualcomm never would have revealed to ParkerVision how its chips worked, and the cost of reverse engineering is very expensive. Ex. 34 at 3. Qualcomm's secret infringement precludes a finding of constructive knowledge and unreasonable delay in this case. *See Eastman Kodak*, 114 F.3d at 1559.

> **e) ParkerVision's closely related patent precludes a finding of constructive knowledge and unreasonable delay.**

Any attempt to charge ParkerVision with constructive knowledge fails to consider or acknowledge that the Patents-in-Suit are closely related to three other patents that were originally part of the complaint: the '401 Patent, which issued in October 2010, the '845 Patent, which issued in May 2010, and the '896 Patent, which issued in April 2009. *See* Dkt. 1 at 2-3; Exs. 39 ('401 Patent); 40 ('845 Patent); 41 ('896 Patent). In addition, the '342 Patent—which still has pending claims—did not issue until February 2009. Ex. 42 ('342 Patent). All four patents relate to down-conversion technology, and there is significant overlap between the inventors and the inventors on the remaining patents. The '896 Patent claims priority to is part of the same family as the '551 Patent, which is still in the suit.

The great weight of authority holds that when patents are closely related, the time between the issuance of the first and second patent is an excused period of delay for laches purposes. *See Brooks Shoe*, 912 F.2d at 1462; *Asics*, 974 F.2d at 1307; *Creative Internet*, 2009 U.S. Dist. LEXIS 65666, at *6-7; *IXYS*, 321 F. Supp. 2d at 1163; *see also R2 Med. Sys. v. Katecho, Inc.*, 931 F. Supp. 1397, 1409 (N.D. Ill. 1996) ("Where patents are closely related, it is generally reasonable for a patentee to delay filing suit under any of the patents until all have been issued."). This rule makes sense, as bringing claims on related patents together in one suit "conserve[s] both the parties' and the courts' resources." *Brooks Shoe*, 912 F.2d at 1462; *IXYS*, 321 F. Supp. 2d at 1163. And the rule has continuing vitality—it has, as is the case here, been

extended by courts to excuse a delay associated with a later-issued patent even when that patent was ultimately not asserted in the lawsuit. *See Creative Internet*, 2009 U.S. Dist. LEXIS 65666, at *6-7; *see also*, *e.g.*, *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 583 (E.D. Tex. 2007) (excusing delay in filing on one patent for the period during which a related patent was in reexamination).

Under this authority, any delay in bringing suit on the Patents-in-Suit until the issuance of the four closely related patents was completed in October 2010 is excused. *See Brooks Shoe*, 912 F.2d at 1462; *Asics*, 974 F.2d at 1307; *Creative Internet*, 2009 U.S. Dist. LEXIS 65666, at *6-7; *IXYS*, 321 F. Supp. 2d at 1163; *R2*, 931 F. Supp. at 1409; *Aukerman*, 960 F.2d at 1038. To borrow from the relevant case law, "[i]n light of the close relationship of these patents, [ParkerVision] was not required to bring suit under [any] patent until the issuance of the ['845] patent" in May 2010. *R2*, 931 F. Supp. at 1409. When infringement first began in 2006, the '551, '518, and '371 patents had issued. Dkt. 1 at 2-3. But the closely-related '401, '845, '896, and '342 patents had all been filed but had not yet issued. The law encourages judicial efficiency, and ParkerVision was entitled to (and indeed, encouraged to) wait to file suit until all of the related patents had issued in October 2010. The laches period could thus be at most less than one year— far less than the four years of delay which courts typically require before making a finding of laches.

### 3. Qualcomm has not suffered any material prejudice

Proof of "material prejudice" resulting from unexcused periods of delay is essential to a laches defense; such prejudice may be economic or evidentiary. *Aukerman*, 960 F.2d at 1033.

