PARKERVISION, INC.,

       Plaintiff,

v.                                    Case No. 3:11-cv-719-J-37TEM

Qualcomm INCORPORATED,

       Defendant.

---

### JOINT FINAL PRETRIAL STATEMENT

Pursuant to the Case Management and Scheduling Order and Local Rule 3.06(c), Plaintiff Parkervision, Inc. ("ParkerVision") and Defendant, Qualcomm Incorporated ("Qualcomm") (collectively, "the Parties") respectfully submit this Joint Final Pretrial Statement.

## I. CERTIFICATION OF SETTLEMENT EFFORTS AND PRE-TRIAL COORDINATION EFFORTS AS REQUIRED BY LOCAL RULE 3.06(B)

As required by the Case Management and Scheduling Order and Local Rule 3.06(b), counsel for each party, including lead trial counsel for each party, met in person in Orlando, Florida on September 3, 2013. The parties met and conferred on issues identified in Local Rule 3.06(b).

ParkerVision's Position On The L.R. 3.06(b) Certification:

ParkerVision cannot agree to certify that the parties have properly met and conferred on objections to all proposed trial exhibits as required by L.R. 3.06(b). The Court specifically ordered the parties to meet and confer in person on objections to the trial exhibit list, dkt. 84 at 9-10, and it further stated in that order that "it is anticipated that counsel will agree to the admission of the bulk of the opposing parties' exhibits without objection . . ." First, late in the

evening on which the Joint Final Pretrial Statement was due, Qualcomm sent ParkerVision a revised exhibit list noting objections to various ParkerVision exhibits it had never previously included an objection to. Because these exhibits were first objected to well-after the in-person meet and confer, the parties have not had an opportunity to meet and confer in person on these exhibits. Qualcomm asserts that because these exhibits fall within the scope of one of their Motions in Limine, that the meet and confer requirement is satisfied. ParkerVision disagrees: in none of the parties' prior exhibit list exchanges did these exhibits have an objection from Qualcomm. Second, and despite the Court's instruction, Qualcomm refuses to designate more than a handful of exhibits as "Joint"—despite the fact that it seeks to affirmatively offer into evidence many of the exact same exhibits that are on ParkerVision's proposed trial exhibit list.[1] Third, on the day that this Joint Final Pretrial Statement was due, Qualcomm also added 25 new exhibits to its trial exhibit list (which ParkerVision was forced to superficially to review and object to at the last minute). Qualcomm's addition of exhibits after the in-person meet and confer also violates the Court's instructions to the parties.[2]

Qualcomm's position on the L.R. 3.06(b) Certification:

---

[1] The exhibits to which new objections were received include: PX9, PX44, PX45, PX46, PX49, PX50, PX53, PX54, PX55, PX56, PX62, PX63, PX64, PX65, PX76, PX82, PX86, PX87, PX88, PX99, PX100, PX104, PX105, PX106, PX110, PX114, PX115, PX116, PX117, PX118, PX119, PX120, PX121, PX122, PX123, PX124, PX125, PX127, PX141, PX143, PX144, PX145, PX146, PX150, PX152, PX153, PX155, PX157, PX159, PX161, PX167, PX168, PX174, PX175, PX178, PX179, PX181, PX182, PX183, PX184, PX188, PX189, PX193, PX195, PX196, PX197, PX201, PX202, PX203, PX205, PX206, PX207, PX208, PX209, PX210, PX211, PX212, PX213, PX216, PX217, PX218, PX220, PX221, PX222, PX223, PX224, PX225, PX226, PX227, PX228, PX229, PX232, PX233, PX234, PX235, PX241, PX242, PX244, PX245, PX246, PX247, PX251, PX252, PX253, PX255, PX256, PX258, PX260, PX262, PX263, PX264, PX265, PX266, PX269, PX271, PX272, PX279, PX282, PX296, PX297, PX302, PX307, PX310, PX312, PX313, PX314, PX874, PX875, PX937, PX938, PX940, PX951, PX953

[2] The exhibits received today include DX1720 - DX1744.

ParkerVision does not accurately describe the parties' meet-and-confer process. First, the parties met and conferred for many hours both in person and by telephone on objections to specific exhibits, "buckets" of objections to categories of exhibits, and the parties' motions in limine. On the motions in limine, the parties agreed that motion-in-limine-related objections need not be made for each individual exhibit to which the motion in limine applied. When that agreement proved unworkable for some documents, Qualcomm added objections to the exhibit list to clarify how the motions in limine applied to certain specific documents. ParkerVision's attempt to characterize those objections as "new" simply has no basis. Second, ParkerVision misstates the discussions regarding the joint exhibit list. The mere inclusion of an exhibit on one party's exhibit list, such as a party admission by the other side, does not waive objections to the other side introducing the document. The current joint exhibit list includes documents as to which neither side has any objections but does not include exhibits that happen to be on both parties' lists but as to which objections remain. Third, both parties have added exhibits since the in-person meet-and-confer. Qualcomm's inclusion of 25 additional documents related to topics the parties had already met-and-conferred on did not prejudice ParkerVision's ability to make the same objections to those documents that it had previously made to other, related documents. In fact, ParkerVision added its objections within hours of the exhibits being noted.

## II. STATEMENT OF JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 1 *et seq*.

Venue and personal jurisdiction are not disputed in this case. The parties do not contest that ParkerVision has standing to bring this suit.

## III. CONCISE STATEMENT OF THE NATURE OF THE ACTION

This is a patent infringement lawsuit. ParkerVision alleges that Qualcomm directly and indirectly infringes U.S. Patent Nos. 6,061,551 ("the '551 patent"), 6,266,518 ("the '518 patent"), 6,370,371 ("the '371 patent"), and 7,496,342 ("the '342 patent") (collectively, the "Patents-in-Suit").[3] ParkerVision alleges that Qualcomm infringes either literally or, in the alternative, under the doctrine of equivalents. Additionally, ParkerVision contends that Qualcomm's infringement was willful. ParkerVision seeks both pre-verdict and post-verdict damages up to the time of judgment to compensate ParkerVision for Qualcomm's acts of infringement, but in no event less than a reasonable royalty, as well as injunctive relief against future acts of infringement by Qualcomm under 35 U.S.C. § 283. In the alternative, ParkerVision contends that any denial of a permanent injunction should be conditioned on payment of future reasonable royalties. ParkerVision also seeks prejudgment and post judgment interests and costs, pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285, as well as treble damages against Qualcomm.

Qualcomm denies ParkerVision's allegations and requests for relief. Qualcomm denies that it has infringed literally, under the doctrine of equivalents, directly, or indirectly. Qualcomm contends that ParkerVision has failed to preserve any doctrine-of-equivalents or contributory infringement claims and objects to their inclusion in the joint pre-trial statement. Qualcomm also contends that all asserted claims of the Patents-in-Suit are invalid under 35 U.S.C. §§ 102, 103, and/or 112, for anticipation, obviousness, non-enablement, and indefiniteness. Qualcomm contends that ParkerVision's claim for pre-suit damages is barred by the equitable doctrine of laches. Qualcomm denies all allegations of willful infringement. Qualcomm denies that

---

[3] The parties have jointly agreed to dismiss their claims and counterclaims with respect to two previously asserted patents. The parties will file a joint motion to this effect shortly.

ParkerVision is entitled to any past or future damages, enhanced damages, an injunction, or an ongoing royalty. Qualcomm seeks its costs and, pursuant to 35 U.S.C. § 285, its attorneys' fees.

## IV. BRIEF, GENERAL STATEMENT OF EACH PARTY'S CASE

### A. ParkerVision's Case

#### 1. Background of the Dispute

This case involves ParkerVision's patented down-conversion technology, sometimes referred to as energy transfer sampling, energy sampling, or direct-to-data ("D2D"), which makes receivers in cell phones and tablets smaller, more power efficient, and able to be used on different mobile phone networks. Prior technologies, including superheterodyne and direct conversion analog-mixer, used methods that require numerous parts and supporting components to work properly, were large and expensive, had high power consumption and limited flexibility to meet cell phone standards and frequencies, and/or had reduced dynamic range. Other approaches that the industry had tried to develop for decades, such as voltage samplers and track-and-hold samplers, were never able to achieve the performance required for high-performance products such as cell phones and tablets. ParkerVision's technology, on the other hand, achieves performance in ways that previous methods never could. Specifically, it simultaneously achieves power efficiency, size and integration benefits, greater range, better noise and interference rejection, higher quality signal, better dynamic range, and overall reduced cost.

