**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

PARKERVISION, INC.,

        Plaintiff,

v.                                                    Case No. 3:11-cv-719-OrlTEM

QUALCOMM INCORPORATED,

        Defendant.

_____

## ORDER

This matter comes before the Court on the following:

1. Parkervision's Daubert Motion to Exclude Portions of the Expert Report and Testimony of Gregory Leonard and Behzad Razavi (Doc. 285), filed July 8, 2013;

2. Qualcomm's Daubert Motion to Exclude Paul Benoit's Damages Testimony and Memorandum in Support (Doc. 288), filed July 8, 2013;

3. Qualcomm's Response to Parkervision's Daubert Motion to Exclude Portions of the Expert Report and Testimony of Gregory Leonard and Behzad Razavi (Doc. 303) filed July 25, 2013; and

4. Parkervision's Response to Qualcomm's Daubert Motion to Preclude Paul Benoit's Damages Testimony (Doc. 305) filed July 25, 2013.

## BACKGROUND

In this patent litigation, Plaintiff Parkervision Inc. and Defendant Qualcomm Incorporated each filed motions in limine challenging the opinion testimony of the other's expert witnesses (Parkervision's Paul Benoit and Qualcomm's Gregory Leonard and

Behzad Razavi). (Doc. 285 ("Parkervision's Daubert Motion"); Doc. 288 ("Qualcomm's Daubert Motion").) Both parties also filed responses in opposition to the Daubert Motions. (Doc. 303 ("Qualcomm's Response"); Doc. 305 ("Parkervision's Response").)

On September 30, 2013, the Court held a hearing concerning the parties' respective Daubert motions (the "*Daubert* Hearing"). (Doc. 375.) At the *Daubert* Hearing, the parties presented the testimony of proposed damages witnesses Gregory Leonard and Paul Benoit. (*Id.*) The testimony of Behzad Razavi was not presented because Qualcomm withdrew its enablement defense; thus, Parkervision's *Daubert* Motion is moot as to Behzad Razavi. (*Id.* at 78-79, 99-100.) As to Gregory Leonard and Paul Benoit, the Daubert Motions are now ripe for resolution.

## STANDARDS

### I.    Rule 702 and Daubert

Federal Rule of Evidence 702 sets out the following requirements for expert opinion testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The party offering the expert's opinion testimony bears the burden of satisfying the requirements of Rule 702 by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

Under Rule 702 and the Supreme Court decision governing its application, *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), district courts must act as gatekeepers, admitting expert testimony only if it is both reliable and relevant, to prevent

speculative and unreliable testimony from reaching the jury.[1]  *Rink*, 400 F.3d at 1291; *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). As gatekeeper, the district court must consider whether: (1) the expert is qualified to testify competently regarding the matters that he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998); *e.g.*, *Cooper v. Marten Transp., Ltd.*, No. 13-10920, 2013 WL 5381152, at *4 (11th Cir. Sept. 27, 2013) (affirming exclusion of expert testimony due to unreliable methodology).

While stringent, the standards set forth in *Daubert* and Rule 702 are "not guarantees of correctness."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011).  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  *Id.*;  *see also United States v. Ala. Power Co.*, No. 11-12168, 2013 WL 5273804, at *3 (11th Cir. Sept. 19, 2013) (explaining that the *Daubert* inquiry "is not intended to supplant" cross-examination and presentation of contrary evidence).

---

[1] In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), the U.S. Supreme Court extended its reasoning in *Daubert* to non-scientist experts.

## II.    Patent Damages

"A patentee is entitled to no less than a reasonable royalty on an infringer's sales."[2] 35 U.S.C. § 284 (1994). "A reasonable royalty can be calculated" from "an established royalty," or from "the infringer's profit projections for infringing sales, or [from] a hypothetical negotiation between the patentee and infringer based on the factors in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970))." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010). The U.S. Court of Appeals for the Federal Circuit has "consistently upheld experts' use of a hypothetical negotiation and *Georgia-Pacific* factors for estimating a reasonable royalty." *i4i Ltd. P'ship*, 598 F.3d at 854.

