**UNITED STATES DISTRICT COURT**
**THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ParkerVision, Inc.,

         *Plaintiff*,

       v.

Qualcomm Incorporated,

         *Defendant*.

Case No. 3:11-cv-719-J-37-TEM

## QUALCOMM'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES AND MOTION TO STRIKE THE OPINIONS OF MR. PAUL BENOIT AND MR. JEFF PARKER ON DAMAGES

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.   LEGAL STANDARD ........................................................................................... 3

     A.    Judgment as a Matter of Law ..................................................................... 3

     B.    The Patentee Bears the Burden of Proof on Damages and the Court Must Tie that Proof to the Claimed Invention's Footprint in the Marketplace ................................................................................................. 4

III.  ARGUMENT ........................................................................................................ 4

     A.    The Base:  ParkerVision Failed to Carry Its Burden of Proving the Portion of the Product's Value Attributable to the Invention. ..................... 4

          1.    ParkerVision Bore the Burden of Proving, by Reliable and Tangible Evidence, What Profits are Attributable to the Patented Invention. ........................................................................... 4

          2.    Mr. Benoit Improperly Assumed that Qualcomm's Own Trade Secrets, Know-How, Patents, and Technology Had No Value. .................................................................................... 5

          3.    Mr. Benoit Improperly Assumed, with No Evidence or Analysis, that Qualcomm Would Make No Sales Without the Patent. ........................................................................................ 9

          4.    Mr. Benoit Improperly Assumed that All Products Had Mobile  "MultiMode" Functionality. ......................................... 13

          5.    Because ParkerVision has Failed to Present Evidence Sufficient to Carry its Burden, the Court Should Grant JMOL on Damages. ................................................................... 15

     B.    The Rate:  Mr. Benoit Offered No Evidence to Support his 50-50 Split. ....................................................................................................... 16

          1.    ParkerVision Did Not Offer Evidence Sufficient to Carry Its Burden. .................................................................................... 16

          2.    Mr. Parker's Statement that He Would Have Demanded 50% Is Contrary to *Georgia-Pacific* and Cannot Support a Verdict ....................................................................................... 21

IV.  CONCLUSION .................................................................................................. 21

Qualcomm respectfully submits this memorandum in support of its motion for judgment as a matter of law on damages under Fed. R. Civ. P. 50(a), and renewed motion to strike the damages testimony of Mr. Paul Benoit and Jeff Parker.

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

At the end of the first week of trial, the Court precluded ParkerVision's expert from presenting an unfounded damages theory in which ParkerVision claimed that 81.1% of Qualcomm's receiver profit resulted from use of the patented inventions.   Undaunted, ParkerVision offered an inflated theory that 90.9%--instead of 81.1%--of Qualcomm's receiver profit results from the use of the patented inventions.   The Court allowed ParkerVision's new theory over Qualcomm's renewed *Daubert* challenge, and ParkerVision presented its massive, unprecedented, and unfounded damages demand to the jury.

ParkerVision's presentation focused on theater, intrigue, and innuendo, not substance. But this case is a major patent litigation between two publicly-traded companies, not a story-telling exercise.   The Federal Circuit and Supreme Court set a high standard for patent damages evidence, and ParkerVision did not even attempt to meet it.

First, the Federal Circuit requires ParkerVision to present "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).   ParkerVision did not even attempt to present any such proof.   To the contrary, ParkerVision announced to the jury, contrary to undisputed facts, that an unnamed competitor would have taken Qualcomm's receiver business unless Qualcomm used the invention. ParkerVision rested its damages theory on that assumption, which collapsed on cross-examination.   As Mr. Benoit admitted, Qualcomm sold hundreds of millions of dollars of

noninfringing receiver products for *years* after the date of the hypothetical negotiation. Furthermore, Mr. Benoit admitted, Qualcomm makes receivers only for Qualcomm's own baseband chipsets, something that no competitor has ever attempted to do.  Finally, customers demand Qualcomm's baseband chipsets; Mr. Benoit conceded that he had no evidence to suggest that Qualcomm's customers would have paid Qualcomm a nickel less without the patents.

Instead, Mr. Benoit pointed to graphs showing that the revenues and market share associated with the accused products have gone up over time under the guise of the so-called "book of wisdom."  Mr. Benoit's conjecture lacks a sound economic basis and contradicts *Integra*, because he made no effort to show that those profits were tied to the claimed invention or foreseeable at the time of the hypothetical negotiation.  *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869–72 (Fed. Cir. 2003), *judgment vacated and remanded on other grounds*, 545 U.S. 193 (2005).  Thus, it is not substantial evidence and cannot support a verdict.

Second, the "[t]he patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence." *Lucent v. Gateway*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). Once again, ParkerVision failed to present the required evidence.  Instead, Mr. Benoit simply dismissed Qualcomm's own intellectual property, patents, trade-secrets, and know-how.  He declared that *all* of the intangible value of Qualcomm's receivers stems from the alleged ParkerVision invention, which comprises less than 1% of the receiver components.  On cross-examination, Mr. Benoit admitted that Qualcomm is the only company in the world that has been able to make a CDMA transceiver able to work with Qualcomm's baseband chipsets; and he

admitted that Qualcomm is the world's leading 3G CDMA, WCDMA, and 4G LTE innovator. In stark contrast, despite having the patents, ParkerVision has never been able to make a CDMA transceiver even for 2G applications, much less make a product for a 3G or 4G environment. ParkerVision has failed to present the necessary analysis under *Lucent*.

