# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

PARKERVISION, INC.,

        Plaintiff,

    vs.

QUALCOMM INCORPORATED,

      Defendant.

Case No. 3:11-cv-719-J-37JRK

## PARKERVISION, INC.'S ALTERNATIVE MOTION FOR ONGOING ROYALTY

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ............................................................................................................1

II.    DURING THE SUNSET PERIOD OR FOR PRODUCTS NOT
     ENJOINED, THE COURT SHOULD AWARD AN ONGOING,
     PER-UNIT ROYALTY OF $0.61/$0.70 ..........................................................................1

     A.     An Ongoing Royalty Is The Appropriate Remedy For
           Continued Infringement ......................................................................................2

     B.     The Court Sets The Ongoing Reasonable Royalty Rate .........................................3

           1.     The Post-Trial *Georgia-Pacific* Analysis
                Considering Changed Economic Circumstances
                Supports an Increased Ongoing Royalty.......................................................5

           2.     The *Read* Post-Trial Willfulness Analysis Weighs
                Heavily In Favor of Enhancing the Ongoing
                Royalty Rate..............................................................................................14

     C.     The Court Defines the Terms of the Ongoing Reasonable
           Royalty................................................................................................................23

           1.     The Ongoing Royalty Should Also Apply to
                Products that Are No More Than Colorably
                Different from the Infringing Products. .....................................................23

           2.     Qualcomm Should Furnish Quarterly Accounting to
                ParkerVision. .............................................................................................24

III.    CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

CASES

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012)......................................................................................3, 14

*Affinity Labs of Tex., LLC v. BMW N. Am., LLC*,
  783 F. Supp. 2d 891 (E.D. Tex. 2011).......................................................................... passim

*Amado v. Microsoft Corp.*,
  517 F.3d 1353 (Fed. Cir. 2008)......................................................................................3, 14

*Amado v. Microsoft Corp.*,
  No. SA-CV-03-242, 2008 U.S. Dist. LEXIS 110152 (N.D. Cal. Dec. 4, 2008) ......................5

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
  670 F.3d 1171 (Fed. Cir. 2012)....................................................................................2, 3, 4

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*,
  No. CV-03-597-PHX-MHM, 2010 U.S. Dist. LEXIS 144259 (D. Ariz. Sept. 8, 2010),
  *affirmed by Bard*, 670 F.3d .......................................................................................... passim

*Boston Sci. Corp. v. Johnson & Johnson*,
  No. C 02-00790, 2009 U.S. Dist. LEXIS 35372 (N.D. Cal. April 9, 2009) ............................8

*Broadcom Corp. v. Emulex Corp.*,
  No. 2012-1309, 2013 U.S. App. LEXIS 20411 (Fed. Cir. Oct. 7, 2013) ............................1, 4

*Broadcom, Corp. v. Qualcomm, Inc.*,
  No. SACV 05-467 JVS, 2007 U.S. Dist. LEXIS 97647 (C.D. Cal. Dec. 31, 2007)........ passim

*Cummins-Allison Corp. v. SBM Co. Ltd.*,
  584 F. Supp. 2d 916 (E.D. Tex. 2008) ...............................................................................14

*Datatreasury Corp. v. Wells Fargo & Co.*,
  No. 2:06-CV-72 DF, 2011 U.S. Dist. LEXIS 118443 (E.D. Tex. Aug. 1, 2011)........12, 13, 14

*Fractus, S.A. v. Samsung Elecs. Co.*,
  876 F. Supp. 2d 802 (E.D. Tex. 2012)..................................................................................2

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  No. 2012-1334, 2013 U.S. App. LEXIS 22460 (Fed. Cir. Nov. 5, 2013) .................................1

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
    593 F. Supp. 2d 1088 (N.D. Cal. 2009) .................................................................17

*Georgia-Pacific Corp. v. U.S. Plywood Corp*,
    318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971) ...........8

*Harris Corp. v. Fed. Express Corp.*,
    2011 U.S. Dist. LEXIS 96257 (M.D. Fla. Feb. 28, 2011) .................................................17, 22

*Hybritech Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988).........................................................................................1

*I/P Engine, Inc. v. AOL Inc.*,
    Case 2:11-cv-00512-RAF-TEM, Dkt. 963, at *6 (E.D. Va. Aug. 14, 2013) ..........................25

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed Cir. 2007) (en banc)...........................................................................17

*Internet Machs. LLC v. Alienware Corp.*,
    No. 6:10-cv-23, 2013 U.S. Dist. LEXIS 115723 (E.D. Tex. June 19, 2013) .................2, 4, 17

*Joyal Prods. v. Johnson Elec. N. Am., Inc.*,
    No. 04-5172, 2009 U.S. Dist. LEXIS 15531 (D.N.J. Feb. 26, 2009),
    *aff'd* 335 F. App'x 48 (Fed. Cir. 2009)..........................................................................4, 5

*Kori Corp. v. Wilco Marsh Buggies & Draglines*,
    761 F.2d 649 (Fed. Cir. 1985).........................................................................................25

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)........................................................................................6

*Mondis Tech., Ltd. v. Chimei Innolux Corp.*,
    822 F. Supp. 2d 639 (E.D. Tex. 2011).................................................................... passim

*Mondis Tech., Ltd. v. Chimei Innolux Corp.*,
    No. 2:11-cv-378-JRG, 2012 U.S. Dist. LEXIS 60004 (E.D. Tex. Apr. 30, 2012),
    *aff'd* 2013 U.S. App. LEXIS 18971 (Fed. Cir. Sept. 13, 2013).........................................24, 25

*Morpho Detection, Inc. v. Smiths Detection Inc.*,
    No. 2:11-cv-498, 2013 U.S. Dist. LEXIS 150376 (E.D. Va. Oct. 17, 2013)...........................14

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007).....................................................................................2, 3

*Paice LLC v. Toyota Motor Corp.*,
    609 F. Supp. 2d 620 (E.D. Tex. 2009) ........................................................................3, 4, 15

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
  No. 08-CV-335, 2010 U.S. Dist. LEXIS 79039 (S.D. Cal. Aug. 5, 2010),
  *vacated on other grounds* 702 F.3d 1351 (Fed. Cir. 2012)...................................................5, 9

*Read Corp. v. Portec, Inc.,*
  970 F.2d 816 (Fed. Cir. 1992)...................................................................................................15

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,*
  758 F.2d 613 (Fed. Cir. 1985).....................................................................................................2

*Soverain Software LLC v. J.C. Penney Corp.,*
  899 F. Supp. 2d 574 (E.D. Tex. 2012) ........................................................................ passim

*Soverain Software LLC v. Newegg Inc.,*
  836 F. Supp. 2d 462 (E.D. Tex. 2010), *vacated in part and remanded
  in part on other grounds*, 705 F.3d 1333 (Fed. Cir. 2013) ....................................................24

*Syntrix Biosystems, Inc v. Illumina, Inc.,*
  No. C10-5870 BHS, 2013 U.S. Dist. LEXIS 85781
  (W.D. Wash. June 18, 2013)................................................................................1, 13, 14, 15

*Trueposition Inc. v. Andrew Corp.,*
  611 F. Supp. 2d 400 (D. Del. 2009)......................................................................17, 21, 23

*Woods v. DeAngelo Marine Exhaust., Inc.,*
  692 F.3d 1272 (Fed. Cir. 2012)................................................................................................20

## STATUTES

35 U.S.C § 284..........................................................................................................................2, 15

## OTHER AUTHORITIES

Fed. R. Civ. P. 26.........................................................................................................................20

## I.   INTRODUCTION

At trial ParkerVision sought compensatory damages from Qualcomm for patent infringement. The jury awarded $172,704,600 in damages to ParkerVision to compensate it for past infringement. Dkt. 468. ParkerVision now requests that, to the extent the Court declines to enter an injunction, for any non-enjoined product, and/or for sales by Qualcomm during the injunction's sunset period, the Court award an ongoing royalty of $0.61 per infringing receiver and $0.70 per infringing transceiver sold in or shipped into the United States post-verdict.

