# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PARKERVISION, INC.,

       *Plaintiff*,

       v.

QUALCOMM INCORPORATED,

       *Defendant*.

Case No. 3:11-cv-719-J-37-JRK

## QUALCOMM'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL REGARDING INVALIDITY

I.  BACKGROUND AND SUMMARY OF ARGUMENT ................................................. 1

II.  LEGAL STANDARD ................................................................................................ 6

III.  ARGUMENT ............................................................................................................ 6

    A.  The Court Should Grant JMOL that Weisskopf (DX 534) Anticipates Each
       Asserted '551, '518, and '371 Claim. .......................................................... 6

        1.  Weisskopf discloses the "generating" limitation. ............................... 7

            a.  ParkerVision and its witnesses disregarded the Court's
               construction of "generating." ..................................................... 7

            b.  Weisskopf anticipates even under ParkerVision's rejected
               claim construction. ................................................................... 10

            c.  Weisskopf shows the capacitor generating the baseband. ........... 12

            d.  Mr. Weisskopf's misguided and irrelevant opinions are not
               substantial evidence. ................................................................ 13

        2.  Dr. Razavi's simulations demonstrated anticipation for the
            "accurate voltage reproduction" limitations. ........................................ 13

        3.  Dr. Razavi was not required to follow a script. ..................................... 14

    B.  The Court Should Grant JMOL that Estabrook (DX 369) Anticipates '551
       Claims 23, 161, 202, '518 Claims 27, 82, 90, 91, and '371 Claim 2 ................. 17

    C.  The Court Should Grant JMOL that DeMaw (DX 549) Anticipates '342
       Claim 18 .................................................................................................... 21

    D.  The Court Should Grant a New Trial ........................................................... 24

IV.  CONCLUSION AND REQUEST FOR ORAL ARGUMENT ...................................... 25

**PAGE(S)**

**CASES**

*Abel v. Dubberly,*
210 F.3d 1334 (11th Cir. 2000) ...................................................................6

*Alexsam v. Idt,*
Nos. 2012-1063, -1064, 2013 U.S. App. LEXIS 10009
(Fed. Cir. May 20, 2013) .............................................................................6

*Am. Calcar, Inc. v. Am. Honda,*
651 F.3d 1318 (Fed. Cir. 2011)..............................................................9, 12

*Celeritas Techs. v. Rockwell,*
150 F.3d 1354 (Fed. Cir. 1998)....................................................7, 10, 21, 24

*ClearValue v. Pearl River Polymers,*
668 F.3d 1340 (Fed. Cir. 2012)................................................................11

*Ecolab v. FMC,*
569 F.3d 1335 (Fed. Cir. 2009).........................................................7, 9, 21

*Exergen v. Wal-Mart Stores,*
575 F.3d 1312 (Fed. Cir. 2009).............................................................5, 9

*Graphic Packaging Int'l v. C.W. Zumbiel Co.,*
No. 10-891-J-37JBT, 2012 WL 2913188
(M.D. Fla. July 16, 2012) ...........................................................................9

*Krippelz v. Ford Motor,*
667 F.3d 1261 (Fed. Cir. 2012)................................................................12

*Microsoft v. i4i Ltd. P'ship,*
131 S. Ct. 2238 (2011)..............................................................................25

*Schering Corp. v. Geneva Pharms.,*
339 F.3d 1373 (Fed. Cir. 2003)................................................................14

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
247 F.3d 1316 (Fed. Cir. 2001)................................................................14

*Verdegaal Bros. v. Union Oil,*
814 F.2d 628 (Fed. Cir. 1987).......................................................7, 8, 9, 21

**PAGE(S)**

**OTHER AUTHORITIES**

Fed.R.Civ.P. 59(a) ............................................................................................6

Local Rule 3.01(j) ...........................................................................................25

Qualcomm renews its motion for JMOL of invalidity as to all asserted claims. Specifically, Qualcomm renews its motion for JMOL that Weisskopf anticipates each asserted claim from the '551, '518, and '371 patents; that Estabrook anticipates '551 claims 23, 161, 202, '518 claims 27, 82, 90, 91, and '371 claim 2; and that DeMaw anticipates '342 Claim 18. Qualcomm also moves for a new trial because the verdict is against the great weight of the evidence, ParkerVision argued erroneous claim constructions to the jury, and the Court's decision not to give Qualcomm's requested invalidity instructions resulted in prejudicial error.

## I.   BACKGROUND AND SUMMARY OF ARGUMENT

At trial, Qualcomm offered unrebutted evidence of invalidity, including three stipulated prior art references and the testimony of Dr. Razavi. Although ParkerVision had designated two invalidity experts—Dr. Prucnal and Mr. Sorrells—ParkerVision called neither of them to testify on validity. Moreover, ParkerVision's cross-examination obtained no relevant admissions from Dr. Razavi. Rather than presenting a rebuttal case, ParkerVision relied on misleading attorney argument and a claim construction position the Court had already rejected. ParkerVision's tactics cannot save the asserted claims from invalidity, and JMOL should be granted.

Mr. Sorrells told the ParkerVision invention story. Having only an amateur RF background, he began his task of designing an RF circuit with book research and a 2-week course at Georgia Tech.[1] He then tested several prior art designs, including a voltage sampler that the "literature basically said…should make a very good receiver," but concluded

---

[1] 10/7 Tr. 219:16-221:4.

that the literature was wrong, and the voltage sampler was not a good receiver at all.[2]  He tested it by trial and error, modifying the values of the sampling aperture (the length of time the switch is on) and the size of the capacitor (the device that collects the sampled energy).[3]  He eventually found a configuration in which performance "actually went up", professed surprise, and sought to patent the configuration as an invention.[4]  His allegedly new idea was to leave the switch on for a *long* period of time to allow more energy to be transferred into a *big* capacitor.[5]  He also discussed one embodiment that allowed energy in the capacitor to *discharge* while the switch was off.[6]

Mr. Sorrells' design process and the invention story he told at trial left out numerous prior art references that had already walked the path he claims to have discovered.[7]  For example, the prior art Weisskopf paper used the same components as Mr. Sorrells' design[8]:



'551 Patent Figure 82A      Weisskopf Figure 2

Weisskopf also disclosed the configuration and values Mr. Sorrells claimed as his invention.  Weisskopf taught using a *long* sampling aperture for transferring lots of energy: "[m]aximum kinetic energy will be transferred to the hold capacitor when the sampling

