## UNITED STATES DISTRICT COURT
## THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ParkerVision, Inc.,

                *Plaintiff*,

                v.

Qualcomm Incorporated,

                *Defendant*.

Case No. 3:11-cv-719-J-37-TEM

## QUALCOMM'S RENEWED MOTION FOR JMOL AND MOTION FOR REMITTITUR <u>AND A NEW TRIAL REGARDING DAMAGES</u>

PAGE

I. BACKGROUND AND SUMMARY OF ARGUMENT ........................................1

II. ARGUMENT ........................................................................................................5

    A. District Courts Evaluate The Record, Including Expert Damages Testimony, For Substantial Evidence And Grounds For A Remittitur Or New Trial........................................................................5

    B. The Profit Base Of Over A Billion Dollars:  No Evidence Shows That Qualcomm Made "More Than A Billion Dollars" Of "Extra" Profit. ...........................................................................................6

        1. ParkerVision And Mr. Benoit Ignored The Relative Contribution of The Claimed Improvement Compared To The Many Other Critical Features Of Qualcomm's Receivers. ...................................................................................7

        2. ParkerVision Did Not Account For The Demand And Profit Created By Qualcomm's Baseband Chipsets. .............11

        3. Mr. Benoit's Cost Credit Is Not Apportionment Evidence............15

        4. Mr. Benoit's Arbitrary "Required Rate of Return" Credit Is Not Apportionment Evidence. ......................................16

        5. ParkerVision's "Major Assumption" Is Not Substantial Evidence and Does Not Excuse The Failure To Apportion Fair Value To The Claimed Invention. .........................................17

    C. The Profit Sharing 50/50 Rate Split, Based On Nash Bargaining, Is Unsupported By Any Evidence Or Remotely Comparable Agreement...........................................................................21

        1. Mr. Benoit's Reliance On The "Nash Solution" Was Nothing More Than A Banned Presumption. ...............................21

        2. Mr. Benoit Applied The Wrong Legal Standard. ..........................22

    D. ParkerVision's Attorney Arguments Are Not Evidence............................23

    E. The Court Should Grant JMOL, Remittitur, And A New Trial.................24

III. CONCLUSION AND REQUEST FOR ORAL ARGUMENT............................25

CASES

*Broadcom v. Qualcomm*,
543 F.3d 683 (Fed. Cir. 2008)) ...................................................................11

*Cornell v. HP*,
2008 WL 2222189 (N.D.N.Y 2008) ........................................................4, 20

*Garretson v. Clark*,
111 U.S. 120 (1884) ......................................................................................7

*Grain Processing v. Am. Maize-Prods.*,
185 F.3d 1341 (Fed. Cir. 1999).................................................................23

*Integra Lifesciences v. Merck*,
496 F.3d 1334 (Fed. Cir. 2007)..............................................................6, 25

*Johnson v. Clark*,
484 F. Supp. 2d 1242 (M.D. Fla. 2007).....................................................15

*LaserDynamics v. Quanta*,
694 F.3d 51 (Fed. Cir. 2012).................................................7, 17, 21, 25

*Lucent v. Gateway*,
580 F.3d 1301 (Fed. Cir. 2009)......................................................... passim

*Mirror Worlds v. Apple*,
692 F.3d 1351 (Fed. Cir. 2012)................................................................19

*Oracle v. Google*,
798 F. Supp. 2d 1111 (N.D. Cal. July 22, 2011) ...............................17, 21

*Pharmastem v. Viacell*,
491 F.3d 1342 (Fed. Cir. 2007)..............................................................6, 25

*Power Integrations v. Fairchild Semiconductor*,
711 F.3d 1348 (Fed. Cir. 2013)................................................................22

*ResQNet.com v. Lansa*,
594 F.3d 860 (Fed. Cir. 2010)...........................................................17, 21

*Riles v. Shell Exploration*,
298 F.3d F.3d 1302 (Fed. Cir. 2002) ........................................................23

*Rodriguez v. Farm Stores Grocery*,
518 F.3d 1259 (11th Cir. 2008) ...................................................................6

*Suffolk v. AOL*,
2013 WL 1700938, at *3 (E.D. Va.)...........................................................21

*U.S. v. Gomez,*
807 F. Supp. 2d 1134 (S.D. Fla. 2011) ........................................................12

*Uniloc v. Microsoft*,
632 F.3d 1292 (Fed. Cir. 2011)......................................................... passim

*Weisgram v. Marley*,
528 U.S. 440 (2000)....................................................................6, 25

*Whitserve v. Computer Packages*,
694 F.3d 10 (Fed. Cir. 2012)......................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 59(a) ............................................................6

Local Rule 3.01(j) ..............................................................25

Rule 403 ..................................................................25

Qualcomm moves to vacate the $173 million damages award and for (1) judgment as a matter of law on damages, (2) a remittitur order requiring ParkerVision to accept $17.75 million or a new trial on damages, and (3) an order granting a new trial on damages.

## I.    BACKGROUND AND SUMMARY OF ARGUMENT

This is a patent case involving complex technology and exacting standards of proof for damages. ParkerVision demanded $432 million dollars, and the jury rewarded ParkerVision's audacity with one of the largest patent awards in history—$173 million. As with other outsized awards struck down by the Federal Circuit, the $173 million award rests on baseless assumptions and grossly exceeds—by an order of magnitude—the maximum amount supported by the record.

The alleged infringement began in 2006. Rather than present evidence of the 2006 marketplace, ParkerVision focused on a far different period of time, 7-8 years earlier. ParkerVision told the jury a "stor[y] about people"[1] based on innuendo and speculation, arguing that in 1998-99, ParkerVision's technology would have been the "holy grail." But seven years is an eternity in the wireless industry, and this case is about the marketplace in 2006, not 1999.

Even in 1999, ParkerVision's purported invention was not a new architecture, receiver, or even a new circuit, but simply an alleged improvement on a well-known prior art circuit. Mr. Sorrells testified that he "discovered" the invention while attempting to implement a prior art voltage sampler to see how it worked. By accident, Mr. Sorrells allegedly discovered that he could improve the sampler's performance by adjusting the

---

[1] 10/7 Tr. 139:9-11 (ParkerVision's opening statement).

values of the components in the prior art design. He dubbed his discovery "energy sampling."[2] ParkerVision tried for years to make its energy sampling idea work in a CDMA environment but failed and eventually gave up before 2006; CDMA was simply too difficult for ParkerVision to master—"out of control in terms of its complexity."[3] ParkerVision's struggles underscore the importance and complexity of the rest of the technology in a receiver for CDMA—a sampler, by itself, was nowhere near enough.

