# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PARKERVISION, INC.,

       *Plaintiff*,

       v.

QUALCOMM INCORPORATED,

       *Defendant*.

Case No. 3:11-cv-719-J-37-JRK

## QUALCOMM'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL REGARDING NONINFRINGEMENT

## REDACTED VERSION

I.  BACKGROUND AND SUMMARY OF ARGUMENT ................................................. 1

II.  LEGAL STANDARDS ........................................................................................ 7

III.  ARGUMENT ...................................................................................................... 8

A.  The Accused Products Do Not Meet the "Generating" Limitations. .................... 8

1.  ParkerVision Claimed a Particular Type of Sampler. ................................ 8

2.  Qualcomm's Double-Balanced Mixers—Not Energy In The Capacitors—Generate the Lower Frequency Signal. .............................. 10

3.  The Capacitors In Qualcomm's TX Filter Block An Unwanted Transmit Signal And Do Not Generate The Baseband Signal ................. 13

B.  The Accused Products Do Not Meet The "Sampling" Limitations. .................... 18

C.  The Accused Products Do Not Meet Three Additional Limitations .................... 20

D.  ParkerVision Failed To Present Evidence That Magellan Is Representative. ...................................................................................................... 21

E.  JMOL Is Required On Inducement. .................................................................... 23

F.  The Court Should Order a New Infringement Trial ............................................ 25

IV.  CONCLUSION AND REQUEST FOR ORAL ARGUMENT ..................................... 25

I.    BACKGROUND AND SUMMARY OF ARGUMENT .................................................. 1

II.   LEGAL STANDARDS ...................................................................................... 7

III.  ARGUMENT ............................................................................................... 8

      A.    The Accused Products Do Not Meet the "Generating" Limitations. .................... 8

            1.    ParkerVision Claimed a Particular Type of Sampler. ................................ 8

            2.    Qualcomm's Double-Balanced Mixers—Not Energy In The
                  Capacitors—Generate the Lower Frequency Signal. ............................... 10

            3.    The Capacitors In Qualcomm's TX Filter Block An Unwanted
                  Transmit Signal And Do Not Generate The Baseband Signal. ................ 13

      B.    The Accused Products Do Not Meet The "Sampling" Limitations. .................... 18

      C.    The Accused Products Do Not Meet Three Additional Limitations. .................. 20

      D.    ParkerVision Failed To Present Evidence That Magellan Is
            Representative. ..................................................................................... 21

      E.    JMOL Is Required On Inducement. ........................................................... 23

      F.    The Court Should Order a New Infringement Trial. ...................................... 25

IV.   CONCLUSION AND REQUEST FOR ORAL ARGUMENT ...................................... 25

**PAGE(S)**

**CASES**

*Alloc v. Pergo*,
2010 WL 3860382 (E.D. Wis. 2010) ................................................23

*Becton, Dickinson v. Tyco*,
616 F.3d 1249 (Fed. Cir. 2010) ...............................16, 17, 20, 23

*Commil v. Cisco*,
720 F.3d 1361 (Fed. Cir. 2013) ......................................................23

*Eugene Baratto v. Brushstrokes Fine Art*,
2010 WL 1233366, at *12 (W.D. Wisc. 2010) ...............................23

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ..............................2, 4, 7, 12

*Implicit Networks v. F5 Networks*,
2013 WL 1007250 (N.D. Cal. Mar. 13, 2013) ................................23

*Johns Hopkins Univ. v. Datascope*,
543 F.3d 1342 (Fed. Cir. 2008) ......................................................12

*L&W v. Shertech*,
471 F.3d 1311 (Fed. Cir. 2006) ......................................................23

*Medtronic Vascular v. Boston Sci.*,
2008 WL 2744909, *3 (E.D. Tex. July 11, 2008) ..........................23

*Moxness Prods., Inc. v. Xomed, Inc.*,
891 F.2d 890 (Fed. Cir. 1989) ........................................................25

*Nobelpharma AB v. Implant Innovations*,
141 F.3d 1059 (Fed. Cir. 1998) ........................................................7

*Pharmastem v. Viacell*,
491 F.3d 1342 (Fed. Cir. 2007) .............................................16, 20, 23

*ResQNet.com v. Lansa*,
594 F.3d 860 (Fed. Cir. 2010) ..........................................................6

*Retractable Techs. v. Becton, Dickinson*,
653 F.3d 1296 (Fed. Cir. 2011) (Plager, J., concurring) ..................2

PAGE(S)

*TiVo v. Echostar*,
  516 F.3d 1290 (Fed. Cir. 2008)............................................................21

*Yoon Ja Kim v. Congra Foods*,
  465 F.3d 1312 (Fed. Cir. 2006)............................................................17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 59............................................................................7, 25

Fed. R. Evid. 705............................................................................23

Fed. R. Evid. 801(c)(2)............................................................................25

Local Rule 3.01(j)............................................................................25

Qualcomm renews its motion for JMOL of noninfringement as to all accused products and all asserted claims on the grounds that the uncontradicted evidence, including ParkerVision's own expert admissions, establishes that the Accused Products do not meet either (i) the "generating" or (ii) the "sampling" limitations, which are present in every asserted claim. Qualcomm also renews its motion for JMOL with respect to the 18 product architectures that ParkerVision did not address during trial except through a sweeping and conclusory assertion from its expert. ParkerVision's argument as to the 18 products was so superficial that the verdict included an architecture that ParkerVision dropped before trial and did not mention to the jury. Qualcomm also renews its motion for JMOL of no inducement, because the uncontradicted evidence shows that Qualcomm had substantial defenses and did not have the required culpable mental state at the time of the alleged infringement (2006-2013). Qualcomm also moves for a new infringement trial, because (1) the verdict is against the great weight of the evidence, (2) the 1998-99 evidence was highly prejudicial, irrelevant, and should have been excluded, and (3) ParkerVision made improper and misleading arguments throughout the trial.

I.      **BACKGROUND AND SUMMARY OF ARGUMENT**

Patent cases should rise or fall on concrete scientific facts. Patent claims are construed as a matter of law and the operation of the accused products should not be a mystery—experts can test the accused products and perform computer simulations to explore how they work. But when a patentee realizes that its expert will admit on the stand that the accused products do not practice key elements of the asserted claims, and when the patentee has the good fortune to discover a collection of inflammatory yet irrelevant emails, "the siren

song of litigation counsel"[1] can lead the patentee to follow another strategy—make the case about the emails and tell a story, dismissing how the accused products actually work. That path does not promote innovation, but rather leads to "short-lived victory at trial" and JMOL of noninfringement.[2]

ParkerVision chose that path. ParkerVision's 1998 patents describe and claim an "energy sampling" technique for downconverting a high frequency radio carrier signal to a lower frequency signal, called the "baseband." All claims require two things for infringement: (i) the lower frequency signal must be "generated" from carrier signal energy in a storage device, and (ii) the continuous time signal must be "sampled" or reduced to a discrete time signal. All of the witnesses agreed that if the lower frequency baseband signal is *not* generated from sampled carrier energy in the storage device, then the Accused Products do not infringe.

