# EXHIBIT C

## THOMSON REUTERS STREETEVENTS
# EDITED TRANSCRIPT
### PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

EVENT DATE/TIME: NOVEMBER 12, 2013 / 9:30PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

# CORPORATE PARTICIPANTS

**Kathy Price** *ParkerVision Inc - IR, The Piacente Group*

**Cindy Poehlman** *ParkerVision Inc - CFO, Corporate Secretary*

**Jeffrey Parker** *ParkerVision Inc - Chairman and CEO*

**David Sorrells** *ParkerVision Inc - CTO*

**Kevin Rivette** *3LP - Managing Partner*

# CONFERENCE CALL PARTICIPANTS

**Greg Lewiin** *Lewin Capital Partners - Analyst*

**Jon Hickman** *Ladenburg Thalmann and Company - Analyst*

**Robert Castle** *RL Kell Investment Advisory - Analyst*

**Ira Nathan** *Nathan Financial - Analyst*

**Michael Cohen** *MDC Financial Research - Analyst*

# PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the ParkerVision Inc., third quarter 2013 conference call and webcast.

(Operator Instructions)

As a reminder, this call will be recorded. I would now like to introduce your host for today's conference, Ms. Kathy Price with The Piacente Group. You may begin.

---

**Kathy Price** *- ParkerVision Inc - IR, The Piacente Group*

Thank you, Katherine. Good afternoon, everyone. Thank you all for joining us today. Before we begin, I would like to remind you that this conference call will contain forward-looking statements which involve known and unknown risks and uncertainties about our business and the economy, as well as other factors that may cause our actual results to differ materially from expected achievements and anticipated results. Included in these risks are the Company's ability to maintain technological advantages in the market place, the ability to increase manufacturing capacity to meet demands, achieving timely market introduction and acceptance of products, maintaining our patent protection, and the availability of capital, among others. Given these uncertainties, as well as other factors related to our business, we caution you not to place undue reliance on any forward-looking statements contained on this conference call. Additional information concerning these and other risks can be found in our periodic filings with the US Securities and Exchange Commission.

On today's call we will hear from Cindy Poehlman, Chief Financial Officer, who will provide a review of the Company's financial results for the third quarter and 9 months of 2013. Following Cindy's remarks Jeffrey Parker, Chief Executive Officer, will provide an update on the Company's business. Also joining us on the call this afternoon are David Sorrells, ParkerVision's Chief Technology Officer, and Kevin Rivette, one of the founders of 3LP, who works closely with the Company on various IP related initiatives. Thank you again, and with that, I would now like to turn the call over to Cindy. Go ahead please, Cindy.

---

2

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

**Cindy Poehlman** - *ParkerVision Inc - CFO, Corporate Secretary*

Thank you, Kathy, and good afternoon to those of you joining us for ParkerVision's third quarter 2013 conference call. This afternoon, we reported a net loss of $6.4 million or $0.07 per share for the third quarter of 2013, compared to a net loss of $5 million or $0.06 per share for the same period in 2012. Nearly 80% of the increase in net loss from the third quarter last year was a result of fees and expenses related to our patent infringement litigation against Qualcomm. Looking at our results for the 9 month period ended September 30, 2013, we reported a net loss of $20 million or $0.23 per share, compared to a net loss of $14.1 million or $0.19 per share for the same period last year. The majority of the increase in our net loss compared to the first 9 months of 2012 was attributable to a $2.7 million increase in total Company share based compensation expense and a $2.4 million increase in litigation fees and expenses.

We continue to use cash for operations at an average rate of approximately $1.4 million per month during the first 9 months of 2013. We ended the third quarter with a solid financial position that included approximately $23.1 million in cash and available for sale securities and $20.8 million in working capital. I'm available at the end of the call today for questions, but for now, let me turn things over to Jeff Parker for an update on business activities.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Thank you, Cindy, and welcome to our third quarter conference call. I think there are a number of you on our call today who have been following ParkerVision for some time now, but it's also possible that there may be some who are more recent followers to the Company. For today's call, I'm going to start with a bit of background to provide as succinct and yet as complete an update as possible. Following this background information, I'll provide a recap of the Qualcomm litigation and our recent jury verdict include what we see as next steps in this case. Then I'll turn to our chip development and commercialization efforts and other strategic business opportunities that we are pursuing based on our intellectual property, and lastly, I will touch on our financial position as we look forward into 2014.

For those of you who may be somewhat newer to the story the ParkerVision technology has its beginnings in the late 1990s, when we developed a completely new technology for down converting radio frequency carrier signals, such as those that arrive at your cell phone from a cell tower to the data, converting that to the data that's been modulated on the carrier. Our invention, which we call energy transfer sampling, enables high performance, direct conversion receivers to be built in very small form factors, using very low voltages and therefore incorporation into the small geometry semiconductor chips, and yet still achieve necessary performance for challenging applications such as 3G and 4G cell phones for WiFi, Bluetooth, and many other applications. We recognized back in the late 1990s that mobile wireless products would be one of the best and highest value applications for our inventions. We worked with one of the foremost patent prosecution law firms, Sterne, Kessler, Goldstein, and Fox, to security comprehensive patent protection for this technology.

