# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

PARKERVISION, INC.,

         Plaintiff,

vs.

QUALCOMM INCORPORATED,

         Defendant.

Case No. 3:11-cv-719-J-37JRK

**PARKERVISION, INC.'S RESPONSE IN OPPOSITION TO QUALCOMM'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, <u>REMITTITUR, AND A NEW TRIAL ON DAMAGE</u>**

# TABLE OF CONTENTS

I.   LEGAL STANDARD...............................................................................................1

    A.   All Inferences Are Drawn In ParkerVision's Favor And The Court Should Not Make Credibility Determinations..........................................................................................1

    B.   The Eleventh Circuit Does Not Permit Remittitur Absent Plaintiff's Consent. ..........................................................1

II.  LEGALLY SUFFICIENT EVIDENCE SUPPORTS THE DAMAGES VERDICT ...................................................................2

    A.   The Jury's Damages Verdict Rests on Reliable, Legally Sufficient Evidence that Qualcomm's Infringement Requires A Reasonable Royalty of $172,704,600.........................................................................2

        1.   Mr. Benoit's testimony provides legally sufficient evidence. ..........................................................3

        2.   Dr. Leonard's testimony independently supports the jury's award. ...............................................4

        3.   Dr. Williams' testimony supports the jury's award. ...............................................................4

        4.   The totality of the evidence supports the jury's award. ...................................................5

    B.   The Jury Awarded Damages Based on Qualcomm's Apportioned Profit Attributable to ParkerVision's Patents-in-Suit..................................................................5

        1.   Qualcomm's waived its apportionment arguments by failing to raise them in its *Daubert* motion. ...............................................7

        2.   Mr. Benoit's apportionment explicitly accounted for Qualcomm's contributions to the Infringing Products. ...................................8

        3.   The jury correctly considered Qualcomm's assertion that its basebands drive demand for the Infringing Products. ...................................11

        4.   Mr. Benoit properly "credited" Qualcomm with its costs to produce the Infringing Products and implement ParkerVision's technology.........................................................13

        5.   Mr. Benoit allocated value to Qualcomm's tangible and intangible assets based on market data and Qualcomm's own rate of

                  return. ........................................................................................ 14

        6.      Evidence of the invention's benefits supports attributing as much as 90% of the receiver profit to the Patents-in-Suit. ............................................. 15

   C.     Mr. Benoit and Mr. Parker Offered Legally Sufficient Evidence, Firmly Grounded in the Facts of the Case, In Support of the 50-50 Split. ................................................. 17

        1.      Mr. Benoit applied a fact-intensive Nash analysis, not a rule of thumb. ........................................... 17

        2.      Mr. Parker's testimony as a fact witness that he would have agreed to a 50-50 split constitutes legally sufficient evidence. .......................................... 18

        3.      Mr. Benoit properly applied the *Georgia Pacific* factors. .............................................................. 19

   D.     Qualcomm's Attempt to Exclude the Testimony of Mr. Benoit and Mr. Parker Is Untimely and Lacks Any Merit. ................................................................................. 20

III.    QUALCOMM'S PASSING ARGUMENTS FOR A NEW TRIAL LACK MERIT ................................................................................................. 20

IV.    CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Accentra Inc. v. Staples, Inc.*,
    851 F. Supp. 2d 1205 (N.D. Cal. 2011) ................................................................8

*Dataquill Ltd. v. High Tech Computer Corp.*,
    887 F. Supp. 2d 999 (S.D. Cal. 2011) ...............................................................11

*Datatreasury Corp. v. Wells Fargo & Co.*,
    2011 U.S. Dist. LEXIS 118443 (E.D. Tex. Aug. 2, 2011) ..................................20

*Ford ex rel. Estate of Ford v. Garcia*,
    289 F.3d 1283 (11th Cir. 2002) ........................................................................20

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
    582 F.3d 1288 (Fed. Cir. 2009) ..........................................................................8

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
    394 F.3d 1368 (Fed. Cir. 2005) ..........................................................................3

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983) ..........................................................................5

*Hewitt v. B.F. Goodrich Co.*,
    732 F.2d 1554 (11th Cir.1984) ...........................................................................1

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ............................................................................2

*Ins. Co. of N. Am. v. Valente*,
    933 F.2d 921 (11th Cir. 1991) ......................................................................1, 20

*Johansen v. Combustion Eng'g, Inc.*,
    170 F.3d 1320 (11th Cir. 1999) ..........................................................................2

*LaserDynamics, Inc. v. Quanta Computer, Inc*,
    694 F.3d 51 (Fed. Cir. 2012) ..........................................................................3, 5

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .....................................................................1, 15

*Micro Chem. v. Lextron, Inc.*,
    318 F.3d 1119 (Fed. Cir. 2003) ........................................................................20

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
    702 F.3d 1312 (11th Cir. 2012) ........................................................................11

*Moulton v. Desue*,
2012 U.S. Dist. LEXIS 95756 (M.D. Fla. July 11, 2012) ....................................................20

*Penny v. Williams & Fudge, Inc.*,
840 F. Supp. 2d 1314 (M.D. Fla. 2012) ........................................................................1, 8, 19

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
563 F.3d 1358 (Fed. Cir. 2009)..................................................................................................3

*Sands v. Kawasaki Motors Corp. U.S.A.*,
513 F. App'x 847 (11th Cir. 2013) ............................................................................................2

*Skydive Ariz., Inc. v. Quattrocchi*,
673 F.3d 1105 (9th Cir. 2012) ...................................................................................................8

*Spectralytics, Inc. v. Cordis Corp.*,
649 F.3d 1336 (Fed. Cir. 2011)..................................................................................................3

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
939 F.2d 1540 (Fed. Cir. 1991)................................................................................................19

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
2013 U.S. Dist. LEXIS 85952 (S.D. Tex. June 19, 2013) ........................................................7


OTHER AUTHORITIES

Federal Rule of Civil Procedure 50 ...............................................................................................1

Federal Rule of Civil Procedure 59 ...............................................................................................1

Federal Rule of Evidence 701........................................................................................................18

John Skenyon, Patent Damages Law & Practice ........................................................................19

The Court should deny Qualcomm's request for JMOL, new trial, or remittitur because the trial record contains more than sufficient evidence supporting the jury's award of damages.

## I.  LEGAL STANDARD

### A.  All Inferences Are Drawn In ParkerVision's Favor And The Court Should Not Make Credibility Determinations.

JMOL is only permissible when, "drawing all reasonable inferences in the light most favorable to the nonmoving party," no "legally sufficient evidentiary basis allows a reasonable jury to find for the nonmoving party on an issue." *Penny v. Williams & Fudge, Inc.*, 840 F. Supp. 2d 1314, 1318 (M.D. Fla. 2012). Additionally, "[i]n ruling on a Rule 50 motion, the court must draw all reasonable inference in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Id.* The Court reviews the record as a whole, but "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* In the patent damages context, the Court must look for legally sufficient evidence "while keeping in mind that a reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).

When ruling on a Rule 59 motion for new trial, the judge must determine if "the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Ins. Co. of N. Am. v. Valente*, 933 F.2d 921, 922-23 (11th Cir. 1991) (citations omitted). "The trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1559 (11th Cir.1984). It is not the judge's role to assess credibility where conflicting testimony has been presented during the trial. *See id.*

### B.  The Eleventh Circuit Does Not Permit Remittitur Absent Plaintiff's Consent.

The Eleventh Circuit requires that a plaintiff be given the option of a new trial in lieu of remittitur.[1] Should the Court conclude that remittitur is appropriate here, ParkerVision reserves

---

[1] *See Sands v. Kawasaki Motors Corp. U.S.A.*, 513 F. App'x 847, 855 (11th Cir. 2013); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1329 (11th Cir. 1999).

the right to choose between a new trial or remittitur.

