# EXHIBIT F

# Patent Damages Law & Practice

## 2012 Edition

John Skenyon
Christopher Marchese
John Land

**WEST**

*Intellectual Property Library*

# Patent Damages Law & Practice

John Skenyon
Christopher Marchese
John Land

Case summary appendix
prepared by Frank Porcelli

Fish & Richardson, P.C.



A Thomson Reuters business

*For Customer Assistance Call 1-800-328-4880*

Mat #41187301

© 2012 Thomson Reuters

Copyright is not claimed as to any part of the original work prepared by a United States Government officer or employee as part of the person's official duties.

For authorization to photocopy, please contact the **Copyright Clearance Center** at 222 Rosewood Drive, Danvers, MA 01923, USA (978) 750-8400; fax (978) 646-8600 or **West's Copyright Services** at 610 Opperman Drive, Eagan, MN 55123, fax (651) 687-7551. Please outline the specific material involved, the number of copies you wish to distribute and the purpose or format of the use.

This publication was created to provide you with accurate and authoritative information concerning the subject matter covered; however, this publication was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

In *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*,[5] the Federal Circuit noted the commercial success of the patented invention in affirming the lower court's finding of a 25% royalty rate. The court stated that the lower court's royalty was supported by the evidence, based on the facts that the invention achieved "immediate commercial success, that it satisfied a long felt need for that technology, and that [the patent owner] intended to maintain its exclusivity of the technology . . . by refusing to grant licenses under the patent."[6]

In *Mitutoyo Corp. v. Central Purchasing, LLC*,[7] the reasonable royalty rate of 29.2% was based on the patentee's profit margin in the patented products. The Federal Circuit affirmed that reasonable royalty rate, primarily on the basis that the patentee would have been unlikely to license for less.[8]

Consequently, a patentee with a high profit margin on the patented invention at the time of the hypothetical negotiation is in far better position relating to the damages royalty rate than a patent owner with no patented product sales or only marginally profitable sales.

### § 3:31 *Georgia-Pacific* Factor 9—Utility and advantage of patented invention

The ninth *Georgia-Pacific* factor is:

The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

This factor looks at the importance of the patented invention in comparison to the prior art. It is rarely addressed separately by the courts, but it is obvious that if the patented invention is of a

---

[5]SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 926 F.2d 1161, 17 U.S.P.Q.2d 1922 (Fed. Cir. 1991).

[6]SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 926 F.2d 1161, 1168, 17 U.S.P.Q.2d 1922 (Fed. Cir. 1991); see also TWM Mfg. Co., Inc. v. Dura Corp., 789 F.2d 895, 900, 229 U.S.P.Q. 525 (Fed. Cir. 1986) ("The master's notation that the Turner invention's immediate commercial success, its satisfaction of a long-felt need, and the absence of a competing suspension possessing all its beneficial characteristics, were factors tending to support a 30% royalty, is supported in the record.").

[7]Mitutoyo Corp. v. Central Purchasing, LLC, 499 F.3d 1284, 84 U.S.P.Q.2d 1001 (Fed. Cir. 2007).

[8]Mitutoyo Corp. v. Central Purchasing, LLC, 499 F.3d 1284, 1292, 84 U.S.P.Q.2d 1001 (Fed. Cir. 2007).

breakthrough variety, it should be entitled to a higher royalty rate[1] than a patented invention covering a minor improvement.[2]

While it does not fit this factor precisely, the Federal Circuit has considered the existence of non-infringing alternatives as relevant to this issue. In the past, courts have concluded that the existence of non-infringing substitutes may reduce the damages royalty rate.[3] While this conclusion remains true today, it must be qualified somewhat. It now appears that the critical legal definition of just what is an "acceptable" substitute for this purpose is an exceedingly narrow one, as explained by Judge Markey in *Panduit*:

> A product lacking the advantages of that patented can hardly be termed a substitute "acceptable" to the customer who wants those advantages.

\* \* \*

The "acceptable substitute" element, though it is to be considered, must be viewed of *limited influence* where the infringer knowingly made and sold the patented product for years while ignoring the "substitute." There are substitute products for virtually every patented product; the availability of railroads and box cameras should not of itself diminish royalties payable for infringement of the right to exclude others from making and selling the Wright airplane or the Polaroid camera.[4]

Consequently, the infringer's view of the "acceptable noninfringing substitute" at the time infringement began may be important in determining a reasonable royalty with the question usually turning on whether the alternative has the same utility and advantages of the patented invention over the prior art. In *Zygo Corp. v. Wyko Corp.*,[5] the infringer ceased making and selling a noninfringing product in favor of what turned out to be the infringing one. Because a portion of the infringement decision was reversed, the case was remanded by the Federal Circuit for recalculation of damages, and in remanding, the Federal Circuit noted that a relevant factor in the hypothetical negotiation would

---

[Section 3:31]

[1]TWM Mfg. Co., Inc. v. Dura Corp., 789 F.2d 895, 900, 229 U.S.P.Q. 525 (Fed. Cir. 1986).