Economic prejudice results where the infringer "will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Aukerman Co.*, 960 F.2d at 1033. To establish economic prejudice, "conclusory averments are not sufficient." *Brooks Shoe*, 912 F.2d at 1463. Nor is mere evidence of investment in the infringing products enough. *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1293-94 (Fed. Cir. 1992). Rather, there must be an "explicitly proven nexus" between any unexcused

delay and the damaging change in economic position during that delay. *Id.*[7] "The change must be *because of* and *as a result of the delay*, not simply a business decision to capitalize on a market opportunity." *Id.* at 1294 (emphasis added).

Qualcomm fails to make such a showing. Instead, it makes only conclusory accusations that it "continued to develop and produce its allegedly infringing direct down-conversion receiver technology, thus increasing the scope of the alleged infringement." Ex. 33. Qualcomm's argument must fail. Evidence that Qualcomm made investments or expanded its business during the delay period is insufficient to establish economic prejudice. *Gasser*, 60 F.3d at 775.

*First*, Qualcomm has not and cannot identify a change in its position caused by any purported delay in filing suit. Any assertion by Qualcomm of a nexus between the alleged delay and economic prejudice fails because it relies on the conclusory allegation, unsupported by any evidence, that it would have acted differently had it known of ParkerVision's claims earlier. Such arguments have repeatedly been rejected by the Federal Circuit.[8] *Second*, ParkerVision's conduct has had no effect on Qualcomm's decision to infringe and to continue infringement. Indeed, Qualcomm still has not stopped infringing. Qualcomm continues to market and sell the Accused Products without implementing a design-around in the two years since ParkerVision filed suit.[9] Qualcomm's unabated infringement after this suit was filed negates a finding of prejudice. "Indications that a party would not have acted differently had suit been brought earlier include continuing to sell and design products after suit was ultimately filed . . . ." *Bristol Co. v.*

---

[7] *See also State Contr. & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1066 (Fed. Cir. 2003) ("A nexus must be shown between the patentee's delay in filing suit and the expenditures; the alleged infringer must change his position 'because of and as a result of the delay.'"); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995) ("Even a considerable investment during a delay period is not a result of the delay if it was a deliberate business decision to ignore [a] warning, and to proceed as if nothing had occurred.").

[8] *See State Contr. & Eng'g Corp.*, 46 F.3d at 1066-67 (infringer failed to present evidence that it would have actually changed its design); *Gasser*, 60 F.3d at 775-76; *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992); *Hemstreet*, 972 F.2d at 1293-94.

[9] In January of this year, Qualcomm announced new products. Ex. 43.  Qualcomm, however, has refused to provide any document production whatsoever on its new products, despite ParkerVision's requests. *See e.g.*, Ex. 44.  If these new products were non-infringing, Qualcomm would be expected to tout them as non-infringing alternatives or design-arounds to ParkerVision's patents-in-suit.

*Bosch Rexroth Inc.*, 758 F. Supp. 2d 1172, 1181 (D. Colo. Dec. 27, 2010).[10] *Third*, Qualcomm's assertions that it does not infringe the Patents-in-Suit and that the Patents-in-Suit are invalid demonstrate that Qualcomm was "indifferent" to whether or not ParkerVision sued, and was simply making "a business decision to capitalize on a market opportunity." *Hemstreet*, 972 F.2d at 1294; *see also Gasser,* 60 F.3d at 775. There is simply no evidence that Qualcomm would have pursued a different approach regarding infringement or validity, or acted differently, had ParkerVision filed this suit earlier.

To establish evidentiary prejudice, Qualcomm must prove that any unexcused delay caused such a loss of evidence as to render Qualcomm unable "to present a full and fair defense on the merits." *Id.* For evidentiary prejudice, the alleged infringer must state with particularity what evidence has been lost by the alleged delay. *Asics*, 974 F.2d at 1308. And as with economic prejudice, the defendant must prove that the loss of evidence resulted from the delay and would not have occurred but for the delay. *See Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1558 (Fed. Cir. 1996) (defendant "utterly failed to demonstrate that the allegedly prejudicial events occurred after [plaintiff] knew or should have known of the allegedly infringing activities"). "Conclusory statements that there are missing witnesses, that the witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient" to establish evidentiary prejudice. *Asics*, 974 F.2d at 1308.