The breakthrough occurred in 1996 when a group of ParkerVision engineers, including David Sorrells, discovered that receiver sensitivity could be increased by transferring power during the sampling down-conversion process. In energy transfer sampling, a signal's energy is transferred and accumulated in a storage device, where controlled charge and discharge cycles create the down-converted baseband signal—which is the information sent on the carrier.

Thereafter, ParkerVision developed prototype chips, and conducted various tests and measurements over a period of approximately one year, concluding that their unique sampling technique provided an optimal solution for direct conversion receivers and many types of RF carrier waveforms. The Patents-in-Suit resulted from ParkerVision's research and development efforts.

From 1998 through 1999, ParkerVision and Qualcomm conducted negotiations over whether Qualcomm would license ParkerVision's energy transfer sampling technology. Qualcomm was enthusiastic about ParkerVision's technology. However, fundamentally believing in the value of its technology and being of the opinion that Qualcomm was not negotiating reasonably, ParkerVision was unwilling to agree to the financial terms Qualcomm offered, and ParkerVision broke off licensing discussions in mid- to late 1999. The parties went their separate ways. However, as the need for smaller, more efficient receivers able to support multiple frequency bands came to the forefront in the mid-2000s, Qualcomm—unbeknownst to ParkerVision—began designing and selling infringing receivers. Despite introducing infringing receivers, Qualcomm never returned to ParkerVision for a license. Instead, ParkerVision independently discovered Qualcomm's infringement in 2011. In mid-2011, after confirming Qualcomm's infringement, ParkerVision filed suit against Qualcomm.

### 2. The Patents-in-Suit

ParkerVision is the sole and exclusive owner of all rights, title and interest to the following valid and enforceable Patents-in-Suit:

| U.S. PATENT NO. | DATE ISSUED | TITLE |
|---|---|---|
| 6,061,551 | May 9, 2000 | Method and System for Down-Converting Electromagnetic Signals |

| U.S. PATENT NO. | DATE ISSUED | TITLE |
|---|---|---|
| 6,266,518 | July 24, 2001 | Method and System for Down-Converting Electromagnetic Signals by Sampling and Integrating Over Apertures |
| 6,370,371 | April 9, 2002 | Applications of Universal Frequency Translation |
| 7,496,342 | February 24, 2009 | Down-Converting Electromagnetic Signals, Including Controlled Discharge of Capacitors |

The Patents-in-Suit generally relate to methods, systems, and apparatuses used to convert electromagnetic signals from higher frequencies to lower frequencies. Such down-conversion is used, for instance, in the operation of cellular telephones.

ParkerVision owned the Patents-in-Suit throughout the period of Qualcomm's infringement and still owns the Patents-in-Suit. ParkerVision has not granted Qualcomm a license to practice the Patents-in-Suit.

The invention date for the '551, '518, and '371 patents is March 6, 1997, rather than each patent's effective filing date of October 21, 1998. For the '342 patent, the invention date is the effective date of filing, April 14, 2000.

### 3. ParkerVision's Infringement Contentions

Qualcomm's infringing products are receivers, transceivers, and integrated transceivers and basebands that Qualcomm's customers incorporate into cell phones and other devices. Qualcomm's infringing products (the "Accused Products") include the following Qualcomm receiver design architectures: Astra, Bahama, Eagleray, GZIF3, GZIF4, Halley, Hercules, Iceman, Iris, Libra/Gemini, Magellan, Merlin (QCT), Napoleon, Odyssey, Ramsis, Solo, Volans, Voltron, and Ywing. These design architectures correspond to the following individual integrated circuits: RGR6240, WCN2243, FTR8700, RTR6275, RTR6237, RTR6280, RTR6285, RTR6285A, MXU6219, QTR9215, RTR8700, RTR9605, WCN3660, WCN1312, MDM6200,

MDM6600, QSC6155, QSC6175, QSC6185, QSC6295, QSC6695, QTR8200, QTR8600, QTR8600L, QTR8601, QTR8615, QTR8615L, RTR8600, RTR8601, RTR8605, QSC1105, QSC1100, QSC1110, WTR1605, WTR1605L, QSC6055, QSC6065, QSC6075, QSC6085, MDM6085, QSC6270, QSC6240, MDM6270, ESC6270, ESC6240, WCN1314, RTR6500, and WCN1320.

Each of the Accused Products directly infringes claims 23, 25, 161, 193, and 202 of the '551 patent; claims 1, 27, 82, 90, and 91 of the '518 patent; claim 2 of the '371 patent; and claim 18 of the '342 patent (the "Asserted Claims")[4] under 35 U.S.C. §§ 271 and 281-285, literally and/or under the doctrine of equivalents. Qualcomm is directly liable for the infringement of the Accused Products because it makes, uses, offers to sell, sells, and/or imports each of the Accused Products into the United States, without authority or license from ParkerVision.

Qualcomm indirectly infringes the Asserted Claims of each of the Patents-in-Suit by active inducement under 35 U.S.C. § 271(b). Qualcomm has induced and continues to induce its customers and/or users of the Accused Products to directly infringe the Asserted Claims of each of the Patents-in-Suit. Qualcomm specifically intends for its customers and/or users of the Accused Products to directly infringe the Asserted Claims of each of the Patents-in-Suit in the United States. Qualcomm knew of or was willfully blind to each of the Patents-in-Suit before the July 20, 2011 filing of the original complaint by ParkerVision. Qualcomm designed the Accused Products such that they would each infringe the Asserted Claims of each of the Patents-in-Suit if made, used, sold, offered for sale or imported into the United States. Qualcomm knows that the customers and/or users of the Accused Products will directly infringe the Asserted

---

[4] The parties have jointly agreed to dismiss their claims and counterclaims with respect to many of the previously asserted claims of the patents-in-suit. The parties will file a joint motion to this effect shortly.

Claims of each of the Patents-in-Suit when those customers and/or users make, use, sell, offer to sell, and/or import into the United States the Accused Products and/or cellular telephones and mobile devices that include the Accused Products.

Qualcomm indirectly infringes the Asserted Claims of each of the Patents-in-Suit by contributory infringement under 35 U.S.C. § 271(c). Qualcomm has contributed to and continues to contribute to the direct infringement of the Asserted Claims of each of the Patents-in-Suit by customers and/or users of the Accused Products. Qualcomm knew of or was willfully blind to each of the Patents-in-Suit before ParkerVision filed the original complaint on July 20, 2011. Since then, Qualcomm has sold, offered to sell, and/or imported into the United States the Accused Products, which Qualcomm knows to be especially made or adapted for use in infringing the Asserted Claims of each of the Patents-in-Suit such that they would infringe the Asserted Claims of each of the Patents-in-Suit if made, used, sold, offered for sale or imported into the United States. The direct conversion receiver technology within the Accused Products has no substantial use that does not infringe the Asserted Claims of each of the Patents-in-Suit.

Qualcomm lacks justifiable belief that there is no infringement, or that the infringed claims are invalid, and has acted with objective recklessness in its infringing activity. Moreover, Qualcomm has long known about each of the Patents-in-Suit, or was willfully blind to the existence of the Patents-in-Suit. Therefore, Qualcomm's infringement is and has been willful.

### 4. ParkerVision Has Suffered Harm as a Result of Qualcomm's Infringement

Qualcomm's acts of direct, contributory, and induced infringement have caused damage to ParkerVision, and ParkerVision is entitled to recover compensatory damages sustained as a result of Qualcomm's wrongful acts in the form of a reasonable royalty. Unless enjoined by this Court, Qualcomm will continue to infringe the Patents-in-Suit, continuing to damage

ParkerVision and causing irreparable harm. ParkerVision therefore requests that this Court enter a permanent injunction enjoining Qualcomm from continuing to infringe each of the Patents-in-Suit. In the alternative, ParkerVision contends that any denial of an injunction should be conditioned on payment of reasonable royalties for future infringement, including during any stay of an injunction pending appeal. Qualcomm's infringement is willful, and ParkerVision is therefore entitled to an award of exemplary damages, attorneys' fees, and costs in bringing this action.