The fifteen *Georgia-Pacific* factors are a "comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).   Several *Georgia-Pacific* factors relate to the general market for the patent, such as: (1) the "royalties the patentee has received for licensing the patent to others" ("Factor One"); (2) the "rates paid by the licensee for the use of comparable patents" ("Factor Two"); (3) "any established policies or marketing programs by the licensor to maintain its patent monopoly by not licensing others to use the invention or granting licenses under special conditions to maintain the monopoly" ("Factor Four"); and (4) the portion of profit or selling price that may be customary in that business "to allow for use of the invention or analogous inventions" ("Factor Twelve"). *i4i Ltd. P'ship*, 598 F.3d at 853 n.3.

---

[2] "The patentee bears the burden of proving damages." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).   To properly carry this burden, the patentee must "sufficiently [tie the expert testimony on damages] to the facts of the case." *Id.* (quoting *Daubert*, 509 U.S. at 591).   "If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded." *Id.*

Other *Georgia-Pacific* factors consider facts unique to the parties in the hypothetical negotiation: (1) "the commercial relationship between the licensor and licensee, such as whether they are competitors" ("Factor Five"); (2) the nature and scope of the hypothetical license, such as whether it is exclusive or nonexclusive ("Factor Three"); and (3) "the duration of the patent and license term" ("Factor Seven"). *Id.*

Another set of *Georgia-Pacific* factors concerns the value of the technology at issue as measured by: (1) "the established profitability of the product made under the patent, including its commercial success and current popularity" ("Factor Eight"); (2) "the utility and advantages of the patent property over old modes or devices" ("Factor Nine"); (3) "the nature of the patented invention and the benefits to those who have used the invention" ("Factor Ten"); (4) "the extent to which the infringer has used the invention and the value of that use" ("Factor Eleven"); (5) "the portion of the realizable profit that should be credited to the invention as opposed to its non-patented elements" ("Factor Thirteen"); and (6) "the effect of selling the patented specialty in promoting sales of other products of the licensee" ("Factor Six"). *i4i Ltd. P'ship*, 598 F.3d at 853 n.3.

Finally, the *Georgia Pacific* factors permit consideration of: (1) "the opinion testimony of qualified experts" ("Factor Fourteen"); and (2) "the results of a hypothetical negotiation between the licensor and licensee" ("Factor Fifteen"). *Id.*

## DISCUSSION

### I.    Comparability of Licenses, Negotiations, and Transactions

Both parties challenge the other party's damages expert's reliance on certain licenses, negotiations, and transactions in their respective damages analyses. Both parties rely on *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed.

Cir. 2009), *ResQNet.com, Inc.*, 594 F.3d at 869,[3] *Wordtech Sytems., Inc.*, 609 F.3d at 1319,[4] and *Uniloc USA, Inc.*, 632 F.3d at 1315, to support their respective positions. Both parties' arguments are partially meritorious, as explained below.

In *Lucent Techs., Inc.*, *ResQNet.com, Inc.*, *Wordtech Sys., Inc.*, and *Uniloc USA, Inc.*, the Federal Circuit reemphasized that patentees seeking to establish a reasonable royalty cannot "rely on license agreements" that are "radically different from the hypothetical agreement under consideration." *Lucent Techs., Inc.*, 580 F.3d at 1327; *e.g.*, *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) ("We have recently reiterated that use of past patent licenses under [*Georgia-Pacific* Factors One and Two] must account for differences in the technologies and economic circumstances of the contracting parties."). Rather, the "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs.*, 580 F.3d at 1325; *Uniloc*, 632 F.3d at 1317 (holding that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case"). There must be a minimally sufficient connection between the license and the patent and "actual

_____

[3] In *ResQNet.com, Inc.*, the patentee's expert witness on damages improperly used "licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels." 594 F.3d at 870. The *ResQNet.com, Inc.* court noted that none of the licenses relied on "even mentioned the patents-in-suit or showed any other discernible link to the claimed technology." *Id.* The Federal Circuit remanded to the district court for a new damages analysis with a warning that "the trial court should not rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology." *Id.* at 872-73.