Third, the Federal Circuit forbids the use of any "rule of thumb" to divide profits. *Uniloc*, 632 F.3d at 1318. Once again, ParkerVision refused to follow Federal Circuit authority. ParkerVision presented its CEO, Jeff Parker, to testify that he would have demanded a 50-50 split. Mr. Benoit announced that if that's what Mr. Parker wanted, that's what he would get, because the parties allegedly had "equal" bargaining power. ParkerVision's theory, divorced from the evidence, is nothing more than a rule of thumb. ParkerVision presented no evidence that Qualcomm would yield to a 50-50 split, which would have been unprecedented and completely irrational. Instead, ParkerVision and Mr. Benoit showed the jury the Nobel Prize Medallion, in a thinly-veiled and misguided effort to suggest that a 50-50 split is appropriate.

Because ParkerVision failed to present evidence to support its requested damages award, Qualcomm moves for (1) judgment as a matter of law on ParkerVision's damages theory, and (2) an order striking Mr. Benoit's testimony and Mr. Parker's testimony. ParkerVision would still have the opportunity to request a reasonable royalty based on the VIA Telecom Agreement, which is already in evidence.

## II.    LEGAL STANDARD

### A.    Judgment as a Matter of Law

Under Rule 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under

controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed.

R. Civ. P. 50(a)(1).

**B.     The Patentee Bears the Burden of Proof on Damages and the Court Must Tie that Proof to the Claimed Invention's Footprint in the Marketplace.**

The patentee bears the burden of proof on damages.  *Lucent Techs., Inc. v. Gateway, Inc.*,

580 F.3d 1301, 1324 (Fed. Cir. 2009).  As the Federal Circuit observed in *ResQNet*, "the trial court

must carefully tie proof of damages to the claimed invention's footprint in the market place."

*ResQNet.com v. Lansa*, 594 F.3d 860, 869 (Fed. Cir. 2010) (per curiam).  "Any evidence

unrelated to *the claimed invention* does not support compensation for infringement but punishes

beyond the reach of the statute."  *Id.* (emphasis added).  Here, ParkerVision failed to present

sufficient evidence to support its requested damages award.

## III.   ARGUMENT.

**A.     The Base:  ParkerVision Failed to Carry Its Burden of Proving the Portion of the Product's Value Attributable to the Invention.**

**1.     ParkerVision Bore the Burden of Proving, by Reliable and Tangible Evidence, What Profits are Attributable to the Patented Invention.**

The Federal Circuit requires ParkerVision to present "sound economic proof of the nature

of the market and likely outcomes with infringement factored out of the economic picture."

*Grain Processing v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).  In

particular, ParkerVision bore the burden of separating the benefits of the alleged invention from

the benefits of the noninfringing components.  As the Supreme Court held long ago and as the

Federal Circuit recently emphasized in *Lucent*:

> When a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance. He must separate its results distinctly from those of the other parts, so that the benefits derived from it may be distinctly seen and appreciated.... The

4

> patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.

*Lucent*, 580 F.3d at 1337 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  *See also Westinghouse Elec. & Mfr. v. Wagner Elec. & Mfg.*, 225 U.S. 604, 617 (1912) (where defendant's contributions added value to the accused product, "the burden of apportionment was … logically on the plaintiff, since it was only entitled to recover such part of the commingled profits as was attributable to the use of its invention"); *Garretson*, 111 U.S. at 121.  As set forth below, ParkerVision failed to carry its burden.

### 2. Mr. Benoit Improperly Assumed that Qualcomm's Own Trade Secrets, Know-How, Patents, and Technology Had No Value.

The invention is only a tiny part of the accused devices, comprising only 1% of the receiver.  As Mr. Benoit admitted:  "From my review of expert reports that have been filed in this case, I understand it to be less than 1 percent."  (Oct. 18 Tr. 96:4-10, Tr. 62:6-8 ("very small" in "terms of componentry"); Tr. 105:1-11).[1]  The receiver, in turn, is often packaged with a transmitter (making a transceiver) or an integrated baseband/transceiver.

Even under ParkerVision's view, the alleged invention constitutes only a modified use of exactly the same components that have long been used in prior art samplers, mixer/filters, and envelope detectors. (*See, e.g.*, Oct. 8 Tr. at 176:4-177:11 (describing purported conception of Mr. Sorrells' modified voltage sampler); Oct. 7 Tr. at 274:18-275:11, 277:11-16, 277:21-278:7 (comparing the admitted prior art (Fig. 78A of the '551 patent) against the purported invention

---

[1] All Transcript references are to the transcript of October 18, 2013 unless otherwise noted.

(Fig. 82A of the '551 patent)); Oct. 10 Tr. at 92:19-22 (switch followed by filter not infringing); Oct. 8 Tr. at 118:23-25 (envelope detector not infringing).)