## II.   DURING THE SUNSET PERIOD OR FOR PRODUCTS NOT ENJOINED, THE COURT SHOULD AWARD AN ONGOING, PER-UNIT ROYALTY OF $0.61/$0.70

The Court should award ParkerVision an enhanced ongoing royalty to compensate ParkerVision for Qualcomm's post-trial sales of infringing products that the Court does not enjoin or that Qualcomm sells during the injunction's sunset period.[1] If the Court sets an ongoing royalty rate in lieu of a permanent injunction, the Court should set an enhanced rate in consideration of the fact that ParkerVision will be compelled to give up its constitutional and statutory right to exclude others from its property.[2] *See Broadcom Corp. v. Emulex Corp.*, No. 2012-1309, 2013 U.S. App. LEXIS 20411, at *31-32 (Fed. Cir. Oct. 7, 2013). When determining the amount of the ongoing royalty, under a modified *Georgia-Pacific* analysis the Court should also consider the changed the economic circumstances in October 2013 that weigh in favor of a per-unit royalty higher than that awarded by the jury—most importantly Qualcomm's admitted lack of an acceptable non-infringing alternative in 2013. *See Syntrix Biosystems, Inc v. Illumina, Inc.*, No. C10-5870 BHS, 2013 U.S. Dist. LEXIS 85781, at *7 (W.D. Wash. June 18, 2013).

---

[1] *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988) (holding that it was not an abuse of discretion to enjoin some products but not others); *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, No. 2012-1334, 2013 U.S. App. LEXIS 22460, at *17 (Fed. Cir. Nov. 5, 2013) (O'Malley, J. dissenting) (A district court has "equitable authority to award prospective relief in the form of an injunction, a compulsory license, or some combination thereof.") (citing *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314-15 (Fed. Cir. 2012)).

[2] In the equitable analysis, it also remains highly relevant that in 1999, ParkerVision walked away from Qualcomm in negotiations over the same patents. *See* Trial Tr. 10/9 at 99:16-100:1.

1

The Court should further consider Qualcomm's willful infringement in the wake of the jury's verdict and enhance the ongoing royalty rate based on the *Read* factors, in particular Qualcomm's lack of any good faith belief of non-infringement and its litigation misconduct. *See Internet Machs. LLC v. Alienware Corp.*, No. 6:10-cv-23, 2013 U.S. Dist. LEXIS 115723, at *65-66 (E.D. Tex. June 19, 2013). In light of the forcible loss of the right to exclude associated with a compulsory license, the *Georgia-Pacific* economic factors, and the *Read* willfulness factors, ParkerVision requests that the Court enhance the jury's royalty rate by a factor of three going forward, for an ongoing royalty rate of $0.61 per infringing receiver and $0.70 per infringing transceiver sold in or shipped into the United States post-verdict.[3]

## A.  An Ongoing Royalty Is The Appropriate Remedy For Continued Infringement

Despite the jury's verdict, Qualcomm continues to infringe ParkerVision's patents-in-suit. ParkerVision is entitled to be compensated for this post-verdict infringement. The Patent Act provides that, "[u]pon finding for the claimant, *the court shall award* the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." 35 U.S.C § 284 (emphasis added). "An ongoing royalty may compensate a patentee for relinquishing his right to exclude others from using his invention." *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012) (quoting *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009)). Courts typically award an ongoing royalty to compensate for infringement in cases where an injunction is not entered and the jury awarded damages based on a running royalty that compensates the patentee only through the time of trial.[4]

---

[3] *See Broadcom, Corp. v. Qualcomm, Inc.*, No. SACV 05-467 JVS, 2007 U.S. Dist. LEXIS 97647, at *6 (C.D. Cal. Dec. 31, 2007) (Qualcomm invited the Court to "impose a mandatory license in an amount treble the reasonable royalty implicitly found by the jury in its award of damages under each patent" in lieu of entering a permanent injunction).

[4] *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012) (confirming award of ongoing royalties to compensate for future infringement); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007) (affirming the appropriateness of compulsory future royalties when an injunction is not issued); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) (upholding a court-ordered royalty as a remedy for continuing

2

Here the jury's award does not compensate ParkerVision for Qualcomm's ongoing and future infringement of the patents-in-suit. Both ParkerVision's and Qualcomm's damages experts calculated damages that would compensate ParkerVision for Qualcomm's infringement only through the time of trial. *See* Trial Tr. 10/17 at 147:2-12, 155:19-24; 10/21 at 108:18-109:3. Accordingly, to the extent that the Court does not enjoin Qualcomm from continued infringing sales, or that the Court allows Qualcomm to continue its infringement during a sunset period, the Court should impose an ongoing royalty on Qualcomm's infringing sales.

### B.  The Court Sets The Ongoing Reasonable Royalty Rate

The jury determined damages for past infringement, but the Court sets a reasonable ongoing royalty rate to compensate ParkerVision for continued infringement by Qualcomm. *See Paice*, 504 F.3d at 1313 n.13, 1315-16. The ongoing rate assessed by the Court will ordinarily be higher than the royalty rate implicit in the jury's award because of changed economic circumstances that were not considered by the jury and the fact that Qualcomm's infringement is now indisputably willful.[5] This is because "[p]rior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a determination of validity and infringement has been rendered, however, the [damages] calculus is markedly different because different economic factors are involved." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1361, 1362 (Fed. Cir. 2008). "[A]n assessment of prospective damages for ongoing infringement should 'take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability.'" *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012) (quoting *Amado*, 517 F.3d at 1362).

---

infringement); *see also Paice*, 609 F. Supp. 2d at 624, 630 ("[T]he law must ensure that an adjudged infringer who voluntarily chooses to continue his infringing behavior must adequately compensate the patent holder for using the patent holder's property. Anything less would be manifestly unjust . . . .").

[5] *See, e.g., Bard*, 670 F.3d at 1193; *Soverain Software LLC v. J.C. Penney Corp.*, 899 F. Supp. 2d 574, 588-90 (E.D. Tex. 2012); *Paice*, 609 F. Supp. 2d at 624; *Broadcom Corp. v. Qualcomm Inc.*, 2007 U.S. Dist. LEXIS 97647, at *29.

An ongoing royalty rate in lieu of an injunction should seek to compensate ParkerVision for the harm resulting from the loss of its constitutional and statutory right to exclude—the unavoidable consequence of a compulsory license and ongoing royalty.[6] As discussed in ParkerVision's Motion for Injunction, if the Court determines that the equitable considerations and public interest favor permitting Qualcomm's continued infringement, ParkerVision will suffer irreparable harm including the losses of: revenue from convoyed sales for its transmit technology, goodwill and brand recognition, the right to exploit its intellectual property as it sees fit, and the ability to compete in the transceiver market on an even playing field. *See* ParkerVision's Motion for Permanent Injunction. This Court's equitable determination of an ongoing royalty should therefore attempt to compensate ParkerVision not only for the sale of the infringing functionality (as the jury's award did) but also for the irreparable harm that ParkerVision will sustain.[7]

The Court has considerable discretion in awarding an ongoing royalty and need only explain its reasoning underlying the amount established for the ongoing royalty rate. *Bard*, 670 F.3d at 1192. District courts have, however, widely adopted a modified *Georgia-Pacific* and *Read* analysis to evaluate changed economic circumstances post-trial, to account for willfulness, and ultimately to determine the appropriate ongoing royalty amount. *See, e.g., Internet Machs.*, 2013 U.S. Dist. LEXIS 115723, at *62. Here, in light of the fact that ParkerVision will be compelled to give up its constitutional and statutory right to exclude others from its property, and the post-verdict *Georgia-Pacific* and *Read* factors discussed below, the jury's effective royalty of

---

[6] *See Broadcom*, 2013 U.S. App. LEXIS 20411, at *31 ("Every patent shall contain . . . a grant to the patentee . . . of the right to exclude others from making, using, offering for sale, or selling the invention . . . ."); *id*. at *32 (recognizing the "'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent cases'") (quoting *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring)).

[7] *See Joyal*, 2009 U.S. Dist. LEXIS 15531, at *30, *39 (considering the relevant equities in arriving at an ongoing royalty rate after finding irreparable harm); *Paice*, 609 F. Supp. 2d at 630 ("Even though a permanent injunction may no longer be proper in many patent cases in light of *eBay*, an ongoing royalty rate must still adequately compensate a patentee for giving up his right under the law to exclude others from making, using, selling, offering for sale or importing his invention.").