---

[2] 10/7 Tr. 226:11-16, 223:19-225:25.
[3] 10/7 Tr. 226:17-227:14, 228:13-23, 229:21-230:7, 278:12-279:3.
[4] 10/7 Tr. 226:17-227:14.
[5] 10/7 Tr. 278:12-279:3; *see also* 10/10 Tr. 20:7-18.
[6] 10/7 Tr. 278:12-279:3; 10/10 Tr. 25:14-21.
[7] Although Mr. Sorrells used non-standard terminology—like "energy transfer sampler"—his patents describe only standard, well-known techniques.  (10/11 Tr. 32:18-33:10.)
[8] 10/11 Tr. 42:2-44:1, 45:25-46:18.

aperture is one-half the period of the frequency of the sampled carrier."[9]  Weisskopf also taught using a *big* capacitor to store the energy: "[t]he hold circuit can achieve optimum performance with a larger capacitor."[10]  Finally, Weisskopf described two embodiments, one with discharge and one without discharge.  Contrary to Mr. Sorrells' conclusion, however, Weisskopf found that the embodiment with discharge performed worse than the no-discharge embodiment: "[t]he resulting poor hold duration manifests itself as an increasing inability of the sample-and-hold circuit to isolate the periodic sampling function discrete-line spectra."[11]

Faced with Weisskopf and other invalidating references, ParkerVision manufactured a new claim construction argument long after the Markman process ended, contending that the "generating" limitation in each claim required the capacitor to discharge energy while the switch was off.  ParkerVision had its technical expert, Dr. Prucnal, advance that argument and even hired Mr. Weisskopf himself, paying him to sign an expert report that pretended ParkerVision's new "generating" claim construction position had been adopted. ParkerVision then moved for summary judgment of no invalidity based on its new argument.

In denying summary judgment, the Court rejected ParkerVision's new claim construction argument.  The Court did not foreclose the possibility that other claim elements might "combine to restrict" the claim as a whole to require discharge.  With respect to the "generating" limitation itself, however, the Court ruled that "the language used is not so restricted" and "does not distinguish between" discharge and no-discharge embodiments.

---

[9] DX 534 at 243.
[10] DX 534 at 242 ("With $R_S$ and $C_H$ [the capacitor value] established to give maximum kinetic energy for a given sampling aperture, the effect of the buffer amplifier impedance on the stored voltage during the hold cycle are considered."); 10/11 Tr. 44:8-45:22 (Weisskopf "goes through a great deal of detail regarding maximizing the transfer of energy from the carrier signal," including "choos[ing] a capacitor value").
[11] DX 534 at 242-43.

(Dkt. 318 at 6.)

Left with no substantive response to Qualcomm's invalidity arguments and a looming trial, ParkerVision adopted a three-prong strategy. First, ParkerVision pressed forward with its rejected view of the claim scope, and asked the Court to reconsider its claim construction ruling. (Dkt. 336 at 30.) Failing to obtain reconsideration, ParkerVision then simply chose to contradict the Court's ruling. ParkerVision elicited testimony from its witnesses that the alleged "plain meaning" of the "generating" elements imposes the discharge requirement the Court rejected.[12] ParkerVision also led its witnesses through passages from the written description in an attempt to bolster its rejected position and reargue claim construction. ParkerVision even tried to discredit Dr. Razavi by asserting that his use of the Court's construction was inconsistent with the patents' written descriptions.

Second, ParkerVision mischaracterized the Weisskopf reference itself. During closing arguments, for example, ParkerVision's counsel ignored Weisskopf's discharge embodiment and argued misleadingly that Weisskopf taught away from the invention:

> The article describes a sample and hold process. That's not what the invention does. It doesn't hold the energy. It transfers it.
>
> ....
>
> ... Because [Weisskopf] is a sample and hold in the capacitor device. This is the opposite of what the invention teaches, because the invention teaches that this buffer should be of low impedance so the energy can pass freely through it.

(10/15 Tr. 100:10-101:10.)

Third, ParkerVision fought to avoid an invalidity verdict by distracting and confusing

---

[12] Dkt. 478 at 6.

the jury. ParkerVision opened its cross of Dr. Razavi with a lengthy and irrelevant argument about the discussions between Qualcomm and ParkerVision in the 1998-99 timeframe.[13] ParkerVision next paged through lists of "references" that ParkerVision flooded the Patent Office with during prosecution of the patents-in-suit.[14] ParkerVision also attacked Dr. Razavi personally, insinuating that he considered himself above both Mr. Sorrells and Mr. Weisskopf: "Dr. Razavi told you that he is extraordinary and knows more about the Weisskopf reference than Mr. Weisskopf himself" and said that "Mr. Sorrells can't be a person of ordinary skill in the art in his own patents because he doesn't have a four-year degree."[15] ParkerVision also raised Dr. Razavi's own unrelated patents, intimating that Dr. Razavi's obtaining his own patents rendered it improper for him to opine that Mr. Sorrells' patents were invalid.[16]

The Court's ruling rejecting ParkerVision's claim construction position was both clear and correct. ParkerVision's decision to disobey that ruling, misrepresent the Weisskopf reference, and distract the jury with attorney theatrics left ParkerVision with a record that requires JMOL of invalidity and, at a minimum, a new trial. As with the plaintiff in *Exergen*, having based its case on "misleading statement[s] to the jury," ParkerVision obtained only a "short-lived victory" that should be overturned.[17]

---

[13] 10/11 Tr. 177:23-188:16.

[14] 10/11 Tr. 189:21-194:7 ("Do you see this here? ... And here? ... And this? ... And this, too? ... And here? ... And here?," etc.).

[15] 10/15 Tr. 142:6-9; 10/11 Tr. 201:2-205:19, 214:3-12. Dr. Razavi's qualifications are unimpeachable. He is one of the preeminent researchers in the field of RF design, clearly a person of "extraordinary skill" in the art. (10/11 Tr. 11:18-23:22.) In contrast, neither Mr. Sorrells nor ParkerVision have published anything in the field. (10/11 Tr. 31:19-32:2.)

[16] 10/11 Tr. 194:24-195:4 ("Q So, in your opinion, the patent office never once got it wrong when it was issuing any of your patents? A That's correct. Q But for ParkerVision, the patent office was wrong in all 11 claims in this case? A That is correct.").