Qualcomm, which pioneered CDMA,[4] moved in another direction. Qualcomm designed the world's most successful CDMA baseband processors, enabling the world's first 3G smartphones. From 1999 through 2006, Qualcomm developed baseband processors with a "tremendous amount of power" and circuitry orders of magnitude smaller than anything before.[5] To support its baseband chips, Qualcomm designed its own RF receivers, using traditional double-balanced mixers for downconversion, and accomplished direct downconversion many years before 2006. Numerous Qualcomm innovations provided the functionality necessary for Qualcomm's success in developing CDMA receivers.[6]

ParkerVision admitted that Qualcomm did not infringe from 1998-2006,[7] but convinced the jury that in 2006, Qualcomm stepped on Mr. Sorrells' "energy sampling" idea and infringed his patents. However, neither Mr. Parker nor Mr. Benoit, ParkerVision's damages expert, could reconcile their theory that ParkerVision's technology was essential

---

[2] Dkt. 398; Dkt. 399.

[3] DX 24 ("out of control in terms of its complexity").

[4] 10/21 Tr. 17:15-16 (Benoit) (admitting that Qualcomm "invented CDMA").

[5] 10/21 Tr. 161:21-162:11 (Williams); Fox Tr. 27:13-28:5 ("tremendous amount of power, computational power").

[6] 10/21 Tr. 274:9-279:23 (Jaffee) (explaining the complexity and importance of Qualcomm's receiver technology).

[7] *E.g.*, 10/18 Tr. 25, 39.

with the fact that the industry rejected ParkerVision's technology and licensing overtures for years. Mr. Parker asserted that "we were probably a little ahead of the market need,"[8] but in fact, the alleged invention was behind the market in 1998 and slid further back as time progressed.

In the damages phase, Mr. Parker speculated about what would have happened if the parties had, hypothetically, negotiated a license in 2006. Eligible for a bonus based on the outcome of this case, Mr. Parker testified that in 2006, both parties would have concluded that ParkerVision's 1998-99 energy sampling idea was "must-have technology" that was "crucial in the marketplace" because "there were no other ways of doing those types of benefits that weren't infringing."[9] As a result, Mr. Parker declared, he would have held out for 50% of Qualcomm's receiver profits.[10] But Qualcomm was successfully selling hundreds of millions of dollars of noninfringing CDMA receivers at that time, and even with its supposed head-start, ParkerVision had already abandoned its effort to make an energy sampler for CDMA. Mr. Parker had no factual basis to declare the technology was "crucial" in 2006, and no evidence that he could have extracted 50% of Qualcomm's profits. His testimony was not an expert opinion based on fact; it was nothing more than a wish presented to the jury as fact.

No economic or factual evidence supported Mr. Parker's ravenous demand, but ParkerVision called an accounting expert, Mr. Benoit, to do the math based on Mr. Parker's 50/50 profit split theory. Mr. Benoit did not perform any analysis of the market demand for

---

[8] 10/9 Tr. 61:4-12 (Parker).

[9] 10/17 Tr. 75:6-12.

[10] 10/17 Tr. 74:22-75:12 (Parker) ("I would have calculated a 50/50 split.").

Qualcomm's basebands and associated receivers. Instead, he simply accepted ParkerVision's completely unsupported "major assumption" that Qualcomm could not sell *any* receivers without the claimed invention.[11] He then ignored numerous key technologies that drove and contributed to Qualcomm's sales, and simply assumed that nearly all (over 90%) of Qualcomm's receiver profits were attributable to the claimed invention. Mr. Benoit cited the Nash Bargaining Solution for the proposition that "if two parties have equal bargaining position, that they would split the surplus benefit of reaching that bargain evenly,"[12] and showed the jury a picture of the Nobel Prize Medallion that Nash received for a complex and mathematically advanced game theory. He provided no analysis or testimony applying Nash bargaining methodology to the facts of the case, but declared that it would be "logical" for Qualcomm to pay ParkerVision $432 million, opening the door to the jury's $173 million damages award.

Mere assumptions without factual support or analysis are not substantial evidence for a $173 million damages award. The Federal Circuit requires "sound economic and factual predicates" and an apportionment that separates the value of the claimed invention from unpatented features.[13] ParkerVision did not offer any such evidence, as its base (over $1 billion in supposedly "extra" profit) and rate (50/50) were out of touch with economic reality and the uncontradicted record. By 2006, Qualcomm had been using its own noninfringing direct downconversion receivers for years which, along with advances in Qualcomm's baseband chips and profound improvements in semiconductor design and fabrication

---

[11] 10/18 Tr. 86:21-24 (a "major assumption").

[12] 10/18 Tr. 11:7-12:5 (Benoit).

[13] *Cornell v. HP*, 2008 WL 2222189 at *2 (N.D.N.Y 2008) (Rader, CAFC CJ, by designation).

technology, had already provided the cost, power, and component-count benefits that ParkerVision had promised in 1998-99. Qualcomm's customers did not pressure Qualcomm to use ParkerVision's 1998-99 energy sampling circuit, as opposed to a prior-art mixer, but rather made purchase decisions based on Qualcomm's *baseband* features. Mr. Benoit admitted that he did not (1) analyze customer demand or the competitive marketplace (he struggled to guess the names of competitors), (2) perform the necessary apportionment, or (3) offer proof that Qualcomm would have lost a nickel if it continued to use noninfringing technology. The record contains *no evidence* to support a royalty base of more than 90% of profits or a 50/50 profit-split theory, much less to support a $173 million award.

The evidence shows that a reasonable royalty award would have been, at most, an order of magnitude less than the verdict. Using ParkerVision's 2007 license to VIA as a baseline, Dr. Greg Leonard calculated that a reasonable royalty under the *Georgia-Pacific* framework could be as much as $17.75 million, though it could have been less. ParkerVision's only response was to claim that VIA was not really interested in the receiver aspect of the license–which even if true, would show only that VIA did not press ParkerVision for its lowest price. As a result, $17.75 million set the upper bound of a reasonable royalty, and is the maximum award that any reasonable jury could have made.

## II. ARGUMENT

### A. District Courts Evaluate The Record, Including Expert Damages Testimony, For Substantial Evidence And Grounds For A Remittitur Or New Trial.