The patents do not mention, much less describe or claim, prior art downconverters known as "double-balanced mixers." There is no dispute that all of Qualcomm's Accused Products have double-balanced mixers, which use additional circuitry with criss-crossing signal paths to generate the lower frequency signal. ParkerVision's expert repeatedly admitted, and the technical documents confirmed without dispute, that the double-balanced mixer generates the lower frequency signal. No email, or insinuation from any email, changes that fact. At trial, ParkerVision presented an unorthodox infringement case. ParkerVision accused electrical circuits made and sold from 2006-2012, but performed no tests and disavowed its expert's computer simulations of them. Instead, ParkerVision told

---

[1] *Retractable Techs. v. Becton, Dickinson*, 653 F.3d 1296, 1311 (Fed. Cir. 2011) (Plager, J., concurring).
[2] *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1324 n.2 (Fed. Cir. 2009).

the jury a story from a much earlier era, returning to its failed 1998-99 discussions with Qualcomm. ParkerVision argued the 1998-99 emails were "circumstantial evidence…that Qualcomm infringes the patents,"[3] and that those emails were "just as good" as direct evidence showing how the accused products worked in 2006.[4] ParkerVision argued that an email from 2004, in which an engineer suggested that he and a colleague "go over ParkerVision approach and see if we can make it work" was "the dripping umbrella," allegedly showing that Qualcomm's products, designed later by other engineers, infringed.[5]

As a matter of basic engineering fact, Qualcomm had an ironclad noninfringement defense, which ParkerVision's witnesses admitted to be correct. ParkerVision urged the jury to brush the science aside, weaving prejudicial inferences from a handful of old emails and arguing that Qualcomm's noninfringement defense was nothing more than a continuation of the "party line" from 1998-99.[6] Pursuing a character attack, ParkerVision led the jury through the alleged "secret Qualcomm documents" and "secret Emails," which suggested only that in the late 1990s, Qualcomm had high hopes for ParkerVision's bold promises about its downconversion technology.[7] ParkerVision accused Qualcomm of "decid[ing] to be untruthful" during the 1998-99 discussions, which had nothing to do with how products designed by other engineers many years later worked.[8] ParkerVision's CEO, Jeff Parker, questioned the character and integrity of the people he met in 1999, saying he became "suspicious" of Qualcomm, and "didn't really trust Qualcomm" or "believe that Qualcomm

---

[3] 10/15 Tr. 86:23-87:5 (ParkerVision's closing).
[4] 10/15 Tr. 86:21-22 (ParkerVision's closing).
[5] 10/15 Tr. 92:4-11 (ParkerVision's closing: "Ladies and gentlemen, that is the dripping umbrella.")
[6] 10/15 Tr. 103:22-25 (ParkerVision's closing).
[7] 10/7 Tr. 159:4-12 (ParkerVision's opening); 10/7 Tr. 160:14-18.
[8] 10/7 Tr. 159:4-12 (ParkerVision's opening); 10/7 Tr. 160:14-18.

was being honest with him"—more irrelevant corporate character attacks that had no bearing on products designed and sold in 2006.[9] He rebuked a Qualcomm engineer for failing to shake hands in 1999 with a ParkerVision executive—another irrelevant character attack.[10]

In an improper effort to bridge over a decade of time and generations of different Qualcomm products and employees, ParkerVision argued that Qualcomm's allegedly bad behavior in 1999 negated Qualcomm's 2013 noninfringement defense: "In short, ladies and gentlemen, we saw that as far back ago as 1999, Qualcomm was putting out the party line. And today, these years later, I'd suggest to you they're still doing it."[11] ParkerVision built its case on prejudicial accusations from an irrelevant time frame, designed to distract the jury from the basic question of how the accused products actually work.

ParkerVision's trial tactics created a dilemma for Qualcomm. It could heed the Federal Circuit's advice in *Exergen* and focus on the merits, or spend its limited trial time chasing ParkerVision far afield, rebutting ParkerVision's prejudicial and misleading storytelling. The written record left no doubt that long before the alleged infringement, Qualcomm (1) expressed great skepticism,[12] (2) "gave up on them…NOT using their technique,"[13] (3) concluded that ParkerVision's "technology offers little novel remedy, if

---

[9] 10/7 Tr. 161:8-11 (ParkerVision's opening); 10/22 Tr. 71:10-15 (ParkerVision's closing). Mr. Sorrells testified that he was "suspicious" as well. 10/8 Tr. 58:10-12, 245:6-8.
[10] 10/9 Tr. 49:15-25 (Parker).
[11] 10/15 Tr. 103:22-25 (ParkerVision's closing).
[12] Persico (1998): "I attended this [ParkerVision] demo but there were technical difficulties and no hard data was seen to support the claims. I am skeptical based on my knowledge of physics and receiver design." (DX 1655.)
[13] Wheatley (2000-2001): "[W]e gave up on them" (DX 1706); ParkerVision engineers "are the same guys who were here a few years ago, and could not explain how they worked ... [s]o we told them to go away, and started our own design" (JX 98); and "[w]e are NOT using their technique" (DX 951).

any,"[14] (4) realized that if Qualcomm used double-balanced mixers, "we do not need Parkervision IPR to proceed,"[15] and (5) noted that ParkerVision's idea "is not enabling…we could use other types of mixer instead of D2D."[16]  The alleged "dripping umbrella" email exchange of 2004 showed only that ParkerVision's approach came to mind when an engineer (not the designer of the Accused Products) was asked to discuss every known approach and urged that "*no idea is too stupid*" to mention.[17]  In short, Qualcomm did nothing wrong in 1998-99, but that was beside the point.  Qualcomm's products do not practice ParkerVision's patents, and that is what matters.

Qualcomm focused on the merits and exposed ParkerVision's groundless infringement case.  During scripted direct examinations, ParkerVision's infringement witnesses, Dr. Prucnal and Mr. Sorrells, offered conclusory opinions that Qualcomm infringed.  But on cross-examination, ParkerVision's case unraveled.  Mr. Sorrells admitted that he had no foundation to allege infringement and did not have the information necessary to conduct a proper analysis.[18]  Dr. Prucnal discredited Mr. Sorrells' opinions, confirming that Mr. Sorrells did not have access to the information necessary to form a valid opinion.[19]  Dr. Prucnal then scuttled ParkerVision's case entirely, repeatedly and unequivocally testifying that Qualcomm's double-balanced analog mixers—not energy samplers—generate the lower frequency signal in a manner distinct from the requirements of the claims.

---

[14] Younis (1999): "[I]t should be evident that ParkerVision's D2D technology offers little novel remedy, if any, to the known problem of zero-IF."  (DX 993.)

[15] Gilmore (1999): "We do not need Parkervision IPR to proceed," because "[w]e can obtain an approximate 6 dB noise figure using a double balanced mixer."  (DX 1692; *see also* DX 1674; DX 741; DX 1695; DX 713; DX 724.)

[16] Bazarjhani (1999): "PV approach is not enabling zero IF, unless we solve the isolation problem and wide dynamic. Then in that case, we could use other types of mixer instead of D2D."  (DX 722.)