We engaged in dialogue with a number of companies in the late 1990s and throughout mid-2000s to see if they were interested in licensing our technology to create the next generations of transceivers for what we saw was the coming advent of smartphones, WiFi products, and Bluetooth. Despite several promising business discussions, the companies we visited ultimately decided not to take us up on licensing our technology, or to partner with us in other ways we suggested. Instead, they decided to stay with the tried and true analogue down converter based receivers.

By the mid-2000s, we couldn't quite understand why we weren't getting adoption of our energy transfer sampling technology, but we decided that its day would come. We decided to maintain significant intellectual property protection on this technology while our research and development team began to development a complementary transmitter technology that we believed would also be needed by the mobile wireless market, as well as other applications that would want lower power consumption and lower heat generation from the RF transmit chains. By the late-2000s, the smartphone market had emerged as one of the largest consumer product markets ever, followed closely behind by boom in WiFi- and Bluetooth-enabled products. Literally, billions of these products would be shipping worldwide each year. We were frustrated that somehow we had missed the target markets that we had invested so heavily in both time and dollars to help enable. In fact by 2010, ParkerVision had invested over $200 million in our technology development. In the latter part of 2010, we came to find that we had not missed the market opportunity. Rather the market growth in wireless was enjoying the benefits of our technology, specifically our energy transfer sampling technology. But we and our shareholders were not enjoying the financial benefits because our technology was being used without authorization by its owner, namely ParkerVision.

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

In late 2010, we found public documentation that indicated that Qualcomm, one of the first companies we approached about using our technology in 1998 and 1999, had in fact incorporated this into 3G chip sets starting in 2006. We filed a complaint against Qualcomm in mid-2011 and a little over two years later, or about two weeks ago now, we received a jury verdict. Now, I'd like to briefly recap the recent events in our Qualcomm litigation and then spend a little time discussing what comes next.

When we last spoke in early August, we were completely focused on preparing for our trial which began on October 7 in Orlando. What I told you then was that we felt very strongly about the merits of our case and our ability to present the facts in a manner that would help the judge and members of the jury understand our position with respect to Qualcomm's infringement of our patented technology and many other elements of our case. On October 17, the jury returned its verdict in phase 1 of the trial, finding that Qualcomm infringed on each of the 11 claims contained in the 4 patents asserted at trial. Furthermore, the jury found this infringement in all accused products which included more than 15 distinct product families, and accounted for approximately 750 million infringing units shipped in the United States, starting in January 2006 through the start of trial. Equally important, the jury found that Qualcomm did not prove that any of the 11 claims of the 4 asserted patents were invalid. In other words, it was a clean sweep finding in favor of ParkerVision.

After phase 1, the jury then deliberated on the amount of damages to award ParkerVision for Qualcomm's infringement as well as whether they viewed the infringement as willful. On October 24, the jury returned a damages verdict of $172.7 million which equates to approximately $0.23 per infringing unit. While the jury found that there was no willful infringement, such a finding in no way diminishes the magnitude of this win. Overall, this represents a huge victory for ParkerVision. An impartial jury has agreed that Qualcomm has been infringing our valid patents since 2006 and that ParkerVision is entitled to compensation for that use.

In my opinion, there's another equally important milestone in this case that is yet to come, and that is the court's ruling with regard to post-verdict relief. ParkerVision will file by early December a document briefing the court on its arguments for an injunction, or as an alternative, ongoing royalties for future infringing products. The judge, not a jury, rules on this matter. Just as we were confident in our ability to demonstrate to the jury Qualcomm's infringement of our products, we are likewise confident in our ability to demonstrate to the judge the need for relief for Qualcomm's ongoing infringement. We believe it is clear based on Qualcomm's witnesses' own testimony that Qualcomm currently does not have any non-infringing alternatives available, and the development of a non-infringing alternative would take years.

Furthermore, Qualcomm's own witnesses testified that the receiver portion of a cell phone is an important and valuable part of the overall device. We also know that our infringed patents in this case have expiration dates extending out to mid-2022. Lastly, we know from trial testimony that Qualcomm shipped approximately 128 million infringing units in the United States in the first half of 2013. Assuming no growth or decline in Qualcomm's US based shipments in the second half of 2013, that equates to just over 250 million infringing United States units annually. We will be asking the court to apply an appropriate royalty rate to those ongoing infringing shipments, and we will be requesting that the court enhance the rate found by the jury since Qualcomm's post-verdict infringement will unquestionably be willful. Even if the court applies the rate awarded by the jury of $0.23 per unit on average, and we assume a quarter of a billion infringing units per year, that equates to nearly $60 million in annual royalties for ParkerVision just based on shipments within the United States.

I hope that you can appreciate that while some of the critical decisions in this case have occurred, there are still important decisions to come. As far as timing, the parties just in the past few days filed a proposed schedule for all post-trial briefings. If the court adopts the proposed schedule, all post-trial briefings will be filed no later than December 20 of this year, with all rebuttals due by January 24, 2014. At that point, the court will take all of the parties' arguments into consideration and will rule on these post-trial motions and enter a final judgment. There's no fixed deadline for the court's final judgment in this matter, but our litigators at McKool Smith have advised us that 30 to 90 days from the court's receipt of all final arguments on these issues is not an unreasonable expectation.