## II.  LEGALLY SUFFICIENT EVIDENCE SUPPORTS THE DAMAGES VERDICT

Qualcomm focuses on targeting the opinions of ParkerVision's damages expert, Paul Benoit. But the issue facing the Court is whether legally sufficient evidence supports the jury's award. The Court's review cannot be limited to Mr. Benoit's testimony, but must encompass the whole trial record. The jury's verdict reflects that it did not simply adopt Mr. Benoit's quantification of damages. Rather, after three days of deliberation, the highly-educated, attentive jury awarded ParkerVision $172,704,600—less than half of the amount opined to by Mr. Benoit. The totality of the evidence provides more than sufficient evidence to support the verdict.

The Court should reject Qualcomm's challenges to Mr. Benoit's testimony because his opinions were firmly grounded in the evidence and conformed to the Federal Circuit's patent damages requirements. He performed the necessary apportionment, considered the benefits of the Patents-in-Suit, analyzed market demand for the benefits of the Patents-in-Suit, and evaluated the facts that impacted how the parties would have divided the incremental profits attributable to the Patents-in-Suit. In contrast, Qualcomm's damages expert, Gregory Leonard, presented no countervailing evidence of an apportionment or profit split. Qualcomm's motion improperly asks the Court to take sides in a "battle of the experts." The Federal Circuit has made clear that "[q]uestions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury. The jury was entitled to hear the expert testimony and decide for itself what to accept or reject." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010).

### A.  The Jury's Damages Verdict Rests on Reliable, Legally Sufficient Evidence that Qualcomm's Infringement Requires A Reasonable Royalty of $172,704,600.

Ample record evidence supports the jury's reasonable decision to award damages of $172,704,600, an amount which falls "well within the range of damages advocated by the parties at trial…." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc*., 563 F.3d 1358, 1272 (Fed. Cir.

2009).[2] The evidence that supports the $172,704,600 award includes not only testimony from ParkerVision's damages expert, Mr. Benoit, but also testimony from ParkerVision's CEO, Jeff Parker, Qualcomm's own witnesses, and exhibits submitted by ParkerVision and Qualcomm.

## 1. Mr. Benoit's testimony provides legally sufficient evidence.

The verdict is supported by Mr. Benoit's analysis of the *Georgia-Pacific* factors to calculate a reasonable royalty.[3] *See* Trial Tr. 10/17 at 152:16-153:25. Mr. Benoit and Dr. Leonard agreed that a running royalty is appropriate and agreed (substantially) on the proper royalty base, *i.e*., the volume and value of Infringing Products.[4] Mr. Benoit then calculated a specific per-unit royalty rate. In doing so, Mr. Benoit evaluated the evidence reflecting the technical benefits imparted by the Patents-in-Suit and the market demand for those benefits. *Id*. 10/17 at 144:13-18, 157:25-160:19, 162:17-163:23. As detailed in section II.B, Mr. Benoit conducted a methodical apportionment. This apportionment analysis calculated Qualcomm's net benefit from use of the Patents-in-Suit: $1.18 per transceiver and $1.02 per receiver. *Id*. at 163:24-164:20, 176:6-25. Mr. Benoit, Mr. Parker, and Dr. Leonard presented evidence that in the hypothetical negotiation, ParkerVision and Qualcomm would have agreed to evenly split this net benefit generated by Qualcomm's use of the Patents-in-Suit.[5] Accordingly, Mr. Benoit opined that the parties would have settled on a royalty rate of $0.51 per receiver and $0.59 per transceiver, resulting in a total royalty of $432.2 million to compensate ParkerVision for Qualcomm's past use of the Patents-in-Suit. *See id*. 10/18 at 13:11-14:3, 21:21-22:6.

---

[2] *See also Versata*, 717 F.3d at 1268 ("[T]he jury is not bound to accept the maximum proffered award and may choose an intermediate rate."); *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011) ("The jury was entitled to choose a damages award within the amounts advocated by the opposing parties."); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1381 (Fed. Cir. 2005) ("This court has previously recognized that the jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate.").

[3] *See LaserDynamics, Inc. v. Quanta Computer, Inc*, 694 F.3d 51, 60 n.2 (Fed. Cir. 2012) ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry. Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue.").

[4] *See* Trial Tr. 10/17 at 154:155:14; 10/21 at 57:24-6, 75:13-24, 105:24-106:9, 108:14-109:3; PX1043.

[5] Trial Tr. 10/17 at 72:10-73:9, 74:22-75:12, 178:16-183:17; 10/21 at 104:6-21, 125:20-126:23.

## 2. Dr. Leonard's testimony independently supports the jury's award.

The testimony of Qualcomm's own damages expert also independently supports the jury's damages award. The VIA agreement provided for a royalty rate of ██████ on net sales. *Id.* 10/21 at 65:18-66:21. Starting with VIA's ████ rate, Dr. Leonard applied reductions of 55% and 50% based on "adjustments" for exclusivity and to account for "know how" provided for in the VIA agreement. *See id.* at 69:9-73:21. ParkerVision, however, disputed Dr. Leonard's downward "adjustments" through testimony from Mr. Parker, Mr. Benoit, and Dr. Leonard himself.[6] For example, no downward adjustment needed to be made for non-exclusivity because when ParkerVision gave VIA an "exclusive" license to its technology in the CDMA space, Qualcomm (which controlled 98% of the CDMA market) was VIA's only competitor. *See id.* 10/17 at 78:12-79:7; 10/18 at 20:13-21:13; 10/21 at 137:12-140:5. Based on this evidence, the jury could reasonably have concluded that the VIA rates did not need to be adjusted downward. Additionally, ParkerVision elicited testimony showing that Dr. Leonard's analysis failed to make certain necessary upward adjustments to the VIA rates.[7] Mr. Parker's and Mr. Benoit's testimony provided several factors that would have an upward influence on the royalty rate analysis, including the assumption of validity and infringement, the license's U.S. only scope (as opposed to worldwide), and the differences in expected benefit between Qualcomm and VIA.[8] Based on this evidence the jury may well have concluded that it should apply the VIA license royalty rate, but adjust the rate upwards instead of downwards.[9]

## 3. Dr. Williams' testimony supports the jury's award.

Qualcomm's expert Tim Williams likewise provided an independent evidentiary basis

---

[6] *See, e.g.*, Trial Tr. 10/17 at 78:18-81:3; 10/18 at 16:22-21:13; 10/21 at 130:23-140:5.

[7] *See* Trial Tr. 10/17 at 78:18-81:3, 82:9-16, 150:15-151:6; 10/18 at 16:22-21:13; 10/21 at 130:23-140:5.

[8] *See* Trial Tr. 10/17 at 78:18-81:3, 82:9-16, 150:15-151:6; 10/18 at 16:22-21:13; 10/21 at 130:23-133:23.