[2]Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1332, 92 U.S.P.Q.2d 1555 (Fed. Cir. 2009), cert. denied, 2010 WL 677637 (U.S. 2010).

[3]Hughes Tool Co. v. G. W. Murphy Industries, Inc., 491 F.2d 923, 930-31, 180 U.S.P.Q. 353 (5th Cir. 1973).

[4]Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1162, 197 U.S.P.Q. 726 (6th Cir. 1978) (emphasis added).

[5]Zygo Corp. v. Wyko Corp., 79 F.3d 1563, 38 U.S.P.Q.2d 1281 (Fed. Cir. 1996).

§ 3:31                      PATENT DAMAGES LAW AND PRACTICE

be that the infringer had its earlier, noninfringing product "in the wings."[6]

This should be contrasted with *Grain Processing Corporation v. American Maize-Products Company*.[7] There, the date of the hypothetical negotiation was in 1979, and after several failed attempts, the defendant finally found a non-infringing alternative in 1991. In a decision that stretches the law on acceptable substitutes considerably to avoid the holding in *Zyco Corp.*, the Federal Circuit affirmed a 3% royalty because the ingredient needed to make the non-infringing alternative was available in 1978 and its effects on the process to make the product in question were known then as well. Thus, according to the court, the non-infringing 1991 product was an "acceptable substitute" because it *could* have existed in 1979.[8] The fact, however, that the infringer made two unsuccessful attempts at avoiding infringement in this period *without* coming up with the 1991 "acceptable" substitute, seems to undercut this conclusion.

In applying this factor, an infringer may do itself far more harm than good in its own marketing memos from the critical time period. In *Deere & Co. v. International Harvester Co.* (1983),[9] for example, the infringer destroyed any possible argument that its own non-infringing corn head available when infringement began was an acceptable substitute for the infringing one because of its own candid marketing memos envisioning "the dismal future" facing its non-infringing product and the "bright future" for the infringing one. Under such circumstances, it was not surprising that the infringer's older, non-infringing product was found *not* to be such a substitute, and predictably, the patent owner obtained significant reasonable royalty damages.

Even if such an acceptable non-infringing alternative exists, it simply impacts the rate, but it does not establish the rate. In

---

[6] Zygo Corp. v. Wyko Corp., 79 F.3d 1563, 1571-72, 38 U.S.P.Q.2d 1281 (Fed. Cir. 1996).

[7] Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 51 U.S.P.Q.2d 1556 (Fed. Cir. 1999).

[8] Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 1354-5, 51 U.S.P.Q.2d 1556 (Fed. Cir. 1999). It should also be noted that for 12 years this was a two-supplier market with only the patentee and the infringer in it. Nevertheless, according to the court, this 1991 "alternative" precluded any lost profit award under the "but for" test. This seems to incorrectly place possible hypothetical events over actual events in the marketplace, as it seems unlikely that the patentee lost no sales under these circumstances.

[9] Deere & Co. v. International Harvester Co., 710 F.2d 1551, 1558, 218 U.S.P.Q. 481, 13 Fed. R. Evid. Serv. 1443 (Fed. Cir. 1983).

REASONABLE ROYALTY DAMAGES § 3:32

*Mars, Incorporated v. Coin Acceptors, Inc.*,[10] the infringer argued that reasonable royalty damages should not exceed the cost of switching to an available noninfringing alterative. After first noting the absence of evidence as to an acceptable noninfringing alternative, the Federal Circuit rejected this argument as a matter of law:

> [E]ven if Coinco had shown that it had an acceptable noninfringing alternative at the time of the hypothetical negotiation, Coinco is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative. We have previously considered and rejected such an argument. *See Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (rejecting infringer's argument that "a reasonable royalty deduced through a hypothetical negotiation process can never be set so high that no rational self-interested wealth-maximizing infringer acting ex ante would ever have agreed to it"). To the contrary, an infringer may be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid infringement.[11]

### § 3:32 *Georgia-Pacific* Factor 10—Nature of the invention

The 10th *Georgia-Pacific* factor is:

> The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor; and the benefit to those that have used the invention.

The portion of this factor dealing with the nature of the patented invention is almost indistinguishable from *Georgia-Pacific* factor 9, which deals with the utility and advantages of the invention. But factor 10 also includes a second part that involves looking at exactly what the *patentee* is making and selling under the patent, and what the particular benefits of the invention are to its customers.[1]

In general, whether or not it is considered in relation to factor 9 or factor 10, the nature of the invention is a most important factor impacting the royalty rate for the simple reason that a breakthrough invention should clearly be entitled to a much higher royalty rate than an invention for a minor improvement in the same field, all other factors being equal. Recently, this portion of factor 10 played an important role in two cases where

---

[10]Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008), cert. denied, 129 S. Ct. 653, 172 L. Ed. 2d 615 (2008).

[11]Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1373, 87 U.S.P.Q.2d 1076 (Fed. Cir. 2008), cert. denied, 129 S. Ct. 653, 172 L. Ed. 2d 615 (2008).

[Section 3:32]

[1]Although worded differently, the same concept involving the infringer's use of the invention is covered by Georgia-Pacific factor 11, *see* § 3:33.