Qualcomm cannot demonstrate evidentiary prejudice. Qualcomm contends—vaguely— that "Qualcomm's ability to present an adequate defense to ParkerVision's claims of infringement may be impaired due to the loss of records, unavailability of witnesses or unreliability of memories of long past events." Ex. 33. But to establish evidentiary prejudice, general and "[c]onclusory statements that there are missing witnesses, that witnesses' memories

---

[10] *See also, Asics*, 974 F.2d at 1308 (considering the fact that "[n]one of the defendants submitted evidence that they curtailed design and development of shoes in response to Meyers' suit once it was actually filed" in finding no economic prejudice"); *Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 613 (D. Del. 2004) (continued infringement in the face of a filed suit suggests defendant "was more concerned about earning a profit than about [plaintiffs'] claim of infringement").

have lessened, and that there is missing documentary evidence, are not enough." *Asics*, 974 F.2d at 1308. Instead, Qualcomm must demonstrate that particular periods of unexcused delay caused the loss of specific evidence, thereby rendering Qualcomm unable "to present a full and fair defense on the merits."[11] *See Aukerman*, 960 F.2d at 1033. Qualcomm's contentions are therefore insufficient as a matter of law. *See Asics*, 974 F.2d at 1308.

### C.   To Establish Equitable Estoppel, Qualcomm Must Show Reliance On Misleading Conduct.

To invoke equitable estoppel, a defendant must prove three separate factors: (1) that through misleading conduct, the plaintiff led the defendant to reasonably infer that it did not intend to enforce its patent against the defendant; (2) the defendant relied on that conduct; and (3) that due to its reliance, the defendant will be materially prejudiced if the plaintiff is allowed to proceed with its claim.  *Aukerman*, 960 F.2d at 1041. Conduct by the plaintiff may include specific statements, action, inaction, or silence where there was an obligation to speak. *Id.* As ParkerVision will show, Qualcomm cannot meet its burden to prove a single factor—let alone all three.

### 1.   ParkerVision consistently demonstrated to Qualcomm that it intended to enforce the Patents-in-Suit.

ParkerVision did not lead Qualcomm to believe that it did not intend to enforce its patents. Rather, ParkerVision consistently demonstrated to Qualcomm that it believed in the fundamental value of its technology and would vigorously protect its intellectual property. ParkerVision updated Qualcomm regarding the status of its patents, insisted on personal as well as corporate nondisclosure agreements, and filed suit immediately upon learning of Qualcomm's infringement.

Equitable estoppel requires misleading conduct on behalf of the plaintiff regarding its intention to pursue infringement claims against the defendant. *See Asics*, 974 F.2d at 1304, 1308.

---

[11] Qualcomm undermines this argument by contending that prior negotiations are irrelevant to this case. *See* Dkt. 325 at 2-9. Qualcomm cannot take the position that it has been prejudiced by fading memories and simultaneously attempt to exclude written documentation of events.

Typically, this involves the patentee making affirmative statements to the infringer suggesting that the patentee has no intention to assert its patent against the infringer. *Aukerman*, 960 F.2d at 1042 (finding that "[i]n the most common situation, the patentee specifically objects to the activities currently asserted as infringement in the suit and then does not follow up for years."). Here, Qualcomm cannot show any evidence that ParkerVision made any affirmative statements that it did not intend to assert its patents. In fact, the opposite is true. *See* Ex. 21. Qualcomm's internal emails show that it knew ParkerVision had every intention of protecting its intellectual property: "[ParkerVision is] trying to capture every possible version of any use" of their device. *Id.* Furthermore, Qualcomm knew that ParkerVision intended to fully protect its intellectual property: "Bottom line is"—Wheatley warned—"I think it is going to be very difficult for anybody to ever use this technique without stepping on one or more of their claims." *Id.*

### 2. Qualcomm cannot demonstrate reliance on a misleading statement.

Qualcomm cannot demonstrate reliance on a misleading statement. Reliance is an "essential" element "[t]o show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security." *Aukerman*, 960 F.2d at 1042. In the absence of such evidence, Qualcomm offers conclusory assertions that it relied on ParkerVision's conduct. This is insufficient as a matter of law. *See Asics*, 974 F.2d at 1309 (reversing summary judgment in favor of the defendant on the basis of equitable estoppel where "[d]efendants make numerous conclusory assertions that they relied on Meyers' conduct, but they have not presented undisputed facts to show that they did.").