### B. Qualcomm's Case

In 1998 and 1999, Qualcomm was using a superheterodyne (multistage) downconversion architecture. At that time, ParkerVision and Qualcomm discussed a potential business relationship involving ParkerVision's direct downconversion technology, "D2D." Based on ParkerVision's bold claims about its technology, Qualcomm was intrigued and assigned some engineers to evaluate the ParkerVision technology. Although the engineering analysis had raised serious questions about the value of ParkerVision's technology, Qualcomm engaged in financial discussions regarding a potential technology transfer and license if ParkerVision's technology could be made to work and was better than other available technologies. The parties never reached agreement.

ParkerVision had significant difficulty demonstrating the viability of its proposed technology. By the time the financial discussions ended in mid-1999, the RF engineering specialists within Qualcomm had concluded that the ParkerVision technology was not particularly novel, would require substantial effort by Qualcomm to incorporate into any cell phone product—if it even could—and that Qualcomm could independently develop its own direct downconversion technology using a different and reliable approach. That is exactly what Qualcomm did. Qualcomm's initial ZIF direct downconversion products—which ParkerVision

has not accused of infringement—were sold by the millions for many years starting in the early 2000's.

Then in approximately 2005, Qualcomm saw an opportunity to purchase a company called Berkana Wireless. Berkana had a number of interesting technologies, including technologies that Qualcomm could immediately incorporate into its next generation of receivers—thereby quickening the time to market. Qualcomm paid over $50 million for Berkana, and then proceeded to combine Berkana's various receiver technologies, which included a direct downconverter, into the existing Qualcomm designs. That is when ParkerVision alleges that Qualcomm's infringement began.

But Qualcomm's ZIF and Berkana-based designs are fundamentally different from ParkerVision's D2D "energy sampler" in many important respects. Qualcomm went a completely different direct downconversion route and Qualcomm's technology does not infringe ParkerVision's very different "energy sampling" technology. Qualcomm is not aware that any ParkerVision "energy sampling" or D2D technology is in use in any cell phone device and, based on the description of the latest product ParkerVision has promoted on its website, ParkerVision itself has not been able to create a viable receiver product for use in cellular devices. Qualcomm's products are different, do not use energy sampling or D2D, do not infringe the patents, and have been used successfully in millions of devices around the world. In addition, ParkerVision's patents are invalid for multiple reasons, including anticipation, obviousness, non-enablement, and indefiniteness.

Indirect infringement and willful infringement require additional elements of proof beyond whether Qualcomm's products meet the limitations of the asserted claims. For example, to prove indirect or willful infringement, ParkerVision must establish that Qualcomm acted with

a culpable state of mind. For example, inducement requires that ParkerVision prove Qualcomm knew of the patents-in-suit and knew that the patents were valid and infringed by third parties. Qualcomm did not believe and does not believe that it infringes any of the Patents-in-Suit or that they are valid. Qualcomm does not believe that D2D could be used in a working, commercially viable receiver – the kind of product Qualcomm must design and produce to satisfy its customers. Qualcomm never intended to induce any customer to infringe the patents-in-suit. Thus, ParkerVision cannot prevail on its indirect infringement claim—which is the basis for virtually all of the alleged damages in this case.

Finally, with respect to damages, Qualcomm contends that ParkerVision's outsized request has no relationship to these patents or any reasonable assessment of their contribution to technology, even assuming they are valid. Further, ParkerVision's damages theory is based on improper assumptions and factors that have clearly been prohibited by law. By way of background, ParkerVision has entered into scores of NDAs so companies could evaluate its technology. Not a single one has ever produced a product using the technology. The market's decision not to use ParkerVision's technology is strong evidence that it does not provide any real value over other technology.



Thus, even if liability is assumed, a proper damages calculation would result in a small fraction of the damages

sought by ParkerVision. ParkerVision's damages theory—that Qualcomm would have agreed to pay hundreds of millions of dollars in 2006 for technology that has generated a total of █████ from the entire industry—simply has no support in the objective market evidence.

## V. LIST OF ALL EXHIBITS AND RULE 5.04 EXHIBIT SUBSTITUTES TO BE OFFERED AT TRIAL WITH NOTATION OF ALL OBJECTIONS THERETO

See Attachments A-1 (ParkerVision's Exhibit Lists); A-2 (Qualcomm's Exhibit List); and A-3 (Joint Exhibit List) to this Statement.

The parties are working together on a procedure for maintaining at trial the confidentiality of a limited number of highly confidential technical and business documents designated pursuant to the parties' Confidentiality Agreement (see Attachment A).

The parties each reserve the right to omit or withdraw any exhibit that party has designated for use at trial. The parties agree that a party's listing of a document on its own exhibit list is not an admission that the document is admissible as evidence if introduced by the other party. Any exhibit, once admitted, may be used equally by either party subject to any limitations as to its admission into evidence. The parties reserve the right to use any demonstrative used by the other party at any time during the trial (including electronic display). The parties reserve the right to present electronic copies of demonstratives furnished in paper form in connection with the pretrial process and to modify such demonstratives.

The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding that exhibit.

## VI. LIST OF ALL WITNESSES WHO MAY BE CALLED AT TRIAL

See Attachments B-1 (ParkerVision's Witness List) and B-2 (Qualcomm's Witness List) to this Statement.

## VII. LIST OF ALL EXPERT WITNESSES INCLUDING, AS TO EACH WITNESS, A STATEMENT OF THE SUBJECT MATTER AND A SUMMARY OF HIS OR HER TESTIMONY

### A. Retained Experts to be Offered by ParkerVision

#### 1. Paul Prucnal

Dr. Prucnal is an expert witness for ParkerVision who is expected to offer opinions about the topics identified in his expert reports, previously testified to in his deposition, or based on updated information subsequently provided by Qualcomm or its experts. Dr. Prucnal will testify as to issues of infringement and invalidity. Dr. Prucnal's expertise relates to RF receiver design and functionality, RF communication systems, optical communications, electrical engineering, the state of the art, the level of skill of one of ordinary skill in the art, and the existence, relevancy, meaning, and significance of art in the field.

#### 2. Paul Benoit

Mr. Benoit is an expert witness for ParkerVision who is expected to offer opinions about the topics identified in his expert reports, previously testified to in his deposition, or based on updated information subsequently provided by Qualcomm. Mr. Benoit's will testify as to the amount of damages that ParkerVision is entitled to as a result of Qualcomm's infringement. Mr. Benoit's expertise relates to accounting, economics, and finance.

### B. Fact Witnesses Who Will Offer Expert Testimony[5]

#### 1. Jeffrey Parker

Mr. Parker is the President and Chief Executive Officer of ParkerVision. He is expected to offer opinions regarding the topics identified in his Rule 26(a)(2)(C) disclosure, previously testified to in his deposition, or based on updated or non-confidential information provided by Qualcomm. In addition to testifying as a fact witness, Mr. Parker will provide expert testimony as to the amount of damages that Qualcomm should be required to pay ParkerVision to compensate it for infringement and the amount of a royalty that ParkerVision would have reasonably accepted in any actual or contemplated negotiation between ParkerVision and Qualcomm. Mr. Parker's expertise relates to the wireless communications industry, business negotiations, and licensing agreements.

#### 2. David Sorrells

Mr. Sorrells is the Chief Technology Officer of ParkerVision and one of the inventors of each of the Patents-in-Suit. He is expected to offer opinions regarding the topics identified in his Rule 26(a)(2)(C) disclosure, previously testified to in his deposition, or based on updated or non-confidential information provided by Qualcomm. Mr. Sorrells's expertise relates to receiver design and functionality, the state of the art, the level of skill of one or ordinary skill in the art, and the existence, relevancy, meaning, and significance of art in the field. In addition to testifying as a fact witness, Mr. Sorrells will testify regarding Qualcomm's infringement of the Patents-in-Suit and validity of the Patents-in-Suit.

---

[5] As detailed in Qualcomm's pending motions in limine, Qualcomm objects to ParkerVision's proffer of expert testimony from Mr. Parker and Mr. Sorrells. (Dkt. 325.) As ParkerVision will detail and set out in its response to Qualcomm's motions in limine, Mr. Parker and Mr. Sorrells each filed expert disclosures pursuant to FED. R. CIV. P. 26(a)(2)(C). In addition, both Mr. Parker and Mr. Sorrells are qualified to provide the disclosed expert testimony.