[4] In *Wordtech Systems, Inc.*, the patentee was defending a jury verdict which awarded more than twice the damages that the patentee had requested. 609 F.3d at 1319. The patentee had presented no expert testimony concerning damages at trial; rather, it submitted copies of thirteen licenses and the testimony of its president. *Id.* at 1321. The *Wordtech Systems, Inc. c*ourt held that the proffered evidence did not provide support for the jury verdict because the licenses were too different from the hypothetical negotiation. *Id.* at 1322.

findings" accounting for "technological and economic differences between the licenses."
*ResQNet.com, Inc.*, 594 F.3d at 873.

## A. Hypothetical Negotiation

"[T]he purpose of the hypothetical negotiation framework" is to "discern the value
of the patented technology to the parties in the marketplace when the infringement
began." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75-76 (Fed. Cir.
2012) (remanding action for a new hypothetical negotiation analysis based on correct
date of first infringement).  Thus, the hypothetical negotiation must relate to the "date of
first infringement." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356,
1363-64 (Fed. Cir. 2006).

Here, the parties agree that January 2006 is the date for the hypothetical
negotiation.  (Doc. 305, Ex. 1, ¶¶ 137, 185.)  The parties also agree that: (1) the
hypothetical license would have been non-exclusive, bare, and based on a running
royalty; (2) the hypothetical license would have covered only the Patents-in-Suit; and (3)
the products covered under the license would include receivers, transceivers, and
integrated transceiver/baseband products used or sold in the United States.  (*Id.* ¶¶
142-43, 173.)  Further, Parkervision concedes that it was not a competitor of Qualcomm
in January 2006; rather, Parkervision's business model at that time was to license its
intellectual property.  (*Id.* ¶¶ 174-75.)  It is against these hypothetical facts that any
license or transaction must be compared.

## B. The 1999 Documents & Negotiations

Qualcomm argues that Benoit's analysis is fatally flawed because it is based on
Qualcomm's internal "business models" created in early 1999 to explore possible
business relationships and licensing arrangements with Parkervision (Doc. 288).  (Doc.

303, Exhibit 1, ¶¶ 61-62, 67-68, 70-72, Exs. 4-6 (the "1999 Documents"); *id.* ¶¶ 130-31, 220-23, 228, 233; *id.* Exs. C, D.4, N, N.1, N.2; Doc. 375, pp. 10-11, 30-32, 44-45, 63-64, 69.) According to Qualcomm, Benoit's reliance on cherry-picked, seven-year-old, internal documents to establish a reasonable royalty is "unprecedented." (Doc. 375, pp. 48-49.) Parkervision counters that: (1) Benoit's methodology is sound under *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011); (2) the 1999 Documents are the "best evidence" of how Qualcomm would value the patented technology; (3) Benoit's analysis is not a comparison of past patent licenses under Factors One and Two; and (4) Benoit adequately addresses the differences between the 1999 negotiations and a hypothetical negotiation. (Doc. 305 pp. 1-9.)

Upon consideration, the Court agrees with Qualcomm that Benoit's analysis is too speculative and unreliable given radical differences between the hypothetical negotiation and the 1999 negotiations, as well as the vast temporal chasm. For instance, the parties do not dispute that between 1999 and 2006, there were seismic changes in the marketplace for wireless receivers, transceivers, and baseband chips. (Doc. 305, Ex. 1, ¶ 238; Doc. 375, pp. 36-38.) Further, both Parkervision and Qualcomm's business models had changed between 1999 and 2006. (Doc. 375 pp. 11-12 (acknowledging that Qualcomm "was totally out of the handset market by 2006"); *id.* at 51-53 ("Qualcomm was a 2G CDMA-only handset maker" in 1999); Doc. 305, Ex. 1 ¶¶ 42-43, 46-48) Further, in 1999, there is no dispute that Qualcomm had noninfringing alternatives to the patented technology. (Doc. 375, pp. 40-41, 65-66; Doc. 305, Ex. 1, ¶¶116-19.) While the 1999 negotiations contemplated a technology transfer with exclusivity for Qualcomm (Doc. 375, pp. 75-76; Doc. 305, Ex. 22 to Ex. 1), the 2006 hypothetical negotiation was for a bare, non-exclusive patent license. Finally, in 1999,

Parkervision had only patent applications.   In 2006, three of the Patents-in-Suit had issued.