Because the invention is an improvement, ParkerVision bore the burden of apportionment under *Lucent*. However, rather than perform the required apportionment, ParkerVision offered Mr. Benoit's testimony that the alleged invention is responsible for nearly ***all*** of the receiver profit, once the value of Qualcomm's tangible assets (cash, inventory, buildings, chairs, etc.) is removed. (Oct. 17 Tr. 173:10-13). Mr. Benoit gave Qualcomm a $7.8 Million dollar "credit" for the cost of implementing the invention in *twenty* different chips, which cover numerous different standards, different process nodes. Mr. Benoit admitted that he had "no idea" how much time and money Qualcomm actually spent bringing *any* of the 20 products to market.

> Q And for every one of those products you have no actual idea as to how much time or money Qualcomm engineers spent in implementing the technology that is at issue in this case in those products, correct?
>
> A Correct.

(Tr. 103:3-104:6; Tr. 126:12-15; Tr. 127:9-22.)

Mr. Benoit received the $7.8 Million dollar credit figure from *ParkerVision's* accounting department, which had no basis for the information, as ParkerVision has *never* made a CDMA transceiver, much less made twenty different designs for $7.8 Million. (Tr. 31:19-32:1.) To the contrary, the evidence conclusively established that despite repeated attempts, ParkerVision was unable to make a working CDMA transceiver for years. (DX24; Oct. 17 Tr. 89:15-19). ParkerVision's engineers near Silicon Valley were unable to make a CDMA transceiver with the accused technology, even with a head-start over other ParkerVision licensees. (Tr. 55:18-56:19, Tr. 57:7-57:14; Tr. 51:20-52:9.)

ParkerVision's inability to make a working CDMA transceiver highlights the importance of Qualcomm's know-how, ingenuity, and hard work, factors that Mr. Benoit completely

ignored.  Although Qualcomm is the only company that has ever been able to make a working CDMA transceiver able to communicate with a Qualcomm baseband, Mr. Benoit declared without any support that Qualcomm's own intellectual property, including its trade secrets and know-how, is responsible for *none* of the value of Qualcomm's receivers or Qualcomm's receiver profit.  (Tr. 124:7-11 (" none of those were credited with any allocation or portion of the 90 percent profit on the receiver sales").)  Mr. Benoit argued that he gave Qualcomm credit for the *cost* that TSMC charges to make the chips.  But by that measure, the ParkerVision invention should be virtually valueless, as the accused components comprise less than 1% of the receiver and costs little to make.

Mr. Benoit testified that he did not know what the other components in the receiver are – he had never heard of them, much less analyzed them to determine whether they are responsible for any of Qualcomm's receiver profit.  (Tr. 119:19-124:25.)  He testified that he had no idea what is involved in making the technology at issue work with Qualcomm's basebands, and did not factor that into his analysis in any way.  (Tr. 47:17-48:1.)  In fact, he did not know what the digital baseband was, much less make any effort to understand what standards it supports.  (Tr. 125:1-8.)

Mr. Benoit admitted that he simply did not account for the many innovations that Qualcomm's thousands of engineers made from 2006 through the present.

> Q You didn't incorporate into your modeling any other potential causes of Qualcomm's increase in market share, correct? Other than the switch from the technology in 2006.
>
> A I didn't specifically, no. That's correct.
>
> Q When you say you didn't specifically, you didn't, correct?
>
> A Correct.

> Q You didn't incorporate into the model the innovations that Qualcomm's engineers have continued to make from 2006 to the present, correct?
>
> A I did not.

(Tr. 73:8-19; Tr. 115:25-116:11 (no effort to "analyze the value of Qualcomm trade secret information that was contributing to the design and implementation of the receivers in those 20 products").)  He did not incorporate into the model any of the factors that could have contributed to Qualcomm's market share increase:

> Q You didn't incorporate into your model any of the other many potential factors that may have contributed to Qualcomm's market share and revenue increases after the date of the hypothetical negotiation, correct?
>
> A I did not.

(Tr. 73:24-74:3.)  *See MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) (affirming exclusion where expert ignored factors contributing to economic impact).  Nor did he make any effort to show that the increase was foreseeable at the time of the hypothetical negotiation.  *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869–72 (Fed. Cir. 2003), *judgment vacated and remanded on other grounds*, 545 U.S. 193 (2005).

Mr. Benoit did not understand anything about the components of the receiver, and admitted that he made *no effort* to understand the components and functionality that Qualcomm brings to its receivers.

> Q When you were doing your analysis for the purpose of explaining to the jury how much value Qualcomm was bringing to the party as compared to the value that the D2D technology was bringing to the party, did you make any effort to go through and understand all of the components and functionality that Qualcomm was actually bringing to the party?
>
> A I did not.

(Tr. 119:19-120:1.)[2]

### 3.   Mr. Benoit Improperly Assumed, with No Evidence or Analysis, that Qualcomm Would Make No Sales Without the Patent.

Mr. Benoit proclaimed that Qualcomm could not have used noninfringing technology to make the sales in question.  (Tr. 86:21-24 (a "major assumption").)  He admitted that if his assumption were wrong, that would change his conclusion.  (Tr. 86:25-87:3.)