4

approximately $0.20 ($0.203) per receiver and $0.24 ($0.235) per transceiver[8] should be trebled to a per unit ongoing royalty rate of $0.61 per receiver and $0.70 per transceiver.[9] This equates to a reasonable royalty percentage of approximately ▮▮ for receivers ▮▮▮▮ and ▮▮ for transceivers ▮▮▮▮.[10]

### 1.  The Post-Trial *Georgia-Pacific* Analysis Considering Changed Economic Circumstances Supports an Increased Ongoing Royalty

To assess changed economic circumstances for the ongoing royalty determination, district courts typically apply a modified *Georgia-Pacific* analysis focused on post-verdict conditions.[11] In this "modified" *Georgia-Pacific* analysis, courts often use the "jury's finding of the pre-judgment reasonable royalty rate as a 'starting point'" in the analysis and simply address how the post-trial reasonable royalty rate would be adjusted under *Georgia-Pacific. Mondis*, 822

---

[8] The jury awarded approximately 40% of the reasonable royalty requested by ParkerVision. The jury's award equates to a reasonable royalty percentage of approximately ▮▮ for receivers ▮▮▮▮ and ▮▮ for transceivers ▮▮▮▮. *See* Declaration of Paul Benoit in Support of ParkerVision's Motion for Post-verdict Royalties, Pre-judgment Interest, Post-judgment Interest, and Costs.

[9] *See generally Mondis Tech., Ltd. v. Chimei Innolux Corp.*, 822 F. Supp. 2d 639, 653 (E.D. Tex. 2011) (awarding 1.5% ongoing royalty where jury awarded 0.5%); *Joyal Prods. v. Johnson Elec. N. Am., Inc.*, No. 04-5172, 2009 U.S. Dist. LEXIS 15531, at *39-40 (D.N.J. Feb. 26, 2009), *aff'd* 335 F. App'x 48 (Fed. Cir. 2009) (awarding ongoing royalty rate of 26% where jury awarded an 8%); *Amado v. Microsoft Corp.*, No. SA-CV-03-242, 2008 U.S. Dist. LEXIS 110152, at *46 (N.D. Cal. Dec. 4, 2008) (awarding $0.12 per unit ongoing royalty where jury awarded $0.04); *Broadcom Corp. v. Qualcomm Inc.*, 2007 U.S. Dist. LEXIS 97647, at *29 (trebling the implicit reasonable royalty rate awarded by the jury, to an enhanced ongoing royalty rate of 4.5% and 6%).

[10] The average sales price of ▮▮▮ per transceiver is derived by Mr. Benoit based on his analysis of Qualcomm's sales of transceivers from 2006-2013. *See* Trial Tr. 10/17 at 168:10-13. During the injunction hearing, Charles Persico testified that ▮▮▮▮▮▮ Injunction Hr'g 10/22 at 77:22-25. Applying the averages sales prices of transceivers in 2013 per the testimony of Mr. Persico yields a reasonable royalty percentage of approximately ▮▮▮▮ for transceivers.

[11] *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, No. CV-03-597-PHX-MHM, 2010 U.S. Dist. LEXIS 144259, at *24 (D. Ariz. Sept. 8, 2010), *affirmed by Bard*, 670 F.3d at 1192 ("The Court finds that a 'modified *Georgia-Pacific* framework' is the most appropriate framework for determining the rate of a compulsory license, since the methodology would take into account (1) the parties' 'changed legal status' and (2) the 'different economic factors [that] are involved.'") (quoting *Amado*, 517 F.3d at 1362); *Mondis*, 822 F. Supp. 2d at 646-50 (applying the modified *Georgia-Pacific* analysis); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335, 2010 U.S. Dist. LEXIS 79039, at *16-21 (S.D. Cal. Aug. 5, 2010), *vacated on other grounds* 702 F.3d 1351, 1364 (Fed. Cir. 2012) (same).

F. Supp. 2d at 645 (quoting *Affinity Labs of Tex., LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 897 (E.D. Tex. 2011)).

The jury has already considered many of the changes to economic circumstances that occurred after the date of the hypothetical negotiation (January 2006). Both parties' damages experts relied on the "book of wisdom"[12] to account for facts that occurred after the hypothetical negotiation. For example, Qualcomm's damages expert, Dr. Gregory Leonard, relied on the VIA license agreement signed after 2006. *See* Trial Tr. 10/21 at 60:15-62:9. ParkerVision's damages expert, Mr.    Paul Benoit, described price and sales trends for infringing products that occurred after 2006. *See* Trial Tr. 10/18 at 13:20-14:3, 70:19-71:2. Thus, the jury's award already accounts for certain changed circumstances after the date of the hypothetical negotiation.

However, the jury's award did not account for certain evidence (not evaluated by the jury) reflecting significant changed circumstances in 2013 relevant to *Georgia-Pacific* factors 1, 3, 5, 6, 8-10, and 15.[13] These economic factors that impact the ongoing royalty include: (1) the impact of the jury's findings of infringement and validity on the comparability of the VIA license; (2) ParkerVision's ability to offer an exclusive license to the patents-in-suit in 2013; (3) ParkerVision's plans to directly compete with Qualcomm in the CDMA space; (4) the runaway commercial success of ParkerVision's patented technology in 2013 that promises to continue; (5) Qualcomm's post-trial admission that in October 2013 no non-infringing alternatives exist to ParkerVision's patented technology; and (6) ParkerVision's improved bargaining position in the

---

[12] The "book of wisdom" rubric acknowledges that post-hypothetical negotiation events and information (such as the infringer's actual sales and revenue up to the date of trial) may be taken into consideration when engaging in the reasonable royalty analysis. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009).

[13] *Georgia-Pacific* factors 2, 7, 11-14, and 16-17 either remain unchanged from the analysis provided by Mr. Benoit at trial or are generally not applicable to the post-trial analysis. *See Mondis*, 822 F. Supp. 2d at 647-48 (applying a modified *Georgia-Pacific* analysis and focusing on "new evidence that was not before the jury and additionally any changed circumstances (other than willfulness) between a hypothetical negotiation that occurred in 2005 (which the jury determined) and a hypothetical negotiation that would occur in 2011 after the judgment (which this Court is determining)" and treating a *Georgia-Pacific* factor as neutral where a party "made the same argument to the jury in this case, and the jury presumably considered that in its verdict").

wake of the jury's verdict. Additionally, the ongoing royalty hypothetical negotiation takes place in 2013, and some evidence heard by the jury must be weighed differently in a 2013 negotiation than it would have been in a 2006 negotiation. *See Mondis,* 822 F. Supp. 2d at 647 ("although there is no new evidence, this does not change the fact that the evidence may be weighed differently for a 2005 negotiation than a 2011 negotiation"). In consideration of these facts under the modified *Georgia-Pacific* analysis, the Court should adjust the jury's implicit royalty rate upwards.

### a) *Georgia-Pacific* Factor 1 (Royalties Paid for Patents-in-Suit)

ParkerVision's license to VIA differs from a 2013 hypothetical license to Qualcomm for a number of reasons, including the mutually-beneficial relationship between ParkerVision and VIA—in contrast to the competitive relationship between ParkerVision and Qualcomm—and the negotiation of the VIA license in 2007, before a finding of infringement and validity.

In arriving at its damages verdict, the jury considered significant evidence regarding the VIA license and the reasons it would not be comparable to a Qualcomm license. *See* Trial Tr. 10/17 at 75:14-81:3; 10/18 at 16:18-18:21. For example, the jury learned that ParkerVision licensed the patents-in-suit to VIA, its baseband partner, in an effort to bring its patented receiver technology to market and develop a productive partnership. Trial Tr. 10/17 at 77:1-15, 126:23-127:9. With Qualcomm, no such mutually beneficial relationship exists. Unlike VIA, who does not produce receivers or transceivers, Qualcomm is ParkerVision's competitor—and the dominant player in the market. Trial Tr. 10/21 at 137:12-24; Injunction Hr'g Tr. 10/22 at 11:3-12:22, 32:20-22. A court-imposed compulsory license to Qualcomm will only unilaterally improve Qualcomm's competitive position in the market. *See Broadcom*, 2007 U.S. Dist. LEXIS 97647, at *18 ("A willingness to license a competitor as part of a broad cross-license arrangement where resolution of litigation is a major incentive is not the same as the willingness to grant a competitor, who is also the dominant firm in at least the CDMA portion of the communications chip market, a license which will only serve to improve unilaterally the competitor's position."). With ParkerVision's forthcoming release of CDMA receiver products,

7

this difference from the VIA agreement takes on additional significance. Injunction Hr'g at 18:16-19:19, 47:5-14.