[17] *Exergen v. Wal-Mart Stores*, 575 F.3d 1312, 1324 n.2 (Fed. Cir. 2009).

JMOL and a new trial are also required for the other two references, DeMaw and Estabrook. As set forth below, ParkerVision had no substantive response to either reference, relying entirely on an irrelevant cross and misleading attorney argument.

## II.   LEGAL STANDARD

"[A] motion for judgment as a matter of law will be denied only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) ("[T]he non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach different verdicts."). Attorney argument cannot substitute for substantial evidence. *Alexsam v. Idt*, Nos. 2012-1063, -1064, 2013 U.S. App. LEXIS 10009, at *28-29 (Fed. Cir. May 20, 2013). The court may also grant a new trial "on all or some of the issues…for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a). Such grounds include that the verdict is against the great weight of the evidence, or substantial errors were made in the admission or rejection of evidence.

## III.   ARGUMENT

### A.   The Court Should Grant JMOL that Weisskopf (DX 534) Anticipates Each Asserted '551, '518, and '371 Claim.

ParkerVision stipulated that Weisskopf (DX 534) was published in 1992, long before the critical date for all of the patents-in-suit. (JX 99, ¶ 72.) ParkerVision also did not dispute that Weisskopf was not considered by the PTO in the prosecution of any of the patents-in-suit. (10/11 Tr. 136:19-22.) During trial, Dr. Razavi presented a complete, detailed, claim-by-claim analysis comparing each element of the asserted '551, '518, and '371 claims to the Weisskopf reference. (10/11 Tr. 41:7-99:10.) That analysis showed conclusively that

Weisskopf anticipates those asserted claims. (10/11 Tr. 41:7-99:10.)

ParkerVision argues that the jury was free at its whim to disregard Qualcomm's evidence of invalidity, including the references themselves and Dr. Razavi's unrebutted testimony. (Dkt. 478 at 3.) To the contrary, the Federal Circuit has long granted JMOL where the references themselves and the accused infringer's unrebutted testimony showed invalidity. *E.g.*, *Ecolab v. FMC*, 569 F.3d 1335, 1345-47 (Fed. Cir. 2009) (reversing denial of invalidity JMOL where accused infringer's expert presented a "strong prima facie case" that the claim was anticipated and the patentee did not introduce substantial evidence in response); *Celeritas Techs. v. Rockwell*, 150 F.3d 1354, 1360-61 (Fed. Cir. 1998) (reversing denial of JMOL of anticipation where "the Telebit article itself and the testimony offered at trial conclusively demonstrate" anticipation); *Verdegaal Bros. v. Union Oil*, 814 F.2d 628, 632 (Fed. Cir. 1987) (reversing denial of invalidity JNOV motion where the "reference itself" and its "uncontradicted disclosure" taught the claimed invention).

ParkerVision's JMOL opposition also raises a long numbered list of arguments, none of which provides substantial evidence sufficient to deny JMOL, as detailed below.

### 1. Weisskopf discloses the "generating" limitation.

#### a. ParkerVision and its witnesses disregarded the Court's construction of "generating."

ParkerVision's JMOL opposition presses the Court to reconsider claim construction, contending that the "generating" limitation in each of the claims requires repeated charge and "discharge" from the storage device. (Dkt. 478 at 6-7.)

The Court properly rejected ParkerVision's argument in its summary judgment ruling. (Dkt. 318.) When it moved for summary judgment, ParkerVision argued that the

"generating" limitation required "discharge" from the storage device/capacitors, and pointed to some of the embodiments in the patents. The Court noted that ParkerVision had not raised that argument at *Markman*, and made clear to ParkerVision that it could no longer seek to reargue claim construction. (Dkt. 318 at 5.)

Moreover, the Court held that ParkerVision's new claim construction position—"generating" requires "discharge"—was incorrect. The Court stated:

> Likewise, the generating limitation does not describe the generating step as being performed by the discharge of a storage device. ***To be sure, the scope of the generating limitation embraces ParkerVision's discharge theory, which is described in detail in the patent specifications, but the language used is not so restricted.*** It claims simply "generating ... from the transferred energy." It is apparent from the briefing and patent specifications that a signal could be "generated" from a charge held in a capacitor either directly, by discharging the capacitor, or indirectly, by measuring the voltage across the capacitor. ***The language used in the generating claim limitation does not distinguish between these two techniques.*** One skilled in the art who reads the disclosure may conclude that the various elements of the claims combine to restrict the claimed invention to the former rather than the latter.

(Dkt. 318 at 6 (emphasis added).) Thus, the Court did not preclude ParkerVision from trying to show that other claim elements "combine to restrict" the claims to the discharge embodiment, but it held that the "generation" element itself does not. (*Id.*[18])

At trial, however, ParkerVision never pointed to any other elements that might restrict

---

[18] The Court's ruling was well-founded in the claim language and the specification, as provided in more detail in Qualcomm's previous briefs. For example, Figure 101 of the '518 patent shows a high impedance output amp, just like in Weisskopf's preferred embodiment. The '551 and '518 patents explain that ParkerVision has a "high impedance" embodiment that creates "*a high impedance node* and allows the Integrator *to hold the last RF signal sample 10206 until the next cycle of the Waveform Generator 10108 output.*" ('518 col. 112:23-30 (emphasis added); *see also id.*, Fig. 102D.) Thus, at ParkerVision's request, the Court expressly incorporated the "high impedance" embodiment from Figure 101 into the claim construction for the '518 patent's "means for generating the baseband signal." (Dkt. 243 at 46.)

all claims to require discharge.[19]  Instead, ParkerVision repeatedly and blatantly contradicted the Court's construction.

ParkerVision's tactics pervaded the trial.  ParkerVision unabashedly agrees that it advanced testimony from both Mr. Sorrells and Dr. Prucnal that the "generating" limitation by itself "meant that the baseband signal, lower frequency signal, or second signal was generated from the repeated accumulation and discharge of charge from the capacitor[s]." (Dkt. 478 at 6.)  ParkerVision asked Dr. Razavi numerous questions about whether the patents described both high and low impedance loads, "at least in the specification."[20] ParkerVision also interjected Weisskopf's misguided opinion based on ParkerVision's incorrect claim construction position.  (10/11 Tr. 213:2-214:12, 228:8-230:15.)  ParkerVision summed up in closing, arguing that Weisskopf could be disregarded because it disclosed a hold capacitor and the patents-in-suit required discharge, an argument that misrepresented both Weisskopf and the asserted claims.  (10/15 Tr. 100:3-101:21.)