The patentee bears the burden of proof on damages, and "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Uniloc v. Microsoft*, 632 F.3d

1292, 1318 (Fed. Cir. 2011). That evidence must be "reliable and tangible ... not conjecture or speculative." *Id.*

"[O]n post-trial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Lucent v. Gateway*, 580 F.3d 1301, 1336 (Fed. Cir. 2009); *Pharmastem v. Viacell*, 491 F.3d 1342, 1354-55 (Fed. Cir. 2007). Moreover, "[t]he rule that a jury verdict is reviewed for support by 'substantial evidence' does not mean that the reviewing court must ignore the evidence that does not support the verdict." *Integra Lifesciences v. Merck*, 496 F.3d 1334, 1345 (Fed. Cir. 2007) (reversing denial of JMOL). Rather, "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached.'" *Id.*

Remittitur is appropriate when substantial evidence supports the damages award (and thus JMOL is denied), but the district court nonetheless concludes that "the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery*, 518 F.3d 1259, 1266 (11th Cir. 2008). A court may grant a new trial "on all or some of the issues ... for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). *Weisgram v. Marley*, 528 U.S. 440, 452 (2000).

## B. The Profit Base Of Over A Billion Dollars: No Evidence Shows That Qualcomm Made "More Than A Billion Dollars" Of "Extra" Profit.

ParkerVision asked for $432 million in damages, promising the jury that it would hear from "an economic expert who has spent hundreds of hours studying the evidence in this case" who would testify "that since 2006, Qualcomm has made ***more than a billion dollars in extra profit*** from using the invention." (10/17 Tr. 55:17-21 (emphasis added).) To

support its extraordinary damages demand, the law required ParkerVision to show that the claimed invention, *not Qualcomm's contributions*, was responsible for that "extra profit." As the Supreme Court held long ago and as the Federal Circuit recently reiterated:

> When a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in *what particulars his improvement has added* to the usefulness of the machine or contrivance. He must *separate its results distinctly from those of the other parts*, so that the benefits derived from it may be distinctly seen and appreciated.

*Lucent*, 580 F.3d at 1337 (emphasis added) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). As the Federal Circuit has recently and repeatedly emphasized, the "patentee...must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Id.* at 1337. Such proof of apportionment must account for the defendant's "manufacturing process, business risks, or significant features or improvements." *Id.* at 1332-33.

### 1. ParkerVision And Mr. Benoit Ignored The Relative Contribution of The Claimed Improvement Compared To The Many Other Critical Features Of Qualcomm's Receivers.

When the Supreme Court first required apportionment in *Garretson*, a case involving 19th Century mop designs, it could not have imagined Qualcomm's modern, complex, feature-rich chipsets, with hundreds of millions of transistors.[14] ParkerVision concedes it was required to apportion, and "apply economic analysis to isolate down . . . the extra benefit

---

[14] *See LaserDynamics v. Quanta*, 694 F.3d 51, 66 (Fed. Cir. 2012) (apportionment is crucial for "electronic devices, which may include dozens of distinct components, many of which may be separately patented, the patents often being owned by different entities"); *Lucent*, 580 F.3d at 1332 ("The evidence can support only a finding that the infringing [date-picker] feature contained in Microsoft Outlook is but a tiny feature of one part of a much larger software program.").

that came from the invention, the lodestar of the *Lucent* case from the Federal Circuit, of the *Uniloc* case, all of these damages cases." (10/17 Tr. 35:22-36:7; *id.* 32:5-21.) But ParkerVision did not present the required proof at trial.[15]

Determining the relative value of the patented feature was particularly important here, where the claimed invention is at most an alleged improvement to a prior-art circuit, and even then, only a tiny part of the accused devices, comprising less than 1% of the receiver. (10/18 Tr. 96:4-10 ("less than 1 percent."); *id.* 62:6-8; *id.*105:1-11). The undisputed fact that, in the years leading up to 2006, ParkerVision tried and failed to implement its sampler in a CDMA receiver underscores the critical nature and value of the rest of the receiver as designed by Qualcomm. (DX 24.) Even in the hands of the inventor, ParkerVision, the claimed invention had no commercial value for CDMA applications and ParkerVision abandoned it; success depended entirely on other technology and engineering. In addition, a stand-alone receiver has little value—receivers must be designed to work with a particular baseband chip, and is often integrated with it, involving massive complexity and functionality outside the scope of the accused circuit.[16]

---

[15] At trial, ParkerVision attributed more than 90% of the operating profits from Qualcomm's receivers to the claimed invention. To reach that astronomical figure, ParkerVision took the operating profits for Qualcomm's receivers, subtracted a few additional costs (the cost of using Qualcomm's cash, fixed assets, and brand name along with the cost of swapping in the accused functionality), and then declared that the remaining 90% of profit is all "attributable to ParkerVision technology based entirely and solely on the bare patent license itself." (10/18 Tr. 107:8-109:8, 117:19-25.)

[16] In its 2004 Business Plan, ParkerVision admitted that its D2D technology was "not a standalone solution" and noted that "the requirement of several third-party technologies for use in final ParkerVision products" was a ParkerVision "weakness." (DX 1276 at 10.) Even under ParkerVision's view, the alleged invention constitutes only a modified use of exactly the same components that have long been used in prior art samplers, mixer/filters, and envelope detectors. (*See, e.g.,* 10/8 Tr. 176:4-177:11 (describing purported conception of Mr. Sorrells' modified voltage sampler); 10/7 Tr. 274:18-275:11, 277:11-16, 277:21-278:7 (comparing the admitted prior art (Fig. 78A of the '551 patent) against the purported invention (Fig. 82A of the '551 patent)); 10/10 Tr. 92:19-22 (switch followed by filter not infringing); 10/8 Tr. 118:23-25 (envelope detector not infringing).)

The claimed invention is not a CDMA receiver and the patents-in-suit do not teach how to make one. Rather, the uncontradicted record at trial established that to make the accused receivers, Qualcomm needed to solve many problems, including the TX jammer problem—"one of the major challenges and complexities" of CDMA[17]—and combine that solution with at least nine other "critical" technologies. Mr. Benoit and ParkerVision ignored all of those features, including (1) the duplexer, which is "very important," because "without the duplexer, [the transmit jammer] would be . . . a million times greater"; (2) the phase-locked loop, without which the receiver "won't work"; (3) the voltage-controlled oscillator, which is also "very important"; (4) the low noise amplifier, which is "very important" due to the transmit signal being "100 million times bigger than [the] received signal" that "has to pass through at the same time"; (5) the sigma-delta analog-to-digital converter, which is "one of the most complex blocks in the design" and also "very important"; (6) gain control circuitry, which is "one of the key things that Qualcomm brought to the table to enable CDMA" and "what made [CDMA] functional"; (7) gain calibration circuitry, which ensures "very accurate gain control"; (8) quadrature calibration circuitry, needed because if the I and Q components are "not matched accurately, you won't get good performance"; and (9) phase rotators, which are "critical" components "used to take out any frequency offsets when you convert the baseband." (10/21 Tr. 274:9-279:23 (Jaffee).)