[17] PX 322.

[18] *See* 10/8 Tr. 89:19-90:4.

[19] 10/10 Tr. 7:20-8:13, 72:1-13.

When a patentee's own witnesses establish noninfringement, a defendant has no reason or obligation to present further testimony and is entitled to JMOL, even without presenting any of its own expert testimony.[20] After conducting extensive cross-examinations of Mr. Parker, Dr. Prucnal, and Mr. Sorrells, and after obtaining admissions clearly establishing noninfringement, Qualcomm presented its invalidity expert, Dr. Razavi. He explained that the claims are invalid, and confirmed the fundamental difference between double-balanced mixers and the claimed energy sampling invention.

In its rebuttal closing, ParkerVision returned to its corporate character attacks and improperly turned the burden of proof on its head, urging the jury to speculate that Qualcomm's engineers would have admitted to infringement.[21] To the contrary, Qualcomm said to ParkerVision throughout this case that its analog double-balanced mixers, not digital energy samplers, generate the baseband in the Accused Products without practicing the claims.[22] Nonetheless, ParkerVision went even further, asking the jury to speculate that Qualcomm's noninfringement expert, Dr. Fox, also believed that Qualcomm infringed.[23] Dr. Fox had emphatically rebutted infringement, not admitted it. He also would have said what the documents, Dr. Prucnal, and Dr. Razavi agreed—the double-balanced mixers generate the baseband signal. Nonetheless, during its rebuttal closing, ParkerVision showed

---

[20] *ResQNet.com v. Lansa*, 594 F.3d 860, 872 (Fed. Cir. 2010) (vacating award where the "district court seems to have been heavily influenced by Lansa's decision to offer no expert testimony to counter Dr. David's opinion.... Lansa had no obligation to rebut until ResQNet met its burden with reliable and sufficient evidence.").

[21] 10/15 Tr. 143:19-144:5 (ParkerVision's rebuttal).

[22] JX 20 at 13 ("In the Accused Products, the down-converted signal ... is formed in the form of current at the output node of the transistors that are part of the continuous mixers. The downconverted signal is not 'generated ... from transferred energy' ...."); *id.* at 14 ("The Accused Products do not include a 'storage module' as required .... [I]nstead, the Accused Products include capacitors used in lowpass filters to ... allow the current representing the baseband signal to pass ...."). 10/21 Tr. 265:1-4; 250:9-17; DX-605 at 17 ("The mixer downconverts the RF signal to baseband signal.").

[23] 10/15 Tr. 95:3-11 (ParkerVision's closing).

the jury a figure from page 82 of Dr. Fox's noninfringement report that was *not* in evidence, and fabricated a story that it showed infringement.[24]  The argument was pure fiction.  But Qualcomm had no right to any rebuttal, and ParkerVision summed up with a conclusion plucked from the formula for writing mystery serials, announcing that Qualcomm "might have gotten away with it" if Mr. Sorrells hadn't "[found] clues."  (10/7 Tr. 164:8-16.)

ParkerVision's improper character attacks resonated with the jury, which asked to see the demonstratives and page 82 of Dr. Fox's report (which ParkerVision mischaracterized in closing).[25]  The jury never saw Dr. Fox's report, but it gave ParkerVision exactly what it wanted and more, including a "finding" that Marimba, a design that was not in evidence because ParkerVision dropped it from the case, infringed.  (Dkt. 367 at 2; Dkt. 387; Dkt. 416.)  ParkerVision's prejudicial "story" is the only explanation for that erroneous result—the jury could not have considered the evidence of how Marimba operated because there was none.  The verdict is the type of "short-lived victory at trial" that the Federal Circuit condemned in *Exergen*.[26]  JMOL of noninfringement is required.

## II.  LEGAL STANDARDS

JMOL is appropriate where the verdict is not supported by substantial evidence, and "an admission made by a plaintiff's witness can be sufficient to support entry of a JMOL in favor of a defendant."  *Nobelpharma AB v. Implant Innovations*, 141 F.3d 1059, 1065 (Fed. Cir. 1998).  The court may grant a new trial "on all or some of the issues…for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R.

---

[24] 10/15 Tr. 140:22-141:10 (ParkerVision's rebuttal).
[25] 10/16 Tr. 6:8-18 (question from the jury read).
[26] *Exergen*, 575 F.3d at 1324 n.2.

Civ. P. 59(a). Such grounds include that the verdict is against the great weight of the evidence or substantial errors were made in the admission or rejection of evidence.

III.   ARGUMENT

A.   The Accused Products Do Not Meet the "Generating" Limitations.

1.   ParkerVision Claimed a Particular Type of Sampler.

The asserted claims relate to downconversion, the process of generating a lower frequency signal from a higher frequency "carrier" signal. The invention "samples" the carrier signal using a digital switch and a storage device. A non-negligible amount of energy from the carrier (RF) signal flows into the storage device, and the lower frequency signal is generated from the transferred energy in the storage device. Generating the lower frequency, baseband signal from the energy transferred into the storage element is essential to the claimed invention. As ParkerVision conceded, its invention (FIG. 82A) uses the same components, connected in exactly the same way, as the voltage sampler prior art (FIG. 78A). (*See* ParkerVision demonstrative below.) Proving infringement thus requires more than identifying similar, or even the same, architecture.



The prior art also included an entirely different type of downconverter, called a "double-balanced mixer." Double-balanced mixers were often coupled to low pass filters, which use capacitors for a different purpose from ParkerVision's invention. Whereas

ParkerVision's energy sampler uses a capacitor to *collect and store the desired carrier energy* used to generate the lower-frequency signal, a filter uses a capacitor to *discard unwanted energy* from noise or interference. (10/10 Tr. 182:21-183:7, 188:10-19, 191:18-22.) Stated another way, a sampler uses a capacitor like a measuring cup to collect and store the desired energy used to generate the baseband signal, whereas a filter uses a capacitor like a garbage disposal to discard the unwanted energy from a different signal, a "jammer" or "interferer" that the design seeks to remove. Mixers, filters, and combinations of them have long been known.[27] The patents-in-suit did not describe or claim double-balanced mixers or any other type of mixer.[28]

ParkerVision distinguished its claimed invention from mixer/filter circuitry, emphasizing to the Patent Office that it used capacitors to generate the baseband signal, not merely as a filter. ParkerVision expressly confirmed that the invention was not a "switch followed by a low-pass filter" which was "universally known and exhaustively proven over the antiquities of communications theory." (DX469 at 70; 10/8 Tr. 161:15-162:2.[29]) In other materials, ParkerVision emphasized that its approach used fewer components than prior art double-balanced mixers. (PX308 at 65 ("No balanced transistor pairs.").)[30]

The asserted claims reflect the distinction between prior art double-balanced mixers and energy samplers, as every one of them requires the energy sampler to "generate" the lower frequency signal from carrier energy transferred to the storage device.[31] At trial,

---

[27] 10/8 Tr. 110:9-12, 111:19-22, 122:17-23, 128:5-15; 10/10 Tr. 107:5-12, 126:10-17, 177:4-7.