With a favorable verdict in district court behind us, we believe the path is clear for ParkerVision to become an active and rightful participant in the wireless market and to secure our place in the ecosystem that makes the wireless market place the economic powerhouse it has become. I'd like to talk for a bit about the initiatives going forward that will make this vision a reality for ParkerVision and our shareholders, but before I do I want to take just a moment to introduce to you David Sorrells, the Chief Technology Officer for ParkerVision. David is one of the chief inventors of our technologies, one of the authors of the patents that Qualcomm was found to be infringing, along with approximately 200 other patents that are credited to David's name. For those of you who closely followed the district court case in Orlando last month, you also know that David was a key

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

witness for ParkerVision. I believe that his expert testimony was instrumental in helping the jury understand our technology and the patents and Qualcomm's infringement. David, could you please say a few words now?

**David Sorrells** - *ParkerVision Inc - CTO*

Thank you, Jeff. I only have a couple of points I'd like to make on this call. Through innovation and investment, we have identified and protected key pieces of radio frequency technology that as far back as the late 1990s we believed had the power to become a de facto standard in the wireless communications industry. Along those lines, Jeff and I and his father, Ed, started working together in 1984. I saw firsthand micro electronic heating and air conditioning control technology that we developed and marketed in partnership with carrier corporation become an industry de facto standard. I gained firsthand knowledge and experience of what happens when the right technology intersects with market needs.

Starting in the late 1990s with help of our outside patent counsel Sterne, Kessler, we endeavored to protect our wireless inventions in such a way that they could hold up to litigation if necessary. Who could have imagined that 12 to 13 years later those patents would be put to the test? I'm extremely pleased that they have held up to the scrutiny of an industry giant like Qualcomm, a company who is no stranger to protecting their own ideas by securing intellectual property. After this trial experience, I've developed a real understanding and appreciation for the quality and breadth of the patent portfolio we've built here at ParkerVision. This case was ultimately reduced down to 4 patents and 11 total claims in order to make the trial proceedings manageable. But it is important to note that this is just a tiny fraction of the patent universe at ParkerVision. I believe the outcome of this trial provides a significant leverage point for ParkerVision, as we explore where our technologies can enable and perhaps have already enabled others in the wireless industry, not just in smartphones but in a wide range of products and applications. I also have a real appreciation for the investment we made in both time and dollars to secure these patents.

Based on our patents and continued innovation, I'd like to share with you another one of my predictions. Just as I believed and predicted 10 to 12 years ago that our technology, which we referred to as D2B would become an industry de facto standard, I am now just as confident that our D2B transmit technology will become so as well, and for many of the same dynamics that created the must-have need for D2B. What is especially exciting is that the business plans and programs that Jeff will discuss in more detail about where we're going from here with our receiver technologies, and how to generate revenue and shareholder value, also directly applies to what I believe is now happening with our D2B transmit technology.

At this time, I'll turn it back over to Jeff. As a final note to the many of you that came to Orlando during the trial, thank you so much for your support. This was greatly appreciated.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Thank you, Dave. That was a very nice segue into our vision of some of the initiatives we see going forward for ParkerVision. As many of you know, we've been working with Kevin Rivette and his team at 3LP for some time now and on various intellectual property related initiatives. Not surprisingly, many of the companies that opted to take a look at our technology and our patents ultimately took a wait-and-see approach as our Qualcomm litigation drew ever nearer. On the heels of our jury verdict, however, I believe we have an immediate leverage point with patents that are battle tested against one of the largest companies in the wireless communications industry. I believe we will be able to pick up our dialogue with a number of those parties quickly. We also have an opportunity to expand our initiative to other perhaps smaller companies and users, where we believe we have the ability to aggressively pursue nearer term licensing opportunities for our technologies. In essence, we see and firmly believe that there are both near term and longer term opportunities that exist, and we are now aggressively pursuing both.

For those of you that have been following ParkerVision, you know that we have engaged 3LP about 18 months ago. 3LP is a firm that's provided analysis of intellectual property portfolios, as well as guidance in IP strategies for growing the business of both large Fortune 100 companies and small companies alike. With respect to ParkerVision, 3LP has helped with an analysis of the landscape of our patent portfolio. It looks beyond what intellectual property protection we've secured for innovations to determine the most likely markets and user profiles for our IP, including specific products and companies. 3LP has assisted us in securing agreements with firms who may have an interest in either licensing our intellectual property, or engaging us using to develop chips in our innovations, perhaps in some cases even both. These agreements have enabled us to have unencumbered business discussions. While those discussions were idled during the past few months while we were focused on our litigation

5

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

against Qualcomm, these are now being re-engaged as well as working with 3LP to open additional discussions. All of this is being done with an eye to securing business and revenue based on the wireless innovations we've developed starting in the near term.

Today, I've asked Kevin Rivette, who is one of the founders of 3LP and who works very closely with us, to join me on this call. Kevin's career includes being a prosecutor of patents and a patent litigator himself, running intellectual property strategy for IBM Corporation, chairing the oversight committee at the United States Patent Office, and counseling and assisting numerous companies in developing and executing their own patent and business strategies, which includes technology adoption and patent licensing. Today, 3LP is partnered with ParkerVision to assist us in our next steps as we pursue relationships with companies, as I mentioned in both licensing area of IP as well as other possible product relationships. Now, I'd like turn it over to Kevin for his comments for a few minutes.