[9] Contrary to Qualcomm's arguments, *see* Dkt. 500 at 24, the jury could reasonably choose to adjust the royalty rate from the VIA agreement based on this evidence from Mr. Benoit, Mr. Parker, and Dr. Leonard. The law does not require that Mr. Benoit recite some magic words that "the VIA agreement should be adjusted upwards" as Qualcomm suggests. *See* Trial Tr. 10/21 at 146:1-9; 10/22 at 90:5-7.

sufficient to support the damages award.[10] Utilizing opinions from Mr. Benoit and Dr. Prucnal, Dr. Williams' report identified the cost savings differential between Infringing Products ($10.91) and products not accused of infringement ($37.96). *See* Trial Tr. 10/21 at 193:24-197:4. The costs savings came to $27.05 per unit. *Id.* at 197:1-4. Dr. Williams agreed that a per unit royalty payment on transceivers of $0.59 (the royalty rate proposed by Mr. Benoit) amounts to 2.2% of the cost savings difference. *Id.* at 198:5-199:1. "Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081-82 (Fed. Cir. 1983).

### 4. The totality of the evidence supports the jury's award.

The jury heard evidence from Mr. Benoit, Mr. Parker, Dr. Leonard, and Dr. Williams permitting a range of options for awarding compensatory damages. The jury had ample evidence to support an amount much larger than the $172,704,600 damages award.

### B. The Jury Awarded Damages Based on Qualcomm's Apportioned Profit Attributable to ParkerVision's Patents-in-Suit.

Qualcomm recognizes that Mr. Benoit undertook an apportionment of Qualcomm's profits derived from the Patents-in-Suit, as opposed to other features, but disputes the accuracy of the analysis. *See* Dkt. 500 at 7-8 (citing Trial Tr. 10/17 at 32:5-21, 35:22-36:7). As Mr. Benoit explained to the jury, he conducted a step-by-step apportionment to arrive at the amount of incremental profit that Qualcomm earned as a result of its infringement of the Patents-in-Suit:

(1) He began with a smallest salable unit: the integrated transceiver/baseband, the transceiver (average price of $▮▮▮), or the receiver.[11] Trial Tr. 10/17 at 164:23-25, 167:7-169:9.

(2) Based on Qualcomm's internal documents, Mr. Benoit derived the amount of transceiver revenue attributable to the non-accused transmitter functionality ($▮▮▮). He subtracted the amount of revenue attributable to the transmitter from the total transceiver revenue.

---

[10] Qualcomm briefly contends that Dr. Williams' testimony cannot be considered legally sufficient evidence because it amounts to no more than "attorney arguments." Dkt. 500 at 23-24. An expert's extrapolation of calculations from his report, however, can provide legally sufficient evidence. *See Versata*, 717 F.3d at 1267.

[11] The parties agree that Mr. Benoit's analysis focused on the smallest salable infringing unit. *See* Dkt. 366 at 20; Ex. A at 27:9-28:3; *see also LaserDynamics,* 694 F.3d at 67 ("it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit'").

*Id.* at 165:10-167:6, 168:11-19.

(3) Next Mr. Benoit quantified and deducted the value of Qualcomm's improvements to the transceiver and receiver (█████). *Id.* at 167:7-169:9; PX1044. This credited Qualcomm with technological contributions that it added to transceivers or the receiver functionality included in the transceiver, and isolated the amount of revenue attributable to the bare-bones receiver functionality within a transceiver (█████). Trial Tr. 10/17 at 169:1-9.

(4) He then calculated and applied the incremental profit rate that Qualcomm generated on the receive functionality (████%), resulting in an incremental profit of $████ per transceiver. *Id.* at 165:1-2, 169:10-171:22. The incremental profit credits Qualcomm with its per-unit costs of sales (~$████), including Qualcomm's contribution of intellectual property, materials, labor, and machinery. *Id.* at 169:10-170:2; 10/18 at 114:2-115:24. It also credits Qualcomm with its incremental operating expenses (~$████), including administrative, accounting, and marketing expenses. *Id.* 10/17 at 170:3-171:2.

(5) Mr. Benoit then credited Qualcomm with the value (based on a required rate of return) of its tangible assets used to generate the profit ($████), which includes capital and fixed assets such as facilities and property. *Id.* at 171:23-175:3.

(6) Following tangible assets, Mr. Benoit deducted the value of Qualcomm's contribution of intangible assets (based on a required rate of return), specifically brand-name value ($████). *Id.* at 171:21-174:6.

(7) Mr. Benoit also credited Qualcomm with expenses necessary to implement the Patents-in-Suit into its Infringing Products ($0.01). *Id.* at 165:5-6, 175:4-15.

This analysis arrives at a net incremental profit attributable to the Patents-in-Suit of $1.02 for receivers and $1.18 for transceivers. *Id.* at 176:1-25. Through these steps, *see* Dkt. 482 at 9, Mr. Benoit "[gave] Qualcomm back all other benefits that they've brought to the table" and quantified only the benefit (or incremental profit) derived by Qualcomm from use of the Patents-in-Suit. Trial Tr. 10/16 at 32:20-21.

Qualcomm challenges Mr. Benoit's apportionment on five grounds. *See* Dkt. 500 at 7-21. Qualcomm's arguments do not warrant JMOL for at least the following reasons: *First*, Qualcomm waived its challenge to Mr. Benoit's apportionment by failing to raise the issue in its *Daubert* motion. *Second*, Mr. Benoit conducted a rigorous apportionment analysis firmly rooted in the record evidence. *Third*, Qualcomm raised these same apportionment arguments at trial and vigorously cross-examined Mr. Benoit on these exact issues. The jury considered and rejected (at

least in part) these same arguments.[12] *Fourth*, the verdict reflects that the jury did not simply adopt Mr. Benoit's apportionment, possibly in consideration of the very arguments that Qualcomm made at trial and re-raises here. *Fifth*, Qualcomm made the decision to not present a countervailing opinion on an alternate apportionment to the jury. *Id*. 10/21 at 114:24-117:20.

### 1. Qualcomm's waived its apportionment arguments by failing to raise them in its *Daubert* motion.

Many of the damages issues that Qualcomm now raises should have been included in a *Daubert* motion according to the timetable in the Scheduling Order.[13] But Qualcomm failed to raise them at that time and *Daubert* challenges are not appropriate at the JMOL juncture.[14] In his expert report, Mr. Benoit presented two damages analyses: the first rested on the 1998-99 negotiation (*see* Dkt. 305, Ex. 1 at 96-98 ¶¶225-228), the second employed an asset-based methodology (*see id*. at 98-99 ¶¶229-233). Qualcomm's *Daubert* motion challenged Mr. Benoit's first analysis. Dkt. 288. Qualcomm's *Daubert* motion did not substantively challenge the second analysis (only mentioning it in a footnote), Qualcomm did not raise it during the

---

[12] *See WesternGeco L.L.C. v. ION Geophysical Corp*., 2013 U.S. Dist. LEXIS 85952, at *57-58 (S.D. Tex. June 19, 2013) (addressing a similar apportionment challenge and reasoning that: "Mr. Sims [plaintiff's damages expert] applied an analytical approach to quantifying the value of the patented technology. ION [the defendant] had the opportunity to thoroughly cross examine Mr. Sims at trial and the jury could make its own determinations of his credibility.").

[13] Those issues include Qualcomm's challenge to Mr. Benoit's opinions regarding apportionment, assessment of the evidence of causation of damages, analysis of market competition, and assessment of the evidence of the benefits of the Patents-in-Suit in the Infringing Products. ParkerVision acknowledges that Qualcomm timely raised a *Daubert* challenge to Mr. Benoit's Nash analysis.