ParkerVision will show, through its experts Dr. Prucnal and Paul Benoit, that by using ParkerVision's energy transfer sampling technology, Qualcomm realized enormous gains in product performance as well as profits. *See* Ex. 29. Because of the benefits, Qualcomm made a business decision to infringe. *See* Ex. 28  (noting legal risk if Qualcomm decided "to go with [ParkerVision's] direct conversion technique."). Qualcomm's actions do not show that it was "lulled into a sense of security"—instead, Qualcomm's actions show willful infringement even in the face of ParkerVision's communicated intent to protect and enforce its intellectual property.

*See* discussion in willfulness section, *supra*.

### 3. Qualcomm suffered no material prejudice.

Because Qualcomm cannot demonstrate misleading conduct nor reliance, the Court need not address material prejudice. To demonstrate material prejudice, Qualcomm must show loss of evidence or change of economic position due to the infringer's reliance on the misleading conduct of a patentee. *Aukerman*, 960 F.2d at 1043. Qualcomm has provided no such evidence. Rather, it relies on conclusory averments. Ex. 33. As explained *supra* at Part II.B.4, such conclusory statements are legally insufficient. *Asics*, 974 F.2d at 1308. And Qualcomm's actions directly contradict any implication that it changed its economic position due to its reliance on ParkerVision. For example, Qualcomm has maintained its business decision to produce and sell infringing products during the pendency of this suit.

The Court should conclude that Qualcomm's equitable estoppel defense is without merit.

### D. Qualcomm's Cannot Meet Its Burden to Overcome Presumption of Validity of the Patents-in-Suit.

Qualcomm contends that the Patents-in-Suit are invalid on the following grounds: (i) obviousness; (ii) lack of enablement; and (iii) indefiniteness. Issued patents are presumed valid. As ParkerVision will show at trial, Qualcomm cannot overcome that presumption.

### 1. Qualcomm cannot meet its burden to prove that any Asserted Claim of the '551, '518,'371, or '342 Patents is invalid as obvious.

Qualcomm argues that Asserted Claims in the Patents-in-Suit are invalid as obvious. Ex. 45 at *e.g.* ¶¶ 21, 249. As ParkerVision will show at trial, Qualcomm's claim of obviousness falls far short of meeting the required clear and convincing standard. *See WMS Gaming*, 184 F.3d at 1355. To prove obviousness, Qualcomm must prove by clear and convincing evidence that the subject matter of the Asserted Claims of the Patents-in-Suit "would have been obvious at the time the invention was made to a person of ordinary skill in the art to which the subject matter of the invention pertains." 35 U.S.C. § 103(a). The ultimate determination of obviousness is a legal conclusion for the Court, based on underlying factual issues addressed by the jury. *WMS Gaming*, 184 F.3d at 1355. Those underlying factual issues include: (1) the scope and content of

the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of non-obviousness. *Id.*

The Federal Circuit has reaffirmed in several recent opinions that the Court and jury *must* consider secondary considerations of non-obviousness in determining whether the asserted patents are obvious. *See, e.g.*, *Apple Inc. v. ITC*, 2013 U.S. App. LEXIS 16282, *19 (Fed. Cir. Aug. 7, 2013). The Federal Circuit emphasized that it has "repeatedly held that evidence relating to all four Graham factors—including objective evidence of secondary considerations—must be considered before determining whether the claimed invention would have been obvious to one of skill in the art at the time of invention." *Id.* The Federal Circuit continued, finding that exclusion of evidence related to secondary considerations of non-obviousness "was not harmless" and "[s]econdary considerations evidence . . . may be the most probative and cogent evidence in the record." *Id*. at *21.

The standard for obviousness involves two steps: (1) construction of the claims by the court as a matter of law; and (2) a comparison of the construed claims to the prior art. *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003). Proving obviousness requires more than conclusory statements: "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citations and quotations omitted).