### C. Retained Experts to be Offered by Qualcomm

#### 1. Dr. Behzad Razavi

Dr. Razavi is an expert witness for Qualcomm who is expected to offer opinions about the topics identified in his expert reports, previously testified to in his deposition, or based on updated information subsequently provided by ParkerVision or its experts (if allowed). Dr. Razavi will testify as to issues of invalidity, including the state of the art before the filing of ParkerVision's asserted claims. Dr. Razavi's expertise includes RF receiver/transceiver design and functionality, RF communication systems, electrical engineering, the state of the art, the level of skill of one of ordinary skill in the art, and the existence, relevancy, meaning, and significance of art in the field.

#### 2. Dr. Robert Fox

Dr. Fox is an expert witness for Qualcomm who is expected to offer opinions about the topics identified in his expert reports, previously testified to in his deposition, or based on updated information subsequently provided by ParkerVision or its experts (if allowed). Dr. Fox will testify as to issues of non-infringement. Dr. Fox's expertise includes RF receiver/transceiver design and functionality, RF communication systems, electrical engineering, the state of the art, the level of skill of one of ordinary skill in the art, and the existence, relevancy, meaning, and significance of art in the field.

#### 3. Dr. Tim Williams

Dr. Williams is an expert witness for Qualcomm who is expected to offer opinions about the topics identified in his expert reports, previously testified to in his deposition, or based on updated information subsequently provided by ParkerVision or its experts (if allowed). Dr. Williams will testify as to issues relevant to invalidity and damages. Dr. William's expertise includes RF receiver/transceiver design and functionality, RF communication systems, electrical

engineering, the state of the art, the level of skill of one of ordinary skill in the art, the existence, relevancy, meaning, and significance of art in the field, the value of any alleged inventions in the Patents-in-Suit, cellular communication systems, and commercial aspects of the wireless communications industry.

### 4. Dr. Gregory Leonard

Dr. Leonard is an expert witness for Qualcomm who is expected to offer opinions about the topics identified in his expert reports, previously testified to in his deposition, or based on updated information subsequently provided by ParkerVision (if allowed). Dr. Leonard will testify as to issues of damages. Dr. Leonard's expertise includes economics.

### 5. Joseph Hanna

In any proceedings related to any request for an injunction, Qualcomm also expects to offer the opinion of Mr. Hanna. He will testify regarding opinions about the topics identified in his expert reports and previously testified to in his deposition. His expertise includes emergency communications systems and the importance of certain communications technology to emergency communication networks.[6]

---

[6] Qualcomm notes that ParkerVision has not preserved the ability to present any expert testimony regarding the *eBay* factors for any request for injunctive relief. To the extent that the testimony of ParkerVision's experts is relevant to the *eBay* factors, ParkerVision has adequately preserved the ability to present such testimony in its request for injunctive relieve. Furthermore, in its response to a Qualcomm interrogatory on the *eBay* factors, ParkerVision identified Mr. Parker as the person most knowledgeable on the related evidence. ParkerVision's Resp. to Qualcomm Interr. No. 14 (Nov. 16, 2012). ParkerVision notes that expert testimony is not required for testimony regarding the *eBay* factors of a request for injunctive relief.

McKool 905908v8

**VIII. IN CASES IN WHICH ANY PARTY CLAIMS MONEY DAMAGES, A STATEMENT OF THE ELEMENTS OF EACH SUCH CLAIM AND THE AMOUNT BEING SOUGHT WITH RESPECT TO EACH SUCH ELEMENT**

ParkerVision is entitled to damages under 35 U.S.C. § 284 for Qualcomm's past acts of infringement. ParkerVision alleges it is entitled to a reasonable royalty for Qualcomm's past direct infringement, totaling at least ███████ for the period from January 2006 through October 2013. ParkerVision alleges it is entitled to a reasonable royalty for Qualcomm's past indirect infringement (induced and contributory infringement), totaling at least ███████ for the period from January 2006 through October 2013. ParkerVision seeks an updated accounting from Qualcomm for use in updating the foregoing totals. ParkerVision has requested updated financial information from Qualcomm and expects to provide testimony on this updated information (if timely obtained from Qualcomm).

In addition to the foregoing actual damages and accounting sought at trial, ParkerVision intends to seek, by way of post-trial motion in the event of a finding of liability, an enhancement of actual damages due to willful infringement, prejudgment interest, postjudgment interest, costs, and an award of attorneys' fees under 35 U.S.C. § 285 upon an "exceptional case" finding by the Court.

Qualcomm denies liability and that ParkerVision is entitled to any remedy. Following a verdict, Qualcomm intends to seek costs and an award of attorneys fees.

**IX. LIST OF ALL DEPOSITIONS TO BE OFFERED IN EVIDENCE AT TRIAL (AS DISTINGUISHED FROM POSSIBLE USE FOR IMPEACHMENT), INCLUDING A DESIGNATION OF THE PAGES AND LINES TO BE OFFERED FROM EACH DEPOSITION**

See Attachments C-1 (ParkerVision's designations) and C-2 (Qualcomm's designations) to this Statement.

The parties are working together on a procedure for maintaining at trial the confidentiality of a limited number of highly confidential deposition testimony designated pursuant to the parties' Confidentiality Agreement (see Attachment A).

The parties each reserve the right to omit or withdraw deposition selections before or during trial.

## IX. CONCISE STATEMENT OF STIPULATED FACTS AND WILL REQUIRE NO PROOF AT TRIAL, TOGETHER WITH ANY RESERVATIONS DIRECTED TO SUCH STIPULATIONS

### Litigation

1. ParkerVision filed its Original Complaint on July 20, 2011.

2. Qualcomm filed its Answer, Defenses, and Counterclaims in response to ParkerVision's original Complaint on September 16, 2011.

3. ParkerVision filed its First Amended Complaint on February 28, 2012.

4. Qualcomm filed its Answer, Defenses, and Counterclaims in response to ParkerVision's First Amended Complaint on March 16, 2012.

5. ParkerVision filed its Second Amended Complaint on August 30, 2012.

6. ParkerVision filed its Third Amended Complaint on August 30, 2012.

7. Qualcomm filed its Answer, Defenses, and Counterclaims in response to ParkerVision's Third Amended Complaint on April 11, 2013.

8. ParkerVision filed its Answer to Qualcomm's Counterclaims on May 6, 2013.

### Corporate Information

9. ParkerVision is a Florida corporation with its principal place of business at 7915 Baymeadows Way, Jacksonville, Florida 32256.

10. ParkerVision was founded in 1989.

11. Qualcomm is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California, 92121.

12. Qualcomm was founded in 1985.

**Accused Products**

13.     Electromagnetic waves are characterized by frequency (or "period" or "cycle") and amplitude.

14.     Electromagnetic waves are also characterized by phase.

15.     The Accused Products fall into three categories: (a) receivers; (b) transceivers, which contain both a receiver and a transmitter; and (c) integrated transceivers/basebands, which combine a transceiver with a baseband processor on a single chip or package.

16.     A transmitter is a device that converts a signal into a form that can be sent over the air, and then sends the converted signal over the air.

17.     A receiver is a device that receives radio frequency signals from the air, and converts those signals into a form that can be used in later processing to convert back into the original signal.

18.     A transceiver combines a receiver with a transmitter on a single chip or in a single package.

19.     Each of the Accused Products is a single unitary product, meaning that it is an individual chip or package that is sold as an indivisible unit.

20.     The Qualcomm dies at issue in this litigation are:  Astra, Bahama, Eagleray, GZIF3, GZIF4, Halley, Hercules, Iceman, Iris, Libra/Gemini, Magellan, Merlin (QCT), Napoleon, Odyssey, Ramsis, Solo, Volans, Voltron, and Ywing.  For purposes of infringement or noninfringement, the design, circuitry, and operation of the accused products created from a particular die is the same. A showing that an accused product created from a particular die infringes an asserted claim is also a showing that the other accused products created from that die also infringe the same claim.  Likewise, a finding that a particular die does not infringe one or more asserted claims of the patents-in-suit also requires a finding that the accused products associated with that die do not infringe the same claims.