Given the foregoing, there can be little dispute that the 1999 documents and negotiations are too different from the hypothetical negotiation to provide a reliable foundation for Benoit's economic analysis.[5]   *See Lucent Techs., Inc.*, 580 F.3d at 1327; *ResQNet.com, Inc.*, 594 F.3d at 869; *Wordtech Sys., Inc.*, 609 F.3d at 1319; *Uniloc USA, Inc.*, 632 F.3d at 1315; *e.g.*, *EPlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 522-23 (Fed. Cir. 2012) (affirming exclusion of damages expert who relied on four-year-old settlement licenses to the exclusion of smaller, temporally comparable settlement licenses).   Further, the Court is not persuaded by Parkervision's argument that Benoit adequately accounts for all of the differences and the time gap.   While analysis of some of the differences between 1999 and 2006 might be permissible under the law, the sheer volume and significance of the differences between the 1999 negotiations and the 2006 hypothetical negotiation make that approach unworkable in this case.

The Court similarly rejects Parkervision's effort to immunize the 1999 Documents and negotiations from the comparability requirements by arguing that they are not pertinent to *Georgia-Pacific* Factor One.[6]   *Dataquill Ltd. v. High Tech Computer Corp.*, No. 08-cv-543, 2012 WL 1284381, at *6 (S.D. Cal. Apr. 16, 2012) (precluding expert from extrapolating a reasonable royalty from a revenue-sharing agreement).   The Court

---

[5]   The Court does not reject the 1999 Documents and negotiations simply because they were unsuccessful, although this fact does counsel against use of the evidence. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 25-34 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 1291 (2013) (noting that "proposed licenses may have some value for determining a reasonable royalty"; however, their "evidentiary value is limited").

[6]   The Court notes that Benoit analyzed the 1999 Documents and negotiation in the portion of his Report addressing Factor One.   (Doc. 305, Ex. 1, ¶¶ 159-64.)

also finds that *Powell* and other cases cited by Parkervision actually undermine its argument.  Indeed, the *Powell* court recognized that unsuccessful negotiations in 2004 did *not* provide a "reliable approximation of the upper limit that the parties would have reached during a hypothetical negotiation in May 2006." *Powell*, 663 F.3d at 1238; *cf. Interactive Pictures Corp. v. Infinite Picture, Inc.*, 274 F.3d 1371, 138-86 (Fed. Cir. 2001) (affirming reasonable royalty judgment based on internal business plan that was only two-months-old at the time of the hypothetical negotiation).

Parkervision has not met its burden to establish by a preponderance of the evidence that Benoit's opinions based on the 1999 Documents satisfy the requirements of Rule 702.  To the contrary, opinions based on Qualcomm's internal financial projections created seven years before the hypothetical negotiation are too speculative and unreliable to be helpful to the jury.  Accordingly, the Court will preclude Benoit from relying on the 1999 Documents and negotiations.

### C.  The VIA Agreement

Parkervision argues that Leonard's reliance on a 2007 license agreement between Parkervision and VIA (the "VIA Agreement") should be excluded because it "contravenes" *ResQNet.com, Inc.*, *Uniloc USA, Inc.*, and *Lucent Technologies, Inc.* (Doc. 285, pp. 3-7.)  Qualcomm counters that the VIA Agreement is pertinent to Factor One and is the "most comparable license" available to the parties.  (Doc. 303, p. 1.) According to Qualcomm, the VIA Agreement "covers the right patents and the right products at the right time," and Leonard properly accounted for the differences between the hypothetical negotiation and the VIA Agreement.  (*Id.* at 1, 7-11; Doc. 305, Ex. 1, ¶¶154-58.)  The Court agrees with Qualcomm.  Thus, Leonard will not be precluded from relying on the VIA Agreement in opining on an appropriate reasonable royalty in

this case. *See Dataquill Ltd.*, 2012 WL 1284381, at *6 (declining to preclude expert from relying on comparable license); *VIRNETX, Inc. v. Apple Inc.*, 925 F. Supp. 2d 816, 837-38 (E.D. Tex. 2013) (permitting reliance on agreements over objections of non-comparability).