Mr. Benoit's opinion unraveled on cross examination.   Mr. Benoit admitted that Qualcomm made hundreds of millions of *noninfringing* sales for two years after the date of the hypothetical negotiation.  (Tr. 81:13-25.)  Mr. Benoit admitted that Qualcomm makes receiver chips only for Qualcomm's own baseband chipsets.  (Tr. 67:21-23.)  No other company has ever sold a receiver for use with Qualcomm's baseband chip, and as Mr. Benoit acknowledged, no other company has even tried.  (Tr. 67:21-23 ("nobody else makes receivers for Qualcomm's baseband chips"); Tr. 69:14-17 ("not even aware of a single company that ever attempted to make a receiver for a Qualcomm baseband chip").)  Thus, Mr. Benoit admitted that he failed to identify even one competitor that would have taken a *single* Qualcomm sale:

> Q And still, sitting here, despite all the hundreds of hours, you failed to identify a single competitor that would have taken a single Qualcomm sale away from Qualcomm had Qualcomm not used the infringing technology, correct?
>
> A Correct.

---

[2] Finally, during Mr. Benoit's cross-examination, ParkerVision urged the Court to commit legal error.  The Federal Circuit and the Supreme Court require the jury to consider evidence of Qualcomm's own contributions to the allegedly infringing product, including Qualcomm's own patents.  *Lucent v. Gateway*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).   However, ParkerVision moved to block any reference to Qualcomm's own patents, erroneously contending (without any citation to authority) that "it's a complete misstatement of the law to say that if you have patents on the product you're selling, that somehow the patent that is being infringed is – that the value of that is being affected."  (Tr. 111:21-25 (Mr. Cawley).)

(Tr. 69:21-25; Tr. 87:14-21.)

Qualcomm's OEM customers purchase Qualcomm's basebands because they want the *baseband* functionality; the sales of RF chips (transceivers and receivers) are along for the ride. ParkerVision presented no evidence to the contrary, nor can it.  (Tr. 69:18-20 ("never performed a study to determine the demand for Qualcomm's baseband chipsets")).)  Mr. Benoit provided no demand curve or other economic link between customer demand and the invention.

> Q And you didn't make any effort to determine or analyze the demand from Qualcomm's customers, did you?
>
> A I can -- well, I would say no, I didn't.

(Tr. 75:7-9.)  To the contrary, Mr. Benoit admitted that he simply *assumed* that Qualcomm's customers would have stopped purchasing without the alleged invention:

> Q You just assumed that Qualcomm's customers would have stopped buying from Qualcomm if they didn't -- if Qualcomm didn't use the down-conversion technology at issue here, correct?
>
> A That's correct, sir.

(Tr. 78:15-19.)  He also simply "assumed" that "there were "no changes in baseband technology that could have driven the increase in market share", an absurd presumption because the market transitioned from 3G to 4G during the time in question.  (Tr. 72:10-13.)  Pressed to explain his view, Mr. Benoit admitted that if baseband technology had changed over the relevant timeframe, his opinion would need to change as well.

> Q My only question is, you would agree that if, in fact, there were changes in baseband technology that contributed to the numbers that you see here, that would change your opinion, correct?
>
> A It would.

(Tr. 72:20-24.)  However, he provided the jury no tools to adjust his analysis to account for his error.  (Tr. 73:2-7; Tr. 74:9-15 (fails to provide any "basis for adjusting or correcting" the analysis).)

Mr. Benoit argued that if Qualcomm did not use the invention, Qualcomm's OEM customers would have incurred $5 in extra costs.  (Oct. 17 Tr. 160:13-19).  However, the OEMs are not Qualcomm, and Mr. Benoit offered no testimony whatsoever that the OEMs would have or could have passed those costs on to their customers.

> Q And as I understand it, those are costs that you say OEM manufacturers would have to incur for peripheral circuitry or devices if Qualcomm did not make the infringing technology available to them.  Is that basically what you're saying?
>
> A Yes, sir.
>
> Q So it's not a change in costs that Qualcomm would face. It's something that would impact its OEMs if it's accurate information, correct?
>
> A That's correct.
>
> Q And then what the OEMs would do with that would depend on whether they could or did or would have passed some or all of those costs right on to their customers, correct?
>
> A Correct.
>
> Q And you didn't make any analysis to determine whether the OEM manufacturers would have or could have passed those costs on, correct?
>
> A Correct.

(Tr. 88:3-20.)  Unable to provide any evidence that the claimed inventions drive demand, Mr. Benoit testified:

> Q If that technology was capable of driving such growth in and of itself, why didn't any one of the other companies that ParkerVision talked to between 2000 and 2006, the date of the hypothetical negotiation, take a license and use it in cell phones?
>
> A I can't answer that question.

(Tr. 68:4-9.)  Mr. Benoit admitted that he made no effort whatsoever to show that any OEM

would have taken a penny of business away from Qualcomm but for the alleged infringement:

> Q And you didn't make any effort to determine a single OEM mobile
> device manufacturer who would have taken so much as 5 cents of business
> away from Qualcomm had Qualcomm not entered into the license,
> correct?
>
> A Correct.