Another factor, not considered by the jury, further differentiates the VIA license from the hypothetical 2013 license with Qualcomm. VIA and ParkerVision negotiated the license in 2007. Trial Tr. 10/8 at 219:23-220:2, 10/21 at 129:7-25. The "vast temporal chasm" of seven years (between 1999 and 2006) guided the Court's decision to exclude damages evidence regarding the parties' 1999 negotiations. *See* Dkt. 395 at 8-9. As discussed herein, the difference of six years between the 2007 VIA agreement and the 2013 hypothetical negotiation also reflects seismic shifts in the market, changes to the parties' business models, and an admitted change in the availability of acceptable non-infringing alternatives. *See id.*

Moreover, the 2007 VIA negotiation took place before a finding of validity and infringement. Because the VIA license rates do not account for the jury's finding of validity and infringement, the VIA licensing rates "are therefore artificially low" and this factor weighs in favor of a higher ongoing royalty rate. *Boston Sci. Corp. v. Johnson & Johnson*, No. C 02-00790, 2009 U.S. Dist. LEXIS 35372, at *19-20 (N.D. Cal. April 9, 2009).

### b) *Georgia-Pacific* Factor 3 (The Nature and Scope of the License) and Factor 4 (ParkerVision's Established Policy As to Licensing)

*Georgia-Pacific* factors 3 and 4 look at the scope of the license to be granted and the licensor's established policy on licensing. *Georgia-Pacific Corp. v. U.S. Plywood Corp*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971). The parties agree that the license granted to Qualcomm will not be exclusive and that ParkerVision does not have a policy of not licensing its patents. Trial Tr. 10/18 at 27:23-28:1, 10/21 at 77:11-78:9. At this time, however, ParkerVision does not have any current licensees to the patents-in-suit. As Jeff Parker testified at trial, the licensing agreement between ParkerVision and VIA for the patents-in-suit is no longer in effect. Trial Tr. 10/17 at 138:21-139:14. Compelling ParkerVision to grant a license to Qualcomm now requires that ParkerVision give up the valuable right to offer an exclusive license to a third party in the future. *See Presidio*, 2010 U.S. Dist. LEXIS 79039, at

*19 (reasoning that "by granting a license to [defendant] now, [plaintiff] will also be giving up the right to offer an exclusive license to a third party in the future" and, therefore, *Georgia-Pacific* factor 3 weighed in plaintiff's favor).

According to the testimony of Qualcomm's own damages expert, compelling ParkerVision to forfeit the right to license its patents-in-suit on an exclusive basis warrants royalty payments of at least double the amount awarded by the jury. Dr. Leonard testified that "a licensee is going to pay more, in general for an exclusive license" and "roughly speaking, a nonexclusive rate is about half what an exclusive royalty rate is…." Trial Tr. 10/21 at 69:9-70:16. The jury calculated a royalty rate for a non-exclusive license. Injunction Hr'g at 105:13-106:5. Compelling ParkerVision to give up its right to exclude Qualcomm from practicing the patents-in-suit in exchange for an ongoing royalty requires that ParkerVision also give up the valuable right to offer an exclusive license to the patents-in-suit—value that it cannot capture elsewhere. *See Presidio*, 2010 U.S. Dist. LEXIS 79039, at *19. Equitable considerations require that Qualcomm compensate ParkerVision for this loss. Accordingly, this factor weighs in favor of at least doubling the jury's royalty rate.

### c) *Georgia-Pacific* Factor 5 (Commercial Relationship Between Licensor and Licensee)

At trial, the parties generally agreed that at the time of the January 2006 hypothetical negotiation the relationship between the parties would have been that of inventor and promoter, rather than competitors. Trial Tr. 10/21 at 79:2-6; Trial Tr. 10/18 at 24:15-17. Since then, however, ParkerVision has redoubled its efforts to market its Direct to Data (D2D) technology that embodies the patents-in-suit. *See* Injunction Hr'g Tr. 10/22 at 10:4-12:22 ("Q: Has ParkerVision always considered Qualcomm a competitor? A: Not always, but in this particular time frame, we sure did."). A post-trial October 2013 hypothetical negotiation must account for ParkerVision's plans to release a product in mid-2014 that will directly compete with Qualcomm's single- and dual-band CMDA products. *See id*. at 18:16-19:20, 47:5-14. The fact that ParkerVision will compete directly with Qualcomm "supports a higher rate because a patent

9

owner is more likely to extract a greater royalty from a direct competitor in order to account for lost sales and profits." *Bard*, 2010 U.S. Dist. LEXIS 144259, at *11-12, 27.

### d) *Georgia-Pacific* Factor 6 (Effect of Patented Feature in Promoting Sales of Other Products)

The jury heard Qualcomm's arguments that its basebands and other functionality in its receivers and transceivers drove demand for the infringing products. *See, e.g.*, Trial Tr. 10/21 at 166:9-167:21. The jury also considered evidence that the features and functionality enabled by the patents-in-suit drove demand for Qualcomm's infringing products. *See, e.g.*, Trial Tr. 10/17 at 160:1-161:20. The jury's damages award presumably accounts for its consideration of this evidence, which remains unchanged post-verdict. *See Mondis*, 822 F. Supp. 2d at 647-48.

In assessing a reasonable royalty, the jury did not, however, consider the impact of convoyed sales benefits.[14] In its analysis of the proper ongoing royalty, the Court should consider the convoyed sales benefits associated with sales of receivers and transceivers that embody the patents-in-suit—both ParkerVision's loss of convoyed sales benefits, and Qualcomm's avoidance of convoyed sales losses. With respect to ParkerVision, a compulsory license will lessen ParkerVision's sales of its complimentary transmit technology, which would "piggyback" on the sales of its receiver technology. *See* Injunction Hr'g at 29:16-20. Additionally, according to the testimony of Mr. Persico, an ongoing royalty in lieu of an injunction will prevent Qualcomm's loss of vast amounts of revenue from the sales of basebands that cannot be sold in the absence of the infringing products. *See id.* at 77:17:25, 79:22-80:4, 80:16-20, 85:12-17 ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. A trebled ongoing royalty rate represents merely a fraction of that revenue.

---

[14] Mr. Benoit had based his theory and quantification of convoyed sales on evidence from the prior negotiations between ParkerVision and Qualcomm in 1999. *See* Ex. 1 at ¶ 181, Ex. 2 (relying on the 1999 negotiations to establish convoyed sales). Although in its *Daubert* ruling the Court did not specifically exclude Mr. Benoit's theory of convoyed sales as unreliable, it nonetheless excluded the evidence of convoyed sales benefits on which Mr. Benoit's based his quantification of the convoyed sales benefits. *See* Dkt. 395 at 7-10.

**e)** ***Georgia-Pacific*** **Factor 8-10 (Established Profitability of the Products, Benefits and Advantages of the Patents-in-Suit)**

Two major differences in the analysis of *Georgia-Pacific* factors 8-10 between 2006 and 2013 should weigh in favor of a higher ongoing royalty: the dramatic commercial success of the infringing products and features enabled by the patents-in-suit in 2013, and the admitted absence of any non-infringing alternative to the patents-in-suit in 2013.

> **(1)** *The benefits enabled by the patents-in-suit are mandatory in cell phones in 2013, whereas in 2006 they were "nice to have."*

As opposed to 2006, in 2013 the patented technology "has proven to be more of a commercial success." *Mondis*, 822 F. Supp. 2d at 648. In 2006, Qualcomm's sales of infringing products generated annual revenue of ███████; by 2012 Qualcomm's sales of infringing products generated annual revenue of ███████. Ex. 3. During the same timeframe, Qualcomm's market share increased from 41% in 2006 to 88% in 2012. *Id*. at 163:5-23. And as Mr. Benoit and Mr. Parker explained at trial, the demand for the features enabled by ParkerVision's patents-in-suit (such as multimode) has climbed dramatically, and continues to climb, in conjunction with the increase in popularity of smartphones that demand features such as "additional receiver inputs which would provide faster data rates." Trial Tr. 10/17 at 160:11-12, 138:2-20; *see* Ex. 4 at 240-44 (recognizing that today's multi-featured RF transceivers need features such as multi-mode and multi-band capabilities, low power consumption, and smaller size). During the injunction hearing, Mr. Persico testified that today—in 2013—Qualcomm's customers value lower cost, better power consumption, and receiver diversity. Injunction Hr'g 10/22 at 60:20-61:6, 95:16-96:11. He further testified that Qualcomm's ███████ ███████ and that without ParkerVision's technology, a major re-design would be necessary to create products that could support LTE. *Id*. at 85:18-86:10.