Where, as here, the patent owner bases its validity opposition on an incorrect claim construction, JMOL of invalidity is required.  *See, e.g.*, *Exergen*, 575 F.3d at 1319; *Am. Calcar, Inc. v. Am. Honda*, 651 F.3d 1318, 1341-42 (Fed. Cir. 2011); *Ecolab*, 569 F.3d at 1347; *Verdegall Bros.*, 814 F.2d at 632; *see also Graphic Packaging Int'l v. C.W. Zumbiel*

---

[19] Shortly before trial, ParkerVision dropped scores of asserted claims, leaving only eleven claims for the jury to address.  Of the claims asserted at trial, claim 27 of the '518 patent required transferring energy from the capacitor.  Claim 27 of the '518 patent includes the four-step process from claim 1, which ends with "(4) generating the baseband signal from the integrated energy."  Claim 27 adds the element "further comprising the step of transferring energy to a load during an off-time."  Even that limitation, however, does not require the signal to be generated downstream from the capacitor but instead allows the baseband to be generated from the sawtooth voltage waveform from the capacitor itself, as the patent itself shows.  '342 claim 18 likewise requires controlling a charging and discharging cycle.

[20] 10/11 Tr. 171, 173-77.  *See also id.* 207 (arguing that "when we look at the prior art, we need to consider those things the patent has told us are different from the prior art"); *id.* 224 ("[T]he patents distinguish hold capacitors from storage capacitors").

*Co.*, No. 10-891-J-37JBT, 2012 WL 2913188, at *2-4 (M.D. Fla. July 16, 2012) (Dalton, J.) (affirming JMOL of noninfringement where patent owner's expert testimony "was based on an incorrect understanding of the claim construction")). ParkerVision's decision to disobey the Court's construction provides grounds to vacate the verdict and grant JMOL of invalidity, not substantial evidence to support it.

### b. Weisskopf anticipates even under ParkerVision's rejected claim construction.

Qualcomm also introduced evidence demonstrating that Weisskopf anticipates, even under ParkerVision's rejected claim construction. As Dr. Razavi explained, Weisskopf discloses two embodiments, "studying whether we should take charge out of this capacitor when the switch is turned off or not." (10/11 Tr. 47:8-10; *id.* 46:3-48:25.) He offered an analogy to a capacitor being "just like a bucket [that] stores water": "So if you pour water into the bucket and then turn off the valve, the water stays in the bucket. So that's one condition.... The other condition would be what if we poke a hole in the bottom of the bucket so that the water leaks away?" (10/11 Tr. 47:14-19; *id.* 47:4-48:17, 81:5-83:16.) The results from the no-discharge embodiment are shown in Weisskopf's Figure 1(b) and the results from the discharge embodiment are shown in his Figure 5. (DX 534.)

Although "Weisskopf's preference is for the charge not to leak away, not to be discharged," Dr. Razavi's opinion that Weisskopf's alternative embodiment anticipates is founded on well-established law. (10/11 Tr. 48:18-25.) A reference still anticipates even if it "teaches away" or "disparages" the claimed invention. *Celeritas*, 150 F.3d at 1360-61 ("A reference is no less anticipatory if, after disclosing the invention, the reference then disparages it."); *id.* at 1360-61 (showing the claimed invention "to be less than optimal does

not vitiate that it is disclosed"); *ClearValue v. Pearl River Polymers*, 668 F.3d 1340, 1344 (Fed. Cir. 2012) ("[W]hether a reference 'teaches away' from [an] invention is inapplicable to an anticipation analysis.") (internal quotation omitted).

ParkerVision's response to Weisskopf's alternative embodiment at trial was to pretend that it did not exist. ParkerVision argued to the jury:

> But you heard Mr. Razavi say that he, Mr. Razavi, is one of extraordinary skill, and he knows better what is in Dr. Weisskopf's paper than Dr. Weisskopf does. But when we opened it up and looked at it, we discovered that wasn't true.
>
> The article describes a sample and hold process. That's not what the invention does. It doesn't hold the energy. It transfers it.
>
> ....
>
> ... Because [Weisskopf] is a sample and hold in the capacitor device. This is the opposite of what the invention teaches, because the invention teaches that this buffer should be of low impedance so the energy can pass freely through it.

(10/15 Tr. 100:10-101:10.)

In its post-trial JMOL opposition, ParkerVision likewise argues that Weisskopf's alternative embodiment can be ignored because it has "an inability to generate the baseband." (Dkt. 478 at 6-7.) Although Weisskopf does disparage the alternative embodiment as creating a poor sampler, nowhere did Weisskopf say that it would be unable to generate a baseband signal. To the contrary, Weisskopf stated only that the embodiment has an "*increasing* inability" to isolate the baseband, simply meaning that the alternative embodiment's baseband signal is weaker by comparison to the primary embodiment, as Dr. Razavi testified without contradiction. (DX 534 at 243, Fig. 5 (emphasis added); 10/11

Tr. 47:4-48:25, 74:1-83:22, 228:1-20, 265:8-268:9.) Weisskopf even included Figure 5, showing time domain and frequency domain measurements of the low-impedance/discharge embodiment, proving that it worked.

In sum, ParkerVision's attorney argument, which contradicts the Weisskopf reference and the unrebutted Dr. Razavi testimony, is not substantial evidence and cannot withstand JMOL. Accordingly, JMOL is required even if ParkerVision's claim construction position is adopted. *Krippelz v. Ford Motor*, 667 F.3d 1261, 1267-69 (Fed. Cir. 2012) (reversing denial of invalidity JMOL motion where patentee argued that reference taught away from claimed invention and offered "conclusory" testimony that failed "to take into account the entire [prior art] disclosure" and contradicted the "actual [prior art] disclosure"); *Am. Calcar*, 651 F.3d at 1341-42 (rejecting patent owner's argument and expert testimony that was "contrary to the express teachings of the prior art").