---

[17] Dr. Prucnal admitted that addressing the TX jammer issue was "one of the major challenges and complexities" of designing a CDMA cell phone. (10/10 Tr. 168:16-169:11.) Prucnal further admitted that "there is no question" that ParkerVision's alleged invention "doesn't solve the TX jammer problem." (10/10 Tr. 174:11-13.)

Each of those technologies is critical to the accused receivers. ParkerVision, which saw its own CDMA efforts stall and spin "out of control in terms of its complexity,"[18] cannot assume that the profitability of the device is due to the claimed invention, a mere improvement on the function of a prior art circuit; it must apportion profit fairly and reasonably for Qualcomm's separate contributions. *Lucent*, 580 F.3d at 1337. But apart from learning about the products "[f]rom a finance and accounting perspective," Mr. Benoit conceded that his analysis did not address anything else about the accused products. (10/18 Tr. 100:22-104:6.) Mr. Benoit admittedly made "no effort to go through and understand" Qualcomm's contributions. (10/18 Tr. 119:19-120:1 (emphasis added).) He did not know what non-patented technology Qualcomm included in its receivers, much less account for its contribution to Qualcomm's profits. (10/18 Tr. 119:4-124:11 (admitting to no understanding of the existence or importance of the nine items listed above).) He completely ignored the reasons for ParkerVision's complete failure to develop a CDMA receiver using the claimed invention. (DX 24.)

Mr. Benoit had "no actual idea" how much time and money Qualcomm spent implementing the technology at issue. (10/18 Tr. 103:3-104:6; *id.* 126:12-15, 127:9-22.) He had no idea what is involved in making the technology at issue work with Qualcomm's basebands, and did not factor that into his analysis in any way. (10/18 Tr. 47:17-48:1.)[19] He simply assumed that Qualcomm's intellectual property, trade secrets, and know-how, are

---

[18] DX 24 (Chen Memo).

[19] Qualcomm has between 50 and 100 engineers working on the proprietary and sophisticated interface between its transceivers and the baseband chip, including hardware and software algorithms. (10/21 Tr. 254:1-256:6 (Jaffee).)

responsible for *none* of Qualcomm's receiver profit. (10/18 Tr. 124:7-11 ("none of those were credited with any allocation or portion of the 90 percent profit on the receiver sales").)

Mr. Benoit's overreaching assumptions and deliberate disregard of critical facts that refute those assumptions are exactly what Federal Circuit law prohibits. *Lucent*, 580 F.3d at 1337. The jury was thus denied precisely the information it needs to arrive at the damages number it chose—or any other number—and Qualcomm is entitled to judgment as a matter of law. ParkerVision illogically contends that Mr. Benoit could simply ignore all of Qualcomm's pre-2006 contributions, and the fact that the claimed invention is a minor contribution to the device, because the hypothetical negotiation happened after Qualcomm had already made enormous progress and designed its own direct downconverters. (Dkt. 482 at 11-12.) Qualcomm's innovations are no less valuable because Qualcomm made them before (and had them available at the time of) the hypothetical negotiation, and the law does not ignore those inventions. ParkerVision cites no authority for its illogical argument, which conflicts with *Lucent* and would negate the apportionment requirement and the concept of fair value. *Lucent*, 580 F.3d at 1337 (requiring apportionment, even though Microsoft made its contributions to the products *before* the hypothetical negotiation).

### 2. ParkerVision Did Not Account For The Demand And Profit Created By Qualcomm's Baseband Chipsets.

Compounding its error, ParkerVision failed to account for the most significant factor driving Qualcomm's receiver sales—the demand for Qualcomm's advanced multi-functional, multimedia MSM baseband chips. (10/18 Tr. 77:3-78:19.) The baseband is the heart of the cellular device. As the Federal Circuit has recognized, Qualcomm's baseband chipsets are a fundamental part of cell phone design and development. *See Broadcom v. Qualcomm*, 543

F.3d 683, 686, 702 (Fed. Cir. 2008) ("Baseband processor chips enable a cell phone's basic communication functions, along with other features such as graphics, multimedia, data transfer, and custom applications…. [T]he market for baseband chips is unlike the typical market for consumer goods ... competition is characterized by competing for 'design wins' for the development and production of cell phones that will embody the proposed [baseband] chip.") (*See also* 10/21 Tr. 251:12-24 (Jaffee).)

Qualcomm and its foundry partners work together to double processing power every eighteen months, yielding "dramatic decreases in the cost, dramatic increases in the processing power" of its baseband chipsets. (10/21 Tr. 161:21-162:11; *id.* 46:16, Fox Tr. 27:13-28:5, Dkt. 482 Ex. A ("tremendous amount of power, computational power").) The advances allowed Qualcomm to dramatically reduce the size of its chips—"over a ten-year span, you'll get 100 to 1 reduction in actual physical size that's required to implement the same function on the die." (10/21 Tr. 162:3-11.) Qualcomm is also able to combine its RF circuitry and baseband together on a single chip, dramatically reducing size and footprint.[20] Industry observers and federal courts refer to the rapid march of semiconductor technology as "Moore's law."[21]

ParkerVision recognized that "advances in foundry technology" including "new foundry processes" would "improve [prior art] mixer shortcomings" and threaten the value of

---

[20] *See* 10/21 Tr. 20:10-21:9; JX 44.00067. Mr. Benoit compared two types of products that the jury found infringing: (1) standalone 6250 transceivers and (2) integrated baseband/transceiver chips. (10/21 Tr. 23:16-22 (Benoit); PX 662.00033.) Although both types of products contained the alleged ParkerVision invention, Mr. Benoit admitted that Qualcomm achieved a dramatic improvement in board-area space by finding a way to integrate all of the functionality on a single die. (10/21 Tr. 23:16-22 (Benoit); PX 662.00033 (showing that Qualcomm dropped the board area from 358 mm$^2$ in a 4 chip chipset to 144 mm$^2$ in an integrated chipset).)

[21] *U.S. v. Gomez,* 807 F. Supp. 2d 1134, 1150 n.16 (S.D. Fla. 2011) ("computing power of today's cell phone…is likely to be, at least, twice as powerful in two years").

ParkerVision's technology.  (DX 1276 at 10.)[22]  It acknowledged that baseband processors were growing more powerful over time, increasing performance and posing another threat to ParkerVision's patents.[23]  In SEC filings, ParkerVision noted that the microelectronics industry "is subject to rapid technological changes" that may "result in a loss of competitive advantage and market opportunity" for older technologies.  (DX 1115 at 10; DX 1108 at 30 ("rapidly changing and evolving technologies"); 10/17 Tr. 106.)