[28] 10/8 Tr. 110:9-12; 10/10 Tr. 141:17-22.

[29] *See also* 10/8 Tr. 110:9-12, 161:15-162:2, 162:18-20; 10/10 Tr. 99:2-18, 100:14-17; DX 466 at 51.)

[30] The inventors were "outraged" when others called the invention a "mixer". (DX 1198 at 1; 10/9 Tr. 135:4-7.)

[31] At ParkerVision's request, the Court did *not* construe the term "generating," giving the term its ordinary meaning. Dkt. 318 at 5. http://www.merriam-webster.com/dictionary/generate ("**gen·er·ate** *transitive verb* : to

ParkerVision's witnesses agreed that every asserted claim requires transferring energy into a storage device from the carrier signal and "generating" the baseband signal from the energy stored in the capacitor. Mr. Sorrells conceded:

> Q. ... In order to prove infringement with respect to any accused product, ParkerVision first has to prove that the accused products transfer energy from the carrier signal into the storage device, correct?
>
> A. Yes, sir.
>
> Q. And, secondly, ParkerVision has to prove that the accused products generate the baseband from the energy that was transferred into the storage device, correct?
>
> A. Yes, sir.[32]
>
> Q. If the accused products get the baseband signal somehow or somewhere other than from the carrier signal energy that has been stored in the capacitor, then those product do not infringe your patents, correct?
>
> A. I believe that is correct.[33]

Dr. Prucnal concurred. (10/10 Tr. 84:23-85:10.[34]) Thus, to practice the claims, the energy from the carrier must be *transferred into the storage device* and that energy must generate the lower frequency signal.

### 2. Qualcomm's Double-Balanced Mixers—Not Energy In The Capacitors—Generate the Lower Frequency Signal.

Unlike the asserted claims, which require energy in a storage device to generate the baseband signal, the Accused Products use a double-balanced mixer to generate the lower

---

produce (something) or cause (something) to be produced : to be the cause of or reason for (something, such as interest or excitement)")
[32] 10/8 Tr. 172:2-10.
[33] 10/8 Tr. 174:1-5.
[34] 10/8 Tr. 171:6-10, 172:12-17, 172:18-173:19, 174:1-5, 175:3-11; 10/10 Tr. 85:20-23, 86:10-14, 86:17-19, 86:24-87:10, 88:1-14, 88:21-89:5, 90:25-91:4, 91:11-15, 91:24-92:3, 144:22-145:16, 163:13-20

frequency baseband signal. As Dr. Prucnal admitted, "double balanced mixers had been making and generating basebands long before ParkerVision ever came up with this invention."[35] Qualcomm's double-balanced mixers use extra transistors and a self-canceling "criss-cross" design to eliminate the RF and LO signals and generate the lower frequency signal from the RF signal, as Dr. Prucnal admitted. (10/10 Tr. 137:9-12, 138:9-14, 199:9-200:7, 215:19-218:7; 10/9 Tr. 215:22-216:7, 229:21-25, 243:15-244:2.)



| **Dr. Prucnal's Testimony** |
| 10/10 Tr. 186:15-187:6 |
| Q And you already said those crossing lines are sort of the hallmark or a hallmark sign of the double balanced mixer, correct?<br>A Yes.<br>Q And the double balanced mixer has balanced transistor pairs, correct?<br>A Yes.<br>Q Those balanced transistor pairs perform an important function, correct?<br>A Yes.<br>…<br>Q. The output of a double balanced mixer is the baseband that we've been talking about, correct?<br>A. Yes. |

On re-direct, ParkerVision attempted to muddy the testimony but failed, as Dr. Prucnal continued his admissions by pointing to the output of the double-balanced mixer, "similar to the crisscross point," and conceding: "This is the baseband signal, ***so this would be a low frequency signal***." (10/10 Tr. 240:11-22, 241:1-13 (emphasis added).[36]) Looking at PX847, the schematic above, Dr. Prucnal again confirmed: "I'm pointing out the baseband output of the mixer." (10/10 Tr. 241:12-13.) Simply put, he conceded that the lower

---

[35] 10/10 Tr. 177:4-7.
[36] DX 605 at 17 ("The mixer downconverts the RF signal to baseband signal.").

frequency signal is generated by and at the double-balanced mixer, not by the energy in the storage elements as required by each and every claim. In doing so, he conceded noninfringement.[37]

Qualcomm's design documents confirmed Dr. Prucnal's admissions, as did Dr. Razavi's uncontradicted testimony. The Magellan design document expressly confirms *noninfringement*, indicating: "The *mixer* downconverts the RF signal to baseband signal." (DX-605 at 17 (emphasis added).) Dr. Razavi described his own double-balanced mixer prior art (which he agreed does not practice the ParkerVision claims) and testified without contradiction that the double-balanced mixer (not the filter and capacitors that follow) "performs the down-conversion operation." (10/11 Tr. 26:1-2.) Testifying about prior art energy samplers, Dr. Razavi further distinguished the claimed energy samplers from double-balanced mixers. He testified that a double balanced mixer "generates the lower frequency signal" and cancels the RF (carrier). (10/11 Tr. 106:12-20.)[38]

The record is uncontradicted. A double-balanced mixer itself generates the lower frequency signal; that is what it is designed to do. ParkerVision basically argues that the jury should believe its insinuations about dated emails that in no way describe the products, but ignore the technical documents and expert testimony that establish noninfringement. That is the epitome of how patent cases should not be decided.

---

[37] ParkerVision erroneously argues that "the jury is not required to believe" Dr. Prucnal's sworn admissions. (Dkt. 485 at 7.) ParkerVision misstates the law. In patent cases, district courts must accept an expert's uncontradicted factual admissions as true, and where those admissions are dispositive, order judgment accordingly. *Johns Hopkins Univ. v. Datascope*, 543 F.3d 1342, 1348-49 (Fed. Cir. 2008) (reversing a denial of noninfringement JMOL and relying on admissions from the patentee's expert); *Exergen*, 575 F.3d at 1321 (reversing denial of noninfringement JMOL). Dr. Prucnal's admissions are uncontradicted and dispositive.

[38] *Id.* at 121:5-9 (noting that in a prior art energy sampler, in contrast to a double-balanced mixer, the high frequency RF signal passes through, "because it's not a double balanced mixer"); *id.* at 144:11-14 (noting that eliminating carrier is "the reason for the crisscross that we saw earlier in this court").

### 3. The Capacitors In Qualcomm's TX Filter Block An Unwanted Transmit Signal And Do Not Generate The Baseband Signal.

In an effort to find "storage devices" that might generate the lower frequency signal, ParkerVision points to the capacitors in Magellan's "TX filter" section, which includes capacitors and comes after the double-balanced mixers. The TX filter has nothing to do with generating the lower frequency signal. The CDMA devices at issue simultaneously transmit and receive signals. The uncontradicted evidence shows that the transmitter creates an enormous jammer that comes through the duplexer and into the receiver. (DX 136 at 19.)[39] This unwanted transmit ("TX") signal must be filtered out to allow for processing of the much smaller receive signal. The TX filter, as the name indicates, exists solely to filter out a portion of the unwanted, massive transmit jammer.[40]

The TX filter is a "low pass filter," a well-known device that allows only the ***low*** frequency signals to ***pass***, and uses capacitors to block or attenuate the high frequency signals. (10/10 Tr. 106:20-108:25.)[41] Qualcomm's engineers designed the TX filter specifically so that it reduces the high frequency transmit jammer while allowing the low frequency downconverted baseband signal (already generated by the double balanced mixer)

---

[39] The power from the out-of-band "transmit jammer" in the receive path is "▮▮▮▮▮▮▮ greater than the power of the baseband signal." (10/10 Tr. 212:2-10; *id.* at 210:3-17, 211:7-24, 221:6-9, 228:12-25.)