**Kevin Rivette** - *3LP - Managing Partner*

Thank you, Jeff. I think everybody's really wondering about what does the verdict mean for ParkerVision? I'll give you my perspective on that. While I've seen this before, and these type of verdicts have led to successful revenue and market capitalizations for the companies that have achieved them. I was on-board of a successful technology company that had to sue Samsung before the market realized how powerful their technology was and their patents were. The company stock price went from $13 to $40 and achieved a $2 billion market cap after that verdict.

I believe ParkerVision has even better opportunities than some of these other tech companies that have had similar successes in the courtroom because at ParkerVision, what I see is a follow on set of technologies that most of the companies don't have. In this case, as David just said, we've been looking at the transmit D2P technologies. We are very impressed by the depth and breadth of the patents that cover substantially all of the low voltage RF products. We at 3LP see adoption not only in mobile, as in the case of Qualcomm, but also in Bluetooth, GPS, WiFi, and satellite. All of these industries, in my opinion, represent technology partnerships and revenue potential.

One of the things I want to emphasize is we've been looking at the transmit technology, and we see a similar type of citation analysis pattern that we noticed with the receive technology back in 2005 and 2006. We believe that we're at the breakpoint where we're going to start seeing adoption of transmit, as we did with receive technology. I have had the good fortune to speak with a number of ParkerVision investors, and one question I have heard repeatedly is why has the market not recognized the value creation after this verdict? In my experience, it takes time for the market to catch up to this type of event, but it always does in the end. It's only a question of when, not if. I think your point is well taken, Jeff. It's only been two weeks. It takes a little longer than that for the market to understand how large this achievement actually is. I'm really looking forward to working with the ParkerVision team in acquiring the Company's first licensing customers and eagerly moving forward to capitalize on the recent achievement with Qualcomm.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Thank you, Kevin, for your comments. As I said, we are pursuing now with 3LP both near term and longer term opportunities for our technology. As I've mentioned to a number of you in conversations over time, a number of you asked me over the last year or so, do I think this was going to go all the way to trial? My comment was the damages in this case are significantly higher than the cost of litigation, so the likelihood is it probably will go to trial even though we would of course had been thrilled had ParkerVision and Qualcomm been able to settle beforehand. However, one of the things we'll be working on with 3LP is identifying a number of customers we already have a good start on, where their use of our technology and the cost of the litigation is much more closely aligned. Those are more typically the kinds of situations that you see that don't go to trial, where arm's length agreements occur, and where things can get done much more quickly.

In addition to that, we also have the ongoing efforts we've had with regard to semiconductor products. We've continued to work with VIA Telecom on the interface development initiatives for their customers. With the trial behind us, I believe we can move more aggressively on that front as well, albeit we of course are ultimately dependent on VIA and their customer program. We are now getting back in discussions with both VIA and one of their customers, perhaps in fact this will turn into more than one, to pursue an order for our D2P mobile phone chips, and longer term we hope our D2D mobile phone chips as well. One of the programs we initiated last quarter was the exploration of component product opportunities in lower volume, higher margin markets.

6

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

In July, some of you may have seen by visits to our website, we introduced among other things the first in the line up of IQ demodulators, or RF down converters based on our patented RF energy sampling down conversion technology. Our sales and marketing efforts around this and other component products have recently commenced. We believe there's a meaningful market for both commercial, industrial, and military applications where RF receivers are deployed, not as fully integrated chips like in cell phones, but where they're built from semi-integrated receiver components that provide more flexibility to customize the design. Our competitive advantage in this space is that we can provide the same performance that these applications look for, but with a fraction of the power consumption. While these component products target lower volume markets, we believe they have a much faster design time to market. We are able to create multiple variations of these components much more quickly which allows us to rapidly expand the product line. At this time, we believe these and other component-based products that we've brought to market are a very good complement to the licensing business we are now pursuing.

It's also important to note that we don't anticipate growing our operating costs to support these initiatives. We have the team in place now that enables us to explore these opportunities immediately, and we do not foresee growth in our operating expenses unless that growth is supported by the creation of revenue and margin dollar generation. We're in the early stages of meeting with companies that use these types of components, and I look forward to bringing you more updates as we get feedback and hopefully the ensuing sales for these products in the near term.

The last thing I think I want to touch on before we open this call to questions is our financial position. As Cindy mentioned, we ended the third quarter with over $23 million in cash and investments. Although our litigation fees and expenses have caused our operating costs to grow significantly in 2013, we expect as we head into 2014 that these costs will be significantly less. We expect our cash usage to drop back closer to the levels we experienced pre-litigation. What you hear me saying is that I believe our current financial position is sufficient at this time to support the initiatives that I have just discussed without looking to the equity markets for additional funding.

In conclusion, we're very excited about the many prospects facing ParkerVision as we wrap up 2013. Our infringement verdict against Qualcomm is a meaningful milestone and leverage for the Company, proving that our technologies bring significant value to the wireless communications industry. There are important milestones yet ahead in this litigation, including the court's post-verdict discussions regarding Qualcomm's ongoing infringement. Meanwhile, the momentum of this verdict will propel us forward with additional business opportunities for both our D2B and our D2P technologies, I believe, in both the licensing and the product business. One more thing I'd like to say before we open the call to your questions is to express my thanks and appreciation to the many of you that came to the trial, some of you for weeks. The support and encouragement you brought with you and your presence provided a much needed balance to the intensity of a litigation like this, and I thank you for that. And so now, let's open this call up for your questions.