[14] The Federal Circuit recently explained:

> Under the guise of sufficiency of the evidence, SAP questions the admissibility of Versata's expert testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert* . . . . SAP has not appealed a *Daubert* ruling. Instead, it argues that the jury could have not had sufficient evidence to award lost profits because the expert's testimony was fatally flawed and should not have been admitted. This is the improper context for deciding questions that, by SAP's own admissions, boil down to the admissibility of evidence.

*Versata*, 717 F.3d at 1264.

*Daubert* hearing, and Qualcomm failed to seek a ruling on the issue.[15] *See id.* at 16 n.11; *see* 9/30 *Daubert* Hr'g Tr. and Trial Tr. 10/17 at 39:8-23. The Court excluded the 1998-99 negotiation analysis, and at trial Mr. Benoit testified as to the second—and unchallenged—asset-based methodology. Qualcomm's belated arguments challenging the admissibility of Mr. Benoit's testimony related to his asset-based model were waived. *See Versata*, 717 F.3d at 1268.[16]

### 2. Mr. Benoit's apportionment explicitly accounted for Qualcomm's contributions to the Infringing Products.

Qualcomm argues that Mr. Benoit's apportionment of the value of ParkerVision's technology could not possibly be correct in light of "the many other critical features" of the Infringing Products. Dkt. 500 at 7. But Qualcomm ignores the plentiful evidence reflecting the critical importance of ParkerVision's inventions to the Infringing Products. *See* sections II.B.3-6. Not only does the record support attributing substantial value to ParkerVision's inventions, but Mr. Benoit's apportionment credited Qualcomm for its contributions to the Infringing Products.[17] *See* section II.B. Qualcomm's JMOL motion dismisses these apportionments and reiterates the numerous arguments that it made to the jury. Dkt. 500 at 7-11. But the jury had the opportunity to weigh Qualcomm's arguments and in large part elected not to credit them—or perhaps did credit those arguments to some extent, resulting in an amount lower than ParkerVision requested.

Qualcomm also improperly asks the Court to set aside the jury's assessment of the testimony and instead credit only Qualcomm's witnesses, Dr. Leonard, Dr. Williams, and Mr. Jim Jaffee. But a JMOL motion is not the proper vehicle for weighing the credibility of witnesses. *See Penny*, 840 F. Supp. 2d at 1318. Rather, the jury had to weigh the evidence and—

---

[15] *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1295 (Fed. Cir. 2009) (holding an argument waived where the defendant "only briefly mentioned" the issue and "relegated its discussion . . . to a single footnote" in the district court).

[16] *See also Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012); *Accentra Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1227 (N.D. Cal. 2011), *rev'd in part*, 500 F. App'x 922 (Fed. Cir. 2013).

[17] Qualcomm argues misleadingly that "ParkerVision attributed more than 90% of the operating profits from Qualcomm's receivers to the claimed invention." Dkt. 500 at 8 n.15. But Mr. Benoit allocated approximately 90% of the value of the of a *baseline* multimode receiver—stripped of any bells and whistles or nonessential features—to the Patents-in-Suit. *See* Trial Tr. 10/17 at 167:7-169:9; Dkt. 305-1 at Ex. D, D1.

despite Qualcomm's argument that "credibility is not necessarily all that important in this case"—the jury was free to disregard the testimony from Qualcomm's witnesses as not credible in light of the compelling evidence presented by ParkerVision. Trial Tr. 10/15 at 132:15-16.

First, Qualcomm reiterates its argument—repeated at least nine times at trial—that the patented part of the receiver allegedly comprises just 1% of the physical circuitry.[18] The jury heard and rejected this argument. And rightfully so—that percentage has no bearing on the value of the Patents-in-Suit. As Mr. Benoit testified: "Something can be very small but have a significant value and importance to a product." *Id*. at 10/21 at 19:14-21; *see also* 10/18 at 106:10-19. Moreover, ParkerVision elicited testimony from Mr. Jaffee demonstrating that ParkerVision's invention in fact encompasses far more than 1% of the physical circuitry of the infringing receivers. *Id*. 10/22 at 52:3-56:21.

Second, Qualcomm argues that the Court must reject Mr. Benoit's apportionment analysis because he failed to "apportion profit fairly and reasonably for Qualcomm's separate contributions" and because ParkerVision's invention "constitutes only a modified use of exactly the same components that have long been used in prior art. . . ." Dkt. 500 at 8-10. Qualcomm recites a list of its alleged contributions to transceivers, including CDMA, low noise amplifiers, duplexers, etc. *See id*. But Qualcomm repeatedly argued these exact points to the jury.[19] The jury had good reason be skeptical of Qualcomm's arguments. For example, Mr. Benoit testified that he included the costs of incorporating the patented technology into a CDMA receiver within the $7.8 million allocation. Trial Tr. 10/18 at 37:6-25. Qualcomm argued that Mr. Benoit's apportionment could not possibly be correct in light of ParkerVision's alleged insurmountable difficulties with producing a CDMA receiver, but its argument suffered from a number of shortcomings. Qualcomm relied largely on DX24, the Chen email (just as its JMOL brief does).

---

[18] *See* Dkt 500 at 8; Trial Tr. 10/18 at 62:5-8, 93:21-96:15, 105:1-11, 118:1-119:3, 120:12-18; 10/21 at 55:10-23, 87:2-10, 96:16-20; 10/22 at 80:1.

[19] *See, e.g.,* Trial Tr. 10/18 at 48:10-58:16; 10/21 at 55:24-56:3, 87:24-90:9.

*See* Dkt. 500 at 2 n.3, 8, 10, 16 n.25; Trial Tr. 10/18 at 53:3-56:19. But the jury had good reason to disregard the Chen email: its date (2000) renders it less relevant to the 2006 hypothetical negotiation, and its author was a junior employee who worked at a satellite office that ParkerVision closed after less than two years due to underperformance. *See* Trial Tr. 10/9 at 70:1-71:1, 148:13-149:17. Additionally, the simple fact that ParkerVision did not develop a CDMA receiver says nothing about the implementation costs or the value of CDMA in a receiver. *Id.* 10/21 at 16:18-18:16. Further, Mr. Sorrells and Mr. Parker testified that although ParkerVision developed a satisfactory CDMA test board using the patented technology, due to ParkerVision's small size and limited resources it decided to implement its invention in a Wi-Fi chip rather than CDMA, and then focus on its transmitter technology. *Id.* 10/8 at 43:17-44:24; 10/9 at 66:19-23, 118:3-8, 157:2-21. Similarly, with respect to Qualcomm's allegation that Mr. Benoit "ignored" a litany of other "critical" technologies (such as duplexers), *see* Dkt. 500 at 9, Mr. Benoit explained that his apportionment credited Qualcomm for this componentry. Trial Tr. 10/18 at 119:13-122:6. Again, Qualcomm had the opportunity to present evidence of *the value* of its contributions to receiver technology, but failed to do so. *See id.* 10/21 at 114:24-117:20.

Mr. Benoit's damages methodology reasonably accounted for the value of Qualcomm's contributions and the other components found in the receiver. The value of purchasing or manufacturing the other components in the receiver is included within his cost of sales allocation, as is the value of intellectual property contributed by Qualcomm. *Id.* 10/17 at 169:18-170:2. Amounts due to contributions of Qualcomm's tangible and intangible assets are included within his allocations. *Id.* at 172:2-24. And Mr. Benoit explained that he credited Qualcomm with implementation costs of $7.8 million. *Id.* at 175:1-24.