Qualcomm cannot meet its burden. Furthermore, ParkerVision will show that the Patents-in-Suit are nonobvious through two means: *first*, through the expert testimony of Dr. Prucnal and David Sorrells, and *second*, through Qualcomm's internal emails, which demonstrate Qualcomm considered energy transfer sampling a significant advance in the state of the art.

        **a)  None of the references identified by the Razavi Report render the Patents-in-Suit obvious.**

Qualcomm contends that Asserted Claims in the Patents-in-Suit is invalid as obvious. Ex. 45 (Razavi Report) at *e.g.* ¶¶ 21, 249. Through its experts, Dr. Prucnal and David Sorrells, ParkerVision will show that the Patents-in-Suit are non-obvious and that none of the references

identified by Dr. Razavi render obvious the Asserted Claims of the Patents-in-Suit. Ex. 46 (Rebuttal Report of Paul Prucnal) at 31-81.

        **b)  Qualcomm's internal correspondence demonstrates that it considered the Patents-in-Suit a significant advance in the state of the art.**

Furthermore, Qualcomm's internal emails show that Qualcomm considered energy transfer sampling a revolutionary breakthrough. In this case, evidence of the parties' negotiations, and in particular Qualcomm's internal commentary on the merits of ParkerVision's inventions and how the Patents-in-Suit differ from the prior art, is a relevant secondary consideration of non-obviousness. *Apple Inc.*, 2013 U.S. App. LEXIS 16282, *22. Qualcomm's internal reactions at the time demonstrate that the differences between the invention and the prior art were vast. Indeed, the initial difficulty of the engineering department to understand the invention, followed by a firm conviction that ParkerVision was "doing something different" reflect the company's reaction without hindsight bias that may improperly color an obviousness analysis. Because energy transfer sampling presented a significant advance over available technology, Qualcomm's engineers—while excited at the prospect—initially had difficulty understanding how energy transfer sampling worked. Ex. 47.

Far from obvious, Qualcomm thought the "ParkerVison approach" offered a totally different solution. Saed Younis and other Qualcomm engineers concluded that "[t]he truth is Parker Vision have [sic] stumbled on something revolutionary . . . ." Ex. 9. Likewise, Chuck Wheatley stated in another internal email that, "[a]fter reading all the references provided by Seyfi, I think PV is doing something different." *See* Ex. 1. These were not isolated incidents. Qualcomm's Don Schrock wrote to Dr. Irwin Jacobs, Qualcomm's CEO at the time, regarding ParkerVision's technology: "FYI, this is critical technology that we must land based on what we have seen so far. It offers revolutionary rf versus power performnace [sic] based on early teat [sic] resuls [sic]." Ex. 48.  And Qualcomm's Prashant Kantak wrote internally that ParkerVision has "invented a new radio receiver technology that turns the conventional radio receiver design on its head." Ex. 49.

### 2.   Qualcomm cannot meet its burden to prove that any Asserted Claim is not properly enabled.

Qualcomm contends that Claims 23, 25, 161, 193, 202 of the '551 Patent, Claims 1, 27, 82 of the '518 Patent, and Claim 2 of the '371 Patent are invalid under 35 U.S.C. § 112 for lack of enablement. Qualcomm bases this challenge on the enablement analysis in the Razavi Report. Ex. 45 (Razavi Report) at ¶¶ 140-153, 351-353, 514-516. Qualcomm cannot meet its clear and convincing burden of proof to show lack of enablement. *See BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1373 (Fed. Cir. 2003). A patent is enabling so long as the disclosure permits one with ordinary skill in the art to make and use the invention "without undue experimentation." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). While enablement is a question of law, it rests on factual determinations decided by the jury. *BJ Servs. Co.*, 338 F.3d at 1371. To prove non-enablement, Qualcomm carries the burden to come forward with sufficient evidence to prove by clear and convincing evidence that the description fails to enable *any* mode of making and using the invention. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1070 (Fed. Cir. 2005).