        The table below categorizes the products accused of infringement by product name and die.  These products are referred to as the "Accused Products":

| Die Name | Products |
|----------|----------|
| Astra | RGR6240 |
| Bahama | WC2243 |
| Eagleray | FTR8700 |

| Die Name | Products |
|---|---|
| GZIF3 | RTR6275 |
| GZIF4 | RTR6237, RTR6280, RTR6285, RTR6285A, MXU6219 |
| Halley | QTR9215 |
| Hercules | RTR8700 |
| Iceman | RTR9605 |
| Iris | WCN3660 |
| Libra/Gemini | WCN1312 |
| Magellan | MDM6200, MDM6600, QSC6155, QSC6175, QSC6185, QSC6295, QSC6695, QTR8200, QTR8600, QTR8600L, QTR8601, QTR8615, QTR8615L, RTR8600, RTR8601, RTR8605 |
| Merlin (QCT) | QSC1105 |
| Napoleon | QSC1100, QSC1110 |
| Odyssey | WTR1605, WTR1605L |
| Ramsis | QSC6055, QSC6065, QSC6075, QSC6085, MDM6085 |
| Solo | QSC6240, ESC6240, MDM6270, ESC6270, QSC6270 |
| Volans | WCN1314 |
| Voltron | RTR6500 |
| Ywing | WCN1320 |

21. A commercial sample of the RGR6240 was first produced on November 12, 2008.

22. A commercial sample of the WCN2243 was first produced on December 31, 2010.

23. A commercial sample of the FTR8700 was first produced on April 14, 2011.

24. A commercial sample of the RTR6275 was first produced in 2006.

25. A commercial sample of the RTR6237 was first produced on June 29, 2007.

McKool 905908v8

26.    Commercial samples of the RTR6280 and RTR6285 were first produced on June 30, 2007.

27.    A commercial sample of the RTR6285A was first produced on August 15, 2011.

28.    A commercial sample of the MXU6219 was first produced on February 28, 2007.

29.    A commercial sample of the QTR9215 was first produced on June 30, 2011.

30.    A commercial sample of the WCN3660 was first produced on December 19, 2011.

31.    A commercial sample of theWCN1312 was first produced on April 28, 2010.

32.    Commercial samples of the MDM6200 and MDM6600 were first produced on January 31, 2011.

33.    Commercial samples of the QSC6155, QSC6185, and QSC6695 were first produced on September 30, 2010.

34.    Commercial samples of the QSC6175, QSC6295, QTR8601, RTR8600, and RTR8601 were first produced on June 30, 2010.

35.    A commercial sample of the QTR8200 was first produced on March 30, 2010.

36.    Commercial samples of the QTR8600, QTR8600L, and RTR8605 were first produced on March 31, 2010.

37.    A commercial sample of the QTR8615 was first produced on December 23, 2010.

38.    A commercial sample of the QTR8615L was first produced on March 24, 2011.

39.    A commercial sample of the QSC1105 was first produced on December 30, 2011.

40.    A commercial sample of the QSC1100 was first produced on February 27, 2009.

41.    A commercial sample of the QSC1110 was first produced on December 17, 2008.

42.    A commercial sample of the WTR1605 was first produced on April 30, 2012.

43.    A commercial sample of the QSC6055 was first produced on June 30, 2007.

44.    Commercial samples of the QSC6065 and QSC6075 were first produced on December 21, 2007.

45.    A commercial sample of the QSC6085 was first produced on April 21, 2008.

46.    A commercial sample of the MDM6085 was first produced on February 15, 2010.

47.     Commercial samples of the QSC6270, QSC6240, ESC6270, and ESC6240 were first produced on December 5, 2008.

48.     A commercial sample of the MDM6270 was first produced on June 30, 2010.

49.     A commercial sample of the WCN1314 was first produced on October 31, 2011.

50.     A commercial sample of the RTR6500 was first produced on November 15, 2007.

51.     A commercial sample of the WCN1320 was first produced on October 15, 2009.

**Qualcomm's Baseband Technology**

52.     Qualcomm receivers/transceivers are designed to function in conjunction with a Qualcomm baseband processor.

**Patents-in-Suit**

53.     U.S. Patent No. 6,061,551 ("the '551 patent") issued on May 9, 2000 and is entitled "Method and System for Down-Converting Electromagnetic Signals."

54.     The application for the '551 patent was filed on October 21, 1998.

55.     The prosecution history of the '551 Patent includes a reference to U.S. Patent Application Serial No. 09/376,359, now U.S. Patent No. 6,266,518 ("the '518 Patent").

56.     The named inventors of the '551 patent are David F. Sorrells, Michael J. Bultman, Robert W. Cook, Richard C. Looke, and Charley D. Moses, Jr.

57.     The '518 patent issued on July 24, 2001 and is entitled "Method and System for Down-Converting Electromagnetic Signals by Sampling and Integrating Over Apertures."

58.     The application for the '518 patent was filed on August 18, 1999.

59.     The '518 Patent is a continuation of the '551 patent.

60.     The named inventors of the '518 patent are David F. Sorrells, Michael J. Bultman, Robert W. Cook, Richard C. Looke, and Charley D. Moses, Jr.

61.     U.S. Patent No. 6,370,371 ("the '371 patent") issued on April 9, 2002 and is entitled "Applications of Universal Frequency Translation."

62.     The '371 patent is a continuation-in-part of U.S. Patent Application Serial No. 09/176,027.

63.     The named inventors of the '371 patent are David F. Sorrells, Michael J. Bultman, Robert W. Cook, Richard C. Looke, and Charley D. Moses, Jr.

McKool 905908v8

64. The application for the '371 patent was filed on March 3, 1999.

65. U.S. Patent No. 7,496,342 ("the '342 patent") issued on February 24, 2009 and is entitled "Down-Converting Electromagnetic Signals, Including Controlled Discharge of Capacitors."

66. The '342 patent is a divisional of U.S. Patent No. 7,010,286, filed May 16, 2001, which is a continuation-in-part of U.S. Patent Application Serial No. 09/550,644, filed on April 14, 2000, which is a continuation-in-part of U.S. Patent Application Serial No. 09/293,342, filed on April 16, 1999, which is a continuation-in-part of U.S. Patent Application Serial No. 09/176,022, now the '551 Patent.

67. The named inventors of the '342 patent are David F. Sorrells, Michael J. Bultman, Robert W. Cook, Richard C. Looke, Charley D. Moses, Jr., Gregory S. Rawlins, and Michael W. Rawlins.

68. ParkerVision is the assignee of the '551 patent, the '518 patent, the '371 patent, and the '342 patent.

69. ParkerVision is the sole and exclusive owner of all rights, title, and interest to the '551 patent, the '518 patent, the '371 patent, and the '342 patent.

**Claim Terms**

70. The parties agree as to the meanings of the following claim terms

| Claim Term | Agreed Meaning |
|---|---|
| "carrier signal" | "an electromagnetic wave that is capable of carrying information via modulation" |
| "aliasing rate" | "sampling rate that is less than or equal to twice the frequency of the carrier signal" |
| "aperture periods" | "the durations of time over which energy is transferred from the carrier signal" |
| "electrically coupling" | "indirectly or directly connecting such that an electric signal can flow between the coupled points" |
| "baseband signal" | "any generic information signal desired for transmission and/or reception" |

**References Identified as Prior Art by Qualcomm**

71. The following references identified by Qualcomm as prior art appear on the face of Patents-in-Suit. Additionally, the file histories for the Patents-in-Suit includes disclosure documents on which the Patent Examiner marked his initials next to each of the following references identified by Qualcomm as prior art:

- U.S. Patent No. 4,346,477, "Phase Locked Sampling Radio Receivers," to R. Gordy ("Gordy") is listed on the face of the '551 patent.

- U.S. Patent No. 5,140,705, "Center-Tapped Coil-Based Tank Circuit for a Balanced Mixer Circuit," to T. Kosuga ("Kosuga") is listed on the face of the '342 patent.

- Rudell, J.C. et al., "A 1.9-Ghz Wide-Band IF Double Conversion CMOS Receiver for Cordless Telephone Applications," *IEEE Journal of Solid-State Circuits*, IEEE, vol. 32, No. 12, pp. 2071-2088 (Dec. 1997) ("Rudell") is listed on the face of the '342 patent.

- U.S. Patent No. 6,121,819, "Switching Down Conversion Mixer for Use in Multi-Stage Receiver Architectures," to K. Traylor ("Traylor") is listed on the face of the '342 patent.

- The '551 patent is listed on the face of the '342 patent.

72. The article "Subharmonic Sampling of Microwave Signal Processing Requirements," Microwave Journal (1992), by Peter Weisskopf, was published in May 1992. The Weisskopf article predates the asserted claims of the patents-in-suit.