### D.  The Berkana Acquisition

Parkervision next challenges "Leonard's secondary analysis based on Qualcomm's acquisition of Berkana Wireless, Inc." because "it is not a comparable transaction to the hypothetical patent license at issue."   (Doc. 285, pp. 7-11.) Qualcomm counters that Leonard's reliance on the Berkana Acquisition was "proper" under *Georgia-Pacific* Factors Nine, Ten, and Eleven. (Doc. 303, pp. 11-13.)  The Court agrees with Parkervision. The Berkana acquisition was not a patent license at all.  (Doc. 375, p. 95.) Moreover, the pertinent technology obtained by Qualcomm as part of the acquisition was not patented. (Doc. 375, pp. 91-92.) These foundational distinctions between the Berkana Acquisition and the hypothetical negotiation cannot be overcome. (*Id.* at 105-106.)   Further, the Court is not persuaded that the Berkana Acquisition is immunized from comparability requirements because Leonard claims that he did not consider it in the context of Factors One and Two. *See Dataquill Ltd.*, 2012 WL 1284381, at *7-8 (precluding expert from extrapolating a reasonable royalty from a revenue-sharing agreement).   Accordingly, Leonard may not rely on the Berkana acquisition to opine on the amount of a reasonable royalty in this action.

### E.  The WRF Agreement

Parkervision also challenges Leonard's reliance on a license agreement between Qualcomm and WRF (the "WRF Agreement").  (Doc. 285, pp. 11-13.)  At the *Daubert* Hearing, Qualcomm appropriately conceded that the WRF Agreement was not

comparable to the hypothetical negotiation, and it did not impact Leonard's opinions. (Doc. 375, pp. 81, 97-98, 108-10.)  Rather, Leonard treated the WRF Agreement merely as a data point that he felt compelled to consider.  (*Id.*)

The Court agrees that the WRF Agreement is insufficiently comparable to the hypothetical negotiation to be considered in opining on a reasonable royalty in this action.  This is so because the WRF Agreement involved a lump-sum payment from Qualcomm to resolve patent infringement litigation six years *after* the hypothetical negotiation. (Doc. 305, Ex. 1, ¶¶ 168-72.)  Accordingly, the WRF Agreement should not be considered in opining on a reasonable royalty in this action. *See AVM Techs., LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 143 (D. Del. 2013) (excluding expert testimony that was based solely on a settlement license entered five years after the hypothetical negotiation); *e.g.*, *LaserDynamics, Inc.*, 694 F.3d at 64 (criticizing use of settlement licenses in determining a reasonable royalty); *Fenner Invs., Ltd. v. Hewlett-Packard Co.*, No. 6:08-cv-273, 2010 WL 1727916, at *2-3 (E.D. Tex. Apr. 28, 2010) (excluding settlement agreements relied on to establish reasonable royalty).

## II.    Other Challenges to Gregory Leonard

Aside from its objections to the VIA Agreement, the Berkana Acquisition, and the WRF Agreement, Parkervision also challenges Leonard's opinions on the grounds that he: (1) failed to apply the required presumption of validity and infringement; (2) improperly assumed that Qualcomm had non-infringing alternatives in 2006; and (3) corrected Benoit's "income approach" without "endorsing" the approach.  (Doc. 285, pp. 13-20.) Upon review of Leonard's Report and the cited case law, the Court rejects each of Parkervision's additional challenges to Leonard's opinions.   First, Leonard acknowledged the pertinent presumptions, and his criticisms appear to go to a lack of

commercial success—-not a lack of patentability.  Second, there is sufficient evidence of

non-infringing alternatives available in 2006 to support Leonard's opinions.  Third, there

is no merit to Parkervision's endorsement argument.  Parkervision's remaining

challenges are best handled with vigorous cross-examination, presentation of contrary

evidence, and appropriate instructions to the jury.