(Tr. 69:4-8.)

Mr. Benoit speculated that "someone would have" taken Qualcomm's sales and argued

that "Broadcom, Texas Instruments, companies of that sort" would have stepped in.  (Tr. 66:3-

14.)  Neither Broadcom nor Texas Instruments have ever made a receiver that could work with a

Qualcomm baseband, and at the time of the hypothetical negotiation, neither of them were

making 3G CDMA chipsets.  (*See also* Tr. 67:16-20 ("didn't identify a single competitor who

would have taken away the receiver business").)

Thus, despite bearing the proof on damages, ParkerVision failed to present the necessary

evidence in support of its theory.  *See Cornell v. HP*, 2008 WL 2222189 (N.D.N.Y 2008) (Rader,

CAFC CJ) (excluding expert damages testimony:  "The fact remains, however, that Cornell did

not offer a single demand curve or attempt in any way to link consumer demand for servers and

workstations to the claimed invention."); *see also Lucent v. Gateway*, 580 F.3d 1301, 1336 (Fed.

Cir. 2009) (in analogous EMV context:  "the patentee must prove that 'the patent-related feature

is the basis for customer demand.'") (quoting *Rite-Hite v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed.

Cir. 1995)).[3]

---

[3] Mr. Benoit failed to consider other noninfringing alternatives.  The Court has already held that
Atheros WiFi chips are noninfringing (Dkt. 320, a p. 4), and many of the accused products are
WiFi devices.  (JX 59, 57, 58, 55).  In addition, ParkerVision itself buys receivers from FCI to
work with VIA basebands, (Oct. 17 Tr. 90:4-8), and ParkerVision admits that other companies,
including GCT and NXP, make receivers.  (Oct. 17 Tr. 104:3-7).   Despite bearing the burden to

### 4.   Mr. Benoit Improperly Assumed that All Products Had Mobile "MultiMode" Functionality.

Based on a single conclusory statement from Dr. Prucnal and the argument of ParkerVision's counsel, the jury returned an infringement verdict on 20 distinct products.  (Dkt. 416.)  Underscoring the indiscriminant nature of ParkerVision's proof, the verdict form included the Marimba product, which ParkerVision and Qualcomm jointly moved to dismiss.  (Dkt. 367 (requesting to dismiss "Qualcomm's Marimba die products, which includes the Bluetooth portions of the QSC6155, QSC6165, QSC6175, QSC6185, QSC6195, QSC6295, QSC6695, QTR8200, QTR8201, QTR8600, QTR8600L, and QTR860l devices").[4]  In fact, the allegedly infringing products are different, comply with different standards, and serve entirely different purposes.

In calculating his damages, Mr. Benoit appeared to make no effort whatsoever to distinguish between the different devices or the capabilities that they have.  On direct, he appeared to assume—erroneously—that all of those products are mobile 3G WCDMA "multimode" products, and appeared to assume—erroneously—that all of them were sold in the same channel to the same market.  To the contrary, the record is undisputed that each product has *different* features and functionality and is sold for different devices in different channels.  In particular, the record evidence shows beyond dispute that the following **ten** products—half of the list that the jury checked—are *not* "multimode" mobile WCDMA products.

---

prove his infringement theory, Mr. Benoit made no independent effort to investigate noninfringing alternatives:  "*I don't know what GCT or NXP is.*"  (Tr. 63:2-21; DX-116.) Finally, neither Dr. Prucnal nor Mr. Benoit compared the (alleged) power and board area savings to the prior art, a necessary step in his analysis.  (Tr. 79:6-81:9.)

[4] ParkerVision presented no proof whatsoever that Marimba infringed, simply sweeping it along with the rest of the list on the verdict form.

Astra – standalone GPS receiver (JX 61, at 8)

Bahama – integrated Bluetooth/FM product (JX 56, at 9)

Iris – WLAN, Bluetooth, and FM radio (JX 59, at 12)

Libra/Gemini – WLAN (JX57, at 16)

Marimba – Bluetooth (ParkerVision previously moved to dismiss at Dkt. 367).

Merlin – CDMA and GSM (JX 77, at 20)

Napoleon – CDMA(JX 79, at 24)

Ramsis – CDMA and GPS (JX 52, at 26)

Volans—WLAN (JX 58, at 9)

Voltron – CDMA and GPS (JX 53, at 12)

Ywing – WLAN (JX 55, at 10)

Although half of the accused products found by the jury to be infringing (based on a single conclusory sentence from Dr. Prucnal) do not have mobile 3G WCDMA multimode functionality, Mr. Benoit appears to have assumed that they were "multimode" and that all "multimode" product are the same.  On redirect, Mr. Benoit argued that all products were the same because they allegedly have multiple "receive paths."  He offered no testimony as to what those paths do in any accused product.  This assumption led him to (1) incorrectly assess the value of the chips, and (2) erroneously conclude that the non-infringing Atheros products were not non-infringing alternatives because they were Wi-Fi chipsets—even though four of the products at issue have WLAN functionality.  (Tr. 89:19-90:3).  Mr. Benoit testified that he based his assumption on what Dr. Prucnal told him in an off-the-record conversation, but did not explain what that conversation entailed.  In any event, the record is undisputed that *ten* of the products at issue do *not* have mobile 3G WCDMA multimode functionality.  ParkerVision has argued and represented to the Court that the products are not different, and now Mr. Benoit has

gone so far as to suggest that all products have mobile 3G WCDMA multimode functionality, when they do not.  (JX 61, 56, 75, 59, 57, 77, 79, 52, 58, 53, 55).