The Court instructed the jury that in formulating a damages award, the jury should consider evidence of the popularity and profitability of the features enabled by the patents-in-suit in 2006, and the subsequent popularity. Trial Tr. 10/22 at 97:24-98:1. In this post-trial 2013

hypothetical negotiation, however, the Court should not consider (as the jury did) an "average" of the market's demand for the features enabled by the patents-in-suit between 2006 and 2013— the Court should consider demand in 2013. *See Mondis*, 822 F. Supp. 2d at 645. Just as the court reasoned in *Mondis*, in 2006 ParkerVision's patented technology had not yet had the success that it now enjoys in 2013. *Id.* at 648. "[T]his changed position in 20[13] warrants an increase from the jury's determination, which was made for a 200[6] hypothetical negotiation." *See id.*

> ### (2) *Unlike in 2006, Qualcomm admits that in 2013 no acceptable non-infringing alternatives exist.*

Availability of acceptable non-infringing alternatives is considered as part of an ongoing royalty analysis within *Georgia-Pacific* Factor 9, "the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." *Datatreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72 DF, 2011 U.S. Dist. LEXIS 118443, at *33-34 (E.D. Tex. Aug. 1, 2011). Here the undisputed lack of an acceptable, non-infringing alternative to ParkerVision's patented downconversion technology in October 2013 renders the jury's reasonable royalty analysis fundamentally different from the Court's ongoing reasonable royalty analysis. During trial, Dr. Leonard stated that the availability of an acceptable non-infringing alternative (purportedly the ZIF technology) was an important factor supporting his proposed royalty rate for the 2006 hypothetical negotiation. Trial Tr. 10/21 at 56:4-11, 80:14-82:3, 96:21-97:7. During the Court's injunction hearing while the jury was deliberating, however, in contradiction to the testimony that the jury heard, Qualcomm's Senior Vice President of Engineering, Charles Persico, testified that in 2013 no acceptable, non-infringing alternatives exist to ParkerVision's patents-in-suit:



Injunction Hr'g Tr. 10/22 at 94:19-25.[15] Qualcomm admittedly "has no readily apparent alternative if it seeks to continue its production and sale of the infringing product[s]." *Syntrix*, 2013 U.S. Dist. LEXIS 85781, at *7. The admitted lack of any acceptable non-infringing alternative weighs heavily in favor of a higher royalty rate. *Id.*; *see also Datatreasury*, 2011 U.S. Dist. LEXIS 118443, at *59.

> (3) *An ongoing royalty permits Qualcomm to save the costs and resources that would be required for a design-around.*

Even assuming that Qualcomm could, given adequate time, develop an acceptable non-infringing alternative, the ongoing royalty rate awarded should be increased to reflect Qualcomm's cost savings that will result from not having to implement changes or design-around ParkerVision's patents-in-suit. "When considering how much the post-judgment market royalty should be enhanced, it is reasonable to examine the costs that the [defendants] avoid by the imposition of an ongoing royalty." *Affinity,* 783 F. Supp. 2d at 904.

Mr. Persico testified that it would take between ███████ months of effort, as well as considerable manpower and expense, to re-design the RFR6000 to conform to the requirements of Qualcomm's customers today (current technology node and multimode capabilities, for example). *See* Injunction Hr'g 10/22 at 72:2-19, 85:18-86:10. An ongoing royalty in lieu of an injunction allows Qualcomm to save the cost of designing around the patents-in-suit.

### f) *Georgia-Pacific* Factor 15 (Consideration of the Relative Bargaining Position of the Parties)

ParkerVision's bargaining position in 2013 has substantially improved since 2006 in light of the jury's verdict that the patents-in-suit are valid and infringed.[16] *See Morpho Detection, Inc.*

---

[15] Qualcomm has not identified any potential noninfringing alternatives other than the IFR3000 and its ZIF products. *See* Ex. 12 at 5 (identifying noninfringing alternatives).

[16] Some courts discuss a tension between the pre-verdict hypothetical negotiation's assumption of infringement and validity, and an enhancement to the post-verdict ongoing royalty rate based on the defendant's new status as an adjudged infringer. *See, e.g., Cummins-Allison Corp. v. SBM Co. Ltd.*, 584 F. Supp. 2d 916, 918 (E.D. Tex. 2008); *Datatreasury*, 2011 U.S. Dist. LEXIS 118443, at *28-30. The Federal Circuit has implicitly rejected this argument. *See Amado*, 517 F.3d at 1362 ("Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in

*v. Smiths Detection Inc.*, No. 2:11-cv-498, 2013 U.S. Dist. LEXIS 150376, at *28-29 (E.D. Va. Oct. 17, 2013) ("Morpho offers a compelling argument that after the jury found Morpho's patent valid and found that Smiths' commercialized product infringed on Morpho's patent, Morpho was in a far superior bargaining position than it was in more than a year earlier . . ."); *Syntrix,* 2013 U.S. Dist. LEXIS 85781, at *7 ("Syntrix is in a stronger bargaining position than it was prior to the verdict . . ."); *Datatreasury*, 2011 U.S. Dist. LEXIS 118443, at *63 ("also tending to increase the proper royalty rate is U.S. Bank's status as an adjudged infringer"). The Court should adjust the ongoing royalty rate upwards to reflect ParkerVision's improved bargaining position in the 2013 hypothetical negotiation.

## 2. The *Read* Post-Trial Willfulness Analysis Weighs Heavily In Favor of Enhancing the Ongoing Royalty Rate

In determining the appropriate ongoing royalty rate, the Court should consider the fact that Qualcomm is now willfully infringing ParkerVision's patents. *See Datatreasury*, 2011 U.S. Dist. LEXIS 118443, at *30. During the willfulness phase of the jury trial, Qualcomm argued that its infringement had not been willful because it did not have knowledge of the patents-in-suit and reasonably believed that it did not infringe any valid patents. *See e.g.*, Trial Tr. 10/17 at 67:2-68:16, 10/22 at 26:24-27:13. In light of the jury's finding of infringement and validity, Qualcomm no longer has such excuses.[17] Following a jury verdict of infringement and validity, courts routinely find that a defendant's continued infringement is necessarily willful. *See, e.g.,*

---

the context of that uncertainty. Once a judgment of validity and infringement have been entered, however, the calculus is markedly different because different economic factors are involved"). Indeed, the Federal Circuit is clear that defendant's status as an adjudged infringer post-verdict causes "a substantial shift in the bargaining position of the parties." *ActiveVideo*, 694 F.3d at 1342.

[17] To the extent Qualcomm argues that its infringement cannot be willful prior to the Court ruling on its motions for judgment as a matter of law and the Federal Circuit resolving its appeal, other courts have rejected such arguments. *See, e.g., Mondis,* 822 F. Supp. 2d at 649-51 (rejecting the argument that ongoing infringement should be considered willful only after the defendant exhausts appellate rights); *Syntrix,* 2013 U.S. Dist. LEXIS 85781, at *7 (rejecting argument that the royalty rate should not be enhanced post-verdict prior to rulings on post-judgment motions on the grounds that the parties' status is changed post-verdict, the plaintiff is in a stronger position to negotiate the ongoing royalty rate, and "if "[the defendant] is successful with its post judgment motions, then the ongoing royalty rate is irrelevant").

*Affinity,* 783 F. Supp. 2d at 901-02; *Paice*, 609 F. Supp. 2d at 626; *Broadcom*, 2007 U.S. Dist. LEXIS 97647, at *29 ("By definition, any infringement by Qualcomm after May 29, 2007 is wilful, and carried out with a full knowledge of, and in spite of, Broadcom's patent rights. This warrants the maximum enhancement of damages permitted by the law. 35 U.S.C. § 284."). The Court should take willfulness into account in calculating the ongoing royalty rate and may award damages up to three times the royalty rate awarded by the jury to compensate for willful infringement. *Paice*, 609 F. Supp. 2d at 626.