### c. Weisskopf shows the capacitor generating the baseband.

In its JMOL opposition, ParkerVision also argues that Weisskopf does not anticipate, because Dr. Razavi opined that the baseband signal was generated by the switches, not from energy stored by the capacitor. (Dkt. 478 at 6.) ParkerVision misstates Dr. Razavi's testimony, which showed that the voltage across Weisskopf's capacitor generates the baseband signal. (*E.g.*, 10/11 Tr. 46:17-18 ("The down-converted signal would appear after the switch on the capacitor. So on the top terminal of CH."); *id.* 56:8-11 ("The lower frequency signal appears right across this capacitor. So a CH. So on the top plate of CH, on the top terminal of CH, it would be able to observe that lower frequency.").) The Court explained that this method satisfies the "generating" limitation of the asserted claims. (Dkt.

318 at 6.)

### d. Mr. Weisskopf's misguided and irrelevant opinions are not substantial evidence.

ParkerVision's JMOL opposition also contends that Dr. Razavi's mere disagreement with Weisskopf's paid opinion (which was based on the wrong claim construction) so "undermines Dr. Razavi's credibility and objectivity" that Dr. Razavi's opinions must be disregarded. (Dkt. 478 at 8.) Mr. Weisskopf's expert report is not in evidence, and ParkerVision did not call him as a witness. (10/11 Tr. 212:20-214:12.) Moreover, ParkerVision's decision to hire a key fact witness, Mr. Weisskopf, and use him to repeat its discharge claim construction position undermines ParkerVision's credibility, not Dr. Razavi's. Finally, the only reason given in the Weisskopf report for his disagreement with Dr. Razavi's conclusion of anticipation was the alleged "discharge" requirement, an erroneous legal position that the Court rejected. (Dkt. 269-10, Ex. I at 14.) Accordingly, Dr. Razavi's disagreement with Mr. Weisskopf's opinion does not provide substantial evidence of validity.

### 2. Dr. Razavi's simulations demonstrated anticipation for the "accurate voltage reproduction" limitations.

ParkerVision's JMOL opposition also argues about the simulations Dr. Razavi used to support his conclusion with respect to two claims, and "accurate voltage reproduction." (Dkt. 478 at 8-9; 10/11 Tr. 232:14-22.)

ParkerVision argues to the Court, as it did to the jury, that Dr. Razavi's simulations of Weisskopf "are not prior art," apparently contending that the simulations can be disregarded because they postdate the patents. (Dkt. 478 at 8; 10/11 Tr. 230:16-231:4.) As the Federal

Circuit has long recognized, "recourse to extrinsic evidence is proper to determine whether a feature, while not explicitly discussed, is necessarily present in a reference." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001) (affirming summary judgment of anticipation); *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1378, 1381-82 (Fed. Cir. 2003) (studies performed in 1987 demonstrated inherency).

ParkerVision also contends that Dr. Razavi "made up" values for his simulations. (Dkt. 478 at 8-9.) To the contrary, Dr. Razavi testified that he analyzed Weisskopf from the perspective of a person of ordinary skill, using values in his simulations that such a person would apply. (10/11 Tr. 63:8-72:15, 233:1-235:6, 238:11-15, 266:15-267:18.) Moreover, ParkerVision's attempts to nitpick Dr. Razavi's simulations fell flat. ParkerVision's counsel accused Dr. Razavi of having "made up" a 50-ohm value for a resistor, but "Weisskopf says that we could have a source impedance of 50 ohms. And that means RS could be 50 ohms." (10/11 Tr. 266:15-267:4; *id.* 237:6-238:6.) Likewise, in response to ParkerVision's claim that Dr. Razavi had missed including a resistor and certain downstream circuitry, Dr. Razavi explained how leaving out those components had no impact on the results from the simulation. (10/11 Tr. 238:11-239:7, 267:7-18.) Dr. Razavi's testimony was not contradicted by any evidence from ParkerVision. Accordingly, ParkerVision has shown no basis to disregard Dr. Razavi's simulations.

### 3. Dr. Razavi was not required to follow a script.

ParkerVision's remaining arguments as to Weisskopf ask the Court to disregard the substance of Dr. Razavi's analysis because he did not speak certain phrases. Contrary to ParkerVision's practice of leading its witnesses with scripted orations and check-the-box

PowerPoint slides, Dr. Razavi gave frank answers to proper questions. Dr. Razavi addressed the substance of each limitation from each asserted claim, doing the work himself to show where the prior art references disclosed the limitations.

ParkerVision first contends that Dr. Razavi's testimony should be disregarded because he paraphrased certain claim constructions. (Dkt. 478 at 3-6.) Dr. Razavi clearly stated that he applied the Court's conclusions in providing his opinions: "Q What claim construction did you apply throughout your analysis of all of the patents-in-suit? A The Court's claim construction." (10/11 Tr. 74:7-9; *id.* 33:11-34:5, 85:18-86:6.) Moreover, ParkerVision has shown no substantive issue with how Dr. Razavi applied the Court's constructions to the prior art references. For example, with respect to the "output impedance match circuit" limitation from '551 claim 25, he testified:

> [I]n applying Weisskopf to claim 25, we have to remember that there's a Court's construction -- there's a Court construction for what we mean by an output impedance match circuit.
>
> Again, just to paraphrase -- I don't remember the exact wording -- to paraphrase, the wording was something like a circuitry that delivers the desired amount of power from the apparatus that we just considered.

(10/11 Tr. 57:25-58:7.) ParkerVision complains that Dr. Razavi used the word "paraphrase," but his testimony captures the substance of the Court's construction, which requires transferring the "desired power." (Dkt. 243 at 27-29.) In any event, the jury was read the claim constructions in the instructions and Dr. Razavi had no need to parrot them word for word during his testimony.

ParkerVision next argues that Dr. Razavi did not prove the "non-negligible amounts of energy" limitation because he did not say the words "distinguishable from noise" during

his direct testimony. (Dkt. 478 at 7.) ParkerVision's argument fails to show any substantive issue with Dr. Razavi's clear, unrebutted testimony that Weisskopf generates a downconverted baseband signal and does so through the transfer of large amounts of energy. (*See, e.g.*, 10/11 Tr. 44:8-45:22 ("Weisskopf goes through a great deal of detail regarding maximizing the transfer of energy from the carrier signal," including "choos[ing] a capacitor value"); *id.* 93:21-25 ("So Weisskopf actually tells us that he wants the aperture period, meaning the time during which the switch is on, to be long enough. In fact, he picks that value to be about half of the period of the incoming signal, what we call 50 percent."); *id.* 88:10-89:10 ("The baseband signal is measured as a voltage across the capacitor.... So the voltage on top of the capacitor is measured by the little triangle on the right-hand side, and it propagates down the chain."); *id.* 91:23-25 ("CH also generates the second signal, meaning the lower frequency signal, while receiving the energy from the carrier through the switch repeatedly."); *see also id.* 46:3-57:4, 59:3-60:18.)