Dr. Tim Williams surveyed Qualcomm's OEM customers and determined that they decide to buy from Qualcomm based on Qualcomm's advanced baseband chip solutions, which includes multimedia and broad smartphone functionality:  "[W]hat was really driving their purchase decisions were the features and functions of the baseband chip and not the functionality of the receiver chip."  (10/21 Tr. 166:14-167:21.)  The customers "didn't care" about the receiver's specific downconversion technique, so long as it met minimum industry standards.  (10/21 Tr. 166:14-167:21.)  Dr. Williams' survey is consistent with all of the other evidence and common sense.  To make the world's most advanced and desirable baseband processors, Qualcomm uses the world's most advanced and expensive process techniques, while making RF transceivers with older processes.  For example, Qualcomm's baseband processors include devices built on cutting edge and more compact 28 nanometer design technology, efficiently packing many 100s of millions of transistors on a smaller silicon footprint, compared to Qualcomm's transceivers, which include approximately 1.2

---

[22] In its 2004 Business Plan, ParkerVision admitted that its D2D technology was "not a standalone solution" and that noted that "the requirement of several third-party technologies for use in final ParkerVision products" was a ParkerVision "weakness."  (DX 1276 at 10.)

[23] DX 1276 at 10 ("THREAT …*improved baseband digital signal processing could raise system performance of non D2D based designs"*) (emphasis original).

million transistors on the less advanced 65 nanometer design. (10/21 Tr. 255:6-12, 259:18-22).)

Mr. Benoit did not dispute any of the evidence. He admitted that according to the OEM study, "customers care about what's in the baseband, not the RF chip." (10/18 Tr. 77:22-78:8.) Conceding that he failed to account for the impact of baseband demand on Qualcomm's RF profits, Mr. Benoit offered the absurd speculation, obviously wrong to even a casual observer of the cellular industry, that perhaps there were "no changes in baseband technology that could have driven the increase in market share." (10/18 Tr. 72:10-13.) But he did not know what the digital baseband was, much less attempt to understand its relevance to 2G, 3G and 4G standards. (10/18 Tr. 125:1-8.) He was oblivious to fundamental facts that were critical to any proper and reliable profits-based analysis.

Facing uncontradicted evidence that the demand for Qualcomm's baseband chipsets—not the accused circuits—drives sales and profits, ParkerVision floated a new theory after Mr. Benoit left the stand, mischaracterizing a two-word phrase in a long answer from Dr. Fox's deposition, and arguing that baseband processing was "almost free." (10/21 Tr. 127:15-128:3.) ParkerVision's attorneys argued that Dr. Fox had conceded that the baseband processor is unimportant, which was the *opposite* of his testimony and his discussions with Qualcomm's expert, Dr. Leonard. As Dr. Leonard testified, ParkerVision's interpretation "*would be horribly mistaken.*" (10/21 Tr. 127:21-128:3.)

Nonetheless, ParkerVision pushed its new attorney argument even further after the verdict, proclaiming that Dr. Fox's testimony proved "the baseband has become commoditized." (Dkt. 482.) As Dr. Leonard observed at trial, Dr. Fox said no such thing,

and ParkerVision never asked Dr. Fox to corroborate its strained and absurd interpretation, for obvious reasons. Dr. Fox testified that to make direct downconversion practical, Qualcomm had to solve the DC offset problem, which was "very difficult to control." (10/21 Tr. 46:16, Dkt. 482 Ex. A Fox Tr. 27:13-28:5.) Dr. Fox testified that "the solutions to those sorts of problems *ultimately comes from clever signal processing*" that Qualcomm made possible by adding a "tremendous amount of power, computational power" in its *baseband chipsets*. (*Id*.) In other words, Qualcomm's baseband chipset innovations—not ParkerVision's invention—solved the DC offset problem and made direct downconversion practical. Baseband *processing* is "almost free" only in the sense that Qualcomm's baseband processors are now so powerful that they can easily take on many new computing tasks, including complex digital signal processing algorithms to adjust and correct the signals output by the receiver. But that makes the baseband *more* valuable, not less so.[24] ParkerVision's "almost free" argument was misleading, wrong, and with no support whatsoever in the record. A jury verdict is not entitled to "the benefit of unreasonable inferences, or those at war with the undisputed facts." *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1246 (M.D. Fla. 2007).

### 3. Mr. Benoit's Cost Credit Is Not Apportionment Evidence.

ParkerVision argues that Mr. Benoit attempted to give Qualcomm credit for (1) the cost of having TSMC make the chips, and (2) the cost of including the accused technology in Qualcomm's chipsets. (Dkt. 482 at 10-11 (citing 10/17 Tr. 169:18-170:2.) The argument is

---

[24] ParkerVision quoted Dr. Razavi's 1998 textbook (eight years before the baseband processors at issue) that the RF section (not the downconverter) was a "bottleneck." (Dkt. 482 at 14.) Dr. Razavi's 1998 book did not address, and has no bearing on, the demand for RF circuits and baseband processors in 2006.

incorrect. ParkerVision confuses Qualcomm's *costs* with the *value/profitability* that Qualcomm contributed and is entitled to retain under *Lucent*. According to ParkerVision's logic, the value of J.K. Rowling's contribution to the *Harry Potter* books is the rent she paid for her apartment and the price of her typewriter. In any event, rather than evaluate *Qualcomm's* costs (which are billions) Mr. Benoit asked *ParkerVision's* accounting department, which "came up with" a $7.8 million dollar figure that supposedly covered the cost of implementing ParkerVision's invention in all 19 different accused Qualcomm designs. (10/17 Tr. 175:18-24.) Mr. Benoit testified that ParkerVision pulled the $7.8 million figure "from their own experience," but ParkerVision had no relevant experience. (10/17 Tr. 175:18-24; 10/18 Tr. 97-98.) Despite years of trying, ParkerVision *never* made a single CDMA transceiver, much less made 19 different designs for $7.8 million. (10/18 Tr. 31:19-32:1.)[25] Selecting an accountant at random from the yellow pages would have been equally reliable; neither source would have had any information about Qualcomm's costs. The biased estimate from ParkerVision's accounting department in any event used the wrong type of information to begin with; *costs* and *value* are not the same. For that reason too, no evidence supported the damages verdict.