[40] 10/10 Tr. 74:9-16, 119:11-14, 125:19-126:7, 202:17-203:16; 10/10 Tr. 168:9-21, 169:8-20, 170:7-173:3, 188:10-19.

[41] *See also* 10/10 Tr. 110:13-111:21; *id.* at 118:3-15 (agreeing that engineers design low-pass filters so that they "will allow certain frequencies essentially to fly by," while "other frequencies [will] be blocked"). In such a circuit, low-frequency signals avoid the capacitor and travel along the direct path to the rest of the circuitry. (10/10 Tr. 107:18-23, 108:5-18.) In contrast, high-frequency signals travel primarily through the capacitor, dropping out of the receive path. *Id.* at 108:19-25. *See also* 10/10 Tr. 112:19-113:3, 113:20-114:7, 114:17-21, 115:18-23, 116:24-117:4, 121:15-21, 123:1-8, 123:14-19, 124:7-12,124:22-25, 125:11-13, 125:19-22, 126:3-7; *see also id.* at 174:14-25, 175:9-16 (unlike a low-pass filter, an energy sampler is used to store energy from the carrier signal and does not have the ability to reject frequencies from any other channel); *see also* 10/10 Tr. 74:4-16, 121:15-21, 240:11-22.)

to pass by.[42]  The uncontradicted evidence, including Dr. Prucnal's sworn testimony and Qualcomm's schematics and design documents, established that the TX filter does *not* generate the baseband signal, which is generated *before* any current reaches the TX filter:

| **Prucnal Admission 10/10 Tr. at 177:15-19** |
| --- |
| Q. So at least in Qualcomm's architecture, the double balanced mixture not only is capable of, ***it does, in fact, create the baseband before it hits the TX filter*** that you're talking about now, correct?<br>A. Yes. |

(10/10 Tr. 133:1-9, 137:1-3 (baseband created "before the current has reached the capacitor"); *id.* at 199:9-200:7 (agreeing that "the mixer down-converts the signal to baseband" (citing DX 605 at 17, Fig. 3-2)); *id.* at 216:11-15, 217:11-20).)  Because the double-balanced mixers generate the lower frequency signal *before* any current can reach the TX filter block, the TX filter – i.e., the capacitor – has nothing to do with generating the lower frequency signal.  It is just a filter, not part of an energy sampler.

Unable to show that the TX filter meets the "generating" limitation, ParkerVision asks the Court to expand its construction of the claim term.  ParkerVision argues that the Accused Products are "like a pizza oven" that bakes the ingredients until they emerge as the "finished, baked pizza at the end of the path through the oven."  (Dkt. 475 at 10 n.63.)

According to ParkerVision, "generating" a lower frequency signal does not mean producing it, but rather, encompasses "baking" that signal as it travels down the wires in the receiver. Under this new theory, it hardly matters how the "oven" works; virtually any direct downconverter, including any prior art, would satisfy the notion that it all comes out of the oven somehow.

ParkerVision cannot unilaterally change the construction of "generating" after trial,[44] and in any event, the patents-in-suit do not support ParkerVision's new pizza oven infringement theory. The patents-in-suit do not describe or mention anything like double-balanced mixers, which generate the lower frequency signal, and do not suggest that "generating" encompasses anything other than its ordinary meaning. (10/8 Tr. 110:9-12; 10/10 Tr. 160:3-161:17.) Even if the Court considers ParkerVision's new theory, ParkerVision presented no evidence and no argument that the TX filter changes or otherwise "bakes" the lower frequency signal after the double balanced mixer generates it. First, ParkerVision and Dr. Prucnal both agree that filtering jammers and interferers is irrelevant to infringement, and thus, such filtering cannot meet the "generating" limitation.[45]

Second, the TX filter does not "bake" the baseband signal. As Dr. Prucnal acknowledged, it has no effect on the baseband current. In fact, if the filter were ripped out, the baseband current signal generated by the double balanced mixer would be unchanged. (10/10 Tr. 208:11-17, 209:13-20.) ParkerVision's "pizza oven" theory is a smokescreen.

---

[44] "[T]he Court adopted ParkerVision's claim construction position that the generating limitation was clear enough that it need not be defined. ParkerVision cannot adopt a new position now." (Dkt. 318 at 5.)

[45] Dkt. 475 at 10 ("the claims and the claim constructions are agnostic as to interferers and jammers"; 10/10 Tr. 178:18-180:24 (Prucnal: "Q.... [I]f those capacitors are used for TX filtering and not for energy sampling, then there is no infringement by any accused product of any claim of any patent at issue in this lawsuit, correct? A. Correct."). 10/10 Tr. 146:23-147:8; 10/8 Tr. 165:14-168:10; 10/10 Tr. 83:5-9, 83:23-84:22, 86:10-14, 210:13-17; 10/10 Tr. 146:23-147:8.

ParkerVision also argues that the low frequency baseband signal, after being generated by the double-balanced mixer, travels through a *detour* into the capacitors in the TX filter. (10/10 Tr. 243:14-244:7.) ParkerVision's "current detour" theory is irrelevant and unsupported by any facts. The claims require the baseband signal to be *generated* from carrier energy in the storage device; they do not cover a system in which the baseband signal is generated elsewhere, and later (allegedly) takes a *detour* through a filter. The Accused Devices indisputably use double-balanced mixers to generate the lower frequency signal before any alleged "detour" in the TX filter could ever occur, and therefore, ParkerVision's argument is wrong and irrelevant.

In addition, there is no evidence that a detour even happens. ParkerVision cites no evidence that the capacitors in the TX filters, which are swamped by the enormous TX jammer energy, ever collect *non-negligible* amounts of carrier energy used to generate the baseband signal.[46] Dr. Prucnal abandoned his computer simulations, and disavowed any reliance on them. (10/10 Tr. 231:3-6.) He offered only legally inadequate testimony "in conclusory terms," without the required scientific evidence. *Pharmastem v. Viacell*, 491 F.3d 1342, 1355 (Fed. Cir. 2007). Although ParkerVision had "ample opportunity to do so," Dr. Prucnal "produced no test evidence and no measurements" showing that non-negligible carrier energy would take a detour into the TX filter's capacitor—which is already flooded with a jammer signal ▮▮▮▮▮▮ larger than the baseband. *Becton, Dickinson v. Tyco*, 616 F.3d 1249, 1257-59 (Fed. Cir. 2010) (ordering JMOL where the patentee's expert, like Dr. Prucnal, offered only conclusory testimony that a device "contained stored energy").