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions)

Greg Lewin, Lewin Capital Investments.

**Greg Lewiin** - *Lewin Capital Partners - Analyst*

Hi, Jeff. Just two things. I just want to ask you two things that happened at trial, which happened in front of the judge, but not the jury. I just want to hear your comments on it. One of them was when the judge asked the parties to address the 2.3 million pages of VIA documents. (inaudible) then shared a series of emails between Paul Jacobs, the Chairman of Qualcomm, and Cher Wang, the Chairwoman of VIA. It seemed like Paul Jacobs was asking Cher Wang to have a VIA executive testify on Qualcomm's behalf. I just want to ask these two questions, as part one. Why would a VIA executive, our business partner, testify against us, and what does that say about our relationship with VIA? Secondarily, if I understand correctly Qualcomm owns 90% of the market, and VIA approximately 10%. According to what you know, does this violate any antitrust or any competitive laws? That was the first question. Sorry to be long winded.

7

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



### NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

The second question is the same kind of thing, again, it happened in front of the judge, not the jury. This was the injunction hearing and Charles Persico, he's some senior VP of RF engineering of Qualcomm, said to the judge it would take at least three years to design around our invention which seemed to be different than what we were hearing in front of the jury. What are your thoughts on Qualcomm's ability to design around our invention? That's the questions.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Greg, thanks for those questions. Let's start with your question about why, I think you asked, would VIA Telecom send a witness to testify on Qualcomm's behalf, especially one that's a competitor of Qualcomm's, in fact Qualcomm's only competitor in CDMA baseband products. Frankly, we were quite surprised to see that VIA's CTO, Mark Davis, was listed as a witness for Qualcomm just before trial. We've been working regularly with Mark and his team at VIA. Quite frankly, I'm not convinced that Mark wouldn't have turned out to be a better witness for ParkerVision than for Qualcomm. But when McKool located that email you referenced, it certainly raised a lot of questions for us about Qualcomm's activities, perhaps their ability to influence, and their willingness to influence the business decisions and actions of third parties. That is certainly something that we are going to carefully consider as we move forward. As far as how do I think that might influence our relationship with VIA, from what I've seen post-trial verdict, VIA has continued to be very willing to support the agreement we just recently entered into with them to support the interfaces and work with us with their customers. This is, again, why I said to you before now I think Mark Davis might have been a better witness for us than for Qualcomm. I'm not exactly sure where they were going with that, but it certainly didn't seem right. As I said, we're certainly going to try to think through if there was something there that wasn't quite correct.

In terms of your question about antitrust, I don't want to speculate on something like that. I can tell you that again I think the whole move I thought was surprising. The judge was clearly unhappy. I wasn't actually in the room when all of that occurred. I was sequestered as a fact witness at that time, but it was reported to me after the trial that the Qualcomm lead litigator jumped out of his seat when Mr. (inaudible) put that email up and said to the judge that they were going to withdraw the witness. The judge apparently said no, you don't have to worry about withdrawing him. He's going to be stricken. He was clearly unhappy with that kind of shenanigans.

In terms of your next question about Charles Persico, you're correct. He is Vice President of Qualcomm. He's in charge of all of the RF chip engineering for quite a number of years now. He by the way was identified in a number of documents that became public as having quite a bit of knowledge of our technology, going all the way back to the 1998,1999 ParkerVision-Qualcomm discussions. We believe he had knowledge of our patents. I think you're correct that he stated that if the Qualcomm products could no longer rely upon ParkerVision technology, and had to find a non-infringing alternative technology, he stated it would take them three years and literally thousands of man-months to decide it out, if in fact it could be done. Clearly, what he stated was in pretty serious conflict with the Qualcomm witness that was put up at the end of the jury's second phase trial, where another Qualcomm engineer seemed to indicate to the contrary. That I believe will all be taken into consideration by the court. We'll see how the court feels about those conflicting testimonies by Qualcomm. Thank you, Greg, for your questions. Next question please.

**Operator**

Jon Hickman, Ladenburg.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Hi. Thanks for taking my call. Can you tell us, Jeff, what's happening right now? I was under the impression since the injunction hearings already happened that we would hear something from the court much sooner than January. Can you go through the steps that your attorneys are taking? Is there any news that we as investors could receive in the intervening weeks leading up to the end of the year?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



| NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call |
|---|

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Sure, Jon. The next news that I think you will see are these briefs that we're working on. You'll see those filed before the end of the year. I think you'll see a lot of the information in there that will be very helpful in understanding what we are asking the court to make a decision, a ruling, on, in terms of both the injunctive relief we're asking for, or in the alternate, royalties, which as I indicated in comments earlier, we believe now that it's willful infringement should be materially higher than what the jury awarded us. I think you'll get a lot of good information on that.