Third, Qualcomm criticizes Mr. Benoit for learning about the Infringing Products "from a finance and accounting perspective." Dkt. 500 at 10. But Mr. Benoit was not offered as a technical or industry expert. Although counsel for Qualcomm repeatedly asked Mr. Benoit technical questions and probed his understanding of the technology, Mr. Benoit is a damages

expert who has never purported to be an engineer. *See* Trial Tr. 10/17 at 159:4-8; 10/18 at 101:11-102:19, 119:4-18, 123:8-25. Mr. Benoit reasonably relied on Mr. Sorrells' and Dr. Prucnal's assessments of the role of ParkerVision's downconversion technology vis-à-vis the other components of the transceiver, transmitter, receiver, baseband, and within the cell phone generally. *Id.* 10/17 at 156:6-160:22; 10/18 at 46:9-15. Damages experts regularly rely on the opinions of technical experts when such opinions are relevant to a damages analysis.[20]

Fourth, Qualcomm asserts that Mr. Benoit "simply assumed that Qualcomm's intellectual property, trade secrets, and know-how are responsible for *none* of Qualcomm's receiver profit." Dkt. 500 at 11. But Mr. Benoit explained that he included within the line item for cost of goods sold the value of the intellectual property that Qualcomm contributed to the Infringing Products. *Id.* at 114:2-115:24. Notably, Qualcomm offered no evidence of the value of Qualcomm's receiver-related intellectual property for which Mr. Benoit allegedly failed to account.

### 3. The jury correctly considered Qualcomm's assertion that its basebands drive demand for the Infringing Products.

Qualcomm also moves for JMOL on the grounds that Mr. Benoit allegedly failed to account for the demand for Qualcomm's basebands, which it claims (without citation to the record) are "the heart of the cellular device."[21] Dkt. 500 at 11. Qualcomm argues—as it argued to the jury—that basebands, not ParkerVision's invention, drove demand for the Infringing Products. *See id.* at 11-14; Trial Tr. 10/18 at 69:9-20.

The jury had good reason to reject Qualcomm's arguments in light of ParkerVision's overwhelming evidence of the benefits of the Patents-in-Suit and the market demand for those

---

[20] *See Dataquill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1026 (S.D. Cal. 2011) ("It is routine and proper for a damages expert in a technical patent case to rely on a technical expert for background.").

[21] Qualcomm attempts to fill holes in the trial record by relying on findings of fact in another case. *See* Dkt. 500 at 11-12. Qualcomm cannot rely on the *Broadcom* case to prove issues of fact that it failed to establish in this case. *See Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1318 (11th Cir. 2012) (issue preclusion applies only when "the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding").

benefits.[22] For example, the evidence established that the Patents-in-Suit contribute the following benefits to receivers: lower power consumption, improved performance (including better dynamic range, linearity, and sensitivity), fewer components, cost savings, better integration, and smaller size.[23] As for demand, Qualcomm's Prashant Kantak testified regarding the importance of power consumption, size of layout area, and cost of components in RF design; Dr. Williams testified that Qualcomm's customers care about multi-mode functionality, signal quality, battery life, and cost; and Mr. Jaffee testified that Qualcomm's customers are interested in products with lower power consumption and better integration.[24]

In addition, the jury considered Qualcomm's insubstantial evidence of the demand for basebands and the contradictory testimony of its own experts—and correctly rejected Qualcomm's argument that the baseband accounts for the demand for the receiver.[25] Dr. Fox testified that "digital baseband processing is very close to becoming almost free." *Id*. 10/21 at 46:16, Ex. B at 27:22-23. Although Qualcomm attempts to spin the plain meaning of Dr. Fox's testimony, the jury had every reason to take his statement at face value. The jury reasonably chose to disregard Dr. Leonard's opinion that accepting the plain meaning of Dr. Fox's statement "would be horribly mistaken" and that Dr. Fox actually meant that the processing power of

---

[22] *See* Trial Tr. 10/5 at 260:12-13; 10/7 at 194:1-6, 235:6-15, 236:20-24, 279:14-281:17; 10/8 at 92:16-21; 10/9 at 42:4-10, 196:9-19, 200:18-24, 203:21-204:4, 205:11-20; 10/17 at 166:24-167:25, 137:17-138:20; 10/18 at 44:18-46:15, 49:18-24, 75:17-76:5, 85:1-4; 10/22 at 52:3-53:16; JX 13 at 24 (a Qualcomm customer "names RF roadmap as a key decision criteria"); PX656 at 5-8, 14 (noting that "value proposition" includes "size reduction" and "increased integration of handset features").

[23] Trial Tr. 10/7 at 279:14-280:22; 10/8 at 135:18-21, 193:5-20; 10/17 at 158:23-159:3, 160:1-19, 161:6-20; 10/18 at 42:7-18; 10/21 at 16:8-17, 22:1-22, 25:1-13; JX44 at 67; JX67 at 16 ("All Rx inter-stage SAW filters are eliminated"); JX93 at 4, 6, 16, 18; PX652 at 4; PX661 at 35 (noting "small size / low power" and "elimination of Rx SAW filters"); PX662 at 33; PX671 at 4-5.

[24] Trial Tr. 10/9 at 159, Ex. C at 53:18-54:13; 10/17 at 138:13-20, 161:6-20; 10/18 at 85:11-24; 10/21 at 178:9-180:13, 10/22 at 29:16-24, 44:6-12; *see also* PX598 at 2 (a Qualcomm customer wishes to receive multimode as opposed to single mode); PX655 at 10 (noting market demand for "more band support and complexity"); PX676; PX682 at 14.

[25] The injunction hearing testimony of Qualcomm's Senior Vice President of Engineering, Charles Persico, confirms the importance of the receiver relative to the baseband. Injunction Hr'g at 51:8-11, 80:16-20. Counsel for ParkerVision asked: "If Qualcomm couldn't sell the RFIC [which includes the receiver] for LTE, could it sell the baseband?" Mr. Persico responded: " ████████████████████████████████████████ ████████████████████████████ " *Id*. at 80:16-20.

12

digital basebands has increased tremendously. *Id*. at 128:1, 148:5-148:23. While Qualcomm critiques ParkerVision for not asking Dr. Fox to "corroborate its . . . interpretation" of his statement, *see* Dkt. 500 at 15, Qualcomm had the same opportunity to clarify Dr. Fox's testimony and chose not to. ParkerVision also elicited testimony regarding Dr. Razavi's opinion that the RF front end is the "bottleneck" of the RF system. Trial Tr. 10/11 at 200:9-2; 10/21 at 126:24-127:10. Again, Qualcomm had its opportunity at trial to argue about the alleged irrelevance of Dr. Razavi's "bottleneck" statement yet failed to do so. The jury also had grounds to reject Dr. Williams' conclusory testimony regarding his alleged "survey" results in light of the absence of details about who he surveyed, how many companies he included in the survey, or any introduction of the results as an exhibit.[26] *See id*. at 10/21 at 166:18-21. On cross-examination, Dr. Williams revealed that ParkerVision had no role in the "survey" (which suggests the bias of the survey), and he agreed that although his "survey" reflected that Qualcomm's customers do not care about what type of down-conversion is used in chips, they certainly care about the features—such as multi-mode functionality, better signal quality, longer battery life, and lower cost—enabled by ParkerVision's technology. *See id*. at 177:16-180:25.