Qualcomm cannot carry its burden to prove non-enablement for three reasons. *First*, Qualcomm's expert applied the legally incorrect test for enablement. Qualcomm's argument rests on an analysis of David Sorrells' technology tutorial testimony, not the patents themselves. Ex. 45 (Razavi Report) at ¶ 145. Qualcomm contends that the invention is non-enabling because Sorrells's presentation, as modified by Dr. Razavi, did not transfer energy in amounts distinguishable from noise (and interferers) when the harmonic was changed from n = 1 to n = 9, but no other input conditions or circuit component values were changed. This is the incorrect test for enablement. Enablement does not require that the invention must be shown to work for all potential sub-harmonic values at a particular set of input conditions and circuit component values. Instead, Qualcomm "can carry its burden only by showing that *all* of the disclosed alternative modes are insufficient to enable the claims." *See Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998) (emphasis added). Even if the jury finds that the

invention is not enabled at this single set of conditions and values chosen by Dr. Razavi, Qualcomm still has failed to show by clear and convincing evidence that the invention is not enabled for "*all* of the disclosed alternative modes." *Second*, the Patents-in-Suit provide examples operable at the ninth sub-harmonic. Figures 86, 88, 90, and 92 of the '551 Patent show example circuits operating at the ninth sub-harmonic. Ex. 50 at 108:56-109:20. Thus, the patents expressly describe embodiments operating at the ninth sub-harmonic and Dr. Razavi does not dispute nor address these examples in his report. *See Invitrogen*, 429 F.3d at 1071. *Finally*, Dr. Razavi admits that with "some small modifications" he could make the allegedly non-enabled circuit he modified work. Ex. 51 at 332:15-21. ParkerVision, through its expert Dr. Prucnal, demonstrated a circuit operable at the ninth sub-harmonic. Ex. 46 (Prucnal Rebuttal) at 28-30. Because the parties' experts agree that those of ordinary skill in the art can make embodiments of the invention work at the ninth sub-harmonic without undue experimentation, the claims by definition are enabled. *Wands*, 858 F.2d at 736.

### 3. Qualcomm cannot meet its burden to prove that any of the Asserted Claims are indefinite.

Indefiniteness is a legal determination for the Court. *BJ Servs. Co.*, 338 F.3d at 1372. As the Court noted in its August 26, 2013 Order, when the question of definiteness involves factual underpinnings, definiteness is amenable to jury resolution. *See* Dkt. 318 at 8.

Proof of indefiniteness must meet "an exacting standard." *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011). Only claims that cannot be construed—those claims that are "insolubly ambiguous"—are indefinite. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010). The burden is on Qualcomm to clearly demonstrate by clear and convincing evidence that "one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Wellman, Inc.*, 642 F.3d at 1366; *see also Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1301 (Fed. Cir. 2010) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one

23

over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."). That some claim language may not be precise does not automatically render a claim invalid. *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). Indeed, close questions of indefiniteness are properly resolved in favor of the patentee. *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1380 (Fed. Cir. 2001). The Court should reject Qualcomm's argument of indefiniteness because (1) the term "substantial" does not render Claims 161 and 202 of the '551 Patent indefinite, and (2) the term "accurate" does not render Claim 202 of the '551 Patent and Claim 91 of the '518 Patent indefinite.

### a) The term "substantial" does not render Claims 161 and 202 of the '551 Patent indefinite.

Qualcomm contends that Claims 161 and 202 of the '551 Patent are indefinite for using the phrase "substantial amounts of energy." Ex. 45 (Razavi Report) at ¶¶ 137-138. The Court should reject Qualcomm's argument for three reasons. *First*, the law is clear that the meaning of the term "substantial" in a patent claim is readily understandable and is not indefinite. *See, e.g.*, *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("This court has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim.").[12] *Second*, ParkerVision intends to show through its expert Dr. Prucnal that an expert would readily know the limitations imposed by the claims. *See* Ex. 46 (Prucnal Rebuttal Report) at 24-25. *Third*, the Court has already construed the allegedly indefinite term as a matter of law. In its Claim Construction Order, this Court construed "substantial amounts of energy" as "energy in amounts that are distinguishable from noise." Dkt. 243 at 10 & n.7, 13. Having construed the allegedly indefinite term as a matter of the law, the Court has already determined that the term "substantial amounts of energy" is not insolubly ambiguous.