73. The article "A Mixer Computer-Aided Design Tool Based in the Time Domain," 1988 IEEE MTT-S Digest, pp. 1107-1110, by Polly Estabrook and Bruce Lusignan, ("Estabrook I") was published in 1989. The Estabrook I article predates the asserted claims of the patents-in-suit.

74. The article "The Design of a Mobile Radio Receiver Using a Direct Conversion Architecture,"1988 IEEE Vehicular Technology Conference, IEEE 38th 06/1989 (1989), by Polly Estabrook and Bruce Lusignan, ("Estabrook II") was published in 1989. The Estabrook II article predates the asserted claims of the patents-in-suit.

75. The article "The Merigo Method: SSB Generator/Producing A Demodulator," Ham Journal, July/August 1993 Issue, pp. 20-31, by Yasuo Nozawa, was published in August 1993. The Nozawa article predates the asserted claims of the patents-in-suit.

76. The article "The Fourth Method: Generating and Detecting SSB Signals," QEX, Sept. 1990, pp. 7-11, by D. H. van Graas, was published in September 1990. The van Graas article predates the asserted claims of the patents-in-suit.

77. ParkerVision's Cameraman MDS-2000 product was a videocamera system that used wireless technology to permit the video user to appear in the video while at the same time being able to control the camera action.

78. ParkerVision's Cameraman MDS-2000 product was made publicly available no later than August 29, 1995. The Cameraman product predates the asserted claims of the patents-in-suit.

79. The article "A 1.5 GHz Highly Linear CMOS Downconversion Mixer, "IEEE Journal of Solid-State Circuits, Vol. 30, No. 7, July 1995, pp. 736-742, by Jan Crols and Michel Steyaert, was published in July 1995. The Crols article predates the asserted claims of the patents-in-suit.

80. U.S. Patent No. 4,346,477, "Phase Locked Sampling Radio Receiver," to R. Gordy, was issued on August 24, 1982. The Gordy patent predates the asserted claims of the patents-in-suit.

81. U.S. Patent No. 5,339,459, "High Speed Sample and Hold Circuit and Radio Constructed Therewith," to T. Schiltz, was issued on August 16, 1994. The Schiltz patent predates the asserted claims of the patents-in-suit.

82. U.S. Patent No. 5,140,705, "Center-Tapped Coil-Based RF Tank Circuit for a Balanced Mixer Circuit," to T. Kosuga, was issued on August 18, 1992. The Kosuga patent predates the asserted claims of the patents-in-suit.

83. The reference "Practical RF Design Manual," by Doug DeMaw, was published in 1982. The DeMaw reference predates the asserted claims of the patents-in-suit.

84. U.S. Patent No. 5,379,457, "Low Noise Active Mixer," to N. Nguyen, was issued on January 3, 1995. The Nguyen patent predates the asserted claims of the patents-in-suit.

## Qualcomm's Sales and Financial Information[7]

85. Qualcomm does not dispute that, in 2006, approximately 29.3% of Qualcomm's revenues from its worldwide sales of Accused Products resulted from sales of Accused Products that were eventually incorporated into devices that were imported into the United States.

86. Qualcomm does not dispute that, in 2007, approximately 19.0% of Qualcomm's revenues from its worldwide sales of Accused Products resulted from sales of Accused Products that were eventually incorporated into devices that were imported into the United States.

---

[7] For purposes of this case only, Qualcomm does not dispute the percentage of revenues associated with Accused Products that were incorporated into devices ultimately imported into the United States, as detailed in the body of the joint pre-trial statement.

87. Qualcomm does not dispute that, in 2008, approximately 20.7% of Qualcomm's revenues from its worldwide sales of Accused Products resulted from sales of Accused Products that were eventually incorporated into devices that were imported into the United States.

88. Qualcomm does not dispute that, in 2009, approximately 28.9% of Qualcomm's revenues from its worldwide sales of Accused Products resulted from sales of Accused Products that were eventually incorporated into devices that were imported into the United States.

89. Qualcomm does not dispute that, in 2010, approximately 24.1% of Qualcomm's revenues from its worldwide sales of Accused Products resulted from sales of Accused Products that were eventually incorporated into devices that were imported into the United States.

90. Qualcomm does not dispute that, in 2011, approximately 21.9% of Qualcomm's revenues from its worldwide sales of Accused Products resulted from sales of Accused Products that were eventually incorporated into devices that were imported into the United States.

91. Qualcomm does not dispute that, in 2012, approximately 29.9% of Qualcomm's revenues from its worldwide sales of Accused Products resulted from sales of Accused Products that were eventually incorporated into devices that were imported into the United States.

### Authenticity

92. To the best of Qualcomm's knowledge, each document produced by Qualcomm in this case with a "QCPV" prefix is authentic.

93. To the best of ParkerVision's knowledge, each document produced by ParkerVision in this case with a "PV" or "CONF-PV" prefix is authentic.


## X. CONCISE STATEMENT OF APPLICABLE PRINCIPLES OF LAW ON WHICH THERE IS AGREEMENT

1. ParkerVision is the exclusive owner of all rights under the Patents-in-Suit, and is the party entitled to bring suit for infringement of the Patents-in-Suit and sue for past infringement of the Patents-in-Suit.

2. Jurisdiction and venue are proper in this Court.

3. Subject to any modifications made by a party before the Court presents the instructions to the jury, the parties submit the proposed jury instructions and agree that the agreed upon principles of law expressed therein apply. See Attachment D to this Statement.

# XI. CONCISE STATEMENT OF ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

## A. Infringement Issues

1. Whether Qualcomm directly infringes the Asserted Claims of the '551 patent, the '518 patent, the '371 patent, and the '342 patent.[8]

2. Whether Qualcomm indirectly infringes the Asserted Claims of the '551 patent, the '518 patent, the '371 patent, and the '342 patent under either induced or contributory infringement.[9]

3. If Qualcomm is found liable for infringement of any Asserted Claim of the Patents-in-Suit, whether the infringement was willful (See below for antecedent question of law).

## B. Invalidity Issues

4. Whether any of the Asserted Claims of the Patents-in-Suit are invalid for anticipation under 35 U.S.C. § 102.

5. Whether the underlying factual elements of the obviousness and non-enablement theories have been proven.

## C. Remedies

6. If Qualcomm is found liable for infringement of a valid claim, whether and what amount of pre-verdict damages ParkerVision has proved.

# XII. CONCISE STATEMENT OF ISSUES OF LAW WHICH REMAIN FOR DETERMINATION

## A. Questions of Validity

1. Whether any of the Asserted Claims of the '551 patent, the '518, or the '371 patent are invalid for failure to meet the enablement requirement of 35 U.S.C.

---

[8] As described in Qualcomm's motions in limine, the parties dispute whether ParkerVision has preserved the issue of infringement under the doctrine of equivalents. As ParkerVision will detail and set out in its response to Qualcomm's motions in limine, ParkerVision's doctrine of equivalents evidence is adequate and Qualcomm's vehicle for challenging such evidence is inappropriate.

[9] As described in Qualcomm's motions in limine, the parties dispute whether ParkerVision has preserved the issue of contributory infringement. As ParkerVision will detail and set out in its response to Qualcomm's motions in limine, ParkerVision's contributory infringement evidence is adequate and Qualcomm's vehicle for challenging such evidence is inappropriate.

McKool 905908v8

§ 112. Enablement is a legal determination of whether a patent enables one skilled in the art to make and use the claimed invention. Dkt. 318 at 7.

2. Whether any of the Asserted Claims of the '551 patent or the '518 patent are invalid under 35 U.S.C. § 112 as indefinite.

3. Whether any of the Asserted Claims of the Patents-in-Suit are invalid under 35 U.S.C. §103(a) as obvious? Obviousness is a question of law based on underlying findings of fact. *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009).

## B. Remedies

4. If Qualcomm is found liable for willfully infringing any Asserted Claim, whether an award of enhanced damages is appropriate pursuant to 35 U.S.C. § 284. In addition, both the judge and the jury play a role in determining the issue of willful infringement. When the underlying defense to willful infringement is predicated on underlying mixed questions of law and fact, as in this case, the Court must address the threshold determination of objective recklessness as a matter of law. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1007 (Fed. Cir. 2012).

5. Whether this case is an exceptional case pursuant to 35 U.S.C. § 285 and whether ParkerVision or Qualcomm is entitled to an award of attorneys' fees.