### III.     Other Challenges to the Testimony of Paul Benoit[7]

Aside from its objection to the 1999 Documents and negotiations, Qualcomm

also challenges Benoit's use of Nash Bargaining Solution ("NBS") to determine the

appropriate "split" of incremental profit between Parkervision and Qualcomm.  (Doc.

288, pp. 16-23.)  According to Qualcomm, Benoit's NBS analysis simply uses a 50/50

split to replace the 25% rule of thumb that was rejected by the Federal Circuit in *Uniloc.*

(*Id.*) Further, Qualcomm contends that Benoit did not reliably apply the NBS, and he has

insufficient qualifications and experience to do so. (*Id.*)  Parkervision counters that the

NBS has been permitted in many courts, it is a reliable methodology, and Benoit reliably

applied it to the facts in this case.  (Doc. 305, pp. 11-18.)

At the *Daubert* Hearing, little time was spent on the NBS arguments. Indeed,

Parkervision expressed relief that "no one asked [Benoit] about it . . .  because . . . it can

get to be pretty heavy sledding."  (Doc. 375, p. 71.)  Further, a review of Benoit's NBS

explanation and analysis indicate that he may have treated the paradigm as an

impermissible default starting point:

> Proper application of the [*Georgia-Pacific* Factors] yields the benefits
> sought under the NBS framework, which results in *a starting point for*
> *negotiation of a 50/50 split between licensor and licensee*, recognizing that

---

[7] The Court rejects Qualcomm's argument that Parkervision has waived its
contributory infringement claim.  Benoit's opinions concerning indirect infringement are
sufficient to preserve Parkervision's claim for damages.

> qualitative considerations that are not quantified under the [*Georgia-Pacific* analysis] may serve to tilt the benefits in favor of either the licensor or licensee. . . .
>
> \*   \*   \*
>
> The [$_____] per receiver and [$_____] per transceiver quantified under [Georgia Pacific Factor Six through Thirteen] in this report represents the benefits *to be split equally between the licensor and licensee in accordance with the NBS.* On balance, the qualitative considerations do not suggest a material shift of benefit to either the licensor or the licensee.

(Doc. 305, Ex. 1, ¶¶ 243-45 (emphasis added).)

At this point, Court has reservations about Benoit's use of the admittedly "complex" NBS (Doc. 375, p. 71), and the Court therefore cannot find that Parkervision has met its burden to establish by a preponderance of the evidence that Benoit's use of the NBS satisfies the requirements of Rule 702 and *Daubert. Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1120 (N.D. Cal. 2011) (rejecting the NBS under *Uniloc* because it was confusing and "cloth[ed] a fifty-percent assumption in an impenetrable façade of mathematics"); *Suffolk Techs. LLC v. AOL Inc.*, No. 1:12-cv-625, 2013 U.S. Dist. LEXIS 64630, at *5-*6 (E.D. Va. Apr. 12, 2013) (rejecting NBS damages opinion as indistinguishable "from the damages opinion rejected in *Uniloc*); *e.g.*, *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, No. C-11-05973, 2013 WL 4538210, at *5 (N.D. Cal. Aug. 22, 2013) (excluding expert testimony basing a hypothetical royalty rate on a fifty percent split).  Rather than preclude Benoit's reliance on the NBS, the Court will provide Parkervision with an additional opportunity to satisfy its burden of proof.  This is the best course of action, particularly given the Court's ruling as to Benoit's reliance on the 1999 Documents and negotiations.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.      Parkervision's Daubert Motion to Exclude Portions of the Expert Report

and Testimony of Gregory Leonard and Behzad Razavi (Doc. 285) is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** with respect to Gregory Leonard's reliance on the WRF Agreement and the Berkana Acquisition, and in all other respects is **DENIED**.

2. Qualcomm's Daubert Motion to Exclude Paul Benoit's Damages Testimony and Memorandum in Support (Doc. 288) is **GRANTED IN PART AND IS DENIED IN PART**. The Motion is **GRANTED** with respect to Paul Benoit's reliance on the 1999 Documents and negotiations, is **DENIED WITHOUT PREJUDICE** as to the Nash Bargaining Solution challenge, and in all other respects is **DENIED**.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida, on October 11, 2013.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record