Mr. Benoit made no effort to determine whether the profit attributable to the invention is the same in every type of product or whether Qualcomm would have agreed to make the same "50/50 split" on standalone Bluetooth, GPS, FM radio, or Wi-Fi chipsets.  Instead, like Dr. Prucnal, he brushed aside the vast differences between the accused products and just assumed that they were all the same, that the patented technology would provide the same benefits for all, that no non-infringing alternatives existed for any, that OEMs demand the same performance for all receivers, that Qualcomm could not have sold any receivers at all (cellular or otherwise) absent the inventions, and that the parties would have agreed to the exact same royalties on all products.  No evidence supports that conclusion.  Qualcomm is not only entitled to JMOL of noninfringement (as previously presented and argued to the Court), but also is entitled to JMOL of no damages on every product without 3G functionality.

### 5. Because ParkerVision has Failed to Present Evidence Sufficient to Carry its Burden, the Court Should Grant JMOL on Damages.

Mr. Benoit's testimony falls far short of meeting the Federal Circuit's requirements as set forth in *Lucent*.  *Lucent*, 580 F.3d at 1337 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  Mr. Benoit and ParkerVision failed to "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" at all, much less provide the "reliable and tangible, and not conjectural or speculative" evidence that the Federal Circuit and Supreme Court require.  *Lucent*, 580 F.3d at 1337 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  Mr. Benoit and ParkerVision failed to carry their burden to "show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire

value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Lucent*, 580 F.3d at 1337.

In addition, the Court should strike the testimony of Mr. Benoit.  The Federal Circuit has urged judges to perform the "gatekeeping" function required by Rule 702 and *Daubert* to ensure that patent damages opinions that do not merit jury review do not find their way into trial. *Power Integrations v. Fairchild*, 711 F.3d 1348, 1373 (Fed. Cir. 2013).  Mr. Benoit has already testified over Qualcomm's renewed objection, but the Court can and should strike his opinion and instruct the jury accordingly.[5]

### B.     The Rate:  Mr. Benoit Offered No Evidence to Support his 50-50 Split.

#### 1.     ParkerVision Did Not Offer Evidence Sufficient to Carry Its Burden.

The Court should also grant JMOL because ParkerVision and Mr. Benoit have presented no evidence to support Mr. Benoit's claimed 50-50 profit split.  Mr. Benoit's 50-50 opinion "is connected to existing data only by the *ipse dixit* of the expert" and should be excluded.  *General Elec. Co.* v. *Joiner,* 522 U.S. 136, 146 (1997) ("there is simply too great an analytic gap between

---

[5] The entirety of Mr. Benoit's opinion is the result of his post-*Daubert* attempt to backfill the record with a new opinion based on the irrelevant and unreliable "check" calculation that Mr. Benoit included in his original report.    Qualcomm's *Daubert* motion challenged Mr. Benoit's base calculation across the board, (Dkt. 288 at 9-16), and Mr. Benoit's original report did not present any damages opinion on his "tangible asset" check.  His base opinion was unreliable and inadmissible under *Daubert*, as Qualcomm has consistently maintained.  (*See, e.g.,* Dkt. 288 at 9-16 and n.11 (Qualcomm's Daubert Motion:  "Benoit's check calculation simply ignores the many other factors that contribute to Qualcomm's profitability, and thus, is inadmissible.   *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) (affirming exclusion where expert ignored factors contributing to economic impact)."); Sept. 30, 2013 Tr. 76 (first *Daubert* hearing:  "That's not a separate basis for damages.  He never said it was.  There's nothing in his report that says that.  clearly it's an attempt to backstop what is a failed analysis here with an opinion that he did not give in a timely manner."); Oct. 17, 2013 Tr. 13-26, 37-39 (second *Daubert* hearing).)

the data and opinion proffered").  Mr. Benoit argued that he applied "Nash Bargaining" and showed the jury a demonstrative with the Nobel Prize Medallion.

Correctly applied, Nash Bargaining produces a 50-50 division only in rare situations where both parties are precisely symmetrical: *i.e.*, they have "identical utility functions" as well as identical "status quo utility points."  (Dkt. 285, Ex. 7, Leonard ¶183.)  Yet Mr. Benoit does not perform any analysis showing that the parties were precisely symmetrical, nor can he.  In fact, ParkerVision agreed to give VIA—a party with far less bargaining power than Qualcomm—███████████████████████.  The notion that ParkerVision could have extracted 50% of Qualcomm's profits is unfounded.