In determining the appropriate amount of enhancement for willfulness, district courts often consider the *Read* factors traditionally taken into account when determining whether, and to what degree, to enhance a past damages award upon a finding of willfulness.[18] *See, e.g., Affinity,* 783 F. Supp. 2d at 901-02. Here, in addition to the changed economic considerations under the *Georgia Pacific* analysis, the relevant *Read* factors favor a post-verdict enhancement of the royalty awarded by the jury. The Federal Circuit has affirmed ongoing royalties that double or treble the jury's royalty rate in consideration of the adjudged infringer's post-trial, ongoing willful infringement. *See, e.g., Bard,* 2010 U.S. Dist. LEXIS 144259, at *27 (enhancement from 10% reasonably royalty rate set by the jury to 20% for surgical graft products); *Soverain*, 899 F. Supp. 2d at 590 ("Taking all of the *Read* factors into consideration, a 2.5x enhancement to the jury's implied royalty rate is appropriate.").

### a) *Read* Factor 1 (Copying)

ParkerVision presented substantial evidence that Qualcomm engaged in copying of ParkerVision's patented technology. During their negotiations in 1998-99, ParkerVision

---

[18] The *Read* factors aid in evaluating the degree of an infringer's culpability for the purpose of making determinations regarding enhancement of damages for willful infringement: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of defendant's misconduct; (7) any remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992).

disclosed to a limited number of senior Qualcomm engineers and executives a detailed view of its technology, including providing several demonstration board prototypes (the Eddie 1 and Eddie 2) that embodied the ParkerVision down-conversion technology protected by the patents-in-suit. Trial Tr. 10/8 at 15:1-37:23. Qualcomm's engineers carefully studied ParkerVision's technology. *See id*. Some of the same senior engineers who received the disclosure of ParkerVision's technology also worked on the design and development of Qualcomm's early infringing products—for example, Charles Persico and Steve Ciccarelli. *See* Trial Tr. 10/9 at 33:16-24, 158:21-159:1; Ex. 5 at 40:15-41:22; 43:05-43:09; 46:08-46:16; 46:18-46:20; 48:20-49:08; 50:14-50:22. Additionally, shortly before Qualcomm began infringing, Qualcomm engineers explicitly discussed copying the ParkerVision approach. In May 2004, Qualcomm product designers Steven Ciccarelli and Seyfi Bazarjani revisited "the idea of RF sampling" for receivers using ParkerVision's approach in Qualcomm's "next generation radio transceiver." Ex. 6. Bazarjani stated he would "set up a meeting with Chuck [Wheatley] to go over parker vision [sic] approach and see if we can make it work." *Id.* This evidence raises an inference of copying and favors enhanced damages.

### b)  *Read* **Factor 2 (Investigation of Scope and Good Faith Belief in Non-Infringement)**

The second *Read* factor addresses whether the infringer investigated the scope of the patent and had a good faith belief that the patent was invalid or not infringed. *Affinity*, 783 F. Supp. 2d at 902-03. *Read* factor two strongly favors enhancement because Qualcomm is now an adjudged infringer and the jury found the patents-in-suit valid. *See Internet Machs.*, 2013 U.S. Dist. LEXIS 115723, at *65-66; *Mondis*, 822 F. Supp. 2d at 653; *Soverain*, 899 F. Supp. 2d at 589; *Trueposition Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400, 411 (D. Del. 2009) ("This factor now weighs heavily in favor of enhanced damages."). Accordingly, Qualcomm "cannot assert a good-faith belief of non-infringement or invalidity," *Soverain*, 899 F. Supp. 2d at 589, and these factors must exert "an upward influence on the amount of the enhancement…." *Affinity*, 783 F. Supp. 2d at 902-03.

16

Moreover, although an infringer's failure to proffer a favorable opinion of counsel is not dispositive of the willfulness inquiry, it is crucial to the analysis. *In re Seagate Tech., LLC,* 497 F.3d 1360, 1369 (Fed Cir. 2007) (en banc). Qualcomm's failure to seek an opinion of this counsel in this case reflects that Qualcomm did not diligently investigate the scope of the patents-in-suit.[19] *See Harris Corp. v. Fed. Express Corp.*, 2011 U.S. Dist. LEXIS 96257, 14 (M.D. Fla. Feb. 28, 2011); *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1114 (N.D. Cal. 2009) (concluding that defendant's failure to "obtain any opinions from U.S. counsel until after this action was initiated" supported an award of enhanced damages). Indeed, "there is no evidence in the record to support a finding that [Qualcomm] made any effort to ensure that it was not infringing" at the time that Qualcomm developed and released the infringing products. *See Harris*, 2011 U.S. *Dist*. LEXIS 96257, at *14. To the extent that Qualcomm conducted any investigation into the scope of the patents-in-suit, one of its most senior engineers, Charles Wheatley, told Qualcomm's top executives that "[b]ottom line is, I think it is going to be very difficult for anybody to ever use this technique [ParkerVision's energy transfer sampling] without stepping on one or more of [ParkerVision's] claims." Ex. 7; Trial Tr. 10/8 at 42:17-22.

### c)  *Read* **Factor 3 (Litigation Related Behavior)**

Qualcomm engaged in litigation misconduct on multiple fronts: using pre-trial tactics for the primary purpose of unnecessarily increasing the cost and burden of this litigation on ParkerVision, publicly filing slanderous documents with no purpose other than mud-slinging, and pursuing discovery and litigation strategies that concealed relevant evidence from the jury.

> (1) *Qualcomm's bad faith litigation strategies inflated ParkerVision's litigation cost and burden.*

Throughout the course of this litigation, rather than addressing the patent infringement

---

[19] Although the jury did not consider Qualcomm's failure to seek or obtain the advice of counsel, the Court may nonetheless consider such evidence in its equitable determination. *See* Trial Tr. 10/22 at 66:22-67:6, 67:13-17.

issues on the merits, Qualcomm pursued frivolous counterclaims and litigation tactics designed to unnecessarily increase the cost and burden of this litigation on ParkerVision.

Qualcomm repeatedly alleged and litigated entirely baseless claims. First, Qualcomm asserted and actively litigated wholly speculative counterclaims against ParkerVision's (and Qualcomm's) former counsel, Sterne Kessler, of breach of fiduciary duty and breach of contract, and against ParkerVision of aiding Sterne Kessler in breach of fiduciary duty and tortious interference with contract. Dkt. 91. Observing that Qualcomm's allegations consisted of "speculation," "innuendo," and an "attenuated chain of inferences," the Court granted Sterne Kessler's Motion to Dismiss and abated the claims against ParkerVision. Dkt. 197 at 3-4; Dkt. 238 at 10. Second, Qualcomm maintained allegations of inequitable conduct against the lead inventor of the patents-in-suit, David Sorrells, and Sterne Kessler attorney, Michael Lee, accusing them of "deliberate egregious misconduct" and "material misrepresentations" made with "specific intent to mislead and deceive the PTO." Dkt. 238 at 4, 7. In the January 2013 hearing on ParkerVision's motion to strike Qualcomm's inequitable conduct pleading, in open court Qualcomm repeatedly accused Mr. Sorrells and Mr. Lee of lying. *See* H'rg Tr. 01/10/13 at 25:3-8, 30:24-31:5, 37:12-13, 38:18. The Court dismissed certain inequitable conduct claims and Qualcomm dropped the remaining claim after the Court cautioned Qualcomm that it would consider imposing sanctions should Qualcomm pursue "specious" inequitable conduct theories. Dkt. 238 at 5, 7, 9; Dkt. 242. Third, Qualcomm filed public allegations of misappropriation of trade secrets and wrongdoing that lacked any basis, again publicly slandering ParkerVision and several of its employees and executives. *See* Dkt. 179. After inappropriately seeking discovery of documents and taking several depositions on topics totally irrelevant to the patent infringement claims in the case,[20] Qualcomm never sought to file claims of misappropriation of trade secrets.