ParkerVision finally argues that Dr. Razavi did not recite the Court's constructions of the means-plus-function limitations in '518 claims 82 and 90 word for word. (Dkt. 478 at 8.) Dr. Razavi testified that he applied the Court's claim constructions to the means-plus-function limitations and showed where the prior art reference disclosed the elements. (10/11 Tr. 83:23-93:5.) Nothing more was required.[21]

Accordingly, because Qualcomm produced unrebutted evidence showing that

---

[21] In closing, ParkerVision's counsel also argued that Weisskopf could not anticipate because it does not disclose a "carrier signal." ParkerVision has apparently dropped that argument, which fails in any event, because the parties' stipulated construction of "carrier signal" requires only "an electromagnetic wave that is *capable of* carrying information via modulation." (10/15 Tr. 155:24-25 (emphasis added).) Nothing about the RF signal input in Weisskopf makes it incapable of carrying information via modulation. To the contrary, as Dr. Razavi testified, Weisskopf shows demodulated I and Q data in Figure 10 as an example. (*E.g.*, 10/11 Tr. 61:8-62:19; DX 534 at 246.)

Weisskopf anticipates the asserted claims of the '551, '518, and '371 patents, and ParkerVision has shown no substantive issue with that analysis, the Court should grant JMOL of invalidity.

**B.** **The Court Should Grant JMOL that Estabrook (DX 369) Anticipates '551 Claims 23, 161, 202, '518 Claims 27, 82, 90, 91, and '371 Claim 2.**

Estabrook (DX 369) is also stipulated prior art, published in 1988 long before the critical date for the '551, '518, and '371 patents. (JX 99, ¶ 73.) ParkerVision did not dispute that Estabrook was not considered by the PTO in the prosecution of any of the patents-in-suit. (10/11 Tr. 136:19-22.)

Dr. Razavi provided an exhaustive claim-by-claim analysis showing that Estabrook (DX369) anticipates '551 claims 23, 161, 202, '518 claims 27, 82, 90, 91, and '371 claim 2. (10/11 Tr. 99:25-133:12.) At a high-level, Estabrook uses a "diode as a switch, just the way the invention would disclose." (10/11 Tr. 100:12-101:23; *id.* 110:6-112:8, 131:14-132:4.) That switch is operated by an "LO, local oscillator," which "decides when the diode, when the switch should be on and the switch should be off, so that we divert energy to the capacitor or we don't divert energy to the capacitor." (10/11 Tr. 101:18-23.) Estabrook uses a 50% duty cycle configuration, which is "best we can do" for transferring the most energy. (10/11 Tr. 130:7-10.) Estabrook also discloses a storage device, "the capacitor denoted by CL on the right-hand side," which is "where we store our charge." (10/11 Tr. 100:23-25; *id.* 112:9-113:1.) Ultimately, "[t]he baseband signal is generated by receiving energy from I RF, through the diode, on to the capacitor. So the capacitor and resistor together form the baseband signal, generate the baseband signal." (10/11 Tr. 107:1-5; *id.* 114:12-14, 117:11-16, 127:5-11, 247:2-16.)



Figure 3

During trial, ParkerVision did not cross-examine Dr. Razavi on any substantive issues for the Estabrook reference. Instead, ParkerVision's counsel talked about the "goose-gander" rule, in an apparent attempt to undermine Qualcomm's *noninfringement* position. (10/11 Tr. 207:12-208:1; *id.* 239:18-247:16.) Focused solely on the fruitless task of trying to imply an infringement argument through a comparison to completely different physical topologies, ParkerVision elicited no testimony whatsoever—and did not try—that Estabrook did not anticipate.

Following trial, ParkerVision filled a JMOL opposition with a laundry list of new complaints about Estabrook. None of these complaints, however, meets the substantial evidence standard required to deny JMOL. ***First***, ParkerVision argues that Dr. Razavi did not quote the Court's claim constructions. (Dkt. 478 at 9.) ParkerVision's argument fails, because Dr. Razavi stated that he followed the Court's constructions for all claims, and ParkerVision has shown no substantive error in Dr. Razavi's analysis. (10/11 Tr. 74:7-9; *id.* 33:11-34:5, 85:18-86:11.)

***Second***, ParkerVision argues that Estabrook did not show the generation limitation because the energy from the LO signal in Estabrook's capacitor is higher than the energy from the carrier signal. (Dkt. 478 at 10; 10/11 Tr. 244:3-13.) Dr. Razavi's unrebutted

testimony, however, establishes that the existence of LO energy in the capacitor does not matter because Estabrook distinguishes the LO signal from the downconverted baseband signal. (10/11 Tr. 270:13-271:13; *see also id.* 105:5-109:23, 113:20-114:14 (discussing DX 369, Fig. 4).)

**Third**, ParkerVision asserts that Dr. Razavi's testimony was deficient because he did not say the words "distinguishable from noise." As with the Weisskopf reference, Dr. Razavi showed for the Estabrook reference that it met the non-negligible energy limitation, transferring more than enough energy to create the downconverted signal.[22]

**Fourth**, ParkerVision contends that Dr. Razavi "skipped" some claim elements of '518 claims 27, 82, 90, and 91. (Dkt. 478 at 10-11.) As Dr. Prucnal did in his infringement analysis, Dr. Razavi treated some elements quickly because they were redundant of elements he had already shown in other claims. (*See generally* 10/10 Tr. 10:3-39:24 (correlating elements from claims 27, 82, 90, and 91 with claims from the '551 and '371 patents).) Dr. Razavi was not required to retread through each of those limitations.