### 4. Mr. Benoit's Arbitrary "Required Rate of Return" Credit Is Not Apportionment Evidence.

ParkerVision argues that Mr. Benoit included "the amounts due to contributions of Qualcomm's own intangible assets" because he gave Qualcomm credit for the "required rate of return." (Dkt. 482 at 11 (citing 10/17 Tr. 172:2-24).) The uncontradicted record shows

---

[25] ParkerVision was unable to make a working CDMA transceiver for years, even with a head-start. (DX24; 10/17 Tr. 89:15-19; 10/18 Tr. 55:18-56:19, 57:7-57:14; 51:20-52:9.)

otherwise.[26]  Mr. Benoit did not determine how much Qualcomm's intangible property contributed to profits.  Rather, he simply *assumed* an arbitrary "rate of return" for each asset class.  (10/17 Tr. 173:10-174:6.)  Mr. Benoit did not testify that his "required rate of return" was the profit Qualcomm's assets *actually* created.  He alleged only that *other* companies normally would have *wanted* that rate.  His "required rate of return" has no relationship to the facts of the case, and is not substantial evidence under *Uniloc*, *Lucent*, or *ResQNet*.[27]

> ### 5.    ParkerVision's "Major Assumption" Is Not Substantial Evidence and Does Not Excuse The Failure To Apportion Fair Value To The Claimed Invention.

Mr. Benoit asserted at trial that the entire profit must be allocated to ParkerVision because—he erroneously assumed—the claimed invention is necessary to sell the accused products.  (10/18 Tr. 110.)  A chip may malfunction if a single, small circuit fails, but that does not mean the entire value of the semiconductor resides in that single circuit.  *See, e.g.*, *LaserDynamics*, 694 F.3d at 68; *Oracle v. Google*, 798 F. Supp. 2d 1111, 1115-16 (N.D. Cal. July 22, 2011) ("Wheels are critical to an automobile but no one would apportion all of the demand for a car to just the wheels.").

The uncontradicted evidence shows the claimed invention is *not* essential to any of Qualcomm's sales.  ParkerVision argues that Mr. Benoit "relied on actual, real-world market data reflecting that sales of Qualcomm's non-accused products dramatically diminished as sales of the Accused Products skyrocketed."  (Dkt. 482 at 15.)  That "real-world market data" showed that Qualcomm's sales increased from 2006 through the present, but did not suggest

---

[26] Mr. Benoit assumed that the alleged invention is responsible for nearly *all* of the receiver profit, after giving a small amount of credit for the use of Qualcomm's tangible assets (cash, inventory, buildings, chairs, etc.). (10/17 Tr. 173:10-13).  Mr. Cawley asked about Qualcomm's "*tangible* assets and brand value," not its *in*tangible assets, and that was the question that Mr. Benoit answered.  (10/17 Tr. 173:10-13.)

[27] *ResQNet.com v. Lansa*, 594 F.3d 860 (Fed. Cir. 2010) (vacating damages award).

that ParkerVision's 1998 claimed sampler deserves *any* of the credit for the change, much less all of it. Mr. Benoit admitted that he did not account for the many innovations that Qualcomm's thousands of engineers made from 2006 through the present, and did not model any other potential causes of Qualcomm's increase in market share–for example, that newer receivers were compatible with newer basebands that the market desired while older receivers were not.[28]

Without any proof or facts, Mr. Benoit admittedly made a "major assumption" that Qualcomm would not have made *any* sales if it used a noninfringing downconversion circuit in its 2006 receivers. (10/18 Tr. 86:21-24, 91:3-19.)[29] No evidence supported that assumption. Qualcomm had already achieved direct downconversion and ParkerVision did not present *any* evidence that Qualcomm would have lost a single baseband sale if it elected to use the noninfringing circuits in its receivers.[30] Mr. Benoit provided no demand curve or other economic link between customer demand and the claimed invention. (10/18 Tr. 75:7-9.) To the contrary, Mr. Benoit admitted, time and again, that he "just assumed" that Qualcomm's customers would have stopped purchasing receivers without the alleged invention. (10/18 Tr. 78:15-19.)

Mr. Benoit's "major assumption" is not evidence and cannot support the verdict. First, no evidence whatsoever supports Mr. Benoit's *assumption* that customers would have stopped purchasing from Qualcomm if it could not use ParkerVision's "energy sampling" idea. ParkerVision argues that the alleged invention "enabled" multi-mode capabilities (Dkt.

---

[28] (10/18 Tr. 73:8-19; *id.* 115:25-116:11 (no effort to "analyze the value of Qualcomm trade secret information that was contributing to the design and implementation of the receivers"). (10/18 Tr. 73:24-74:3.)

[29] He admitted that if his assumption were wrong, that would change his conclusion. (Tr. 86:25-87:3.)

[30] 10/18 Tr. 69:18-20 ("never performed a study to determine the demand for Qualcomm's baseband chipsets").

482 at 15), but the uncontradicted evidence showed that Qualcomm made noninfringing multimode receivers for 3G smartphones, including the RTR6200, RTR6300, and RTR6250 (also called the GZIF1 and GZIF2), beginning in 2002 and continuing for years. (10/21 Tr. 242:1-242:2, 243:14-244:11 (Jaffee); DX 795.) In fact, as ParkerVision concedes, Qualcomm continued to make hundreds of millions of dollars of *noninfringing* sales for *two years* after the date of the hypothetical negotiation. (10/18 Tr. 81:13-25.)[31]

Customers continued to purchase hundreds of millions of noninfringing receivers because, as the uncontradicted record shows, Qualcomm's *baseband* chips drive decisions. (10/21 Tr. 166:14-167:21.) ParkerVision and Mr. Benoit admit that Qualcomm is the pioneer of CDMA technology and the world leader in providing CDMA chips. (10/21 Tr. 17:15-16.) ParkerVision and Mr. Benoit ignored the obvious fact that when customers make purchase decisions, they value that capability over all other factors, including the downconversion circuit that resides in less than 1% of the receiver. (10/21 Tr. 166:14-167:21.) There is no evidence at all in the record that customers could look to another supplier even if they wanted a different receiver. Mr. Benoit admitted that he failed to identify even one competitor that would have, or could have, taken a *single* sale. (10/18 Tr. 69:21-25; *id.* 87:14-21, 132-35.)[32] Even VIA—with its own established CDMA baseband business—would not bother to make

---

[31] *See Mirror Worlds v. Apple*, 692 F.3d 1351, 1359 (Fed. Cir. 2012) (relying on admission of plaintiff's damages expert to conclude that Apple did not infringe prior to the critical date).

[32] Mr. Benoit speculated that "someone would have" taken Qualcomm's sales and argued that "Broadcom, Texas Instruments, companies of that sort" would have stepped in. (10/18 Tr. 66:3-14.) Neither Broadcom nor Texas Instruments have ever made a receiver that could work with a Qualcomm baseband, and at the time of the hypothetical negotiation, neither of them were making 3G CDMA chipsets. (*See also* 10/18 Tr. 67:16-20 ("didn't identify a single competitor who would have taken away the receiver business").)

RF circuits for its *own* basebands, much less attempt to make RF circuits for *Qualcomm's* basebands.[33]  No evidence suggests that Qualcomm would have lost a single sale.