---

[46] '551 claim 23; 10/10 Tr. 211:7-13.

Mr. Sorrells' conclusory testimony also fails. He admittedly did not have access to the confidential information necessary to perform a "proper and legitimate analysis" or "properly informed and useful opinion" regarding infringement. (10/10 Tr. 71:16-23, 72:1-13.)

Without evidence that the baseband signal leaves the direct path and takes a detour through the capacitors, ParkerVision mischaracterized Figure 3-2 from a Magellan design document (DX605). Even if a "detour" mattered—and under the claims, it does not— Dr. Prucnal admitted that Figure 3-2 provides "no way" to determine how much if any of the current takes the alleged detour, and he performed no tests whatsoever to show that any of the current takes the alleged detour. (10/10 Tr. 220:10-20.[47]) *Becton, Dickinson*, 616 F.3d at 1257-59; *Yoon Ja Kim v. Congra Foods*, 465 F.3d 1312, 1319-20 (Fed. Cir. 2006) (upholding JMOL where plaintiff's expert "did not support [her] determination with any examinations or tests of the actual accused products").

No evidence supports ParkerVision's TX filter baking and detouring infringement theories. ParkerVision's theories miss the basic point–the entire idea of the claimed invention is to use the storage element to capture the RF signal and to generate the desired baseband signal using that captured energy. Pizzas and detours do not meet that requirement. Qualcomm's double-balanced mixers generate the lower frequency signal *without* the capacitor, which is used as a low pass filter, the very thing ParkerVision disclaimed in prosecution. (DX 469 at 70; 10/8 Tr. 161:15-162:2; *see* note 29, *supra*.) JMOL of

---

[47] ParkerVision points to Dr. Prucnal's testimony that ███████ flows into the "Tx filter" block and ████ flows out. (Dkt. 475 at 11.) But that is beside the point. The Tx filter block includes lines that *bypass* the capacitors. PX 847 at 2000. *See also* 10/10 Tr. 193:7-14; 195:7-14; 208:11-17; 209:13-20; 221:19-24; 213:8-215:5. Also, without evidence to support its irrelevant "current detour" theory, ParkerVision mischaracterizes a figure in Dr. Fox's expert report (not in evidence), contending that it shows that the capacitors charge and discharge. (Dkt. 475 at 10.) To the contrary, Dr. Fox's report showed that the TX jammer swamped the capacitor, and that the capacitor did not receive non-negligible amounts of energy from the carrier.

noninfringement is required.

**B.    The Accused Products Do Not Meet The "Sampling" Limitations.**

In addition to lacking the "generating" feature, the Accused Products do not satisfy the "sampling" limitations.  The Court held that the sampling limitations require "reducing a continuous time signal to a discrete time signal."  (Dkt. 243 at 6.)  ParkerVision's demonstratives show that a mixer outputs a continuous-time output (the green line below), while ParkerVision's digital sampler outputs a discrete-time output (the white dots).  (10/7 Tr. 269:12-270:5.)



The uncontradicted evidence demonstrated that the Accused Products do not satisfy the "sampling" limitations for several reasons.  First, all of Qualcomm's Accused Products are analog circuits that have a continuous output, not a discrete output.  ParkerVision recognized that its energy transfer sampler took "a fundamentally different approach" from the "traditional approach [that] employs an 'engine' known as a mixer."  (DX1729 at 1.[48]) ParkerVision distinguished the *digital* switch of the claims (which has a discrete output) from

---

[48] PX 308 at 49 (stating that "[t]he RF technology of choice for other system-on-chip transceivers are [sic] mixers," belittling mixers as "an inferior foundation" for such transceivers); *id.* at 65 ("The benefits of D2D RF energy sampling ... No balanced transistor pairs."); *id.* at 56 (describing "D2D's single FET [field effect transistor] architecture"); DX 1729 (D2D "mak[es] a clean break with the past"); 10/8 Tr. 129:13-21, 131:17-132:6, 133:16-24, 133:6-9, 135:22-136:9, 156:16-20, 157:5-9, 158:4-8, 158:13-16, 158:20-23; 10/9 Tr. 126:4-7, 126:17-21, 127:8-17, 127:22-128:1, 129:23-130:3, 130:22-131:1, 131:19-25, 132:4-12, 132:25-136:18; 10/10 Tr. 104:5-20; DX 1235; DX 91.

the *analog* mixers of the prior art, including the analog mixer described in the prior art Couch textbook. (DX 541 at 259, 261; 10/8 Tr. 137:14-23; 141:25-142:2.)[49] Mr. Sorrells clearly admitted ("Yes, sir.")[50] that if a downconverter has a "continuous output," *it does not infringe*. At trial, Dr. Prucnal conceded that the mixers in the Accused Products perform a "direct down-conversion from RF to *analog* baseband." (10/9 at 217:9-17 (emphasis added) (citing PX 499 at 16); *id.* at 169:7-13.) He admitted that "[a]nalog is another way of saying continuous," (10/9 Tr. 171:1-7), and confirmed that the signals out of the TX filter are analog, not digital.[51]

Second, all of Qualcomm's Accused Products, including the 25% duty cycle products, redirect the continuous time signal through the various paths in the mixer core, rather than sample it.[52] ParkerVision conceded that a downconverter does not practice the sampling limitation so long as "there's always a connection from the input to the output of the device." (10/7 Tr. 269:12-270:1; 10/8 Tr. 126:21-127:23.) This requirement arises from the Court's construction, requiring that sampling "reduc[e] a continuous-time signal to a discrete time signal." (Dkt. 243 at 6.) *Reducing* a continuous time signal is different than *redirecting* a continuous-time signal, and all of the claims require that the continuous time signal be *reduced*.[53]

---

[49] Couch's Fig. 5-10 depicted a analog mixer that outputs an analog, continuous signal, even though the switch is on some of the time and off some of the time, *i.e.*, the switch "is activated by a square-wave oscillator signal" with a "discrete gain of ... either unity [1] or zero." (DX 541 at 261.)

[50] 10/8 Tr. 150:9-16, 152:9-15; *id.* 150:9-16 (Figure 5-10 is noninfringing because it has "a continuous output" and thus is "not a discontinuous output made up of discrete samples"); *id.* 109:25-110:3.

[51] 10/10 Tr. 227:5-228:11; *id.* 223:3-12, 225:13-228:11, 255:9-14, 255:18-23, 256:4-9; PX 499 16; DX 491; *see also* 10/10 Tr. 36:21-41:6 (Razavi).

[52] *E.g.*, DX 835 10 (showing that at least one LO signal is high at all times) (25% duty-cycle product); 10/10 Tr. 185:20-25; JX-62 at 17; 10/9 Tr. 233:5-235:3; 10/10 Tr. 185:17-25.