Then you're see, three, four weeks after that, Qualcomm's reply to that. Then it's going to be anywhere from maybe, if we're fortunate, three or four weeks after that to get the judge's final judgment. Again, McKool Smith advises us it could take the judge 60 days, 90 days. Typically, they see these in 30 to 90 days. Our judge seems to really want to keep a tight calendar, but he also balances that from what we've seen with really thoughtful rulings that are carefully thought through, and we think that's a good balance. Three or four weeks from now, you'll see our brief. Three or four weeks after that, you'll see Qualcomm's brief, and then you will see the judge's final ruling. I think that's cadence.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

I already thought your brief would've been filed, but that's not the case.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

No, no, that's not the case. What's happened here is only the hearing, the in-person hearing, occurred. But now the briefs will be filed.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

So it's up to you guys?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

We proposed --

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

The judge isn't setting any date.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

What we did is we proposed a schedule that both ParkerVision and Qualcomm have agreed on. Now, the court of course has to accept that schedule, but many times when the plaintiff and defendant agree on a schedule unless the court has some major conflicts, they tend to accept that. We'll find out from the court, I think, shortly. But that's the schedule now that we've agreed on, so those are the briefs that I think will indicate what you should be looking for next. I think that's going to provide a lot of useful information for investors.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Then let's go out to January 11, and then the judge takes whatever time. When he issues a final ruling, then Qualcomm can appeal if they decide to appeal, right?

9

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Yes. They then have 30 days to file an appeal. Now, the caveat I'll throw there is a judge always has the authority to call for a hearing. We don't think he will, but he could, instead of after his final judgment, he could say I want to have a hearing. We don't expect that. If that doesn't occur, 30 days from the time the judge issues his final ruling, then yes, they would have to file for an appeal.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Why don't you comment on those? Certainly, you understand the scenario is that Qualcomm will just appeal you into the ground?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

I don't know that's a foregone conclusion.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

No, I don't think it's a foregone conclusion. I think there's people who think that.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

I see. Let me just tell you say this. I've seen situations that McKool Smith was the plaintiff's litigator, that went to appeal. I've also seen situations they've described to me that were just as contentious as the one we're going through, with a giant in another industry that a number of months after the verdict, settled. It can go either way. Here's what we know. I guess best case is ParkerVision and Qualcomm get together. We settle on mutually agreeable terms, and we all go on with our business. Obviously, we would think that would be great but you've got to have two willing parties for that to occur.

Another possibility is that Qualcomm appeals. The appellate court right now, if you look on their website, has been running at about 10 months from appeal, to where the appellate court hears it. If you look at the appeal, 30 days, plus the time to get to that court, plus the time it takes them to rule, 12 months, 15 months, something like that. Now, one thing that I would ask our investors to consider is when you appeal what you're asking the federal circuit to do, the appellate court do, is to change something that was done incorrectly as a matter of law. One of the reasons we are so pleased with our verdict is its consistency. Remember, the first phase the jury ruled on the validity of 11 claims and a number of products. I think I said over 15 product families. Those rulings by that verdict by that jury was completely consistent. There was not, well, these claims are valid, but these other claims are not. These products infringe, but these other products don't. That type of a result can invite appeal because you go to the appellate court and say, why is it these were okay claims, but these other ones were not? If these weren't, then these other ones you said were, should be. Why do these products infringe but these others don't? They use the same type of techniques.

We don't have any of that. So, that ruling by the jury or that verdict by the jury being consistent we think is extremely powerful and may influence how the parties get together and try to work together from here. Again, I don't know. It takes two people, takes two parties, but that was a very, we think, powerful and correct verdict that the jury came to. One of the things that you should be looking for on appeal is what exactly are they going to appeal? What is it as a matter of law that wasn't properly done? We don't see anything. It doesn't mean Qualcomm that won't try to create something. You guys have seen their motions and their filings before now, but you also see what that got them, so stay tuned for more. We'll see.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Okay. I have two more quick questions. It seems weird to me with the size of the award, and the fact that this is Qualcomm, which is the Goliath of the industry, why haven't we heard more? There's been no press. What does that mean?

10

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



| NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call |
|---|

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

We appreciate that, Jon. Thank you for that. We hope you'll continue to follow us. I guess I'll say this, as far as press. Our litigators, I've said this before, asked us to be extremely conservative during litigation with regard to public relations activities. When I say during the litigation, I meant up to the trial and through the trial. They didn't want us to share our litigation strategies in advance. They wanted us to be focused on trying the case in the courtroom, not in the press. They wanted us to be very focused on the trial and only the trial.

What I can tell you going forward is that we're going to be a lot more proactive in terms of both investor relations and public relations. We think we have a great story. It's only been heard by a limited audience to date. It's no question it's our job and obligation to get that story out there on a much broader scale. We have some things in the works right now that we think will make that happen. Keep in mind though, that when we get out there and tell the story, we will be playing with a slightly different rule book than some of our detractors in the market place. Our rule book will be using honesty, integrity, and the accuracy of the actual situation as the foundation of our story, not making stuff up as we go. Jon, I think that's a perfectly valid question. I believe you will see in the coming weeks and months a lot more about this story and ParkerVision's future and, I think, a very bright future that we have in this space.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Okay. My last question is the jury award, what was the end date, 2006 to what? The day you filed the litigation, or the end of the date of the verdict?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

I'm going to ask Cindy on that. That's been a point of discussion. Cindy, what was the actual date?