More importantly, the parties agreed that the baseband is entirely distinct from the receiver. *Id*. at 148:21-149:2, 167:18-21. At trial ParkerVision did not seek one cent of profit attributable to Qualcomm's basebands (nor does Qualcomm dispute this fact). Mr. Benoit's analysis was not based on any recovery from the baseband: he analyzed the demand for *receiver* technology that includes the benefits afforded by the Patents-in-Suit, he calculated the apportioned value of Qualcomm's *receiver* technology, and he did not offer opinions regarding convoyed sales or the entire market value rule. *See* Ex. D at 4 ¶ 10. Mr. Benoit therefore had no cause to affirmatively address the role of the baseband, as Qualcomm suggests without any citation to authority. *See* Dkt. 500 at 10-15.

### 4. Mr. Benoit properly "credited" Qualcomm with its costs to produce

[26] And in fact, Dr. Williams' alleged "survey" was not actually a "survey" at all. *See* Dkt. 323 at 24-25.

**the Infringing Products and implement ParkerVision's technology.**

In a game of semantics, Qualcomm argues that Mr. Benoit's allocation for Qualcomm's "costs of sales," *see* Trial Tr. 10/17 at 169:18-170:2, cannot be considered "apportionment evidence." Dkt. 500 at 15. Qualcomm can label Mr. Benoit's allocation however it likes, the end result is the same: Mr. Benoit properly subtracted the value of Qualcomm's contributions to the receiver functionality within the Infringing Products.

Qualcomm also argues that Mr. Benoit's $7.8 million allocation for implementation costs cannot be deemed reliable. Dkt. 500 at 16. At the outset, Qualcomm has never presented contradictory evidence of Qualcomm's actual implementation costs. Qualcomm asserts, as it repeatedly did to the jury, that Mr. Benoit's use of $7.8 million cannot be reasonable in light of his reliance on ParkerVision's estimate, and ParkerVision's alleged lack of experience in making a CDMA chip.[27] *Id*. But as Mr. Benoit explained at trial, regardless of ParkerVision's experience with CDMA, at the time of the hypothetical negotiation Qualcomm already had existing CDMA chips—it therefore would not have incurred start-to-finish costs to develop a CDMA receiver that included ParkerVision's technology. Trial Tr. 10/21 at 16:18-18:16. Qualcomm also claims that the $7.8 million must be wrong because Qualcomm implemented ParkerVision's invention in 19 different architectures. Dkt. 500 at 16. But as shown at trial, this amount need not compensate Qualcomm for the amount it spent to develop each Infringing Product, because that amount is already included in the profit calculation. Trial Tr. 10/18 at 99:20-100:10. Once Qualcomm learned how to implement the ParkerVision technology in one of its receivers, it did not need to re-learn that process for every subsequent receiver. *Id*. at 98:1-12, 99:13-100:10.

5. **Mr. Benoit allocated value to Qualcomm's tangible and intangible assets based on market data and Qualcomm's own rate of return.**

---

[27] Cindy Poehlman, ParkerVision's Chief Financial Officer, and Jeff Yarnell, ParkerVision's Program & Supply Chain Operations Manager (previously Product Planning Manager), prepared the itemized estimate, which Mr. Benoit included in his report. *See* Trial Tr. 10/18 at 99:1-4; Dkt. 305-1 at 80. Qualcomm had the opportunity to call Ms. Poehlman at trial but chose not to. *See* Dkt. 336-5. Also, Mr. Benoit relied on Qualcomm's internal documentation to confirm the $7.8 million, although the Court precluded ParkerVision from introducing that exhibit. *See* Dkt. 305-1 at 80; Dkt. 418 at 17; PX126.00005; Trial Tr. 10/18 at 32:2-5.

Qualcomm argues that the rate of return on assets applied by Mr. Benoit must be rejected because the rate was not "the profit Qualcomm's assets actually created." Dkt. 500 at 16-17; *see* Trial Tr. 10/17 at 172:2-175:3. But Qualcomm has offered no evidence (now or at trial) showing the profit that Qualcomm earns on its tangible and intangible assets, or reflecting that the rate of return used by Mr. Benoit differs from the actual rate. Mr. Benoit reasonably utilized market data (including rates on corporate securities) as well as Qualcomm's own average rate of return on intangible assets to allocate profitability to the contributing assets. *See* Dkt. 305-1 at 98-99.

### 6. Evidence of the invention's benefits supports attributing as much as 90% of the receiver profit to the Patents-in-Suit.

Qualcomm argues that the Court must grant JMOL because Mr. Benoit did not prove that Qualcomm would have made no receiver sales without the use of ParkerVision's technology; did not demonstrate that Qualcomm would have lost baseband sales without infringement; failed to prove that demand for ParkerVision's technology drove the sales of the Infringing Products; and did not specifically name Qualcomm's competitors. *See* Dkt. 500 at 17-21.

As an initial matter, Qualcomm attempts to hold ParkerVision to the heightened standard of the entire market value rule, which does not apply here. The law simply does not require such a showing in this case.[28] ParkerVision did not need to prove that its invention drove demand for the entire Qualcomm chipset, as in an entire market value rule case.[29] Nor did ParkerVision need to prove that Qualcomm would have made no sales absent infringement, as it would in a "but for" analysis to recover lost profits.[30]

Regardless, Mr. Benoit relied on real-world market data reflecting that sales of Qualcomm's non-accused products dramatically diminished as sales of the Infringing Products skyrocketed. Trial Tr. 10/17 at 161:21-163:12; 10/18 at 64:10-65:21. Qualcomm did not dispute

---

[28] *See Versata*, 717 F.3d at 1268 (emphasizing that the entire market value rule is a "narrow exception" and declining to impose its requirements to reasonable royalty analysis when not invoked).

[29] *See id.* (explaining that an expert is "not required to show that demand for [the patented feature] drove demand for [infringer's] product as whole" if "the entire market value exception was never triggered").

[30] *See Lucent*, 580 F.3d at 1324 (distinguishing between the analysis for lost profits and reasonable royalties).

the veracity of this data. And just as at trial, Qualcomm fails to acknowledge the elephant in the room: if ParkerVision's "invention was behind the market in 1998 and slid further back as time progressed"—as Qualcomm argues—then it makes no sense that Qualcomm consistently infringed with every product released from 2006-2013. *See* Dkt. 500 at 3; Trial Tr. 10/21 at 175:20-177:15.

In addition, ParkerVision introduced abundant evidence of the benefits afforded by the Patents-in-Suit, the market demand for those benefits, and the importance of the Patents-in-Suit to the Infringing Products. *See* section III.B.3. The evidence demonstrated that Qualcomm's customers demand products at lower cost, with lower power consumption, multi-mode capabilities, fewer components, and improved performance.[31] The evidence further reflected that demand for those features enabled by the Patents-in-Suit drove sales of Infringing Products.[32] Trial Tr. 10/17 at 138:2-16. Moreover, "effectively all of the receiver functionality was enabled by use of the Patents-in-Suit." *Id*. 10/18 at 33:9-10; *see id*. at 106:10-19; 10/8 at 92:16-22.