---

[12] *See also LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359-60 (Fed. Cir. 2001) (the term "substantially completely wetted" was not indefinite because the intrinsic evidence helped elucidate the term's meaning); *Andrew Corp. v. Gabriel Elecs., Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988) (the phrase "substantially equal" was not indefinite and adding that "[s]uch usages, . . . have been accepted . . . and upheld by the courts.").

24

**b) The term "accurate" does not render Claim 202 of the '551 Patent and Claim 91 of the '518 Patent indefinite.**

Likewise, Qualcomm cannot meet the exacting standard required to prove that the term "accurate voltage reproduction" renders Claim 202 of the '551 Patent and Claim 91 of the '518 Patent indefinite The Court should conclude that the claims are readily understood by those of ordinary skill in the art, and therefore, not indefinite.

ParkerVision will demonstrate that the claims are sufficiently definite for the following two reasons: *first*, ParkerVision intends to show through Dr. Prucnal and David Sorrells that "accurate voltage reproduction" is not insolubly ambiguous and, therefore, that Claim 202 of the '551 Patent and Claim 91 of the '518 Patent are not invalid for indefiniteness. *Second*, Qualcomm's own expert, Dr. Razavi, applied this allegedly indefinite term with no difficulty in his validity analysis. *See* Ex. 45 (Razavi Report) at ¶¶ 315-17 (interpreting the phrase "substantially prevents accurate voltage reproduction of the carrier signal during apertures" to mean that "the input signal is negatively impacted or distorted during each aperture" and he contends that several references anticipate this claim limitation). A claim "that is amenable to construction is not invalid on the ground of indefiniteness." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006).[13]

**E.     ParkerVision Intends To Brief Injunctions At A Later Date.**

ParkerVision intends to request an injunction to prevent continued infringement by Qualcomm. ParkerVision will brief its request for an injunction post-trial.

**III.   CONCLUSION**

For the foregoing reasons, ParkerVision respectfully requests that the Court accept the above conclusions of law.

---

[13] *See also Apple, Inc., v. Samsung Elecs. Co.*, Case No. 11-CV-01846, 2013 U.S. Dist. LEXIS 13237, at *26 (N.D. Cal. Jan. 29, 2013) (expert's application of "substantially centered" to accused products supported conclusion that term was not insolubly ambiguous).

September 12, 2013

Respectfully submitted,

**McKOOL SMITH, P.C.**

/s/ *Douglas A. Cawley*
Douglas A. Cawley, Lead Attorney
Texas State Bar No. 04035500
E-mail: dcawley@mckoolsmith.com
Richard A. Kamprath
Texas State Bar No.: 24078767
rkamprath@mckoolsmith.com
Ivan Wang
Texas State Bar No.: 24042679
E-mail: iwang@mckoolsmith.com
McKool Smith P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

T. Gordon White
Texas State Bar No. 21333000
gwhite@mckoolsmith.com
Kevin L. Burgess
Texas State Bar No. 24006927
kburgess@mckoolsmith.com
Josh W. Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
Leah Buratti
Texas State Bar No. 24064897
lburatti@mckoolsmith.com
Mario A. Apreotesi
Texas State Bar No. 24080772
mapreotesi@mckoolsmith.com
Kevin Kneupper
Texas State Bar No. 24050885
kkneupper@mckoolsmith.com
James Quigley
Texas State Bar No. 24075810
jquigley@mckoolsmith.com
McKool Smith P.C.
300 West Sixth Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

**SMITH HULSEY & BUSEY**

/s/ *James A. Bolling*
Stephen D. Busey
James A. Bolling
Florida Bar Number 117790
Florida Bar Number 901253
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jbolling@smithhulsey.com

**ATTORNEYS FOR PLAINTIFF
PARKERVISION, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on September 12, 2013.

*/s/ Leah Buratti*
Leah Buratti