6. Whether ParkerVision and/or Qualcomm is entitled to costs, and, if so, the dollar amount of its costs.

7. If ParkerVision is awarded any damages, whether ParkerVision is entitled to post- and pre-trial interest and post-trial damages.

8. Whether ParkerVision is entitled to pre-judgment and post-judgment interest, and, if so, the dollar amount of pre-judgment and post-judgment interest.

## C. Injunction

9. If Qualcomm is found liable for infringing any Asserted Claim, whether ParkerVision is entitled to an injunction against Qualcomm pursuant to 35 U.S.C. § 283 and the extent of any such injunction.

10. ParkerVision proposes as an issue whether any denial of an injunction should be conditioned on payment of reasonable royalties for future infringement, and if so, the royalty amount set for future infringement and a means or mechanism to account for future royalty payments, including during any stay of an injunction pending appeal.

McKool 905908v8

### D. Claim Construction

11. ParkerVision respectfully submits that *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) requires the Court to construe the meaning of the "generating" limitation in light of the parties' disagreement regarding its plain and ordinary meaning. Qualcomm objects to ParkerVision's submission on the grounds that the Court has already determined both that the claims do not include ParkerVision's "discharge" requirement and that ParkerVision did not preserve the claim construction position it now advances. (Dkt. 318 at 5-6.)

## XIII.  CONCISE STATEMENT OF ANY DISAGREEMENT AS TO THE APPLICATION OF THE FEDERAL RULES OF EVIDENCE OR THE FEDERAL RULES OF CIVIL PROCEDURE

The parties have presented a number of evidentiary disputes in their respective motions in limine. The parties' additional disputes regarding the admissibility of exhibits and deposition designations are documents and testimony are provided in the attached exhibits to this Pretrial Statement. The parties have been working to further limit the number of disputes and will continue to do so up to and throughout the trial.

The parties jointly request that in advance of trial, the Court allow each party an equal amount of time (between 30 minutes to an hour) to make arguments regarding the admissibility of certain exhibits that remain in dispute.

## XIV.  JOINTLY-PROPOSED SET OF JURY INSTRUCTIONS IN ORDER OF PRESENTATION TO THE JURY

See Attachment D to this Statement.

Each party reserves the right to modify its requested jury instructions in light of the evidence introduced at trial and any rulings the Court may enter before the conclusion of the trial.

## XV.  PROPOSED JURY VERDICT FORMS

See Attachment E-1 (ParkerVision's proposed verdict form) and E-2 (Qualcomm's proposed verdict form) to this Statement.

Each party reserves the right to modify its requested verdict form in light of the evidence introduced at trial and any rulings the Court may enter before the conclusion of the trial.

## XVI.  JOINTLY-PROPOSED JUROR QUESTIONNAIRE AND LIST OF VOIR DIRE QUESTIONS

See Attachment F to this Statement for the parties' Jointly Proposed List of Voir Dire Questions.

The parties additionally jointly request that the Court ask that the potential jurors in the panel respond to this Court's Juror Questionnaire for Civil Cases. The Juror Questionnaire for Civil Cases from the Court's website is attached to this Statement as Attachment F.

## XVII.  AGREED MOTIONS IN LIMINE

1.  Any argument, evidence, testimony, or reference to ParkerVision in a derogatory manner (such as a "patent troll" or "patent pirate"), to economic detriment suffered generally by businesses as a result of patent litigation, or to suggest that ParkerVision has less right to enforce its patents than others, including larger companies. This agreed motion in limine is not intended to limit in any way Qualcomm's ability to argue that the Asserted Claims are invalid.

2.  Any argument, evidence, testimony, or reference to alleged issues between either party and the SEC, or any investigations into either party's compliance with SEC regulations.

3.  Any argument, evidence, testimony, or reference that ParkerVision had an obligation to call or otherwise contact Qualcomm about its allegations of infringement prior to the filing of this lawsuit. This agreed motion in limine is not intended to limit in any way Qualcomm's ability to support its laches defense before the Court or argue that it did not have sufficient knowledge of potential infringement of the Patents-in-Suit prior to the suit under the state-of-mind elements for indirect and willful infringement.

4. Any argument, evidence, testimony, or reference regarding rejected claim construction positions, except as made to the Court to show a reasonable, good faith claim construction position regarding state-of-mind elements for indirect and willful infringement.

5. Any argument, evidence, testimony, or reference regarding the Nozawa board. This agreed motion in limine is not intended to limit Qualcomm's ability to rely on the Nozawa article as a prior art reference.

6. Any argument, evidence, testimony, or reference that the Patents-in-Suit issued under an incorrect obviousness standard.

7. Any argument, evidence, testimony, or reference to valuations of or the book value of ParkerVision's patents or intellectual property.

8. Any argument, evidence, testimony, or reference to issues to be decided by the Court, such as laches, equitable estoppel, double patenting, inequitable conduct, unclean hands, injunction, etc., except as to facts relevant to other issues properly before the jury.

9. Any argument, evidence, testimony, or reference regarding patents or patent claims that have never been asserted in this case or were previously asserted and willingly withdrawn (including the fact that ParkerVision voluntarily withdrew asserted patents or asserted claims), except as argued to the Court in addressing exceptional case and prevailing party findings.

10. Any argument, evidence, testimony, or reference to motions *in limine*, motions to strike, and motions to exclude filed by the parties and the outcomes of such motions.

11. Any argument, evidence, testimony, or reference regarding Sterne Kessler's alleged breach of fiduciary duty to Qualcomm, or other abated claims against Sterne Kessler.

12. Any argument, evidence, testimony, or reference regarding the workload of the PTO (or its examiners) or any attempt to disparage the PTO (or its examiners). This agreed motion in limine is not intended to limit Qualcomm's ability to argue that the PTO incorrectly issued the Patents-in-Suit or did not have all the information needed to assess the validity of the Patents-in-Suit.

13. Any argument, evidence, testimony, or references to the possible consequences of a verdict in ParkerVision's or Qualcomm's favor, including the possible issuance of an injunction, an award of enhanced damages, an award of attorney's fees, or arguments that a verdict would result in (1) consumers paying more for products; (2) the economy being negatively impacted; (3) an injunction or the accused products no longer being available for use, or (4) firings or layoffs.

14. Any argument, evidence, testimony, or reference to settlement discussions between ParkerVision and Qualcomm covered by Federal Rule of Evidence 408 that have taken place since the filing of this lawsuit, or any related documents.

15. Any argument, evidence, testimony, or reference to the office location of the parties' lawyers.

16. Any argument, evidence, testimony or reference to the retention agreements or nature of the agreements (including any contingency fee arrangement) between the parties and their counsel or any argument, evidence, testimony or reference to either parties' change of counsel during the litigation.

17. Any argument, evidence, testimony, or reference to (1) any jury study or focus groups that have been conducted by either party or (2) the use by either party of a shadow jury during trial.

18. Any argument, evidence, testimony, or reference, regarding any witness relating to criminal charges, tax liens, divorce proceedings, alleged drug use, size of a person's residence or water consumption.

19. Any argument, evidence, testimony, or reference referring to a prior retention or relationship between any expert with counsel or any party in this case, including whether a party has attempted to retain another party's expert.

20. Any argument, evidence, testimony, or reference to the "win/loss" record of the parties' expert witnesses or what percentage of the time the juries agreed with the parties' experts in other cases.

21. Any argument, evidence, testimony, or reference to legal and expert fees and expenses incurred by the parties in prosecuting and defending this litigation and/or incurred in a typical patent litigation. This motion in limine is not intended to preclude either party from inquiring as to the rate and amounts an expert has charged.

22. Any cross examination of a witness using documents the witness was previously precluded from seeing, including, but not limited to, due to the Confidentiality Agreement in this case.

23. Any argument, evidence, testimony, or reference to online postings, letters, or documents, or statements by Mike Farmwald or opinions of Mike Farmwald.

24. Any argument, evidence, testimony, or reference to postings, statements, documents, or content located only on the website www.pvnotes.com.

25. Any evidence, reference to or argument to expert's earnings in other matters or general financial success.

26. Any evidence, reference to or argument regarding other cases in which ParkerVision or Qualcomm has been a party or any case or any instance where either party was accused of misappropriating another's technology or infringed another's patents.