Absent the necessary mathematical analysis and careful evaluation of the appropriate utility functions, Mr. Benoit's "Nash Solution" reduces to no more than a 50/50 presumption—precisely the sort of "rule of thumb" that Federal Circuit authority prohibits.  For years, patentees invoked the so-called 25/75 "Rule of Thumb" in an effort to justify large damages awards.  *Uniloc*, 632 F.3d at 1318.  Under that rule of thumb, experts presumed, regardless of the facts, that the parties would consensually allocate 25% of the profit to the patent holder in the form of a royalty.  In 2011, the Federal Circuit in *Uniloc* struck down a $388 million damages award, holding that reliance on such a "rule of thumb" approach was impermissible.  632 F.3d at 1318.

Such a "rule of thumb," the Federal Circuit held, is "fundamentally flawed" because it is not "tied to the relevant facts and circumstances of the case at issue" and the "hypothetical negotiations that would have taken place...at the relevant time."  *Id.* at 1315, 1318.  The Federal Circuit struck down the 25% rule of thumb even when "offered merely as a starting point to which the *Georgia-Pacific* factors are then applied to bring the rate up or down."  *Id.* "Begin-

17

ning from a fundamentally flawed premise and adjusting it based on legitimate consideration specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id.*

In this case, Mr. Benoit presumed patentees would receive a 50/50 division of a patent's benefits—*twice* the presumptive share under the disallowed 25/75 rule—in a hypothetical negotiation. (Oct. 17 Tr. 190:11-191:10). ParkerVision argues that Mr. Benoit is not using a banned "rule of thumb" because he purports to define the economic benefits from use of the technology. ParkerVision is incorrect. First, Mr. Benoit admitted, as set forth in detail above, that he did **not** separate the value of the patents from the value of Qualcomm's patents, trade secrets, know-how, and other intellectual property. Thus, Mr. Benoit's opinion is indisputably another version of the banned "rule of thumb."

Second, even if Mr. Benoit performed the required apportionment (and he clearly did not) the expert opinion excluded in *Uniloc* did not simply apply the 25% to the operating profit of the accused product. To the contrary, Uniloc's expert purported to isolate the value of the patented technology (an electronic "product key") within defendant Microsoft's larger software products and then apply a presumptive split to that value—just as Mr. Benoit has done here. *Uniloc*, 632 F.3d at 1310. The Federal Circuit banned the rule of thumb because it "fails to account for the unique relationship between the parties" and thus "fails to tie a reasonable royalty base to the facts of the case at issue." *Uniloc*, 632 F.3d at 1313, 1315. Like the rule of thumb, Benoit's 50/50 split is not the product of any economic analysis or mathematical model; it is nothing more than his presumption. The Federal Circuit has declared the 25% presumption unacceptable. *Id.* at 1315. There is no possibility 50% would fare better.

ParkerVision's other response was to take a slide with three highly edited snippets from journal articles and proclaim that a "substantial body of economic literature" exists that

concludes that "it is reasonable to assume that the parties would have split the benefit equally unless there's some compelling reason to do otherwise." (Oct. 17 Tr. 34:15-23 (Mr. Cawley's Argument; Oct. 17 Tr. 190:21-191:10 (Benoit Testimony re Articles).)   In *Uniloc,* the Federal Circuit acknowledged empirical studies that sought to confirm the veracity of the 25% rule of thumb.   *Uniloc,* 632 F.3d at 1313 (citing empirical studies from 1997, 2002, and 2010 that purported to show the accuracy of the 25% rule in real world licensing situations).   The Federal Circuit nonetheless proceeded to strike down use of the 25% rule.   Here, ParkerVision does not even claim that its "substantial body of economic literature" are empirical studies supporting a 50/50 split in real world situations.   Rather, they "assume" a 50/50 profit split unless the actual facts of the case show otherwise.   If the Federal Circuit refused to accept empirical studies supporting a rule of thumb, it will certainly not accept a couple of articles based on a pure assumption.

ParkerVision also argues that Mr. Benoit recited the *Georgia-Pacific* factors to the jury. However, reciting the *Georgia-Pacific* factors does not inoculate a damages analysis that fails to include the necessary analysis:   "This type of superficial recitation of the *Georgia-Pacific* factors, followed by conclusory remarks, can not support the jury's verdict."   *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).

District courts have already rejected the very 50% solution that Mr. Benoit attributes to the Nash Bargaining Solution here.   In *Suffolk v. AOL,* Judge Ellis excluded the testimony of the patentee's expert (submitted by ParkerVision's counsel) because the "hypothetical negotiation" he posed was not "tied to the facts of the case."   2013 WL 1700938, at *3 (E.D. Va. 2013). Instead, Suffolk's analysis (like Mr. Benoit's) was "in essence" an application of *Georgia Pacific* "followed by" a "50/50 split" allegedly "derived from the [Nash Bargaining Solution]."

*Id.* Such a methodology, the court observed, is "not meaningfully distinguishable from the damages opinion rejected in *Uniloc*," which "first applied a theoretical rule of thumb"—namely 25/75—"and then applied the *Georgia Pacific* factors." *Id.* The order is reversed—Suffolk's expert (and Mr. Benoit) applied the theoretical rule of thumb second, where the expert in *Uniloc* applied it first. *Id.* But that change in sequencing does not eliminate "the fundamental and fatal fl[a]w of both calculations"—the rule of thumb was not tied to the facts of the case. *Id.* at *4.