Additionally, Qualcomm stonewalled on providing discovery without any legal basis or

---

[20] Qualcomm spent hours questioning ParkerVision's witnesses (Jeffrey Leach, Richard Harlan, Bill Baker, and David Sorrells) on these irrelevant issues and demanded that ParkerVision undertake extreme discovery measures. *See, e.g.*, Exs. 8, 9, 10.

justification. For example, ParkerVision had to resort to filing a motion to compel Qualcomm's responses to its interrogatories number 20-25, which the Court's case management order explicitly provided for. *See* Dkt. 232. As the Court stated in its order granting ParkerVision's motion to compel, "[i]t should go without saying that upon the issuance of a court order, the order becomes binding on the parties . . ." and "it is explicitly stated in the CMSO, 'This order controls the subsequent course of this proceeding.'" *Id*. at 2.

### (2) *Qualcomm engaged in public slander designed only to negatively impact public opinion of ParkerVision.*

Qualcomm also engaged in misconduct by using this litigation as a means to publicly make slanderous allegations against ParkerVision, unrelated to the claims at issue. Qualcomm publicly filed a "Notice of Counterclaim" in which it accused ParkerVision and its employees and executives of "theft," "illegal conduct," and "stealing." Dkt. 179 at 3, 7. For example, the Notice states: "the involvement of virtually all of ParkerVision's high-ranking executives make this theft . . . particularly shocking." Dkt. 179 at 3; *see also id*. at 6 ("It is clear that ParkerVision and its employees, including executives, and ParkerVision's sources, understood that their activity was illegal and that the documents they had illegally obtained."). Qualcomm knew that these allegations lacked any basis in fact, and never sought to plead actual claims of misappropriation of trade secrets. *See* Ex. 8 at 13:16-14:15, 16:18-20, 97:2-98:22.

### (3) *Qualcomm undertook a trial strategy designed to conceal key information from the jury's consideration.*

Qualcomm also pursued discovery and litigation strategies that improperly prevented the jury from considering the full scope of the damages evidence adverse to Qualcomm. Specifically, Qualcomm failed to timely admit that no acceptable non-infringing alternatives exist in 2013.

Throughout the duration of this litigation—in discovery responses, expert reports, briefs filed with the Court, and the testimony of Mr. Jaffee, Dr. Williams, and Dr. Leonard at trial— Qualcomm repeatedly asserted that its Zero-IF technology is an acceptable non-infringing

alternative to ParkerVision's Patent-in-Suit, and the existence of the non-infringing alternative must depress the reasonable royalty rates. *See* Ex. 11 at ¶¶ 32, 70, 94, 102, 135, 138, 143, 146, 203; Dkt. 270 at 8-9; Ex. 12 at 5; Trial Tr. 10/21 at 55:3-56:11, 96:26-97:7, 120:12-15, 122:4-10, 184:22-190:25. Through the testimony of these three individuals, Qualcomm presented the jury with the fallacy that non-infringing alternatives to ParkerVision's technology exists today. As discussed above, however, during the injunction hearing outside of the presence of the jury, and in contradiction to Qualcomm's long-standing discovery responses, Mr. Persico definitively stated that in 2013 no acceptable, non-infringing alternatives exist to ParkerVision's patented technology. Injunction Hr'g Tr. 10/22 at 94:19-25. Mr. Persico's testimony confirms the position that ParkerVision and its damages expert, Mr. Benoit, have consistently maintained. Trial Tr. 10/17 at 180:21-181:1, 10/18 at 32:6-19. The reality of the absence of any non-infringing alternative should have been truthfully disclosed to ParkerVision in discovery or, at the latest, in expert reports, so that ParkerVision could have presented this evidence as an admitted fact to the jury. *See Woods v. DeAngelo Marine Exhaust., Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012) ("Rule 26 . . . requires that a party who responded to an interrogatory . . . supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect. . . ."). Instead, Qualcomm waited until after trial, outside of the presence of the jury, and when it would serve their interests to establish undue hardship from a permanent injunction to reveal this critical fact—that it previously concealed. Qualcomm's "lack of candor with the court, the jury, and [ParkerVision] tips this factor heavily in favor of enhanced damages." *Trueposition*, 611 F. Supp. 2d at 412.

> (4) *Qualcomm consistently concealed communications with VIA, causing prejudice to ParkerVision's litigation and business efforts.*

Throughout the course of this litigation, Qualcomm has repeatedly engaged in opaque, improper efforts to use ParkerVision's business partner VIA to ParkerVision's detriment. First, as discussed in greater detail in ParkerVision's Motion for Rule 37 Sanctions, Qualcomm has repeatedly concealed suspect communications with VIA—in violation of its obligations to

ParkerVision—and thereby prejudiced ParkerVision in this litigation and in business. *See* Dkt. 323 at 26-35. Since April 2012, ParkerVision has requested that Qualcomm produce all correspondence with subpoenaed third parties. *See* Exs. 13, 14, 15, 16. ParkerVision ultimately had to resort to filing a motion to compel, and only then did Qualcomm agree to produce third party correspondence. *See* Dkt. 171 at 9; Dkt. 221 at 1. Qualcomm's correspondence with VIA revealed the cause for Qualcomm's reluctance: Qualcomm had attempted to keep the correspondence with VIA secret in order to prevent ParkerVision's involvement. *See* Ex. 17. Second, Qualcomm received a tremendous production of third-party discovery from VIA and, despite ParkerVision's numerous discovery requests and reminders, Qualcomm failed to produce the documents to ParkerVision until August 16, 2013. *See* Ex. 18. Despite ParkerVision's good faith effort to clarify the issue with Qualcomm and resolve the issue, Qualcomm failed to provide ParkerVision with any explanation of the circumstances of the failure to produce documents— forcing ParkerVision to brief the issue and seek relief from the Court. Dkt. 323 at 16-25. Third, Qualcomm attempted to subvert the Court's order excluding the late-produced VIA documents by calling a VIA representative, Mark Davis, to testify at trial. *See* Trial Tr. 10/8 at 211:3-215:16. Fourth, in the midst of trial and just days before it planned to present Mark Davis' testimony, Qualcomm (at 4:46 am on October 8, 2013) served ParkerVision with 54 documents reflecting its communications with VIA—documents that Qualcomm should have produced far sooner under the parties' agreement. *See* Trial Tr. 10/8 at 216:10-11; Ex. 19. Some of these documents bore dates as early as August 14, 2013. Ex. 20.

The contents of these communications between Qualcomm and VIA raise serious questions regarding the propriety of Qualcomm's attempts to secure the testimony of a VIA representative at trial. *See* Trial Tr. 10/8 at 214:14-16. Qualcomm entered into a previously undisclosed agreement with VIA to indemnify VIA in the event that it got sued by ParkerVision. *See* Ex. 21 at 1-5; Trial Tr. 10/8 at 215:7-10. And correspondence involving Qualcomm suggests that improper business arrangements may have been offered in exchange for VIA producing Mark Davis as a witness at trial. *See* Exs. 22, 21 at 1-5.

### d) *Read* Factor 4 (Qualcomm's Size and Financial Condition)

The fourth *Read* factor, the defendant's size and financial condition, supports a higher enhancement amount under the facts of this case. *See Affinity*, 783 F. Supp. 2d at 903, 905 (holding that *Read* factor 4 supported imposing a greater ongoing royalty greater where defendants' were large, profitable companies). Qualcomm is a large company by any standard, but especially in comparison to ParkerVision. *Compare* Ex. 23 at 35 *with* Ex. 24 at 49. *Read* factor 4 weighs in favor of enhancement where the defendant is a large, profitable company. *Soverain*, 899 F. Supp. 2d at 589. Infringement by a large, extraordinarily profitable company such as Qualcomm is "not likely to be deterred by a per unit enhancement amount that is low in absolute terms, even if the amount sounds high when expressed as a percentage." *Affinity*, 783 F. Supp. 2d at 903.

### e) *Read* Factor 5 (Closeness of the Case)

This was not a close case. With respect to claim construction, the Court adopted most of ParkerVision's proposed constructions and rejected 43 out of 44 of Qualcomm's proposed constructions. Dkt. 243 at 9, 13, 16, 17, 20, 26, 27, 29, 32, 36, 38, 40, 44-46; *see Harris Corp.*, 2011 U.S. Dist. LEXIS 96257, at *23 (considering claim construction rulings in evaluating *Read* factor five). The Court dismissed Qualcomm's inequitable conduct claims. Dkt. 238 at 9. Qualcomm dropped its defenses based on laches, enablement, and obviousness. *See* Trial Tr. 10/15 at 20:2-4, 176:13-17; Ex. 25. Qualcomm presented no expert testimony of non-infringement. And the jury returned a verdict in ParkerVision's favor on infringement and validity for each of the eleven asserted claims and against each of the 19 accused Qualcomm products. Dkt. 416. The lack of closeness of the case weighs in favor of enhancing damages.