**Fifth**, ParkerVision complains that Dr. Razavi did not expressly recite the Court's constructions for the means-plus-function limitations in '518 claims 82 and 90. (Dkt. 478 at 11.) For each means-plus-function limitation, Dr. Razavi showed where the prior art

---

[22] *E.g.*, 10/11 Tr. 130:7-10 (Estabrook turns on the switch for 50% of the time: "She insists on turning on the switch for 50 percent of the time. And that's the best we can do."); *id.* 106:1-6 (Figure 4 shows wave with a "generally slowly varying signal, which is a downconvert[ed] signal"); *id.* 114:4-11 ("So do we generate a lower frequency signal? Yes, we do. We saw in the other figure a slowly varying waveform. Is it generated from the transfer of energy? Yes, it is. Because the only way that we could have any waveform across the capacitor CL and as to RL ...."); *id.* 115:18-22 ("When we look at the value of the capacitor, 2.8 picofarads, as shown in Figure 3 of Estabrook, we see that it does store substantial amounts of energy relative to energy contained in a percentage of half cycles of a carrier signal."). ParkerVision also argues in a footnote that Dr. Razavi did not add noise to his simulations. (Dkt. 478 at 10 n.27.) ParkerVision's argument is misplaced, because Dr. Razavi did not rely on his simulations with regard to the non-negligible energy limitation. Moreover, Dr. Razavi did not need to add artificial noise to show that Estabrook meets the non-negligible energy limitation.

reference disclosed the element. (10/11 Tr. 126:11-129:16.) He also made clear that he applied the Court's claim constructions to the means-plus-function limitations. (10/11 Tr. 85:18-86:11.) He did not have to "check any other boxes" to meet his prima facie burden.

**Sixth**, ParkerVision argues that Dr. Razavi did not show that Estabrook describes a sampler, but cites only the following testimony: "Q In fact, Estabrook never once uses the word sampler, does it? A I'll take your word for it. I don't recall." (Dkt. 478 at 11 n.30 (citing 10/11 Tr. 241:5-7).) Whether Estabrook uses the word "sampler" is irrelevant to whether it discloses one. Dr. Razavi testified without rebuttal that Estabrook discloses a sampler. For example, Estabrook uses a "diode as a switch, just the way the invention would disclose"; the local oscillator determines "when the switch should be on and the switch should be off"; and "the capacitor denoted by CL ... is where we store our charge" for the sample. (*E.g.*, 10/11 Tr. 100:12-101:23; *id.* 132:8-133:9.)

**Seventh**, ParkerVision offers attorney argument that the RF wave in Estabrook is a "pure sine wave" that is not capable of carrying information via modulation. (Dkt. 478 at 11-12.) ParkerVision's argument fails, because the agreed claim construction requires only that the incoming signal be "capable of" being modulated with information, and Dr. Razavi provided unrebutted testimony that Estabrook discloses a circuit directed to "taking an RF signal, signal coming from the antenna or somewhere else, [and] try[ing] to downconvert it." (10/15 Tr. 155:24-25; 10/11 Tr. 102:4-13.)

**Eighth**, ParkerVision argues that Dr. Razavi did not show that Estabrook samples at an aliasing rate. (Dkt. 478 at 12.) To the contrary, Dr. Razavi testified that Estabrook met that limitation, showing that for Estabrook the aliasing rate had an N equal to 1. (*E.g.*, 10/11

Tr. 113:20-114:1, 132:17-133:9.)

**Last**, ParkerVision asserts generically that "Dr. Razavi also failed to provide substantial evidence that any of the other limitations" of the relevant claims "are found in Estabrook." (Dkt. 478 at 12.) ParkerVision's conclusory argument has no substance and should be rejected.

In sum, Dr. Razavi offered comprehensive, unrebutted testimony that Estabrook anticipates nearly all of the asserted claims from the '551, '518, and '371 patents, and ParkerVision has shown no substantive issue with his analysis. JMOL should be granted. *See Ecolab*, 569 F.3d at 1345-47; *Celeritas Techs.*, 150 F.3d at 1360-61; *Verdegaal Bros.*, 814 F.2d at 632.

### C. The Court Should Grant JMOL that DeMaw (DX 549) Anticipates '342 Claim 18.

DeMaw (DX 549) is also stipulated prior art. (JX 99, ¶ 83.) DeMaw was published in 1982, nearly 20 years before the critical date of the '342 patent. ParkerVision did not dispute that DeMaw was not considered by the PTO in the prosecution of any of the patents-in-suit. (10/11 Tr. 164:19-21.) Dr. Razavi provided exhaustive analysis showing that DeMaw anticipates '342 claim 18. (10/11 Tr. 140:9-164:21.)

At trial, ParkerVision's counsel did not cross-examine Dr. Razavi on the substance of DeMaw's disclosure. Instead, he tried to create infringement arguments from the cross-examination about DeMaw. ParkerVision's cross-examination, however, equated a "dual FET" mixer with a "dual balanced" mixer, an erroneous statement that Dr. Razavi rejected:

> Q This is the circuit you discussed with the jury for the '342 patent, correct?

A That's correct, yes.

Q Now, do you see what this figure is called? Do you see the name?

A Dual FET balanced mixer using a Siliconix U430 device.

Q So what we see here in DeMaw is a dual balanced mixer?

A No, that is not correct.

Q So when he says dual FET balanced mixer, he's wrong?

A You need a hyphen between the word dual and the word FET. That would mean 2 FET, that there are 2 FET.

Q So you interpret this as a 2 FET balanced mixer?

A That is correct.

(10/11 Tr. 248:9-21.[23])

In its post-trial JMOL opposition, ParkerVision created a laundry list of arguments for DeMaw as well, but none of the arguments provides substantial evidence allowing JMOL to be denied. **First**, ParkerVision repeats its argument that Dr. Razavi only paraphrased claim constructions. (Dkt. 478 at 12-13.) That argument fails for DeMaw for the same reasons that it also failed for Weisskopf and Estabrook.

**Second**, ParkerVision argues that DeMaw does not teach sampling. (Dkt. 478 at 13.) Dr. Razavi's testimony about DeMaw, however, is unrebutted. Dr. Razavi testified that DeMaw teaches a transistor that "operates as a switch," using a water analogy to describe

---

[23] Similarly, ParkerVision's questions erroneously stated that the switches in DeMaw could not both be off—another point on which Dr. Razavi disagreed:
Q Now, these switches are controlled to open and close by the flow of energy or current from this LO through the transformer?
A That is correct, yes.
Q And so what that means is either this switch is on, or this switch is on?
A That is not correct. I do not believe so.
(10/11 Tr. 251:18-24.)

how DeMaw's switch works.  (10/11 Tr. 146:16-147:15.)  In addition, ParkerVision has no evidence that the two paths in DeMaw come back together such that the DeMaw circuit as a whole would be deemed to always have a connection between the input and the output and thus not sample.