Second, even if customers wanted the alleged benefits of ParkerVision's energy sampling circuit, ParkerVision offered no evidence quantifying those alleged benefits, or any evidence of what, if anything, they would have paid Qualcomm for them.  Mr. Benoit admitted that he did not know anything about the technology, but speculated that OEM customers (not Qualcomm) were able to save $5 in costs "from savings of SAW filters and power splitters."  (10/17 Tr. 160:13-19; 10/18 Tr. 36:9-14.)  But even if the invention allowed such savings, no evidence indicated that would have benefitted Qualcomm, rather than the OEMs or their customers.  (10/18 Tr. 88:3-20.)  And, the uncontradicted evidence showed that Mr. Benoit's guess was wrong.  Improvements in duplexer technology—not the use of the allegedly infringing technology—"allowed for the elimination of intersta[g]e SAW filters."  (10/21 Tr. 164:25-165:12 (Williams); *id.* 274:23-275:5 (Jaffee).)  Mr. Benoit admitted that he was unaware that the receivers include a duplexer—"I'm just not familiar with the circuitry"—and thus failed to consider them.  (10/18 Tr. 119:4-12.)  Similarly, Qualcomm's RF chips did not use power splitters either before or after the alleged infringement.  (10/21 Tr. 165:23-166:8 (Williams).)  Thus, Mr. Benoit's "major assumption" was a guess in conflict with the record.  It is not evidence, and cannot support the verdict.[34]

\* \* \* \* \*

---

[33] (Tr. 10/18 17:20-21 (Benoit) (VIA would "have to start from ground zero" and "have so little of an opportunity to actually implement and make some profit on that that they might not even consider it to be a viable opportunity.").)

[34] *See Cornell*, 2008 WL 2222189 at *3 ("Cornell did not offer a single demand curve or attempt in any way to link consumer demand for servers and workstations to the claimed invention.").

ParkerVision chose to pursue a profits analysis using a basis completely divorced from the facts. In this way, Mr. Benoit grossly inflated the value of the claimed invention and its alleged contribution to the technology. This is exactly what the Federal Circuit, in numerous recent cases such as *Lucent*, *Uniloc*, *ResQNet*, and *LaserDynamics*, is trying to stop. Neither Mr. Benoit's testimony nor any other evidence supported the damages verdict, which therefore must be overturned as a matter of law.

### C. The Profit Sharing 50/50 Rate Split, Based On Nash Bargaining, Is Unsupported By Any Evidence Or Remotely Comparable Agreement.

#### 1. Mr. Benoit's Reliance On The "Nash Solution" Was Nothing More Than A Banned Presumption.

In an effort to support Mr. Parker's desired 50/50 split, Mr. Benoit cited the Nash Bargaining Solution and snippets from three academic articles, declaring that "if two parties have equal bargaining position, that they would split the surplus benefit of reaching that bargain evenly." (10/18 Tr. 11:7-12:5.) Even assuming Nash's viability here, the "if" in the proposition is critical. Mr. Benoit did no analysis and presented no evidence to determine "if" the parties had equal bargaining position. He just assumed it. In fact, ParkerVision had no leverage over Qualcomm, because (unlike 1998) Qualcomm had accomplished direct downconversion and had been selling hundreds of millions of dollars of non-accused receivers for years. With no analysis or factual support, Mr. Benoit's opinion reduced to a mere 50/50 presumption—precisely the sort of "rule of thumb" that Federal Circuit authority prohibits. *Uniloc*, 632 F.3d at 1318 (striking down a $388 million award, as such a "rule of thumb" approach was impermissible); *Suffolk v. AOL,* 2013 WL 1700938, at *3 (E.D. Va. 2013); *Oracle*, 798 F. Supp. 2d at 1119.

Mr. Parker's testimony that he would have demanded a 50/50 split of Qualcomm's receiver profits is not substantial evidence; it is not even a reasonable opinion based on fact. It conflicts with the *Georgia-Pacific* framework, which requires and presupposes a *willing* licensor, not an intransigent one. Although ostensibly presented in his role as an "expert," Mr. Parker's claim is not an expert opinion. It is simply a claim that he would have, as a matter of fact, demanded that split. Any patent holder can make the same claim—*i.e.*, "I would have demanded a 50%, 75%, 100% royalty rate." Such claims have no evidentiary basis as "fact" and no usefulness as "opinion."

Mr. Parker's "opinion" that he would have obtained 50%, and Mr. Benoit's numerous baseless assumptions are not substantial evidence. *Power Integrations v. Fairchild Semiconductor*, 711 F.3d 1348, 1374 (Fed. Cir. 2013) (vacating damages award where patentee's analysis rested on assumptions, "an expert opinion derived from unreliable data and built on speculation").

## 2. Mr. Benoit Applied The Wrong Legal Standard.

ParkerVision argues that Mr. Benoit did not rely entirely on Nash, noting that he recited the *Georgia-Pacific* factors to the jury. Even if Mr. Benoit considered all of the factors, that would not inoculate his damages analysis, which adopts a flawed 50/50 premise in the first place. *Uniloc*, 632 F.3d at 1317 (striking down a rule of thumb when "offered merely as a starting point to which the *Georgia-Pacific* factors are then applied to bring the rate up or down"); *Whitserve v. Computer Packages*, 694 F.3d 10, 31-32 (Fed. Cir. 2012).

Besides, Mr. Benoit failed to perform the analysis *Georgia-Pacific* requires. He disregarded three of the *Georgia-Pacific* factors because Mr. Sorrells and Dr. Prucnal knew

of no "alternative *to achieve the same benefit*."  (10/18 Tr. 32:6-15 (emphasis added); 10/17 Tr. 180:21-181:10.)  But noninfringing alternatives do not have to provide "*the same benefit*" as the invention.  Even if an invention is (allegedly) better than the alternatives, the *Georgia-Pacific* framework requires an expert to consider the value of the difference over alternatives to infringement, something that Mr. Benoit admittedly failed to do.  (10/18 Tr. 79-81.)[35]

Mr. Benoit erroneously assumed that Qualcomm had no alternative whatsoever to infringement, even though the uncontradicted evidence established that Qualcomm had very successful alternatives—it sold hundreds of millions of dollars of *noninfringing* RF chips, including multimode RF chips such as the RTR6250, for years before and after the date of first infringement.  (10/18 Tr. 81:13-25 (Benoit); 10/21 Tr. 242:1-242:2, 243:14-244:11 (Jaffee); DX 795.)  Similarly, the Court held that Qualcomm-Atheros WiFi chips are noninfringing (Dkt. 320 at 4), and many of the accused products are WiFi devices.  (JX 59, 57, 58, 55).  The record also contains extensive evidence of other successful noninfringing downconverters, including one made by Bell Labs,[36] FCI, and GCT and NXP.  (10/17 Tr. 90:4-8, 104:3-7; 10/18 Tr. 63:2-21; DX 116.)  Mr. Benoit's assumptions are false in light of these readily available, and actually implemented, alternatives.  Thus, ParkerVision failed to present substantial evidence, and the $173 million verdict cannot stand.