[53] At trial, ParkerVision argued that the 25% duty cycle Accused Products infringe because by splitting the continuous time signal into two separate and distinct halves – an "I" half, and a "Q" half. (10/9 Tr. 249:4-

Third, Qualcomm's 50% duty cycle products always have a signal in both the I and Q paths in the receiver.[54] (*E.g.*, DX 505 at Fig. 7-16 (50% duty-cycle product).) ParkerVision argues that if the duty cycle is actually *less* than 50%, then the lines would for a brief time have a "gap" – *i.e.,* they would not carry a continuous time signal. However, ParkerVision offered no evidence that *any* of the 50% products had duty cycles less than 50%. Dr. Prucnal stated that the duty cycles of the Accused Products are not "always" 50 percent (10/10 Tr. 65:13-66:3), but did not say whether they were higher, which could not infringe under any theory, as opposed to lower, for any product or any product category.[55] Similarly, Dr. Prucnal stated that duty cycles for some of the Accused Products can "vary to less than 50 percent" but did not explain whether he was referring to the 25% duty cycle products, or something else. His testimony is so imprecise and conclusory it cannot establish infringement; it simply begs the question. *Pharmastem*, 491 F.3d at 1354; *Becton*, 616 F.3d at 1257-59. Dr. Prucnal's vague testimony also highlights the lack of substantial evidence for the jury's inducement finding; no evidence suggests that Qualcomm specifically designed such a gap with the intent to infringe ParkerVision's sampling claims.

### C.     The Accused Products Do Not Meet Three Additional Limitations.

Qualcomm renews its JMOL that ParkerVision failed to present proof of (1) the "impedance matching" limitation of '518 claim 90 and '551 claim 25, (2) the "prevention of accurate voltage reproduction" limitation of '551 claim 202 and '518 claim 91, and (3) the

---

252:7; 10/10 Tr. 278:22-280:5.) However, ParkerVision is merely noting that the Accused 25% duty cycle products *redirect* the continuous time signal, not that they *reduce* it as the claims require.

[54] The 50% duty cycle products include the Astra, Bahama, Eagleray, GZIF4, Hercules, Iris, Libra/Gemini, Merlin, Ramsis, Volans, Voltron, and Ywing dies. (PX 4027 at 9; JX 99 at 2-3.)

[55] The uncontradicted evidence shows that the duty cycles in the 50% products vary to *greater* than 50%; *i.e.,* the signal is always a continuous time signal, because the signal is always being redirected down one or more paths. (DX 505 at Fig. 7-16.)

"demodulated baseband signal" limitation of '551 claim 193.  Dr. Prucnal offered only conclusory testimony without rationale, which is insufficient as a matter of law.

### D. ParkerVision Failed To Present Evidence That Magellan Is Representative.

ParkerVision also failed to present substantial evidence that the Magellan design is a representative product for the other 19 on the verdict form.  Dr. Prucnal offered a "50,000-foot view" and a conclusory statement:  "I've concluded that the design documents and circuits show that the circuits are substantially the same as they relate to the patents."  (10/15 Tr. 59:12-19)[56]  Based on that slim guidance, the jurors found that a multitude of varied and complex product architectures infringe – even the Marimba architecture, which was dropped from the case pre-trial and as to which there was no evidentiary support whatsoever.  Marimba was the canary in the coal mine; a finding of infringement on a product not mentioned in evidence or argument is a clear sign of a verdict gone awry.

ParkerVision cites *TiVo* and argues that any further proof would have been "an egregious waste."  (Dkt. 475 at 2.)  In *TiVo*, the defendant agreed that the other accused devices "use the same hardware" and pointed "to no distinction among the DVRs that would require separate analysis."  *TiVo v. Echostar*, 516 F.3d 1290, 1308 (Fed. Cir. 2008).  That is not this case.  The Accused Products indisputably address different standards and have

---

[56] *See also* 10/10 Tr. 64:14-18, 65:7-12; 10/9 Tr. 212:14-16; 10/10 Tr. 64:14-23.  ParkerVision also offered testimony from Mr. Sorrells regarding one claim and one die design, but he admittedly did not have access to the confidential information necessary to perform a "proper and legitimate analysis" or "properly informed and useful opinion" regarding infringement.  10/10 Tr. 71:16-23, 72:1-13.  Moreover, the two documents Mr. Sorrells based his opinion on affirmatively support noninfringement, only one of which was admitted into evidence.  (JX 43; 10/8 Tr. 229:10-16.)10/8 Tr. 6:25-7:5; 10/8 Tr. 89:19-90:15, 10/8 Tr. 225:24-226:1, 229:6-9 (no capacitor values); PX 842 (cover page); DX 835.

different circuit designs and different component values.  (PX 4027 at 5-10.)[57]  Although the Accused Products each use double-balanced mixers, that similarity does not create a representative products case—as ParkerVision admitted, not every mixer followed by a filter infringes.  (10/10 Tr. 100:23-101:23.)[58]

ParkerVision argued that the jury did not need any representative products testimony, because the jurors could analyze thousands of circuit schematics on their own.  (10/10 Tr. 281:14-15.)  No case has ever held that thousands of pages of undifferentiated circuit schematics are substantial evidence to support a jury verdict.[59]  The jury would also have to be adept enough to figure out all of the component values and what they imply.  ██

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████  ParkerVision introduced no testimony to help the jury sort out such distinctions.  It is not enough for Dr. Prucal to wave his hands and say everything is the same.  No such concession was made, no such evidence was ever introduced and, in fact, there are a multitude of differences, including capacitor sizes, duty cycles, and supported

_____

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

[58] ParkerVision erroneously argues that Qualcomm's experts treated Magellan as representative.  (Dkt. 475 at 4-5.)  The fact that all of the accused products use double-balanced mixers makes them all *noninfringing* but does not mean that all of the accused products are the same for purposes of ParkerVision's strained "pizza oven" and "TX detour" infringement theories, which required ParkerVision to address the specific values of capacitance and impedance.  (*E.g.*, 10/7 Tr. 277:21-278:6.)  Qualcomm's interrogatory responses also do not support ParkerVision's argument.  In response to a question asking what components downconvert, Qualcomm responded that the passive mixers in the accused products do the downconversion.  (JX 23 at 4 (referring to Ex. B: PX 387).)

[59] Dr. Prucnal misread the schematics, modeled the differential capacitors incorrectly, and incorrectly included a resistor to ground.  (10/10 Tr. 136, 140-42, 154-65, 194.)  If Dr. Prucnal could not correctly analyze the technical documents, no lay jury could be expected to do so.

standards.[60]  The Federal Circuit holds that a patentee "must make a prima facie showing of infringement as to *each* accused device."  *L&W v. Shertech*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) (emphasis added).  ParkerVision failed to even come close to this standard.