**Cindy Poehlman** - *ParkerVision Inc - CFO, Corporate Secretary*

My understanding is that the jury was awarding damages from the beginning of infringement through the start date of the trial. I'm assuming they had numbers that would have cut off around the end of the third quarter.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

October, okay.

**Cindy Poehlman** - *ParkerVision Inc - CFO, Corporate Secretary*

Yes.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Post-verdict infringement started with the end of the trial, or the end of the trial basically?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Yes, when we are going to ask in our brief the judge for enhanced royalty rates, based on Qualcomm's willfulness now, that starts with the day the verdict was rendered by the jury.

11

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call**

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Can you tell us if you had any discussions with Qualcomm at all?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

I cannot tell you that, but that's a great question. I really can't.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

You're not going to answer that question?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

No, I can't. My litigators have asked me. They said it's not unlikely or unreasonable that two parties will get together from time to time to try to work things out, and I just unfortunately will not be able to share with you guys whether we are or we're not.

**Jon Hickman** - *Ladenburg Thalmann and Company - Analyst*

Okay. Thank you.

**Operator**

Robert [Castle], [RL Kell] Investment Advisory. Your line is open.

**Robert Castle** - *RL Kell Investment Advisory - Analyst*

Hi, Jeff. How are you doing? My question is a little bit different. The potential injunctive remedy really is a threat to Qualcomm's big customers. Their supply chain of components is their life blood. Any threat is really a significant problem since their orders go out about 15 months in advance. It would seem to me that Parker would have tremendous leverage regardless of the appeal in talking to some of the big customers, the Samsungs, the other major customers, about alternative sources of those components, specifically your technology which would certainly short circuit a lot of the litigation and motion practice that's currently going on. Can you comment on whether you thought through the potential dialogue that you can open with these big customers, for them to avoid any supply chain disruptions which, as you know, recently with Apple and some others have almost shut them down?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Bob, this is one of the many reasons why we partnered with 3LP. They have reach into a number of those types of companies, have already got us in dialogue and stand still agreements with some of those companies. Those are some of the very companies that we'll be having conversations with very shortly. Will companies want to engage with us in some type of a business relationship to protect their supply chain? I hope so. That will be certainly one of the topics of discussion. There are a myriad of reasons why we think companies will want to enter into business arrangements with ParkerVision. I couldn't be excited to get out there with Kevin and his team and some of our folks as well and get these dialogues going again. Your observation is I think spot-on.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

**Robert Castle** - *RL Kell Investment Advisory - Analyst*

My point is that the risk, even with whatever percentage you want to attach to appeals being reversed or not reversed, the overwhelming evidence that Parker had in their favor during trial, the likelihood of any reversal on their verdicts is really slim to none. If that's the case, and an injunction is granted, Qualcomm's between a rock and a hard place, as far as being able to supply the customers. Unless they enter into a fair and equitable royalty arrangement with ParkerVision, they have nowhere to go. These guys have got to have product.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Bob, I appreciate that. We believe there's a number of reasons why companies should be talking with us, and why we believe some of them will become ParkerVision customers. In terms of the injunction and the likelihood of that, I don't know what it is. We're going to make our best case to the court as to why it's appropriate and why we believe it should be granted. We'll just have to wait and see if the court agrees with that, but there's no question even beyond injunctive relief, there are a lot of good reasons why companies we think and we believe with this verdict we've received want do business with ParkerVision. Thank you for your observation.

**Operator**

Ira Nathan, Nathan Financial.

**Ira Nathan** - *Nathan Financial - Analyst*

Jeff, how are you?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Hi, Ira. Nice to hear from you.

**Ira Nathan** - *Nathan Financial - Analyst*

I have two kind of opposite kinds of questions. First one, if it goes to appeal, would the verdict of not being willful is that subject to appeal also? Could that decision be reversed and say it was willful violation of your patents?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

That's an excellent question, and I have to feign ignorance. I don't know the answer to that, Ira, but I will ask our litigators that question and see if they have some guidance I can share with you on that. I don't know the answer to that. It's a good question.

**Ira Nathan** - *Nathan Financial - Analyst*

The other question I have, and unfortunately I've been asking this for probably three or four years at every conference call, when does it look like you'll finally consummate a sale or sales and start bringing in revenue?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

That's just as appropriate a question now as it was three and four years ago, and I appreciate that. I think we are in a better place today than we've ever been to go generate revenue for this Company. You've got four patents that have been shown to be completely valid, and you've got the

13

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call**

world now recognizing that our technology is the backbone of some of the most high volume, most challenging wireless chip sets that are shipped today in products. Kevin's raising his hand. He wants to jump in here apparently and also help with this question. I'll take the help, sure.

**Kevin Rivette** - *3LP - Managing Partner*

Ira, how are you? This is Kevin Rivette.

**Ira Nathan** - *Nathan Financial - Analyst*

Yes, thank you.