Attempting to undermine ParkerVision's evidence, Qualcomm repeatedly characterizes hotly-contested issues as "uncontradicted," "undisputed," or "admitted"—it does so at least thirty times in its JMOL motion. Qualcomm's characterizations are flat-out wrong.[33] Two pertinent examples illustrate Qualcomm's mischaracterization of the record. First, Qualcomm claims that "uncontradicted evidence" shows that ParkerVision's technology is not essential to Qualcomm's sales. Dkt. 500 at 17. But numerous witnesses directly rebutted that exact point.[34] Second, Qualcomm repeatedly insists that the "uncontradicted" record shows that the baseband drives

---

[31] Trial Tr. 10/17 at 160:1-12; 10/18 at 36:15-23; 10/21 at 178:15-180:13.

[32] The conclusion that demand for features enabled by the Patents-in-Suit drove sales of Infringing Products is consistent with evidence heard by the Court at the injunction hearing. Injunction Hr'g at 80:16-20.

[33] ParkerVision's actual admissions can be found in the pretrial statement. Dkt. 336 at 19-24.

[34] *See, e.g.,* Trial Tr. 10/17 at 138:19 (Mr. Parker testifying that D2D is "must have technology" for infringing circuits); 10/21 at 22:1-22 (Mr. Benoit stating that the benefits and improved performance provided by ParkerVision's patented technology drive demand for the infringing products); 10/22 at 44:6-12 (Mr. Jaffee reiterating that Qualcomm's customers demand features enabled by the Patents-in-Suit).

sales. Dkt. 500 at 14, 19. Again, ParkerVision effectively negated this contention.[35]

Just as it repeatedly argued to the jury, Qualcomm asserts that Mr. Benoit's testimony was flawed because he failed to identify the Qualcomm competitors who in the hypothetical world would have taken Qualcomm's sales absent infringement. *See* Dkt. 422 at 9. Qualcomm cites no authority in support of the unprecedented requirement that a damages expert must specifically identify those competitors who would have won the infringer's sales in the absence of infringement. Mr. Benoit studied the market in which Qualcomm competes and evaluated its competitors, as he testified at trial. *See* Trial Tr. 10/18 at 66:7-9, 131:22-23 (identifying Broadcom and Texas Instruments as Qualcomm competitors).[36]

### C. Mr. Benoit and Mr. Parker Offered Legally Sufficient Evidence, Firmly Grounded in the Facts of the Case, In Support of the 50-50 Split.

#### 1. Mr. Benoit applied a fact-intensive Nash analysis, not a rule of thumb.

Qualcomm's challenge to Mr. Benoit's Nash Bargaining Solution analysis and so called "50-50 split" (which is, in fact, a 70-30 profit split)[37] has already been properly rejected by the Court. *See* 10/17 Trial Tr. at 40:9-10. The Court correctly concluded the appropriate split of the benefit between the parties presented a question of the fact for the jury. *See id.* Mr. Benoit's fact-specific evaluation is a far cry from the 25% rule of thumb addressed in *Uniloc*. As explained in Mr. Benoit's expert report, during the *Daubert* hearing, in his declaration, and at trial, he conducted a careful analysis of numerous factors when (1) calculating the agreement surplus available to the parties and (2) determining that the parties would have had equal bargaining

---

[35] *See, e.g.,* Trial Tr. 10/11 at 200:9-21; 10/17 at 166:24-167:3; 10/21 at 46:16, Ex. B at 27:22-23.

[36] Qualcomm inexplicably argues that ParkerVision offered no evidence quantifying the amount that its customers would have paid Qualcomm for the "alleged benefits of ParkerVision's energy sampling circuit." Dkt. 500 at 20. The prices that Qualcomm's customers *actually paid* for the Infringing Products reflects exactly that amount. Qualcomm also acknowledges that ParkerVision presented evidence of the quantification of the cost-savings benefits that Qualcomm's Infringing Products provide to its customers. *See id.*

[37] The jury may very well have found a 50-50 split unwarranted. Based on Mr. Benoit's calculation of $1.18 as the agreement surplus for transceivers, it is possible that the jury concluded that a 20-80 split (or some other split) of the agreement surplus would be appropriate.

power when negotiating how to split this agreement surplus.[38] Mr. Benoit also appropriately relied on fact testimony from Mr. Parker that he would have expected a 50-50 split of the agreement surplus. Trial Tr. 10/17 at 73:5-9, 74:19-75:15, 182:14-20. Moreover, as ParkerVision showed at trial, industry experts, academics, and Qualcomm's own damages expert have agreed that a 50-50 split of the agreement surplus may be appropriate.[39] While Dr. Leonard attempted to disclaim his prior opinion regarding the applicability of the Nash analysis, the jury had good reason to disregard his testimony trying to backpedal from it. *See id.* 10/21 at 111:12-114:2, 125:20-126:23. And although he criticized Mr. Benoit's analysis, Dr. Leonard offered no opinion of his own as to an appropriate split. *Id.* at 102:3-6, 124:9-125:5.

2.     **Mr. Parker's testimony as a fact witness that he would have agreed to a 50-50 split constitutes legally sufficient evidence.**

As he testified at trial (as both a fact and expert witness), Mr. Parker, an experienced license negotiator, would have been the negotiator sitting across the table from Qualcomm in the 2006 hypothetical negotiation. *Id.* 10/17 at 70:4-12, 73:5-9. Mr. Parker's testimony is evidence of the split of benefits that he would have requested. *See id.* at 74:22-75:12. Mr. Parker walked away from Qualcomm when it refused to agree to the royalty rates that he requested in 1998-99, supporting his testimony that he would refuse to grant a license to Qualcomm unless it would agree to the reasonable royalty rate that he requested. *Id.* at 10/9 at 54:15-55:2, 149:22-150:14. Mr. Parker's testimony provides independent, legally sufficient evidence to support a 50-50 split.[40] Qualcomm improperly asks the Court to assume a quintessential jury function: evaluating the credibility of Mr. Parker's testimony regarding the royalty rate that he would have requested

---

[38] *See* Dkt. 305-1 at 103-105; Dkt. 396; 9/30 *Daubert* Hr'g Tr. at 20:19-23:5; Trial Tr. 10/17 at 30:21-37:11, 178:16-183:17.

[39] Trial Tr. 10/17 at 181:21-182:13; 10/18 at 12:1-8; 10/21 at 124:4-14, 125:20-126:23.

[40] Mr. Parker's damages testimony was entirely permissible under the Federal Rules of Evidence. The Advisory Committee Notes to Rule 701 provides that "most courts have permitted the owner or officer of a business to testify to the value of projected profits of the business . . . ." Additionally, the parties agreed on the admissibility of Mr. Parker's testimony. *See* 9/19 Pretrial Hr'g at 52:5-55:9.

in the hypothetical negotiation.[41] *See* Dkt. 500 at 3, 22; *Penny*, 840 F. Supp. 2d at 1318.