## XVIII. LIST OF ALL MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT

### A. Pending Motions

1. ParkerVision's Daubert Motion to Exclude Portions of the Expert Reports and Proposed Testimony of Gregory Leonard and Behzad Razavi (Dkt. 285).

2. Qualcomm's Daubert Motion to Preclude Paul Benoit's Damages Testimony (Dkt. 288).

3. Qualcomm's Motion to Phase Trial Proceedings (Dkt. 322).

4. ParkerVision's Motions in Limine (Dkt. 323).

5. Qualcomm's Motions in Limine (Dkt. 325).

### B. Issues to be Tried to the Bench

The parties agree that the equitable issues of laches and equitable estoppel are issues that should be tried before the judge and not the jury. The parties propose trying these issues before the bench at the Court's convenience during the trial.

In addition, any request for any post-trial remedies, such as an injunction, would be heard by the Court.

### C. Access to Schematic Review Computer During Trial

As provided for in the parties Confidentiality Agreement, ParkerVision requests that the Court order Qualcomm to provide access to the Source Code Computer for review of Qualcomm's schematics under the same conditions and with the same limitations and restrictions as provided in this section at a site in or near Orlando, Florida beginning one week prior to the start of trial and continuing through the end of trial.

### D. Length of Trial

ParkerVision estimates that the necessary time for trial will be 6 days. ParkerVision requests 15 hours per side for direct, cross, and rebuttal examination. ParkerVision further

McKool 905908v8

requests 45 minutes per side for an opening statement and 45 minutes per side for closing arguments.

Qualcomm estimates that the necessary time for trial will be 12 days. Qualcomm requests 25 hours per side for direct, cross, and rebuttal examination.

### E.  Juror Notebooks

ParkerVision requests that the Court provide the jury notebooks or binders that include a blank pad for taking notes, a copy of the patents in this case, and a copy of the Court's claim constructions. Qualcomm objects to the inclusion of certain exhibits and not others in items provided to the jurors.

## XIX.  STIPULATIONS REGARDING TRIAL PROCEDURES

1. The parties will exchange copies of all documentary, graphic, slide, animation, and any other form of Demonstratives they plan to use at trial for use during direct examination or opening—but not for cross-examination—by 7:00 p.m. the night before their intended use. In other words, if a demonstrative will be used on a Wednesday, it must be exchanged or made available by 7:00 p.m. on the previous Tuesday. The parties shall exchange objections to these demonstratives by 9:00 p.m. on the day the exhibits are received. Demonstratives exchanged will not be used by the opposing party prior to being used by the disclosing party.

   "Demonstratives" subject to this ¶ 1 do not include (1) exhibits created in the courtroom during testimony or opening at trial, (2) the enlargement, highlighting, ballooning, etc. of trial exhibits or transcripts of testimony, (3) composites of admitted exhibits and/or testimony, so long as the demonstrative includes only portions of the underlying exhibit or testimony, or (4) demonstratives previously displayed in the course of the trial. Reasonable nonsubstantive edits or corrections of typographical and similar errors to demonstrative exhibits may be made to such exhibits prior to use.

   Demonstratives subject to this ¶ 1 must be cleared of outstanding objections before being shown to the jury.

   Additionally, any transcripts of testimony (excluding testimony given during this trial) that has been previously designated by the parties and cleared of outstanding objections can be shown to the jury during opening, closing or on direct examination. On cross-examination, transcripts of testimony may be used so long as it is not in violation of a motion in limine or other exclusionary order, regardless of whether it was previously designated by the parties.

In reaching the agreements contained within this document, the parties are not agreeing to waive any evidentiary objection and expressly reserve the right to make said objections as appropriate.

2.  The parties will make available for inspection all non-documentary demonstratives or live product demonstrations, such as physical exhibits, physical prior art or physical products, they plan to use at trial for use during direct examination or opening—but not for cross-examination—by 7:00 p.m. two nights before their intended use.  In other words, if a demonstrative will be used on a Wednesday, it must be exchanged or made available by 7:00 p.m. on the previous Monday.  The parties shall exchange objections to these non-documentary demonstratives or live product demonstrations by 7:00 p.m. the night before their intended use.  Demonstratives and demonstrations exchanged pursuant to this ¶ 2 will not be used by the opposing party prior to being used by the disclosing party.

3.  The parties will exchange lists of exhibits they intend to use during direct examination by 7:00 p.m. the night before their intended use. The parties shall exchange any objections and confidentiality designations to the exhibits by 9:00 pm on the date the lists of exhibits are exchanged.

4.  The parties agree to continue to meet and confer to resolve their objections to the other party's deposition designations and exhibits. The parties agree to endeavor to enter into further stipulations and resolve any remaining objections as to the authenticity and use of produced documents following the exchange of exhibit lists and objections.

5.  The parties will identify witnesses to be called live (in the order of call) and by deposition at 7:00 p.m., two days in advance of the day of trial during which the witnesses will testify. In other words, if a witness will testify on a Wednesday, the witness must be identified by 7:00 p.m. on. the previous Monday.

6.  For deposition video testimony, the parties will provide a list of any deposition designations to be played by 6:00 pm two days before the designation is to be played. Counters and objections to the 6:00 pm designations are due by 9:30 pm the same evening, and any unresolved objections will be raised with the Court the next morning.

7.  The parties agree that any exhibit listed on a party's own exhibit list as to which no objection remains pending at the time of opening statements may be shown to the jury by that party during opening statements if the exhibit will be the subject of testimony by a witness at trial.

8.  The parties will meet and confer regarding demonstratives, exhibits, and deposition objections, as well as any confidentiality designations, by 9:30 pm the night before the objected materials are to be used in Court.

36

9. The parties will work to jointly stipulate on exhibits that may be pre-admitted into evidence by the Court on the first day of trial.

10. All exhibits that are not pre-admitted by the Court must be admitted into evidence before the sponsoring party shows the exhibit to the jury.

11. Each party will provide access to the Source Code Computer under the same conditions and with the same limitations and restrictions as provided in the Confidentiality Agreement at a site in or near Orlando, Florida beginning one week prior to the start of trial and continuing through the end of trial.

12. Provided the Court consents, parties will agree to split the costs of bringing in lunch for the jury each day.

13. Consistent with the Confidentiality Agreement, the party asserting confidentiality with respect to any exhibit, deposition, or demonstrative must notify the Court on the morning that the exhibit, deposition, or demonstrative will be shown to the jury.

14. During the parties' meet and confer process regarding exhibits and continuing through the end of trial, each party will make a good faith effort to de-designate those exhibits, depositions, and demonstratives that may be shown to the jury without clearing the courtroom.

McKool 905908v8

September 12, 2013

Respectfully submitted,

**McKOOL SMITH, P.C.**

/s/ *Douglas A. Cawley*
Douglas A. Cawley, Lead Attorney
Texas State Bar No. 04035500
E-mail: dcawley@mckoolsmith.com
Richard A. Kamprath
Texas State Bar No.: 24078767
rkamprath@mckoolsmith.com
Ivan Wang
Texas State Bar No.: 24042679
E-mail: iwang@mckoolsmith.com
McKool Smith P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Kevin L. Burgess
Texas State Bar No. 24006927
kburgess@mckoolsmith.com
Josh W. Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
Leah Buratti
Texas State Bar No. 24064897
lburatti@mckoolsmith.com
Mario A. Apreotesi
Texas State Bar No. 24080772
mapreotesi@mckoolsmith.com
Kevin Kneupper
Texas State Bar No. 24050885
kkneupper@mckoolsmith.com
James Quigley
Texas State Bar No. 24075810
jquigley@mckoolsmith.com

McKool Smith P.C.
300 West Sixth Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

**SMITH HULSEY & BUSEY**

/s/ *James A. Bolling*
Stephen D. Busey
James A. Bolling
Florida Bar Number 117790
Florida Bar Number 901253
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jbolling@smithhulsey.com

**ATTORNEYS FOR PLAINTIFF
PARKERVISION, INC.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day, September 12, 2013, I served the foregoing on all counsel of record via ECF.

/s/ Leah Buratti
Leah Buratti


**LOCAL RULE 3.06 CERTIFICATION**

On September 3, 2013 lead counsel for ParkerVision and lead counsel for Qualcomm met and conferred in person as required by Dkt. 84 and Local Rule 3.06 regarding the issues addressed in this Pre-Trial Statement, except as the parties have described above.

/s/ Leah Buratti
Leah Buratti