In *Oracle v. Google*, the district court likewise excluded that methodology, observing that it is impermissible to use a "fifty-percent assumption" attributed to the Nash Bargaining Solution with no anchor "in the record of actual transactions." 798 F. Supp. 2d at 1119. Allowing the old 25% "rule of thumb" to be replaced with a new 50% version supposedly attributed to the Nash Bargaining Solution would "invite a miscarriage of justice by clothing a fifty-percent assumption in an impenetrable façade of mathematics." *Id.* at 1120. "It is no wonder that a patent plaintiff would love" to rely on a putative presumption from Nash Bargaining "because it awards fully half of the surplus to the patent owner, which in most cases will amount to half of the infringer's profits, which will be many times the amount of real-world royalty rates." *Oracle*, 798 F. Supp. 2d at 1119. The more Nash is applied in different cases, with different parties and different facts, to arrive at *precisely* the same result, the more it is revealed to be just a formulaic rule of thumb in disguise. The courts in *Oracle* and *Suffolk* correctly concluded that a 50/50 presumptive split is foreclosed by Federal Circuit precedent, even when proffered by doctorate-level economists.

Damages testimony must be "tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc*, 632 F.3d at 1318. Mr. Benoit's 50/50 split, even more than the 25% rule that preceded it, is plucked from ether: It is the same formulaic

result reached in opinions rejected in other cases, it is divorced from the facts of this case, unsupported by the bargaining theory Mr. Benoit invokes, and it ignores the requirements for reliable application of the Nash Bargaining Solution even in the abstract. Consequently, "the testimony must be excluded." *Uniloc*, 632 F.3d at 1316, 1318.[6]

**2.   Mr. Parker's Statement that He Would Have Demanded 50% Is Contrary to *Georgia-Pacific* and Cannot Support a Verdict.**

ParkerVision presented Mr. Parker's "expert" opinion testimony that he would have insisted on 50% of the profits. (Oct. 17 Tr. 74:19-75:1). However, Mr. Parker is not an engineer, and has no basis to offer any opinion that the claimed invention is worth 50% of Qualcomm's receiver profit. Mr. Parker's conclusory statements that the "technology" is "must-have" cannot defeat JMOL; they are nothing more than a litigant's wish clothed as an expert conclusion. As such, Mr. Parker's desire clearly conflicts with the *Georgia-Pacific* framework, which requires and presupposes a *willing* licensor, not an intransigent one. The *Georgia-Pacific* framework simply does not allow one party unilaterally to insist on a certain result after-the-fact. A reasonable royalty is based on the hypothetical negotiation, not based on the royalty either party may have preferred. Thus, the Court should either strike Mr. Parker's opinion, or instruct the jury to give it no weight in deciding damages.

## IV.   CONCLUSION

For the foregoing reasons, Qualcomm moves for judgment as a matter of law on damages, and requests the Court strike Mr. Benoit's and Mr. Parker's testimony in their entirety.

---

[6] ParkerVision not only fails to present the required economic analysis and mathematical modeling, but as Qualcomm argued at the second *Daubert*, ParkerVision makes no showing that Mr. Benoit is "qualified by knowledge, skill, experience, training or education" to perform it. For that reason too, his testimony should be excluded.

21

October 21, 2013

Respectfully submitted,

COOLEY LLP

By:      /s/ Timothy S. Teter
             Stephen C. Neal (admitted pro hac vice)
             nealsc@cooley.com
             Timothy S. Teter (admitted pro hac vice)
             teterts@cooley.com
             Jeffrey S. Karr (admitted pro hac vice)
             Ben Damstedt
             bdamstedt@cooley.com
             Five Palo Alto Square
             3000 El Camino Real
             Palo Alto, CA 94306-2155
             Telephone:  (650) 843-5182
             Facsimile:  (650) 849-7400


CRAVATH, SWAINE & MOORE LLP
             Keith R. Hummel (admitted pro hac vice)
             khummel@cravath.com
             David Greenwald (admitted pro hac vice)
             dgreenwald@cravath.com
             Worldwide Plaza
             825 Eighth Avenue
             New York, New York 10019
             Telephone:  (212) 474-1000
             Facsimile:  (212) 474-3700

                   -and-

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A.
             John A. DeVault, III
             Florida Bar No. 103979
             jad@bedellfirm.com
             Courtney K. Grimm
             Florida Bar No. 953740
             cgrimm@bedellfirm.com
             The Bedell Building
             101 East Adams Street
             Jacksonville, Florida 32202
             Telephone:  (904) 353-0211
             Facsimile:  (904) 353-9307

*Counsel for Defendant Qualcomm Incorporated*

22

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st day of October, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Timothy S. Teter
Timothy S. Teter (admitted pro hac vice)
teterts@cooley.com
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone:  (650) 843-5182
Facsimile:  (650) 849-7400

*Attorney for Defendant Qualcomm Incorporated*

1184016/HN

23