### f) *Read* Factors 6 and 7 (Duration of Misconduct and Any Remedial Efforts)

The sixth *Read* factor weighs in favor of enhanced damages. Qualcomm's infringement began in January 2006. Prior to trial, Qualcomm had already infringed for more than seven years. Qualcomm has made no showing that, in the two years after ParkerVision filed suit (from 2011-

2013) it undertook any measures to stop infringing or design around ParkerVision's patents-in-suit. Qualcomm has continued to sell and ship infringing products even after the jury's verdict that Qualcomm infringes ParkerVision's patents. *See* Injunction Hr'g at 85:18-25. "Insofar as [Qualcomm's] infringement has never ceased, this factor now tips heavily in favor of enhancement." *Trueposition*, 611 F. Supp. 2d at 412.

Likewise, *Read* factor seven, "regarding remedial action, favors enhancement because there is no evidence that [Qualcomm has] taken any steps to stop infringement" or that Qualcomm has attempted to design around the patents-in-suit. *Soverain*, 899 F. Supp. 2d at 589. Accordingly, *Read* factors six and seven support enhancing the ongoing royalty.

### g) *Read* Factor 8 (Motivation to Harm Plaintiff)

Qualcomm's actions described above with respect to *Read* factor eight reflect that, through its actions in this litigation, Qualcomm intended to inflict harm on ParkerVision's business and reputation. As discussed above, Qualcomm seized the opportunity to use this litigation to publicly slander ParkerVision, making accusations irrelevant to the actual issues involved in the litigation and exceeding the bounds of zealous advocacy.

Evaluating all of the *Read* factors together reflects a trend of willfulness and misconduct by Qualcomm that warrants an enhancement of treble damages to the ongoing royalty rate.

### C.  The Court Defines the Terms of the Ongoing Reasonable Royalty

As demonstrated in *Bard*, in order to short-circuit future disputes the Court may include the specific terms of the ongoing royalty in its final judgment. Should the Court deny a permanent injunction, ParkerVision requests that the Court adopt the language and terms of the attached ongoing royalty proposal in its final judgment.[21]

### 1.  The Ongoing Royalty Should Also Apply to Products that Are No More Than Colorably Different from the Infringing Products.

---

[21] ParkerVision's proposed order is modeled after the ongoing royalty terms ordered by the court in *Bard*, 2010 U.S. Dist. LEXIS 144259, at *32-41; *see also* Ex. 27.

The ongoing royalty should apply not only to the products found to be infringing at trial, but also those Qualcomm products that are not more than "colorably different" from the products adjudicated to infringe. The Federal Circuit recently affirmed a district court's determination that, for the purposes of an ongoing royalty, "'Infringing Products' should be defined as those [products] that were actually accused at trial, *and those that are not colorably different* from those [products] accused at trial with respect to the infringed claims." *Mondis Tech., Ltd. v. Chimei Innolux Corp.*, No. 2:11-cv-378-JRG, 2012 U.S. Dist. LEXIS 60004, at *7 (E.D. Tex. Apr. 30, 2012), *aff'd* 2013 U.S. App. LEXIS 18971 (Fed. Cir. Sept. 13, 2013) (emphasis added).[22] Thus, the ongoing royalty set by the Court should apply to each product that the jury found infringes ParkerVision's patents-in-suit and all products that are not more than a colorable variation of the products adjudicated to infringe.

### 2.   Qualcomm Should Furnish Quarterly Accounting to ParkerVision.

ParkerVision respectfully requests that the Court order Qualcomm to (1) keep certified records of sales, shipments, and accounting, (2) tender royalty payments and reports on a quarterly basis, and (3) pay interest in the event of an underpayment. ParkerVision also requests the right to audit Qualcomm's books as necessary to ensure compliance.

ParkerVision first requests that the Court order Qualcomm to keep complete, true and accurate books of account and records, including but not limited to, unit sales, dollar sales, final destination, and average selling price for infringing products, for the purpose of determining the royalty amounts payable. *Bard*, 2010 U.S. Dist. LEXIS 144259, at *37 (imposing similar terms); *see Kori Corp. v. Wilco Marsh Buggies & Draglines*, 761 F.2d 649, 655 (Fed. Cir. 1985) ("Fundamental principles of justice require us to throw any risk of uncertainty upon the

---

[22] *See also Bard*, 2010 U.S. Dist. LEXIS 144259, at *30 ("[w]ith respect to the range of products that the compulsory license will cover, the Court . . . finds the compulsory license should also cover new vascular indications for the products that have been found by the jury to infringe upon the Goldfarb patent."); *Soverain Software LLC v. Newegg Inc.*, 836 F. Supp. 2d 462, 484 (E.D. Tex. 2010), *vacated in part and remanded in part on other grounds*, 705 F.3d 1333 (Fed. Cir. 2013) (ongoing royalties are appropriate when a defendant's alleged "design-arounds are not colorably different and thus still infringing") (citing *Creative Internet Adver. Corp. v. Yahoo!, Inc.*, 674 F. Supp. 2d 847, 855 (E.D. Tex. 2009)).

wrongdoer rather than upon the injured party."). Second, ParkerVision requests that the Court order Qualcomm to tender quarterly royalty reports and payments to ParkerVision. *See Mondis*, 2012 U.S. Dist. LEXIS 60004, at *11 (ordering infringer to make ongoing royalty payments and provide reports on a quarterly basis). Qualcomm should tender the reports and payments within thirty days after the end of each calendar quarter. *See id*. Third, ParkerVision requests the right to direct an independent certified accounting firm to inspect and audit Qualcomm's relevant accounting and sales books and records.[23]

## III. CONCLUSION

To the extent that the Court enters an injunction with a sunset period or denies ParkerVision's Motion for Injunction, ParkerVision respectfully requests that the Court grant this motion and adopt ParkerVision's proposed order awarding an enhanced ongoing royalty.

---

[23] *See Bard*, 2010 U.S. Dist. LEXIS 144259, at *38 (imposing identical terms); Ex. 26, *I/P Engine, Inc. v. AOL Inc.*, Case 2:11-cv-00512-RAF-TEM, Dkt. 963, at *6 (E.D. Va. Aug. 14, 2013) (granting plaintiff the right to request audits).

December 2, 2013

Respectfully submitted,

**McKOOL SMITH, P.C.**

/s/ *Douglas A. Cawley*
Douglas A. Cawley, Lead Attorney
Texas State Bar No. 04035500
E-mail: dcawley@mckoolsmith.com
Richard A. Kamprath
Texas State Bar No.: 24078767
rkamprath@mckoolsmith.com
Ivan Wang
Texas State Bar No.: 24042679
E-mail: iwang@mckoolsmith.com
McKool Smith P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4322

T. Gordon White
Texas State Bar No. 21333000
gwhite@mckoolsmith.com
Kevin L. Burgess
Texas State Bar No. 24006927
kburgess@mckoolsmith.com
Josh W. Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
Leah Buratti
Texas State Bar No. 24064897
lburatti@mckoolsmith.com
Mario A. Apreotesi
Texas State Bar No. 24080772
mapreotesi@mckoolsmith.com
Kevin Kneupper
Texas State Bar No. 24050885
kkneupper@mckoolsmith.com
James Quigley
Texas State Bar No. 24075810
jquigley@mckoolsmith.com
McKool Smith P.C.
300 West Sixth Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

**SMITH HULSEY & BUSEY**

/s/ *James A. Bolling*
Stephen D. Busey
James A. Bolling
Florida Bar Number 117790
Florida Bar Number 901253
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jbolling@smithhulsey.com

**ATTORNEYS FOR PLAINTIFF
PARKERVISION, INC.**

26

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on December 2, 2013.

*/s/ Leah Buratti*
Leah Buratti

**LOCAL RULE 3.01 CERTIFICATION**

On December 2, 2013, counsel for ParkerVision conferred with counsel for Qualcomm regarding the issues raised by this motion. Qualcomm opposes this motion.

*/s/ Leah Buratti*
Leah Buratti

McKool 941552v13