**Third**, ParkerVision argues that DeMaw cannot anticipate because Dr. Razavi agreed that the downconverted information signals have been generated before the capacitor.  (Dkt. 478 at 13.)  ParkerVision's argument misstates Dr. Razavi's testimony.  Unlike the accused current-mode devices, DeMaw employs a voltage signal.  Thus, for DeMaw, the signal voltage is the same both at the output of the switch and the top plate of the capacitor and by "[c]harging the capacitor with an arrow through it and discharging it, we generate a down-converted information signal."[24]  (10/11 Tr. 158:5-9; *id.* 259:8-260:4.)

**Fourth**, ParkerVision argues that Dr. Razavi did not have sufficient values to model DeMaw.  (Dkt. 478 at 13.)  ParkerVision's argument fails, because Dr. Razavi did not rely on his simulations to show any elements in DeMaw and the values he selected had no effect on the simulated operation of the circuit.  (10/11 Tr. 261:10-262:15.)  As he explained:

> Can you put up figure 6.7, was it?  So Mr. Budwin asked if the figure shows some of the values.  And I said no, it does not show, for example, the value of the capacitors and the inductors, and et cetera.  And then he said that you pick these values yourself, and you claim that these have no bearing on your opinion.  And that is correct.  Because if you look at the claim language, we can match up everything that we see in DeMaw with everything we see in the claim language.  There's not a single element that is missing from DeMaw when we compare these two.  So regardless of what I have chosen for my simulation purposes to illustrate one or two effects, not the

---

[24] ParkerVision's invalidity arguments only demonstrate the appropriateness of Qualcomm's noninfringement JMOL.

> entire behavior of the circuit, DeMaw exactly matches the claim language.

(10/11 Tr. 271:18-272:7.)

**_Finally_**, ParkerVision contends that Dr. Razavi did not show that DeMaw discloses an "information signal." (Dkt. 478 at 14.) To the contrary, Dr. Razavi provided unrebutted testimony that DeMaw teaches "an RF signal . . . that carries the information." (10/11 Tr. 152:7-9.) ParkerVision thus fails to raise an issue for DeMaw and JMOL should be granted.

### D.    The Court Should Grant a New Trial.

The Court should also grant a new trial for three reasons. First, the validity verdict was against the great weight of the evidence for the reasons given above. In short, Qualcomm presented complete, unrebutted testimony for each limitation of each asserted claim. Through arguments about an incorrect claim construction and ad hominem attacks on Dr. Razavi himself, ParkerVision succeeded in distracting and confusing the jury. Once those distractions are stripped away, the great weight of the evidence contradicts the verdict.

Second, the Court's decision not to instruct on the disparagement doctrine was erroneous and prejudicial. As detailed above, ParkerVision pressed the mistaken assertion that the jury could ignore Weisskopf's alternative discharge embodiment because Weisskopf himself thought it did not work as well as the primary sample-and-hold embodiment. Qualcomm sought to instruct the jury on the well-established, but highly counter-intuitive, doctrine that "[a] reference is no less anticipatory if, after disclosing the invention, the reference then disparages it." *Celeritas*, 150 F.3d at 1360-61. ParkerVision's counsel seized upon the absence of any disparagement instruction to argue that Weisskopf was irrelevant because its primary embodiment had a sample-and-hold configuration with a high-impedance

load following the capacitor.  (10/15 Tr. 100:3-101:10.)

Third, the Court's decision not to give the requested *i4i* instruction was erroneous and prejudicial.  None of Qualcomm's three prior art references were considered by the Patent Office.  (10/11 Tr. 136, 164.)  ParkerVision did not attempt to show that the elements taught by Qualcomm's references were previously considered by the Patent Office.  Instead, ParkerVision argued that the sheer number of references ParkerVision cited meant that Qualcomm's new prior art could be ignored: "The patent office considered this issue. You saw these multiple pages of references that were before the patent office. If you want to see them again, you'll have the patents during the deliberations.  Open them to the first few pages and see how many references the patent office had available to consider."  (10/15 Tr. 98:23-99:25, 142:10-23.)  Under those circumstances, the *i4i* instruction should have been given. *Microsoft v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251 (2011).

## IV.  CONCLUSION AND REQUEST FOR ORAL ARGUMENT

For the foregoing reasons, Qualcomm requests that the Court grant JMOL of invalidity for all asserted claims.  In the alternative, Qualcomm further requests that the Court grant a new trial on invalidity.  Due to the complex issues presented and the magnitude of the damages award, Qualcomm respectfully requests oral argument pursuant to Local Rule 3.01(j).  Qualcomm respectfully submits that an afternoon argument (two hours per side) would be sufficient for Qualcomm's post-trial infringement, damages, and invalidity motions.

December 20, 2013

Respectfully submitted,

COOLEY LLP

/s/Timothy S. Teter

Stephen C. Neal (admitted pro hac vice)
nealsc@cooley.com
Timothy S. Teter (admitted pro hac vice)
teterts@cooley.com
Jeffrey S. Karr (admitted pro hac vice)
jkarr@cooley.com (admitted pro hac vice)
Benjamin G. Damstedt (admitted pro hac vice)
bdamstedt@cooley.com
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone:  (650) 843-5182
Facsimile:  (650) 849-7400

CRAVATH, SWAINE & MOORE LLP
Keith R. Hummel (admitted pro hac vice)
khummel@cravath.com
David Greenwald (admitted pro hac vice)
dgreenwald@cravath.com
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A.
John A. DeVault, III
Florida Bar No. 103979
jad@bedellfirm.com
Courtney K. Grimm
Florida Bar No. 953740
cgrimm@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone:  (904) 353-0211
Facsimile:  (904) 353-9307

*Counsel for Defendant Qualcomm Incorporated*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

COOLEY LLP

/s/Timothy S. Teter

Timothy S. Teter (admitted pro hac vice)
teterts@cooley.com
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone:  (650) 843-5182
Facsimile:  (650) 849-7400

*Counsel for Defendant Qualcomm Incorporated*