### D.     ParkerVision's Attorney Arguments Are Not Evidence.

After the trial, ParkerVision raised two attorney arguments without evidentiary support.  First, ParkerVision argued that one of Qualcomm's experts, Dr. Williams, agreed with the far-fetched idea that the invention saves OEM customers billions of dollars and that

---

[35] *Riles v. Shell,* 298 F.3d 1302 (Fed. Cir. 2002); *Grain Proc. v. Am. Maize-Prods.*, 185 F.3d 1341 (Fed. Cir. 1999)
[36] DX 1150; 10/11 Tr. 23:13-22; 29:17-25; 10/11 Tr. 24:25-26:25; DX 1150 Fig. 1.

Mr. Benoit's damages analysis was "a mere 2.2%" of that amount. (Dkt. 425 at 11-12.) No witness, including Dr. Williams, testified that the invention saved OEMs billions of dollars, and no evidence supported that theory. ParkerVision's experts floated that argument in discovery, but abandoned it at trial (10/21 Tr. 202:1-5), and Dr. Williams disagreed with it as well. (10/21 Tr. 194:17-23 ("this table was wrong."); *id.* 198:15-21.)[37]

Second, ParkerVision argued that the jury "could reasonably have concluded" it should make "upward adjustments" to the VIA license based on Mr. Benoit's testimony. (Dkt. 482 at 4.) Mr. Benoit did not provide any evidentiary basis for any "adjustment" to the VIA license—he dismissed it entirely, opining that VIA "might not even consider it to be a viable opportunity." (Tr. 10/18 17:20-18:21.) Mr. Parker and Mr. Benoit both testified that VIA did not care about the patents-in-suit, and did not try to drive a hard bargain for them or seek a low price. At most, VIA supports a $17.75 million award as an upper bound.

### E. The Court Should Grant JMOL, Remittitur, And A New Trial.

ParkerVision attempts to shield Mr. Benoit's testimony from review, arguing that, after deciding *Daubert* and presiding over a trial, a district court cannot consider any criticism of the experts and that Qualcomm supposedly "waived" its objections to it. (Dkt. 482 at 5-6.) Qualcomm filed a *pre*-verdict JMOL motion, preserving its challenge to the sufficiency of the evidence. (Dkt. 422.) Furthermore, Qualcomm raised lengthy *Daubert* objections to both Benoit's base (nearly all of Qualcomm's profit) and rate (50/50) calculations, even though *Lucent* does not require them. (Dkt. 288.)[38]

---

[37] As the Court observed, Dr. Williams did *not* agree with ParkerVision or its counsel. (10/22 Tr. 23:11-16.)

[38] Qualcomm's *Daubert* challenged Mr. Benoit's opinion across the board, challenging both the profit base and the rate. (Dkt. 288; *see generally* 9/30 Tr.; 10/17 Tr. 12:4-26:2, 37:14-39:22.)

Because Mr. Benoit's testimony falls far short of the Federal Circuit's requirements for damages proof, the Court should excise it from the record and grant JMOL. *Weisgram*, 528 U.S. at 454. And even if the Court does not excise Mr. Benoit's testimony, substantial evidence does not support the award, and JMOL is required. *Pharmastem*, 491 F.3d 1342 at 1354-55; *Integra*, 496 F.3d at 1346. The Court should also order a remittitur to $17.75 million, which Dr. Leonard reached after his conservative analysis; the evidence did not establish a higher award. Finally, the Court should order a new trial because (1) Mr. Benoit's testimony and Mr. Parker's damages testimony should not have been admitted under *Daubert* and Rule 403 and their admission could not "help but skew the damages horizon for the jury"[39] (*e.g.,* Dkt. 288), and (2) the $173 million damages award is against the great weight of the evidence (*see supra* § II.A to II.D) and ultimately resulted from ParkerVision's improper arguments and character attacks for the reasons described above (*see generally supra* § I). Finally, Qualcomm also moves for a new trial on damages if the Court grants all or any portion of Qualcomm's JMOL and new trial motions regarding liability.

## III.    CONCLUSION AND REQUEST FOR ORAL ARGUMENT

The Federal Circuit requires "sound economic and factual predicates," not major unfounded assumptions. The $173 million award has no basis in the record and cannot stand. Due to the complex issues presented and the magnitude of the damages award, Qualcomm respectfully requests oral argument pursuant to Local Rule 3.01(j); an afternoon argument (two hours per side) would be sufficient for Qualcomm's post-trial infringement, damages, and invalidity motions.

---

[39] *LaserDynamics*, 694 F.3d at 68; *Uniloc*, 632 F.3d at 1320.

December 20, 2013

Respectfully submitted,

COOLEY LLP

By:      /s/ Timothy S. Teter
            Stephen C. Neal (admitted pro hac vice)
            nealsc@cooley.com
            Timothy S. Teter (admitted pro hac vice)
            teterts@cooley.com
            Jeffrey S. Karr (admitted pro hac vice)
            Ben Damstedt
            bdamstedt@cooley.com
            Five Palo Alto Square
            3000 El Camino Real
            Palo Alto, CA 94306-2155
            Telephone:  (650) 843-5182
            Facsimile:  (650) 849-7400

CRAVATH, SWAINE & MOORE LLP
            Keith R. Hummel (admitted pro hac vice)
            khummel@cravath.com
            David Greenwald (admitted pro hac vice)
            dgreenwald@cravath.com
            Worldwide Plaza
            825 Eighth Avenue
            New York, New York 10019
            Telephone:  (212) 474-1000
            Facsimile:  (212) 474-3700

               -and-

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A.
            John A. DeVault, III
            Florida Bar No. 103979
            jad@bedellfirm.com
            Courtney K. Grimm
            Florida Bar No. 953740
            cgrimm@bedellfirm.com
            The Bedell Building
            101 East Adams Street
            Jacksonville, Florida 32202
            Telephone:  (904) 353-0211
            Facsimile:  (904) 353-9307

*Counsel for Defendant Qualcomm Incorporated*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Timothy S. Teter

Timothy S. Teter (admitted pro hac vice)
teterts@cooley.com
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5182
Facsimile: (650) 849-7400

*Attorney for Defendant Qualcomm Incorporated*