Third, ParkerVision argues that Rule 705 and *Symbol Technologies* hold that an expert's conclusory opinion is by itself sufficient evidence to shift the burden of proof.  (*See* Dkt. 475 at 3-4.)  ParkerVision misreads *Symbol* and Rule 705.  The "purpose behind Rule 705 is to avoid 'complex and time consuming' testimony by permitting an expert to 'state his opinion *and reasons* without first specifying the data upon which it is based.'"  *Symbol*, 935 F.2d at 1576 (emphasis added).  Rule 705 does not permit conclusory expert testimony without reasoning.  *Pharmastem*, 491 F.3d at 1354; *Becton*, 616 F.3d at 1257-59.[61]

## E.    JMOL Is Required On Inducement.

JMOL on inducement is required because Qualcomm had substantial defenses to infringement, and thus, did not have the required mental state.  As the Federal Circuit recently observed, "a good-faith belief of non-infringement is relevant evidence that tends to show that an accused inducer lacked the intent required to be held liable for induced infringement" and "evidence of an accused inducer's good-faith belief of invalidity may negate the requisite intent for induced infringement."  *Commil v. Cisco*, 720 F.3d 1361, 1364-68 (Fed. Cir. 2013).  Here, Qualcomm had both—it had no reason to believe that double-balanced mixers followed by low-pass filters were infringing (they were well-known prior art), and it had substantial, uncontradicted invalidity arguments that Dr. Razavi

---

[60] PX 4027 at 5-10.  *See also* note 57, *supra* (capacitor sizes); Dkt. 422 at 14 (collecting cites re different standards); *see supra* § II.B (discussing differences between 25% and 50% duty cycle products).

[61] *Medtronic Vascular v. Boston Sci.*, 2008 WL 2744909, *3 (E.D. Tex. July 11, 2008); *Eugene Baratto v. Brushstrokes Fine Art*, 2010 WL 1233366, *12 (W.D. Wisc. 2010); *Alloc v. Pergo*, 2010 WL 3860382, *10 (E.D. Wis. 2010); *Implicit Networks v. F5 Networks*, 2013 WL 1007250, *12 (N.D. Cal. Mar. 13, 2013).

presented at trial. Those defenses, in and of themselves, negate inducement. Moreover, ParkerVision offered no evidence of the mental state of any of the Qualcomm employees who designed, made, and sold the Accused Products in the 2006-13 timeframe. The evidence thus came solely from the technical documentation the engineers created, which unequivocally describes the intent to design the accused products "to filter out the TX signal before it hits the baseband," with no evidence suggesting they were "setting up the TX to perform energy sampling rather than transmit jamming filtering."[62]

ParkerVision's focus on the 1998-99 interactions also missed the mark. ParkerVision presented no evidence that Qualcomm knew of either the '518 or '342 patents, but more to the point, Qualcomm concluded that ParkerVision's "technology offers little novel remedy, if any," "we do not need Parkervision IPR to proceed," and ParkerVision's idea "is not enabling…we could use other types of mixer instead of D2D."[63] ParkerVision focused on a 1999 email from Dr. Wheatley, who stated at the time that ParkerVision's then-pending claims[64] covered *ParkerVision's* energy sampling technique, not double-balanced mixers. (Wheatley Tr. at 67:10-12.) By December 2000, Dr. Wheatley observed that Qualcomm's architecture was different: "*We are NOT using their technique.*" (DX-951 (emphasis added).) ParkerVision's "dripping umbrella" email from 2004 changed nothing. In response to a comment that "*no idea is too stupid*" to consider, Mr. Bazarjhani wrote "I will set up a meeting with Chuck [Wheatley] to go over parker vision [sic] approach and see if we can make it work. *There are other published approaches and we need to study them all.*" (PX-

[62] *E.g.*, 10/10 Tr. 182:21-183:7, 188:10-19, 191:18-22.

[63] DX 993, DX 1692, DX 722.

[64] *Compare, e.g.*, DX371 at PV0000565 (application claim 30), *with* DX 364 at col. 116, ll. 24-37 (issued claim 23). Several '551 claims were added months after Dr. Wheatley's review. (DX 371 at PV0007222, PV0007225-26.)

322 (emphasis added).)  If Mr. Bazarjhani ever asked for that meeting, nothing came of it—Dr. Wheatley had already considered and rejected ParkerVision's idea.  Qualcomm's receivers, designed by others, continued to use noninfringing double-balanced mixers.  By 2005-2006, ParkerVision was a distant memory—"we had not found their technology to be viable" and "could never figure out what their 'architecture' was about, and it was never substantiated with any believable data."[65]

### F.    The Court Should Order a New Infringement Trial.

Qualcomm also requests a new trial under Rule 59.  The infringement verdicts are against the great weight of the evidence for the reasons described above, and ParkerVision's improper arguments, character attacks, and prejudicial use of the 1998-99 evidence, which should have been excluded, require a new trial as well.  *E.g.*, *Moxness Prods., Inc. v. Xomed, Inc.*, 891 F.2d 890, 893 (Fed. Cir. 1989).  Furthermore, a new trial on all issues is required because ParkerVision repeatedly argued an erroneous construction of "generating."

## IV.   CONCLUSION AND REQUEST FOR ORAL ARGUMENT

ParkerVision's energy samplers and double-balanced mixers use entirely different approaches, as ParkerVision recognized before it filed this case.  JMOL and a new trial are required.  Due to the complex issues presented and the magnitude of the damages award, Qualcomm respectfully requests oral argument pursuant to Local Rule 3.01(j).  Qualcomm respectfully submits that an afternoon argument (two hours per side) would be sufficient for Qualcomm's post-trial infringement, damages, and invalidity motions.

---

[65] DX 1709, DX 744.  The Court sustained ParkerVision's hearsay objection (10/15 Tr. 9:6-10:25), but can and should reconsider them in addressing Qualcomm's new trial motion.  Qualcomm offered the emails for a non-hearsay purpose—the state of mind of Qualcomm employees at the time the emails were written.  Fed.  R. Evid. 801(c)(2).

December 20, 2013

Respectfully submitted,

COOLEY LLP

By:    <u>/s/ Timothy S. Teter</u>
        Stephen C. Neal (admitted pro hac vice)
        nealsc@cooley.com
        Timothy S. Teter (admitted pro hac vice)
        teterts@cooley.com
        Jeffrey S. Karr (admitted pro hac vice)
        Ben Damstedt (admitted pro hac vice)
        Five Palo Alto Square
        3000 El Camino Real
        Palo Alto, CA 94306-2155
        Telephone:  (650) 843-5182
        Facsimile:  (650) 849-7400

CRAVATH, SWAINE & MOORE LLP
        Keith R. Hummel (admitted pro hac vice)
        khummel@cravath.com
        David Greenwald (admitted pro hac vice)
        dgreenwald@cravath.com
        Worldwide Plaza
        825 Eighth Avenue
        New York, New York 10019
        Telephone:  (212) 474-1000
        Facsimile:  (212) 474-3700

BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A.
        John A. DeVault, III
        Florida Bar No. 103979
        jad@bedellfirm.com
        Courtney K. Grimm
        Florida Bar No. 953740
        cgrimm@bedellfirm.com
        The Bedell Building
        101 East Adams Street
        Jacksonville, Florida 32202
        Telephone:  (904) 353-0211
        Facsimile:  (904) 353-9307

*Counsel for Defendant Qualcomm Incorporated*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Timothy S. Teter
Timothy S. Teter (admitted pro hac vice)
teterts@cooley.com
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone:  (650) 843-5182
Facsimile:  (650) 849-7400

*Attorney for Defendant Qualcomm Incorporated*

1203704/HN