**Kevin Rivette** - *3LP - Managing Partner*

I think it's a good question. I'll give it to you from a historical, my experiences, historical examples. Other companies that have had these types of verdicts have developed licensing programs that become extremely profitable. There's near term ones that are probably a little smaller, then you go to, middle term ones, and then long term ones. The company I talked to you about before, the company that I was on the Board of, actually developed about a $200 million a year revenue cash flow that was based on lower number of units and lower percentages than the $0.23 the jury provided. That's the sort of thing I would hope that we're going to start seeing.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Ira, just to refresh what I said earlier, there are smaller customers we believe for this that we think will begin to generate revenue for the Company in the coming months, not quarters. That's a big part of our focus. It's not the only part of our focus because we have longer term, much larger customers also that we don't want to wait. We want to get started with those as well, but they will take longer to bring to agreement conclusions. Stay tuned. I know you've been hearing answers over the years that are sharing our optimism, but I think we've never had more basis for this optimism than we have right now today.

**Ira Nathan** - *Nathan Financial - Analyst*

Just one more thing that may not be appropriate, I don't know. When you start getting income, and you are in a financial comfortable position, have you thought about declaring dividends, not so that the stockholders get the dividends but that apply a little pressure against the shorts?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

I can only tell you that I have thought about the day. I can hardly wait for the day that we generate the kind of cash flow in this Company, which I agree with Kevin, I think is very practical given what we now understand about where our technology is being used and the kind of markets it's enabled, that we will very much want to dividend to provide certain dividends to shareholders for their investment in ParkerVision. Do I have a number in mind right now? I don't. Do I philosophically agree with the concept? I absolutely do. As far as the short sellers go, Ira, I think our execution from here on out will put the greatest pressure on the naysayers. We've just shown in a courtroom that we were right. Now we're going to show you guys that we can generate revenue from that. That's what's going to put pressure on the short sellers. They're going to have to start making up new stories. I have no doubt that they'll figure out new stories to make up because they've always been able to figure out new stories. Hopefully, you guys will stop listening to the nonsense. Great question.

**Ira Nathan** - *Nathan Financial - Analyst*

Okay. Thank you and good luck in the months to come.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2013 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



| NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call |
|---|

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Maybe one more question?

**Operator**

Michael Cohen, MDC Financial Research.

**Michael Cohen** - *MDC Financial Research - Analyst*

Thank you, Jeff, for squeaking me in there. My first question is clarification of one of your prior answers. You previously said that the jury awarded damages up to the date of the verdict. In many other cases, we see requests for supplemental damages from the date of the close of discovery through the date of judgment on the verdict. I was wondering, did the close of discovery, or were the numbers actually updated literally to the date of the trial? Or is there truly a period of time in between the close of discovery and the verdict, where it might be requesting supplemental loyalties?

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Michael, let me give that question to Cindy. I think she's got that answer.

**Cindy Poehlman** - *ParkerVision Inc - CFO, Corporate Secretary*

I don't know if the numbers were updated exactly through the start of trial, but I do know that we did receive updated numbers fairly close to the start of trial. Our damages ask going into the damages phase had been recently updated.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Okay. Great. My second question, I am not sure if you are going to be able to answer this or not, but I might as well ask it, I was one of the ones that attended the entirety of trial and during trial it sounded like you had activity with both Samsung and Microsoft. I was wondering if you could give us any comments or details there? I can only say this. When I'm a witness on the witness stand, under oath and I am asked questions, I want to answer those absolutely truthfully. Outside the courtroom, I'm going to have to defer back to non-disclosure agreements we have in place and certainly respect those. I think all I can really say to you is if you were there and you heard a little bit about some of the conversations we're having with certain companies, that's a nice advantage. As I mentioned to you guys on this call, we are pursuing conversations with a number of companies. Michael, because you were there, you might have a little bit more visibility into who some of those are, but I can't really make further comments on that right now.

**Michael Cohen** - *MDC Financial Research - Analyst*

Okay. My final question, you mention that McKool Smith has represented people that settled shortly after the verdict large parties. One to my knowledge is they represented VirnetX and they got a Microsoft settlement shortly after trial. They did that largely by filing a second lawsuit against Microsoft, and Microsoft settled for more than the jury's award from the first trial. I'm also not sure how much detail you can talk about this, but do you believe you have technology that Qualcomm is infringing that could warrant a second suit?

15



### NOVEMBER 12, 2013 / 9:30PM, PRKR - Q3 2013 Parkervision, Inc. Earnings Conference Call

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

I can't really comment on that, but I'll say this. We think there are a number of very good reasons why Qualcomm should want to put this behind them. As I said, it takes two parties to agree. We're always open to sitting down and having conversation about fair agreements, but there are absolutely a number of reasons beyond what you guys saw in this trial that Qualcomm, we think, should want to get this behind them, and we can all get on with our business. That's about all I can say.

**Michael Cohen** - *MDC Financial Research - Analyst*

Great. Thank you.

**Jeffrey Parker** - *ParkerVision Inc - Chairman and CEO*

Thank you, Michael. Thanks for listening in today. I hope you found this update helpful and informative. We are going to be out there working fast and hard to start generating revenue for this Company, based on what was achieved here. I hope that if I don't speak to many of you until next year, that you have a great holiday season and be well. Take care. Thank you. Bye-bye.

**Operator**

Thank you, ladies and gentlemen, for participating in today's conference. This concludes today's program. You may all disconnect. Everyone, have a great day.

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2013, Thomson Reuters. All Rights Reserved.