### 3. Mr. Benoit properly applied the *Georgia Pacific* factors.

Qualcomm essentially argues that Mr. Benoit misapplied the *Georgia Pacific* analysis merely because he disagreed with Qualcomm's assessment of non-infringing alternatives.[42] Mr. Benoit's analysis clearly addressed each of the *Georgia Pacific* factors.[43] Mr. Benoit's analysis concluded that no acceptable non-infringing alternatives exist to ParkerVision's technology. Trial Tr. 10/17 at 158:9-159:12, 180:21-181:10. In arriving at this conclusion, Mr. Benoit reasonably relied on the opinions of ParkerVision's technical experts. *Id.* 10/8 at 90:25-91:10, 91:17-24; 10/18 at 89:10-24. The trial evidence reflected that Qualcomm's purported non-infringing alternatives would not offer the same benefits as the Patents-in-Suit.[44] *See id.* at 10/17 at 75:9-12, 158:9-159:12, 180:21-181:10; 10/18 at 85:1-86:6. Mr. Benoit testified that the Qualcomm-Atheros Wi-Fi chips could not be a non-infringing alternative, especially because all but three of the Infringing Products include functionality other than Wi-Fi. *Id.* at 10/18 at 89: 10-24. In addition, the evidence failed to show that Qualcomm's alleged non-infringing alternative, its ZIF technology, did not infringe the Patents-in-Suit.[45] Moreover, during the Injunction

---

[41] Qualcomm attempts to impugn Mr. Parker's credibility based on ParkerVision's corporate bonus structure, just as it did at trial. *See* Dkt. 500 at 3; Trial Tr. 10/9 at 123:8-124:23; 10/10 at 103:18-23; 10/15 at 135:2-4. But at trial the jury also heard Mr. Parker's response (the bonus plan went to a shareholder vote). *Id.* at 10/9 at 157: 22-158:15. To the extent this is even relevant, it goes to the weight or credibility of the testimony—a task for the jury. Also, Qualcomm's executives are eligible for exactly the same type of bonus that Qualcomm references as to Mr. Parker. *See* Ex. E.

[42] Qualcomm's 50(a) JMOL motion did not assert that Mr. Benoit failed to perform a proper *Georgia Pacific* analysis by disregarding certain *Georgia Pacific* factors. *See* Dkt. 422. Thus, Qualcomm waived this argument.

[43] If anyone failed to incorporate a non-infringing alternatives analysis into their reasonable royalty calculation, it was Dr. Leonard. *Compare* Trial Tr. 10/21 at 121:9-122:10 *with id.* 10/17 at 152:16-153:25, 158:9-159:12, 180:21-181:10; 10/18 at 14:8-15:6, 34:1-36:4, 38:3-6, 80:23-83:8, 85:1-87:3. *See also* Dkt. 305-1 at 62-106.

[44] Qualcomm misstates the law of non-infringing alternatives. Dkt. 500 at 23. For the *Georgia Pacific* analysis, "the critical legal definition of just what is an 'acceptable' substitute for this purpose is an exceedingly narrow one… '[a] product lacking the advantages of that patented can hardly be termed a substitute 'acceptable' to the customer who wants those advantages.'" Ex. F, John Skenyon, Patent Damages Law & Practice § 3:31 (West 2012)*; see Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

[45] Trial Tr. 10/21 at 169:5-13-172:3, 183:19-191:17; JX23 at 4-5. Contrary to Qualcomm's claim, *see* Dkt. 500 at 2, ParkerVision has never admitted that Qualcomm did not infringe from 1998-2006. The parties have hotly disputed this issue and ParkerVision has consistently maintained that its decision not to accuse products pre-

Hearing, Mr. Persico's testimony reflected that the ZIF technology could not be considered an "available" non-infringing alternative.[46] *See* Injunction Hr'g at 104:6-24.

### D. Qualcomm's Attempt to Exclude the Testimony of Mr. Benoit and Mr. Parker Is Untimely and Lacks Any Merit.

Qualcomm demands that the Court strike or "excise" Mr. Benoit's and Mr. Parker's testimony. *See* Dkt. 422 at 18, 23; Dkt 500 at 25. In doing so, Qualcomm seeks to rehash *Daubert* issues that the Court has already properly rejected. But the Federal Circuit does not allow litigants to revisit *Daubert* issues (or raise them in the first instance) "[u]nder the guise of sufficiency of the evidence." *Versata*, 717 F.3d at 1264. Qualcomm's request also contravenes the Court's own precedent.[47] Additionally, for the reasons discussed above, Mr. Benoit and Mr. Parker offered reliable testimony as to the appropriate amount of damages.

## III. QUALCOMM'S PASSING ARGUMENTS FOR A NEW TRIAL LACK MERIT

Qualcomm's request for a new trial lacks any merit. For the foregoing reasons, the damages verdict is not against the great weight of the evidence.[48] *See Ins. Co. of N. Am.*, 933 F.2d at 922-23. For the reasons discussed in section II.B.1, the Court should reject Qualcomm's waived *Daubert* challenge to Mr. Benoit and Mr. Parker.

## IV. CONCLUSION

For the reasons discussed above, ParkerVision respectfully requests that the Court deny Qualcomm's renewed motion for JMOL, new trial, or remittitur on damages.

---

dating 2006 is not an admission of non-infringement. Trial Tr. 10/17 at 27:13-28:12; Dkt. 345 at 5-6, 15-17. Proving the acceptability and availability of non-infringing alternatives is Qualcomm's burden. *See Datatreasury Corp. v. Wells Fargo & Co.*, 2011 U.S. Dist. LEXIS 118443, at *47 (E.D. Tex. Aug. 2, 2011) (citing *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1298 (Fed. Cir. 2007)).

[46] *See Micro Chem. v. Lextron, Inc.*, 318 F.3d 1119, 1122-1124 (Fed. Cir. 2003).

[47] *See Moulton v. Desue*, 2012 U.S. Dist. LEXIS 95756, at *3-4 (M.D. Fla. July 11, 2012) (Dalton, J.) (*citing Polite v. Dougherty Cnty. Sch. Sys.*, 314 F. App'x 180, 184 (11th Cir. 2008)); *see also* Dkt. 482 at 18-20.

[48] To the extent that Qualcomm requests a new trial on the grounds of "improper arguments" or "character attacks," those arguments not only lack any merit, but Qualcomm waived the issue by failing to object during trial. *See* Dkt. 500 at 25; *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1296 (11th Cir. 2002).

January 24, 2014

Respectfully submitted,

**McKOOL SMITH, P.C.**                                      **SMITH HULSEY & BUSEY**

/s/ *Douglas A. Cawley*                                     /s/ *James A. Bolling*
Douglas A. Cawley, Lead Attorney                           Stephen D. Busey
Texas State Bar No. 04035500                               James A. Bolling
E-mail: dcawley@mckoolsmith.com                            Florida Bar Number 117790
Richard A. Kamprath                                         Florida Bar Number 901253
Texas State Bar No.: 24078767                              225 Water Street, Suite 1800
rkamprath@mckoolsmith.com                                  Jacksonville, Florida 32202
Ivan Wang                                                   (904) 359-7700
Texas State Bar No.: 24042679                              (904) 359-7708 (facsimile)
E-mail: iwang@mckoolsmith.com                              jbolling@smithhulsey.com
McKool Smith P.C.
300 Crescent Court, Suite 1500                             ATTORNEYS FOR
Dallas, Texas 75201                                        PLAINTIFF PARKERVISION,
Telephone: (214) 978-4000                                  INC.
Telecopier: (214) 978-4044

Kevin L. Burgess
Texas State Bar No. 24006927
kburgess@mckoolsmith.com
Josh W. Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
Leah Buratti
Texas State Bar No. 24064897
lburatti@mckoolsmith.com
Mario A. Apreotesi
Texas State Bar No. 24080772
mapreotesi@mckoolsmith.com
Kevin Kneupper
Texas State Bar No. 24050885
kkneupper@mckoolsmith.com
James Quigley
Texas State Bar No. 24075810
jquigley@mckoolsmith.com
McKool Smith P.C.
300 West Sixth Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on January 24, 2014.

*/s/ Leah Buratti*
Leah Buratti